**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **1:21-CR-287-1 (TNM)** |
| | : | |
| **v.** | : | |
| | : | |
| **KEVIN SEEFRIED** | : | |

**MOTION TO DISMISS COUNTS ONE, TWO AND THREE**
**OF THE INDICTMENT**

Defendant Kevin Seefried moves to dismiss Counts One, Two and Three of the

Indictment and, in support of the motion, sets forth the following facts and argument.

**I.      INTRODUCTION**

Mr. Seefried is charged in a superseding indictment with, *inter alia*, obstruction of an

official proceeding in violation of 18 U.S.C. § 1512(c)(2) (Count One), entering and remaining

in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(1) (Count Two), and

disorderly and disruptive conduct in a restricted building or grounds in violation of 18 U.S.C. §

1752(a)(2) (Count Three).  (ECF at 20).  All of the charges against Mr. Seefried arise out of the

events that took place at the United States Capitol on January 6, 2021.

Mr. Seefried moves this Honorable Court to dismiss Counts One, Two and Three for the

reasons set forth below.

**II.     STANDARDS OF REVIEW**

**A.      Motion to Dismiss**

An indictment must be a "plain, concise, and definite written statement of the essential

facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  An indictment "must provide

the defendant sufficient detail to allow him to prepare a defense, to defend against a subsequent

prosecution of the same offense, and to ensure that he be prosecuted upon facts presented to the grand jury." *United States v. Apodaca*, 275 F. Supp. 3d 123, 153 (D.D.C. 2017) (citing *Russell v. United States*, 369 U.S. 749 (1962), and *Stirone v. United States*, 361 U.S. 212 (1960)).  A defendant "may raise by pretrial motion any defense, objection, or request that the Court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(B).  Rule 12 provides that a defendant may also move to dismiss the indictment for "failure to state an offense" and "lack of specificity."  Fed. R. Crim. P. 12(b)(3)(B)(iii), (v).  In considering a Rule 12 motion to dismiss, "the Court is bound to accept the facts stated in the indictment as true."  *United States v. Syring*, 522 F. Supp. 2d 125, 128 (D.D.C. 2007); *United States v. Sampson*, 371 U.S. 75, 78 (1962).  Accordingly, "the Court cannot consider facts beyond the four corners of the indictment." *United States v. Ring*, 628 F. Supp. 2d 195, 204 (D.D.C. 2009)(internal quotations omitted).

>      **B.    Statutory Interpretation**

To determine the legislative intent of a law, courts "always, [ ] begin with the text of the statute."  *Am. Fed'n of Gov't Emps., AFL-CIO, Local 3669 v. Shinseki*, 709 F.3d 29, 33 (D.C. Cir. 2013). "It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according to its terms."  *United States v. Hite*, 769 F.3d 1154, 1160 (D.C. Cir. 2014) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917) (internal quotes omitted)).  "The search for the meaning of the statute must also include an examination of the statute's context and history." *Hite*, 769 F.3d at 1160 (citing *Bailey v. United States*, 516 U.S. 137, 144-45 (1995)). Importantly, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."  *United States v. Lanier*, 520 U.S. 259, 266 (1997).

>      **C.    Vagueness**

A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *United States v. Bronstein,* 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)).  "The touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259 (1997).  The void-for-vagueness doctrine protects against arbitrary or discriminatory law enforcement.  *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Kolender v. Lawson,* 461 U.S. 352, 358 (1983)).

## III.   MOTION TO DISMISS COUNT – OBSTRUCTION OF JUSTICE

Count One of the Indictment charges Mr. Seefried with a violation of 18 U.S.C. § 1512(c)(2), as follows:

> On or about January 6, 2021, within the District of Columbia and elsewhere, Kevin Seefried and Hunter Seefried, attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, by entering and remaining in the United States Capitol without authority and engaging in disorderly and disruptive conduct and destroying federal property.

(ECF 20 at 2).

Section 1512(c) falls under Chapter 73 of Title 18, which deals with "Obstruction of Justice."  *See generally*, 18 U.S.C. §§ 1501-1521.

### A.  Section 1512(c)(2) is Unconstitutionally Vague

Under the same principles of *United States v. Johnson*, 576 U.S. 591 (2015) and its progeny, 18 U.S.C. § 1512(c)(2) violates due process because it is vague and does not provide fair notice to Mr. Seefried as to the conduct it punishes.  Section 1512(c)(2) provides that:

> Whoever *corruptly* –
>
> > (1)   alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

> (2)    *Otherwise* obstructs, influences, or impedes any *official proceeding*, or attempts to do so, . . . shall be fined . . . or imprisoned . . .

18 U.S.C. §§ 1512(c)(1) and (2).

First, §1512(c) uses words throughout both subsections that require courts to speculate as to their meaning in the context of the defendant's particular actions.  To wit, the residual clause of subsection (c)(2) is so ambiguous, requiring courts to line-draw when determining if a defendant has "otherwise" obstructed, impeded, or influenced an official proceeding before Congress.  In addition, courts must speculate as to the meaning of the word "corruptly" and the phrase "official proceeding."

In *United States v. Garret Miller*, 1:21-CR-119 (CJN), ECF No. 72, the court found the word "otherwise" in §1512(c)(2) "critical to determining what §1512(c)(2) covers."  *Id*. at 11.  The court rejected the government's suggestion that "otherwise" "serve[d] as a clean break between subsections (c)(1) and (2)."  *Id*. at 11-12.  It explained that the government's proffered reading failed to "give meaning to the word 'otherwise,'" and rendered the word "pure surplusage."  *Id*. at 12.  The court further reasoned that the government's reading was inconsistent with *Begay v. United States*, 553 U.S. 137 (2008), in which the United States Supreme Court concluded that the Armed Career Criminal Act's ("ACCA") use of the word "otherwise" tied together the preceding and following words. *Id*. at 12-13.  Specifically, the Supreme Court in *Begay* concluded that "the text preceding 'otherwise' influenced the meaning of the text that followed: it 'limited the scope of the clause to crimes that are *similar to the examples themselves*.'" *Id*. at 13 (quoting *Begay*, 553 U.S. at 143).  The court also explained why cases that adopted the "clean break reading of 'otherwise' in §1512(c)(2)" were incorrect. *Id*. at 14-15.

Judge Nichols also rejected the government's alternative reading of the statute – "that

subsection (c)(1) contains specific examples of conduct that is unlawful under subsection (c)(2)" such that that the "link between" the two subsections "is that the unlawful conduct must relate to an 'official proceeding.'" *Id*. at 15 (citing *United States v. Montgomery*, 2021 WL 6134591, at *12). As the court explained, the problem with this alternative reading is that it renders the word "otherwise" superfluous because both subsections contain the phrase "official proceeding." *Id*. at 15-16.

The court concluded that "[s]ubsection (c)(2) is a residual clause for subsection (c)(1)," operating as a "catchall for the prohibition contained in subsection (c)(1)." *Id.* at 17. Under this interpretation, consistent with the Supreme Court's holding in *Begay*, the link between the two subsections is the conduct prescribed in subsection (c)(1), and "subsection (c)(2) operates to ensure that by delineating only certain specific unlawful acts in (c)(1) . . . – Congress was not 'underinclusive'" by allowing other ways to violate the statute that are similar to the conduct prohibited in (c)(1). *Id*. at 17-18.

Delving deeper, the court reasoned that the structure and scope of §1512 suggests that subsection (c)(2) has a narrow focus, because the other subsections criminalize specific conduct in narrow contexts. *Id*. at 20. The court further reasoned that while subsections (c)(2) and (c)(1) are different than the other subsections, because they prohibit an individual from taking certain actions directly rather than towards another person, the language in subsection (c)(1) still "hones in on a narrow, focused range of conduct." *Id*. at 21. The court explained that, by contrast, if §1512(c)(2) "signals a clean break" from subsection (c)(1), it would be inconsistent with the statute as a whole because it would be the only provision to not contain a narrow focus. *Id*. The court reiterated that any different reading would improperly render subsection (c)(2) unnecessary. *Id*. at 21-22.

The court also discussed how the historical development of §1512 supports the conclusion that §1512(c)(2) operates as a catchall to (c)(1). *Id*. at 23-25.  Per the court, the revisions to §1512(c) in 2002 filled a gap that existed because §1512(b) made it unlawful to cause "another person" to take certain actions but not for a person to take such action directly. The 2002 enactment of 1512(c) fixed that problem and took much of its language directly from 1512(b). *Id*. 23-24. The fact that Congress took much of the language from a provision already contained in subsection (b), shows Congress's intent for subsection (c) to have a narrow, limited focus – just like subsection (b)(2)(B). *Id*. at 25.

As the Department of Justice's own Attorney General recently explained, Supreme Court case law demonstrates that this is so. Relying on *Begay v. United States*, 553 U.S. 137 (2008), and *Yates v. United States,* 574 U.S. 528 (2015), the former Attorney General explained:

> [I]t is clear that use of the word "otherwise" in the residual clause [of Section 1512(c)(2)] expressly links the clause to the forms of obstruction specifically defined elsewhere in the provision. Unless it serves that purpose, the word "otherwise" does no work at all and is mere surplusage. [An] interpretation of the residual clause as covering any and all acts that influence a proceeding reads the word "otherwise" out of the statute altogether. But any proper interpretation of the clause must give effect to the word "otherwise;" it must do some work.

Memorandum from William Barr to Deputy Attorney General Rod Rosenstein and Assistant Attorney General Steve Engel of June 8, 2018 [hereinafter "Barr Memo"] at 4.[1]

After discussing *Begay* and *Yates* and how those cases emphasized that "specific examples enumerated prior to the residual clause are typically read as refining or limiting in some way the broader catch-all term used in the residual clause," he continued,

> Consequently, under the statute's plain language and structure, the most natural and plausible reading of 1512(c)(2) is that it covers acts that have the same kind of obstructive impact as the listed forms of

---

[1] This is available at https://s3.documentcloud.org/documents/5638848/June-2018-Barr-Memo-to-DOJ-Muellers-Obstruction.pdf (last visited April 4. 2022).

> obstruction — *i.e.*, impairing the availability or integrity of evidence — but cause this impairment in a different way than the enumerated actions do. Under this construction, then, the "catch all" language in clause (c)(2) encompasses any conduct, even if not specifically described in 1512, that is directed at undermining a proceeding's truth-finding function *through actions impairing the integrity and availability of evidence*.

*Id.* at 4-5 (emphasis omitted) (emphasis added).[2]

The former Attorney General noted that case law reflects this application of the residual clause as only applying to "attempts to interfere with, or render false, evidence that would become available to a proceeding" or "to prevent the flow of evidence to a proceeding." *Id*. at 5 (citing *United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014) (soliciting tips from corrupt cops to evade surveillance); *United States v. Phillips*, 583 F.3d 1261 (10th Cir. 2009) (disclosing identity of undercover agent to subject of grand jury drug investigation); *see also e.g. United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009) (involving false testimony to a grand jury); *United States v. Jefferson*, 751 F.3d 314, 321 (5th Cir. 2014) (involving intentional false statements to court during a preliminary injunction hearing); *United States v. Lucas*, 499 F.3d 769, 780–81 (8th Cir. 2007) (involving a defendant having others falsely claim ownership of a

---

[2] Although *Yates* was a plurality opinion, Justice Alito's concurring opinion also supports the former Attorney General's and the Defendants' position. According to Justice Alito, the statute's list of nouns, its list of verbs, and its title all stood out as showing that the statute in question did not reach the conduct of the defendant in that case. *Yates*, 574 U.S. at 549 (Alito, J., concurring). Regarding the nouns, Justice Alito considered the application of both noscitur a sociis and ejusdem generis to find that the term "tangible object" should refer to "something similar to records or documents." *Id*. at 549–50. In this case, Section 1512(c)(1) refers to "a record, document, or other object." There is no allegation that Mr. Seefried interfered with any such item, much less any evidence. Justice Alito then looked at the verbs and noticed some glaring problems trying to apply those verbs to any tangible object. *Id*. at 551 ("How does one make a false entry in a fish?"). Because there was no evidence interfered with by Seefried, the verbs in Section 1512(c) have no object to reference. Finally, Justice Alito pointed to the title of the statute: "Destruction, alteration, or falsification of records in Federal investigations and bankruptcy" and noted "This too points toward filekeeping, not fish." *Id*. at 552 (emphasis added). As Mr. Seefried has already addressed above, the title of Section 1512 clearly supports a finding that it was not intended to apply to all forms of arguably obstructive conduct.

firearm); *United States v. Mintmire*, 507 F.3d 1273, 1290 (11th Cir. 2007) (involving defendant's "attempt[s] to orchestrate" grand jury witness's testimony by sending notes to an attorney who in turn "coached" the witness); *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (involving false statements in a court proceeding); *United States v. Pugh*, 945 F.3d 9, 28 (2d Cir. 2019) (involving destruction of several USB drives and deletion of data); *see also United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013) (involving providing false answers to interrogatories in a civil law suit filed by a person seeking damages for mistreatment while in police custody, explaining that §1512(c)(1) "covers obstructive conduct in the form of physical destruction of documents and records" whereas § 1512(c)(2) covers "otherwise" obstructive behavior to include giving false statements in interrogatories relating to a civil law suit). As the former Attorney General correctly observed, "the natural and plausible reading of 1512(c)(2)" requires some conduct that impairs the integrity and availability of some *evidence.*

This is entirely consistent with the legislative history of Section 1512(c)(2) as noted by the former Attorney General and Judge Nichols in *Miller*. *Miller*, 2022 WL 823070 at *13-14. Section 1512(c) was passed as part of the Sarbanes-Oxley Act of 2002, "[a]n Act to protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to securities laws, and for other purposes." SARBANES-OXLEY ACT OF 2002, Pub. L. No. 107-204, 116 Stat. 745. Subsection (c) was added in part to ensure that there would be liability for those who destroyed records before an "official proceeding" had convened even if they did not foresee one convening (so long as their intent is to ensure that the records would be unavailable), and even if they acted alone (rather than caused others to act in ways that obstructed justice), largely in reaction to Arthur Andersen LLP having evaded criminal liability for destroying documents in

the wake of the Enron scandal under Section 1512(b)(2), because that section only criminalized actions directed at another person.[3]

The Senate Judiciary Committee report described the Act's purpose as "provid[ing] for criminal prosecution and enhanced penalties of persons who defraud investors in publicly traded securities or alter or destroy evidence in certain Federal investigations." S. REP. NO. 107-146, at 2 (2002). The Committee Report noted that much of Arthur Andersen's document destruction was "undertaken in anticipation of a SEC subpoena to Andersen for its auditing and consulting work related to Enron." *Id.* at 4. Congress was adamant that "[w]hen a person destroys evidence with the intent of obstructing any type of investigation and the matter is within the jurisdiction of a federal agency, overly technical legal distinctions should neither hinder nor prevent prosecution and punishment." *Id.* at 6-7. Thus, the legislative history of Section 1512(c)(2) "was expressly designed to 'clarify and close loopholes in the existing criminal laws *relating to the destruction or fabrication of evidence* and the preservation of financial and audit records.'" Barr Memo at 5-6 (quoting S. REP. NO. 107-146, at 14-15) (emphasis added). As Judge Nichols put it, "in the wake of the Enron scandal, Congress was faced with a very specific loophole: that then-existing criminal statutes made it illegal to case or induce another person to destroy documents, but it did not make it illegal to do by oneself. Congress closed that loop by passing subsection (c), and *nothing in the legislative history suggest a broader purpose than that." Miller,* 2022 WL 823070 at *14 (emphasis added). Likewise, the former Attorney General also observed that "[r]eading the residual clause as an all-encompassing proscription cannot be reconciled either with the other subsections of § 1512, or with the other obstruction provisions in Title 18 that must be read in *pari passu* with those in § 1512." Barr Memo at 5.

---

[3] *See Arthur Andersen LLP v. United States*, 544 U.S. 696, 707-07 (2005).

If this Court were to interpret Section 1512(c)(2) as the government wants it to — as an all-encompassing catch-all to include something so unique as protesting the election certification proceedings — "clause (c)(2) would render all the specific terms in clause (c)(1) surplusage; moreover, it would swallow up all the specific prohibitions in the remainder of § 1512 — subsections (a), (b), and (d)." *Id*. And, as Mr. Barr continued, "[m]ore than that, it would subsume virtually all other obstruction provisions in Title 18. . . . It is not too much of an exaggeration to say that, if § 1512(c)(2) can be read as broadly as being proposed, then virtually all Federal obstruction law could be reduced to this single clause." *Id*.; *see also Marx v. General Revenue Corp*., 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

The Supreme Court's analysis in *Johnson* is also instructive.  There, the court considered the constitutionality of residual clause of the Armed Career Criminal Act, which enhanced a defendant's sentence if the defendant had a conviction for a prior felony that "otherwise involved conduct that presented a serious potential risk of physical injury to another." *Johnson,* 576 U.S. at 591.  In finding a due process violation, the Supreme Court explained that the residual clause required a "wide-ranging inquiry" in each case as to what could potentially cause injury in each set of circumstances. *Johnson,* 576 U.S. at 597.  Observing that the ambiguity of the residual clause resulted in disparate interpretations, the Supreme Court acknowledged that the "failure of persistent efforts to establish a standard can provide evidence of vagueness." *Id*. at 598.

For all those reasons, the court in *Miller* held that §1512(c)(1) limits the scope of (c)(2) and "requires that the defendant have taken some action with respect to a document, record, or

other object in order to corruptly obstruct, impede or influence an official proceeding."[4] *Id*. at 28. Because the government did not allege that Mr. Miller took any action with respect to records or documents or "other objects," the court held that the indictment failed to state an offense against him. *Id*. at 29.

Here, just as in *Miller*, the indictment does not allege or imply that Mr. Seefried took any action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence Congress's certification of the electoral vote. *See* Indictment, ECF 20. Therefore, it fails to allege a violation of §1512(c)(2).

Other courts facing this issue in other January 6th cases in the District have determined that "otherwise" is not vague: "The use of 'otherwise' is better understood as 'clarifying that the latter prohibits obstruction by means <u>other than</u> document destruction." *United States v. Mostofsky*, 2021 WL 6049891 at *11 (D.D.C. 2021); *see also e.g. United States v. Caldwell*, 2021 WL 606271 at *12 (same).

Only one opinion has been issued since Judge Nichols' decision in *Miller*. In *United States v. Puma*, the court rejected the analysis in *Miller*, disagreeing with Judge Nichols' analysis of *Begay*. 2022 WL 820379 at *12. *Puma* concludes that "the word 'otherwise' carries a clear meaning as it is used in Section 1512(c)(2)." *Id.* "The word 'otherwise' in the second subsection clarifies that a defendant can violate Section 1512(c)(2) through 'obstruction by means <u>other than</u> document destruction.'" *Id.* (emphasis in original). But as Judge Nichols observed, such a reading would render the word "otherwise" meaningless.

Compare:

---

[4] The *Miller* court also explained that, even assuming *arguendo* its interpretation was incorrect, at the very least the Court would be left with "serious ambiguity in a criminal statute" requiring lenity. *Id.*

"Whoever corruptly alters, destroys, mutilates or conceals a record, document or other object or obstructs, influences, or impedes any official proceeding" ***with***

"Whoever corruptly alters, destroys, mutilates or conceals a record, document or other object or otherwise obstructs, influences, or impedes any official proceeding"

Both versions would support the conclusion that the second phrase refers to "obstruction by means other than document destruction."  Because *Puma*'s interpretation renders the word "otherwise" obsolete and "pure surplusage", "under this reading, subsection (c)(2) would have the same scope and effect as if Congress had instead omitted the word 'otherwise.'" *Miller¸*2022 WL at *7.

The court's approach in *United States v. Sandlin¸* 2021 WL 5865006 (D.D.C. 2021) is similarly flawed.  There, the court ruled that "otherwise" means "in a different manner" or "by other means."  But *Sandlin* ignores the word "or" that precedes "otherwise."  "Or" is defined as a word "used to coordinate two (or more) sentence elements between which there is an alternative." Oxford English Dictionary (3d ed. 2004).  In other words, "or" means "alternative" which is another word for "in a different manner" or "by other means."   The word "or", by itself renders the word "otherwise" meaninglessThe additional presence of the word "otherwise" would then only serve as an ambiguous catch all that does not provide notice of what it purports to criminalize.

In sum, the canons of construction employed by the Court in *Begay* and *Yates*, the text, structure, and the practical application of Section 1512(c)(2) as demonstrated in caselaw, as well as its legislative history all support a holding that the "otherwise" clause in Section 1512(c)(2) must be construed in a similar vein to the terms that are in clause one. Thus, in order for Count One to sufficiently allege a violation, it must allege that Mr. Seefried took "some action with respect to a document, record, or other object in order to corruptly obstruct, impede, or influence

an official proceeding." *Miller*, 2022 WL 823070 at *15.   Because no such allegation exists in the Indictment here (nor can there ever be one), this Court should adopt the reasoning applied by Judge Nichols in *Miller* and dismiss Count One of the Indictment alleging a violation of Section1512(c)(2).

Moreover, the residual clause of §1512(c) is unconstitutionally vague, requiring courts to speculate and line-draw when distinguishing "official proceedings" from mere ancillary proceedings or investigations.  As discussed at length below, courts have generally interpreted "official proceeding" to mean something more formal than an investigation, but there has been no established standard, leaving the courts to deal with this ambiguity.

Further, the vagueness of the statute is not limited to the confusion that surrounds what constitutes an "official proceeding."  The D.C. Circuit has acknowledged that the word "corruptly" is vague on its face as used in a similar statute, 18 U.S.C. § 1505, that prohibits obstruction of a proceeding before departments, agencies, or congressional investigations.  The court held that "in the absence of some narrowing gloss, people must guess at its meaning and application." *United States v. Poindexter*, 951 F.2d 369, 398 (D.C. Cir. 1991).  Previously, in *Ricks v. District of Columbia*, 414 F.2d 1097 (D.C. Cir. 1968), the court had held that a statute that criminalized "leading an immoral or profligate life" vague because it found "immoral" to be synonymous with "corrupt, depraved, indecent, dissolute, all of which would result in 'an almost boundless area for the individual assessment of another's behavior.'" *Poindexter*, 951 F.2d at 399 (quoting *Ricks*, 414 F.2d at 1097).  The court explained that various dictionary definitions of the word "corrupt" did not reduce the confusion as to its meaning for purposes of the statute.  *Id.* After an assessment of the legislative history and judicial interpretation, the court concluded that neither of those inquiries provided defendants with the constitutionally required notice that the

statute requires, and found the term vague as applied to the defendant making false statements. *Id*. at 406.

Following *Poindexter*, Congress amended §1515 to define "corruptly" for purposes of §1505 only to mean "acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." §1515(b). However, this amendment did not resolve the vagueness that still exists in §1512 as Congress did not amend §1515 as it applies to §1512.

Even though the D.C. Circuit later held that the word "corruptly" was not vague as applied, it was because in that case the defendant influenced a witness, which fits squarely within the non-vague category that Poindexter established. *See United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996). In *Morrison*, the defendant tried to influence a witness's testimony and "exhorted her to violate her legal duty to testify truthfully in court." *Id.* The *Poindexter* Court explained that influencing another to "violate their legal duty" was not vague because "it would both take account of the context in which the term 'corruptly' appears and avoid the vagueness inherent in words like 'immorally.'" *Poindexter*, 951 F.2d at 379. However, *Morrison* was not faced with the question of what "corruptly" means in the context of §1512(c) and does not resolve the ambiguity that the word presents in conjunction with the rest of the statute. Even taking "corruptly influences" together is still vague because "influence" alone is another vague word and means something different than "influencing another to violate their legal duty" as described in §1515.

Further, analyzing the government's approach to charging defendants with a violation of §1512(c)(2) arising out of events on January 6, 2021, illustrates how vague and arbitrary the enforcement of this statute can be. Initially, it seemed that the government was only charging

those individuals who had entered the Senate chamber[5] with a §1512(c)(2) violation.  However, a snapshot of some of defendants that have been charged with a violation of §1512(c)(2) brings the inconsistencies into stark relief.

(1)     *United States v. Isaac Sturgeon*, 21-cr-91, Mr. Sturgeon is alleged to have assisted in pushing a barricade outside the Capitol building but never entered the Senate chamber, never went inside the Capitol building, and never made any threats to law enforcement or on social media suggesting he wished to disrupt the vote.  Mr. Sturgeon is not alleged to be part of the Oath Keepers or the Proud Boys.

(2)     *United States v. Kenneth Grayson*, 21-cr-224, Mr. Grayson is alleged to have entered the Capitol building, but not alleged to have entered the Senate chamber.  Prior to January 6, 2021, he allegedly wrote in a private message, "I am there for the greatest celebration of all time after Pence leads the Senate flip!  OR IM THERE IF TRUMP TELLS US TO STORM THE FUKIN CAPITOL IME DO THAT THEN!"

(3)     *United States v. Benjamin Larocca*, 21-cr-317, Mr. Larocca allegedly entered the Capitol building while screaming "Our House!"  He was with an individual who was allegedly yelling, "You fucking oath breakers!"  Mr. Larocca is not alleged to have entered the Senate floor and is not a member of the Proud Boys or Oath Keepers.

(4)     *United States v. Sean Michael McHugh*, 21-cr-436, Mr. McHugh allegedly employed bear spray in direction of officers and yelled insults at officers.  He also allegedly used a megaphone and engaged the crowd with chant, such as "our house!" There is no evidence he entered the Capitol building or the Senate floor.

---

[5] The ceremonial Electoral College certification took place in the Senate Chamber.

(5)     *United States v. Dale Jeremiah Shalvey*, 21-cr-334, Mr. Shalvey allegedly entered the Senate chamber and is captured on video rummaging through Senator Cruz's notes. However, he is not alleged to be a part of the Oath Keepers or the Proud Boys.

As illustrated by these cases, the facts and circumstances of each vary drastically from each other and make it clear that the government's charging decisions are inconsistent. Some cases allege entry into the Capitol building while others do not. More importantly, the government does not specify what "influence" these defendants had or how exactly they "impeded." With respect to Mr. Seefried, he was originally charged via criminal complaint and indicted in March of 2021. Mr. Seefried is alleged to have entered the Capitol building, but not the Senate chamber, and he was inside the building for approximately four minutes. The inconsistent charging decisions along with the inherently vague words of the statute, as well as the "residual clause" that is the basis for charging Mr. Seefried all show that 18 U.S.C. § 1512(c)(2) is unconstitutionally vague and does not provide fair notice to Mr. Seefried.

Other cases, outside of the January 6th context, support a narrow reading of 18 U.S.C. § 1512. As the Ninth Circuit has carefully considered and recognized, based on the plain language of the statute, an offense under §1512(c) does not prohibit the obstruction of every governmental function; it only prohibits the obstruction of proceedings such as a hearing that takes place before a tribunal. *See United States v. Ermoian*, 752 F.3d 1165, 1179 (9th Cir. 2013). Stated differently, Section 1512(c), by its plain language, does not criminalize the obstruction of legislative action by Congress. Any alleged obstruction of the certification of the Electoral College vote is simply outside the scope of §1512(c). Alternatively, on its face §1512 is constitutionally infirm because of its inherent vagueness and arbitrary enforcement in the panoply of January 6th cases.

    **1.     Section 1512 Must be Strictly Construed**

18 U.S.C. § 1512 prohibits "corruptly. . . obstruct[ing], influenc[ing], or imped[ing] any *official proceeding*, or attempt[ing] to do so." *Id.* (emphasis added).  Section 1515(a)(1) of Chapter 73 of Title 18 defines an official proceeding as:

> (A)     a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B)     a proceeding before the Congress;
>
> (C)     a proceeding before a Federal Government agency which is authorized by law; or
>
> (D)     a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agen tor examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce[.]

18 U.S.C. § 1515(a)(1).

Count One of the Indictment against Mr. Seefried concerns "a proceeding before the Congress" as set forth in §1515(a)(1)(B).

With respect to 18 U.S.C. § 1512, the Supreme Court has instructed lower courts to "exercise[] restraint in assessing the reach of [the] . . . statute both out of deference to the prerogatives of Congress . . . and out of concern that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed."  *United States v. Arthur Anderson, LLP,* 544 U.S. 696, 703 (2005) (internal citations and quotations omitted) (strictly construing §1512(b)(2)'s broadly worded language in finding that jury instructions failed to instruct that knowledge of wrongdoing and proof of a nexus between the alleged obstruction and an official proceeding were required elements of the offense).

> **2.     An "Official Proceeding" under §1512(c) Concerns the Administration of Justice**

A review of the text, history, and judicial interpretations of §1512, especially in light of the Supreme Court's long-standing guidance to strictly construe penal statutes, demonstrates that §1512(c), which punishes obstruction of "official proceedings," does *not* apply to the Electoral College certification.[6]

*Ermoian* was one of the first appellate decisions to consider the meaning of "official proceeding" as that term is used in §1512(c) and defined in §1515. *See Ermoian*, 752 F.3d at 1168 ("Our circuit has never before addressed the meaning of the term 'official proceeding' as used in the obstruction of justice statute at 18 U.S.C. § 1512").  The *Ermoian* court, tasked with deciding whether a criminal investigation by the FBI was considered an "official proceeding" for purposes of §1512(c), noted that "the definition of the phrase 'official proceeding' depends heavily on the meaning of the word 'proceeding.'" *Id*. at 1169.

Reviewing the plain language of §1515, the *Ermoian* court explained that "[s]everal aspects of the definition for 'official proceeding' suggest that the legal – rather than lay – understanding of the term 'proceeding' is implicated in the statute."  *Id*. at 1170.  The court noted that "the descriptor 'official' indicates a sense of formality normally associated with legal proceedings," and not "a mere 'action or series of actions.'"  *Id*. (citing "*Proceeding*," Oxford English Dictionary, *available at* http://www.oed.com).  Moreover, the court pointed to the fact that "the word 'proceeding' is surrounded with other words that contemplate a legal usage of the

---

[6] Congress counts the electoral votes pursuant to the Twelfth Amendment to the United States Constitution and the Electoral Count Act of 1887, later codified in 3 U.S.C. § 15.  Congress counts the electoral votes after the states have already heard any disputes and certified the vote. *See Bush v. Gore*, 531 U.S. 98, 154 (2000) (Breyer, J., dissenting). Members of Congress may make an objection, in writing, and without argument.  3 U.S.C. § 15.  According to the statute, there is no testimony, no witnesses, no argument, and no evidence introduced at the electoral count.  The event is merely ceremonial.  *See* Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 FLLR 541, 585 (2004).

term, including 'judge or court,' 'Federal grand jury,' 'Congress,' and 'Federal Government

agency.'" *Id.*

> The Ninth Circuit further observed that
>
> Examining the term 'proceeding' within the grammatical structure of the
> definition at issue, it becomes clear that the term connotes some type of formal
> hearing.  [Section 1515(a)(1)(C)] refers to proceedings "before a Federal
> Government agency" – a choice of phrase that would be odd if it were referring to
> criminal investigations.  The use of the preposition "before" suggests an
> appearance in front of the agency *sitting as a tribunal.*

*Id.* at 1170-71 (internal citation omitted)(emphasis added); *see also United States v. Ramos*, 537

F.3d 439, 462-63 (5th Cir. 2008)("use [of] the preposition 'before' in connection with the term

'Federal Government agency' . . . implies that an 'official proceeding involves some formal

convocation of the agency in which parties are directed to appear.").  The court also considered

that §1512 uses the terms "attendance, "testimony," "production" and "summon[]" when

describing an official proceeding, and found the use of these terms "strongly implie[d] that some

formal hearing before a tribunal is contemplated."  *Id.* at 1172.

The logic and reasoning used by the *Ermoian* court in considering whether an FBI

investigation fell under the scope of §1512(c) applies with equal force to interpreting the term

"proceedings before the Congress."  Taking §1512 and the definitions contained in §1515 as a

whole, it is plain that the statute is directed at conduct that interferes with the administration of

justice.[7]  Even the title of the statute, "Tampering with a witness, victim, or an informant,"

---

[7] *See McAndrew v. Lockheed Martin Corp.,* 206 F.3d 1031, 1039 (11th Cir. 2000)("Section 1512
. . . applies to attempts to *prevent or influence testimony* not only in federal courts but also *before
Congress*, federal agencies, and insurance regulators.")(emphasis added); *United States v. Dunn*,
434 F. Supp. 2d 1203, 1207 (MD. Ga. 2006)(" . . . § 1515(a)(1) . . . describe[s] events that are
best thought of as hearings (or something akin to hearings): for example, federal court cases,
grand jury testimony, *Congressional testimony*, and insurance regulatory hearings.")(emphasis
added); *United States v. Georgia*, 2014 WL 2084891 (N.D. Georgia 2014) ("official proceeding"
for purposes of §1512(c) did not include a FBI investigation); *United States v. Sutherland*, 921
F.3d 421 (4th Cir. 2019) (the term "proceeding" implies 'some formal convocation . . . in which

suggests an adversarial proceeding related to the administration of justice.[8]  There is little doubt

that §1512 only criminalizes obstructive conduct related to a hearing before a tribunal affecting

the administrative of justice and the ceremonial certification of the Electoral College votes does

not qualify as an "official proceeding" under the statute.[9]

### 3.   The Legislative History Demonstrates that §1512(c) Concerns the Administration of Justice

Section 1512(c)(2) was enacted as part of the Sarbanes-Oxley Act of 2002, which was

titled "Corporate Fraud Accountability," and had the express purpose of targeting "corporate

malfeasance."  Pub. L. No. 107-204, 116 Stat. 745.  Nothing in the legislative history of the

Sarbanes-Oxley Act supports the notion that Congress enacted §1512(c)(2) to criminalize the

disruption of a ceremony before Congress by persons engaged in a political rally, no matter how

large the crowd or how disorderly the activities of some in the crowd may have become.  Rather,

the Sarbanes-Oxley Act "was prompted by the exposure of Enron's massive accounting fraud

and revelations that the company's outside auditor, Arthur Andersen LLP, had systematically

destroyed potentially incriminating documents."  *Yates v. United States*, 574 U.S. 528, 535-36

(2015).  The Senate Judiciary Committee report described the Act's purpose as "provid[ing] for

criminal prosecution and enhanced penalties of persons who defraud investors in publicly traded

---

parties are directed to appear") (quoting *United States v. Young*, 916 F.3d 368, 384 (4th Cir. 2019)).

[8] *See I.N.S. v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 189 (1991)("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text.").

[9] This interpretation is consistent with the case law that has clarified the meaning of the statutory language at issue here.  *See e.g. Arthur Anderson, LLP,*  544 U.S. at 708 (interpreting §1512(c) as requiring that the defendant have "knowledge that his actions are likely to affect [a]judicial proceeding" in order to have the "requisite intent to obstruct'); *United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013)(considering the application of §1512 and noting that "[o]bstruction of justice occurs when a defendant acts to impede the types of proceedings that take place before judges or grand juries.") *cert. denied*, 571 U.S. 888 (2014); *United States v. Sampson*, 898 F.3d 287, 300 (2d Cir. 2018)(noting that §1512 "broadly criminalizes various forms of witness tampering").

securities or alter or destroy evidence in certain Federal investigations," S. Rep. No. 107-146, at 2 (2002)(emphasis added).

In *Yates*, the Supreme Court narrowly construed the term "tangible object" as set forth in 18 U.S.C. § 1519, which penalized a person who

> knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . .

18 U.S.C. § 1519.  Keeping in mind that Congress designed the Sarbanes-Oxley Act with a "trained [] attention on corporate and accounting deception and cover-ups," the Court held that the Act did not contemplate penalizing the act of tossing undersized fish overboard to avoid the consequences of an inspection by federal authorities.  *Id*. at 532.  Rather, in the context of the statute's purpose, a "tangible object" must be one used to record or preserve information. *Id*. Thus, while fish are tangible objects in the lay sense of that phrase, they do not qualify as tangible objects under §1519 given the broader context of the Sarbanes-Oxley Act.  In rendering the *Yates* decision, the Supreme Court clearly telegraphed that legal terms are to be narrowly construed given the legislative history and purpose of the Sarbanes-Oxley Act.

In short, when considering the Act's preamble and legislative history, it is clear that §1512(c) was aimed at preventing corporations from destroying records relevant to a federal hearing related to the administration of justice.  The legislative background of §1512(c) makes plain that it was not intended to apply in all circumstances where *any* government function may have been impeded, and given this context, the certification of the Electoral College votes does not qualify as an "official proceeding" under the statute.

### 4.    Other Tools of Statutory Interpretation Support Mr. Seefried's Motion to Dismiss

Sections 1512 and 1515 are contained in Chapter 73 of Title 18 of the United States Code.  Examining the surrounding statutory provisions in Chapter 73 further supports Mr. Seefried's interpretation of the statute at issue.[10]  Several of the subsections of Chapter 73 explicitly relate to the administration of justice.  *See* 18 U.S.C. §§ 1503, 1504 (Influencing or injuring a juror); §1513 (Retaliating against a witness, victim or informant); § 1521 (Retaliating against a federal judge or law enforcement officer by false claim or slander of title).  There is even a statute within Chapter 73 that prohibits "picketing or parading" near the residence of a judge, juror, witness, or court officer "with the intent of interfering with, obstructing, or impeding *the administration of justice*."  18 U.S.C. § 1507 (emphasis added).  All of these laws are related to the obstruction of the administration of justice.  Section 1512(c) falls right within their midst.

### 5.  Congress Has Used Other Terms to Describe Interference with Electoral College Certification

Mr. Seefried submits that the government incorrectly conflated an "official proceeding" under §1512 with a "federally protected function" under 18 U.S.C. § 231(a)(3) or the "official business" of Congress under 40 U.S.C. § 5104(e)(2)(c).  In other cases, the government has charged Civil Disorder under 18 U.S.C. § 231(a)(3), alleging that his actions "affected the conduct and performance of a *federally protected function*."[11] (Doc. 27, p. 2)(emphasis added).

---

[10] *See NASDAQ Stock Mkt., LLC v. Sec. & Exch. Comm'n*, 961 F.3d 421, 426 (D.C. Cir. 2020)(quoting *Util. Air Regulatory Grp. V. E.P.A.*, 573 U.S. 302, 321 (2014))("A statutory provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme[,] because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.").

[11]  The term "federally protected function" is defined as:

[A]ny function, operation or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof; and such term shall specifically include, but not be limited to, the collection and distribution of the United States mails.

Similarly, in Counts Six and Seven, the government charged Mr. Seefried with violation 40

U.S.C. § 5104(e), which prohibits entering "any of the Capitol Building[s]" intending "to disrupt

the orderly conduct of *official business*[.]" 40 U.S.C. § 5104(e)(2)(c) (emphasis added).  Mr.

Seefried submits that the ceremonial certification of the Electoral College by Congress may be

more appropriately considered the "official business" of Congress or a "federally protected

function" rather than an "official proceeding before the Congress" as captured by 18 U.S.C. §§

1512(c) and 1515.  Charging Mr. Seefried with obstruction under 18 U.S.C. § 1512(c)(2) is,

quite simply, overkill.


## V.     MOTION TO DISMISS COUNTS TWO AND THREE – RESTRICTED BUILDING AND GROUNDS

Counts Four of the Superseding Indictment charges Mr. Seefried with a violation of 18

U.S.C. § 1752(a)(1) as follows:

> On or about January 6, 2021, within the District of Columbia and elsewhere, Joseph W. Seefried, did knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting, without lawful authority to do so.
>
> (**Entering and Remaining in a Restricted Building or Grounds**, in violation of Title 18, United States Code, Section 1752(a)(1))

Count Five of the Indictment charges Mr. Seefried with a violation of 18 U.S.C. §

1752(a)(2) as follows:

> On or about January 6, 2021, within the District of Columbia and elsewhere, Kevin W. Seefried, did knowingly and with intent to impede and disrupt the orderly conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions.

---

18 U.S.C. § 232(3).

(**Disorderly and Disruptive Conduct in a Restricted Building or Grounds**, in violation of Title 18, United States Code, Section 1752(a)(2))

(Doc. 52, Superseding Indictment, pp. 2-3).

Both of these charges concern certain conduct related to statutorily "restricted building or grounds."  18 U.S.C. § 1752(c) provides the following definition:

> (1)    the term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area –
>
> (A)    of the White House or its grounds, or the Vice President's official residence or grounds;
>
> **(B)    of a building or grounds where the President or other person protected by the Secret Service is or will temporarily be visiting; or**
>
> (C)    of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

18 U.S.C. § 1782(c)(1)(A)-(C) (emphasis added).

The United State Capitol and its grounds are not specifically included in the definition set forth above.  Rather, the government alleges that the Capitol was a "restricted building and grounds" on January 6th because it was a "building or grounds where the President or other person protected by the Secret Service is or will temporarily be visiting." 18 U.S.C. § 1752(c)(1)(B).  The "other person," as set forth in the Indictment, was then-Vice President Michael Pence. Accordingly, Mr. Seefried did not violate §1752 unless then-Vice President Pence was 1) "visiting" or "temporarily visiting" the specific area that Mr. Seefried traversed; and 2) the Secret Service designated that area as a restricted zone.  The government cannot establish either element for the reasons that follow.

### A.    Vice President Pence was not "Temporarily Visiting" the Capitol

Then-Vice President Pence was not "temporarily visiting" the Capitol on January 6, 2021.  The Capitol is a federal government building in the District of Columbia.  Vice President Pence lived and worked in D.C. at his official residence, and actually worked at the Capitol

Building and grounds – it was his place of employment.  Vice President Pence had a permanent office "within the United States Capitol and its grounds," in his capacity as President of the Senate.  On January 6th, Vice President Pence was working -- he was presiding in the Senate chamber to count the electoral votes.  *See* U.S.C. § 15 ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors.  The Senate and House of Representatives shall meet in the hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and *the President of the Senate shall be their presiding officer.*") (emphasis added).

Past cases support this plain, common-sense reading of the statute, as they involve conduct in or near areas where the President and Vice President were clearly "temporarily visiting."  *See United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) (defendant entered and remained in a restricted area at an airport in South Carolina where the President was visiting for a political rally); *United State v. Junot*, 902 F.2d 1580 (9th Cir. 1990) (defendant pushed his way through a restricted area where then-Vice President George Bush was speaking at a rally at a park in Los Angeles that was secured by Secret Service agents); *Blair v. City of Evansville, Ind.*, 361 F. Supp. 2d. 846 (S.D. Ind. 2005) (defendant charged with 18 U.S.C. § 1752 at protest during then-Vice President Richard Cheney's visit to the Centre in Evansville, Indiana).  These cases all involve the President and Vice President traveling *outside* of the District of Columbia and "visiting" that area for a "temporary" purpose, consistent with the plain meaning of §1752(c)(1)(B).  Vice President Pence was not traveling to a speaking event or political rally on January 6th – rather he was performing a duty of his office in a building where he had a permanent office.  Based on the plain language of 18 U.S.C. § 1752, he was not "temporarily visiting" the Capitol building and §1752 does not apply as charged.

> **B.    The Secret Service did not "Restrict" the Capitol or its Grounds on January 6th**

The legislative history of 18 U.S.C. § 1752 and the statutory authorization of 18 U.S.C. § 3056[12] make it clear that <u>only</u> the United States Secret Service ("Secret Service") can restrict areas for temporary visits by the President or Vice President.  A particular place does not become restricted just because the Vice President enters it; rather, the Secret Service, the agency in charge of protecting the Vice President, must create the temporary restricted zone to facilitate its duty to protect.  Indeed, the Government has specifically argued that it is the "Secret Service" that "exercise[s] its discretion to determine the scope of the restricted area necessary to protect" a designated person.  *United States v. Jabr*, Cr. No. 18-105 (PLF), ECF #26 at page 9.  The Government does not allege that any of the barriers that Mr. Seefried allegedly crossed were specifically erected for the Vice-President's visit *at the direction of the Secret Service*.   On January 6, 2021, the restrictions placed on the Capitol were created by the Capitol Police, not the Secret Service.[13]  As such, a necessary factual predicate to a 18 U.S.C. § 1752 offense is lacking, and Counts Four and Five must be dismissed for failure to state a claim.

## VI.   In the Alternative, the Indictment Should be Dismissed because its Language Neither Provides Adequate Notice nor Assures that the Grand Jury Made the Determinations Required by the Fifth Amendment

---

[12] This statute authorizes the Secret Service to protect high-ranking officials, including the Vice President.

[13] Additional legislative history and language also confirm that the "posted, cordoned off, or otherwise restrict area[s]" must be created by the Secret Service to trigger the statute.  As originally passed in 1970, the statute, 84 Stat. 1891, authorized the Treasury Department, which included the Secret Service at that time, to prescribe regulations for restricting grounds where the President and other protected leaders would visit.  *See* 18 U.S.C. § 1752(d)(2); 84 Stat. 1891. Accordingly, the Treasury Department implemented numerous regulations, including requirements that the Secret Service designate certain "temporary residences" and "temporary offices" of their protectees and provide "notice to prospective visitors."  31 C.F.R. § 408.2(c).  In 2006, Congress, likely because the Secret Service was reassigned to the Department of Homeland Security, repealed subsection (d) of §1752, which authorized the Treasury Department to promulgate regulations.  *See* Pub. L. 109-177, Title VI, Sec. 602, 120 Stat. 252 (March 9, 2006).  Nonetheless, the clear legislative intent behind §1752 from the date of its enactment was to provide the Secret Service with authorization to create temporary protected zones to facilitate its role in protecting the President and other protectees.

The constitutional rights to presentment to a grand jury and adequate notice of the charges are embedded in the Fifth and Sixth Amendments to the United States Constitution and in Rule 7(c) of the Federal Rules of Criminal Procedure.  In the array of January 6th cases, the government mass produced indictments identical in language with little exception.  A review of Superseding Indictment against Mr. Seefried reveals that the charges lack *any* specifics regarding the alleged acts or circumstances and contains only conclusory allegations.

"[R]eal notice of the true nature of the charge" is "the first and most universally recognized requirement of due process."  *Smith v. O'Grady*, 312 U.S. 329, 334 (1941).  In holding that the notice requirements of the Sixth Amendment apply to the States through the requirement of due process, the Supreme Court stated: "No principle of procedural due process is more clearly established than that notice of the specific charge [is] among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal."  *Cole v. Arkansas,* 333 U.S. 196, 201 (1948); *see* Joseph Story, *Commentaries on the Constitution*, § 1799 (1833) ("[T]he indictment must charge the time, and place, and nature, and circumstances of the offense, with clearness and certainty; so that the party may have full notice of the charge, and be able to make his defense with all reasonable knowledge and ability.").

The Fifth Amendment's presentment provision also requires that the facts be elucidated sufficiently in the indictment so that the grand jury's finding of probable cause can be ascertained and to foreclose conviction based on any offense not found by the grand jury.  *See Stirone,* 361 U.S. at 215.  Without specificity of charged conduct and circumstances, the court would be forced to "guess what was in the minds of the grand jury at the time they returned the indictment," which would "deprive the defendant of a basic protection that the grand jury was designed to secure," by allowing a defendant to be convicted "on the basis of facts not found by, and perhaps not even presented to, the grand jury that indicted him."  *United States v. Du Bo*,

27

186 F.3d 1177, 1179 (9th Cir. 1999) (quoting *United States v. Keith*, 605 F.2d 462, 464 (9th Cir.

1979) (citing *Russell v. United States*, 369 U.S. 749, 770 (1962)).

The assembly-line indictments in the January 6th cases generally, and Mr. Seefried's case

in particular, fail to fulfill either the notice or presentment requirements of the Fifth and Sixth

Amendments.  There is no attempt within the indictment to fulfill Rule 7(c)'s requirement of a

"plain, concise, and definite written statement of the essential facts constituting the offense

charged."  The indictment does not include *any* description of Mr. Seefried's actual conduct or

the specific circumstances involved. [14]  Accordingly, the indictment in this case does not

demonstrate that the grand jury made the required finding of probable cause, and it provides the

defense no notice of the conduct charged.

## VII.    CONCLUSION

For the reasons set forth hereinabove, the defendant, Kevin Seefried, respectfully requests

that this Honorable Court grant the foregoing motion to dismiss.

Respectfully submitted:


_____/s/_____
EUGENE OHM, ESQUIRE
Federal Public Defender
625 Indiana Avenue, NW
Washington, D.C. 20004
Tel. No. (202) 208-7500
*eugene_ohm@fd.org*

*Attorney for Kevin Seefried*

Date:  April 8, 2022

---

[14] In the course of discovery, the Government has provided the defense with some details of some the offenses charged, however Mr. Seefried maintains his contention that the indictment itself does not satisfy the requirements of Fed. R. Crim. P. 7(c).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **1:21-CR-287-1 (TNM)** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **KEVIN SEEFRIED** | **:** | |

## ORDER

Upon consideration of Mr. Kevin Seefried's Motion to Dismiss Counts One, Two and Three of the Indictment, it is hereby ORDERED that the Motion is GRANTED and that Counts One, Two and Three of the indictment be DISMISSED with prejudice.

Date: _____

_____
THE HONORABLE TREVOR MCFADDEN
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA