**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-287 (TNM)** |
| **v.** | : | |
| | : | |
| **KEVIN SEEFRIED, and** | : | |
| **HUNTER SEEFRIED,** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS COUNT ONE OF THE INDICTMENT AND DEFENDANT KEVIN SEEFRIED'S MOTION TO DISMISS COUNTS TWO AND THREE OF THE INDICTMENT**

The United States of America, by and through its attorney, United States Attorney for the District of Columbia, hereby respectfully submits this opposition to defendants' motions to dismiss. Defendants, Kevin Seefried and Hunter Seefried, move this Court to dismiss Count One of the Indictment, charging the Seefrieds with obstruction of an official proceeding and aiding and abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2. As it relates to Count One, the Seefrieds contend, first, that Section 1512(c)(2) is unconstitutionally vague. They also assert that the conduct alleged in Count One – *i.e.*, their corrupt obstruction, influencing, and impeding of Congress's certification of the Electoral College vote on January 6, 2021 (ECF. No. 20, at 1-2) – falls outside the scope of Section 1512(c)(2). Additionally, defendant Kevin Seefried moves to dismiss Counts Two and Three of the Indictment, which charge violations of 18 U.S.C. § 1752.

Defendants' contentions lack merit. Several courts in this district have rejected many, if not all, of the challenges that defendants rehash in their motions. *See, e.g.*, *United States v. Sandlin,* 21-cr-88 (DLF), 2021 WL 5865006 (D.D.C. Dec. 10, 2021); *United States v. Caldwell*, 21-cr-28 (APM), 2021 WL 6062718 (D.D.C. Dec. 20, 2021); *United States v. Mostofsky*, 21-cr-138 (JEB), 2021 WL 6049891 (D.D.C. Dec. 21, 2021); *United States v. Montgomery,* 21-cr-46 (RDM), 2021

WL 6134591 (D.D.C. Dec. 28, 2021); *United States v. Nordean,* 21-cr-175 (TJK), 2021 WL

6134595 (D.D.C. Dec. 28, 2021); *United States v. McHugh,* 21-cr-453 (JDB), ECF No. 51 (D.D.C.

Feb. 1, 2022); *United States v. Griffin*, No. 21-cr-92 (TNM), 2021 WL 2778557 (D.D.C. July 2,

2021).  This Court should adopt the well-reasoned view of the overwhelming majority of district

judges to have considered the issues and deny their motions to dismiss.

## FACTUAL BACKGROUND

At 1:00 p.m., on January 6, 2021, a Joint Session of the United States Congress convened

in the United States Capitol building.  The Joint Session assembled to debate and certify the vote

of the Electoral College of the 2020 Presidential Election.  With the Joint Session underway and

with Vice President Mike Pence presiding, a large crowd gathered outside the U.S. Capitol.  At

approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over

erected barricades.  The crowd, having breached police officer lines, advanced to the exterior

façade of the building.  Members of the U.S. Capitol Police attempted to maintain order and keep

the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd

forced entry into the U.S. Capitol.  At approximately 2:20 p.m., members of the United States

House of Representatives and United States Senate, including the President of the Senate, Vice

President Mike Pence, were instructed to – and did – evacuate the chambers.

Defendants' roles in the January 6, 2021, attack on the Capitol are described in the

statement of facts supporting the criminal complaint (ECF No. 1).  In summary, Kevin and Hunter

Seefried, father and son, traveled from their home in Delaware to participate in the events of

January 6.  After attending the rally where former President Trump spoke, defendants walked to

the Capitol.  Standing outside of the Capitol, Hunter Seefried, along with other rioters, damaged a

window affixed to the building to enter the Capitol.  He then used his hand to remove a remaining

piece of glass before jumping through the window pane.  Kevin Seefried followed behind, entering

the Capitol as well.  Shortly thereafter, Kevin Seefried was photographed holding a Confederate Battle flag inside the Capitol Building.  While in the building, the defendants were part of a larger group of who verbally protested and paraded through the Capitol, including in the Ohio Clock Corridor, where they were part of a larger group of individuals who verbally confronted several Capitol police officers for approximately 15 minutes.

## PROCEDURAL HISTORY

On April 7, 2021, the Grand Jury returned an eight-count Indictment charging Kevin Seefried and Hunter Seefried with multiple offenses arising from their conduct on January 6, 2021. Both defendants are charged with obstruction of an official proceeding and aiding and abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One); entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two);  disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); disorderly conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four); and parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five). Hunter Seefried is also charged with entering and remaining on restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(4) (Count Six); destruction of government property, in violation of 18 U.S.C. § 1361 (Count Seven); and act of physical violence on the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Eight).

On October 12, 2021, defendants filed motions to dismiss certain counts of the Indictment. (ECF No. 36 and 37).  This Court denied those motions without prejudice on March 14, 2022.  The Court explained that if defendants desired to refile their motions to dismiss, they should engage with recent relevant decisions in the District, including *United States v. Sandlin*, No. 21-CR-88 (DLF), 2021 WL 5865006 (D.D.C. Dec. 10, 2021); *United States v. Montgomery*, No. 21-CR-46

(RDM), 2021 WL 6134591 (D.D.C. Dec. 28, 2021); and *United States v. Miller*, 21-CR-00119 (CJN) (D.D.C. Mar. 7, 2022).

On April 27, 2022, the Grand Jury returned an eight-count Superseding Indictment charging Kevin Seefried and Hunter Seefried with the offenses charged in the initial Indictment arising from their conduct on January 6, 2021. (ECF No. 67).  The government superseded the Indictment to remove references to then Vice President-elect Kamala Harris in the counts charging the defendants with violations of 18 U.S.C. § 1752.

## LEGAL STANDARD

A defendant may move to dismiss an indictment or count thereof for failure to state a claim prior to trial.  *See* Fed. R. Crim. P. 12(b)(3)(B)(v). "[A]n indictment must be viewed as a whole, and the allegations must be accepted as true in determining if an offense has been properly alleged." *United States v. Bowdoin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011).  The question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed.  *Id.*  "An indictment must contain every element of the offense charged, if any part or element is missing, the indictment is defective and must be dismissed." *See United States v. Hillie*, 227 F. Supp. 3d 57, 70 (D.D.C. 2017).

## ARGUMENT

I. **The Defendants' Motions to Dismiss Count One, Alleging a Violation of 18 U.S.C. § 1512(c)(2), Lack Merit.**

Count One of the Indictment charges defendants with corruptly obstructing, influencing, or impeding an "official proceeding," – *i.e.*, Congress's certification of the Electoral College vote on January 6, 2021 – in violation of 18 U.S.C. § 1512(c)(2).  In 2002, Congress enacted Section 1512(c)'s prohibition on "[t]ampering with a record or otherwise impeding an official proceeding"

as part of the Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745, 807.  Section 1512(c)'s prohibition applies to

> [w]hoever corruptly--
>
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) *otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so.*

18 U.S.C. § 1512(c) (emphasis added).  Section 1515(a)(1), in turn, defines the phrase "official proceeding" to include "a proceeding before the Congress."  18 U.S.C. § 1515(a)(1)(B).  By the statute's plain terms, then, a person violates Section 1512(c)(2) when, acting with the requisite *mens rea*, he engages in conduct that obstructs a specific congressional proceeding, including, as here, Congress's certification of the Electoral College vote.

Defendants' statutory and constitutional arguments lack merit.  At least ten district judges of this Court have considered, in other cases arising out of the events at the Capitol on January 6, 2021, one or more of the arguments raised by the Seefrieds.  *See supra* pp. 3-4 (citing cases).  Every district judge to have reached the issue has concluded that Congress's certification of the Electoral College is an "official proceeding" within the meaning of 18 U.S.C. 1512(c)(2) and that Section 1512(c)(2) is not unconstitutionally vague.  In addition, every reported court of appeals decision to have considered the scope of Section 1512(c)(2), and all but one of the district judges of this Court to have considered the issue in cases involving January 6, 2021, have concluded that Section 1512(c)(2) prohibits obstruction regardless of its connection to documentary or tangible evidence.  And, in any event, even if a nexus to documentary or tangible evidence were required, the allegations in the Indictment, which track the statutory language, more than adequately informed the Seefrieds about the charge against them; nothing more was or is required.  *See, e.g.,*

5

*United States v. Williamson*, 903 F.3d 124, 130-131 (D.C. Cir. 2018).  The defendants' claims that Section 1512(c)(2) is unconstitutionally vague are also meritless.  This Court should adopt the well-reasoned view of the overwhelming majority of district judges to have considered the issues raised by the Seefrieds and deny their motions to dismiss.[1]

### A.   Section 1512(c)(2) Applies to the Conduct Alleged in the Indictment.

The defendants appear to advance two distinct statutory arguments for the notion that Section 1512(c)(2) does not reach the conduct alleged in the indictment: (1) that Section 1512(c)(2) is limited to obstruction tied to documentary or tangible evidence; and (2) that Congress's certification of the Electoral College vote is not an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2).  Neither claim has merit, as other judges on this Court have concluded with near-perfect uniformity.  The former would fail even on its own terms.

### 1.   Section 1512(c)(2)'s Prohibition on Obstructive Conduct Does Not Require a Nexus to Documentary or Tangible Evidence.

Citing *Miller*, 2022 WL 823070, the defendants contend that Section 1512(c)(2) is limited to obstruction tied to documentary or tangible evidence.  (*See, e.g.*, ECF Nos. 59, at 20; 61, at 10).[2] They are incorrect, as at least 9 judges of this Court have concluded in rejecting analogous claims by other defendants charged in connection with the events of January 6, 2021.  *See Sandlin*, 2021

---

[1]   Although defendants' motions present vagueness as their lead claim (ECF Nos. 59, at 3; 61, at 7), it is well-settled that, when both statutory and constitutional questions are presented, courts should consider the statutory questions first.  *See, e.g.*, *United States v. Wells Fargo Bank*, 485 U.S. 351, 354 (1988) ("[O]ur established practice is to resolve statutory questions at the outset where to do so might obviate the need to consider a constitutional issue.").  The government accordingly addresses the defendants' statutory claims first.

[2]   Defendants appear to rely on *Miller* primarily as support of their contention that Section 1512(c)(2) is unconstitutionally vague.  *Miller*, however, addressed only the scope of Section 1512(c)(2), without reaching the defendant's vagueness claim in that case.  2022 WL 823070, at *6-14.  It therefore lends no support to defendants' vagueness challenge.  *See infra*. Nonetheless, the government will address the statutory arguments discussed in *Miller*, which defendants cite.

WL 5865006, at *5-9 (Friedrich, J.); *Caldwell*, 2021 WL 6062718, at *11-21 (Mehta, J.); *Mostofsky*, 2021 WL 6049891, at *11 (Boasberg, J.); *Montgomery*, 2021 WL 6134591, at *10-18 (Moss, J.); *Nordean*, 2021 WL 6134595, at *6-8 (Kelly, J.); *United States v. Bozell*, 21-cr-216, 2022 WL 474144, at *5 (D.D.C. Feb. 16, 2022) (Bates, J.); *Grider*, 2022 WL 392307, at *5-6 (Kollar-Kotelly, J.); *Andries*, 2022 WL 768684, at *9 (Contreras, J.); *Puma*, 2022 WL 823079, at *7-9, 12 & n.4 (Friedman, J.).

> **a.**   **Section 1512(c)(2)'s text, structure, and history demonstrate that its prohibition on obstructive conduct covers the defendants' actions on January 6, 2021.**

In Section 1512(c)(2), Congress comprehensively prohibited conduct that intentionally and wrongfully obstructs official proceedings. The ordinary meaning of "obstruct[], influence[], or impede[]" encompasses a wide range of conduct designed to frustrate an official proceeding. That conduct can include lying to a grand jury or in civil proceedings, exposing the identity of an undercover agent, and burning a building to conceal the bodies of murder victims. It also includes storming into the Capitol to derail a congressional proceeding. A defendant who, acting with the necessary *mens rea*, obstructs (or attempts to obstruct) Congress's certification of the Electoral College vote, commits a crime under Section 1512(c)(2).

> **i.**   Section 1512(c)(2)'s text and structure demonstrate that it serves as a comprehensive prohibition on corrupt conduct that intentionally obstructs or impedes an official proceeding. When interpreting a statute, courts look first to the statutory language, "giving the words used their ordinary meaning." *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014) (internal quotation marks omitted). If the statutory language is plain and unambiguous, this Court's "inquiry begins with the statutory text, and ends there as well." *National Ass'n of Mfrs. v. Department of*

*Defense*, 138 S. Ct. 617, 631 (2018) (internal quotation marks omitted). Here, the meaning of "obstruct[], influence[], or impede[]" is controlled by the ordinary meaning of those words.

The verbs Congress selected in Section 1512(c)(2) reach broadly. For example, the words "obstruct" and "impede" can "refer to anything that 'blocks,' 'makes difficult,' or 'hinders.'" *Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018) (brackets omitted) (citing dictionaries). Similarly, "influence" includes "affect[ing] the condition of" or "hav[ing] an effect on." *Influence*, Oxford English Dictionary, *available at* http://www.oed.com. By their plain meaning, therefore, the string of verbs in Section 1512(c)(2) are properly viewed as "expansive" in their coverage. *See United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013).

Section 1512(c)'s structure confirms that straightforward interpretation. Section 1512(c) consists of two provisions, which both require the defendant to act "corruptly." First, Section 1512(c)(1) criminalizes "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding." Section 1512(c)(2), by contrast, applies more generally to any acts that "otherwise obstruct[], influence[], or impede[]" an official proceeding. The term "otherwise," consistent with its ordinary meaning, conveys that Section 1512(c)(2) encompasses misconduct that threatens an official proceeding "beyond [the] simple document destruction" that Section 1512(c)(1) proscribes. *Id.; United States v. Petruk*, 781 F.3d 438, 446-47 (8th Cir. 2015) (noting that "otherwise" in Section 1512(c)(2), understood to mean "in another manner" or "differently," implies that the obstruction prohibition in that statute applies "without regard to whether the action relates to documents or records") (internal quotation marks omitted); *see also United States v. Ring*, 628 F. Supp. 2d 195, 224 n.17 (D.D.C. 2009) (noting that Section 1512(c)(2) is "plainly separate and independent of" Section 1512(c)(1), and declining to read "otherwise" in Section 1512(c)(2) "as limited by § 1512(c)(1)'s separate and independent prohibition on evidence-

tampering"); *Otherwise*, Oxford English Dictionary, *available at* http://www.oed.com (defining otherwise as "in another way" or "in any other way"); *see also Gooch v. United States*, 297 U.S. 124, 127-28 (1936) (characterizing "otherwise" as a "broad term" and holding that a statutory prohibition on kidnapping "for ransom or reward or otherwise" is not limited by the words "ransom" and "reward" to kidnappings for pecuniary benefit); *Collazos v. United States*, 368 F.3d 190, 200 (2d Cir. 2004) (construing "otherwise" in 28 U.S.C. § 2466(1)(C) to reach beyond the "specific examples" listed in prior subsections, thereby covering the "myriad means that human ingenuity might devise to permit a person to avoid the jurisdiction of a court").

In this way, Section 1512(c)(2) criminalizes the same *result* prohibited by Section 1512(c)(1) – obstruction of an official proceeding – when that result is accomplished by a different *means, i.e.*, by conduct other than destruction of a document, record, or other object. *Cf. United States v. Howard*, 569 F.2d 1331, 1333 (5th Cir. 1978) (explaining that 18 U.S.C. § 1503, which criminalizes the result of obstructing the due administration of justice, provides specific means of accomplishing that result and then a separate catch-all clause designed to capture other means). Section 1512(c)(2), in other words, "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense involving documents or records under Section 1512(c)(1). *Petruk*, 781 F.3d at 447 (quoting *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014)); *cf. United States v. Aguilar*, 515 U.S. 593, 598 (1995) (describing similar "[o]mnibus" clause in 18 U.S.C. § 1503 as a catchall that is "far more general in scope than the earlier clauses of the statute").

Consistent with that interpretation, courts have upheld convictions under Section 1512(c)(2) for defendants who attempted to secure a false alibi witness while in jail for having stolen a vehicle, *Petruk*, 781 F.3d at 440, 447; disclosed the identity of an undercover federal agent to thwart a grand jury investigation, *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir.

2009); lied in written responses to civil interrogatory questions about past misconduct while a police officer, *Burge*, 711 F.3d at 808-09; testified falsely before a grand jury, *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009); solicited information about a grand jury investigation from corrupt "local police officers," *Volpendesto*, 746 F.3d at 286; and burned an apartment to conceal the bodies of two murder victims, *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021) (unpublished); *see also United States v. Martinez*, 862 F.3d 223, 238 (2d Cir. 2017) (police officer tipped off suspects before issuance or execution of search warrants), *vacated on other grounds*, 139 S. Ct. 2772 (2019); *United States v. Ahrensfield*, 698 F.3d 1310, 1324-26 (10th Cir. 2012) (law enforcement officer disclosed existence of undercover investigation to target).

Here, Section 1512(c)(2) also applies to the Seefrieds' conduct, which involved breaking a window to enter, and allow other to enter into the Senate Wing of the Capitol Building, and engaging in disruptive conduct inside of the Capitol Building. In so doing, the defendants hindered and delayed the certification of the Electoral College vote, an "official proceeding" as that term is defined in the obstruction statute. *See* 18 U.S.C. § 1515(a)(1)(B); *supra* pp.3-4 (listing cases). Because construing Section 1512(c)(2) to reach that conduct would neither "frustrate Congress's clear intention" nor "yield patent absurdity," this Court's "obligation is to apply the statute as Congress wrote it." *Hubbard v. United States*, 514 U.S. 695, 703 (1995) (internal quotation marks omitted).

ii. In contrast, reading Section 1512(c)(2) as limited only to obstructive acts akin to the document destruction or evidence tampering captured in Section 1512(c)(1) (as the Seefrieds suggest) suffers at least three flaws. *First*, it would give rise to unnecessarily complex questions about what sort of conduct qualifies as "similar to but different from" the proscribed conduct "described in [Section 1512](c)(1)." *United States v. Singleton*, No. 06-CR-80, 2006 WL 1984467,

at *3 (S.D. Tex. July 14, 2006) (unpublished); *see id.* (concluding that Section 1512(c)(2) "require[s] some nexus to tangible evidence, though not necessarily tangible evidence already in existence"); *see also United States v. Hutcherson*, No. 05-CR-39, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) (unpublished) (concluding that a violation of Section 1512(c)(2) requires proof that "an individual corruptly obstructs an official proceedings [*sic*] through his conduct in relation to a tangible object").  So construed, for example, Section 1512(c)(2) may not encompass false statements made to obstruct a proceeding – though courts have widely upheld convictions for such conduct. *See Petruk*, 781 F.3d at 447 (collecting cases).

Limiting Section 1512(c)(2) in that way would effectively render that provision superfluous considering the comprehensive prohibitions against document and evidence destruction in both Sections 1512(c)(1) and 1519. *See Yates v. United States*, 574 U.S. 528, 541 n.4 (2015) (Section 1512(c)(1) provides a "broad ban on evidence-spoliation") (internal quotation marks omitted). By contrast, the straightforward interpretation that treats Section 1512(c)(2) as a catch-all for corrupt obstructive conduct not covered by Section 1512(c)(1) would "give effect to every clause and word" of Section 1512(c). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013); *cf. United States v. Poindexter*, 951 F.2d 369, 385 (D.C. Cir. 1991) (explaining that limiting the catch-all provision in Section 1503's omnibus clause to obstructive acts "directed against individuals" would render that catch-all superfluous because "earlier, specific[] prohibitions" in Section 1503 "pretty well exhaust such possibilities") (internal quotation marks omitted); *United States v. Watt*, 911 F. Supp. 538, 546 (D.D.C. 1995) (rejecting interpretation of the Section 1503 omnibus clause that would "serve no other purpose than to prohibit acts already prohibited in the first part of the statute" because that reading would "reduce[] the omnibus clause to mere redundancy").

Contrary to Kevin Seefried's assertions (ECF No. 59, at 10), the fact that Congress adopted a more general catch-all in Section 1512(c)(2) does not render superfluous other obstruction prohibitions found in Chapter 73, the criminal code's chapter on obstruction of justice. *See, e.g.*, *Montgomery*, 2021 WL 6134591, at *13 ("[T]he Court is also unpersuaded by Defendants' more general superfluity argument, which posits that, unless Section 1512(c)(2) is narrowly construed, much of Chapter 73 would be rendered superfluous."). Instead, the catch-all in Section 1512(c)(2) serves to capture "known unknowns." *Yates*, 574 U.S. at 551 (Alito, J., concurring) (quoting *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009)). Indeed, "the whole value of a generally phrased residual clause … is that it serves as a catchall" to ensure that the full range of conduct Congress sought to regulate comes within the statute, including "matters not specifically contemplated" by more specific provisions. *Beaty*, 556 U.S. at 860. In any event, "[r]edundancies across statutes are not unusual events in drafting," *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992), and the "rule[] of thumb" that statutes should be interpreted to avoid superfluity necessarily yields to the "cardinal canon" that Congress "says in a statute what it means and means in a statute what it says there," *id.* at 253-54.

Judicial treatment of the nearby omnibus clause in Section 1503, which prohibits "corruptly … influenc[ing], obstruct[ing], or imped[ing], or endeavor[ing] to influence, obstruct, or impede, the due administration of justice," 18 U.S.C. § 1503, is instructive. Drafted in "very broad language," the omnibus clause or "catchall provision," see *Aguilar*, 515 U.S. at 599, principally operates to criminalize obstructive conduct that falls outside the narrower prohibitions within Section 1503 and neighboring provisions. *See, e.g.*, *United States v. Sussman*, 709 F.3d 155, 168-170 (3d Cir. 2013) (removing gold coins from safe-deposit box); *United States v. Frank*, 354 F.3d 910, 916-919 (8th Cir. 2004) (removing car to avoid seizure); *United States v. Lefkowitz*, 125 F.3d 608, 619-620 (8th Cir. 1997) (instructing employee to remove documents from a house); *United*

*States v. Lester*, 749 F.2d 1288, 1295 (9th Cir. 1984) (hiding a witness); *United States v. Brown*, 688 F.2d 596, 597-598 (9th Cir. 1982) (warning suspect about impending search warrant to prevent discovery of heroin); *Howard*, 569 F.2d at 1333-1334 (attempting to sell grand jury transcripts). No court has held that the omnibus clause's broad language should be given an artificially narrow scope to avoid any overlap with Section 1503's other, more specific provisions. *Cf. Pasquantino v. United States*, 544 U.S. 349, 358 n.4 (2005) ("The mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either."). The same is true for the catch-all provision in Section 1512(c)(2).

Similarly, Section 1512(c)(2)'s partial overlap with other obstruction statutes does not render those other provisions superfluous. For example, the omnibus clause in 1503 and the congressional obstruction provision in 1505 both reach an "endeavor[] to influence, obstruct, or impede" the proceedings – a broader test for inchoate violations than Section 1512(c)(2)'s "attempt" standard. *See United States v. Sampson*, 898 F.3d 287, 301 (2d Cir. 2018) ("[E]fforts to witness tamper that rise to the level of an 'endeavor' yet fall short of an 'attempt' cannot be prosecuted under § 1512."); *United States v. Leisure*, 844 F.2d 1347, 1366-1367 (8th Cir. 1988) (collecting cases recognizing the difference between "endeavor" and "attempt" standards). Section 1519, which covers destruction of documents and records in contemplation of an investigation or agency proceeding, does not require a "nexus" between the obstructive act and the investigation or proceeding – but Section 1512(c)(2) does. Again, the existence of even "substantial" overlap is not "uncommon" in criminal statutes. *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014). But given that Sections 1503, 1505, and 1519 each reach conduct that Section 1512(c)(2) does not, the overlap provides no reason to impose an artificially limited construction on the latter provision. *See, e.g.*, *Sandlin*, 2021 WL 5865006, at *8 ("[T]he fact that there is

overlap between § 1512(c)(2) and the rest of § 1512, or other provisions in Chapter 73, is hardly remarkable.").

Importing into Section 1512(c)(2) a nexus-to-tangible-evidence-or-documents requirement would require inserting an extratextual gloss that would render the verbs in Section 1512(c)(2) nonsensical. *See Dean v. United States*, 556 U.S. 568, 572 (2009) (courts "ordinarily resist reading words or elements into a statute that do not appear on its face") (internal quotation marks omitted). The *actus reus* that those verbs encompass is obstructing, influencing, and impeding; a defendant cannot "obstruct" a document or "impede" a financial record. *Cf. Yates*, 574 U.S. at 551 (Alito, J., concurring) (rejecting interpretation of "tangible object" in Section 1519 that would include a fish in part because of a mismatch between that potential object and the statutory verbs: "How does one make a false entry in a fish?"); *id.* at 544 (plurality opinion) ("It would be unnatural, for example, to describe a killer's act of wiping his fingerprints from a gun as 'falsifying' the murder weapon.").

       iii.    Because "the statutory language provides a clear answer," the construction of Section 1512(c)(2) "ends there" and it is unnecessary to resort to legislative history. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999); *see Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 599 (2011) (same); *see also United States v. De Bruhl-Daniels*, 491 F. Supp. 3d 237, 251-52 (S.D. Tex. 2020) (declining to consider Section 1512's legislative history). Regardless, the legislative history of Section 1512(c)(2) – particularly when considered alongside the history of Section 1512 more generally – provides no support for a different conclusion, contrary to the Seefrieds' assertions (*e.g.*, ECF No. 59, at 8-9; 61, at 8-9). *See, e.g.*, *Montgomery*, 2021 WL 6134591, at *15-17.

When Congress in 1982 originally enacted Section 1512, that legislation did not include what is now Section 1512(c).  *See* VWPA, Pub. L. No. 97-291, § 4(a), 96 Stat. 1248, 1249-1250.

Its title then, as now, was "Tampering with a witness, victim, or an informant." *Id.*; 18 U.S.C. § 1512. As that title suggested, Section 1512 as originally enacted targeted conduct such as using intimidation, threats, or corrupt persuasion to prevent testimony or hinder, delay, or prevent communication of information to law enforcement or the courts as well as intentionally harassing another person to hinder, delay, or prevent that person from taking certain actions. *See* Pub. L. No. 97-291, § 4(a) (now codified as Section 1512(b) and Section 1512(d)).

Twenty years later, following the collapse of the Enron Corporation, Congress passed the Sarbanes-Oxley Act of 2002. Pub. L. No. 107-204, 116 Stat. 745; *see Yates*, 574 U.S. at 535 (plurality opinion). That legislation, which principally aimed to "prevent and punish corporate fraud, protect the victims of such fraud, preserve evidence of such fraud, and hold wrongdoers accountable for their actions," S. Rep. No. 107-146, at 2 (2002), included several different provisions, *id.* at 11 (describing different components of the law); *see also* 148 Cong. Rec. H4683-84 (daily ed. July 16, 2002) (outlining new provisions). Foremost among them were two new criminal statutes, 18 U.S.C. § 1519 and 18 U.S.C. § 1520, which were intended to "clarify and close loopholes in the existing criminal laws relating to the destruction or fabrication of evidence and the preservation of financial and audit records." S. Rep. No. 107-146, at 14. The Senate Judiciary Committee Report discussed those two provisions in detail. *See id.* at 14-16.

By contrast, the Sarbanes-Oxley Act's legislative history provides limited explanation of Congress's objective in enacting Section 1512(c). The only discussion of Section 1512 in the Senate Judiciary Committee Report, for example, noted that the pre-existing prohibition in Section 1512(b) made it a crime to induce "another person to destroy documents, but not a crime for a person to destroy the same documents personally"—a limitation that "forced" prosecutors to "proceed under the legal fiction that the defendants [in then-pending *United States v. Arthur Andersen*] are being prosecuted for telling other people to shred documents, not simply for

destroying evidence themselves."  S. Rep. No. 107-146, at 6-7. Similarly, Senator Hatch observed

that the legislation "broaden[ed]" Section 1512 by permitting prosecution of "an individual who

acts alone in destroying evidence."  148 Cong. Rec. S6550 (daily ed. July 10, 2002) (statement of

Sen. Hatch). At a minimum, nothing in these passing references casts doubt on the plain meaning

of Section 1512(c)(2), which is reflected in the interpretation described above.

Section 1512(c) also differed from the newly enacted Sections 1519 and 1520 in that

Congress added the former to an existing statutory section: Section 1512. *See Yates*, 574 U.S. at

541 (plurality opinion) (noting that, unlike Section 1519, Section 1512(c)(2) was placed among

the "broad proscriptions" in the "pre-existing" Section 1512). Moreover, although Section 1512(c)

as enacted in the Sarbanes-Oxley Act recognized two distinct prohibitions, *see* Pub. L. No. 107-

204, § 1102, 116 Stat. 807 ("Tampering with a record *or* otherwise impeding an official

proceeding") (emphasis added; capitalization altered), Congress did not amend Section 1512's

title. That title, "Tampering with a witness, victim, or an informant," § 1512, thus encompassed

the pre-existing provisions aimed at a defendant's obstructive conduct directed toward another

person,[3] but did not reflect the newly enacted prohibitions in Section 1512(c) that criminalized a

defendant's own obstructive act, either through destroying documents (§ 1512(c)(1)) or otherwise

impeding a proceeding (§ 1512(c)(2)). *See Yates*, 574 U.S. at 541 n.4 (plurality opinion) (noting

that Congress added Section 1512(c)(1), which covered evidence-spoliation, to Section 1512 "even

though § 1512's preexisting title and provisions all related to witness-tampering").

---

[3]      *See* § 1512(a) (applies to killing, attempting to kill, or using physical force or the
threat of physical force against a person to prevent testimony or induce a witness to withhold
information); § 1512(b) (applies to using intimidation, threats, or corrupt persuasion against a
person to prevent testimony or hinder, delay, or prevent communication of information to law
enforcement or the courts); § 1512(d) (applies to intentionally harassing another person to hinder,
delay, or prevent that person from taking certain actions).

Section 1512(c)'s legislative and statutory history thus offers two reasons to interpret Section 1512(c)(2) consistently with its plain text and structure. First, Section 1512(c) aimed at closing a "loophole" in Section 1512: the existing prohibitions did not adequately criminalize a defendant's *personal* obstructive conduct *not* aimed at another person. *See* 148 Cong. Rec. S6550 (daily ed. July 10, 2002) (statement of Sen. Hatch). Read together in this light, Section 1512(c)(1) criminalizes a defendant's firsthand destruction of evidence (without having to prove that the defendant induced another person to destroy evidence) in relation to an official proceeding, and Section 1512(c)(2) criminalizes a defendant's firsthand obstructive conduct that *otherwise* impedes or influences an official proceeding (though not necessarily through another person). *See Burge*, 711 F.3d at 809-10. Second, no substantive inference is reasonably drawn from the fact that the title of Section 1512 does not precisely match the "broad proscription" it in fact contains, given that the Sarbanes-Oxley Act unequivocally and broadly entitled the new provisions now codified in Section 1512(c), "Tampering with a record *or* otherwise impeding an official proceeding." Pub. L. No. 107-204, § 1102, 116 Stat. 807 (emphasis added; capitalization altered). Section 1512's title is more limited simply because Congress did not amend the pre-existing title when it added the two prohibitions in Section 1512(c) in 2002. *Cf. Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947) (describing "the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text").

### b.   This Court should not adopt the outlier construction reflected in *United States v. Miller*

Defendants largely disregard the authorities discussed above, which are analyzed in the many decisions adopting the government's reading of the statute. *Supra* pp. 3-4 (citing cases). Instead, they urge this Court to adopt the reasoning of *United States v. Miller*, No. 21-cr-119, 2022 WL 823070 (D.D.C. Mar. 7, 2022) (Nichols, J.), the sole decision in which a judge of this Court

has construed Section 1512(c)(2) to require proof that "the defendant ha[s] taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding." *Id.* at *15.[4] *Miller*'s outlier reasoning is unpersuasive for several reasons.

Focusing on the word "otherwise" in Section 1512(c)(2), *Miller* identified "three possible readings" of Section 1512(c)(2). 2022 WL 823070, at *6. First, Section 1512(c)(2) could serve as a "clean break" from Section 1512(c)(1), *id.* at *6, a reading that "certain courts of appeals have adopted," *id.* at *7. *Miller*, however, identified multiple "problems" with that interpretation, all rooted in the interpretation of the term "otherwise." It stated that reading "otherwise" in Section 1512(c)(2) to mean "in a different way or manner" is "inconsistent" with *Begay v. United States*, 553 U.S. 137 (2008), which considered whether driving under the influence qualified as a "violent felony" under the now-defunct residual clause of the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1). 2022 WL 823070, at *7. Second, *Miller* hypothesized that Section 1512(c)(1) could "provide[] examples of conduct that violates" Section 1512(c)(2). 2022 WL 823070, at *8. Third, *Miller* stated that Section 1512(c)(2) could be interpreted as a "residual clause" for Section 1512(c)(1), such that both provisions are linked by the document-destruction and evidence-tampering "conduct pr[o]scribed by" Section 1512(c)(1). 2022 WL 823070, at *9. After considering Section 1512(c)'s structure, "historical development," and legislative history, *Miller* found "serious ambiguity" as to which of the two "plausible" readings – the second and third readings identified above – Congress intended. *Id.* at *15. Applying what it described as principles of "restraint," *Miller* then interpreted Section 1512(c)(2) to mean that a defendant violates the statute only when he or she "take[s] some action with respect to a document, record, or other object in order to corruptly obstruct, impede, or influence an official proceeding" (the third reading). *Id.*

---

[4]     The government has moved for reconsideration in *Miller*. That motion is pending.

Miller's reasoning is unpersuasive. *Miller* ultimately turned on the court's determination that no "single obvious interpretation of the statute" controlled and that the rule of lenity was applicable and was dispositive. 2022 WL 823070, at *15. The rule of lenity, however, "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998); *Young v. United States*, 943 F.3d 460, 464 (D.C. Cir. 2019). Some ambiguity is insufficient to trigger the rule of lenity; instead, a court must find "grievous ambiguity" that would otherwise compel guesswork. *See Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (internal quotation marks omitted). "Properly applied," then, "the rule of lenity therefore rarely if ever plays a role because, as in other contexts, 'hard interpretive conundrums, even relating to complex rules, can often be solved.'" *Wooden*, 142 S. Ct. at 1074 (Kavanaugh, J., concurring).

The rule of lenity is plainly "inapplicable" here. *Puma*, 2022 WL 823079, at *12 n.4. For the reasons set forth above, Congress made clear in Section 1512(c)(2) that it sought to protect the integrity of official proceedings – regardless of whether a defendant threatens such a proceeding by trying to interfere with the evidence before that tribunal or threatens the tribunal itself. Any such distinction produces the absurd result that a defendant who attempts to destroy a document being used or considered by a tribunal violates Section 1512(c) but a defendant who threatens to use force against the officers conducting that proceeding escapes criminal liability under the statute. Such an outcome would, ironically, lose sight of a core value that animates the lenity rule: that defendants should be put on notice that their conduct is criminal and not be surprised when prosecuted. *See Wooden*, 142 S. Ct. at 1082 (Gorsuch, J., concurring) ("Lenity works to enforce the fair notice requirement by ensuring that an individual's liberty always prevails over ambiguous

laws."). It would strain credulity for any defendant who was focused on stopping an official proceeding from taking place to profess surprise that his conduct could fall within a statute that makes it a crime to "obstruct[], influence[], or impede[] [any] official proceeding or attempt[] to do so." 18 U.S.C. § 1512(c)(2).

None of the grounds identified in *Miller* for finding "serious ambiguity," 2022 WL 823079, at *15 – grounds which the Seefrieds reprise in their motion – withstand scrutiny. *Miller* stated – and defendants repeat – that the government's reading either "ignores" that the word "otherwise" is defined with reference to "something else" (namely Section 1512(c)(1)) or fails to "give meaning" to the term "otherwise." 2022 WL 823079, at *7. That is incorrect. Far from suggesting that Section 1512(c)(2) is "wholly untethered to" Section 1512(c)(1), *id.*, under the government's reading, the word "otherwise" in Section 1512(c)(2) indicates that Section 1512(c)(2) targets obstructive conduct in a manner "other" than the evidence tampering or document destruction that is covered in Section 1512(c)(1). That understanding of "otherwise" is both fully consistent with the definitions of the term surveyed in *Miller*, *see* 2022 WL 823079, at *6 (noting that "otherwise" in Section 1512(c)(2) may be read as "in a different way or manner; differently"; "in different circumstances: under other conditions"; or "in other respects") (internal quotation marks omitted), and ensures that the term is not rendered "pure surplusage," *id.* at *7. In other words, "otherwise" makes clear that Section 1512(c)(1)'s scope encompasses document destruction or evidence tampering that corruptly obstructs an official proceeding, while Section 1512(c)(2)'s ambit includes "other" conduct that corruptly obstructs an official proceeding.

*Miller* also stated (and the Seefried repeat) that, without a nexus to a document, record, or other object, Section 1512(c)(2) "would have the same scope and effect ... [as] if Congress had instead omitted the word 'otherwise.'" 2022 WL 823079, at *7. But, as already noted, overlap is "not uncommon in criminal statutes," *Loughrin* 573 U.S. at 358 n.4, and Section 1512(c)(2)'s

broader language effectuates its design as a backstop in the same way that a "generally phrased residual clause … serves as a catchall for matters not specifically contemplated." *Beaty*, 556 U.S. at 860. And, in any event, interpreting the interplay of Sections 1512(c)(1) and 1512(c)(2) in this way does not foreclose a defendant from arguing that his conduct falls outside Section 1512(c)(2)'s scope because his document destruction or evidence concealment is prohibited and punishable only under Section 1512(c)(1). A defendant prevailing on such a theory may be securing a Pyrrhic victory – where success leads to reindictment under Section 1512(c)(1) – but those practical considerations provide no reason to depart from the plain meaning of Section 1512(c). And, in any event, the "mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either." *Pasquantino*, 544 U.S. at 358 n.4.

The *Miller* court and the defendants (ECF No. 59, at 4, 6, 12; 61 at 9) also posit that the government's reading is inconsistent with *Begay*. That conclusion is flawed in several respects. First, in considering whether driving under the influence was a "violent felony" for purposes of the ACCA's residual clause – which defines a "violent felony" as a felony that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury," 18 U.S.C. § 924(e)(2)(B)(ii) – the Supreme Court in *Begay* addressed a statutory provision that has an entirely different structure from Section 1512(c)(2). *See, e.g.*, *Sandlin*, 2021 WL 5865006, at *6 (distinguishing *Begay* on the ground that, unlike the ACCA residual clause, the "otherwise" in Section 1512(c)(2) is "set off by both a semicolon and a line break"); *United States v. Ring*, 628 F. Supp. 2d 195, 224 n.17 (D.D.C. 2009). Differently from the ACCA residual clause, the "otherwise" phrase in Section 1512(c)(2) "stands alone, unaccompanied by any limiting examples." *Ring*, 628 F.Supp.2d at 224 n.17. In other words, the "key feature" in Section 924(e)(2)(B)(ii) at issue in *Begay* – "namely, the four example crimes," 553 U.S. at 147 – is "absent" in Section 1512(c)(2). *Caldwell*, 2021 WL 6062718, at *14.

Second, *Miller*'s assertion that the meaning of "otherwise" was "[c]rucial" to the Supreme Court's decision in *Begay* misapprehends *Begay*'s express analysis. The majority in *Begay* noted first that the "listed examples" in Section 924(e)(2)(B)(ii) – burglary, arson, extortion, or crimes involving explosives – indicated that the ACCA residual clause covered only similar crimes. *Begay*, 553 U.S. at 142. The majority next drew support from Section 924(e)(2)(B)(ii)'s history, which showed that Congress both opted for the specific examples in lieu of a "broad proposal" and described Section 924(e)(2)(B)(ii) as intending to encompass crimes "similar" to the examples. *Id.* at 143-144. Only in the final paragraph of that section of the opinion did the majority address the word "otherwise," noting that the majority "[could ]not agree" with the government's argument that "otherwise" is "sufficient to demonstrate that the examples do not limit the scope of the clause" because "the word 'otherwise' can (we do not say must, cf. post at [150-52] (Scalia, J. concurring in judgment)) refer to a crime that is similar to the listed examples in some respects but different in others." *Id.* at 144. A tertiary rationale responding to a party's argument where the majority refrains from adopting a definitive view of "otherwise" cannot plausibly be described as "crucial." Rather, the majority's "remarkably agnostic" discussion of "otherwise" in *Begay* explicitly noted that the word may carry a different meaning where (as here) the statutory text and context suggests otherwise. *Montgomery*, 2021 WL 6134591, at *11; *see also Caldwell*, 2021 WL 6062718, at *14 (declining to depart from the "natural reading" of "otherwise" as "'in a different way or manner'" based on the discussion in *Begay*). In short, the majority in *Begay* actually "placed little or no weight on the word 'otherwise' in resolving the case." *Montgomery*, 2021 WL 6134591, at *11.

Third, whatever the significance of the majority's interpretation of "otherwise" in *Begay*, *Begay*'s ultimate holding demonstrates why this Court should not embark on imposing an extra-textual requirement within Section 1512(c)(2). The Supreme Court held in *Begay* that Section 924(e)(2)(B)(ii) encompassed only crimes that, similar to the listed examples, involve "purposeful,

violent, and aggressive conduct."  553 U.S. at 144-145.  But "*Begay* did not succeed in bringing clarity to the meaning of the [ACCA's] residual clause."  *Johnson v. United States*, 576 U.S. 591, 600 (2015).  Whatever the merits of grafting an atextual (and ultimately unsuccessful) requirement in the context of the ACCA, that approach is unwarranted in the context of Section 1512(c)(2).  In the nearly 20 years between Congress's enactment of Section 1512(c)(2) and *Miller*, no reported cases adopted the document-only requirement urged by defendants.[5]

Finally, Kevin Seefried suggests that the government's position is inconsistent with the Supreme Court's decision in *Yates*. (ECF No. 59, at 7 n.2, 21).  He is incorrect.  In *Yates*, five Justices concluded, in a fractured decision, that a fisherman who ordered his crew to throw his catch back into the sea to prevent federal authorities from determining whether he had harvested undersized fish did not violate Section 1519's prohibition on "knowingly alter[], destroy[], mutilate[], conceal[], cover[] up, falsif[y], or make[] a false entry in any record, document, *or tangible object* with the intent to impede, obstruct, or influence" a federal investigation.  *Yates*, 574 U.S. at 531 (plurality opinion).  Accordingly, five Justices in *Yates* concluded that "tangible object" as used in Section 1519 did not include a fish.

Neither the *Yates* plurality nor Justice Alito's controlling concurrence support defendants' position in this case.  For one thing, the two textual canons that the majority and Justice Alito found significant in interpreting Section 1519 in *Yates – i.e.*, that "a word is known by the company

---

[5]      Kevin Seefried also cites a memo written by former Attorney General William Barr. (ECF No. 59, 6 (quoting quoting Memorandum from William Barr to Rod Rosenstein, Deputy Att'y Gen., Dep't of Justice (June 8, 2018), *available at* https://s3.documentcloud.org/documents/5638848/June-2018-Barr-Memo-to-DOJ-Muellers-Obstruction.pdf).  But the memoranum was written by private citizen William Barr.  It was not issued while Mr. Barr was the Attorney General of the United States, and the Department of Justice has not adopted the memo or its reasoning. The memo is simply one private citizen's take on a legal issue.  "[A]ny suggestion that the memorandum represents the views of the Department of Justice is inaccurate."  *Montgomery*, 2021 WL 6134591, at *10.

it keeps" (*noscitur a sociis*) and that general words that follow specific ones should be construed as limited to the "same kind" as the specific ones (*ejusdem generis*) – "have little bearing on the interpretative question" of Section 1512(c)(2), which involves entirely different statutory text.  *See Montgomery*, 2021 WL 6134591, at *14.  For another, whereas, in *Yates*, the statutory title of Section 1519 ("Destruction, alterative, or falsification of records in Federal investigations and bankruptcy") weighed against interpreting "tangible object" to include fish, *see* 574 U.S. at 552 (Alito, J., concurring in the judgment), no comparable inference can be drawn with respect to Section 1512(c)(2).  *See supra* p. 14-16 (Congress did not amend Section 1512's preexisting title in the U.S. Code when it added Section 1512(c), but Section 1512(c)'s title in the Sarbanes-Oxley Act of 2002 ("Tampering with a record *or* otherwise impeding an official proceeding" (emphasis added)) supports a broad reading of the prohibition); *see Montgomery*, 2021 WL 6134591, at *15. Finally, while the *Yates* plurality (but not Justice Alito) found Section 1519's origin in the Sarbanes-Oxley Act probative that the provision was not intended to prohibit the destruction of a fish, *see* 574 U.S. at 546 (plurality), "the inclusion of [Section 1512(c)(2)] in the Sarbanes-Oxley Act and the placement of that provision in an existing section of Chapter 73, make sense." *Montgomery*, 2021 WL 6134591, at *15.

> **c.** **Even if it agrees with *Miller*, this Court should not dismiss Count One of the Indictment, which merely tracks Section 1512(c)(2)'s operative statutory text.**

In any event, even under the defendants' theory, Count One sufficiently alleges a violation of Section 1512(c)(2) by tracking the provision's "operative statutory text."  *Williamson*, 903 F.3d at 130.  It is well-settled that it is "'generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence

intended to be punished.'" *Id.* (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  The indictment in this case therefore did not need to more specifically allege that the obstruction took the form of taking some action with respect to a document.  *Id.*; *see also United States v. Resendiz-Ponce*, 549 U.S. 102, 108-109 (2007).  In other words, the indictment's allegations, by charging the operative statutory text, permissibly embrace two theories: (1) that defendants obstructed an official proceeding by taking some action with respect to a document; and (2) that defendants obstructed an official proceeding without taking some action with respect to a document.  Even a ruling finding the second theory invalid would leave the first theory intact.  For that reason alone, at this stage in the proceedings, dismissal of Count One would be unwarranted.

> **B.** **Congress's Joint Session to Certify the Electoral College Vote Is a "Proceeding Before the Congress" under Section 1515(a)(1)(B) And, Therefore, an "Official Proceeding" under Section 1512(c)(2)**

Kevin Seefried's alternative statutory argument – that Congress's Joint Session to certify the Electoral College vote is not a "proceeding before the Congress" under the statute (ECF No. 59, at 17-22) – also lacks merit.

> **1.** **The plain text of the statute established that the Joint Session is an "official proceeding."**

To determine the meaning of a statute, a court "look[s] first to its language, giving the words used their ordinary meaning."  *Levin v. United States*, 568 U.S. 503, 513 (2013) (internal quotation omitted).  Section 1515(a)(1)(B), as noted, defines "official proceeding" as a "proceeding before the Congress."  In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is a congressional proceeding, or "a proceeding before the Congress."  Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete."  *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation omitted).

Congress's Joint Session to certify the Electoral College vote constitutes a "proceeding" under any interpretation of that term.  In its broadest and most "general sense," a "proceeding" refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013) (quoting *Proceeding*, Oxford English Dictionary, available at http://www.oed.com).  Neither defendant meaningfully contends that Congress's Joint Session to certify the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding – and indeed an official proceeding – under that broad definition.

A narrower definition of the term "proceeding" would look to the "legal – rather than the lay – understanding" of the term.  *Ermoian*, 752 F.3d at 1170.  This narrower definition includes the "business conducted by a court or other official body; a hearing."  Black's Law Dictionary, "Proceeding" (11th ed. 2019).  Taken with its modifier "official," the term "proceeding" thus "connotes some type of formal hearing."  *Ermoian*, 752 F.3d at 1170.  But even under this narrower definition, Congress's Joint Session to certify the Electoral College vote – business conducted by an official body, in a formal session – would easily qualify.

The formality involved in the certification of the Electoral College vote places it well within the category of an official proceeding, even under the narrower legal definition of the term "proceeding."  Few events are as solemn and formal as a Joint Session of the Congress.  That is particularly true for Congress's certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute.  Required by law to begin at 1:00 pm on the January 6 following a presidential election, Congress's meeting to certify the Electoral College vote is both a "hearing" and "business conducted by … [an] official body."  *See* Black's Law Dictionary, "Proceeding."  The Vice President, as the President of the Senate, serves as the

"presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15. As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.* And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall." *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform"). Congress's certification of the Electoral College vote, moreover, must terminate with a decision: Congress may not recess until "the count of electoral votes" is "completed," and the "result declared." *Id.*

Under the plain meaning of Sections 1512(c)(2) and 1515(a)(1)(B), Congress's Joint Session to certify the Electoral College vote is a "proceeding before the Congress." That alone disposes of the defendants' contentions.

### 2. The statutory phrase "proceeding before Congress" is not limited to proceedings solely relates to the "administration of justice."

Kevin Seefried nevertheless argues (ECF No. 59, at 17-23) that the phrase "official proceeding" in Section 1512 applies only to proceedings that involve a "hearing before a tribunal affecting the administrative of justice." But this narrow reading of the statute finds no textual support when applied to Section 1515(a)(1)(B), which speaks broadly of a proceeding "before the Congress." Had Congress wanted to impose a definition that more closely resembled a quasi-adjudicative setting (as defendants contend), it needed look only a few provisions away to 18 U.S.C. § 1505, which criminalizes, among other things, the obstruction of (i) "the due and proper administration of the law under which any pending proceeding is being had" by a federal

department or agency; and (ii) "the due and proper exercise of the power of inquiry under which any inquiry or investigation [that] is being had by" Congress, including by congressional committees and subcommittees.  18 U.S.C. § 1505; *see United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020).  If Congress wished to similarly limit the obstruction prohibition under § 1512(c)(2) to congressional investigations and the like, it could have enacted language similar to Section 1505.  Instead, Congress chose different terms, with different meanings.  See *Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each.  We would not presume to ascribe this difference to a simple mistake in draftsmanship.").  Congress enacted broader language ("a proceeding before the Congress") that covers a broader range of proceedings than only the "inquir[ies] and investigation[s]" envisioned in Section 1505.  That broader definition includes the Electoral College vote certification that defendants obstructed on January 6, 2021.

None of Kevin Seefried's contrary arguments have merit.  He cites at length (ECF No. 59, at 18-19) the Ninth Circuit's decision in *Ermoian*, 752 F.3d 1165.  But *Ermoian* involved a different statutory definition, 18 U.S.C. § 1515(a)(1)*(C)*, and an entirely different issue: whether an FBI investigation counts as "a proceeding before a Federal Government agency which is authorized by law" under Section 1515(a)(1)(C).  In *Ermoian*, the Ninth Circuit reasoned at the outset that the term "proceeding" did not "conclusively resolve whether an FBI investigation qualifies" because narrower definitions of the term "would exclude criminal investigations in the field."  752 F.3d at 1170.  This case, which involves a proceeding before Congress and implicates Section 1515(a)(1)*(B)* (and not *(C)*), presents no such question.  And, in any event, the Joint Session of Congress to certify the Electoral College vote would satisfy even the narrower formulations of "proceeding" cited in *Ermoian*.  The Joint Session plainly constitute "*business conducted* by a court *or other official body*; a *hearing*," or "[a] legal … process."  *Id.* at 1169

28

(emphasis added).  And there can be no serious dispute that the Joint Session is a "proceeding …

authorized *by law*" or that it has the "sense of formality" that the Ninth Circuit found absent from

mere criminal investigations.  *Id.* at 1170 (emphasis added).

Kevin Seefried also notes that other provisions in Chapter 73 "explicitly relate to the

administration of justice."  (ECF No. 59, at 22 (citing 18 U.S.C. §§ 1503, 1504, 1507, 1521)).

That, too, is unpersuasive.  If anything, those neighboring provisions – which criminalize

obstruction of other types of investigations and protect judges, jurors, witnesses and the like –

underscore how robustly Congress sought to penalize obstructive conduct across a vast range of

settings.  That Congress wished to penalize efforts to obstruct everything from a federal audit to a

bankruptcy case to an examination by an insurance regulatory official only crystallizes that it is

more the acts of obstructing, influencing, or impeding – than the particular type of hearing – that

lie at "'the very core of criminality' under the statute[s]."  *Williamson*, 903 F.3d at 131.

Kevin Seefried also contends (ECF No. 59, at 23) that Congress's certification of the

Electoral College vote "may be" "more appropriately" considered the "'official business'" of

Congress or a "'federally protected function'" – the statutory phrases used in 40 U.S.C.

§ 5104(e)(2)(c) and 18 U.S.C. § 231(a)(3), respectively – "rather than an 'official proceeding

before the Congress'" under 18 U.S.C. §§ 1512(c) and 1515.  He is, again, incorrect.  Sections

213(a)(3), 1512(c)(2), and 5104(e)(2)(C) were enacted at different times and as part of largely

unrelated statutory schemes.  It is unremarkable that Congress used different – but overlapping –

terminology in defining the proceedings, functions, and activities that it intended to protect in those

distinct enactments.  See *Russello v. United States*, 464 U.S. 16, 25 (1983) ("Language in one

statute usually sheds little light upon the meaning of different language in another statute, even

when" – unlike there – "the two are enacted at or about the same time.").  Nothing supports Kevin

Seefried's premise that the terms should somehow be read as mutually exclusive.

Finally, Kevin Seefried claims (ECF N0. 59, at 20-21) that Section 1512(c)'s legislative history weighs in favor of interpreting the obstruction statute narrowly because, in enacting Section 1512(c) in 2002, Congress was principally preoccupied with closing a loophole in connection with potential investigations.  Putting aside that the "best evidence of [a statute's purpose] is the statutory text adopted by both Houses of Congress and submitted to the President," *West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991), the obstruction statute's legislative history confirms that Congress intended "official proceeding" to reach broadly.  Although Congress enacted Section 1512(c) as part of the Sarbanes-Oxley Act of 2002, Section 1512(c) adopted – but did not modify – the pre-existing definition of "official proceeding" in Section 1515(a)(1), which had been in place since 1982.  *See* Victim and Witness Protection Act of 1982 ("VWPA"), Pub. Law 97-291, § 4(a), 96 Stat. 1252.  And, tellingly, in considering the VWPA in 2002, the Senate Judiciary Committee urged the inclusion of a "broad residual clause" – in a provision that was ultimately omitted from the 1982 enactment, but that resembles the current iteration of Section 1512(c)(2) – precisely because the "purpose of preventing an obstruction or miscarriage of justice cannot be fully carried out by a simple enumeration of the commonly prosecuted obstruction offenses.  There must also be protection against the rare type of conduct that is the product of the inventive criminal mind and which also thwarts justice."  S. Rep. 97-532, at 18 (1982).  The upshot is clear: when it enacted the operative definition of "official proceeding," Congress intended that term to be construed broadly, not narrowly.  And this case underscores Congress's foresight in doing so: Defendants sought to thwart justice in an unprecedented and inventive manner, by literally driving Congress out of the chamber.[6]

---

[6]     Even if defendants were correct that the obstruction statute's application to the Electoral College vote certification proceeding was not expressly anticipated by Congress at the time of enactment, that alone "does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command."  *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1749

Since the events of January 6, 2021, at least 10 judges on this Court have considered whether Congress's certification of the Electoral College vote constitutes an "official proceeding" for purposes of Section 1512(c)(2).  All 10 have ruled that it does, largely adopting the government's rationale and rejecting the arguments that defendants press in this case.  *See Sandlin*, 2021 WL 5865006, at *4 (Friedrich, J.); *Caldwell*, 2021 WL 6062718, at *7 (Mehta, J.); *Mostofsky*, 2021 WL 6049891, at *10; *Montgomery*, 2021 WL 6134591, at *4-10 (Moss, J.); *Nordean*, 2021 WL 6134595, at *4-6 (Kelly, J.); *McHugh*, 2022 WL 296304, at *5-9 (Bates, J.); *Grider*, 2022 WL 392307 (Kollar-Kotelly, J.); *Miller*, 2022 WL 823070, at *5; *Andries*, 2022 WL 768684, at *3-7 (Contreras, J.); *Puma*, 2022 WL 823079, at *4-9 (Friedman, J.).  Nothing in Kevin Seefried's briefing warrants departing from that well-reasoned line of decisions.

### 3. In the alternative, Congress's certification of the Electoral College vote would qualify as an adjudicatory proceeding.

In any event, even if the statute required the "administration of justice" gloss urged by defendants, Congress's certification of the Electoral College vote as set out in the Electoral Count Act of 1887 would satisfy it.  The certification of the Electoral College vote involves the convening of a Joint Session of Congress, a deliberative body over which a government officer, the Vice President as President of the Senate, "presid[es]."  3 U.S.C. § 15.  That Joint Session renders judgment on whether to certify the votes cast by Electors in the presidential election.  Under the Constitution, the Electors create "lists" of the presidential and vice-presidential candidates, which they "sign" and "certify" before sending to Congress.  U.S. Const. amend. XII.  Congress then decides whether to count those certified lists, or certificates in conformity with the Electoral Count

---

(2020) (internal quotation and alterations omitted).  A statute's application may "reach[] beyond the principal evil legislators may have intended or expected to address."  *Id.* (internal quotation omitted); *cf.*, *Montgomery*, 2021 WL 6134591, at *15-17 (rejecting a narrow understanding of Section 1512(c) based on its legislative history).

Act.  3 U.S.C. § 15.  As in an adjudicative setting, parties may lodge objections to the certification, and if any such objection is lodged, each House must consider the objection and make a "decision" whether to overrule or sustain it.  3 U.S.C. § 15.  And just as a jury does not (barring a mistrial) recess until it has reached a verdict, the Joint Session cannot "be dissolved" until it has "declared" a "result."  3 U.S.C. § 16.  Even under defendants' theories, Congress's certification of the Electoral College vote possesses sufficient "tribunal-like" characteristics to qualify as an "official proceeding," as several judges of this Court have already concluded.  *See Caldwell*, 2021 WL 6062718, at *11 (Mehta, J.); *Nordean*, 2021 WL 6134595, at *6; *McHugh*, 2022 WL 296304, at *9.

### C.      Section 1512(c)(2) Is Not Unconstitutionally Vague.

In what they style as their lead claim, defendants contend that Section 1512(c)(2) is unconstitutionally vague.  (*See* ECF No. 59, at 3-16; 61, at 7-14).  They are incorrect, as every judge on this Court to have considered the issue has concluded.

1.      The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV. An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)). To avoid arbitrary enforcement, the law must not "vest[] virtually complete

discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'" *Bronstein*, 849 F.3d at 1107 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)). A provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

a.      Defendants fail to overcome the "strong presumpti[on]" that Section 1512(c)(2) is constitutional. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963). Section 1512(c)(2) does not tie criminal culpability to "wholly subjective" terms such as "annoying" or "indecent" that are bereft of "narrowing context" or "settled legal meanings," *Williams*, 553 U.S. at 306, nor does it require application of a legal standard to an "idealized ordinary case of the crime," *Johnson*, 576 U.S. at 604. Section 1512(c)(2)'s prohibition on "corruptly … obstruct[ing], influenc[ing], or imped[ing]" an "official proceeding" gives rise to "no such indeterminacy." *Williams*, 553 U.S. at 306. The statute requires that a defendant, acting with consciousness of wrongdoing and intent to obstruct, attempts to or does undermine or interfere with a statutorily defined official proceeding. While "it may be difficult in some cases to determine whether these

33

clear requirements have been met," "'courts and juries every day pass upon knowledge, belief and intent – the state of men's minds – having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.'" *Id.* (quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).

        b.     Defendants' counterarguments lack merit.  In the "vagueness" sections of their memoranda, both defendants cite extensively to Judge Nichols' recent ruling in *Miller*.  (*See* ECF No. 59, at 7-9; 61, at 7-10).  But, as already noted (*see supra* p.6 n.2), *Miller* did not consider, much less rule on, a vagueness claim at all.  It considered only Miller's statutory claims.  Whatever its merit as a matter of statutory construction (*but see supra*), *Miller* lends no support to the Seefrieds' vagueness claims.

        Kevin Seefried's passing reliance on *Johnson* (ECF No. 59, at 10) is equally misplaced. He appears to suggest that, just because the Supreme Court in *Johnson* found that the "residual clause" of the Armed Career Criminal Act ("ACCA") violated due process, the same must be true of the "residual clause" in Section 1512(c)(2).  But any such contention would fail for at least two reasons, as Judge Friedman recently explained.  First, "*Johnson* does not stand for the proposition that any criminal provision with a residual clause is necessarily vague."  *Puma*, 2022 WL 823079, at *12; *cf. United States v. Davis*, 139 S. Ct. 2319, 2327 (2019) (explaining that if the ACCA's residual clause required "a case-specific approach," "there would be no vagueness problem").  Second, "unlike the residual clause of ACCA at issue in *Johnson*, Section 1512(c)(2) does not require the Court to 'imagine the kind of conduct typically involved in a crime' in order to determine whether that crime, in the abstract, met the statutory criteria."  *Puma*, 2022 WL 823079, at *12.  "Rather, a defendant violates Section 1512(c)(2) if his own conduct 'obstructs, influences, or impedes any official proceeding.'"  *Id.*

Kevin Seefried's attempt (ECF No. 59, at 15) to conjure vagueness from the government's charging decisions in particular cases arising out of the events of January 6, 2021, lacks merit. *Ibid.* (citing cases). Contrary to defendants' suggestion, nothing in the text, context, or history of Section 1512(c)(2) limits the statute's applicability to those January 6, 2021 rioters who "entered the Senate chamber." (ECF No. 59, 15). The statute is properly applied to all individuals who, acting with the requisite *mens rea* (*i.e.*, corruptly), either engaged in conduct that obstructed Congress's certification of the Electoral College vote, or aided and abetted such obstructive conduct. The fact that obstructive conduct can take many forms – and that the appropriate *mens rea* may be inferred from a wide range of actions – does not make the statute unconstitutionally vague.

       c.      Finally, defendants' various attacks on the discrete terms in Section 1512(c)(2) as unconstitutionally vague lack merit.

       i.      Defendants assert that "the term 'otherwise' as used in Section 1512 is unconstitutionally vague." (ECF No. 61, at 7; *see also* ECF 59, at 10-12). But they never explain why or how the word "otherwise" renders the statute unconstitutionally vague. In fact, the opposite is true. As explained above, the word "otherwise" "carries a clear meaning" in Section 1512(c)(2): it "clarifies that a defendant can violate Section 1512(c)(2) through 'obstruction by means other than document destruction.'" *Puma*, 2022 WL 823079, at *12 (citing cases). But, even under *Miller*'s interpretation, *see* 2022 WL 823070, at *15, no vagueness concern would arise: the contours of the statute would be narrower, but not unconstitutionally nebulous. Under all interpretations, Section 1512(c)(2) provides sufficient notice of the "standard of conduct" it proscribes. *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971).

       ii.      Kevin Seefried's claim that the word "corruptly" in Section 1512(c)(2) is unconstitutionally vague (ECF No. 59, at 13-14) is also mistaken. As Judge Friedman recently

observed, "[j]udges in this district have construed 'corruptly' to require 'a showing of "dishonesty"

or an 'improper purpose'[;], 'consciousness of wrongdoing'[;] or conduct that is 'independently

criminal,' 'inherently malign, and committed with the intent to obstruct an official proceeding.'"

*Puma*, 2022 WL 823079, at *10 (quoting *Montgomery*, 2021 WL 6134591, at *19; *Bozell*, 2022

WL 474144, at *6; *Caldwell*, 2021 WL 6062718, at *11; and *Sandlin*, 2021 WL 5865006, at *13)

(alterations omitted).  Under any of these common-sense constructions, the term "corruptly" "not

only clearly identifies the conduct it punishes; it also 'acts to shield those who engage in lawful,

innocent conduct – even when done with the intent to obstruct, impede, or influence the official

proceeding.'" *Id.* (quoting *Sandlin*, 2021 WL 5865006, at *13).  It presents no vagueness concern.

Nor does *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), support defendants'

attacks on the word "corruptly," for at least three reasons.  First, the D.C. Circuit narrowly confined

*Poindexter*'s analysis to Section 1505's use of "corruptly," and expressly declined to hold "that

term unconstitutionally vague as applied to all conduct."  951 F.2d at 385. Five years later, in

*United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), the D.C. Circuit rejected a *Poindexter*-

based vagueness challenge to 18 U.S.C. § 1512(b) and affirmed the conviction of a defendant for

"corruptly" influencing the testimony of a potential witness at trial. *Id.* at 629-30. Other courts

have similarly recognized "the narrow reasoning used in *Poindexter*" and "cabined that vagueness

holding to its unusual circumstances."  *United States v. Edwards*, 869 F.3d 490, 502 (7th Cir.

2017); *see also, e.g.*, *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (rejecting vagueness

challenge to "corruptly" in 26 U.S.C. § 7212(a)); *United States v. Shotts*, 145 F.3d 1289, 1300

(11th Cir. 1998) (same for 18 U.S.C. § 1512(b)); *United States v. Brenson*, 104 F.3d 1267, 1280

(11th Cir. 1997) (same for 18 U.S.C. § 1503). The defendants' invocation of *Poindexter*

accordingly fails to establish that Section 1512(c) suffers the same constitutional indeterminacy.

Second, *Poindexter* predated the Supreme Court's decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). There, the Court explained the terms "'[c]orrupt" and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil." *Id.* at 705 (citation omitted). In doing so, the Court "did not imply that the term was too vague." *Edwards*, 869 F.3d at 502. Third, and as noted above, courts have encountered little difficulty when addressing "corruptly" in Section 1512(c)(2) following *Arthur Andersen*. *See supra*, at 18-19. Such efforts demonstrate that the statute's "corruptly" element does not invite arbitrary or wholly subjective application by either courts or juries.

Third, as noted above, courts have encountered little difficulty when addressing "corruptly" in Section 1512(c)(2) following *Arthur Andersen*. That history demonstrates that the statute's "corruptly" element does not invite arbitrary or wholly subjective application.

  iii. Finally, Kevin Seefried's claim that the phrase "official proceeding" renders Section 1512(c)(2) unconstitutionally vague is meritless. (*See, e.g.*, ECF No. 59, at 13 (asserting that the statute "require[es] courts to speculate and line-draw when distinguishing 'official proceedings' from mere ancillary proceedings or investigations"). As explained above, the Joint Session of Congress qualifies as an "official proceeding" under both the "lay" and "legal" definitions of the term. It also contains the necessary "adjudicatory" features to satisfy even defendants' counter-textual construction. *See supra* pp._31-32. Section 1512(c) therefore provided the defendants with more than "a fair warning … of what the law intends to do if a certain line [was] passed" on January 6, 2021. *Arthur Andersen*, 544 U.S. at 703 (citation omitted).

## II. The Court Should Deny Kevin Seefried's Motion to Dismiss Counts Two and Three, Alleging Violations of 18 U.S.C. § 1752

Counts Two and Three allege violations of Section 1752 of Title 18, which prohibit the unlawful entry into and disruptive or disorderly conduct in a "restricted buildings or grounds." A

"restricted building or grounds" is a "posted, cordoned off, or otherwise restricted area…where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B). At the time the defendant entered the U.S. Capitol on January 6, 2021, the Vice President, who was protected by the Secret Service, was present. Defendant's conduct accordingly falls within the Section 1752's plain sweep because he unlawfully entered a restricted building while the Vice President was "temporarily visiting," as alleged in the indictment.

### A. The Vice President can "temporarily visit" the U.S. Capitol

Contrary to Section 1752's plain terms, purpose, and structure, Kevin Seefried argues that Vice President Pence could not have "temporarily visited" the U.S. Capitol on January 6, 2021, because he had an office there on that day. He is wrong. In *United States v. Griffin,* 21-cr-92 (D.D.C. Mar. 22, 2022), this Court denied a motion for judgment of acquittal where a defendant claimed that the Vice President was not temporarily visiting the Capitol on January 6, 2021.  And three other judges in this district have now concluded that the Vice President was temporarily visiting the Capitol that day.  *See Puma*, 2022 WL 823079, at *16-*19 (Friedman, J.); *Andries*, 2022 WL 768684, at *16-*17 (Contreras, J.); *McHugh*, 2022 WL 296304, at *20-*22 (Bates, J.).

The "ordinary meaning" of "temporarily visit" unambiguously includes a trip to one's office.  *Andries*, 2022 WL 768684, at *16 (it is "quite natural to say that a person 'temporarily visits' a place where she has an office.").  The term "temporary" means "[l]asting for a time only; existing or continuing for a limited time; transitory."  *Temporary*, Black's Law Dictionary (11th ed. 2019). The verb "visit" means, *inter alia,* "to go see or stay at (a place) for a particular purpose (such as business or sightseeing)" or "to go or come officially to inspect or oversee."  *See* https://www.merriam-webster.com/dictionary/visit.  Putting these definitions together, "someone is 'temporarily visiting' a location if they have gone there for a particular purpose, be it 'business, pleasure, or sight-seeing,' and for a limited time, which could be 'brief' or 'extended' while

nonetheless remaining 'temporary.'"  *McHugh*, 2022 WL 296304, at \*20.  People commonly go to their offices for one particular purpose (business), and for a limited time, often returning home at the end of the day.  They may return the following day, but there is no reason why one cannot repeatedly "temporarily visit" the same location.  One can "temporarily visit" a place where one has an office.

Vice President Pence was physically present at the U.S. Capitol for a particular purpose: he presided over Congress's certification of the 2020 Presidential Election, first in the joint session, and then in the Senate chamber. While not specifically alleged in the indictment, two other Secret Service protectees (members of the Vice President's immediate family), also came to the U.S. Capitol that day for a particular purpose: to observe these proceedings. Furthermore, as President of the Senate, Vice President Pence oversaw the vote certification. Given the presence of the Vice President (and his family members), the U.S. Capitol plainly qualified as a building where "[a] person protected by the Secret Service [was] … temporarily visiting." 18 U.S.C. § 1752(c)(1)(B).

Kevin Seefried emphasizes Section 1752's use of the term "temporarily" and cites cases where either the President or Vice President were "traveling *outside* of the District of Columbia 'visiting' that area for a 'temporary' purpose." Section 1752, however, does not impose a requirement that the location being temporarily visited be outside of the District of Columbia. Second, the visit to the U.S. Capitol *was* temporary: Vice President Pence (and his family) had traveled to the U.S. Capitol to oversee and attend the Joint Session of Congress, a proceeding of limited duration. At the close of the proceeding, they left, confirming the "temporary" nature of their visit. *See McHugh*, 2022 WL 296304, at \*20-21 (citing various dictionary definitions of "temporary" as "for a limited time" and finding that the Vice President can "temporarily visit" the U.S. Capitol).

Kevin Seefried offers two further observations, both irrelevant. First, he notes that Vice President Pence "lived and worked" in the District of Columbia. (ECF No. 59, at 24). But Section 1752(c)(1)(B) defines the restricted area by reference to "buildings or grounds," not municipal borders. That Vice President Pence lived and worked in Washington, D.C. does not detract from the fact that he "temporarily visit[ed]" the U.S. Capitol on January 6. "Simply being in the visitor's hometown does not mean a place cannot be 'visited.'" *McHugh*, 2022 WL 296304, at *22. Second, Kevin Seefried stresses that Vice President Pence had a permanent U.S. Capitol office. (ECF No. 59, at 24). Section 1752(c)(1)(B), however, defines the restricted area by reference to the location of the protectee, not his office. When Vice President Pence traveled to the U.S. Capitol on January 6 to oversee the Joint Session of Congress, he was "visiting" the building. And because Vice President Pence intended to leave at the close of the session, this visit was "temporar[y]." Moreover, the U.S. Capitol is not the Vice President's regular workplace; even if "there is some carveout in § 1752 for where a protectee normally lives or works, it does not apply to Vice President Pence's trip to the Capitol on January 6, 2021." *McHugh*, 2022 WL 296304, at *22.

Such a "carveout," taken to its logical end, would undermine the government's ability to protect the President and Vice President by deterring and punishing individuals who seek unauthorized access to the President's or Vice President's location. It would restrict Section 1752(c)(1)(B)'s application to only locations outside the District of Columbia—on the view that any visit by the President or Vice President to a location within municipal limits cannot be "temporary" because they reside in the District of Columbia. Second, under the defendant's construction, Section 1752(c)(1)(B) would not apply where the President or Vice President temporarily stayed at their permanent residences in Delaware or California—on the view that such a trip would not qualify as "visiting." Nor would it apply to Camp David, where there is a presidential cabin and office. In another strange scenario, a restricted area could exist when, as

here, the Vice President's family visits the Capitol (because they are Secret Service protectees without an office there), but not when the Vice President does, affording a higher level of protection for the family of the elected official than to the elected official himself (or herself). No support exists for the defendant's effort to insert such large and irrational exceptions into the statute's sweep. *See Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020) (courts will avoid a "statutory outcome … if it defies rationality by rendering a statute nonsensical").

The defendant's position also defies Section 1752's clear purpose. In drafting Section 1752, Congress sought to protect "not merely the safety of one man, but also the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world." *United States v. Caputo*, 201 F. Supp. 3d 65, 70 (D.D.C. 2016) (quoting *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984)). To that end, the statute comprehensively deters and punishes individuals who seek unauthorized access to the White House grounds and the Vice President's residence—fixed locations where the President and Vice President live and work, 18 U.S.C. 1752(c)(1)(A); and also any other "building or grounds" where they (or other protectees) happen to be "temporarily visiting," 18 U.S.C. 1752(c)(1)(B). Reading Sections 1752(c)(1)(A) and 1752(c)(1)(B) together protects the President and Vice President in their official homes and wherever else they go. Interpreting the statute as the defendant suggests would create a gap in Section 1752's coverage by removing areas, such as the U.S. Capitol, from protection. It could expose the leaders of the Executive Branch even as they perform their official duties. That gap is both illogical and contrary to the statutory history of Section 1752, where, "at every turn," Congress has "*broadened* the scope of the statute and the potential for liability." *Griffin,* 2021 WL 2778557, at *5 (D.D.C. July 2, 2021).

All the relevant metrics – plain language, statutory structure, and congressional purpose – foreclose the defendant's crabbed reading of Section 1752(c)(1)(B). This Court should reject it. The defendant's cited cases, involving either an arrest or conviction under Section 1752, do not discuss the "temporarily visiting" language. Mot. at 29–30 (citing *United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005); *United States v. Junot,* 1990 WL 66533 (9th Cir. May 18, 1990) (unpublished); *Blair v. City of Evansville, Ind.,* 361 F. Supp.2d 846 (S.D. Ind. 2005)).

### B. 18 U.S.C. § 1752 does not require the government to prove that the restricted area was restricted at the Secret Service's direction.

Kevin Seefried also argues that because the Capitol Police, not the Secret Service, barricaded the area around the Capitol, he should not be charged with violating 18 U.S.C. § 1752(a)(1) and (2). Courts in this district have rightly rejected this contention. *See Griffin*, 2021 WL 2778557; *Mostofsky*, 2021 WL 6049891, at *12–*13, *Nordean,* 2021 WL 6134595, at *18; *McHugh,* 21-cr-453, ECF No. 51, at 38–40.

Subsection 1752(c) defines the phrase "restricted buildings or grounds" as

> any posted, cordoned off, or otherwise restricted area—
>
>> of the White House or its grounds, or the Vice President's official residence or its grounds;
>>
>> of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
>>
>> of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

18 U.S.C. § 1752(c)(1). It then defines the term "other person protected by the Secret Service" as "any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection." 18 U.S.C. § 1752(c)(2).

By its plain terms, then, Section 1752 prohibits the unlawful entry into a restricted or otherwise cordoned off area where "a person protected by the Secret Service is or will be temporarily visiting." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd* 831 F. App'x 513 (D.C. Cir. 2021). Section 1752, in other words, "focuses on perpetrators who knowingly enter a restricted area around a protectee, not on how it is restricted or who does the restricting." *Griffin*, 2021 WL 2778557, at *6.  That straightforward analysis has a straightforward application here: a protected person (the Vice President) was present inside the Capitol building or on the Capitol grounds, and that some portion of the Capitol building and grounds was posted, cordoned off, or otherwise restricted, making it a "restricted building or grounds" under § 1752(c)(1).  By engaging in prohibited conduct on those premises, the defendant violated 18 U.S.C. § 1752.

The defendant nonetheless urges the Court to import an extra-textual requirement that the Secret Service be required to designate the restricted area. That is so, the defendant claims, because it is the Secret Service who protects the President and others, so it is the Secret Service who must make the designation of a restricted area. That theory, in addition to finding no support in the text, fails for another obvious reason:  Section 1752 is directed not at the Secret Service, but at ensuring the protection of the President and the office of the Presidency. *See* S. Rep. 91-1252 (1970); *see also* Elizabeth Craig, *Protecting the President from Protest: Using the Secret Service's Zone of Protection to Prosecute Protesters*, 9 J. Gender Race & Just. 665, 668–69 (2006). "Indeed, the only reference in the statute to the Secret Service is to its protectees. Section 1752 says nothing about who must do the restricting." *Griffin*, 2021 WL 2778557, at *7; *see also Mostofsky*, 2021 WL 6049891 at *13 ("The text plainly does not require that the Secret Service be the entity to restrict or cordon off a particular area."). "If Congress intended a statute designed to safeguard the President and other Secret Service protectees to hinge on who outlined the safety perimeter around

the principal, surely it would have said so." *Griffin,* 2021 WL 2778557, at *6. Seefried's reading would have the Court create a "potentially massive procedural loophole" from the statute's "silence." *McHugh,* 21-cr-453, ECF No. 51, at 40. The Court should not do so.

The statute's history also undercuts the defendant's argument. *See Griffin,* 2021 WL 2778557, at *4–*5 (explaining how Congress has consistently "*broadened* the scope of the statute and the potential for liability"). While the earlier version of Section 1752 also did not say who must restrict a building or grounds, it did incorporate regulations promulgated by the Department of the Treasury (which at the time housed the Secret Service) governing restricted areas. *Id*. Seefried erroneously conflates the Treasury's Department's authority to promulgate certain regulations with a requirement that the Secret Service cordon off areas.  Even so, Congress subsequently struck subsection (d) and did not replace it with language limiting the law enforcement agencies allowed to designate a restricted area. Pub. L. 109-177, Title VI, Sec. 602, 120 Stat. 192 (Mar. 9, 2006). By eliminating reference to the Treasury Department (without replacing it with the Department of Homeland Security, which currently houses the Secret Service) indicates that the statute no longer depends (if it ever did) on whether the Secret Service has defined an area as "restricted."[7] Moreover, Seefried's reading of the statute, which would require the Secret Service to "cordon off" a private residence, "no matter how secure the location or how imposing the preexisting walls," leads to "pressing absurdities." *Griffin*, 2021 WL 2778557 at *6.

## III.    The Indictment Satisfies the Notice and Presentment Requirements

Finally, Kevin Seefried asserts that the indictment is deficient because it "lacks *any* specifics regarding the alleged acts or circumstances and contains only conclusory allegations." Once again, Seefried's claim is without merit. An indictment is sufficient if it contains the elements

of the charged offense and enough detail to allow a defendant to prepare a defense and invoke the Double Jeopardy Clause if necessary. *Hamling v. United States*, 418 U.S. 87, 117–19 (1974); *United States v. Resendiz-Ponce*, 549 U.S. 102, 108–10 (2007); *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) ("the validity of an indictment is not a question of whether it could have been more definite and certain. Rather, to be sufficient, an indictment need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense.") (cleaned up).

"[B]y using the statutory language and specifying the time and place of the offense," an indictment provides both "fair notice" and protection against future prosecution. *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[N]either the Constitution, the Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the defendant on notice as to every detail considered by the grand jury. Further, indictments 'must be read to include facts which are necessarily implied by the specific allegations made.'" *United States v. Cisneros*, 26 F. Supp. 2d 24, 46 (D.D.C. 1998) (quoting *United States v. Silverman*, 430 F.2d 106, 111–12 (2d Cir. 1970)).

Following his citations to general Fifth Amendment and due process principles, Seefried's only authority for his attack on the format of the indictment is *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999). But *Du Bo* is inapposite because, there, the indictment failed to allege all elements of the offense. *Id.* at 1179–80 (concluding Hobbs Act charge was fatally flawed where it failed to "properly allege an offense"). In this case, there is no reason to examine what facts the grand jury received, or what facts could have been added to the indictment, because the indictment properly alleges all elements of the charges. Moreover, the charging instruments and disclosures in this case – which Kevin Seefried acknowledges in a footnote – make clear what Seefried is charged with doing, which explains why he did not seek a bill of particulars. Nothing further need

be included. Seefried criticizes the January 6 indictments as "assembly-line," but those commonalities result from the fact that the District suffered an unprecedented number of similar crimes during the unlawful assault on the Capitol. It is no sign of insufficiency. Seefried's motion to dismiss fails.

## **CONCLUSION**

For the foregoing reasons, and any additional reasons as may be cited at a hearing on this motion, the government respectfully requests that the defendants' motion be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ *Brittany L. Reed*
BRITTANY L. REED
Assistant United States Attorney, Detailee
Louisiana Bar No. 31299
650 Poydras Street, Ste. 1600
New Orleans, Louisiana 70130
Brittany.Reed2@usdoj.gov
(504) 680-3031

/s/ *Benet J. Kearney*
BENET J. KEARNEY
Assistant United States Attorney, Detailee
New York Bar No. 4774048
1 Saint Andrew's Plaza
New York, New York 10007
Benet.Kearney@usdoj.gov
(212) 637- 2260