1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA

2
      * * * * * * * * * * * * * * *   )
3     UNITED STATES OF AMERICA,       )      Criminal Action
                                      )      No. 21-00287
4                    Plaintiff,       )
                                      )
5        vs.                          )
                                      )
6     KEVIN SEEFRIED and              )      Washington, D.C.
      HUNTER SEEFRIED,                )      June 13, 2022
7                                     )      9:40 a.m.
                     Defendants.      )
8     * * * * * * * * * * * * * * *   )

9

10              TRANSCRIPT OF BENCH TRIAL - DAY 1
            BEFORE THE HONORABLE TREVOR N. McFADDEN,
11                 UNITED STATES DISTRICT JUDGE

12

13    APPEARANCES:

14    FOR THE GOVERNMENT:      BRITTANY L. REED, ESQ.
                               UNITED STATES ATTORNEY'S OFFICE
15                             650 Poydras Street
                               Suite 1600
16                             New Orleans, Louisiana 70130

17                             BENET KEARNEY, ESQ.
                               UNITED STATES ATTORNEY'S OFFICE
18                             One Saint Andrew's Plaza
                               New York, New York 0007

19

20    FOR THE DEFENDANT        EUGENE OHM, ESQ.
         KEVIN SEEFRIED:       ELIZABETH A. MULLIN, ESQ.
21                             OFFICE OF THE FEDERAL PUBLIC
                                  DEFENDER
22                             625 Indiana Avenue, Northwest
                               Suite 550
23                             Washington, D.C. 20004

24

25

APPEARANCES, CONT'D:

FOR THE DEFENDANT          EDSON BOSTIC, ESQ.
  HUNTER SEEFRIED:         THE BOSTIC LAW FIRM
                           1700 Market Street
                           Suite 1005
                           Philadelphia, Pennsylvania 19103


REPORTED BY:               LISA EDWARDS, RDR, CRR
                           Official Court Reporter
                           United States District Court for the
                             District of Columbia
                           333 Constitution Avenue, Northwest
                           Room 6706
                           Washington, D.C. 20001
                           (202) 354-3269

```
 1                            I N D E X

 2

 3                                   Direct      Cross       Red.

 4

     WITNESSES FOR THE GOVERNMENT:
 5
     Thomas Loyd                       18          81
 6                                                 82          83
     Eugene Goodman                    84         139
 7                                                185
     Brian Morgan                     200         217         224
 8
     Joseph Lear                      228
 9

10

     EXHIBITS RECEIVED IN EVIDENCE                            PAGE
11
     Government's Exhibit Nos. 422, 423, 704 & 704-A           16
12   Government's Exhibit Nos. 422, 423, 704, 704-A            16
     Government's Exhibit Nos. 601, 601-A, 602,
13     602-A, 603, 603-A, 604, 604-A, 605                      17
     Government's Exhibit No. 706                              18
14   Government's Exhibit No. 701                              20
     Government's Exhibit No. 101                              21
15   Government's Exhibit Nos. 102, 103, 104, 105              22
     Government's Exhibit No. 106                              25
16   Government's Exhibit No. 525                              29
     Government's Exhibit No. 526                              30
17   Government's Exhibit No. 702                              33
     Government's Exhibit Nos. 403, 404, 405,
18     406, 407, 410, 414                                      34
     Government's Exhibit Nos. 403-A, 405-A                    34
19   Government's Exhibit No. 401                              35
     Government's Exhibit No. 524                              37
20   Government's Exhibit Nos. 703, 703-A, 703-B               41
     Government's Exhibit Nos. 501, 502, 503,
21     504, 505, 506                                           54
     Government's Exhibit No. 527                              59
22   Government's Exhibit Nos. 510, 511, 513, 514              70
     Government's Exhibit Nos. 515, 516, 418, 521              71
23   Government's Exhibit Nos. 504-D, 504-E                   109
     Government's Exhibit No. 504-F                           112
24   Government's Exhibit No. 203                             234
     Government's Exhibit Nos. 302-A, 302-B                   235
25
```

1    <u>EXHIBITS RECEIVED IN EVIDENCE</u>                        <u>PAGE</u>

2    Government's Exhibit No. 707                           242
     Government's Exhibit Nos. 204-A, 204-B, 204-C          254
3    Government's Exhibit No. 1                             256

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    THE COURT:  Good morning.

 2                    MR. OHM:  Good morning, your Honor.

 3                    MS. REED:  Good morning.

 4                    THE COURTROOM DEPUTY:  Your Honor, this is

 5     Criminal Case 21-287, the United States of America versus

 6     Kevin Seefried and Hunter Seefried.

 7                    Counsel, please come forward to identify

 8     yourselves for the record, starting with the Government.

 9                    MS. REED:  Good morning, your Honor.  AUSA

10     Brittany Reed and Benet Kearney on behalf of the United

11     States.

12                    THE COURT:  Good morning, ladies.

13                    MR. OHM:  Eugene Ohm along with Elizabeth Mullin

14     on behalf of Kevin Seefried.  Good morning, your Honor.

15                    THE COURT:  Good morning, Mr. Ohm.

16                    Good morning, Ms. Millin.

17                    Good morning, Mr. Seefried.

18                    MR. BOSTIC:  Good morning, your Honor.  Edson

19     Bostic on behalf of Hunter Seefried.

20                    THE COURT:  Good morning, Mr. Bostic.

21                    Good morning, Mr. Hunter Seefried.

22                    Ms. Reed, is the Government ready for trial?

23                    MS. REED:  Yes, your Honor.  The Government is

24     ready to proceed.

25                    THE COURT:  Mr. Ohm, are you ready for trial?
```

```
 1              MR. OHM:  Yes, your Honor, with one caveat:  We
 2    did ask the Government to make available a Capitol Police
 3    officer that apparently the Government has not heard back
 4    from the General Counsel's office.  But my understanding is
 5    that office policy is that that shouldn't be an issue.  But
 6    I did want to let the Court know that that's still out
 7    there.
 8              THE COURT:  My guess is this would probably be --
 9    you wouldn't probably wouldn't need the witness before
10    tomorrow.
11              MR. OHM:  Correct.
12              THE COURT:  Ms. Reed, do you feel comfortable
13    proceeding?
14              MS. REED:  Yes, your Honor.  I'm working on it as
15    we speak.
16              THE COURT:  Mr. Bostic, are you ready for trial?
17              MR. BOSTIC:  Yes, your Honor.
18              THE COURT:  Ms. Reed, I'll hear your opening
19    statement.
20              MS. REED:  Good morning, your Honor.
21              Your Honor, for the sake of time I know that we
22    submitted a very lengthy and detailed trial memo to you.
23    And --
24              THE COURT:  I appreciate it and I read it.
25              MS. REED:  And unless your Honor has any questions
```

 1    for me at this time, I think that we are ready to proceed

 2    with our first witness, your Honor.

 3              THE COURT:  Great.

 4              Mr. Ohm, do you wish to make an opening statement

 5    at this point?

 6              Ms. Mullin.

 7              I should say in light of the CDC's recent guidance

 8    on COVID, I don't require people to wear a mask in my

 9    courtroom.  Obviously, you're welcome to do so if you wish

10    to.

11              MS. MULLIN:  Thank you, your Honor.  On behalf of

12    Kevin Seefried, I'm Elizabeth Mullin.  We have a brief

13    opening statement.

14              For your Honor's orientation, Mr. Seefried,

15    Mr. Kevin Seefried, is charged with Counts 1 through 5 in

16    the indictment.

17              He is not guilty of Counts 1, 3 and 4 because the

18    evidence will show he did not have the requisite intent for

19    those counts.

20              As a preliminary matter, your Honor, Mr. Seefried

21    does not dispute that he knowingly entered a restricted

22    building, that is, the Capitol, and that he entered with the

23    purpose of parading, demonstrating and picketing for

24    purposes of Counts 2 and 5.

25              But he is not guilty of Counts 1, 3 and 4, and the

1    Court will see that for the following reasons:  As to

2    Count 1, Mr. Seefried lacked the requisite intent for

3    obstruction.

4            On January 6, the evidence will show that

5    Mr. Seefried, his wife, his son, his son's girlfriend

6    traveled together from their home in Delaware to hear the

7    president's speech.

8            Mr. Seefried's purpose that day was to support the

9    departing president.  Once they got there, they couldn't

10   hear the speech so well so they decided to go back to

11   Delaware.

12           As they made their way back to their car, they

13   stopped and got something to eat and continued to make their

14   way back to their car.

15           During that time, they saw that the crowd around

16   the Capitol began to swell.  From their perspective, they

17   saw a protest continuing and decided to join the crowd.  And

18   Hunter and Kevin Seefried specifically walked up to the

19   Capitol Building and went inside.

20           And while it was a mistake, a mistake that Kevin

21   Seefried has regretted ever since, he did not go in because

22   congressmen and -women were counting the votes.  He did not

23   go in in order to stop anyone from certifying the election.

24           It is true that the Seefrieds entered at a time

25   when some of the most notorious of the January 6 characters

1    entered the building.  The Court will see him on video

2    footage in proximity to the Q-Anon shaman, the judge's son

3    who was dressed as a caveman, Dominic Pezzola and a notable

4    man with a Q T-shirt.  But other than happenstance

5    proximity, there is nothing linking Mr. Seefried to these

6    individuals.

7          As for his intent and lack of intent to disrupt

8    the certification of the vote, your Honor, there is no

9    evidence that Mr. Seefried ever said anything on social

10    media that day, during that day or after that day about the

11    electoral count.

12          That Mr. Seefried did not intend to stop the vote

13    count is going to be demonstrated by all of the Government's

14    evidence.  The officers will not testify that Mr. Seefried

15    said anything in particular to any of them about stopping

16    the vote count.  While the officers will testify that

17    protesters that day generally spoke of supporting the

18    police, being there for police and that some people talked

19    about stopping the vote, none of those statements about the

20    vote count will be attributed to Mr. Seefried because he did

21    not say any of those things.

22          Because that wasn't his intent that day, your

23    Honor.  Indeed, he was not even aware that the electoral

24    count was happening or happening in the Capitol.

25          Finally, the Court will know that he did not

1    intend to disrupt the vote count because of his actions.

2    While he did enter the Capitol, CCTV footage shows that he

3    left and made his way back to his car well before violence

4    at the Capitol peaked.

5            Now, the Government has charged Mr. Seefried

6    alternatively on Count 1 with aiding and abetting other

7    people's obstruction.

8            The Government's theory will be that since

9    Mr. Seefried was next to or near others who are talking

10   about the vote count, or near others who were obstructing

11   justice, that he must have been.

12           But your Honor well knows that that is not the law

13   on aiding and abetting.  The Government has to prove more

14   than mere presence.  It has to prove that Mr. Seefried knew

15   the obstruction was going to be committed, that he did

16   something in furtherance of it, that he knowingly did these

17   acts for the purpose of obstructing justice.

18           And finally, as the Court knows, the Government

19   must prove that he specifically intended to disrupt the

20   certification of the vote.

21           The Government will want the Court to speculate

22   and to guess that he had the same intent as others around

23   him that day.  But the evidence will not establish that.

24   And as the Court knows, that simply is not enough to show

25   that he was aiding and abetting other individuals'

1    obstruction.

2             As for Count 3 and 4, for the same reasons, the

3    Government will not be able to establish that he engaged in

4    disorderly and disruptive conduct and that he intended to

5    disrupt governmental business.

6             Now, your Honor, while it may be hard for the

7    Government and the Court and us lawyers to appreciate that

8    Mr. Seefried was not aware of the certification of the vote,

9    or even what it signifies, that's the truth, your Honor.

10   Mr. Seefried completed the ninth grade before leaving school

11   to work.  He has worked his whole life to support his

12   family.  But he's not a Beltway denizen up with the

13   intricacies and news of politics.  He was just like

14   thousands of citizens who came to D.C. on January 6th to

15   come give support to his departing president.

16             Now, Mr. Seefried acknowledges and he regrets that

17   he carried a Confederate flag into the Capitol.  He along

18   with many other rally-goers brought a flag to the Trump

19   rally.  And when he went into the Capitol, he brought it

20   with him.  When he set out for D.C. that morning, he never

21   intended to carry it into the Capitol to send any kind of

22   message.

23             Of course, the flag understandably evokes many

24   emotions in many people.  But whatever you think about him

25   carrying the flag that day, it says nothing about his intent

1      to disrupt the certification of the vote, because he simply

2      didn't have that intent.

3               And although Mr. Seefried made the grave mistake

4      of entering the Capitol, and he acknowledges that, he did

5      not have the requisite intent for Counts 1, 3 and 4, your

6      Honor.  And that is why we submit that after the evidence,

7      the Court will find him not guilty of Counts 1, 3 and 4.

8               THE COURT:  So, Ms. Mullin, am I correct in

9      thinking you're not -- you don't really anticipate

10     contesting any of the facts that the Government is showing

11     per se?  He is the person you think the Government is going

12     to show in the video, all of these different things?

13              MS. MULLIN:  Yes, your Honor.  We don't dispute

14     that he is the one that is depicted in the Government's

15     exhibits and he entered the Capitol.  And so it really boils

16     down to whether the Government has sufficient evidence as to

17     his intent for Count 1, 3 and 4.  He doesn't dispute Counts

18     2 and 5, your Honor.

19              THE COURT:  Understood.  Thank you, ma'am.

20              Mr. Bostic, do you wish to make an opening

21     statement at this point?

22              MR. BOSTIC:  Thank you, your Honor.

23              Good morning, your Honor, counsel for the

24     Government, counsel for Kevin Seefried:  My remarks, like

25     co-counsel, will be brief.

1          I believe that there are certain points, however,

2     that I'd like the Court to consider as the evidence is

3     entered in this case.

4          We agree that the evidence will show that Hunter

5     was merely 22 years old at the time of these events and that

6     he initially had no desire or intent to go to the Capitol on

7     January 6th, 2021.

8          Your Honor learned that Hunter is not affiliated

9     with any group and that he came to the Capitol with his

10    father, mother, girlfriend at his father's suggestion.  He

11    lives with them.  He lived with them then and continues to

12    live with his parents now.

13         Second, while the evidence will show that Hunter

14    entered the Capitol Building and he remained there for about

15    25, 30 minutes, the evidence will also show that he had no

16    physical contact or harsh words with any officers or law

17    enforcement.  It will show that he did not threaten anyone.

18    And in fact, we expect the evidence will also show that from

19    law enforcement's perspective and the officers' present in

20    the Capitol Building as the events unfolded, he was not

21    considered as a person of concern.

22         Third, this Court will learn of Hunter's good

23    character for being a peaceful, law-abiding individual who

24    left school in ninth grade and has been gainfully employed

25    ever since.

1          We believe that at the end of the trial the

2     evidence will not support most of the charges brought by the

3     Government.  Particularly, the evidence will not support

4     that Hunter attempted to or had the intent to obstruct or

5     impede an official proceeding, the counting of the Electoral

6     College votes.

7          It will show that he did not act corruptly in any

8     of his actions that day.  Stupidly, perhaps, in terms of the

9     excitement of a young individual, but not corruptly nor with

10    any intent to block the certification of the vote.

11         Neither will the evidence show that he aided or

12    abetted any individual in actions taken by others.

13         In fact, I believe the evidence will show that

14    Hunter was not even aware that the electoral -- the

15    certification of the Electoral College votes were being held

16    in the Capitol Building on that day.

17         As noted before, Hunter has only a ninth grade

18    education.  And I believe the evidence will show that he was

19    not until recent to those events even concerned about

20    politics.

21         Your Honor, at the end of the case, we'll ask the

22    Court to find Hunter Seefried not guilty of many of these

23    charges, which I'll outline at that time.  But particularly,

24    not guilty of obstruction of an official proceeding.

25         Thank you, your Honor.

```
1              THE COURT:  So, Mr. Bostic, I guess the same
2     question for you.  You didn't say anything about the broken
3     window.  I completely understand if you just don't want to
4     take a position on that right now.  But it would help me if
5     you are saying, yes, he is who the Government says he is in
6     the videos --
7              MR. BOSTIC:  Your Honor, we will not contest the
8     evidence as to Hunter Seefried's contact with the window.
9     The question, I believe, for the Court will be at the end of
10    the Government's case to what extent his removal of a shard
11    of glass from a window would constitute destruction of
12    property that had already been destroyed by all counts.
13             THE COURT:  I see.  That's helpful.  Thank you,
14    Mr. Bostic.
15             MR. BOSTIC:  Thank you, your Honor.
16             THE COURT:  Ms. Reed, if you could call your first
17    witness.
18             MS. KEARNEY:  Thank you, your Honor.  The
19    Government's first witness will be United States Capitol
20    Police Inspector Thomas Loyd.
21             Before we call Inspector Loyd, as outlined in our
22    trial memo, I just wanted to offer some stipulations to the
23    Court on those exhibits.
24             THE COURT:  Okay.
25             MS. KEARNEY:  First, Government's Exhibit 704
```

1    concerns the testimony of Lanelle Hawa, the United States

2    Secret Service inspector who testified before your Honor in

3    the *United States v. Griffin* trial.  The parties have agreed

4    that the transcript of her testimony and the accompanying

5    exhibits will be admitted into evidence.  The transcript of

6    her testimony is Government's Exhibit 704 and the exhibits

7    that accompany that are Government's Exhibits 422 and 423.

8    So at this time, the Government offers Exhibit 704, 704-A,

9    422 and 423.

10                THE COURT:  Mr. Ohm, no objection to any of that,

11   I take it?

12                MR. OHM:  Correct, your Honor.

13                THE COURT:  And Mr. Bostic?

14                MR. BOSTIC:  That's correct.  No objection.

15                (Whereupon, Government's Exhibit Nos. 422, 423,

16   704 and 704-A were entered into evidence.)

17                THE COURT:  I just want to say, I appreciate all

18   of the attorneys working to streamline this.

19                MS. KEARNEY:  Thank you, your Honor.

20                THE COURT:  I think it does make a lot of sense in

21   this case.

22                MS. KEARNEY:  And along the same lines, your

23   Honor, the Government pursuant to stipulation of the parties

24   offers the testimony of Daniel Schwager, who previously

25   testified before your Honor in the *United States versus*

1    *Hale-Cusanelli* trial.  That stipulation is Government's

2    Exhibit 705 and the transcript of his testimony is 705-A.

3    The accompanying exhibits are Government's Exhibit 601, 602,

4    602-A, 603, 603-A, 604, 604-A, and the Government moves --

5    and 605.  And the Government offers those at this time.

6              THE COURT:  Did you say 601-A?

7              MS. KEARNEY:  601.

8              THE COURT:  But not 601-A?  I guess it's the

9    Constitution.  I don't know if that's --

10             MS. KEARNEY:  Yes.  601-A as well, your Honor.

11             THE COURT:  So 601, 601-A, 602, 602-A, 603, 603-A,

12   604 and 604-A.

13             Any objection to --

14             MS. KEARNEY:  And 605, your Honor.  Yes.  605.

15             THE COURT:  Any objection to any of that, Mr. Ohm?

16             MR. OHM:  No, your Honor.

17             THE COURT:  And Mr. Bostic?

18             MR. BOSTIC:  No, your Honor.

19             THE COURT:  Thanks.  All of these are admitted.

20             (Whereupon, Government's Exhibit Nos. 601, 601-A,

21   602, 602-A, 603, 603-A, 604, 604-A and 605 were entered into

22   evidence.)

23             MS. KEARNEY:  Thank you.

24             Lastly, the parties have reached a stipulation

25   which regards Government's Exhibit 605 that's already been

```
 1      offered and entered.  That is a stipulation regarding the

 2      authenticity of the film clips featured in Government's

 3      Exhibit 605.

 4              The stipulation is Government's Exhibit 706, and

 5      the Government offers that exhibit.

 6              THE COURT:  Without objection, 706 is in as well.

 7              (Whereupon, Government's Exhibit No. 706 was

 8      entered into evidence.)

 9              MS. KEARNEY:  Thank you, your Honor.

10              And the Government calls Inspector Thomas Loyd.

11              (Thereupon, the witness entered the courtroom and

12      the following proceedings were had:)

13              THE COURT:  If you could just come up here,

14      Inspector.

15              THOMAS LOYD, GOVERNMENT WITNESS, SWORN.

16              THE COURT:  Good morning, sir.

17              THE WITNESS:  Good morning.

18                          DIRECT EXAMINATION

19      BY MS. KEARNEY:

20      Q.  Good morning, Inspector.

21      A.  Good morning.

22      Q.  Can you please state and spell your name.

23      A.  Inspector Thomas Loyd.  The last name is spelled

24      L-O-Y-D.

25      Q.  And where do you work?
```

1    A.  United States Capitol Police.

2    Q.  What's your title?

3    A.  Inspector.

4    Q.  How long have you worked at the United States Capitol

5    Police?

6    A.  32 years.

7    Q.  What are your general responsibilities both as a member

8    of the United States Capitol Police and as an inspector?

9    A.  My current assignment is I'm assigned to the Capitol

10   division.  I'm responsible for the safety and security of

11   the Capitol Building, the Capitol Visitors Center and the

12   Capitol Square.

13   Q.  Where in the hierarchy is an inspector?

14   A.  You have sergeant, lieutenant, captain, inspector,

15   deputy chief, assistant chief and chief.

16   Q.  And approximately how many inspectors are there in the

17   Capitol Police?

18   A.  We have allocation for nine.

19          THE COURT:  And there are police officers below

20   all that?

21          THE WITNESS:  Yes.  I have three captains assigned

22   to me, 30-some sergeants and probably eight lieutenants.

23   BY MS. KEARNEY:

24   Q.  And do you actually work at the United States Capitol?

25   A.  Yes.

1    Q.  And where is that located?

2    A.  No. 1 First Street Northwest.

3    Q.  And that's in Washington, D.C.?

4    A.  Yes.

5            MS. KEARNEY:  Your Honor, the Government and the

6    parties have reached a stipulation of Government's Exhibit

7    701 regarding a description of the Capitol grounds and

8    building.  And the Government offers that exhibit at this

9    time.

10           THE COURT:  Okay.

11           MS. KEARNEY:  That's Exhibit 701.

12           MR. OHM:  Without objection, your Honor.

13           MR. BOSTIC:  No objection, your Honor.

14           THE COURT:  Without objection, 701 is in.

15           (Whereupon, Government's Exhibit No. 701 was

16    entered into evidence.)

17   BY MS. KEARNEY:

18   Q.  Inspector Loyd --

19           MS. KEARNEY:  Mr. Leach, could you pull up

20   Government's Exhibit 101.

21   BY MS. KEARNEY:

22   Q.  Inspector Loyd, what does this exhibit depict?

23   A.  It's a picture of the Capitol grounds.  The yellow

24   surrounding it is the bike rack that was in place on January

25   6th.

 1    Q.  And is that a fair and accurate representation of the

 2    Capitol Building and the surrounding area?

 3    A.  Yes.

 4            MS. KEARNEY:  The Government offers Exhibit 101.

 5            MR. OHM:  No objection for Kevin Seefried.

 6            MR. BOSTIC:  No objection, your Honor.

 7            THE COURT:  Without objection, 101 is in.

 8            (Whereupon, Government's Exhibit No. 101 was

 9    entered into evidence.)

10    BY MS. KEARNEY:

11    Q.  Inspector Loyd, can you show us on Government's Exhibit

12    101, where is the Capitol Building?

13    A.  Yeah.  The Capitol Building is right in the middle.  You

14    have the Senate to the north and the House to the south.

15    The west front is to the left and the east front is to the

16    right.

17    Q.  And based on your employment with the United States

18    Capitol Police, are you familiar with the interior layout of

19    the Capitol Building?

20    A.  Yes.

21            MS. KEARNEY:  Mr. Leach, could you pull up

22    Government's Exhibit 102, then 103, 104 and 105.

23    BY MS. KEARNEY:

24    Q.  Inspector Loyd, did you review these exhibits prior to

25    your testimony today?

```
1    A.  Yes.

2              MS. KEARNEY:  103, Mr. Leach.

3    BY MS. KEARNEY:

4    Q.  Are these exhibits fair and accurate representations of

5    the floor plan of the United States Capitol Building?

6    A.  Yes.

7              MS. KEARNEY:  The Government offers Exhibits 102,

8    103, 104 and 105.

9              MS. MULLIN:  No objection, your Honor.

10             MR. BOSTIC:  No objection, your Honor.

11             THE COURT:  Without objection, 102, 103, 104 and

12   105 are in.

13             (Whereupon, Government's Exhibit Nos. 102, 103,

14   104 and 105 were entered into evidence.)

15   BY MS. KEARNEY:

16   Q.  Let's talk about the security measures that are in place

17   at the Capitol Building and grounds.

18             As a general matter, is the Capitol Building

19   secured 24 hours a day by the Capitol Police?

20   A.  Yes.

21   Q.  And what about the grounds surrounding that building?

22   A.  Currently, the grounds are open.  We close them on

23   occasion depending on demonstration activity.

24   Q.  And let's talk about the measures that were in effect on

25   January 6th, 2021.
```

1          On January 6th, 2021, was the Capitol Building

2     open to the public?

3     A.   No, it was not.

4     Q.   What about the Capitol grounds?

5     A.   The Capitol grounds, it was completely closed.  The

6     square, the Capitol Square, was completely closed on the

7     west side.  On the east side around the plaza was closed

8     also with bike racks.

9          MS. KEARNEY:  Mr. Leach, could you pull up

10    Government's Exhibit 101, please.

11    BY MS. KEARNEY:

12    Q.   When you say the grounds were closed on the west side,

13    where were they closed?

14    A.   Yes.  You have First Street Northwest and Southwest with

15    Garfield Circle and Peace Circle.  It goes up Constitution

16    Avenue.  You go up Independence Avenue and it goes around

17    the east plaza.  Everything yellow was closed.

18    Q.   Were there any physical barriers, like fences or

19    barricades, erected around the Capitol grounds on that date?

20    A.   Yes.  On that particular day, everything yellow was bike

21    racks.  There was also a layer of snow fence on the west

22    front that was segregating the inauguration stage.

23    Q.   What is snow fencing?

24    A.   Snow fencing is a green plastic netting type.  It was

25    used up until January 6th to segregate certain areas on

 1    Capitol grounds.

 2              But after January 6th, we don't use that anymore.

 3    We use only bike rack.

 4    Q.  And when was the snow fencing put in place?

 5    A.  It was put in in late 2020, when the construction of the

 6    inauguration stage was started.

 7    Q.  When were the bike racks installed?

 8    A.  On the east side, the bike racks were installed in the

 9    summer of 2010 when the Black Lives Matter protest started

10    coming up.  On the west side, it was completely enclosed on

11    January 5th, late on Jane 5th.

12    Q.  And why on January 5th were those bike racks put up?

13    A.  I believe there was some concern at headquarters that

14    things -- that additional security measures were needed to

15    reinforce the snow fence on the west side.

16    Q.  You mentioned inauguration construction.

17              MS. KEARNEY:  Mr. Leach, could you show

18    Government's Exhibit 106.

19    BY MS. KEARNEY:

20    Q.  When is this a rendering of?

21    A.  It's the United States Capitol Building with the

22    addition of the inauguration stage on the west front.

23    Q.  Is that a fair and accurate depiction of how it appeared

24    on January 6th, 2021?

25    A.  Yes.

```
1                  MS. KEARNEY:  The Government offers Exhibit 106.

2                  THE COURT:  Ms. Mullin?

3                  MS. MULLIN:  No objection.

4                  MR. BOSTIC:  No objection, your Honor.

5                  THE COURT:  Without objection, 106 is in.

6                  (Whereupon, Government's Exhibit No. 106 was

7       entered into evidence.)

8       BY MS. KEARNEY:

9       Q.  Can you point out where north is on Government's Exhibit

10      106 and where south is?

11      A.  Yes.  North would be on the Senate side over here and

12      south would be on the House side over here.

13      Q.  So the Senate side is on the left?

14      A.  Yes.

15      Q.  And the House side is on the right?

16      A.  That's correct.

17      Q.  You said there were some concerns on January 5th about

18      events that might be occurring.  What events were scheduled

19      to occur around the Capitol on January 6th, 2021?

20      A.  That was the presidential ballot process.

21      Q.  And did that include a visit by the vice president?

22      A.  That's correct.

23      Q.  Were there any other events scheduled in D.C. on that

24      date?

25      A.  You had a MAGA rally down on the other end of the Mall,
```

1    down by the White House.

2    Q.  What do you mean by MAGA rally?

3    A.  Make America Great Again with the current president at

4    the time, Mr. Trump.

5    Q.  So let's talk about -- you said the certification of the

6    ballots.  Was Vice President Pence scheduled to visit the

7    Capitol on January 6th?

8    A.  Yes.

9    Q.  And how do you know that?

10   A.  I have a five-Secret Service agent team that's assigned

11   to the Capitol, and they coordinate with me on a daily

12   basis.  Any VIP under Secret Service protection, their team

13   liaisons with myself and my team to make sure the arrival,

14   the visit and the departure go smoothly.  And so I

15   coordinate with Paul Wade, the lead agent from the Secret

16   Service team.

17   Q.  Paul Wade was your contact?

18   A.  Yes.

19   Q.  Have you coordinated with Paul Wade on other visits to

20   the Capitol?

21   A.  Yes.

22   Q.  Was Paul Wade aware of where the fencing was on January

23   6th --

24   A.  Yes.

25   Q.  -- 2021?

1    A.  Yes.

2    Q.  In connection with other visits, has the Capitol Police

3    also erected fencing around the Capitol Building and

4    grounds?

5    A.  I'm sorry?

6    Q.  In connection with other visits, not the January 6th,

7    2021, visit, by Secret Service protectees, has the Capitol

8    Police also erected fencing and other barriers around the

9    Capitol grounds?

10   A.  Yes.

11   Q.  And was Mr. Wade aware of where those fencing barriers

12   were?

13   A.  Yes.

14   Q.  Did you coordinate with Mr. Wade and notify him about

15   where those would be?

16   A.  Yes.

17            MS. KEARNEY:  Let's pull up Government's

18   Exhibit -- sorry.

19   BY MS. KEARNEY:

20   Q.  Did Mike Pence visit the Capitol that day?

21   A.  Yes, he did.

22   Q.  Approximately what time did he arrive?

23   A.  Between 12:30 and 12:40.

24            MS. KEARNEY:  Let's pull up Government's Exhibit

25   101 again, please.

1     BY MS. KEARNEY:

2     Q.   I think you already mentioned what the yellow line on

3     this exhibit represents.   Could you just describe what that

4     is?

5     A.   Yeah.   The yellow line is the bike rack.   If you start

6     up here in this corner, if you go across the east plaza, you

7     can see the paved area.   That's the east plaza.   You go

8     south to Independence Avenue and you go down the hill to

9     First Street Southwest, Garfield Circle Southwest, over the

10    Peace Circle, Northwest and First and Constitution Avenue

11    Northwest.   And then it went up Constitution Avenue.

12    Q.   Now, you mentioned that the Capitol Building was closed

13    to the public on January 6th, 2021.

14    A.   Yes.

15    Q.   If someone -- if a member of the public had wanted to

16    visit the building, what would they need to do?

17    A.   They would need to be personally invited by somebody who

18    works in the building.

19    Q.   And if they had been, would they need to go through any

20    screening or other security measures to enter?

21    A.   Yes.

22    Q.   What would those be?

23    A.   They would have to walk through a magnetometer to check

24    their purse and for weapons.   If they have any bags with

25    them, we would search the bags.

```
 1   Q.  Were you on duty on January 6th, 2021?

 2   A.  Yes.

 3   Q.  What time did you start?

 4   A.  Around 7:30 in the morning.

 5   Q.  Was that your scheduled shift?

 6   A.  Yes.

 7           MS. KEARNEY:  Mr. Leach, could you pull up

 8   Government's Exhibit 525, please.

 9           I'm going to try to clear this, the markings.

10   BY MS. KEARNEY:

11   Q.  Inspector, is this a fair and accurate representation of

12   what the Capitol looked like on the morning of January 6th,

13   2021?

14   A.  Yes.

15           MS. KEARNEY:  The Government offers Exhibit 525.

16           MS. MULLIN:  No objection.

17           MR. BOSTIC:  No objection, your Honor.

18           THE COURT:  Without objection, 525 is in.

19           (Whereupon, Government's Exhibit No. 525 was

20   entered into evidence.)

21   BY MS. KEARNEY:

22   Q.  Which side of the building is this?

23   A.  This is the west side of the building.

24   Q.  And so this structure below the dome in the middle, is

25   that the inaugural stage?
```

1   A.  Yes.

2   Q.  Can you describe what security measures are visible in

3   this photo?

4   A.  You can see the green fence -- green netting, snow

5   fence, at the bottom.  That would correspond with the

6   Olmsted wall.  And you have another line of green snow fence

7   that goes through the middle of the center section of the

8   east front with signs telling people they're not permitted

9   in that area.

10  Q.  And are you familiar with the signs that the United

11  States Capitol Police uses on those snow fences?

12  A.  Yes.

13          MS. KEARNEY:  Mr. Leach, can you pull up

14  Government's Exhibit 526, please.

15  BY MS. KEARNEY:

16  Q.  Is this a fair and accurate representation of one of

17  those signs?

18  A.  Yes.

19          MS. KEARNEY:  The Government offers Exhibit 526.

20          MS. MULLIN:  No objection.

21          MR. BOSTIC:  No objection.

22          THE COURT:  Without objection, 526 is in.

23          (Whereupon, Government's Exhibit No. 526 was

24  entered into evidence.)

25

BY MS. KEARNEY:

Q.  And is this one of the signs that was posted on January 6, 2021?

A.  Yes.

Q.  Can you just read what's on the sign?

A.  It says:  "Area closed by order of the United States Capitol Police Board."

Q.  Did there come a time on January 6, 2021, when you learned that the security perimeter around the Capitol grounds had been breached?

A.  Yes.

Q.  Approximately when?

A.  12:53.

Q.  How did you learn that?

A.  I heard it on the radio.

Q.  What did you do when you heard that?

A.  I was stationed in the area of the Ohio Clock outside the Senate main door.  When I heard the radio call for the breach, Senator McConnell's office is adjacent to that area and I knew his office had a bird's-eye view of the breach. So I ran in his office, saw the breach, saw it was very bad and then immediately made my way down to the inauguration stage.

Q.  Now, you said you were stationed in the Ohio Clock area right outside the Senate?

```
 1    A.  Yes.

 2    Q.  What were you doing there?

 3    A.  I was waiting to escort the vice president and the

 4    entourage with the ballot process from the Senate chamber

 5    down to the House chamber.

 6    Q.  Does the United States Capitol Police maintain a system

 7    of closed-circuit videocameras?

 8    A.  Yes.

 9    Q.  And are you familiar with that system?

10    A.  Yes.

11    Q.  How are you familiar with it?

12    A.  Just previous investigations, mostly administrative.

13    You have to review videotapes to see what happened.

14    Q.  And are you familiar with the general locations of where

15    the cameras are around the Capitol Building and grounds?

16    A.  Yes.

17    Q.  Do some of the cameras have the ability to pan?

18    A.  Yes.

19    Q.  And does the CCTV system also maintain a timestamp for

20    recorded footage?

21    A.  Yes.

22    Q.  Do the cameras capture audio or just video?

23    A.  Just video.

24    Q.  Why does the Capitol Police have a video system to

25    monitor the building and grounds?
```

1    A.  For security purposes.

2    Q.  In preparation for your testimony, have you reviewed

3    certain footage captured by United States Capitol Police

4    CCTV footage on January 6, 2021?

5    A.  Yes.

6    Q.  Based on your presence at the Capitol on that date and

7    your knowledge of the system, does that footage fairly and

8    accurately depict events that took place at the Capitol

9    Building and grounds on January 6, 2021?

10   A.  Yes.

11            MS. KEARNEY:  Your Honor, the parties have reached

12   another stipulation, which is Government's Exhibit 702.

13   That concerns the closed-circuit video system maintained by

14   the Capitol Police.

15            The Government offers Government's Exhibit 702 at

16   this time.

17            MS. MULLIN:  No objection.

18            MR. BOSTIC:  No objection, your Honor.

19            THE COURT:  Without objection, 702 is in.

20            (Whereupon, Government's Exhibit No. 702 was

21   entered into evidence.)

22            MS. KEARNEY:  Pursuant to that stipulation, the

23   Government offers Exhibits 403, 404, 405, 406, 407, 410,

24   414, and 422, which has already been offered.

25            THE COURT:  Ms. Mullin?

```
 1                MS. MULLIN:  No objection, your Honor.

 2                THE COURT:  Mr. Bostic?

 3                MR. BOSTIC:  No objection, your Honor.

 4                THE COURT:  Without objection, 403, 404, 405, 406,

 5      407, 410 and 414 are admitted.

 6                (Whereupon, Government's Exhibit Nos. 403, 404,

 7      405, 406, 407, 410 and 414 were entered into evidence.)

 8                MS. KEARNEY:  Mr. Leach, could you pull up

 9      Government's Exhibits 403-A and 405-A.

10      BY MS. KEARNEY:

11      Q.  Are these still images from the videos we just

12      discussed?

13      A.  Yes.

14                MS. KEARNEY:  The Government offers 403-A and

15      405-A.

16                MS. MULLIN:  No objection.

17                MR. BOSTIC:  No objection.

18                THE COURT:  Without objection, 403-A and 405-A are

19      in.

20                (Whereupon, Government's Exhibit Nos. 403-A and

21      405-A were entered into evidence.)

22      BY MS. KEARNEY:

23      Q.  Inspector, in preparation for your testimony today, have

24      you also reviewed a video montage prepared by the United

25      States Attorney's Office?
```

1    A.  Yes.

2    Q.  And is that montage made up of portions of video footage

3    from the Capitol Police CCTV cameras on January 6, 2021?

4    A.  Yes.

5              MS. KEARNEY:  The Government offers --

6    BY MS. KEARNEY:

7    Q.  Is that Government's Exhibit 401?

8              MS. KEARNEY:  Mr. Leach, could you pull up the

9    beginning of 401, please.

10             Just play the first few seconds.

11             (Whereupon, segments of Government's Exhibit No.

12   401 were published in open court.)

13             MS. REED:  If you can pause it at 312 seconds.

14   BY MS. KEARNEY:

15   Q.  Is Government's Exhibit 401 the video montage you

16   reviewed in preparation for your testimony today?

17   A.  Yes.

18             MS. KEARNEY:  The Government offers Government's

19   Exhibit 401.

20             MS. MULLIN:  No objection.

21             MR. BOSTIC:  No objection.

22             THE COURT:  Without objection, 401 is in.

23             (Whereupon, Government's Exhibit No. 401 was

24   entered into evidence.)

25             MS. KEARNEY:  Now, your Honor, much of the footage

1     in Government's Exhibit 401 was played at the recent

2     Hale-Cusanelli trial, and so we don't intend to play every

3     minute of it here.  But I just wanted your Honor to be aware

4     that there some additions which I'll highlight with

5     Inspector Loyd.

6               THE COURT:  Great.  Yes.  This looks like

7     something I've seen several times.

8               MS. KEARNEY:  Understood.

9               THE COURT:  So I appreciate your moving on and

10    highlighting the things that are most pertinent.  Thank you.

11              MS. KEARNEY:  Mr. Leach, could you go to 5 seconds

12    in, please.

13              (Whereupon, segments of Government's Exhibit No.

14    401 were published in open court.)

15    BY MS. KEARNEY:

16    Q.  Inspector Loyd, could you please orient us and let us

17    know what direction we're looking?

18    A.  Yeah.  This is a view from the west side of the Capitol.

19    You're actually looking west.  You have the Peace Monument

20    with the Peace Circle down there on First Street Northwest.

21    Further down is a parking area -- it's actually Pennsylvania

22    Avenue -- that goes all the way to the White House.  And

23    that's a parking area for the staff Monday through Friday.

24    Q.  Is that parking area open to the general public?

25    A.  On January 6, because of the COVID, it was not being

1     enforced.

2          MS. KEARNEY:  Mr. Leach, could you please pull up

3     Government's Exhibit 524.

4     BY MS. KEARNEY:

5     Q.  Inspector Loyd, does there appear to be a photograph

6     taken in the vicinity of the Capitol grounds?

7     A.  Yes.

8     Q.  And based on your experience on January 6, 2021, does it

9     appear to have been taken on that date?

10    A.  Yes.

11         MS. KEARNEY:  The Government offers Exhibit 524.

12         MS. MULLIN:  No objection.

13         MR. BOSTIC:  No objection, your Honor.

14         THE COURT:  Without objection, 524 is in.

15         (Whereupon, Government's Exhibit No. 524 was

16    entered into evidence.)

17    BY MS. KEARNEY:

18    Q.  Inspector Loyd, where was this photograph taken?  Can

19    you point out some landmarks?

20    A.  You can see the Peace Monument in the top of the

21    background right above the Confederate battle flag.  You see

22    the Olmsted wall.  This is on the west front of the Capitol.

23    And you see the snow fence on the ground there.

24         MS. KEARNEY:  Let's go back to Government's

25    Exhibit 401, please.

1          Mr. Leach, could you please play from 50 seconds

2     to one minute 10 seconds.

3          (Whereupon, segments of Government's Exhibit No.

4     401 were published in open court.)

5     BY MS. KEARNEY:

6     Q.  Inspector Loyd, what is this a view of?

7     A.  This is a view from the inauguration stage on the west

8     front.

9     Q.  And where were you -- this image is from approximately

10    12:58 p.m.  Is that right?

11    A.  Yes.

12    Q.  Where were you at this time?

13    A.  I was en route to the stage from the Ohio Clock area.

14          MS. KEARNEY:  Mr. Leach, could you play 1:10

15    through 1 minute and 20 seconds.

16          (Whereupon, segments of Government's Exhibit No.

17    401 were published in open court.)

18          THE WITNESS:  There I am on the bottom walking

19    out.

20    BY MS. KEARNEY:

21    Q.  So that's you standing on the kind of balcony area of

22    the stage?

23    A.  Yes.

24    Q.  And what did you do with respect to Capitol security at

25    this point?

 1    A.  Called for help and also locked down the Capitol

 2    Building.

 3    Q.  What does it mean to lock down the Capitol Building?

 4    A.  All the doors get locked and nobody can leave or enter

 5    the building from the outside.

 6    Q.  So that's just the exterior doors or does it include

 7    interior doors?

 8    A.  Just the exterior doors.

 9    Q.  How long did you stay in this area on the west side of

10    the Capitol?

11    A.  I was out there for about an hour and ten minutes.

12    Q.  What were you doing?

13    A.  We were setting up police lines, temporary police lines,

14    because the original line was broken.  My officers had to

15    eventually retreat, several retreats, and after about 30

16    minutes the Metropolitan Police Department team came over --

17    came and helped us and actually took over the line on the

18    west front.

19    Q.  Did you yourself engage with any of the rioters on the

20    west front?

21    A.  Yes.  When Metropolitan got there, I evacuated all my

22    officers.  They had been beaten up.  Got them back in the

23    building, got them treated and I joined Metropolitan out

24    there on the line and physically engaged the rioters.

25                THE COURT:  Inspector, the vice president was

```
1    already in the building?

2            THE WITNESS:  Yes.  He got in between 12:30 and

3    12:40.  Yes.

4    BY MS. KEARNEY:

5    Q.  Did there come a time on January 6, 2021, where you were

6    in an area known as -- well, you already testified that you

7    were in the area known as the Ohio Clock Corridor at about

8    12:53?

9    A.  Yes.

10   Q.  Did you return to that area later in the day?

11   A.  Yes.  I received a phone call from headquarters, after I

12   had been out there for about an hour and ten minutes,

13   ordering me to the east front because the same thing was

14   happening over there.  So I entered the building.  I never

15   made it to the east front.  As soon as I entered the

16   building, I heard Officer Goodman call out for help and

17   advising everybody that the rioters had breached the

18   building and they were headed to the Senate chamber.

19   Q.  How did you hear that?

20   A.  On the police radio.

21   Q.  So approximately when -- so where did you go when you

22   heard that?

23   A.  I ended up going to the Senate chamber to assist Officer

24   Goodman.

25   Q.  Is that adjacent to the Ohio Clock Corridor?
```

1     A.  Yes.

2     Q.  Approximately when did you do that?

3     A.  About 2:10, 2:15.

4          MS. KEARNEY:  Your Honor, the parties have reached

5     another stipulation, which is Government's Exhibit 703,

6     regarding Kevin Seefried and Hunter Seefried's presence in

7     the Capitol Building.

8          The Government offers that stipulation as well as

9     Government's Exhibits 703-A and 703-B.

10         MS. MULLIN:  No objection.

11         MR. BOSTIC:  No objection, your Honor.

12         MS. KEARNEY:  Mr. Leach, could you show 703-A and

13    703-B, please?

14         THE COURT:  I'll just say for the record, without

15    objection, 703, 703-A and 703-B are in.

16         (Whereupon, Government's Exhibit Nos. 703, 703-A

17    and 703-B were entered into evidence.)

18         MS. KEARNEY:  I apologize.  Thank you.

19    BY MS. KEARNEY:

20    Q.  Inspector Loyd, do you recall seeing the two individuals

21    depicted in these exhibits in the Ohio Clock Corridor on

22    January 6th, 2021?

23    A.  Yes.

24    Q.  Let's focus on 703-A.  Can you describe what that

25    individual is wearing?

```
1    A.  It appears to be a tan jacket, holding a Confederate

2    battle flag.

3    Q.  Let's look at 703-B.  Can you describe what that

4    individual is wearing?

5    A.  Wearing a black baseball cap with a tan brim.

6              MS. KEARNEY:  Mr. Leach, can we go back to

7    Government's Exhibit 401, please, and start it at two

8    minutes, 46 seconds.  Play until two minutes, 57 seconds,

9    please.

10             (Whereupon, segments of Government's Exhibit No.

11   401 were published in open court.)

12   BY MS. KEARNEY:

13   Q.  Inspector Loyd, is this two videos side by side?

14   A.  Yes.

15   Q.  And is the footage from approximately the same area on

16   the Capitol grounds?

17   A.  Yes.

18   Q.  Can you describe the locational relationship between

19   camera -- the footage in camera 0925 and the footage in

20   camera 0924?

21   A.  Yes.  This is on the west front.  It's the north side of

22   the stage.  You can see the white.  You see the railing.

23   Those are the steps that go from the lower west terrace up

24   to the upper west terrace.

25   Q.  And the relationship of the footage on the right-hand
```

1   side of the screen to the footage on the left-hand side of

2   the screen, are there any landmarks that are in both images?

3   A.  Yes.  You see the flowerpots that were on there.  You

4   see the railing and the stairwell.

5   Q.  When you say "flowerpots," do you mean the one kind of

6   in the center of camera 0924 or all the way on the left?

7   A.  That one right there.

8   Q.  I'm sorry?

9   A.  That one right there.  That's the same flowerpot.

10          MS. KEARNEY:  And, Mr. Leach, could you pull up

11   Government's Exhibit 106, please.

12   BY MS. KEARNEY:

13   Q.  Inspector, can you show us where that -- what area we're

14   looking at in those views?

15   A.  It's the north side of the stage in this area.

16   Q.  Let's go back to Government's Exhibit 401.

17          MS. KEARNEY:  Mr. Leach, could you please play two

18   minutes and 57 seconds through three minutes and 15 seconds.

19          (Whereupon, segments of Government's Exhibit No.

20   401 were published in open court.)

21   BY MS. KEARNEY:

22   Q.  Inspector, can you describe what just happened in that

23   footage?

24   A.  Yeah.  A temporary police line that was established on

25   the stairwell was breached.

1          MS. KEARNEY:  Mr. Leach, can you play from three

2     minutes, 15 seconds until four minutes and five seconds.

3               (Whereupon, segments of Government's Exhibit No.

4     401 were published in open court.)

5     BY MS. KEARNEY:

6     Q.  Inspector, what time is this footage, approximately?

7     A.  Approximately 2:10 p.m.

8     Q.  And let me direct your attention to the view for camera

9     0924.  To the right side of the image, do you see the top of

10    a Confederate flag just before the tree line?

11    A.  Yes.

12          MS. KEARNEY:  Mr. Leach, could you please play

13    Government's Exhibit 401 from 4:05 to 4:21.

14               (Whereupon, segments of Government's Exhibit No.

15    401 were published in open court.)

16    BY MS. KEARNEY:

17    Q.  Inspector, do you see the person with the Confederate

18    flag coming up the stairs there?

19    A.  Yes.

20          MS. KEARNEY:  Mr. Leach, can you bring up

21    Government's Exhibit 403-A, please.

22    BY MR. KEARNEY:

23    Q.  Is this just a still image of the view from just camera

24    0924?

25    A.  Yes.

1    Q.   Do you see the person holding the Confederate flag?

2    A.   Yes.

3    Q.   What's he wearing?

4    A.   A tan jacket.

5    Q.   And the person to his right, our left?  Is he wearing a

6    black baseball cap with a tan brim?

7    A.   That's correct.

8            MS. KEARNEY:  Mr. Leach, could you play until four

9    minutes, 48 seconds, please, of Government's Exhibit 401.

10           (Whereupon, segments of Government's Exhibit No.

11   401 were published in open court.)

12   BY MS. KEARNEY:

13   Q.   Let me direct your attention to the view from Camera

14   0925.  Do you see the Confederate flag in the view of that

15   camera?

16   A.   Yes.

17   Q.   And held by the same person?

18   A.   Yes.

19           MS. KEARNEY:  Mr. Leach, could you please play

20   from four minutes, 48 seconds to four minutes and 57

21   seconds.

22           (Whereupon, segments of Government's Exhibit No.

23   401 were published in open court.)

24           MS. KEARNEY:  And could you also play it from four

25   minutes, 57 seconds to five minutes, six seconds.

```
 1                    (Whereupon, segments of Government's Exhibit No.

 2       401 were published in open court.)

 3       BY MS. KEARNEY:

 4       Q.  Inspector, I'm going to ask Mr. Leach to pull up

 5       Government's Exhibit 106 again.  Could you point out where

 6       that view is on Government's Exhibit 106.

 7       A.  Yes.  That is the Senate Wing door.  It's over here

 8       adjacent to the Senate side of the Capitol.

 9                    MS. KEARNEY:  Let's go back to Government's

10       Exhibit 401.

11                    Mr. Leach, can you play from five minutes, six

12       seconds to five minutes, 56 seconds.

13                    (Whereupon, segments of Government's Exhibit No.

14       401 were published in open court.)

15                    MS. KEARNEY:  Could you play one more second,

16       Mr. Leach.

17                    (Whereupon, segments of Government's Exhibit No.

18       401 were published in open court.)

19       BY MS. KEARNEY:

20       Q.  On the right-hand side of the screen, Inspector, do you

21       see an individual carrying a Confederate flag?

22       A.  Yes.

23       Q.  Does he appear to be wearing that same jacket?

24       A.  Yes.

25                    MS. KEARNEY:  Mr. Leach, can you please play -- I
```

 1    think we're at five minutes, 58 seconds through six minutes,

 2    nine seconds.

 3                  (Whereupon, segments of Government's Exhibit No.

 4    401 were published in open court.)

 5                  MS. KEARNEY:  Then can you play from six minutes,

 6    nine seconds through six minutes, 29 seconds, please.

 7                  (Whereupon, segments of Government's Exhibit No.

 8    401 were published in open court.)

 9                  MS. KEARNEY:  Ms. Rouhi, can I ask you to set up

10    Government's Exhibit 103 on the easel, please?  And leave it

11    back there so everyone can see it.

12                  MS. ROUHI:  (Complies.)

13                  MS. KEARNEY:  Thanks.

14    BY MS. KEARNEY:

15    Q.  Inspector, we're at six minutes and 29 seconds in

16    Government's Exhibit 401.  Can you point out on Government's

17    Exhibit 103 where in the building this depicts?

18    A.  Yes.  This is the Senate Wing door area.  This is the

19    outside.  This is the door and the two windows and that's

20    the hallway right in the side of the Senate Wing door.

21                  MS. KEARNEY:  You Honor, do you need it angled to

22    see it?

23                  THE COURT:  I could see it.  Thank you.

24                  MS. KEARNEY:  Mr. Leach, can you please play

25    Government's Exhibit 401 until 7:29.

```
1              (Whereupon, segments of Government's Exhibit No.

2    401 were published in open court.)

3    BY MS. KEARNEY:

4    Q.  Inspector Loyd, approximately what time does this

5    depict?

6    A.  Approximately 2:13 in the afternoon.

7    Q.  In the footage, a person just entered on the left-hand

8    side of the screen.  Is that a Capitol Police officer?

9    A.  Yes.

10   Q.  Can you tell which officer that is?

11   A.  No.

12   Q.  What's the officer doing?

13   A.  It appears he's pepper-spraying towards a suspect

14   entering that window.

15             MS. KEARNEY:  Mr. Leach, could you please play

16   until eight minutes, 17 seconds.

17             (Whereupon, segments of Government's Exhibit No.

18   401 were published in open court.)

19             THE COURT:  Could I get you to replay that?

20             MS. KEARNEY:  I'm sorry?

21             THE COURT:  Could I get you to replay that?

22             MS. KEARNEY:  Yes.

23             Mr. Leach, could you play from seven minutes, 29

24   seconds to eight minutes, 17 seconds, please.

25             (Whereupon, segments of Government's Exhibit No.
```

Loyd - DIRECT - By Ms. Kearney

```
 1    401 were published in open court.)

 2    BY MS. KEARNEY:

 3    Q.  Inspector Loyd, the rioters head screen right in that

 4    footage.  Could you show us on Government's Exhibit 103

 5    where they're going?

 6    A.  Yes.  This is the hallway right inside --

 7              THE COURT:  Inspector, if you can just step to the

 8    side, please.  Everyone needs to see it.

 9              THE WITNESS:  This is the outside of the Senate

10    Wing door.  It's the door and the two windows.  And this is

11    the hallway.  The Senate Wing door is immediately inside.

12    And they are traveling north towards the north door of the

13    Capitol.

14              THE COURT:  Underneath this Senate --

15              THE WITNESS:  Yes.  This is the north door.  They

16    are going there and going north.

17    BY MS. KEARNEY:

18    Q.  Is that the House side or the Senate side?

19    A.  That's the Senate side.

20              THE COURT:  Thanks.

21              MS. KEARNEY:  Mr. Leach, could you please play

22    8:17 through nine minutes, 12 seconds.

23              (Whereupon, segments of Government's Exhibit No.

24    401 were published in open court.)

25              MS. KEARNEY:  Mr. Rouhi, could you bring up
```

1    Exhibit 104 to the easel, please.

2              MS. ROUHI:   (Complies.)

3    BY MS. KEARNEY:

4    Q.  Inspector, looking at Government's Exhibit 104, is this

5    two camera views side by side?

6    A.  Yes.

7              MS. KEARNEY:   Your Honor, I alerted defense

8    counsel this morning.   These cameras are actually

9    mislabeled, so we've reached a stipulation.   Camera 0961 is

10   the camera on the right and camera 0213 is the camera on the

11   left.   So I'll just refer to them as the image on the right

12   and the image on the left rather than the camera view.

13             THE COURT:   Understood.   Thank you.

14   BY MS. KEARNEY:

15   Q.  Inspector, using Government's Exhibit 104, can you show

16   the judge what the camera view on the right-hand side of the

17   screen is looking at?

18   A.  Yes.   On the right-hand side of the screen, that's a

19   view from the Ohio Clock Corridor looking -- you can

20   actually see the Senate east grand staircase to the left.

21   Q.  Can you point on Government's Exhibit 104 where the

22   Senate east grand staircase is?

23   A.  Right there.

24   Q.  So that kind of triple stairs?

25   A.  Yes.

1    Q.  And the camera view on the left?

2    A.  That is actually the Ohio Clock Corridor area.

3    Q.  I'm sorry to make you get up again, but could you point

4    out where that is on the map?

5    A.  Yes.  That's this area right in here.

6              THE COURT:  Okay.

7              MS. KEARNEY:  Mr. Leach, could you play nine

8    minutes, 12 seconds through nine minutes, 27 seconds.

9              (Whereupon, segments of Government's Exhibit No.

10   401 were published in open court.)

11   BY MS. KEARNEY:

12   Q.  Now I want to switch to Government's Exhibit 410.  Is

13   this one of the views that we were just looking at?

14   A.  Yes.

15             MS. KEARNEY:  Mr. Leach, can you please play until

16   seven seconds in.

17             (Whereupon, segments of Government's Exhibit No.

18   401 were published in open court.)

19   BY MS. KEARNEY:

20   Q.  Inspector, do you recognize the officer at the top of

21   the stairs?

22   A.  Yes.  That's Officer Goodman.

23   Q.  And what is this landing?

24   A.  That's the Senate east grand staircase and that is the

25   second-floor landing.

1          MS. KEARNEY:  Mr. Leach, could you play until 23

2     seconds, please.

3               (Whereupon, segments of Government's Exhibit No.

4     401 were published in open court.)

5     BY MS. KEARNEY:

6     Q.  Now, Officer Goodman turns out of the screen.  Where is

7     he turning into?

8     A.  To the Ohio Clock area.

9          MS. KEARNEY:  Mr. Leach, could you play until 25

10    seconds, please.

11              (Whereupon, segments of Government's Exhibit No.

12    401 were published in open court.)

13    BY MS. KEARNEY:

14    Q.  Now, Inspector, do you see the person in the

15    gray-and-black striped sweatshirt?

16    A.  Yes.

17    Q.  Now, behind him to our left, his right, do you see the

18    person in the black ball cap with the tan brim?

19    A.  Yes.

20         MS. KEARNEY:  Mr. Leach, can you play until 53

21    seconds, please.

22              (Whereupon, segments of Government's Exhibit No.

23    401 were published in open court.)

24    BY MS. KEARNEY:

25    Q.  Let me direct your attention to the lower left-hand

1      corner, Inspector.

2                Do you see a person in the black ball cap with the

3      tan brim?

4      A.  Yes.

5      Q.  And then about two people behind him, do you see a man

6      in a tan vest with a Confederate flag?

7      A.  Yes.

8      Q.  So are they also turning towards the Ohio Clock

9      Corridor?

10     A.  Yes.

11     Q.  Prior to your testimony today, did you review

12     Government's Exhibits 501, 502, 503, 504, 505 and 506?

13     A.  Yes.

14     Q.  And are those videos?

15     A.  Yes.

16     Q.  Do they depict locations that appear to be around and

17     inside the Capitol Building?

18     A.  Yes.

19     Q.  Do they appear to have been taken between approximately

20     2:10 p.m. and 2:15 p.m. on January 6th, 2021?

21     A.  Yes.

22                MS. KEARNEY:  The Government offers Exhibits 501,

23     502, 503, 504, 505 and 506.

24                MS. MULLIN:  No objection.

25                MR. BOSTIC:  No objection, your Honor.

1          THE COURT:  Without objection, 501, 502, 503, 504,

2     505 and 506 are in.

3          (Whereupon, Government's Exhibit Nos. 501, 502,

4     503, 504, 505 and 506 were entered into evidence.)

5     BY MS. KEARNEY:

6     Q.  Mr. Leach, could you please play just the first two

7     seconds of Government's Exhibit 501.

8          (Whereupon, segments of Government's Exhibit No.

9     501 were published in open court.)

10    BY MS. KEARNEY:

11    Q.  Where does this video appear to be taken?

12    A.  That's on the west front of the Capitol.

13         MS. KEARNEY:  Mr. Leach, back up to one second in

14    maybe.  A little farther ahead.

15         (Whereupon, segments of Government's Exhibit No.

16    501 were published in open court.)

17         MS. KEARNEY:  That's all right.  Let's just watch

18    the whole video.  There we go.

19         (Whereupon, segments of Government's Exhibit No.

20    501 were published in open court.)

21         MS. KEARNEY:  Is there supposed to be sound?

22    You're muted.

23         (Whereupon, segments of Government's Exhibit No.

24    501 were published in open court.)

25         MS. KEARNEY:  Mr. Leach, could you pull up

1    Government's Exhibit 106, please.

2    BY MS. KEARNEY:

3    Q.  Inspector, can you show us approximately what location

4    this video depicts?

5    A.  Yeah.  That was on the north side of the stage, that

6    general vicinity.

7    Q.  Thank you.

8         MS. KEARNEY:  Now, Mr. Leach, let's go back to

9    Government's Exhibit 501 and play until eight seconds in.

10        (Whereupon, segments of Government's Exhibit No.

11   501 were published in open court.)

12   BY MS. KEARNEY:

13   Q.  Inspector, the middle of the picture there, do you see

14   someone with a tan vest on?

15   A.  Yes.

16   Q.  And right above him, someone that has a black ball cap

17   with a tan brim?

18   A.  Yes.

19   Q.  And then to the right of that -- or I guess to the left

20   of that individual, a Confederate flag?

21   A.  Yes.

22        MS. KEARNEY:  Mr. Leach, could you please play the

23   first five seconds of Government's Exhibit 503.

24        (Whereupon, segments of Government's Exhibit No.

25   503 were published in open court.)

1    BY MS. KEARNEY:

2    Q.  Where does this video appear to be taken?

3    A.  It appears to be from the second floor of the Capitol.

4    It's looking west to the west front of the Capitol.

5         MS. KEARNEY:  Could you play, Mr. Leach, from that

6    point until 42 seconds in.

7         (Whereupon, segments of Government's Exhibit No.

8    503 were published in open court.)

9    BY MS. KEARNEY:

10   Q.  Inspector, do you see a figure at the opening of the

11   ramp there?

12   A.  Yes.

13   Q.  Is he wearing a black ball cap with a tan brim?

14   A.  Yes.

15        MS. KEARNEY:  Mr. Leach, can you play until 45

16   seconds in, please.

17        (Whereupon, segments of Government's Exhibit No.

18   504 were published in open court.)

19   BY MS. KEARNEY:

20   Q.  Do you see the person holding the Confederate flag

21   there?

22   A.  Yes.

23   Q.  And he's right behind the person in the black ball cap

24   with the tan brim?

25   A.  Yes.

1          MS. KEARNEY:  Mr. Leach, could you pull up

2    Government's Exhibit 502, please, and play the first 54

3    seconds.

4          (Whereupon, segments of Government's Exhibit No.

5    502 were published in open court.)

6          MS. KEARNEY:  Mr. Leach, could I ask you to stop

7    at 30 seconds, please.

8          Is there any way to turn up the volume?  Let's

9    back up to about 15 seconds and then play until 54 seconds,

10   please.

11         (Whereupon, segments of Government's Exhibit No.

12   502 were published in open court.)

13   BY MS. KEARNEY:

14   Q.  Where does this video appear to be taken?

15   A.  That's the Senate Wing door.

16   Q.  Do you see someone wearing gloves with a black baseball

17   cap with a tan brim?

18   A.  Yes.

19   Q.  Can you point him out?

20   A.  Right there.

21   Q.  Thank you.

22         MR. KEARNEY:  If you could go back a few seconds.

23   Thank you.

24         Mr. Leach, could you back up until about 45

25   seconds and play until about one minute in.

1    (Whereupon, segments of Government's Exhibit No.

2    502 were published in open court.)

3    MS. KEARNEY:  Can you play just one more second,

4    Mr. Leach.

5    (Whereupon, segments of Government's Exhibit No.

6    502 were published in open court.)

7    BY MS. KEARNEY:

8    Q.  There's a figure inside the building.  Who is that?

9    A.  That's a Capitol Police officer.

10   Q.  Now, do you see --

11   MS. KEARNEY:  Mr. Leach, actually, could you play

12   until one minute and 21 seconds, please.

13   (Whereupon, segments of Government's Exhibit No.

14   502 were published in open court.)

15   BY MS. KEARNEY:

16   Q.  Do you see the person climbing through the window --

17   A.  Yes.

18   Q.  -- wearing a tan vest?

19   A.  Yes.

20   Q.  What's he holding?

21   A.  A Confederate battle flag.

22   MS. KEARNEY:  Can you play, Mr. Leach, until the

23   end of Government's Exhibit 502, please.

24   (Whereupon, segments of Government's Exhibit No.

25   502 were published in open court.)

1          MS. KEARNEY:  Mr. Leach, could you please pull up

2     Government's Exhibit 527 and just play the first two

3     seconds.

4               (Whereupon, segments of Government's Exhibit No.

5     527 were published in open court.)

6     BY MS. KEARNEY:

7     Q.  Inspector, is this a side-by-side rendering of a portion

8     of the CCTV footage of the Senate Wing doors and then a

9     portion of the video we just watched, Government's Exhibit

10    502?

11    A.  Yes.

12              MS. KEARNEY:  The Government offers Exhibit 527.

13              MS. MULLIN:  No objection, your Honor.

14              MR. BOSTIC:  No objection.

15              THE COURT:  Without objection, 527 is in.

16              (Whereupon, Government's Exhibit No. 527 was

17    entered into evidence.)

18              MS. KEARNEY:  Mr. Leach, could you play until 27

19    seconds, please.

20              (Whereupon, segments of Government's Exhibit No.

21    527 were published in open court.)

22    BY MS. KEARNEY:

23    Q.  There's a green arrow there.  Is that denoting the

24    person in the black baseball cap with the tan brim?

25    A.  Yes.

1        MS. KEARNEY:  Mr. Leach, can you play until 52

2    seconds, please.

3            (Whereupon, segments of Government's Exhibit No.

4    527 were published in open court.)

5    BY MS. KEARNEY:

6    Q.  There's a yellow arrow there.  Do you --

7        MS. KEARNEY:  Mr. Leach, maybe play two more

8    seconds.

9            (Whereupon, segments of Government's Exhibit No.

10   527 were published in open court.)

11   BY MS. KEARNEY:

12   Q.  Is that yellow arrow denoting the person in the tan vest

13   with the Confederate flag?

14   A.  Yes.

15       MS. KEARNEY:  Please play the rest of the clip,

16   Mr. Leach.

17           (Whereupon, segments of Government's Exhibit No.

18   527 were published in open court.)

19       MS. KEARNEY:  Mr. Leach, could you pull up

20   Government's Exhibit 504, please, and play the first 15

21   seconds.

22           (Whereupon, segments of Government's Exhibit No.

23   504 were published in open court.)

24   BY MS. KEARNEY:

25   Q.  Inspector Loyd, where does this video appear to have

 1    been taken?

 2    A.   It's inside the Senate Wing door and now you're facing

 3    north towards the north door of the Capitol.

 4             MS. KEARNEY:  Mr. Leach, could you play until 50

 5    seconds in, please.

 6             (Whereupon, segments of Government's Exhibit No.

 7    504 were published in open court.)

 8    BY MS. KEARNEY:

 9    Q.   Inspector Loyd, are you able to trace the several turns

10    that the rioters made or did you need me to play that again?

11    A.   (Witness indicates.)

12    Q.   I'm sorry.  That's the second floor.  So if you'd move

13    one down.  That's Government's Exhibit 103.

14    A.   (Witness indicates.)

15    Q.   Thank you.

16    A.   So this is the Senate Wing door area.  This is the

17    outside.  This is the inside with the door around the

18    windows.  This is the hallway.  They came in through the

19    door windows and went north towards the north door and then

20    they made a right and are now heading east towards the

21    Senate carriage door.

22    Q.   So did they make a subsequent turn?

23    A.   Yes.  Then they went south to the base of the east

24    Senate grand staircase.

25    Q.   Thank you.

 1             MS. KEARNEY:  Mr. Leach, could you please play the

 2      first five seconds of Government's Exhibit 505.

 3             (Whereupon, segments of Government's Exhibit No.

 4      505 were published in open court.)

 5      BY MS. KEARNEY:

 6      Q.   Inspector Loyd, what area does this depict?

 7      A.   That's -- you're approaching the base of the Senate east

 8      grand staircase.

 9      Q.   That same staircase you just referred to?

10      A.   Yes.  On the first floor.

11             MS. KEARNEY:  Mr. Leach, could you play until 30

12      seconds in, please.

13             (Whereupon, segments of Government's Exhibit No.

14      505 were published in open court.)

15      BY MS. KEARNEY:

16      Q.   Inspector Loyd, do you recognize this Capitol Police

17      officer?

18      A.   Yes.  That's Officer Goodman.

19             MS. KEARNEY:  Mr. Leach, can you play until the

20      end of Government's Exhibit 505, please.

21             (Whereupon, segments of Government's Exhibit No.

22      505 were published in open court.)

23             THE COURT:  That's the Ohio Clock?

24             THE WITNESS:  Yes.

25

1    BY MS. KEARNEY:

2    Q.  You had testified earlier that you had ordered a

3    lockdown of the Capitol Building at approximately 1:00 p.m.?

4    A.  Yes.

5    Q.  Did there come a time when -- at approximately 2:00

6    p.m., were officers stationed outside the Senate and House

7    chambers?

8    A.  Yes.

9    Q.  And did there come a time when they implemented

10   additional security measures?

11   A.  Yes.  My team, when they heard the rioters had broken

12   into the building, they took it upon themselves to secure

13   the Senate chamber.

14   Q.  What does it mean to secure the Senate chamber?

15   A.  The officers who are positioned outside all the doors,

16   they go inside and they lock the doors and shelter in place

17   until help arrives.

18          MS. KEARNEY:  Let's go back to Government's

19   Exhibit 505, approximately 45 seconds in.

20          (Whereupon, segments of Government's Exhibit No.

21   505 were published in open court.)

22   BY MS. KEARNEY:

23   Q.  Can you point out on Government's Exhibit 104 --

24          MR. KEARNEY:  Ms. Rouhi, would you mind pulling

25   104 back up --

 1      BY MS. KEARNEY:

 2      Q.  -- where this landing is?

 3      A.  So this is the grand staircase.  And Officer Goodman

 4      came up the north side of the grand staircase onto the

 5      second floor.

 6      Q.  So that's the landing at the top of the stairs?

 7      A.  Yes.

 8      Q.  Officer Goodman is standing next to a doorway at this

 9      point in the footage.

10      A.  Yes.

11      Q.  What is behind that doorway?

12      A.  That goes to the rear of the Senate chamber.

13              MS. KEARNEY:  Mr. Leach, could you play until one

14      minute and ten seconds in.

15              (Whereupon, segments of Government's Exhibit No.

16      505 were published in open court.)

17      BY MS. KEARNEY:

18      Q.  In the middle of the frame, there is an officer in a

19      garrison cap.  Who is that?

20      A.  That is me.

21      Q.  And were you already in the Ohio Clock Corridor when

22      Officer Goodman arrived?

23      A.  We met there.  I was coming from the west front after

24      being ordered back into the building and he was coming from

25      the stairwell.

1    Q.  And what were you doing back in the building after you

2    were on the west front?

3    A.  I was ordered to go to the east front by headquarters

4    because the barricades had been breached on the east front.

5    But shortly after I entered the building, I heard Officer

6    Goodman put on the radio that they had breached the building

7    and they were headed for the Senate chamber.  So I

8    re-diverted on my own.

9              MS. KEARNEY:  Mr. Leach, could you please play

10   Government's Exhibit 414 from about the first minute and 25

11   seconds in.

12             (Whereupon, segments of Government's Exhibit No.

13   414 were published in open court.)

14   BY MS. KEARNEY:

15   Q.  Can you point out yourself at one minute and 25 seconds?

16   A.  Right there.

17   Q.  Can you point out Officer Goodman?

18   A.  Officer Goodman is right there.

19   Q.  Do you see the portrait between the two busts?

20   A.  Yes.

21   Q.  And right below that, do you see the man in the tan vest

22   holding a Confederate flag?

23   A.  Yes.

24   Q.  And then maybe three people in front of him, in front of

25   Officer Goodman, a man in a black baseball cap with a tan

1    brim?

2    A.  Yes.

3    Q.  Now, there's a line of officers in the corridor here.

4    There's a door in the upper left-hand corner behind that

5    line.  What is that?

6    A.  That's the main Senate door into the Senate chamber.

7    Q.  And is that the door that you referenced earlier when

8    you were going to --

9    A.  Yes.

10   Q.  I'm sorry.  Let me just finish.

11             -- the door you referenced earlier when you said

12   you were going to escort Vice President Pence?

13   A.  Yes.

14   Q.  You were going to add something?

15   A.  Yes.  That's where I was.  That's where I started out

16   the day.  I was getting ready to escort the vice president

17   from that door down the hallway to the House side.  And it

18   didn't work out for me on that particular assignment.

19   Q.  Now, based on this image, can you tell whether those

20   additional security measures you talked about had already

21   gone into effect?

22   A.  Yes.  If the -- if it was regular business, I would have

23   had an officer posted at the door on the outside accompanied

24   by a doorkeeper, a two-person post, a Capitol Police officer

25   and a doorkeeper.

```
1              They are not there.  So that tells me that they
2      have locked -- they've gone inside the chamber and locked
3      themselves in and are sheltering in place until help
4      arrives.
5      Q.  Now, you testified earlier that Vice President Pence was
6      visiting the Capitol Building in connection with the
7      certification of the electoral vote.  Is that right?
8      A.  Uh-huh.
9              THE COURT REPORTER:  Is that a "yes"?
10             THE WITNESS:  Yes.  Sorry.
11     BY MS. KEARNEY:
12     Q.  In connection with that certification, does the Senate
13     conduct proceedings in their chamber?
14     A.  Yes.
15     Q.  And does the vice president preside over those
16     proceedings?
17     A.  Yes.
18     Q.  And in connection with that proceeding and with other
19     proceedings, do members of the Senate sometimes travel to
20     the House chamber?
21     A.  Yes.
22     Q.  And is that on the other side of the building?
23     A.  Yes.
24     Q.  When they do that, generally what path do they take?
25     A.  They take that door, the Senate main door and go
```

 1    straight down the middle of the building through the

 2    Rotunda, through the Statuary Hall, through to the House

 3    main door.

 4            MS. KEARNEY:  Let's go back to the Ohio Clock

 5    Corridor in Government's Exhibit 414 at 1:25.  Stay there,

 6    Mr. Leach.

 7            (Whereupon, segments of Government's Exhibit No.

 8    414 were published in open court.)

 9    BY MS. KEARNEY:

10    Q.  Approximately how large is the area we're looking at?

11    A.  From the bench right there to the bench on the other

12    side, it's approximately 10 yards.  From the doorway to the

13    right, up to where I am, it's about 15 yards.

14    Q.  Does it feel spacious or does it feel --

15    A.  No.  It's a small area.

16    Q.  When the rioters entered the Ohio Clock Corridor, what

17    was their demeanor?

18    A.  Very angry and very upset.

19    Q.  And as they enter, what is going through your mind?

20    A.  The first thing is I'm fully aware they will have not

21    been screened.  They're there for nefarious purposes.  I'm

22    worried about weapons.

23    Q.  And so what are you looking for?

24    A.  Just any sign of weapons at this point, people reaching

25    in bags, anything in their hands, scanning the room for

 1    weapons.

 2    Q.  Do you recall anything specific that members of the

 3    group were saying?

 4    A.  The individual right in front of me with the black and

 5    the hat -- he has the big Q on the front of his shirt -- he

 6    was trying to tell me to surrender the building so the mob

 7    could get to Pence.

 8    Q.  And how did you respond?

 9    A.  I said that wasn't happening.

10    Q.  Was he satisfied with that?

11    A.  No.  When I told him no, he wanted me to go find the

12    vice president and arrest him myself.

13           THE COURT:  Sorry.  That's the first guy who came

14    in?

15           THE WITNESS:  Yes.  The guy right here.  He's

16    directly in front of me.  He's got the black with the gray

17    hoodie on.  That's the person I had the conversation with.

18           MS. KEARNEY:  Mr. Leach, could you pull up

19    Government's Exhibits -- there are a lot of them, so bear

20    with me.  Maybe we'll do it in two groups.  So 510, 511, 513

21    and 514.

22    BY MR KEARNEY:

23    Q.  Where were each of these photographs taken?

24    A.  In the Ohio Clock area.

25    Q.  And do they depict individuals that you recall seeing in

```
 1    that --

 2    A.  Yes.

 3    Q.  -- area on January 6?

 4    A.  Yes.

 5    Q.  Sorry.  Do they depict individuals --

 6    A.  Yes, they do.

 7              MS. KEARNEY:  The Government offers Government's

 8    Exhibits 510, 511, 513 and 514.

 9              MR. BOSTIC:  No objection.

10              MS. MULLIN:  No objection.

11              THE COURT:  Without objection, 510, 511, 513 and

12    514 are in.

13              (Whereupon, Government's Exhibit Nos. 510, 511,

14    513 and 514 were entered into evidence.)

15              MS. KEARNEY:  Mr. Leach, could you now pull up

16    515, 516, 518 and 521.

17              THE COURT:  Can you just clear the screen?

18              MS. KEARNEY:  (Complies.)

19    BY MS. KEARNEY:

20    Q.  Where do these photographs appear to have been taken?

21    A.  In the Ohio Clock area.

22    Q.  Do they also depict individuals you recall seeing there

23    on January 6?

24    A.  Yes.

25              MS. KEARNEY:  The Government offers Government's
```

```
1    Exhibits 515, 516, 518 and 521.

2              MS. MULLIN:  No objection, your Honor.

3              MR. BOSTIC:  No objection, your Honor.

4              THE COURT:  Without objection, 515, 516, 518 and

5    521 are in.

6              (Whereupon, Government's Exhibit Nos. 515, 516,

7    518 and 521 were entered into evidence.)

8              MS. KEARNEY:  Mr. Leach, can you pull up 513,

9    please.

10   BY MS. KEARNEY:

11   Q.  Do you see the individual who wanted -- who told you

12   that he wanted Vice President Pence in this picture?

13   A.  Yeah.  That's him right there with the Q shirt on.

14   Q.  Do you recall any specific statements or interactions

15   with other individuals in the Ohio Clock Corridor?

16   A.  No.

17             MS. KEARNEY:  Mr. Leach, could you pull up

18   Government's Exhibit 515, please.

19   BY MS. KEARNEY:

20   Q.  Let me draw your attention to the man in the black

21   baseball cap with the tan brim.

22             Do you recall seeing him in the Ohio Clock

23   Corridor on January 6?

24   A.  Yes.

25   Q.  What, if anything, do you recall about him?
```

1    A.  Nothing specific.  Just that he was there.

2    Q.  Did he pose any particular concerns for you?

3    A.  Just because he was in the building, you know.  It's an

4    unauthorized entry.  They broke into the building.  He had

5    not been screened.  He was not supposed to be there.

6    Q.  Let me direct your attention to the man to our left, his

7    right, in the tan vest holding the Confederate flag.

8            Do you recall seeing him in the Ohio Clock

9    Corridor on January 6, 2021?

10   A.  Yes.

11   Q.  What do you recall about him?

12   A.  He was very upset, very angry, directing a lot of anger

13   towards Officer Goodman.  But I could not remember anything

14   specific he said.  I just remember he was very upset towards

15   Officer Goodman.

16   Q.  Did he pose any particular concerns for you?

17   A.  He was very angry, very agitated, showed a lot of body

18   language directed at Officer Goodman, yelling.

19   Q.  And the flag he's holding, did that pose any concerns

20   for you?

21   A.  Yeah.  That's the Confederate battle flag.  The

22   Confederate battle flag means different things to different

23   people.  Some people view it as heritage and history.  Some

24   people view it as a sign of intimidation and hate,

25   especially in the District of Columbia.

1    Q.  And is there any historical context to the Confederate

2    flag?

3    A.  Yes.  It was used in the Civil War between the North and

4    the South.

5    Q.  Representing which side?

6    A.  The Confederate side.

7            MS. KEARNEY:  Let's go back to Government's

8    Exhibit 414.  Let's start at one minute in.

9            (Whereupon, segments of Government's Exhibit No.

10   414 were published in open court.)

11   BY MS. KEARNEY:

12   Q.  Right next to that first bust, do you see the man

13   holding the Confederate flag?

14   A.  Yes.

15           MS. KEARNEY:  Mr. Leach, can you please play until

16   one minute, 15 seconds.

17           (Whereupon, segments of Government's Exhibit No.

18   414 were published in open court.)

19   BY MS. KEARNEY:

20   Q.  What does that man appear to be doing?

21   A.  With the Confederate battle flag?

22   Q.  Yes.

23   A.  You know, yelling at one of my officers up on the front

24   row there.

25           MS. KEARNEY:  Let's skip to two minutes and nine

1   seconds, please.

2   BY MR. KEARNEY:

3   Q.  Do you see the man in the tan vest by the second bust?

4   A.  Yes.

5          MS. KEARNEY:  Mr. Leach, can you play until two

6   minutes, 49 seconds, please.

7          (Whereupon, segments of Government's Exhibit No.

8   414 were published in open court.)

9          MS. KEARNEY:  Let's skip to three minutes, ten

10  seconds.

11  BY MS. KEARNEY:

12  Q.  Can you identify Officer Goodman in this image?

13  A.  Yes.  Officer Goodman is to the top left, right there.

14  Q.  Wearing the mask?

15  A.  Yes.

16  Q.  To his right, our left, do you see a black ball cap with

17  a tan brim?

18  A.  Yes.  Right there.

19          MS. KEARNEY:  Mr. Leach, can you play until three

20  minutes, 30 seconds, please.

21          (Whereupon, segments of Government's Exhibit No.

22  414 were published in open court.)

23          MS. KEARNEY:  Let's skip to four minutes, 45

24  seconds, please.

25

```
 1    BY MS. KEARNEY:

 2    Q.  Now, all the way to the right up against the police

 3    line, do you see a man holding a flag?  It's the back of his

 4    head.  He appears to be slightly balding.  Let me clear the

 5    screen.

 6              Do you see the man standing next to the cabinet

 7    under one of the portraits?

 8    A.  Yes.

 9    Q.  The man to his left?

10    A.  Yeah.  With the bald spot.  Yes.

11    Q.  Yes.  Do you see him?

12    A.  Yes.

13    Q.  What's he holding?

14    A.  I'm sorry?

15    Q.  Is he holding a flag?

16    A.  It appears so.  Yes.

17    Q.  And then do you see the officer standing next to Officer

18    Goodman?

19    A.  Yes.

20    Q.  And between that officer -- and there's a man in a blue

21    mask --

22    A.  Yes.

23    Q.  -- do you see the black ball cap?  It may be hard to see

24    in this image.

25              MS. KEARNEY:  Mr. Leach, could you play two more
```

 1    seconds.

 2              (Whereupon, segments of Government's Exhibit No.

 3    414 were published in open court.)

 4    BY MS. KEARNEY:

 5    Q.  Do you see the man facing the officer with red hair and

 6    his mask pulled down?  Between him and the man with the blue

 7    mask.

 8    A.  I'm having a hard time.

 9    Q.  (Counsel indicates.)

10    A.  There it is.  Got it.

11              MS. KEARNEY:  Mr. Leach, can you play until five

12    minutes, 15 seconds, please.

13              (Whereupon, segments of Government's Exhibit No.

14    414 were published in open court.)

15              MS. KEARNEY:  Let's skip to 17 minutes and 20

16    seconds, please.

17    BY MS. KEARNEY:

18    Q.  All the way on the left-hand side of the frame right by

19    the cabinet, do you see the Confederate flag?

20    A.  Yes.

21    Q.  And the hand holding it?

22    A.  Yes.

23    Q.  And to his right, do you see the black cap with the tan

24    brim?

25    A.  Yes.

1          MS. KEARNEY:  Mr. Leach, could you play until

2     seven minutes, 46 seconds, please.

3               (Whereupon, segments of Government's Exhibit No.

4     414 were published in open court.)

5          MS. KEARNEY:  Mr. Leach, skip to 18 minutes, 35

6     seconds.

7               (Whereupon, segments of Government's Exhibit No.

8     414 were published in open court.)

9     BY MS. KEARNEY:

10    Q.  Inspector, are those individuals in approximately the

11    same positions?

12    A.  Yes.

13          MS. KEARNEY:  Mr. Leach, can you play until 19

14    minutes.

15               (Whereupon, segments of Government's Exhibit No.

16    414 were published in open court.)

17    BY MS. KEARNEY:

18    Q.  By this point, what time is it?

19    A.  2:34.

20    Q.  And do you know approximately where the vice president

21    is at this time?

22    A.  He's either still in the Senate chamber or in the

23    process of evacuating.

24          MS. KEARNEY:  Mr. Leach, could you please play the

25    first five seconds of Government's Exhibit 422.

1          (Whereupon, segments of Government's Exhibit No.

2     422 were published in open court.)

3     BY MS. KEARNEY:

4     Q.  Do you recognize this location?

5     A.  Yes.

6     Q.  Where is it?

7     A.  That's the east side of the Senate lobby.

8     Q.  Can you show us on Government's Exhibit 104 where that

9     is?

10    A.  I'm sorry?

11    Q.  Using Government's Exhibit 104, can you show us where

12    that is?

13    A.  That would be right here.

14    Q.  So in the east Senate grand staircase to the north?

15    A.  Yes.  That's the east grand staircase and that's the

16    east side of the Senate lobby and these are the stairs going

17    down.

18          MS. KEARNEY:  Mr. Leach, can you play that video

19    until the end.

20          (Whereupon, segments of Government's Exhibit No.

21    422 were published in open court.)

22          THE COURT:  I'm sorry.  This isn't the east Senate

23    grand staircase, is it?

24          THE WITNESS:  No.  This is the east side of the

25    Senate lobby into the Senate chamber.

 1             THE COURT:  I see.  That's a different staircase?

 2             THE WITNESS:  Yes.

 3             THE COURT:  I understand.

 4    BY MS. KEARNEY:

 5    Q.  Actually, Inspector, if you could show the east Senate

 6    grand staircase and then this staircase in relationship to

 7    each other.

 8    A.  Here's the east grand staircase right here.  Officer

 9    Goodman came up here on the north side.  This staircase --

10    this is the east lobby door of the Senate, and that's the

11    stairwell there.

12             THE COURT:  Thank you.

13    BY MS. KEARNEY:

14    Q.  Going back to that video footage, did you recognize

15    anyone in that footage?

16    A.  Yes.  There was at least three of the Secret Service

17    liaison officers that I work with:  Lani, Paul Wade and

18    Jason Jolly.  I saw those three.  I saw the vice president

19    and his entourage.

20    Q.  They're going down the stairs.  What area are they

21    exiting?

22    A.  They're exiting the east Senate lobby.

23    Q.  Is that near that back entrance to the Senate we talked

24    about?

25    A.  Yes.

```
 1              MS. KEARNEY:  Let's go back to Government's
 2   Exhibit 414 for a minute.
 3   BY MS. KEARNEY:
 4   Q.  Inspector, we had watched minute 18:35 through minute
 5   19.
 6              MS. KEARNEY:  Mr. Leach, could you just play that
 7   again, please.
 8              (Whereupon, segments of Government's Exhibit No.
 9   414 were published in open court.)
10   BY MS. KEARNEY:
11   Q.  I want you, Inspector, to focus on the officer who's
12   standing in front of the two people in the red hats.
13   A.  Yes.
14              (Whereupon, segments of Government's Exhibit No.
15   414 were published in open court.)
16   BY MS. KEARNEY:
17   Q.  What does it appear that officer is doing?
18   A.  It appears he's searching a bag.
19   Q.  We've reviewed footage of the Ohio Clock Corridor
20   starting at approximately 2:15 on January 6.  How long did
21   you remain in the Ohio Clock Corridor that day?
22   A.  I was there about ten minutes.
23   Q.  Where did you go after that?
24   A.  Deputy Chief Walto came in shortly after I got there.
25   We had a conversation.  I was happy that the Senate chamber
```

1    was locked down.  My personnel had done what they were

2    trained to do and things were relatively stable for the

3    events, and so I asked them if I could go check on my team

4    at the House chamber.  He gave me permission.  So he stayed

5    at the Senate chamber and I went to check on the House

6    chamber for the House of Representatives.

7              MS. KEARNEY:  One moment, your Honor.

8              No further questions.

9              THE COURT:  Let's take about a ten-minute break.

10             Inspector Loyd, I'll ask you not to discuss the

11   substance of your testimony with anyone during the break.

12             THE WITNESS:  Yes.  Thank you.

13             (Thereupon a recess was taken, after which the

14   following proceedings were had:)

15             THE COURT:  Ms. Mullin?

16             Inspector Loyd, I'll remind you you're still under

17   oath.

18                       CROSS-EXAMINATION

19   BY MS. MULLIN:

20   Q.  Good morning, Inspector.

21   A.  Good morning.

22   Q.  I have just a few questions.  You don't recall anything

23   in particular that the man in the tan vest with the

24   Confederate battle flag said, do you?

25   A.  No.

1   Q.  Do you remember any specific statements that he made?

2   A.  No.

3   Q.  And you don't recall him, then, saying anything about

4   knowing where the Senate chamber was in relation to where

5   you all were standing in the Ohio Clock Corridor.  Correct?

6   A.  No.

7   Q.  No, you don't remember any statements attributed to him?

8   A.  No.

9   Q.  In the Government exhibits that were shown to you on

10  direct examination, those CCTV cameras of the inside of the

11  Capitol, you don't see any signage directing a visitor to

12  where the Senate chamber is, do you?

13  A.  No.

14  Q.  And there is no such signage once you're inside the

15  Capitol.  Correct?

16  A.  No, there is not.

17           MS. MULLIN:  That's all I have.  Thank you.

18           THE COURT:  Mr. Bostic?

19           MR. BOSTIC:  Very briefly, your Honor.

20                      CROSS-EXAMINATION

21  BY MR. BOSTIC:

22  Q.  Good morning, Officer Loyd.

23  A.  Good morning.

24  Q.  I'm sorry.  "Inspector."  My apologies.

25  A.  That's all right.

```
 1    Q.  You've been doing this for a long time, right?
 2    A.  Yes.
 3    Q.  You testified earlier that your only concern with the
 4    individual in the black-and-tan cap was because he was in a
 5    place he wasn't supposed to be.  Would that be fair to say?
 6    A.  Correct.  And he was unscreened.
 7    Q.  He was unscreened?
 8    A.  Right.
 9    Q.  But you didn't hear him screaming or shouting or
10    anything like that?
11    A.  No.
12              MR. BOSTIC:  Thank you.
13              THE COURT:  Ms. Kearney, any redirect?
14              MS. KEARNEY:  Thank you, your Honor.
15                       REDIRECT EXAMINATION
16    BY MS. KEARNEY:
17    Q.  Inspector Loyd, Ms. Mullin asked you about whether you
18    heard any statements by the man in the tan vest with the
19    Confederate flag.  Do you remember that?
20    A.  Correct.
21    Q.  When the group of rioters entered the Ohio Clock
22    Corridor, do you remember statements they were making?
23    A.  Just a lot of yelling and screaming.  The only
24    individual statements I remember is the conversation that I
25    had with the one gentleman with the Q on his shirt.
```

```
1    Q.  Do you remember the subject matter of what the group --

2    individuals in the group were screaming about, even if you

3    don't remember the statements?

4    A.  Not really.  Just a lot of yelling and screaming.  Very

5    loud.  The most direct knowledge I have was the individual

6    with the Q shirt on.

7    Q.  When the group entered the Ohio Clock Corridor, did you

8    instruct them to do anything?

9    A.  Yeah.  I told them to stop and eventually then to leave.

10   Q.  Did they do that?

11   A.  No.

12           MS. KEARNEY:  No further questions.  Thank you.

13           THE COURT:  Thank you, Inspector.  I appreciate

14   your testimony here today.  You're free to leave.

15           THE WITNESS:  Thank you.

16           (Witness excused.)

17           MS. REED:  Your Honor, at this time the Government

18   would call Officer Eugene Goodman.

19         EUGENE GOODMAN, GOVERNMENT WITNESS, SWORN.

20           THE COURT:  Good morning.

21           THE WITNESS:  Good morning.

22                      DIRECT EXAMINATION

23   BY MS. REED:

24   Q.  Good morning, Officer Goodman.

25           MS. REED:  I don't know if you need his name
```

1    spelled for the record.

2    BY MS. REED:

3    Q.  Can you just please spell your name for the record.

4    A.  First name Eugene, E-U-G-E-N-E; last name Goodman,

5    G-O-O-D-M-A-N.

6    Q.  And, Officer Goodman, where are you currently employed?

7    A.  The United States Capitol Police.

8    Q.  And how long have you been employed as an officer with

9    the Capitol Police?

10   A.  It'll be 15 years come next month.

11   Q.  Are you assigned to a particular unit or division with

12   the Capitol Police?

13   A.  I'm assigned to the Senate chamber section in the

14   Capitol division with the United States Capitol Police.

15   Q.  Prior to your 15 years with the Capitol Police, did you

16   have any other law enforcement background?

17   A.  Law enforcement, no.

18   Q.  What about any military experience?

19   A.  I was in the Army for four and a half years.

20   Q.  Did you do any overseas missions during that time?

21   A.  I got one combat deployment with the 101st Airborne

22   Division out of Fort Campbell, Kentucky.

23   Q.  What influenced your decision to leave the military and

24   join the Capitol Police?

25   A.  Money.  More money.

1    Q.  Understandable.

2    A.  Yes.

3    Q.  So going back to becoming a police officer with Capitol

4    Police, is any specific training required?

5    A.  You do a six-month training academy.  The United States

6    Capitol Police most particularly, we -- it's broken up into

7    two sections.  We do three months down at the Federal Law

8    Enforcement Training Center down in Glenco, Georgia, and

9    then we finish up out at another facility in Cheltenham,

10   Maryland, on the back side of Andrews Air Force Base.

11   Q.  And does any of that training include riots and any sort

12   of raid situations?

13   A.  Yes.  We do get civil disturbance unit training or CDU

14   training, where we're pretending to be officers standing on

15   the line and instructors are pretending to be rioters and

16   trying to cross police lines.  So we do get training.  Yes.

17   Q.  Did you have to use any of that training on January 6th

18   of 2021?

19   A.  Yes.

20   Q.  Now I want to start at the beginning of that day.

21        What time were you expected to go to work that

22   day?

23   A.  I think start time that day was maybe 6:00 a.m.  It was

24   really, really early.  I got there an hour early.

25   Q.  And where do you currently park?

1   A.  That day, I parked on Louisiana Avenue adjacent of the

2   truck tunnel to the CBC, just a block from Union Station.

3   Q.  To your knowledge, was there any sort of rallies in town

4   that day on January 6th?

5   A.  To my knowledge, no.

6   Q.  Did you see any individuals making their way over

7   towards the Capitol when you arrived for work that way?

8   A.  That morning, yes.  When I first got to -- when I first

9   parked, I set my clock because I had plenty of time before I

10  was to go in the building.  There were individuals who I

11  presumed were coming from Union Station and they were

12  walking down the Mall with -- and yeah.  And some were even

13  at that point yelling things.  And they had Trump

14  paraphernalia, hats, flags.

15  Q.  What were they yelling?

16  A.  Stop the Steal, things of that nature.  Yes.

17  Q.  So I asked you about Capitol Police.  To be clear, you

18  didn't have any knowledge as a Capitol Police officer.

19  Specifically, the officers weren't given any notice about

20  any sort of rallies.  Is that correct?  Or is that --

21  A.  No.  That's correct.

22  Q.  Did you yourself have independent knowledge about what

23  Stop the Steal meant?  Did you know anything at all about a

24  rally in town or just what Stop the Steal meant?

25  A.  I kind of gathered what they meant by Stop the Steal,

1    but I had no idea about any rally being in town.  I had no

2    idea for that day.  No.

3    Q.  Was the Capitol under security at that time for the

4    inauguration?

5    A.  Yes.  The entire Capitol was blocked off as per usual

6    for -- as per usual for the inauguration.  They block off

7    the entire complex, First Street to First Street, going west

8    to east, and also Con is fenced in.

9    Q.  Were you aware of any proceedings that were happening in

10   Congress on January 6th?

11   A.  Yes.  I was there specifically for the joint session of

12   Congress for that day.

13   Q.  So is it fair to say that you're pretty well-versed in

14   some aspects of what happens during that process as someone

15   who worked in the Senate that long?

16   A.  Yes.  Yes.

17   Q.  I want to go back a little bit.  You said that you were

18   working for the Senate unit that day.  Correct?

19   A.  I was assigned to the Rotunda that day.

20   Q.  Can you explain what were your responsibilities with

21   that particular assignment?

22   A.  So that assignment meant that I had to challenge and

23   validate individuals passing between the Rotunda and going

24   from one side of the building to the other, so from the

25   House side to the Senate or from the Senate to the House,

1    and securing the route for members as they passed through

2    the Rotunda on the way to the House side of the building.

3    Q.  Did you see members inside that day when you were sort

4    of going through your process and your responsibilities?

5    A.  Yes.

6    Q.  Talk to us a little bit about the second floor.  The

7    judge has heard about that, so I won't belabor the point.

8    But you do see that there is a map on the side of you.

9    Correct?

10   A.  Yes.

11   Q.  Can you tell us in your responsibility, are you assigned

12   to the second floor of the Capitol?

13   A.  I'm assigned to the Senate chamber section, which is on

14   the second floor of the Capitol.  Yes.

15   Q.  Are there any particular offices of significance on that

16   second floor area?

17   A.  Yes, ma'am.  So you have the vice presidential office,

18   which has two offices, the ceremonial office and the staff

19   office.  You also have Senate leadership, both whips'

20   offices on that floor and you have various other offices.

21   And you also have the main entrance to the Senate.

22   Q.  And this is an easy way of saying, that's your floor.

23   Correct?

24   A.  That's my floor.  Yes.

25   Q.  Of all the floors in the Capitol, are you most familiar

1   with that floor?

2   A.  Yes.

3   Q.  Now, at some point on January 6, did you learn that

4   there had been a breach?  I want to start with the exterior

5   grounds of the Capitol.

6   A.  Yes.  I don't recall specifically what time, but I was

7   on post in the Rotunda and I heard "breach of the west

8   front."

9   Q.  And how did you hear that?

10  A.  Over the radio.

11  Q.  At that point, were your radio channels fairly clear so

12  that you could hear what was going on?

13  A.  Yes.  At that point, yes.

14  Q.  And did you respond to this breach?

15  A.  Yes.  Myself and the other officers that were assigned

16  to the Rotunda, we ran down the Rotunda stairs, looped

17  around and ran down the lowest terrace stairs, which is the

18  staircase that the president would take as he goes out to

19  address the public during the inauguration.  And I went down

20  to the lowest terrace door.

21  Q.  So just to be clear, when you hear this information come

22  across the radio, what floor of the Capitol are you on?

23  A.  When I hear the information come across the radio, I'm

24  on the second floor.

25  Q.  And then at some point do you transition to the first

Goodman - DIRECT - By Ms. Reed

1  floor?

2  A.  I transfer from the second floor to the first floor and

3  then to the basement, which is where the lower west terrace

4  door is.

5  Q.  Okay.  Do you know at that point where the breach had

6  occurred?

7  A.  Yeah.  I could see where the breach had occurred,

8  because once I got to the lower terrace door I could see

9  that people were spilling over the snow fencing and

10  advancing up the west terrace.

11  Q.  And at this point, were you still inside of the physical

12  Capitol?

13  A.  I was still inside the building.

14  Q.  At what point did you go outside of the door?

15  A.  I stayed inside for a little while because I'm not

16  assigned to the civil disturbance unit.  They're the guys

17  that wear the riot gear.  So I stayed inside for a while.

18          And then not too long after that, the civil

19  disturbance unit, they arrived.  They go outside.  And then

20  not too long after that, an officer comes up and says:  We

21  need you guys' help.  That's when I go outside.

22          MS. REED:  If we could go to Exhibit 401.

23  Actually, let's hold that for one moment.

24  BY MS. REED:

25  Q.  Officer Goodman, was this the first breach point of the

```
 1    building at that point as you know it?
 2    A.  To my knowledge, yes.
 3    Q.  Were you aware of any other breach points at that point
 4    that were going on in the Capitol?
 5    A.  No.
 6    Q.  At some point, you learned that there were other breach
 7    points inside of the Capitol.  Correct?
 8    A.  Eventually, yes.  Yes.
 9    Q.  Now, sticking with where you were sort of looking out,
10    is that the inaugural stage side that you were looking from?
11    And what are you facing to?
12    A.  Yeah.  That's the inaugural stage side.  I'm facing
13    west.  I'm facing looking down the Mall --
14    Q.  Okay.
15    A.  -- at a point.
16    Q.  Can you tell the Court from your perspective, what are
17    you seeing happening at this point?
18    A.  At that point, because I'm still inside, I just see a
19    lot of people spilling over the fence and just sort of
20    engulfing the west front.  They're sort of coming up the
21    west front.
22    Q.  And what, if anything, was the response from Capitol
23    Police as these individuals are going closer to the Capitol?
24    A.  You had the riot units or the civil disturbance unit
25    running out to form their line to the -- at the base of the
```

Goodman - DIRECT - By Ms. Reed

1    west terrace, at the base of the staircase to form their

2    perimeter and their line.

3    Q.  And at some point, did you actually assist with those

4    officers once they themselves had been breached?

5    A.  Yes.  At some point in time, I go out because an officer

6    comes up and he says:  We need your help.  So I go outside.

7            And that's when I'm handed, I'm assuming, the

8    first person who came over who breached the police line.

9    And they had taken him into custody and they handed him off

10   to me; and I walked that individual around to the prisoner

11   collection point, which is on the south plaza, the House

12   plaza of the building, and to wait for the wagon to show up,

13   the prisoner transport wagon to show up.

14   Q.  At some point, did that wagon show up?

15   A.  About 30 to 45 minutes later.

16   Q.  And then after that first initial response, did you have

17   a second response still on the exterior of the Capitol?

18   A.  Yes.  Once the wagon showed up and I searched my

19   prisoner and attended to him and put him on the wagon, I go

20   back around the upper west terrace to the west front side of

21   the building.  And that's when I encounter a sergeant or

22   supervisor; and they tell me to get in there, get in there

23   now.

24   Q.  And did you know what they meant when they told you to

25   get in there, get in there --

1    A.  Not initially, because the way the stage was built,

2    there's -- it's a high platform and there's scaffolding all

3    over.  So I couldn't see much until I went and looked

4    underneath the scaffolding and the white cloth that was

5    covering the scaffolding.  And that's when I could see

6    actually what was going on.

7    Q.  What did you see, Officer Goodman?

8    A.  From my experience, it looks like something out of

9    medieval times, where you have one huge force clashing with

10   another opposing force.  I've never seen something like that

11   ever.

12   Q.  Well, let me ask you, when you say "two forces," was one

13   of the forces -- would that be police officers?

14   A.  One side was police officers.  The other side was

15   protesters.

16   Q.  At some point, did you physically engage with those

17   individuals who were -- again, we're talking about the

18   exterior of the Capitol.  Correct?

19   A.  Yes.  So right -- so as soon as the supervisor tells me

20   to get in there, I draw up my baton and I pull out my pepper

21   spray and I get in and engage the individual.  I sprayed

22   until I ran out of spray.  And as they would attack, I'd

23   strike with my baton and do what I could to propel and

24   maintain the line as they kept advancing it.

25              THE COURT:  You're still on the west terrace?

Goodman - DIRECT - By Ms. Reed

1          THE WITNESS:  Yes.  Still on the west terrace.

2     BY MS. REED:

3     Q.  While you were still at that west terrace side, do you

4     yourself end up getting sprayed?

5     A.  Yes.  I have got sprayed.  It looked like bear spray.  I

6     got hit with -- I had several objects thrown at me.  I

7     had -- I think somebody threw what looked like an apple or a

8     fruit or something, hit me in my head.

9     Q.  What was the response once all of that happened to you?

10    Do you remain positioned there?

11    A.  Yeah.  I remained positioned there and maintained the

12    line.  And about that time is when Metropolitan Police

13    showed up and their civil disturbance unit comes out and

14    they reinforced our police line.

15    Q.  How many times were you bear sprayed or sprayed while

16    you were out at that section on the west side?

17    A.  Just once.  And then Metropolitan Police began to deploy

18    their teargas at that point, and a lot of the blow-back from

19    the teargas came back on a lot of us and it kind of had a

20    pretty bad effect on me.

21    Q.  So at that point, do you relocate to the inside of the

22    Capitol?

23    A.  So I come back into the lower west terrace door.  I go

24    back upstairs to the first floor, where a few of our

25    officers along with the Office of the Attending Physician

1    had set up a sort of triage point for us to rinse our faces

2    off or do what we needed to do to get back into the fray of

3    things.

4              I sat down.  I rinsed my face.  I threw up a

5    couple of times from the reaction from the teargas.  And

6    then I go back outside.

7    Q.  Now, at some point, do you go back on the inside of the

8    Capitol where you continue to address another breach?

9    A.  Yes, I do.  But at that moment, I went back outside.

10   Q.  Okay.

11   A.  And I got back into the fight and ran up and down

12   scaffolding, chasing rioters off the scaffolding.  And it

13   was at that point where a few of us were on top of the

14   scaffolding and they started shaking the scaffolding, trying

15   to rock us down off the scaffolding.  And by that point is

16   when we sort of started to become overrun.  And a supervisor

17   called us, a few of us back, and that's when I go inside.

18   Q.  Do you know how long you were outside on that west

19   front?

20   A.  That I do not know.

21   Q.  And once the supervisor called you back inside, did you

22   in fact go back inside and remain inside for the rest of the

23   day at least?

24   A.  Yes, I did.

25   Q.  So now I want to talk about the interior.  At some point

1   when you're back inside, do you learn of an interior breach

2   to the Capitol?

3   A.  When I go back inside, because I can't see what's going

4   on outside, all I can hear is the radio and what's being

5   said on the radio.  So I hear something to the effect of

6   "breach of the Rotunda."

7   Q.  Okay.

8   A.  So I run up and --

9   Q.  Let me stop you right there.

10          When you go back inside, what area of the Capitol

11  do you respond to or where do you go inside the Capitol?

12  A.  So I go -- when I go back inside, I go back upstairs to

13  the first floor and sort of stand in the Crypt area, which

14  is where the triage area was.  And then I hear "breach of

15  the Rotunda."

16  Q.  I asked you earlier about the radio transmission when

17  you started.

18          So when you began the day, it was pretty clear.

19  Correct?

20  A.  Yes.

21  Q.  At this point, can you describe to the Court what's

22  going on with the radios?

23  A.  The radio was haywire.  I could just hear officers

24  trying to come across and I guess give their positions or

25  individual battles that they happened to be dealing with

1   around the Capitol.  And if you -- not too many people could

2   get across the radio.  It was just haywire.

3   Q.  So was it happenstance that you were just able to hear

4   about this breach in the Rotunda area?

5   A.  Yes.  Yes.

6   Q.  And did you respond to that area?

7   A.  So I went up -- yes.  I go up to the second floor, which

8   is what the Rotunda is on.  And I look out and I go to the

9   Rotunda door, which faces east of the building.

10  Q.  Okay.  At some point, did you learn that there was a

11  breach to the Senate Wing door?

12  A.  Yes, I did.  Once -- I heard the radio go "breach of the

13  Senate."  Somebody said something to the effect of "The

14  Senate has been breached" or "breach to the Senate" over the

15  radio.  Yes.

16  Q.  Did you respond to that Senate Wing door area?

17  A.  Yes.  I run down to -- from the Rotunda to the Senate

18  wing of the building, which is where I pass by a leadership

19  office and also pass by Senator Romney on the way.  And I

20  round the corner.

21       I passed another leadership office and I see

22  individuals, an officer and a few staffers and doorkeepers

23  standing outside the Republican door to the Senate or the

24  Republican -- Senate Republican cloakroom.

25  Q.  And by the time that you were making your way to the

Goodman - DIRECT - By Ms. Reed

 1     Senate Wing area, do you know about how many offices that

 2     you were able to pass by of significance?

 3     A.   Officers or offices?

 4     Q.   Offices, like any signage that said any offices, the --

 5     A.   Yes.  I passed by three significant offices on the way

 6     to --

 7     Q.   What were those offices?

 8     A.   The majority leader, minority leader and majority whip.

 9     And also the vice presidential staff office and the -- once

10     I rounded the corner, I'm facing the vice presidential

11     ceremonial office and the -- her staff office.  And then I

12     have the Republican door, which is a main entrance that is

13     the most heavily used entrance for senators when they are

14     entering the floor of the Senate.

15     Q.   How, before we address what eventually was your

16     encounter in the archway, correct? -- and I'm going to have

17     you explain that -- I want to go back to the Rotunda very

18     quickly.  When you heard about the breach to the Rotunda

19     area, did you actually know if rioters had entered that

20     area?

21     A.   No.  They hadn't.  When I -- I didn't know they had

22     entered that area.  And when I got up to the second floor,

23     no one had entered that area.  I went to -- I looked out the

24     Rotunda door and I could see officers in riot gear outside

25     of the door with their backs pressed up against the door

1    and just a mob of people pressing up against them.  But

2    nobody to that point had breached the Rotunda door.

3    Q.  Okay.  So now there is a chart behind you.  And if you

4    could, Officer Goodman, just take us through your route.  Do

5    you actually go into the Rotunda?

6    A.  Yes.  I actually go into the Rotunda.  I took the --

7    there's a staircase that sits --

8              THE COURT:  You can step down.

9              THE WITNESS:  Okay.  So there's a staircase --

10             THE COURT:  But I need to see the exhibit.  So

11   just turn -- you can go to the other side.

12             THE WITNESS:  Okay.  So there's two staircases

13   here.  You have the staircase that takes you up into the

14   Rotunda from the first floor and then there's another

15   staircase directly underneath here that takes you to the

16   west front -- to the basement out to the west front.

17             So when I come back into the building, when I

18   hear -- and I'm standing at the base -- standing at the top

19   of the staircase on the first floor and I hear "breach of

20   the Rotunda," I come up the second -- the next stairs, and

21   it takes me into the Rotunda, which is where I can -- I'm

22   actually into the Rotunda and I can actually see the west

23   front -- I mean, the east front.  I can see the officers in

24   the window pressed against the doors.

25

1    BY MS. REED:

2    Q.  So staying where you are, Officer Goodman, as you leave

3    out of this Rotunda area, can you show the Court where you

4    then went to?

5    A.   Okay.  So we hear "breach of the Senate."  At this

6    point, when I hear "breach of the Senate," I'm here,

7    facing -- I'm facing west.  I'm looking out the door -- no.

8    I'm facing east.

9           I come out.  I run -- this would be going north

10   towards the Senate.  I go around the roundabout past just

11   here.  There's a leadership office.  It's the minority

12   leader.  I come in this area.  That's when I pass by Senator

13   Romney.  Just in front of me is the Senate main door here,

14   where -- which was locked and secured.  Just to the left

15   here is the majority leader's office.

16          I hang a right and come down this hall, and just

17   in front of me here is the minority whip's office.  I make a

18   left and I -- when I get around the corner, this area right

19   here is the Senate cloakroom here.  And this is the -- what

20   we call the rep door, the Republican door.  There were

21   officers standing outside of here.  There were staff,

22   doorkeepers standing outside of here.

23          And this entrance is the entrance I said that's

24   most highly used because you have the bank of six elevators

25   here.  These are the elevators the members take when they

1    are going back and forth between the tunnels to come to the

2    floor to give speeches and vote.

3              So I get here and I tell the individuals that I

4    see, I said:  I think you guys might need to get inside.  I

5    think they're in here.

6              And I said:  Well, let me go see.  And then I go

7    downstairs.  This would be the east grand staircase.  I go

8    downstairs, and that's when I'm immediately confronted by

9    Mr. Seefried.

10   Q.  Now, let me pause for a second.

11             When you see these individuals and you tell them,

12   "I think you need to go back inside," could you hear any

13   rioters in the building at that point?

14   A.  At that point, no, because I was on the second floor.

15   So no.  I couldn't hear anything.

16   Q.  So then you go down to the first floor.  Correct?

17   A.  That's when I go down to the second -- the first floor.

18   Q.  And tell us what you see, first of all, when you arrive

19   in this first floor.

20             And let me just for record purposes say, your

21   Honor, we're referencing the second floor.  That's

22   Exhibit 104.  That's just for the record.

23             Can you tell us, what is it that you are seeing

24   when you are heading towards this direction on the first

25   floor?

1    A.  So when I go down these stairs -- they're a winding

2    staircase.  So I go down and there's the kitchen, which is

3    conjoined with the Senate dining room.  This is where

4    senators go -- which would have been in use that day,

5    because this is where senators go with their guests and

6    that's where they get their food at.  And it's like

7    restaurant-quality food.  That's where they would go to eat.

8            So I go downstairs.  And when I hang a right at

9    the base of the staircase, that's when I'm immediately

10   confronted by Mr. Seefried.

11   Q.  And just -- Officer, if you can give the Court some

12   orientation as well, can you describe the area?  Are there

13   arches in the area?

14   A.  So the area is -- it's a small sort of hallway.  It's

15   tight.  The archway the exits that little hallway is even

16   tighter, about the size of a doorway.  And so it's really,

17   really a confined space.

18   Q.  And you can take the stand again, sir, Officer Goodman.

19   A.  (Witness complies.)

20   Q.  So suffice it to say you are attired that day just like

21   you are today.  Correct?

22   A.  Yes.

23   Q.  And did you have any items in your possession?  Did you

24   have a firearm on you?

25   A.  I had my firearm.

Goodman - DIRECT - By Ms. Reed

1   Q.  Did you have any pepper spray on you at that time?

2   A.  I was completely out of pepper spray, but I had an empty

3   cannister on me.

4   Q.  Why was it empty?

5   A.  I used it all outside in the fight on the west front.

6   Q.  Did you also have a police officer baton on you?

7   A.  Yeah.  And I dropped it at the base of the stairs coming

8   down.

9   Q.  And it's your testimony that at some point you see

10  Mr. Seefried.  Correct?

11  A.  Yes.

12  Q.  Do you see Mr. Seefried in court today?

13  A.  Yes.

14  Q.  And can you tell us where you see him seated and

15  describe him?

16  A.  Just to my left wearing an orange shirt.

17          MS. REED:  Your Honor, I'm not sure if this is --

18  in my jurisdiction, let the record reflect -- I'm not sure

19  if I need to do that here, but let the record reflect the

20  in-court identification.

21          THE COURT:  Of Mr. Hunter Seefried?

22          MS. REED:  Mr. Kevin Seefried, your Honor.

23          MR. OHM:  No objection.

24  BY MS. REED:

25  Q.  So, Officer Goodman, we're going to slow it down a

1    little bit.

2            Can you tell us what you first see when you see

3    Mr. Seefried?

4    A.  He's standing in an archway, sort of forward of the

5    archway.  He's wearing his tan-looking vest.  And he's got a

6    flag, a Confederate flag, in his hand.

7    Q.  At that point, is he the only person standing in the

8    archway?

9    A.  At that point initially, yes.

10   Q.  And when you first observed him, does he say anything or

11   do anything towards you?

12   A.  I approach him and I tell him:  You need to get out.

13   You need to leave.

14           And that's when he uses the base of his flagpole

15   in a jabbing motion sort of to create space between he and

16   I.  Yeah.

17   Q.  Now, you testified earlier about training and

18   experience.

19           While you are confronted directly with

20   Mr. Seefried, are you advancing towards him?

21   A.  Initially, yes.  I'm advancing towards him.  Yes.

22   Q.  Can you explain why?

23   A.  If I needed to take him into custody, if -- I mean, at

24   this point I don't see everybody else.  So if I have to make

25   an arrest of just him, I can take it.  If I have to take him

1    into custody, I can do that.

2              So yes.  I'm advancing to him.  I'm telling him to

3    back up, to leave.  But I'm just -- I'm closing ground on

4    him, yes, to get the advantage.

5    Q.  Was he paying attention to your commands?

6    A.  No.  Not at all.

7    Q.  How was he disregarding your commands?

8    A.  He was saying things like:  "F" you.  I'm not leaving.

9    Where are the members at?  Where are they counting the votes

10   at?  Things to that nature.

11             He was -- he was just ignoring me.  He wasn't

12   following.  I'm giving him commands.  He's giving me

13   commands in return.  He's not doing what I say.

14   Q.  What was his demeanor?

15   A.  He was very angry, screaming, talking loudly.  The

16   complete opposite of pleasant, if you will.

17   Q.  I believe Exhibit 504 has already been introduced.

18             MS. REED:  If we could pull that up, Mr. Leach,

19   please.

20             THE COURT:  Can I just ask you, when he was

21   jabbing the flag at you, how far was he from you?

22             THE WITNESS:  Within reaching distance.

23             THE COURT:  So did you have to move?

24             THE WITNESS:  I held my ground and he backed up --

25             THE COURT:  Okay.

```
 1                THE WITNESS:  -- at that point.
 2                MS. REED:  Actually, Judge, I can get us there.
 3                If we can start, Mr. Leach, about 15 seconds in.
 4      Thank you, sir.
 5                (Whereupon, segments of Government's Exhibit No.
 6      504 were published in open court.)
 7                MS. REED:  Can we stop it there.
 8      BY MS. REED:
 9      Q.  It's a little fuzzy there, and I'm going to get us a
10      better image in a little bit.  Can you see yourself standing
11      in the doorway?
12      A.  Yeah.  I see an image of me.  Yes.
13                MS. REED:  If we could go to 504-D, please.  And
14      if we could pause it, please, right here at the seven-second
15      mark.
16      BY MS. REED:
17      Q.  Now, Officer Goodman, is this a better view?
18      A.  Yes.  Still hazy, but I can see better.
19      Q.  And where do you see yourself standing?
20      A.  I'm the furthest person away in this picture to the
21      right-ish.  Yes.
22                MS. REED:  And if we could continue the video,
23      please.
24                (Whereupon, segments of Government's Exhibit No.
25      504-D were published in open court.)
```

```
 1    BY MS. REED:
 2    Q.  Do you see an individual with a brown vest standing in
 3    front of you?
 4    A.  Yes.
 5    Q.  Who is that individual?
 6    A.  That's Mr. Seefried.
 7              MS. REED:  If we could go to -- if we could
 8    continue to play that out, please.
 9              (Whereupon, segments of Government's Exhibit No.
10    504-D were published in open court.)
11              MS. REED:  Mr. Leach, can we go to 504-E, please.
12              (Whereupon, segments of Government's Exhibit No.
13    504-E were published in open court.)
14    BY MS. REED:
15    Q.  Now, do you recognize what 504-E is, Officer Goodman?
16    A.  Yeah.  I see myself.  I see.  Yes.
17    Q.  And do you see Mr. Seefried?
18    A.  Yes.  He's the closest person to me.
19    Q.  Do you see a wooden dowel in his hand?
20    A.  Yes.
21    Q.  And can you tell the Court, what is happening at this
22    moment in 504-E?
23    A.  I'm giving him commands.  And this is the point where he
24    sort of backs up to -- I believe he had already jabbed at me
25    with the base end of the flagpole.  But he sort of -- at
```

Goodman - DIRECT - By Ms. Reed

1    this point, he sort of backs off to kind of, you know, fall

2    back into the group, so to speak.  Yeah.

3    Q.  Now, at some point, as you testify, it was just you and

4    Mr. Seefried who had contact with one another?

5    A.  Yes.

6    Q.  In 504-E we see other individuals.  But was that always

7    the case?

8    A.  That wasn't always the case.  At one point it was just

9    me -- he and I.  And there's a bunch of people.

10             MS. REED:  Your Honor, the Government would seek

11   to introduce 504-D and 504-E.

12             MR. OHM:  No objection.

13             THE COURT:  Without objection --

14             I take it you don't object?

15             MR. BOSTIC:  No objection.

16             THE COURT:  -- 504-D and 504-E are in.

17             (Whereupon, Government's Exhibit Nos. 504-D and

18   504-E were entered into evidence.)

19             MS. REED:  Thank you, your Honor.

20             And the last one, 504-F, please.

21   BY MS. REED:

22   Q.  Do you recognize 504-F as well, Officer Goodman?

23   A.  Yes.

24   Q.  And can you see the wooden dowel again in Mr. Seefried's

25   hand?

1    A.  Yes.

2    Q.  Are you saying anything back to him when he's doing this

3    jabbing motion at you?

4    A.  Just to get back; get out; you guys need to leave.

5    Things of that nature.

6    Q.  Do you know how many times he made this jabbing motion

7    at you?

8    A.  Three, two or -- three or four times, maybe.  Not a

9    whole lot.

10   Q.  On the other side of this wooden dowel, is there a

11   Confederate flag?

12   A.  Yes.

13   Q.  Now, at some point, Officer Goodman, do more individuals

14   come into this archway area?

15   A.  Yes.

16   Q.  And you just testified to the Court that this is a

17   pretty tight area.  Correct?

18   A.  Yes.

19   Q.  Okay.  Are you good with measurements at all?  Can you

20   give us any sort of approximation as to what that space is

21   as far as the measurements?

22   A.  I couldn't begin to tell you.

23   Q.  Okay.

24   A.  It's pretty tight for me.  I felt confined.

25   Q.  Let me ask you, did a number of individuals sort of

```
 1    huddle in this confined space?
 2    A.  Yes.
 3    Q.  Were they close to you when they came to you?
 4    A.  Yes.
 5    Q.  Do you know how close they were to you?
 6    A.  Just outside of arm's length.
 7    Q.  As far as Mr. Seefried goes, when he was doing this
 8    jabbing motion at you, was he an arm's length of you?
 9    A.  Yes.
10    Q.  Is that why you were giving him the command to back up?
11    A.  Yes.
12    Q.  I'm jumping ahead a little bit.  As these other
13    individuals sort of entered this archway, are you still
14    giving commands for them to back up?
15    A.  Yes.
16            MS. REED:  Your Honor, I know you have seen 504,
17    but I do have some pointed questions.
18            So if you could just start again at 504 at the
19    beginning, please, Mr. Leach.
20            THE COURT:  Did you want to move in 504-F?
21            MS. REED:  Yes, your Honor.  504-F, please.
22            THE COURT:  Any objection?
23            MR. OHM:  No, your Honor.
24            MR. BOSTIC:  No, your Honor.
25            THE COURT:  Without objection, 504-F is in.
```

```
 1                    (Whereupon, Government's Exhibit No. 504-F was

 2        entered into evidence.)

 3                    (Whereupon, segments of Government's Exhibit No.

 4        504 were published in open court.)

 5                    MS. REED:  If we could stop it for a moment.

 6        BY MS. REED:

 7        Q.  Now, at some point, does Mr. Seefried indicate to you

 8        that he was willing to shoot you?

 9        A.  He was willing to shoot me?

10        Q.  Yes.

11        A.  No.  I didn't hear that.

12        Q.  Kevin Seefried, to be specific for the record.

13        A.  No.  I didn't hear him say that he would shoot me.  No.

14        Q.  Did he say that he was going to shoot anyone to proceed

15        his way into this archway?

16        A.  I didn't hear him say anything about shooting anybody.

17        No.

18        Q.  At any point did he make any threats to you?

19        A.  Just more like:  You better -- you better get the "F"

20        out of my way.  We're here.  We're taking back our country.

21        Things like:  We're thousands.  You're just one.  You're by

22        yourself.  Stuff to that effect.

23        Q.  Do you recall any statement being made that "You'll have

24        to shoot me to stop me from going inside" being made from

25        the crowd?
```

```
1    A.  From the crowd, yes.  I've heard -- I heard that.  From

2    the crowd, yes, I did hear that.  Not specifically him.

3    Q.  Okay.  Now, what were you hearing the crowd say?  We're

4    going to break this down a little bit.  But what's happening

5    as this crowd is approaching you in the hallway?

6            MS. REED:  And if we could continue.  I know we

7    stopped at the 54-second mark.  But if we could move forward

8    a little bit, Mr. Leach.

9            (Whereupon, segments of Government's Exhibit No.

10   504 were published in open court.)

11           MS. REED:  Stop it there, please.

12   BY MS. REED:

13   Q.  Did you hear individuals talking about votes being

14   counted?

15   A.  Yes.  "Where are they counting the effing photos at?"

16   Yes.

17   Q.  What's going through your head as you're hearing this?

18   A.  That they were trying to get in and obviously interrupt

19   the process.

20   Q.  And what process are you referring to?

21   A.  The election process and the counting the votes to

22   proceed with the presidential nomination.

23   Q.  From this video, were you able to tell who was making

24   that statement?

25   A.  There was a guy in red who made that -- was one of the
```

Goodman - DIRECT - By Ms. Reed

1    individuals that made that statement.  It was a few guys

2    that make that statement.

3              MS. REED:  If we could please go to Exhibit 505.

4              THE COURT:  Sorry.  Did you just hear that on that

5    video there?

6              THE WITNESS:  Yes.

7              THE COURT:  Can you do that --

8              MS. REED:  Would you like me to back it up again,

9    your Honor?

10             THE COURT:  Yes.

11             MS. REED:  If we could go back to the 30-second

12   mark, please.

13             (Whereupon, segments of Government's Exhibit No.

14   504 were published in open court.)

15   BY MS. REED:

16   Q.  In addition to "Where are they counting" -- excuse me --

17   "the fucking votes," did you hear anyone ask, "Where's the

18   meeting at?"

19   A.  "Where the meeting's at?  Where are the members at?"

20   Q.  And again, given what was happening in the building, did

21   you have an understanding of what that meant?

22   A.  That they were there to interrupt the process.  Yes.

23             MS. REED:  Now if we could go to Exhibit 505,

24   please.

25   BY MS. REED:

1    Q.  Now, Officer Goodman, are you familiar just seeing these

2    steps with 505?

3    A.  Yes.  That's the east grand staircase.

4    Q.  You've already testified that you ran to -- down that

5    stairwell to address the breach.  Correct?

6    A.  Yes.

7    Q.  Is this the point right before you see Mr. Seefried?

8    A.  Well, in this --

9    Q.  We can continue the video a little bit.

10   A.  Okay.

11            (Whereupon, segments of Government's Exhibit No.

12   505 were published in open court.)

13            THE WITNESS:  Right about there is where I'm

14   confronting him.  You can't see me, but right about there.

15   BY MS. REED:

16   Q.  Now, you testified earlier that you had dropped your

17   baton.  Correct?

18   A.  Yes.

19   Q.  Is that reflected in Exhibit 505?

20   A.  Yes.

21            MS. REED:  If we could continue the video,

22   Mr. Leach.

23            (Whereupon, segments of Government's Exhibit No.

24   505 were published in open court.)

25

1    BY MS. REED:

2    Q.  Did you hear an individual from this perspective in 505

3    asking, "Where are the votes being counted?"

4    A.  Yes.

5    Q.  "Where are they counting the votes?"  I believe that's

6    it specifically?

7    A.  Yes.

8    Q.  Do you know where that person is positioned in this

9    picture?

10   A.  He's just --

11   Q.  Can you --

12   A.  I'm facing him.  He's sort of to my left.  He's the red.

13   He's the red hat there.  And he's standing right next to

14   Mr. Seefried.

15            MS. REED:  Can we back it up a little bit,

16   Mr. Leach, to the ten-second mark.

17            (Whereupon, segments of Government's Exhibit No.

18   505 were published in open court.)

19            MS. REED:  Can we pause it again, please, at the

20   20-second mark.

21   BY MS. REED:

22   Q.  The individual in the red hat, is that the person who

23   you said was standing next to Mr. Seefried?

24   A.  Yes.

25   Q.  When the individual was making these statements to

1    Mr. Seefried, what was he doing, "he" being Mr. Kevin

2    Seefried?

3    A.  He was just sort of standing off to the side right next

4    to him.  The mass is slowly starting to advance on me.  So

5    he, along with everybody else, is slowly advancing.

6    Q.  So it's your testimony "Where are they counting the

7    votes?" and these individuals are now moving closer to you.

8    Correct?

9    A.  Yes.

10   Q.  They're making their way into the building even more.

11   Correct?

12   A.  Yes.

13   Q.  The individual who you described with the red hat, do

14   you know how many times he asked, "Where are the votes being

15   counted?"

16   A.  I couldn't remember.

17   Q.  Was it more than once?

18   A.  Yes.  I -- yes.

19   Q.  Now, this crowd that is growing in this archway,

20   obviously now it's more than just Mr. Seefried at this

21   point.  Correct?

22   A.  Yes.

23   Q.  Are you able to hear what they are saying, Officer

24   Goodman?

25   A.  So at one point I have my hand on my gun and you have a

1  few with the hands up saying, "We're not here for" -- just a

2  small few.  They're saying, "I'm not here for that.  I'm not

3  here for violence.  I'm here for the country.  You need to

4  be on our side."

5          And then I have others that were angry or said,

6  "What are you going to do?  Are you going to shoot us?  What

7  are you going to do?"

8  Q.  Was Mr. Seefried in that group?

9  A.  Yes.

10 Q.  And when I say "in that group," are we talking about

11 still this corridor area that is marked at 20 seconds in

12 Exhibit 505?

13 A.  Yes.

14 Q.  Okay.  At any point -- had you seen Hunter Seefried at

15 that point?

16 A.  No.

17 Q.  As far as you placing your hand on your weapon, can you

18 tell us why you went from having your baton being on the

19 ground, picked up, to now your hand being on your weapon?

20 A.  Well, my hand was on my weapon before I fell back to

21 pick up my baton.

22 Q.  Okay.

23 A.  I put my hand on the weapon.  It means compliance.  Back

24 up.  They kept advancing.

25 Q.  Suffice it to say, did you feel threatened at this point

1   where this crowd is growing?

2   A.  Yes.

3   Q.  In the video, did you hear them say that they were here

4   for you?

5   A.  Not in this video that you played, but there in that

6   moment you had a few saying that.  Yes.

7   Q.  Okay.  And what did you take that to mean?

8   A.  That they were trying to come across as being nonviolent

9   and attempting to try to gain my trust in order to get an

10  edge on me, so to speak.

11  Q.  Is that how they were, in fact, acting?

12  A.  Yes.

13  Q.  Violent or nonviolent?

14  A.  Aggressive.  Aggressive.

15  Q.  Is there anyone in this picture again at the 20-second

16  mark who you would say was aggressive?

17  A.  So the guy in the -- that's directly in front of me,

18  he's advancing the most.  He's -- I'm telling him to back

19  up.  "You need to leave."  I even pushed him a few times.

20          And he sort of is being sly, like he's inching

21  closer as I look at the other individuals and address other

22  individuals.  He sort of creeps along, you know, kind of

23  trying to be sly.  Yeah.  That was aggressive to me.

24          MS. REED:  Mr. Leach, if we could continue the

25  video, please, starting at 20 seconds.

```
 1                    (Whereupon, segments of Government's Exhibit No.

 2       505 were published in open court.)

 3                    MS. REED:  Pause for a second at 48 seconds,

 4       please, or 49 seconds.

 5       BY MS. REED:

 6       Q.  Now, Officer Goodman, there appears to be a hallway

 7       behind you.  Correct?

 8       A.  Yes.

 9       Q.  Can you explain to the Court, what is down that hallway?

10       A.  Okay.  So just to the left there you see the base of a

11       chair.  That's the entrance to the Republican door of the

12       Senate.

13                    Just past there, there's a second archway right

14       there.  And that's called the Senate reception room.

15                    Just to the right you have the vice presidential

16       staff office.

17                    And to the left you have the Senate lobby, which

18       is a back entrance to the Senate floor, and it's also where

19       the vice presidential ceremonial office is.

20       Q.  Was there a concern that this group could have gone down

21       that corridor?

22       A.  Yes.

23       Q.  And why was that a concern of yours?

24       A.  Because when I came out, when I initially responded to

25       the breach that I thought I heard over the radio, there were
```

Goodman - DIRECT - By Ms. Reed

1    individuals out in front of the ceremonial office sitting

2    outside that chair.  Because that's a natural post

3    assignment for my section.  And there was a Senate

4    doorkeeper there who controls the access to the Senate

5    chamber.  And so that's -- there were people out there.  So

6    that's why I was concerned.

7    Q.  Okay.  Now, here where we have it stopped again at 49

8    seconds, the person who you described as Q shirt, is this

9    the person who was being aggressive towards you?

10   A.  Yes.

11   Q.  And can you explain to the Court your sort of touching

12   him at this point, it appears?

13   A.  To create distance between him -- myself and he.

14   Q.  Was he giving you that distance?

15   A.  No.  He kept advancing.

16          MS. REED:  If we could continue, video.  Please.

17          (Whereupon, segments of Government's Exhibit No.

18   505 were published in open court.)

19          MS. REED:  If we could stop again.

20   BY MS. REED:

21   Q.  Now, where did you lead this group of rioters?

22   A.  Okay.  So right now, I'm currently face -- you see

23   there's a door right there.  That's the office of the

24   Republican whip.  And so this is what's called the Ohio

25   Clock Corridor.  It's also the Senate main door, which is to

1    my rear, sort of my rear left.  That door faces the House

2    main door.

3           You can look straight across the main hallway all

4    the way down to the House side of the building and see the

5    House main door from that place.  So that's where I'm at

6    currently.

7    Q.  At some point before you even engaged this group -- and

8    by "engage," I mean leaving from the second floor, going to

9    the first floor -- did you know there were other officers

10   who were available to help you?

11   A.  I had -- on my response from the Rotunda, I left a group

12   of officers who were already in the Rotunda to go respond to

13   what I heard over the radio, the "breach of the Senate."

14   Q.  And so did that influence you taking this group to the

15   Ohio Clock Corridor?

16   A.  Yes.

17   Q.  Okay.

18           MS. REED:  We can finish the video out, please,

19   Mr. Leach.

20           (Whereupon, segments of Government's Exhibit No.

21   505 were published in open court.)

22   BY MS. REED:

23   Q.  Stopping at the 11-second mark, did you hear an

24   individual telling the group they needed to leave now?

25   A.  Yes.

1    Q.  Do you know who that individual is?

2    A.  That's Inspector Loyd.

3    Q.  And Inspector Loyd, is he your supervisor?

4    A.  Yes.  He's the division commander.

5           MS. REED:  And if we could continue, please,

6    Mr. Leach.

7           (Whereupon, segments of Government's Exhibit No.

8    505 were published in open court.)

9           MS. REED:  Stop, please, at 1:20.

10   BY MS. REED:

11   Q.  Can you tell us what's happening in this frame, Officer

12   Goodman?

13   A.  So we're forming a line to keep them from advancing any

14   further.  They began to come in -- the group began to come

15   in, and they're still shouting stuff at us:  This is our

16   America.  We're here to Stop the Steal.  You guys need to be

17   on our side.  Where are they counting the votes at?  The

18   same rhetoric that I confronted when I was down at the base

19   of the stairs.  They're saying the same things.

20          MS. REED:  If we could continue the video, please.

21          (Whereupon, segments of Government's Exhibit No.

22   505 were published in open court.)

23          MS. REED:  Thank you.

24   BY MS. REED:

25   Q.  Now, at some point, does a line of police officers form

1    inside of the corridor?

2    A.  Yes.

3    Q.  And what was the purpose of you all forming a line in

4    the corridor?

5    A.  To keep them from advancing any further --

6    Q.  Okay.

7    A.  -- than they had.

8    Q.  Do they continue to advance upon you?

9    A.  They filled up the room, but they don't come any further

10   than the line we established.

11   Q.  While you all are positioned in the line, are you saying

12   anything as officers to the group?  I want to start with you

13   specifically.  Are you saying anything to them?

14   A.  Just:  You need -- you guys need to leave.  You need to

15   get out.

16   Q.  And did they leave?

17   A.  No.

18           MS. REED:  If we could pull up Exhibit 414,

19   please.

20           Your Honor, I believe this has already been

21   introduced.

22           (Whereupon, segments of Government's Exhibit No.

23   414 were published in open court.)

24   BY MS. REED:

25   Q.  Can you tell us what we're looking at in this video,

1     Officer Goodman?

2     A.  So you see the group of officers standing in front of --

3     just to the right in this picture is the Senate main door.

4     That's the door all the way to the back of them.  That is

5     the majority whip's office right there.

6            And so I guess they're establishing a line.  It

7     looks to be -- or coming around the corner.  They don't see

8     me at this point, I don't think.

9            MS. REED:  If we can continue the video, please.

10           (Whereupon, segments of Government's Exhibit No.

11    414 were published in open court.)

12           MS. REED:  Stop the video, please, at the

13    24-second mark.  It's 25.

14    BY MS. REED:

15    Q.  Can you tell us what -- I'm going to refer to him as

16    Q shirt.  Is that how you referred to him?

17    A.  Yes.

18    Q.  Okay.  Can you tell us what Q shirt, Q guy, is telling

19    you at this point?

20    A.  At this point, he sees the other officers; and that's

21    when he stops and puts his hands up.  But before that,

22    he's -- I'm just telling him to back up.  And he's not

23    leaving.  He's just continuing to advance.

24    Q.  He's continuing to follow you?

25    A.  Yes.

```
 1                 MS. REED:  Continue, please.
 2                 (Whereupon, segments of Government's Exhibit No.
 3       414 were published in open court.)
 4                 MS. REED:  Can you pause it at the 31-second mark,
 5       please.
 6       BY MS. REED:
 7       Q.  We heard Inspector Loyd in the other video mention,
 8       "Give them the command that they need to leave."  Is that
 9       what's happening at the 31-, 32-second mark?
10       A.  Yes.
11                 MS. REED:  If we could continue, please.
12                 (Whereupon, segments of Government's Exhibit No.
13       414 were published in open court.)
14                 MS. REED:  Pause, please at the 38-second mark.
15       BY MS. REED:
16       Q.  It appears there is an individual who is engaging
17       directly with you.  Is that accurate?
18       A.  Yes.
19       Q.  And do you recall what this individual was telling you?
20       A.  He's just saying:  This is our America.  We're here to
21       get our country back.  That's what he was saying.  Yeah.
22                 MS. REED:  If we could continue, Mr. Leach,
23       please.  Thank you.
24                 (Whereupon, segments of Government's Exhibit No.
25       414 were published in open court.)
```

```
 1              MS. REED:  Pause at 58, please.
 2   BY MS. REED:
 3   Q.  Do you see the individual in the red hat who was
 4   standing next to Mr. Seefried while they were in the archway
 5   downstairs on the first floor?
 6   A.  Yeah.
 7   Q.  Where do you see him positioned in the corridor?
 8   A.  He looks to be at the base of the picture here.
 9   Q.  You actually can touch your screen, Officer Goodman.
10   A.  Yeah.
11   Q.  You can --
12   A.  Yeah.
13   Q.  Is that the person who you heard downstairs stating,
14   "Where are they counting the fucking votes?"
15   A.  Yes.
16   Q.  "Where are they meeting?"
17   A.  Yes.
18              MS. REED:  If we could continue, Mr. Leach.
19              (Whereupon, segments of Government's Exhibit No.
20   414 were published in open court.)
21              MS. REED:  I'd like to pause here at 104.
22   BY MS. REED:
23   Q.  Do you see Mr. Seefried, Kevin Seefried, in this video?
24   A.  Yes.  He's near the bench.
25   Q.  And is he holding an object in his hand?
```

1    A.  Yes.

2    Q.  And what is he holding?

3    A.  A Confederate flag.

4    Q.  Is he holding another object in the opposite hand?

5    A.  Yes.  It looks to be a water bottle, maybe.  I can't

6    tell.

7    Q.  Is he confronting you or is he talking to you at this

8    point?  Do you recall?

9    A.  Yeah.  He looks to be talking to me.  I don't recall

10   what he's saying because I'm yelling over top of them as

11   they're yelling at me.

12              MS. REED:  Can we continue the video, please.

13              (Whereupon, segments of Government's Exhibit No.

14   414 were published in open court.)

15              MS. REED:  Can we pause, please.

16   BY MS. REED:

17   Q.  Do you see an individual standing next to Mr. Seefried

18   with a baseball cap and sort of a yellow or tan brim?

19   A.  Yes.

20   Q.  And did you recall seeing that person down in the

21   archway?

22   A.  No.  I don't recall seeing him in the archway.  No.

23   Q.  But you eventually obviously did see him in the Ohio

24   Clock Corridor.  Correct?

25   A.  Yes.  Yes.

1   Q.  Do you know who that person is today?

2   A.  Yes.  That's Mr. Seefried's son.

3   Q.  Did you know that at the time, though, when --

4   A.  No.

5   Q.  -- you were in the Ohio Clock Corridor?

6   A.  No, I didn't.

7   Q.  Did you see them together inside of the Ohio Clock

8   Corridor?

9   A.  Not standing together as if to see that they were with

10  one another.  No.

11  Q.  At any point did this individual engage you directly?

12  A.  Yes.  At one point, I repositioned on the line.  I go

13  from like the far, to one side, to the complete opposite

14  side; and he sort of appears to the front of the line, sort

15  of comes to the front of the line at one point.

16          And I tell him to leave.  "You need to get out

17  now."  And he says no.

18  Q.  When you say "he," who are you referring to?

19  A.  The son.

20  Q.  What was his demeanor like?

21  A.  He wasn't aggressive.  He was just sort of -- sort of

22  sly, sort of smirkish, had a smirkish look on his face the

23  entire time.  He's not really yelling or anything.  He just

24  sort of had this smirkish look on his face.

25          MR. BOSTIC:  Your Honor, I'm going to object to

 1    that.  It's pure speculation as to what he's thinking.

 2            THE COURT:  I'm going to overrule the objection.

 3    BY MS. REED:

 4    Q.  He smirked.  Correct?

 5    A.  Yes.

 6            MS. REED:  Can we pull up Exhibit 515, please.

 7    BY MS. REED:

 8    Q.  Have you seen Exhibit 515 before, Officer Goodman?

 9    A.  Yes.

10    Q.  Do you recognize yourself in 515?

11    A.  Yes.

12            MS. REED:  Your Honor, the Government would seek

13    to introduce Exhibit 515.

14            THE COURT:  I think it's already in.

15            MS. REED:  Oh, thank you.

16    BY MS. REED:

17    Q.  So, Officer Goodman, it looks like Mr. Seefried, Kevin

18    Seefried, is speaking directly to you.  Do you remember if

19    you had a moment where you spoke with him inside of the Ohio

20    Clock Corridor?

21    A.  I don't remember at this moment.  I just remember the

22    entire time just telling them they need -- at this point,

23    telling them they need to leave and they need to get out

24    now.

25    Q.  And did he listen to that command?

1    A.   No.

2    Q.   Were you giving that same command to Hunter Seefried --

3    A.   Yes.

4    Q.   -- as well as the individual who is standing to the left

5    of Kevin Seefried in the black hoodie?

6    A.   Yes.

7    Q.   Was there anybody who was in 515 who you engaged with

8    directly?

9    A.   At one point, the gentleman standing behind -- this

10   gentleman here.

11   Q.   If you could just describe what you see him wearing for

12   the Court.

13   A.   He's got a camouflage-colored Trump hat on and he's got

14   the mask and he's got on what looks like a dark brown coat,

15   like maybe, dark brown.

16   Q.   Is that individual saying anything to you while in the

17   corridor?

18   A.   When he comes to the front, he becomes really

19   aggressive.  He starts yelling, "We're ready for war.  We're

20   ready to take down this place.  We're ready to take down

21   this building.  We're ready to take over.  We're ready for

22   war."

23   Q.   Do you know if that person was positioned where he is in

24   515 in proximity to Mr. Seefried, Kevin Seefried, and Hunter

25   Seefried?

1    A.  Yes.  When he eventually comes to the front, yeah, he's

2    near them.

3    Q.  Okay.  Is there anybody else in 515 who you had direct

4    contact with?

5    A.  So the gentleman standing with the full beard standing

6    directly to his right.

7    Q.  Just for the record, is this individual standing behind

8    Mr. Kevin Seefried?

9    A.  Yes.

10   Q.  And can you tell us what you remember about this

11   individual?

12   A.  So that gentleman was standing -- he stood -- once he

13   came to the front of the line.  And his sentiment is

14   different.  "He's here to take back our country."  He's

15   talking in a calm voice.  He's not yelling.  He's almost

16   talking as if he was trying to reassure me or something like

17   that.

18          And over-talking him with the war talk is the

19   gentleman standing to -- next to him with the camouflage

20   hat.

21   Q.  Okay.  The individuals who are in 515, was there anybody

22   else who stood out to you?

23   A.  The gentleman with the face paint and the horns on his

24   hat.

25          THE COURT:  You noticed him?

1                    THE WITNESS:  Yes.

2               (Laughter.)

3     BY MS. REED:

4     Q.  Well, let me ask you, did you engage directly with him?

5     A.  At one point, yes.

6     Q.  And what was your engagement with him?

7     A.  So at one point, he had -- I engaged him -- the first

8     time I engaged him was downstairs on the first floor.  He

9     raised his American flag.  And what stood out to me was that

10    the tip looked to be razor sharp.  It looked to be

11    sharpened.  That was one of the points where I put my hand

12    on my gun.  And he raised his hand and he said, "I'm not

13    here for that."  That was on the first floor.

14               On the second floor, he's got a megaphone and he's

15    yelling:  Where are the members at?  Where are you all

16    counting the votes at?  Things of that sentiment.  He's

17    trying to come across as a peaceful protester, but he's

18    yelling for the members:  Where are you at?  Where are you

19    all hiding at?

20    Q.  So let me slow that down a little bit.

21               First of all, do you remember when he made those

22    statements inside of the corridor?

23    A.  Yes.  It was right there in that.

24    Q.  So in Exhibit 515, would you say that he's within arm's

25    length of at least Hunter Seefried?

1    A.  Yes.

2    Q.  Okay.  And is that when you hear him making these

3    statements?

4    A.  Yes.

5    Q.  Did he have a blow horn?

6    A.  Yes.

7    Q.  Do you remember him using the blow horn to make any

8    statements?

9    A.  Yes.  He was using it the entire time he was yelling.

10   He was using a blow horn.

11   Q.  What is he saying over the blow horn?

12   A.  "Where are you guys counting the votes at?  Where are

13   they hiding at?"

14   Q.  And were Hunter and Kevin Seefried positioned in the

15   Ohio Clock Corridor when he's using that blow horn?

16   A.  Yes.

17   Q.  Is there anybody else in 515 that stands out to you,

18   Officer Goodman?

19   A.  Just my co-workers.  Yeah.

20   Q.  Now, I want to go to -- I believe that Ms. Kearney had

21   pulled up 510, 511, 513 and 514.

22           MS. REED:  If we could just see those all

23   together, Mr. Leach.  It's 515.  I apologize.

24   BY MS. REED:

25   Q.  Out of these individuals starting with 510, I believe

1    you've already provided the Court with information about the

2    Q person while you were on -- sort of coming up the

3    stairwell.  Correct?

4    A.  Yes.

5    Q.  Did you have any direct contact with him when he

6    actually was in the Ohio Clock Corridor?

7    A.  The Q shirt goy?

8    Q.  Yes, sir.

9    A.  No.

10   Q.  Going to 515, you've already talked to us about the

11   shaman.  There's an individual with another flag with a red

12   hat on that's standing next to him.  Do you have any

13   engagement with him?

14   A.  Not that I remember.

15   Q.  Standing on the opposite side of the shaman, there is

16   somebody with a long beard; and I believe that you had

17   testified about him previously.  Correct?

18   A.  Yes.

19   Q.  And can you tell the Court just -- what do you remember

20   about him again now that we can see him better?

21   A.  So as did the other gentleman that I testified about,

22   with the Trump hat on, he's screaming, "We're ready for

23   war."  And I have him on the opposite -- the guy with the

24   full beard on the opposite side and I'm standing next to

25   him.  He's saying, "We're here for peace.  We're here to

1    take back our country."

2            And I turned to him and I said:  Well, how are you

3    guys here for peace?  Listen to your guy.  You say you're

4    here for peace, but listen to your guy.

5            And that's when he and the taller guy in 515

6    grabbed his man and sort of bring him to the rear of

7    their -- of their group and tell him to calm down.

8    Q.  And when you say "the taller guy in 515," is that the

9    gentleman with the black hoodie on?

10   A.  Yes.

11   Q.  At any point did you hear Mr. Kevin Seefried make any

12   peaceful comments?

13   A.  Not the entire time.  No.

14   Q.  What about Hunter Seefried?  Any peaceful comments?

15   Were they doing any behavior like the person in the

16   mustard-colored sweatshirt?

17   A.  No.  No.

18            MS. REED:  One moment, your Honor.

19   BY MS. REED:

20   Q.  Now, other than -- you've already sort of identified

21   Mr. Seefried when you saw him inside of the Capitol with the

22   Confederate flag.  Were there any other markings on him at

23   that time that stood out to you?

24   A.  I noticed the teardrop tattoo on his face.

25   Q.  And did that give you any reason to be concerned for

1    your safety, either the flag and/or the teardrops?

2    A.  Yes.

3    Q.  Why?

4    A.  Because to my knowledge, in street culture the teardrop

5    tattoo is synonymous with saying that you killed somebody.

6    Q.  And was Mr. Seefried being aggressive towards you that

7    day?

8    A.  Yes.

9    Q.  Were you concerned for your safety?

10   A.  Yes.

11          MS. REED:  I want to go back to 504, your Honor,

12   before I wrap up.

13          I don't believe I've played the video the full

14   duration, but if we could go to the 15-second mark and start

15   it there.

16          (Whereupon, segments of Government's Exhibit No.

17   504 were published in open court.)

18          MS. REED:  Can we pause, please.

19   BY MS. REED:

20   Q.  Did you see Hunter Seefried ascending those steps?

21   A.  Yes.

22          MS. REED:  Can we go back, please, Mr. Leach,

23   about ten seconds.  1:36.

24          (Whereupon, segments of Government's Exhibit No.

25   504 were published in open court.)

```
 1                 MS. REED:  Pause it there.
 2    BY MS. REED:
 3    Q.  Do you see Mr. Seefried, Hunter Seefried, on that
 4    stairwell?
 5    A.  Yes.  He's on the left.
 6    Q.  And did he follow you into that corridor area?
 7    A.  Yes.
 8    Q.  You heard these individuals telling you that you were
 9    one and they were thousands.  Correct?
10    A.  Yes.
11    Q.  What was going through your head when you heard that?
12    A.  That I was just outnumbered and I needed to get backup
13    quick.
14                 MS. REED:  If we could go to 506, please.
15                 (Whereupon, segments of Government's Exhibit No.
16    506 were published in open court.)
17                 MS. REED:  Pause it there.
18    BY MS. REED:
19    Q.  What's happening in Exhibit 506, Officer Goodman?
20    A.  So they're continuing to follow me around to the Ohio
21    Clock Corridor.
22                 MS. REED:  If we could continue the video.
23                 (Whereupon, segments of Government's Exhibit No.
24    506 were published in open court.)
25                 MS. REED:  Pause it there, please.
```

Goodman - DIRECT - By Ms. Reed

1   BY MS. REED:

2   Q.  On this video, do you see Mr. Kevin Seefried in the

3   video?

4   A.  Yes.

5   Q.  And how do you recognize him?

6   A.  He's wearing the tan vest.

7           MS. REED:  No further questions, your Honor.

8   Thank you.

9           THE COURT:  This is a good place for us to break

10  for lunch.  Why don't we return at 2:00.

11          Officer Goodman, I'll ask you not to discuss the

12  contents of your testimony with anyone over the lunch break.

13  Thank you.

14          (Thereupon, a luncheon recess was taken, after

15  which the following proceedings were had:)

16          THE COURT:  Good afternoon.

17          Mr. Ohm?

18          MR. OHM:  Thank you, your Honor.

19          THE COURT:  And, Officer Goodman, I'll remind you

20  you're still under oath.

21          MR. OHM:  Your Honor, may I inquire?

22          THE COURT:  You may.

23                          CROSS-EXAMINATION

24  BY MR. OHM:

25  Q.  Good afternoon, Officer.

1   A.   Good afternoon.

2   Q.   Officer, I just want to begin by thanking you for your

3   actions on January 6.  I think everybody here agrees that

4   this country owes you a debt of gratitude.  Okay?  So thank

5   you.

6   A.   Obliged.

7   Q.   Would it be fair to say that January 6 was the most

8   chaotic day that you've ever experienced in your 15-year

9   career?

10   A.   As a police officer, yes.

11   Q.   And in your 15-year career, there probably wasn't a

12   close second.  Would that be a fair assumption to make?

13   A.   No.

14   Q.   No?

15   A.   There wasn't a close second.

16   Q.   Okay.  And you had said on direct examination that when

17   you were walking to work or coming to work, you were passing

18   people by at Union Station and you heard them chanting.

19            Do you remember answering those questions?

20   A.   I said I was sitting in my car and they were passing by,

21   coming -- looked to be coming from Union Station.

22   Q.   And I think you said that some of them were chanting

23   "Stop the Steal"?

24   A.   Yes.

25   Q.   And you took that to mean -- well, I think you said that

1    you didn't even know that there had been a rally scheduled

2    for January 6.  Is that right?

3    A.  No.

4    Q.  I'm sorry.

5    A.  I didn't know there was a rally.

6    Q.  Okay.  But you did know there was a joint session of

7    Congress that day.  Right?

8    A.  Yes.

9    Q.  Do you know what the joint session of Congress was

10   specifically for?

11   A.  We do it every four years when we confirm the next

12   president.

13   Q.  Okay.  So because of your sort of role as a Capitol

14   Police officer, you know that there was something going on

15   for you work-related that had to do with the certification

16   of the president?

17   A.  Yes.

18   Q.  All right.  Now, just sort of getting back to the things

19   you were talking about with Ms. Reed here, I mean, I know

20   that there's been a lot of attention on what your actions

21   were before that.  But even before the time in the Ohio

22   Clock Corridor, it sounded like a lot had already happened

23   to you.  Is that fair?

24   A.  Yes.

25   Q.  Because you were one of the -- well, first, you were

1   involved in taking into custody one of the first people who

2   breached a fence.  Correct?

3   A.  Yes.

4   Q.  It sounds like you were sort of responsible for holding

5   onto that person while his transport came?

6   A.  Yes.

7   Q.  That person -- you simply arrested that person or

8   maintained -- you maintained custody of that person while

9   you were waiting?

10  A.  Yes.  I maintained custody.

11  Q.  And then after you were done there, then you went out to

12  the west front.  Right?

13  A.  Went back around the upper west terrace to the west

14  front.  Yes.

15  Q.  And at that time, there was a perimeter breach out at

16  the west front.  Right?

17  A.  The perimeter had already been breached when I initially

18  went out.  So it had already been breached when I went back

19  around to the west front.

20  Q.  I see.

21          And when you had described -- I think you said

22  that it was sort of like medieval times out there.  You were

23  talking about the time -- what was going on in the west

24  front.  Right?

25  A.  Yes.

1    Q.  Because it was like complete pandemonium.  Right?

2    A.  Yes.

3    Q.  You ended up actually being engaged in some physical

4    combat out there, really.  Right?

5    A.  Yes.

6    Q.  Because you were bear-sprayed in the face?

7    A.  Yes.

8    Q.  And I think at a certain point in time, Metropolitan

9    Police Department came, too.  Right?

10   A.  Yes.

11   Q.  And they were also deploying their own pepper spray.

12   Right?

13   A.  Yes.

14   Q.  And there was -- I mean, there was there was chemical

15   irritants everywhere and it was affecting you as well.

16   Right?

17   A.  Yes.

18   Q.  And then you also -- you were under attack.  Is that

19   fair?

20   A.  Yes.

21   Q.  And you had to use your baton to actually inflict force

22   upon some of the individuals who were attacking you.  Right?

23   A.  Yes.

24   Q.  At some point in time, while all this was going on, you

25   realized that you had to get in and sort of take a break so

```
 1    you could at least get the pepper spray out of your eyes.
 2    Right?
 3    A.  Yes.
 4    Q.  And so you disengaged from that line and you went into
 5    what I think you called -- I've heard people call it a
 6    decontamination area.  Is that a fair way to describe it?
 7    A.  Yes.  Yes.
 8    Q.  So like officers had sort of taken -- found like a place
 9    where you all can just go and wash up and try to get the
10    chemicals out of your eyes so you can sort of go back and
11    do -- help out your other fellow officers.  Right?
12    A.  Yes.
13    Q.  And you went ahead and did that.  Right?
14    A.  Yes.
15    Q.  And I think you mentioned that you had vomited a few
16    times while you were in there.  Right?
17    A.  Yes.
18    Q.  Because things had gotten so intense while you were out
19    on the west front?
20    A.  Yes.
21    Q.  Okay.  So that was -- after you did that, you actually
22    went back outside.  Right?
23    A.  Yes.
24    Q.  And I think that is where you confronted the individuals
25    on the scaffolding.  Right?
```

```
 1    A.  Yes.
 2    Q.  And you took it upon yourself to try and get people off
 3    the scaffolding.  Right?
 4    A.  Yes.
 5    Q.  Okay.  And did you have to, I guess, deploy your baton
 6    at anybody when you were in the scaffolding area?
 7    A.  No.  As I would run up to chase after them on the
 8    scaffolding, they would sort of run away.
 9    Q.  Okay.  So there was no actual physical --
10    A.  There was no physical contact there at that point.
11    Q.  In terms of the physical contact on the west front, do
12    you remember how many people you ended up having to strike?
13    A.  No, I don't.  I don't remember.
14    Q.  Could you describe any one of those people?
15    A.  No, I can't.
16    Q.  Could you describe what any individual person said when
17    you were in that situation on the west front?
18    A.  No.
19    Q.  Is it fair to say that the day was so chaotic that it
20    was impossible for you to remember individually what
21    everybody said at least out there on the west front?
22    A.  Particularly on the west front, yes.
23    Q.  Now, when you were -- after you were on the scaffolding,
24    did you come inside -- were you -- I know you said that you
25    had heard -- or that you had come inside at some point in
```

Goodman - CROSS - By Mr. Ohm

1    time after you were out on the scaffolding.  Right?

2    A.  A supervisor was out there with us and he kind of was

3    waving folks in.

4    Q.  So you come inside, and then let's just sort of

5    fast-forward.  Well, how long had you been inside at the

6    time where you were running down the stairs like we saw in

7    Government's Exhibit 505?

8    A.  That I don't know.  That I don't know.  I don't have a

9    time --

10   Q.  Would you say it was an hour?

11   A.  I couldn't even give you that.  I don't know.

12   Q.  But in terms of, I guess, the course of events, at this

13   point in time, you had already done the west perimeter

14   breach.  Then you went to the decontamination area and then

15   you went to the scaffolding and then you were at the -- then

16   you went back inside at the direction of your supervisor.

17   Right?

18   A.  Yes.

19   Q.  Okay.

20   A.  A supervisor.

21   Q.  A supervisor.  Not your particular supervisor?

22   A.  Yes.

23   Q.  And I think you said --

24          MR. OHM:  If it's possible, Madam Clerk, to show

25   the witness a screen.

1          Your Honor, these are all exhibits that have been

2     previously admitted in the Government's case.  So if I could

3     publish them as well.

4          THE COURT:  Of course.

5     BY MR. OHM:

6     Q.  So do you remember looking at this video while you were

7     testifying on direct examination?

8     A.  Yes.

9     Q.  We're looking at --

10         THE COURT REPORTER:  Counsel, could you identify

11    what you're publishing for the record, please?

12         MR. OHM:  It's Government's 505.

13         (Whereupon, segments of Government's Exhibit No.

14    505 were published in open court.)

15    BY MR. OHM:

16    Q.  If I have it correct, I think you said you were about

17    halfway down that final set of stairs -- I'm sorry -- the

18    video was halfway down the final set of stairs when you

19    initially encountered Mr. Seefried at that archway.  Is

20    that --

21    A.  Yes.

22    Q.  So right now --

23    A.  Right now I'm already around the corner --

24    Q.  Right.

25    A.  -- confronting Mr. Seefried --

```
 1    Q.  Okay.

 2    A.  -- in that video.

 3    Q.  And it was your understanding -- you've seen all these

 4    videos, probably quite a few times at this point.  Right?

 5    A.  This one, yes.

 6    Q.  And so sort of by your recollection and sort of seeing

 7    these videos, you came to the conclusion that when you first

 8    started your interaction with Mr. Kevin Seefried, it was

 9    right around this time.  Is that fair?

10    A.  Yes.

11    Q.  Okay.

12              MR. OHM:  And just for the record, your Honor --

13    actually, this doesn't have a timestamp.

14    BY MR. OHM:

15    Q.  You see yourself in front of the individuals at 18 --

16    around 18 seconds.  Right?  You see yourself on that?

17    A.  Yes.  I see myself on this video.  Yes.

18              (Whereupon, segments of Government's Exhibit No.

19    505 were published in open court.)

20    BY MR. OHM:

21    Q.  About six and a half seconds is when you're about

22    halfway down those steps.  Right?  Do you see that?  6.3 --

23    A.  Yes.

24    Q.  So that's where you're about halfway down the steps.

25    Right?
```

1    A.  No.  I'm already around the corner.

2    Q.  I'm sorry.  The video is halfway down the steps.  You're

3    starting to talk to Mr. Kevin Seefried.

4    A.  Yes.

5    Q.  So let's go back to what you say that you recall the

6    conversation with Kevin Seefried being.  Okay?

7    A.  Yes.

8    Q.  Now, this is the first time you've encountered anybody

9    inside.  Right?

10   A.  Yes.  Inside.  Yes.

11   Q.  And you hadn't -- you had never seen Mr. Seefried

12   before.  Right?

13   A.  No.

14   Q.  So you're running down the stairs and then you see him

15   in the archway and then you stop.  Is that fair?

16   A.  Yes.

17   Q.  And did you speak to him first or does he speak to you

18   first?

19   A.  I believe I speak to him first.  I tell him:  You need

20   to leave.  Yeah.

21   Q.  You didn't say "Stop" first or anything like that?

22   A.  I don't recall saying -- specifically what I said, but I

23   know it was along the lines of:  Leave or get out.

24   Q.  Okay.  Well, let me delve into that a little bit,

25   because I think I was under the impression that you

1    remembered the words that you said.

2              Are you saying that you don't remember the actual

3    words that you said?

4    A.  I'm saying I told him to leave.

5    Q.  Okay.

6    A.  You need to leave now.

7    Q.  So it was something to the effect of, Get out of here?

8    A.  Yes.  Leave.  Get out of here.

9    Q.  And then his response was:  No?

10   A.  His -- at that point, he started to jab at me with

11   the --

12   Q.  Okay.  Let's talk about this.  You had said that he

13   had -- he was jabbing at you with the base of his

14   Confederate flag.  Correct?

15   A.  Yes.  The end of the flag.

16   Q.  That would be the end -- that's not where the flag is,

17   but the bottom end of it?

18   A.  The way he held it, it would have been the bottom end

19   that he's jabbing at me with.

20   Q.  So --

21              THE COURT:  So not the flag part?

22   BY MR. OHM:

23   Q.  So say this is a flag and the top part is where the flag

24   is.

25   A.  And if you're holding it with both hands like this, and

1    he's doing this.  Yes.

2    Q.  Like this?

3    A.  Yes.

4    Q.  So the bottom of the base of the flag is coming towards

5    you?

6    A.  Yes.

7    Q.  Okay.  So when you're saying he's jabbing, it's sort of

8    with the short end of the stick in terms of where he could

9    be holding onto it?

10   A.  Yes.

11   Q.  And how far are you from him at this point?

12   A.  Within arm's length.  I'm right on him at that point.

13   Q.  So, like, 2 feet?

14   A.  Arm's length.

15           MR. OHM:  Your Honor, may I approach and try to --

16           THE COURT:  Sure.

17   BY MR. OHM:

18   Q.  Just stop me where we are.  You can stand up if you

19   want.

20   A.  Here.

21   Q.  So like there?

22   A.  Yes.

23   Q.  Right here?

24   A.  Yes.

25   Q.  So --

```
 1                    MR. OHM:  3 feet, your Honor?

 2                    THE COURT:  Okay.

 3     BY MR. OHM:

 4     Q.  Does that sound right?

 5     A.  Arm's length.

 6     Q.  I am short.

 7                    So then he's not actually -- it sounds like if he

 8     wanted to, he could have made contact with you at that

 9     point.  Right?

10     A.  I don't know what he would have wanted to do.

11     Q.  But he didn't make contact with you?

12     A.  He didn't make contact.

13     Q.  You were continuing to sort of advance on him?

14     A.  Yes.

15     Q.  Because you weren't really worried about him making

16     contact.  Right?

17     A.  I don't know what he was doing.  He was jabbing at me.

18     Q.  And this is -- you're saying this is when nobody else is

19     in the doorway.  Right?

20     A.  Yes.

21     Q.  And you have -- at a certain point in time, you put your

22     hand on your service weapon.  Right?

23     A.  Yes.

24     Q.  When is that?

25     A.  When the rest of the -- by then, the rest of the crowd
```

Goodman - CROSS - By Mr. Ohm

1    had appeared.  And there was the gentleman with the face

2    paint and he's got the American flag and what looked like a

3    spear tip.  The tip is sharpened.  He's raising that.

4    That's when I put my hand on my gun.

5    Q.  So your recollection is that once you saw -- well,

6    regardless of whatever happened with Kevin Seefried and his

7    flag, it wasn't until you saw the face-paint-and-horns guy

8    that you put your hand on your gun?

9    A.  Initially.  Yes.

10   Q.  Okay.  That was the first time you put your hand on your

11   gun?

12   A.  Yes.

13   Q.  And your recollection is because that was the first time

14   you observed a threat that caused you to put your hand on

15   your gun?

16   A.  Yes.

17   Q.  Okay.

18         MR. OHM:  Let's just play -- we're back to

19   Government's 505.

20         (Whereupon, segments of Government's Exhibit No.

21   505 were published in open court.)

22   BY MR. OHM:

23   Q.  Here, we can see you standing in front of the doorway.

24   Right?

25   A.  Yes.

1    Q.  Do you see anybody -- well, do you see Mr. Seefried in

2    this picture yet?

3    A.  My view is small, so I can't see anybody here.  I see

4    the people in the rear.  I can't see --

5    Q.  Let me see if I can go in.  Is that better?  Can you see

6    Mr. Seefried?

7    A.  In this picture, no.

8    Q.  Can you see the shaman, the face paint guy?

9    A.  Yes.

10   Q.  I'm going to call him the shaman.  I think that's what

11   everybody calls him.

12   A.  From this angle, no.

13   Q.  But you think he's there at this point?

14   A.  To the right, I think so.  He would be there --

15   Q.  Okay.

16   A.  -- standing to the right out of camera view.

17   Q.  Do you remember this particular -- let me just ask you

18   this also:  Is a lot of your memory sort of affected by

19   looking at these videos over and over again or would you say

20   that you have like an independent memory of every second of

21   that day?

22   A.  I don't understand your question specifically.

23   Q.  Well, you've obviously looked at this video a lot.

24   Right?

25   A.  Yeah.

1   Q.  And you have -- I guess what I'd like to know is how

2   much you're testifying from, like, your independent

3   recollection versus, you know, seeing the videos over and

4   over again.

5   A.  Yeah.  I'm testifying based on what I remember.  Yes.

6   Q.  What you remember.

7           So here, you remember that the shaman guy is

8   standing in front of you?

9   A.  I put my hand on my gun and pointed --

10  Q.  Okay.

11  A.  -- when I saw him waving his flag.

12  Q.  So that's why you're concluding that the shaman must be

13  in your view, because you see that your hand is on your gun

14  and you're pointing?

15  A.  Yes.

16  Q.  So when you were saying that you were -- it was just you

17  and Mr. Seefried alone in that archway, that time period has

18  already ended at this frame.  Right?

19  A.  Yes.

20  Q.  Okay.

21          (Whereupon, segments of Government's Exhibit No.

22  505 were published in open court.)

23          MR. OHM:  For the record, your Honor, that is at

24  about 10.8 seconds on Government's 505.

25          THE COURT:  Okay.

```
1              (Whereupon, segments of Government's Exhibit No.

2    505 were published in open court.)

3    BY MR. OHM:

4    Q.  Do you see yourself sort of pointing again and

5    continuing to --

6              (Whereupon, segments of Government's Exhibit No.

7    505 were published in open court.)

8    BY MR. OHM:

9    Q.  You saw yourself pointing.  Right?

10   A.  Yes.

11   Q.  And you saw yourself sort of starting to retreat just a

12   couple seconds after that.  Right?

13   A.  Yes.

14   Q.  I'll go back to this.

15             I just want to ask you, do you remember where

16   Mr. Kevin Seefried was after you started going up the

17   stairs?

18   A.  Once I started going up the stairs, no.  I lost sight of

19   him.

20             (Whereupon, segments of Government's Exhibit No.

21   505 were published in open court.)

22   BY MR. OHM:

23   Q.  As you're first running up the stairs -- and we're at

24   about 27 seconds, your Honor -- do you see Kevin Seefried in

25   there?
```

```
 1    A.  No.  I don't see him.
 2              (Whereupon, segments of Government's Exhibit No.
 3    505 were published in open court.)
 4    BY MR. OHM:
 5    Q.  Is it fair to say that the primary person you're dealing
 6    with is the person with the black Q shirt?
 7    A.  Yes.  The closest person to me at that point.  Yes.
 8              (Whereupon, segments of Government's Exhibit No.
 9    505 were published in open court.)
10    BY MR. OHM:
11    Q.  Do you see Kevin Seefried in your -- among the first,
12    let's say, four or five people following you at this point?
13    A.  Well, my -- the gentleman up front is blocking the view.
14    So no.  I don't see.
15              (Whereupon, segments of Government's Exhibit No.
16    505 were published in open court.)
17    BY MR. OHM:
18    Q.  Up until now, have you seen Kevin Seefried once you
19    started going up the stairs?
20    A.  No.
21    Q.  Now, I know that you had mentioned earlier that on this
22    floor in the Ohio Clock Corridor that was where I think you
23    said the minority leader, the majority leader and the whip
24    and vice president's office was.  Right?
25    A.  Yes.
```

1   Q.  You weren't taking them to those areas because anybody

2   asked you to take them to those areas.  Right?

3   A.  Well, I wasn't taking anybody -- what I was doing was

4   going to where backup was.

5   Q.  So you knew there were other officers who were over in

6   the Ohio Clock Corridor.  Right?

7   A.  No.  I knew that officers were somewhere on that floor.

8   Q.  Okay.  So you knew that officers were on the second

9   floor?

10  A.  Yes.

11  Q.  And so it was your decision to take these individuals

12  towards those other officers on the second floor?

13  A.  For backup.  Yes.

14  Q.  Because you knew -- you felt like they were going to

15  follow you.  Right?

16  A.  Because I was outnumbered and I needed backup.

17  Q.  But they didn't independently decide, Hey, we're going

18  to go to the second floor where the Senate minority leader

19  and the Senate majority leader is and president -- vice

20  president?

21          MS. REED:  Your Honor, I'm just going to object to

22  the speculative nature of that question.

23          THE COURT:  Overruled.

24  BY MR. OHM:

25  Q.  There was nothing that you had, no information that you

1    had that made you think that these individuals are going to

2    that particular floor for a particular reason except that

3    they were following you.  Right?

4    A.  Well, no.  The individuals are saying to me:  Where are

5    they counting the votes at?

6    Q.  Okay.  Because they didn't know where they were counting

7    the votes at.  Right?

8    A.  I don't know what they knew.  I don't presume to know

9    what any of them knew that day.

10   Q.  What you also don't know is they were trying to get to

11   the second floor, trying to get to this hallway.  Right?

12   A.  I don't know what they were trying -- what they thought

13   they were trying to do.

14   Q.  Okay.

15   A.  I just know what they were doing.

16   Q.  You didn't hear anybody say, Hey, let's go to the second

17   floor where Vice President Pence's office is.  Right?

18   A.  No.  I didn't hear that.

19   Q.  You didn't hear anybody say, Hey, I know that the Senate

20   minority leader is on the second floor.  Right?

21   A.  No.  I didn't hear that.

22   Q.  And you didn't hear anybody say that about the Senate

23   majority leader.  Right?

24   A.  No.

25   Q.  And as far as you could tell from your perspective, the

1    reason that they came onto the second floor is because they

2    were following you and you wanted to go to the second floor?

3    A.  Right.  No.  They were asking me:  Where are they

4    counting the votes at?  So in my mind, they're trying to

5    find out where they're counting the votes.

6    Q.  But if that was what was going on in your mind, you

7    wouldn't have led them right to the Senate chamber?

8    A.  Right.  Well, the Senate chamber was locked down.  So

9    I --

10   Q.  Sure.

11   A.  In my mind is, what they were doing was trying to find

12   out where the votes are.  I'm trying to get to backup.

13   Q.  Okay.  The first floor doesn't have any senators.

14   Right?

15   A.  It has one senator.  Yes.  One officer.

16   Q.  And the rest of them you think are up on the second

17   floor?

18   A.  I know they're on the second floor.

19   Q.  So you're saying that hearing that they are looking for

20   senators on the first floor, that your decision was to go to

21   the second floor where all the senators were?

22   A.  I'm saying my decision was to go to where backup was.

23   Q.  Okay.  In terms of you -- and this was such a long day

24   for you, Officer.  In terms of you remembering and

25   segmenting little pieces of information, who said them,

1    where it happened, 15, 16 months ago, that's not an easy

2    thing to remember.  Is that fair?

3    A.  I remember what I remember.

4    Q.  You had previously talked to -- well, you've been

5    interviewed several times by the FBI about what happened

6    that day.  Right?

7    A.  Yes.

8    Q.  And I know that you had sort of these general meetings

9    where the FBI, you know, didn't know exactly who they were

10   asking you about.  But more recently, you started meeting

11   with Ms. Reed and Ms. Kearney.  Right?

12   A.  Yes.

13   Q.  And that was to go over your testimony here today.

14   Right?

15   A.  Yes.

16   Q.  And you knew when you had these meetings with them that

17   it was an important part of the process for the prosecutors

18   to know precisely what it was that you were saying happened

19   on that day.  Right?

20   A.  Yes.

21   Q.  And they went into great detail with you to try to

22   figure out everything that did happen and everything that

23   you remembered.  Right?

24   A.  Yes.

25   Q.  Okay.  And the first of these meetings was back in May

1    6th over a conference call.  Right?

2    A.  I'm assuming.  I don't remember.

3    Q.  It was about a month ago or maybe close to two months

4    ago?

5    A.  Yeah.  Whatever the date is that you have, then yes.

6    That's what it is.

7    Q.  And at this conference call was these two assistant U.S.

8    attorneys.  Right?

9    A.  Yes.

10   Q.  And Special Agent Dinkel was also there.  Right?

11   A.  Yes.

12   Q.  And Special Agent Dinkel was taking notes.  Right?

13   A.  Yes.  I assume.  Yes.

14   Q.  In that conversation, you knew that the main focus of

15   Ms. Reed and Ms. Kearney was Kevin Seefried.  Right?

16   A.  Yes.

17   Q.  And Hunter Seefried?

18   A.  Yes.

19   Q.  In that conversation, you did not say anything about

20   Mr. Kevin Seefried saying, "Where are the senators?  I need

21   to stop the count," anything like that.  Right?

22   A.  I don't recall the exact details of that conversation,

23   our initial conversation.

24   Q.  But you know that those are important things.  Right?

25   A.  Yes.

1   Q.  That those are facts that are important?

2   A.  Yes.

3   Q.  And you know they're facts that are particularly

4   important to this case.  Right?

5   A.  Yes.

6   Q.  And if that was how you remembered things two months

7   ago, you know that you would have made sure that you told

8   the prosecutors of this case and the special agent assigned

9   to this case that those things happened.  Right?

10  A.  Yes.  I remember how I remember it.

11  Q.  Okay.  And in fact, you've had other followup

12  conversations with Ms. Reed and Ms. Kearney.  Right?

13  A.  Yes.

14  Q.  In none of those conversations did you ever say that you

15  recall Mr. Kevin Seefried himself saying that -- "Where are

16  the senators?  Where are they counting the votes?"  Anything

17  like that.  Right?

18  A.  I don't recall what I specifically -- how I said what I

19  said in those conversations.  I don't recall.

20  Q.  You've never actually said it before at all, right, that

21  Mr. Kevin Seefried said those things?

22  A.  I don't recall never saying it at all either.

23  Q.  Okay.  But you don't recall ever saying it?

24  A.  No.  I mean, no.  I don't recall -- what I'm saying is I

25  don't recall the specific conversations.

1    Q.  Got it.

2          In terms of -- I'm sorry.  Now I'm getting

3    confused, because there's a conversations with the

4    prosecutors and also the conversations from January 6.  I

5    just want to make clear that you're agreeing that you've

6    never said to anybody that you specifically remember Kevin

7    Seefried not -- Kevin Seefried saying, "Where are those

8    senators?  Where are they counting the votes?"

9    A.  I don't recall saying in conversation with them

10   specifically anything about him --

11   Q.  Okay.

12   A.  -- with regards to counting the votes.

13   Q.  Got it.

14          And recognizing, okay, that during this point in

15   time, there are, you know, at least five people shouting

16   things at you all at once.  Right?

17   A.  Yes.

18   Q.  And your attention is not drawn in particular to one

19   person because you're trying to assess the threat of all of

20   these people who are in front of you.  Right?

21   A.  There were -- yes.  As they stood out to me, yes.

22   Q.  Okay.  Let me just take you to the next clip, which is

23   the same exhibit, which was 50 -- I'm sorry.

24          MR. OHM:  This is 504, your Honor, which has

25   previously been admitted.

1    BY MR. OHM:

2    Q.  Now, this is the same archway that you and Kevin

3    Seefried first had your confrontation.  Right?

4    A.  Yes.

5              MR. OHM:  Your Honor, this is at 2:13 and 51

6    seconds.

7              THE COURT:  Okay.

8              (Whereupon, segments of Government's Exhibit No.

9    504 were published in open court.)

10   BY MR. OHM:

11   Q.  I'm going to show you the next, which is 2:13 and 51

12   seconds, about a half second later.

13             (Whereupon, segments of Government's Exhibit No.

14   504 were published in open court.)

15   BY MR. OHM:

16   Q.  On the right of the exhibit, do you see yourself there,

17   Officer?

18   A.  I don't see myself at all in this.  Well, actually, I

19   do.

20   Q.  You're sort of -- it looks like you're actually coming

21   down the stairs at that point.  Right?

22   A.  No.  I was already down the stairs at that point.  I had

23   already confronted Mr. Seefried for the first time.  I think

24   this is when I back up to retrieve my baton, if I'm not

25   mistaken.  I'm not sure.  But I was -- I had already been

1    downstairs in this picture because the crowd wasn't there

2    when I came downs.  The crowd wasn't there.  It was just

3    Mr. Seefried.

4    Q.  When you retrieved your baton, that was like after you

5    had turned around to run back up the stairs.  Right?

6    A.  I retrieved my baton and then I went back up the stairs.

7    Q.  Right.  But you had already turned around from the

8    archway?

9    A.  Say again.

10   Q.  You had already turned your back on the archway, grabbed

11   a baton on the ground and then ran up the stairs.  Right?

12   A.  Yes.

13   Q.  And so this is before that because you're facing the

14   archway.  Right?

15   A.  Yeah.  I didn't turn my -- okay.  So just to be clear, I

16   didn't turn my back on them to retrieve my baton.  I backed

17   up and picked up my baton.

18   Q.  That's fair.

19          Now, here, it looks like you're not quite at arm's

20   length away from Mr. Seefried.  Is that --

21   A.  Not at that point, no.

22   Q.  So this is prior to you sort of closing in with

23   Mr. Seefried?

24   A.  This point right here?

25   Q.  Right.

1    A.  I want to say this is after I closed in on Mr. Seefried.

2    Q.  You think this is after you closed in on Mr. Seefried?

3    A.  Yes.

4    Q.  Why do you think that?

5    A.  Because, again, in this video there's a crowd.

6    Q.  Right.

7    A.  When I encountered Mr. Seefried, there was nobody but

8    him.

9    Q.  Okay.  At this point in time, you can see like sort of

10   the pole and the hand of Mr. Seefried.  Right?

11   A.  Yes.

12   Q.  And you can see that the base of the pole is pointing

13   towards the statue.  Right?

14   A.  Yes.  In this picture, yes.

15   Q.  And so presumably, the flag part of the pole is

16   pointing, more than in your direction, inside that doorway.

17   Right?

18   A.  Say again.

19   Q.  Presumably the flag part of the flagpole is inside that

20   doorway more towards you.  Right?

21   A.  Yes.

22   Q.  Okay.  I'm sorry.  Now, going back to 213-51-B, it looks

23   like at that point like your hand is already on your

24   holster.  Right?

25   A.  I can't see where my hand is.

1    Q.  Is it possible your hand is already on your holster

2    there?

3    A.  I can't tell from here where my hand is actually

4    sitting.

5    Q.  And you don't remember one way or the other?

6    A.  Say again.

7    Q.  You don't recall, like, independently one way or the

8    other?

9    A.  No.

10   Q.  Okay.

11   A.  I was focused on individuals.

12   Q.  And then I think you said that -- well, at this point in

13   time, you could see the pole again.  Right?  At 2:13 and 51

14   seconds, C?

15   A.  Yes.  I see the pole.

16   Q.  And can you tell whether your hand is on your holster at

17   that point?

18   A.  Looks to be.  Yes.

19   Q.  And at this point, Mr. Seefried actually drops the flag.

20   Right?

21   A.  I don't recall whether he dropped the flag or no.  I

22   don't remember him dropping the flag.

23   Q.  Let's take a look at the next.  This is at 3:13:56.

24   This is where you're pointing.  Right?

25   A.  Yes.

1   Q.  And you're saying that you're pointing at the face paint

2   guy with the horns, the shaman guy.  Right?

3   A.  In this, he's in my face.  I'm telling him to get out

4   now.  Leave.  He's in my face now.

5   Q.  Okay.  So is this the point where you're saying that the

6   flag was used for sort of a jab towards you?

7   A.  Before then, because when I first encountered him, he

8   was not in the archway.  He was further into the -- that

9   area there.  He was closer to -- he was midway between the

10  base of the stairs and the archway there --

11  Q.  Okay.  So let me --

12  A.  -- when I first encountered him.

13  Q.  When you say "midway," are you saying sort of like where

14  the statue is or even farther in?

15  A.  Oh, he was further in.  He was about where I'm standing

16  now when I got to -- when I first got to the bottom of the

17  stairs.

18  Q.  Okay.  Got it.

19          So you think that at this point you're gesturing

20  towards him?

21  A.  To him, to back up.  Yes.

22  Q.  Now, this is 2:14, a couple seconds later.  There we can

23  clearly see your hand on the holster.  Right?

24  A.  Yes.

25  Q.  Then we can also see there are more people that are sort

```
 1    of --

 2    A.  Yes.

 3    Q.  -- coming towards the archway?

 4    A.  Yes.

 5    Q.  Okay.  Now, at 2:14 and four seconds, that's when the

 6    individual who was behind you enters the picture, this

 7    perspective of the picture.  Right?

 8    A.  Yes.

 9    Q.  And when that happened, that's where we can see I think

10    from left to right probably about five, seven, seven at

11    least individuals in that doorway.  Right?

12    A.  Yes.

13    Q.  Now, do you see where that green arrow is?

14    A.  Yes.  I see the green arrow.

15    Q.  Do you see an empty right hand on that slide?

16    A.  See what?

17    Q.  An empty right hand.  Right where it's pointing.  Do you

18    see how there's a hand there and it's empty?

19    A.  No.  I don't see what you're talking about.

20    Q.  We can go back and go to the other video.

21              Do you see at least here an empty left hand?

22    A.  It's cut off at the base on this picture.

23    Q.  You see there's no flag in it, though.  Right?

24    A.  From this video -- from this picture, yes.  But it's cut

25    off from this angle.
```

1    Q.  But in terms of where, like, the thumb meets the rest of

2    the hand, you don't --

3    A.  I can't see his thumb or his hand in this picture.

4    Q.  Okay.  Let's see if we can both look and hear this.

5               (Whereupon, segments of Government's Exhibit No.

6    504 were published in open court.)

7    BY MR. OHM:

8    Q.  Here, you can sort of see yourself on the right side of

9    the exhibit.  Right?

10   A.  Yes.

11   Q.  Let me know if you need me to make it bigger for you,

12   Officer.

13              Then there was a split-second where you could see

14   Mr. Kevin Seefried, right, on the right-hand side?

15   A.  Not much of him.  But...

16              (Whereupon, segments of Government's Exhibit No.

17   504 were published in open court.)

18   BY MR. OHM:

19   Q.  Did you hear that sound?

20   A.  What --

21   Q.  Did you hear the sound of wood hitting the ground?

22   Here.  Listen again.

23              (Whereupon, segments of Government's Exhibit No.

24   504 were published in open court.)

25

```
1     BY MR. OHM:

2     Q.  Did you hear that?

3     A.  No.  I didn't hear anything.

4               (Whereupon, segments of Government's Exhibit No.

5     504 were published in open court.)

6     BY MR. OHM:

7     Q.  So you can't --

8               MR. OHM:  Your Honor, we'll also have this

9     exhibit, and you can see the left hand and the right hand.

10    So I'm just going to move on.

11    BY MR. OHM:

12    Q.  I'm going to show you Government's Exhibit 506.  We were

13    talking about earlier who was going up the stairs and when.

14              Do you remember those questions?

15    A.  Yes.

16              (Whereupon, segments of Government's Exhibit No.

17    506 were published in open court.)

18    BY MR. OHM:

19    Q.  Do you see Mr. Kevin Seefried in this video?

20    A.  Yeah.  He's closest to the wall.  Yes.

21    Q.  And he's -- one second.  Could you see him go -- veer

22    off from where everybody else was going?

23    A.  Yes.

24    Q.  He eventually comes back and you see him in the Ohio

25    Clock Corridor.  Right?
```

1    A.  Yes.

2    Q.  But he's not following lockstep with everybody else.  Is

3    that fair?

4    A.  Well, up to that point, yeah.

5    Q.  So then you had mentioned somebody who was sort of

6    yelling "Ready for war" throughout this sort of -- I

7    guess -- I don't know what you would call it, but in the

8    Ohio Clock Corridor.  Correct?

9    A.  At one point in time, he started to come to the front

10   and yell out, "We're ready for war."

11   Q.  Are you saying that he was yelling that -- I think the

12   question was, like, were you within, like -- was he close by

13   to Mr. Kevin Seefried when he was yelling that?  Do you

14   remember that?

15   A.  Yes.

16   Q.  And your recollection is that you remember where

17   Mr. Seefried --

18   A.  Yes.  He was -- this gentleman had maneuvered to the

19   front at that point.

20   Q.  Okay.

21   A.  Yeah.  He starts to yell, "We're ready for war."

22   Q.  Okay.  Are you -- when you say at that point -- do you

23   stay at the right side of this line?  Like if we're facing

24   you, so the way the exhibit is, are you on the right side

25   the whole time or is there a point in time where --

1    A.  I'm on the right side at this point, but there's a time

2    when I later on shift to the left side --

3    Q.  Okay.

4    A.  -- as we're facing this picture.

5    Q.  And the ready-for-war person was yelling "Ready for war"

6    when you were on the right side or the left side?

7    A.  When I was on the right side.

8    Q.  So when you're saying the right side, you mean our

9    right?

10   A.  As we're facing this -- looking at this picture, to the

11   right, where the busts are.

12   Q.  Let me confirm that with you.

13              (Whereupon, segments of Government's Exhibit No.

14   506 were published in open court.)

15   BY MR. OHM:

16   Q.  Do you see the ready-for-war guy here on the left side

17   of the exhibit?  I'll rewind it a little bit.  The

18   ready-for-war guy had a flag.  Right?

19   A.  He had a camouflage hat.

20   Q.  Yeah.

21   A.  But I can't tell much from here.

22   Q.  Let me see if I can get it better.

23              (Whereupon, segments of Government's Exhibit No.

24   506 were published in open court.)

25

1    BY MR. OHM:

2    Q.  Do you see the ready-for-war guy on the left side of the

3    exhibit?

4    A.  No.  I don't see him.

5    Q.  You don't see him?  You don't see the camouflage guy

6    there sort of animated, screaming?

7    A.  I can't tell if that's him or not from this picture.

8    Q.  Okay.  Let me find the other exhibit.

9            MR. OHM:  Your Honor, while that's loading, I'll

10   circle back.

11   BY MR. OHM:

12   Q.  Now, I think you had testified that back in -- was it

13   October or January of 2021, you had your first sort of set

14   of interviews with the FBI since the days of -- since right

15   after January 6.  Right?

16   A.  I don't recall the actual date.  But yes.

17   Q.  You remember having sort of a set of interviews?

18   A.  Yes.

19   Q.  Okay.  And actually, back on January 16, you actually

20   had an interview.  That was just ten days after this all

21   happened.  Right?  Do you remember that?

22   A.  I don't recall.  But yes.

23   Q.  And when you had that interview, you told the FBI that

24   you didn't believe many people in the group were trying to

25   hurt you, that it appeared as though most of the group

1    merely wanted to get around you and that you tried to keep

2    the group in front of you.  Right?

3    A.  Yes.  That sounds familiar.

4    Q.  And you also did, like, a use-of-force report in terms

5    of the amount of force that you had to use on people who had

6    posed a threat to you.  Right?

7    A.  Yes.

8    Q.  And you had not mentioned in either of those

9    conversations any interaction that you had with Kevin

10   Seefried.  Right?

11   A.  I don't recall whether in those interactions with the

12   FBI that I made any mention of him.

13   Q.  There was a point in time when you were asked to write a

14   letter to a judge sort of as a victim of one of the cases,

15   one of the January 6 cases.

16           Do you remember that?

17   A.  Yes.

18   Q.  Okay.  And you described -- you described all of the

19   incidents of that day, including the west side, the

20   scaffolding and the Ohio Clock Corridor.  Right?

21   A.  I described my events for the day.  Yes.

22   Q.  When you talked about the Ohio Clock Corridor --

23           MS. REED:  I'm sorry.  May we approach for a

24   moment?

25           THE COURT:  You may.

1          (Whereupon, the following proceedings were had at

2     sidebar:)

3          THE COURT:  Let's wait for Mr. Bostic.

4          MS. REED:  So, Judge, this is actually the

5     different statement that was given in another case.  It's

6     under seal.  So obviously, it's been given for *Jencks*

7     purposes, but we didn't know if everybody -- it was under

8     seal.  So --

9          THE COURT:  Do you know why it's under seal?

10         MS. REED:  Because it was for a sentencing.

11    Obviously, I had to turn it over for *Jencks* purposes.

12         THE COURT:  Right.  Is there anything particularly

13    sensitive?

14         MS. REED:  No.  It's just -- no, not at all.  I

15    just wanted to bring it to everyone's attention how to

16    handle the situation of something that's been sealed.

17         MR. OHM:  I mean, because we're on a bench trial,

18    I don't see why I can't rebut any aspects.  I could do this

19    part of the cross in a sealed courtroom.  I don't know that

20    it matters.  It's really a description of the incident.

21         THE COURT:  I appreciate you raising it.  I don't

22    think -- to the extent there's an objection, I'm going to

23    overrule the objection.  I think it's appropriate for us

24    to --

25         MS. REED:  I'm not going to object, Judge.

Goodman - CROSS - By Mr. Ohm

```
 1                    THE COURT:  Thank you.
 2                    (Whereupon, the following proceedings were had in
 3          open court:)
 4          BY MR. OHM:
 5          Q.  So you filled out or you wrote a letter to the judge
 6          essentially sort of describing your -- the impact of all
 7          this on your -- on you.  Right?
 8          A.  Yes.
 9          Q.  And then in that, you gave a description of the things
10          that you heard, the things that were yelled at you and the
11          things that were done towards you.  Right?
12          A.  Yes.
13          Q.  Okay.  And in that, you said that you had no idea what
14          these people wanted to do.  Right?
15          A.  I had no idea what their intentions were.  Yes.
16          Q.  Okay.  You were actually referring to the moment where
17          you had encountered individuals downstairs in that archway
18          that we --
19          A.  I was referring to the entire event as a whole.  I had
20          no idea what -- from my perspective what their overall
21          intentions were.
22          Q.  Okay.
23                    MR. OHM:  Your Honor, may I approach?
24                    THE COURT:  You may.  To Officer Goodman?
25                    MR. OHM:  Yeah.  Defense 1, your Honor.  I'm going
```

```
 1    to mark this.

 2    BY MR. OHM:

 3    Q.  (Tendering document to the witness) All right, Officer.

 4    This is your letter to the judge.  Right?

 5    A.  Yes.

 6    Q.  This is your typed signature, Officer Eugene Goodman?

 7    A.  Yes.

 8    Q.  There you write -- let's go back all the way here.

 9    You're talking about all of the things that were yelled and

10    screamed at you.  Right?

11    A.  Yes.

12    Q.  And you said:  The rioters were saying there were [sic]

13    for us.  They just wanted to take back our country.  Other

14    rioters were being antagonistic, asking what we were going

15    to do --

16    A.  On that part, yes.  I'm talking about the archway.

17    Q.  -- shoot them?  And then one person said:  There's one

18    of them and a hundred of us.

19    A.  Yes.

20    Q.  So that specifically is talking about that confrontation

21    that we've just been watching video for.  Right?

22    A.  Yes.

23    Q.  And you said:  I had no idea what their intentions were,

24    and you retreated to the top of the stairs.

25    A.  Yes.  That's in there.  Yes.
```

1   Q.  So when you're saying that you had no idea what their

2   intentions were, you're talking about that very moment where

3   you just testified you had that confrontation with Mr. Kevin

4   Seefried.  Right?

5   A.  When I'm by myself and the whole mob of individuals

6   there.

7   Q.  Right.  But we're talking about that moment at the

8   bottom of the stairs in the archway where you're with

9   Mr. Kevin Seefried.  Right?

10  A.  Yes; along with the -- everybody else.

11  Q.  But that period of time, that is when you're saying you

12  had no idea what their intentions were.  Right?

13  A.  Yes.

14  Q.  Throughout the course of this day, you saw a wide

15  variety of people in terms of how -- what they were prepared

16  for inside of the Capitol.  Right?

17  A.  I saw a variety of people.  Yes.

18  Q.  You saw some people with, like, helmets, like Army

19  helmets.  Right?

20  A.  Yes.

21  Q.  You saw some people with tactical vests?

22  A.  Yes.

23  Q.  You saw people with stun guns?

24  A.  I didn't see stun guns.  No.

25  Q.  You heard of people with stun guns.  Right?

```
1    A.  Sorry?

2    Q.  You heard of people having stun guns out there.  Right?

3    A.  Just hearsay.  Nothing I saw.

4    Q.  I appreciate that.

5            You saw pepper spray or bear spray?

6    A.  Yes.  I got that.

7    Q.  Did you see any baseball bats?

8    A.  I don't recall seeing a baseball bat specifically.  No.

9    Q.  Were there people that you saw using police batons as

10   weapons?

11   A.  Outside, yes.

12   Q.  And did you see any people with baseball bats -- we

13   already asked that.

14           Riot shields?

15   A.  Yes, I did.  Yes.

16   Q.  There were people out there with walkie-talkies.  Right?

17   A.  I didn't see any from where I was or what I was doing.

18   So I couldn't tell you.  No.

19   Q.  There were people with plastic zip ties.  Did you hear

20   about that?

21   A.  Yes.  I heard about -- hearsay.  Yes.

22   Q.  And there were some people with, like, masks, not like

23   COVID masks, but like masks that -- to protect them from

24   chemical irritants.  Right?

25   A.  Gas masks.  Yes.
```

1    Q.  Mr. Seefried had none of those things when you saw him.

2    Right?

3    A.  Right.  He had none of those things.

4    Q.  And as far as you know, he never had any of those

5    things.  Right?

6    A.  To my knowledge.  No.

7    Q.  You had mentioned earlier that there was some

8    individuals who said:  We're supporting you.  We're here for

9    you.  Comments sort of like:  We're here for police.  We're

10   in support of police.

11           Do you remember that?

12   A.  Yes.

13   Q.  And Mr. Seefried is one of the people who were saying

14   those sorts of things.  Right?

15   A.  No.  Not at all.

16   Q.  You're sure that you don't remember him saying that?

17   A.  At no time did he ever say that to me.

18   Q.  You weren't aware of all the things that he was saying

19   to everybody.  Right?

20   A.  I can't speak to what he said to anybody else.

21   Q.  He never called you -- well, let's just --

22           THE COURT:  For the record, why don't we just

23   clarify.  Kevin Seefried?

24           MR. OHM:  Kevin Seefried.

25

 1    BY MR. OHM:

 2    Q.  I'm talking about Kevin Seefried.

 3    A.  (No audible response.)

 4    Q.  You have to say yes.

 5    A.  Yes.

 6    Q.  Obviously, Mr. Kevin Seefried is holding a Confederate

 7    flag.  Right?

 8    A.  Yes.

 9    Q.  You've never said that he said anything racist or

10    anything like name-calling to you.  Right?

11    A.  Not racist name-calling.

12    Q.  Okay.

13    A.  No.

14    Q.  He in particular never called you anything that was

15    racist towards you.  Right?

16    A.  No.

17            MR. OHM:  Your Honor, I'll be honest.  I'm

18    stalling, hoping my video will load.

19            THE COURT:  Did you have to restart it?

20            MR. OHM:  I think the problem is that the version

21    I had on my computer wasn't working, so I'm trying to get it

22    from the network.  And the Wi-Fi combined with the VPI --

23            THE COURT:  Is that your last area?  I'm just

24    wondering if maybe I should ask Mr. Bostic to do his cross

25    and I'll let you circle back on that one point.

1          MR. OHM:  Let me see if there are other things.

2          MS. REED:  This is 414.

3          MR. OHM:  If we can go to 18:29.

4          (Whereupon, segments of Government's Exhibit No.

5     414 were published in open court.)

6     BY MR. OHM:

7     Q.  Let me know when you see the person with the camouflage

8     hat.  Okay?

9          While we're here, Officer Goodman, you see the

10    shaman guy.  Right?

11    A.  Yes.

12    Q.  You see he's communicating with individuals there?

13    A.  Yes.

14    Q.  He's not using his bullhorn.  Right?

15    A.  No, he's not.

16    Q.  And you were saying that all of the things that he was

17    yelling about "Where are the senators," that he was doing

18    through the bullhorn?

19    A.  Yes.

20    Q.  Also, to the right -- the top over where it says p.m.,

21    do you see that?  Do you see that part of the exhibit over

22    on the top?

23    A.  Where it says p.m.?

24    Q.  Yes.

25    A.  Yes.

```
 1    Q.  Do you see by that statue that officer to the left of

 2    the statue?

 3    A.  Yes.

 4    Q.  That's Officer Steven Lees.  Right?

 5    A.  I don't know his name.  I can't tell who that is.

 6    Q.  You remember an officer that was standing sort of right

 7    behind you throughout most of this time in the Ohio Clock

 8    Corridor.  Right?

 9    A.  Standing behind me?

10    Q.  Yeah.  Like sort of flanking you.

11    A.  Well, initially, yes.  I do remember that officer.

12    Q.  Okay.  And he was, like, within arm's distance of you.

13    Right?

14    A.  Yes.

15              MR. OHM:  Your Honor, given that this is a bench

16    trial, I'm -- I can just move in the thing and make my

17    point.

18              No further questions.

19              THE COURT:  Thank you, Mr. Ohm.

20              Mr. Bostic.

21              MR. BOSTIC:  Thank you, your Honor.

22                         CROSS-EXAMINATION

23    BY MR. BOSTIC:

24    Q.  Good afternoon.  Officer Goodman.

25    A.  Good afternoon.
```

1    Q.  I'll be fairly brief.

2         You testified on cross-examination to Mr. Ohm's

3    question about what you recalled.  You said you remember

4    what you remember.  Is that correct?

5    A.  Yes.

6    Q.  Right.

7         And earlier this morning, you testified with

8    respect to Hunter Seefried, the young man in the blue shirt,

9    that you remember he wasn't aggressive.  Is that correct?

10   A.  Yes.

11   Q.  And you testified that he wasn't yelling.  Is that

12   correct?

13   A.  Yes.  He wasn't yelling.

14   Q.  And you testified that as you recall he didn't have

15   anything in his hands.  Do you remember that?

16   A.  Yeah.  I didn't see anything in his hands.

17   Q.  And you testified also that all he did was he had a

18   smile on -- you described it as a smirk -- on his face.

19   Correct?

20   A.  Yes; as he moved about the line that they had formed.

21   Yes.

22   Q.  As he moved around.

23        And you testified that all he did was he didn't

24   leave when you told him to leave?

25   A.  For me, from my perspective, yes.  I told him to leave.

Goodman - CROSS - By Mr. Bostic

 1    He wouldn't leave.

 2    Q.  Now, in response to Ms. Reed's question, you indicated

 3    that there was an individual who was upset.  And you came to

 4    the front of the line and someone else moved and took him to

 5    the back, apparently to calm him down.

 6         Do you remember that?

 7    A.  Yes.  At one point, yes.

 8    Q.  And I think you had a question to the effect of -- you

 9    were asked:  Well, did you see Hunter Seefried take any

10    action to calm anybody down who was in the Ohio Clock

11    Corridor?  Do you remember that?

12    A.  Yes.

13    Q.  And you said no?

14    A.  I didn't see him.

15    Q.  Right.  You didn't see him.

16         Now, would it be fair to say that Hunter Seefried

17    was not amongst the people that you were most concerned with

18    at that time in the Ohio Clock Corridor?  Would it be fair

19    to say?

20    A.  I was concerned about everybody.

21    Q.  You were concerned about everybody.

22    A.  Because of the -- who was -- where the -- because of

23    where I was and the officers.  Everybody was a concern.

24    Q.  But you weren't concerned about him with respect to him

25    being aggressive?

```
 1    A.  No.

 2    Q.  And you indicated some other individuals were

 3    aggressive?

 4    A.  Yes.

 5    Q.  And you weren't concerned about him screaming because

 6    you said earlier he wasn't screaming or yelling?

 7    A.  He wasn't yelling.  He was just disobeying commands.

 8    Q.  Right.

 9         And now there was only one individual that moved

10    towards -- that person who was upset in the front moving

11    that person away and as you indicated calming that person

12    down?

13    A.  It was two.

14    Q.  There were two?

15    A.  I said two.

16    Q.  There were two.

17         So two out of the people that were in there took

18    such action to calm this individual down?

19    A.  Yes.

20    Q.  And you don't know of any action that Mr. Hunter

21    Seefried took with respect to anybody else?

22    A.  No, I don't.

23    Q.  So the only thing that Hunter Seefried did that you can

24    recall is that he didn't disperse when you told him to

25    disperse?
```

```
 1   A.  From my -- from what I saw, that's -- yeah.  He
 2   disobeyed commands.
 3             MR. BOSTIC:  Thank you, Officer.  Nothing else.
 4             THE COURT:  Thank you, Mr. Bostic.
 5             Ms. Reed.
 6             MS. REED:  Yes, sir, your Honor.
 7                      REDIRECT EXAMINATION
 8   BY MS. REED:
 9   Q.  I'll try to be very brief, Officer Goodman.  I'll work
10   my way back.
11             Suffice it to say you just told Mr. Bostic that
12   you were concerned about Hunter Seefried.  Can you explain
13   why?
14   A.  I wasn't concerned about him as far as aggressiveness,
15   but I was concerned about everybody in that area because of
16   the location where they were.  They were outside -- just
17   outside of the Senate main door and also because of the
18   leadership offices that they were all in close proximity of.
19   Q.  As far as the police line, do you recall if he was close
20   in proximity to you at any point?
21   A.  At one point in time, he was.  Yes.
22             MS. REED:  Can we please pull up 515.
23   BY MS. REED:
24   Q.  Now, just to give some context to this picture, Officer
25   Goodman, can you tell us, did you see the Seefrieds, Hunter
```

1   and Kevin Seefried, when they entered the corridor?

2   A.  When they entered the corridor?  I don't think I saw

3   them right out when they entered.  It wasn't until they came

4   to the front of the line that I saw them.

5   Q.  And so they did make their way to the front.  Correct?

6   A.  Yes.

7   Q.  Were there other individuals who were behind them who

8   sort of just walked around in the corridor behind them?  Can

9   you kind of explain?  What did the individuals do as they

10  came in?

11  A.  Okay.  So they stopped, formed the middle line, and they

12  started -- some of which were -- like this gentleman to

13  my -- in this picture to my left, he's the one that he's

14  more -- he's an aggressive tone but he's saying things like:

15  We're here to Stop the Steal.

16          This gentleman, he's saying:  We're here for you.

17  You guys need to be on our side --

18  Q.  How, let me --

19  A.  -- for the whole country.

20  Q.  Let me pause for a second just for the record.  And you

21  have the screen still in front of you.  You can circle it.

22  Can you tell us where you see the person who you're speaking

23  of right now?

24  A.  Oh, he's immediately in front of me in the black.

25  Q.  Thank you.

1           And the person who is behind this individual with

2      the Trump hat on, how do you recall this person?  What do

3      you recall about him?

4      A.  That is the gentleman who made his way to the front.

5      And after this gentleman, to my -- that's directly in front

6      of me, he's the individual that started yelling and

7      screaming, "We're ready for war."  That's the gentleman with

8      the Trump hat.

9      Q.  The individuals as they are positioned in this picture,

10     is it safe to say that the line that they've created is soon

11     after you arrived in the corridor?

12     A.  Yes.

13     Q.  Okay.  And suffice it to say Hunter and Kevin Seefried

14     are at the front of that line?

15     A.  Yes.

16     Q.  Just so I have it clear, Mr. Ohm asked you about the

17     individual who said something to the effect of, "Ready for

18     war."

19     A.  Yes.

20     Q.  Who is the person -- do you see that person depicted in

21     515?

22     A.  Yes.

23     Q.  And who is that individual?

24     A.  He's the gentleman standing directly behind the

25     gentleman in the black with the Trump hat on in the blue

1    mask, the camouflage hat and the blue mask.

2    Q.  Now, you were asked some questions about your victim

3    impact statement.  Correct?

4    A.  Yes.

5    Q.  And you recall writing that statement to express

6    yourself about how you felt about this investigation.

7    Correct?

8    A.  Yes.

9    Q.  And at some point, you did state that you had no idea

10   what their intentions were.

11           Can you explain to the Court what you meant when

12   you wrote that sentence?

13   A.  Well, I didn't know what their intentions were with

14   regard to -- in that corridor with regards to me,

15   specifically me.  That's all I know.

16   Q.  Is it fair to say that when you were asked about that,

17   you were only asked --

18           MR. OHM:  Leading.

19           THE COURT:  Sustained.

20   BY MS. REED:

21   Q.  Were you asked about what the remainder of that sentence

22   was?

23   A.  Say again.

24   Q.  When Mr. Ohm asked you about that statement, did he read

25   the full sentence to you?

 1    A.  Yes.

 2    Q.  And what did that full sentence say in its entirety?

 3    A.  I had no idea why they were here.  I had --

 4    Q.  Would you like to see it?

 5    A.  I'd have to look at it and see it specifically.

 6    Q.  (Tenders document to the witness.)

 7              MS. REED:  For the record, your Honor, this is

 8    Page 2 of the victim impact statement.  They're not lined,

 9    but it's Line 4.

10    BY MS. REED:

11    Q.  I want you to take the time and read it to yourself.

12    A.  Okay.

13    Q.  Is your memory refreshed about the entirety of the

14    sentence?

15    A.  Yes.

16    Q.  And what exactly did you state in that sentence?

17    A.  That one of the individuals had stated that there's

18    thousands of us and one of him.

19    Q.  And the statement was, "I had no idea what to believe,

20    what their intentions were, and I retreated to the top of

21    the stairs."  Correct?

22    A.  Yes.

23    Q.  So when you wrote this statement, you were talking about

24    why you actually went up the stairs.  Correct?

25    A.  Yes.

1    Q.  Were you attempting at all to talk about what their

2    intent was, these individuals who were entering the Capitol?

3    A.  No.  I had no idea what their intent was.

4    Q.  Do you recall how many times you've been interviewed by

5    the FBI in this investigation?

6    A.  No.  Not off the top of my head.  No.

7    Q.  Do you remember being interviewed back in January of

8    2021 after this incident happened?

9    A.  Vaguely.

10   Q.  Tell us about those interviews.  Do you remember --

11   A.  They were mostly over the phone.  And I kind of gave --

12   I answered the questions they asked me, you know, about

13   specific things.  I can't remember off the top of my head

14   specifics.

15   Q.  In a lot of your interviews that you've had with either

16   the FBI or with the U.S. Attorney's Office, can you explain

17   to the Court how those interviews usually happened?

18   A.  It was just usually over the phone and not face to face

19   at all.  So it --

20   Q.  Is it usually tied to a specific individual like a

21   specific Defendant or someone who they're trying to -- or

22   we're trying to ask if you have identification for?

23   A.  Yeah.  Yes.  Pictures and stuff like that.  Yeah.  It

24   was more if I can identify individuals and stuff like that.

25   Q.  Do you recall back in January 16 of 2021 actually -- you

1   actually identified Mr. Seefried, specifically Kevin

2   Seefried?

3   A.  I would have, yes, because he stood out to me the most

4   because of the Confederate flag and the tattoo.

5   Q.  Is that what you told the FBI back on January 16, 2021?

6   A.  Yes.

7   Q.  One last line of questioning, Officer Goodman.

8          Was it very chaotic that day on January 6?

9   A.  Yes.  Very.

10  Q.  You testified to your own experiences while you were out

11  on the west front.  Correct?

12  A.  Yes.

13  Q.  Would you say that the opportunity that you had to

14  encounter individual people was the same on the west front

15  as it was when you went back inside of the Capitol Building?

16  A.  Not individual people.  Not quite, because outside it

17  was just a mass, a huge mass of individuals.

18  Q.  How were you able to after all this time identify

19  individuals by what they said and what they did?

20  A.  Because of their clothing, different things and items,

21  the personality.  Things they said and just -- I just -- as

22  they were being aggressive, I would kind of make a mental

23  note of their height, anything I could do to recall

24  something that they -- you know, this person was a problem.

25  He has on this shirt, whatever.  That's how I remembered who

 1   was -- who stood out, based on what they were wearing.  I

 2   had to identify key features about a specific person, what

 3   they had.

 4   Q.  In fact, do you remember telling me just yesterday how

 5   you were able to remember the guy who you said made the

 6   statement "Ready for war"?

 7   A.  Yeah.  "Ready for war," because he looked like a

 8   supervisor of mine, actually.  He favored a supervisor of

 9   mine.  So I kind of in my head nicknamed him after the

10   supervisor.

11         And then Mr. Seefried, I nicknamed him in my head

12   Confederate flag; the gentleman with the Q shirt, I

13   nicknamed him Q.  Just certain things to identify each

14   individual in my own head.

15   Q.  So in spite of all the day otherwise, that's how you're

16   able to recall your memory of these individuals?

17   A.  Yes.

18         MS. REED:  Thank you, your Honor.  No further

19   questions.

20         THE COURT:  Thanks.

21         I had a couple questions, Officer.

22         So listening through those videos, am I right you

23   don't hear either Defendant specifically talk about the

24   votes?  Is that correct?

25         THE WITNESS:  I don't -- not him, not either of

1   the Defendants.  No.  I don't recall them specifically

2   talking about the votes.

3           THE COURT:  But am I correct you do have a

4   specific memory about Kevin Seefried talking about the votes

5   downstairs?

6           THE WITNESS:  Yes, and "Where the 'F' are the

7   members," along with everyone else that was out there, and

8   being antagonistic.  "What are you going to do?  Are you

9   going to shoot us?  What are you going to do?"

10          THE COURT:  That's before anyone else was there?

11          THE WITNESS:  Yes.  That was before -- well,

12  before and sort of during.

13          THE COURT:  Mr. Ohm, do you have any questions

14  based on my questions?

15          MR. OHM:  Just one or two, your Honor.

16                   RECROSS-EXAMINATION

17  BY MR. OHM:

18  Q.  When you're saying that Mr. Seefried was in the archway

19  and that it was just the two of you, there were still other

20  individuals in the hallway, right, behind Mr. Seefried?

21  A.  When it's just he and I, no.  There's nobody.

22  Q.  I'm not talking about the hallway necessarily like

23  directly in front of you, but there are people like sort of

24  streaming past.  Right?

25  A.  I don't recall anybody streaming.  My focus was him.  He

1    was the closest person to me.  I didn't see beyond -- I

2    didn't take notice of beyond him to see when I initially

3    came down the stairs.  So no.  It was just he and I.

4    Q.  So you don't recall people coming by; you don't recall

5    people yelling; and you don't recall, I mean, alarms

6    going --

7    A.  I didn't see people behind him.  My focus was him.  I

8    was looking at him.

9    Q.  Okay.

10   A.  He was the closest person to me.  He was right there.

11   He was -- and that's at the point when --

12   Q.  So you're not saying there weren't people there.  You're

13   just saying that you were focused on him?

14   A.  Yes.

15   Q.  So it's also possible that there were other people who

16   were yelling and screaming things behind him, right, that

17   you weren't focused on?

18   A.  Yeah.  My focus was him.  When he first -- when I first

19   encountered him, he's the only person right there.

20   Q.  Okay.

21   A.  Yeah.  There's Mr. Kevin, Kevin Seefried.  There's

22   nobody else.  Just Mr. Seefried.

23   Q.  I guess I just want to make the distinction here.

24   You're saying that it's because you were so focused on him.

25   You're not saying that it was only Kevin Seefried and that

1   there was nobody else around?

2   A.  I'm saying that when I first came down to the bottom of

3   the stairs, he was the only person there.  That's what I'm

4   saying.

5   Q.  That is different than what I thought you had said, so

6   I'm just going to ask you a couple more questions again.

7   I'm sorry.

8            So when he was the only person at the bottom of

9   the stairs, it wasn't but an instant before there were other

10  people who were also right behind him.  Right?

11  A.  Yes.  Once he jabbed and retreated, yeah, then they were

12  there.

13  Q.  Those people were all shouting and yelling.  Right?

14  A.  Yes; as was he.

15  Q.  Okay.  Multiple people were shouting and yelling?

16  A.  Yes.

17            MR. OHM:  That's all, your Honor.

18            THE COURT:  Ms. Reed, any questions based on my

19  questions?

20            MS. REED:  No, sir, your Honor.

21            THE COURT:  Thank you, Officer Goodman.  I

22  appreciate your testimony here.  You're free to go.

23            (Witness excused.)

24            THE COURT:  Ms. Reed?

25            MS. REED:  Your Honor, at this time, the

1    Government would call Officer Brian Morgan.

2              BRIAN MORGAN, GOVERNMENT WITNESS, SWORN.

3              THE COURT:  Good afternoon, Officer.  Please feel

4    free to remove your mask.  We've got you well away from

5    everyone else.

6              THE WITNESS:  Thank you.

7                        DIRECT EXAMINATION

8    BY MS. REED:

9    Q.  Good afternoon, Officer Morgan.  Would you please spell

10   your name for the record?

11   A.  B-R-I-A-N M-O-R-G-A-N.

12   Q.  And, Officer Morgan, where are you currently employed?

13   A.  U.S. Capitol Police.

14   Q.  And how long have you been employed with the Capitol

15   Police?

16   A.  Approximately 15 and a half years.

17   Q.  And what is your current assignment with the police

18   department?

19   A.  My current assignment is the Senate chamber section.

20   We're responsible for protecting everything that goes on

21   within the Senate chamber.

22   Q.  And were you working the Senate chambers on January 6th

23   of 2021?

24   A.  Yes, ma'am, I was.

25   Q.  And can you tell us, at some point did you learn that

1    there had been a breach to the exterior Capitol grounds?

2    A.  Yes, ma'am.  It came over the radio at approximately

3    12:45 that people had started to breach our outer snow

4    fence.  And officers started calling it out one at a time.

5    Q.  Where were you inside of the Capitol when you first

6    learned of this information?

7    A.  I was currently at the majority leader -- at the time,

8    he was the minority leader -- Chuck Schumer's office, S-221,

9    at that time when the first breaches started to happen.

10   Q.  And did you have to respond in any particular way once

11   you learned that there was an exterior breach?

12   A.  Once there was an exterior breach, I prepared my head

13   for the worst-case scenario.  So I strapped up my duty belt

14   a little bit and I started going over our evacuation

15   procedures and different things like that for the worst case

16   in case it happened.

17   Q.  And at some point after learning about the exterior

18   breach, did you learn that there was an interior breach to

19   the Capitol?

20   A.  Yes, ma'am.  Approximately around 2:15.

21   Q.  Can you tell the Court what you learned?

22   A.  I'm sorry?

23   Q.  What did you learn about that breach, the interior

24   breach?

25   A.  I was on the third floor by Senator Durbin's office,

```
 1    S-321.  And it came out over the radio that -- right before,
 2    our chief had enacted a lockdown.  And then people started
 3    coming over the radio.  Officers who were responding in said
 4    that there were currently breaches within the building.
 5    Q.  Can you explain what the radio traffic was that day?
 6    A.  It was very hectic.  Some commanders were better than
 7    others with specific orders and what was happening.  It was
 8    very clear that the building had been breached.  It was very
 9    clear that the outer perimeter had been breached.  Those
10    things were very particular.
11    Q.  And as it relates to the interior breach, at that point
12    did you know where in the Capitol the breach had occurred?
13    A.  I could actually hear it.  I was on the third floor.  It
14    happened probably about two floors below me, but it's all
15    open.  So you could hear the glass breaking and you can hear
16    the screaming downstairs.
17    Q.  Did you have any idea where specifically -- where you
18    were hearing the glass breaking?
19    A.  No.  I just knew that was probably coming from the first
20    floor because there's no other way to get in other than the
21    first floor.
22    Q.  And so, Officer Morgan, at some point did you hear
23    Officer Goodman over the channels?
24    A.  Yes, ma'am.  I had heard him say "second floor."
25    Q.  Can you tell the Court how you know Officer Goodman?
```

1   A.  We've been working on the same shift for approximately

2   ten years together.

3   Q.  Can you describe how he sounded over the radio channel?

4   A.  Yes.  He sounded very intense.  He said, "second floor."

5   And he almost yelled it into the radio, so I knew that

6   something was happening that I'd have to respond very

7   quickly.

8   Q.  And did you in fact respond to his radio dispatch?

9   A.  Yes, ma'am, I did.

10  Q.  Can you tell us about that response?  What did you do?

11  A.  First, I have procedures I have to go through.  I took

12  several staff themselves, shoved them in their offices,

13  locked the doors, briefly explained what was going on.  Then

14  I ran down the stairs to where I thought Officer Goodman

15  would go.  And he ended up being there.

16  Q.  Where did you first see Officer Goodman?

17  A.  In the Ohio Clock Corridor.

18  Q.  And when you saw him, did you see other individuals

19  inside of the corridor?

20  A.  Yes.  I saw what was forming as a makeshift police line

21  and I saw several other individuals who were running into

22  the area.

23  Q.  Can you briefly explain to the Court, why did you all

24  decide to form a line at that area?

25  A.  Because the Senate was currently on the other side of

1    the wall, and we had no idea if the doors behind us were

2    locked.  And if they were not locked, that would be easy

3    access to the Senate chamber itself.

4    Q.  At that point, Officer Morgan, did you know if there

5    were senators who were still positioned in the Senate

6    chambers?

7    A.  At that time when I arrived to the line, yes.  I did

8    know they were still in there and they had not yet been

9    evacuated.

10   Q.  And so can you sort of take us through what you are

11   observing when you see Officer Goodman come into the

12   corridor?

13   A.  So Officer Goodman had been there with Inspector Loyd

14   and several other police officers during their makeshift

15   line that I had joined.  I had saw a crowd of people.  Some

16   were still streaming in; some were already there.  They were

17   yelling, screaming, almost chanting different lines.

18   Q.  And can you tell the Court specifically if you remember

19   what was stated by the group?

20   A.  The group?  We heard different things.  They called us

21   traitors.  I remember the phrase "Stop the Steal."  There

22   was different people yelling different things towards us,

23   profanities, stuff like that.

24   Q.  Did anyone say anything directly to you at that point?

25   A.  At that point, yes.  There was a man in the black

Morgan - DIRECT - By Ms. Reed

1     skullcap.  He had told me if I didn't put my baton away and

2     ease down a little bit that he would take it a step further.

3              MS. REED:  Can we pull up Exhibit 513.

4     BY MS. REED:

5     Q.  Now, Officer Morgan, do you recognize Government's

6     Exhibit 513?

7     A.  Yes, ma'am.

8     Q.  And what do you recognize it to be?

9     A.  I recognized this as soon as I got there.  And the man

10    who had said that line to me is standing right in front of

11    me.

12    Q.  Let me ask you -- I think you just described it.  Do you

13    see yourself in this photograph?

14    A.  Yes, ma'am.  I have the -- my hat on right here and I

15    have my black mask on.

16    Q.  And where is the person who was the individual who you

17    just spoke about who was speaking to you directly?

18    A.  He's standing right in front of me with the black hat on

19    with the black shirt with the Q with the American flag.

20    Q.  At that point, are you able to give your sole attention

21    to this individual?

22    A.  Not at the time, because we didn't know what these

23    people had had on them.  For instance, there was a gentleman

24    in the back.  He had a police riot shield.  They had -- or

25    police vests on.

```
 1              Yes.  I focused on one person, but you also had to
 2    keep your guard up.  You had no idea what these people had.
 3    Over the radio, we had heard that they had weapons, baseball
 4    bats.  Outside, we were working a bomb threat.  We didn't
 5    know if they had different weapons like that on them.  So I
 6    was pretty much cognizant of everything else that was going
 7    on in the room as well.
 8    Q.  So you've already identified one individual.  Still
 9    sticking with 513, were there any other individuals who you
10    had direct contact with on that day?
11    A.  Yes.  The man standing over his -- what would be his
12    right shoulder with the horns on with his face painted red,
13    white and blue.  Yes.  I had direct contact with him.
14    Q.  Can you tell the Court what you observed this individual
15    doing?  And just for the record, I feel like we can just say
16    "shaman" at this point --
17    A.  Yes.
18    Q.  -- just to be clear.  So what do you recall seeing the
19    shaman do or hearing him say?
20    A.  The shaman has a bullhorn that you can see in his hands.
21    He would yell, "Where are you hiding?  Where are all the
22    members at?"  Different things like that.
23    Q.  And what was the response, if any, to the crowd when the
24    shaman was yelling these things into the microphone or
25    bullhorn?
```

1    A.  Most of them -- he drowned most of them out.  Most of

2    them listened to him.  They were still parading around,

3    individually yelling at different officers still.

4    Q.  Were there other individuals who were asking questions

5    that the shaman was asking on his bullhorn?

6    A.  Yes.

7    Q.  And do you see them depicted in Exhibit 513?

8    A.  Yes, ma'am.

9    Q.  And can you take the time and point them out?  Officer

10   Morgan, if it's easier for you, you can also use the touch

11   screen in front of you and point to them.

12   A.  Yes.

13   Q.  Okay.  I'm sorry.  It's not showing -- now it's showing

14   on my screen.

15          When did you first have the opportunity to engage

16   with this individual?

17   A.  A little after I had arrived on the scene, I remember

18   him coming up.  He would walk up and down the line.  And I

19   remember one key thing he said to me was, "Why are you

20   protecting them?"

21   Q.  Now, explain to us what you mean when you say he would

22   walk up and down the line.

23   A.  So most of the people here did not stay in one spot.

24   They would congregate.  They would mull around.  They would

25   go back and forth talking to different officers, my guess is

1   trying to agitate us to try to do something, tell them where

2   the members were, stuff like that.

3   Q.  So the individual who you have marked with a red dot at

4   this point, do you see this person in court today?

5   A.  Yes, ma'am.

6   Q.  Can you tell us where you see him seated?

7   A.  Yes, ma'am.  He's right there.

8   Q.  Can you describe what he's wearing for the record?

9   A.  Yes, ma'am -- I'm sorry.  Repeat.

10  Q.  Can you describe what he's wearing?

11  A.  Yes.  He's got -- I believe that's an orange shirt.

12  He's got a beard.  It's gray and it's about several inches

13  long.

14           MS. REED:  Your Honor, just let the record reflect

15  the identification.

16  BY MS. REED:

17  Q.  Now, Officer Morgan, can you tell us, did you -- let me

18  go back a little bit.

19           You had the opportunity to speak specifically to

20  this individual?

21  A.  Yes.

22  Q.  And what did he tell you directly?

23  A.  I'm sorry?

24  Q.  What did he tell you?

25  A.  He just asked:  Why are we protecting them?

1    Q.  And what -- I mean, did you understand what he meant or

2    did you make anything of what he was asking you?

3    A.  I assumed he was talking about Congress.

4    Q.  Okay.  Why would you make that assumption?

5    A.  Because of where we work.  And even the patches on our

6    uniform say U.S. Capitol Police.  And the people who occupy

7    the Capitol are the Senate and the House of Representatives.

8    Q.  Now, at some point, did you have an additional encounter

9    with this individual?

10   A.  Yes, ma'am, I did.

11   Q.  I want to just be clear for the record.  Did the

12   individual have a Confederate flag at the time that you

13   first saw him?

14   A.  Yes, ma'am.  He had a Confederate battle flag.

15   Q.  Now, there was another opportunity for you to engage

16   with this individual with the Confederate battle flag.

17   Correct?

18   A.  Yes, ma'am.

19   Q.  Can you tell the Court about that?

20   A.  Yes.  So there's another individual in this photo.  He's

21   in the back.  You can't see him.  Should I mark him?

22   Q.  Sure.  You can do that.

23   A.  Okay.  He had had what we thought was a cannonball or an

24   unidentified object.  So we had asked him to show it to us.

25   Once we deemed it not a threat, he put it back into his bag.

Morgan - DIRECT - By Ms. Reed

1            When he pulled out his bag, he also pulled out a

2     hatchet.  So we were currently searching his bag.  Officer

3     Gelfand, my partner at the time, was searching through the

4     bag.  I was observing that individual.

5            And during that time, the Defendant started

6     badgering us, saying, "Why are you doing this?  Why are you

7     checking his bag?" and stuff like that.

8     Q.  Now, prior to coming to court today, did you have an

9     opportunity to watch video?

10    A.  Limited.

11    Q.  And if I were to show you that video, would you possibly

12    be able to identify it for us?

13    A.  Yes, ma'am.

14            MS. REED:  If we could pull up Exhibit 414,

15    please.  If we could go to 18:35, please.

16            (Whereupon, segments of Government's Exhibit No.

17    414 were published in open court.)

18    BY MS. REED:

19    Q.  Now, Officer Morgan, do you generally recognize this

20    area?

21    A.  Yes, ma'am.

22    Q.  What do you recognize this area to be?

23    A.  This is the Ohio Clock Corridor.

24    Q.  And is this the area where you engaged with the

25    individual who you've identified in court?

1     A.  Yes.

2              MS. REED:  Can we continue to play, please, until

3     19 minutes.

4              (Whereupon, segments of Government's Exhibit No.

5     414 were published in open court.)

6     BY MS. REED:

7     Q.  Now, Officer Morgan, you just testified about searching

8     an individual.  Correct?

9     A.  That's correct.

10    Q.  Do you see that depicted in this portion of the video

11    that we played?

12    A.  Yes, ma'am, I do.

13    Q.  Did you in fact find an object on that person?

14    A.  Yes, we did.

15             MS. REED:  Mr. Leach, now we can continue to play

16    until 19 minutes.

17             (Whereupon, segments of Government's Exhibit No.

18    414 were published in open court.)

19    BY MS. REED:

20    Q.  Now, at some point, do you personally engage with the

21    individual with the Confederate battle flag again?

22    A.  After he had continued to badger and yell, "Why are you

23    searching him?  What's going on?  Why him?"  After that, no.

24    That was my last interaction with him.

25    Q.  Now, in the video, it seems like there's a little bit of

1    distance between where you're doing your search and where

2    this individual is standing.  Is that accurate?

3    A.  Yes, ma'am.

4    Q.  So can you explain to the Court, is he yelling these

5    commands at you or these questions of you?  Can you explain

6    to the Court, where was he when he made these statements to

7    you?

8    A.  Yes.  He was standing amongst the crowd there.  He was

9    yelling.  But he was very identifiable because he's holding

10   a large flag.

11   Q.  As he's asking you these questions about the search that

12   you're conducting, are you engaging with him in any way?

13   A.  I'm trying not to.  I might have said:  He's got a

14   weapon.  We're searching for weapons.  But generally, no.  I

15   didn't try to interact with any of them.

16   Q.  Can you describe his demeanor when he was asking these

17   questions of you while you were doing your search?

18   A.  Angry and volatile, yelling and trying -- there

19   wasn't -- at this point, there wasn't a lot of noise in the

20   corridor.  But he was yelling.  So I took that to be angry.

21   Q.  Now, Officer Morgan, you testified that you heard a term

22   used.  I believe that you stated "thieves."  Is that

23   accurate?

24   A.  Yes, ma'am.

25   Q.  Can you tell us when you would have heard that statement

Morgan - DIRECT - By Ms. Reed

1    be made?

2    A.   While we were searching the individual's bag.

3    Q.   Could you tell who was making that statement towards

4    you?

5    A.   Yes.   The man with the Confederate battle flag.

6              THE COURT:   What did he say?

7              THE WITNESS:   Called us thieves because we were

8    trying -- because we were looking through the individual's

9    bag.

10             THE COURT:   I see.

11   BY MS. REED:

12   Q.   Do you recall at any point him mentioning or stating

13   that you or any of the officers were liars?

14   A.   Yes.

15   Q.   When would that have happened?

16   A.   At the same instance.

17   Q.   At that point, did you attribute anything to why he

18   would have been calling you a liar?

19   A.   My congesture [sic] is because we were searching through

20   the bag.   And the only thing I can guess is maybe they

21   thought -- he thought that we were stealing stuff out of the

22   bag.   But truthfully, we were searching it for other

23   weapons.

24   Q.   Now, at some point -- at any point, did you see the

25   individual with the Confederate flag with another

1    individual?

2    A.  Yes.  I had seen him with a man with a black baseball

3    cap with a yellow brim.

4    Q.  Okay.  And do you see that person present in court

5    today?

6    A.  Yes.  He's over your right-hand shoulder.

7    Q.  For the record, can you please describe what you see him

8    wearing?

9    A.  He's wearing a blue-colored, long-sleeved shirt.

10              MS. REED:  Your Honor, just let the record reflect

11   the identification of this individual.

12   BY MS. REED:

13   Q.  You don't know these people by name.  Correct?

14   A.  That is correct.

15   Q.  Can you tell us what you saw him wearing inside of the

16   Capitol on January 6?

17   A.  He was wearing -- to my recollection, he was wearing a

18   black -- almost like a hoodie.  And what stood out the most

19   is his black baseball cap with the yellow brim, the gold

20   brim.

21   Q.  Can you tell us about any communications or contact that

22   you had with this individual?

23   A.  I personally didn't have any contact with him.  I did

24   see -- as police officers, we're trying to observe people

25   and they give off what we call nonverbals.  I did see him

1    with his fists clenched and pacing back and forth a little

2    bit.

3    Q.  Can you tell the Court when you would have seen this?

4    A.  Sometime -- a lot of it probably happened pre-searching

5    the bag here.

6    Q.  Okay.  Would it have been when we saw them facing you as

7    a line of police officers or do you not know?

8    A.  Yes, ma'am.  That's it.

9    Q.  Okay.

10   A.  When they were facing us.

11   Q.  Tell us about what you saw at that time.

12   A.  At the time, he would be standing to my right, I

13   remember.  And like I said, nonverbals such as

14   fist-clenching, tightening of muscles, pacing back and

15   forth.

16         MS. REED:  If we could pull up Exhibits 510, 511,

17   513 and -- I think it's 515.

18         THE COURT:  I'll say for the record that second

19   identification was of Hunter Seefried.

20         MS. REED:  Thank you, your Honor.

21   BY MS. REED:

22   Q.  Now, Officer Morgan, can you tell us where you see the

23   person who you identified in court, the second individual?

24   A.  Yes.  In the top left photo.  He is right there.

25   Q.  And that would be Exhibit 510, sir?

```
1    A.  Yes, ma'am.

2    Q.  And is he depicted with the hat that you just described

3    him wearing?

4    A.  Yes, ma'am.

5    Q.  Now, you mentioned that there were nonverbals.  Correct?

6    A.  Yes, ma'am.

7    Q.  Can you explain to us what you mean by that?

8    A.  So in law enforcement, just because someone says

9    something verbally, you also can take into account people

10   with nonverbals that want to engage or are angry.  For

11   instance, the clenching of fists, their muscles tightening.

12   The thousand-yard stare is common where someone looks right

13   through you like you're not even there.  You can be talking

14   to them and they'll just look right past you, things of that

15   nature.

16   Q.  Did you see the individual who, for the record, the

17   Court has noted is Mr. Hunter Seefried?  Did you see him

18   engaging with any other police officers on January 6th

19   inside of the corridor?

20   A.  Verbally?

21   Q.  Yes.

22   A.  Yes, ma'am.

23   Q.  And what did you hear him say?

24   A.  I couldn't hear.  He was too far away.

25   Q.  The demeanor that you just testified to, did he give you
```

Morgan - DIRECT - By Ms. Reed

1    any sort of those nonverbal cues when you saw him?

2    A.   That day, I was really looking.  So in law enforcement,

3    the quickest threat to us is areas accessible to hands, such

4    as waistbands and such, pockets, things like that.  So I was

5    looking at everybody's waists.  I was looking where their

6    hands were as well as a way to harm us.  So at that point I

7    did notice that his fists were clenched.

8    Q.   The last question for you, Officer Morgan:  As it

9    relates to Mr. Hunter Seefried, did you see him engaged with

10   the line of police officers when these statements were being

11   made about the votes and -- did you see him engaged with

12   police officers at that point?

13   A.   Yes, ma'am.

14   Q.   And was he giving anyone in particular a thousand-yard

15   stare that you just mentioned?

16   A.   Not that I remember.

17            MS. REED:  Thank you, your Honor.  No further

18   questions.

19            THE COURT:  Thank you.  Why don't we take a

20   ten-minute break.

21            Officer Morgan, I'll ask you not to discuss the

22   substance of your testimony with anyone over the break.

23            THE WITNESS:  Yes, sir.

24            (Thereupon a recess was taken, after which the

25   following proceedings were had:)

```
 1              THE COURT:  Officer Morgan, I had one question for
 2     you.  Did you say you heard people saying something about
 3     voting or votes?
 4              THE WITNESS:  The shaman.
 5              THE COURT:  Oh, right.
 6              THE WITNESS:  He was yelling it out of the
 7     bullhorn.
 8              THE COURT:  Understood.  Thank you.
 9              Mr. Ohm.
10              Officer, I'll remind you you're still under oath.
11              THE WITNESS:  Yes, sir.
12              MR. OHM:  Thank you, your Honor.
13                            CROSS-EXAMINATION
14     BY MR. OHM:
15     Q.  Good afternoon, Officer.
16     A.  Good afternoon, sir.
17     Q.  So your first encounter with Mr. Seefried was in Ohio --
18     in the Ohio Clock Corridor?
19     A.  Yes, sir.
20     Q.  And I think you had said that the reason that you formed
21     a line there is because right behind you was an entrance to
22     the Senate.  Right?
23     A.  That is correct.
24     Q.  Mr. Seefried in the time that you saw him speaking
25     didn't indicate he had any idea that the Senate was right
```

1  behind you.  Right?

2          THE COURT:  You're talking about Kevin Seefried.

3  Right?

4          MR. OHM:  I'm sorry.  Kevin Seefried.

5          THE WITNESS:  I can't be sure of that.

6  BY MR. OHM:

7  Q.  Well, you don't have any information for the Court to

8  say that Mr. Kevin Seefried knew that behind you was where

9  the Senate door was.  Right?

10 A.  Correct.

11 Q.  Okay.  And you had said something about how there was a

12 point in time where a bunch of you had to, I guess, check

13 out what was in this individual's bag.  Right?

14 A.  Correct.

15 Q.  And there was -- it sounded like several of the people

16 sort of went -- several of the officers sort of went and

17 attended to that situation.  Right?

18 A.  Officer Gelfand and myself.

19 Q.  So while that was going on, Officer Seefried [sic]

20 didn't, like, make a break to try and break the line or

21 anything.  Right?

22 A.  Not at that time, no.

23 Q.  There was no time where Mr. Kevin Seefried tried to

24 break and -- make a break for the line and tried to get past

25 you all.  Right?

1   A.  Not to my knowledge.

2   Q.  Okay.  And there's no -- there were no statements that

3   Mr. Kevin Seefried made to you or in your earshot that

4   indicated to you that he knew that the senators were

5   anywhere on that floor, even.  Right?

6   A.  Not to my knowledge.

7   Q.  Okay.  But the one thing that he did say, according to

8   you, was "Why are you protecting them?" or "Why are you

9   protecting these people?"

10  A.  "Why are you protecting them?"

11  Q.  And you -- so it wasn't -- I think you said that you

12  made the assumption that because you work at the Capitol and

13  because the Capitol is the seat of Congress, that you

14  assumed that it had something to do with Congress.  Right?

15  A.  Correct.

16  Q.  Okay.  He didn't say anything about them being in that

17  building at that moment at that time.  Right?

18  A.  Correct.

19  Q.  All he said was sort of generally, "Why are you

20  protecting these" -- I think -- you assume they were

21  individuals.  Right?

22  A.  He said "them."

23  Q.  Okay.  Then I think the other thing you said was that he

24  was, I think, badgering, when -- you say badgering you and

25  Officer Gelfand while you were trying to look through this

1    bag.  Is that right?

2    A.  That is correct.

3    Q.  Now, when you say "badgering," did he do anything to

4    physically stop you?

5    A.  No.  It was more verbal.

6    Q.  Was it entirely verbal or was there anything physical?

7    A.  Verbal.

8    Q.  And it sounded like he was more sort of concerned that

9    you were violating the rights of the individual?

10   A.  He called us liars.  But yes.

11   Q.  Recognizing that you were doing your job.  Right?  And

12   that you were looking through the bag.  The nature of the

13   comments directed towards you were more about:  Are you --

14   why are you violating this person's right?  Is that fair to

15   say?

16   A.  Yes.

17   Q.  From your perspective, from your interactions with

18   Mr. Seefried, you didn't see him have anything that made you

19   believe that he had come prepared for any sort of

20   confrontation.  Right?

21   A.  The flag, as we saw on multiple occasions that day, was

22   used as a weapon.  So you could consider the flag as a

23   weapon.

24   Q.  So when you're saying -- you're not saying that

25   Mr. Seefried used a flag as a weapon.  You're saying that

Morgan - CROSS - By Mr. Ohm

1   there were times that day where other individuals used

2   flagpoles as a weapon?

3   A.  I had seen him flailing it around.  Did I see him hit

4   anybody with it?  No.

5   Q.  Could you say that first part?

6   A.  He was parading it around, flailing it around.  But I

7   did not see it physically come in contact with anybody.

8   Q.  And you didn't see it flailing towards anybody, either.

9   Right?

10  A.  Different directions.  There were people milling around.

11  Q.  I mean, you understand the point that we're trying to

12  get at, though.  Right?  He didn't assault anybody with a

13  flag.  Right?

14  A.  Not that I saw.

15  Q.  Okay.  And when you're saying that he was using it, he

16  wasn't using it as a weapon from what you could objectively

17  see.  Right?

18  A.  Correct.

19  Q.  And he didn't have anything like gas masks or Kevlar or

20  helmets or anything like that.  Right?

21  A.  Not that I saw.

22  Q.  What you saw was an individual with a vest and pants and

23  sort of regularly dressed.  Right?

24  A.  And the flag.

25  Q.  And the flag.  That's it, though.  Right?

```
1    A.  Yes, sir.
2              MR. OHM:  A brief indulgence.
3    BY MR. OHM:
4    Q.  Mr. Kevin Seefried leaves -- I think you described him
5    as sort of walking up and down the line.  But in reality,
6    what he did, there were times when he sort of disengaged
7    from the line to take phone calls and sort of walk around.
8    Right?
9    A.  If you say so.
10   Q.  Well, he wasn't -- you did review the video, though, of
11   the Ohio Clock Corridor at least in part.  Right?
12   A.  I'm sorry.  Say that again.
13   Q.  You've reviewed the video of the Ohio Clock Corridor at
14   least in part.  Right?
15   A.  Very limited.
16   Q.  And you also saw that he left well before the shaman
17   left, well before the guy with the beanie hat.  He leaves
18   well prior to all those folks.  Right?
19   A.  No, I did not.
20   Q.  You didn't see that on the video?
21   A.  No.  Like I said, I've seen very limited video.
22   Q.  Got it.
23              There was a point in time later on where
24   individuals sort of came behind you and then the shaman and
25   all of the other folks sort of walked through the part that
```

1    you were protecting.  Right?

2    A.  Yes.

3    Q.  You didn't see Mr. Kevin Seefried even around at that

4    point.  Right?

5    A.  Not to my knowledge.  We had just been sprayed by a fire

6    extinguisher, so...

7    Q.  Well, that happened actually well before the line broke,

8    though.  Right?

9    A.  Okay.

10   Q.  So the fire extinguisher happened and then I think about

11   ten minutes later people came from behind you and that's

12   when people -- when the shaman and the guy with the beanie

13   sort of just walked through.  Right?

14   A.  Yes.

15            MR. OHM:  Nothing further, your Honor.

16            THE COURT:  Mr. Bostic?

17            MR. BOSTIC:  Thank you, your Honor.

18                        CROSS-EXAMINATION

19   BY MR. BOSTIC:

20   Q.  Officer, as I understand it, your attention was for a

21   lot of your testimony today centered on the individual that

22   you were searching with the bag.  Right?  Had the bag?

23   A.  Say it again.  I'm sorry.

24   Q.  Your attention for a lot of your testimony today

25   centered around the individual that had the bag that you

1   were -- of whom you were conducting the search?

2   A.  I had paid attention to him, but also, like I had

3   previously stated, I was still on high alert with everyone

4   around because our building is secured.  And all these

5   people came in and no one went through a metal detector.

6   You had no idea what these people had on them.  We had heard

7   reports over the radio about officers being drug into the

8   crowd and beaten.  There were bomb threats outside.  So my

9   high alert was everybody.

10          Was I paying attention to that certain individual

11  during the bag check?  Yes; for officer safety.  But also

12  for my safety and the rest of the officers.  I was still

13  cognizant of the other people in the area.

14  Q.  Okay.  Now, with respect to the bag checked, when you

15  said that you believed Kevin Seefried was talking to you --

16  A.  Yelling.

17  Q.  -- would it be fair to say that --

18  A.  Yelling.

19  Q.  -- that Hunter Seefried was not present while that

20  conversation was going on?

21  A.  I do not recall him.

22  Q.  When you indicated that you saw him with his fists

23  clenched, he was not engaging with any officer or anyone

24  else at that point.  Is that right?

25  A.  He was at the line.  He was to my right.

1    Q.  He was at the line to your right?

2    A.  Yes.

3    Q.  But he hadn't said anything to you.  Am I correct?

4    A.  Not to me directly.

5    Q.  And you say that when he did engage an officer, his

6    fists were not clenched?

7    A.  I don't remember saying that.

8    Q.  You don't remember saying that?

9    A.  No.

10   Q.  You were asked by the prosecutor:  Did you see him

11   engage with other police?

12              You said:  Yes.

13              And you said -- you were asked:  Did he give that

14   stare?

15              You said:  No.  He didn't give that stare, the

16   thousand-yard stare.

17   A.  The thousand-yard stare.

18   Q.  Right.  When you saw him engaged with all the police,

19   would it be fair to say he didn't give the stare and he

20   didn't have his hands clenched?

21   A.  Maybe at that time.  But I did -- I do remember saying

22   that when he was on the line and he was to my right, that I

23   did look over because I was looking for hands accessible to

24   weapon areas.  And that's when I did notice his fists were

25   clenched.

Morgan - CROSS - By Mr. Bostic

1    Q.  And would you agree with me that he wasn't carrying

2    anything in his fists?

3    A.  I didn't see anything.

4    Q.  And he didn't have any weapons?

5    A.  Not to my knowledge.

6    Q.  Or anything that could be used as a weapon?

7    A.  Fists can always be used as weapons.

8    Q.  Outside of the fists.  In terms of an object, whether it

9    be a blow horn or -- I'm sorry -- a horn or anything in his

10   fists?  He wasn't carrying anything in his fists?

11   A.  No, sir.

12             MR. BOSTIC:  Thank you, Officer.

13             THE COURT:  Thank you, Mr. Bostic.

14             Ms. Reed?

15             MS. REED:  No redirect, your Honor.

16             THE COURT:  Thank you, Officer Morgan.  You may

17   step down.  You're free to go.

18             THE WITNESS:  Thank you.

19             (Witness excused.)

20             THE COURT:  Ms. Reed?

21             MS. REED:  Your Honor, the Government would call

22   Special Agent Joseph Lear.

23             JOSEPH LEAR, GOVERNMENT WITNESS, SWORN.

24             THE COURT:  Good afternoon, Agent.

25             THE WITNESS:  Good afternoon, your Honor.

```
 1                        DIRECT EXAMINATION
 2    BY MS. REED:
 3    Q.  Good afternoon, Agent Lear.  Would you please spell your
 4    name for the court reporter?
 5    A.  Yes.  L-E-A-R.
 6    Q.  And, Special Agent Lear, you are currently assigned
 7    to -- employed with the FBI.  Correct?
 8    A.  That's correct.
 9    Q.  How long have you been an FBI agent with the Bureau?
10    A.  For 18 years.
11    Q.  And where are you currently assigned?
12    A.  To Delaware's Fusion Center in Dover, Delaware.
13    Q.  And where were you assigned in January of 2020?
14    A.  To the Baltimore division FBI Salisbury resident agency
15    covering Maryland's Eastern Shore.
16    Q.  And in 2021 specifically?  I'm sorry.  I think I asked
17    you about 2020.
18    A.  Up until November of '21, I was in the Salisbury RA.
19    Q.  During your tenure in the department, how many different
20    assignments have you had?
21    A.  Numerous assignments.
22    Q.  Okay.
23    A.  I've been in numerous field offices.  I've had varying
24    leadership positions in investigative matters from criminal
25    national security.  I spent couple a years as an instructor
```

1    at our academy teaching new agents.

2    Q.  At some point in early January of 2021, were you tasked

3    with conducting an interview of Kevin Seefried?

4    A.  Yes.

5    Q.  Do you see Mr. Seefried present in court today?

6    A.  Yes.  He is at the Defendant's table with an orange-ish

7    shirt on.

8    Q.  And, Agent --

9              MS. REED:  Let the record reflect the

10   identification of Mr. Kevin Seefried.

11   BY MS. REED:

12   Q.  And, Agent Lear, did you also have the opportunity to

13   meet Mr. Hunter Seefried?

14   A.  Yes.

15   Q.  And do you see Mr. Hunter Seefried present in court?

16   A.  Yes, ma'am.  He's directly behind you in a light blue

17   shirt.

18             MS. REED:  Your Honor, just let the record reflect

19   the identification of Mr. Hunter Seefried.

20             THE COURT:  It will so reflect.

21   BY MS. REED:

22   Q.  So, Agent Lear, can you please explain to the judge,

23   how did you first get involved in this investigation?

24   A.  On the evening of January the 11th, 2021, I was called

25   by my supervisor to meet him and other Bureau colleagues the

 1   following morning at the Worcester County Sheriff's Office,

 2   which is in Worcester County, Maryland.

 3   Q.  And what happened when you -- well, did you respond

 4   based on what your office asked you to do?

 5   A.  I do have a correction.  I apologize.  It was Wicomico

 6   County, not Worcester County.  Excuse me.

 7   Q.  That's okay.  Wicomico is actually a little bit easier

 8   for me to say than what you stated first, so that works

 9   perfect.

10            So can you tell us why you were asked to go to

11   Wicomico County?

12   A.  Yes, ma'am.  Because I was informed that the Seefrieds

13   wanted to meet with us the following morning and turn

14   themselves in.

15   Q.  At that point, did you know why the Seefrieds wanted to

16   turn themselves in?

17   A.  Slightly; that they were wanted in questioning with

18   their activities at the United States Capitol on January 6,

19   2021.

20   Q.  And so did you relocate to Wicomico County with another

21   agent to meet with them?

22   A.  Yes.  It was actually myself and two other agents and a

23   supervisory special agent.

24   Q.  Who were those agents?

25   A.  It was myself, Special Agent Ryan McCabe, Special Agent

1    Brian Dinkel and Supervisory Special Agent Michael

2    McIlhenny, who myself and Agent McCabe worked for at this

3    time.

4    Q.  So can you -- let's walk the Court through your meeting

5    with the Seefrieds.

6             What was your first encounter with them?  Where

7    did you meet with them?

8    A.  Initially, we saw each other in the front parking lot of

9    the Wicomico County Sheriff's Office.

10   Q.  And was it decided that Mr. Seefried, specifically Kevin

11   Seefried, would be interviewed by yourself?

12   A.  Yes.

13   Q.  And was there another agent present during that

14   interview?

15   A.  Yes.  That was Agent Brian Dinkel.

16   Q.  And was the decision made that Mr. Hunter Seefried would

17   be interviewed by another agent?

18   A.  Yes.

19   Q.  Who was that agent?

20   A.  Special Agent Ryan McCabe.

21   Q.  So I want to talk a little bit about your interview with

22   Mr. Kevin Seefried.

23            So can you explain, what was Mr. Seefried's

24   demeanor when you began your interview with him?

25   A.  He seemed nervous at first.

1    Q.  Did you ask him why he was nervous?

2    A.  I didn't ask.  I had a presumption.

3    Q.  And what were you observing that made you think that he

4    was nervous?

5    A.  Mr. Seefried, I presumed, was -- it was the first time

6    he had spoken to the FBI.  And for the years I've been with

7    the Bureau, I've had interactions on many occasions.  It

8    just can make people feel nervous at the onset.  And then

9    also likely given the nature of the reason why I was meeting

10   with Mr. Seefried, one could theorize that that would make

11   that individual also nervous.

12   Q.  Was this a consensual interview?

13   A.  Yes.

14   Q.  But did you still decide to meet -- read him his *Miranda*

15   rights?

16   A.  Yes.

17   Q.  And why did you elect to provide that to him?

18   A.  Several factors.  For one, the Seefrieds, they were

19   residents of Delaware.  They had crossed the state line into

20   Maryland.  And although they were speaking with the FBI, we

21   were doing so within the Wicomico County Sheriff's Office

22   Criminal Investigation Division rooms.

23           So for a series of factors that were somewhat

24   atypical, I thought it best to read Mr. Seefried -- Kevin

25   his *Miranda* warnings, rights.

1    Q.  Did you have any reason to think that he could not read

2    the rights himself?

3    A.  I didn't want to presume that he could.  And oftentimes

4    what I prefer to do is to read them verbatim.  In the event

5    someone cannot read, they could at least hear me read them

6    to them.  And then I'd prevent -- I'd present them the form

7    to read and review for as long as they wish.

8            MS. REED:  If we can pull up Exhibit 203, please.

9    BY MS. REED:

10   Q.  Now, Agent Lear, I'm sure the judge is very familiar

11   with *Miranda* rights, so I'm not going to ask you to read

12   through these.  But do you recognize this form to be the

13   form that you read to Mr. Kevin Seefried?

14   A.  That's correct.

15   Q.  And did Mr. Seefried indicate to you that he understood

16   the rights that were read to him?

17   A.  Yes.

18   Q.  And do you see his signature on the form consenting to

19   the interview?

20   A.  Yes.

21   Q.  Thank you.

22           MS. REED:  Your Honor, the Government would ask

23   that Exhibit 203 be admitted into evidence.

24           MS. MULLIN:  No objection.

25           MR. BOSTIC:  No objection, your Honor.

1            THE COURT:  Without objection, 203 is in.

2            (Whereupon, Government's Exhibit No. 203 was

3    entered into evidence.)

4            MS. REED:  Thank you, your Honor.

5    BY MS. REED:

6    Q.  Now, Agent Lear, did you have a goal in this interview

7    with Mr. Seefried?

8    A.  The goal was to figure out what happened and what level,

9    if any, was his participation in the U.S. Capitol on January

10   the 6th.

11   Q.  Given that this was an investigation that involved a

12   certain act that occurred, were you given a list of

13   questions from another agency or from another office to ask

14   of Mr. Kevin Seefried?

15   A.  Yes.

16   Q.  And can you explain to the Court why you as an agent

17   would have been given a list of questions from another

18   office?

19   A.  All agents from across the country who were called to

20   conduct an interview of a possible subject in their area of

21   responsibility receive standard questions likely that were

22   originally derived by either the Washington field office of

23   the FBI or the counterterrorism division.  And they were

24   used as boilerplate questions to ask the subject during the

25   interviews post-January the 6th.

1    Q.  Was your interview with Mr. Kevin Seefried -- was it

2    audio- and video-recorded?

3    A.  Yes, ma'am.

4    Q.  And have you had an opportunity to review that video for

5    the -- prior to coming to court today?

6    A.  Yes.

7               MS. REED:  Your Honor, we've previously stated to

8    defense counsel that this exhibit is 302-A and B.  I'm not

9    sure if they want me to play a portion for Agent Lear or if

10   we can just move to admit that.

11              MS. MULLIN:  No objection.

12              MR. BOSTIC:  No objection.

13              THE COURT:  So 302-A and B are in.

14              (Whereupon, Government's Exhibit Nos. 302-A and

15   302-B were entered into evidence.)

16              MS. REED:  Thank you, your Honor.

17   BY MS. REED:

18   Q.  So, Agent Lear, let's start with the beginning of your

19   interview.

20              At the beginning of your interview, did Kevin

21   Seefried admit to entering the Capitol on January 6th of

22   2021?

23   A.  Yes.

24   Q.  And can you tell the Court what he told you about being

25   inside of the Capitol?

1    A.  On the morning of January the 6th, 2021, Mr. Kevin

2    Seefried and his son, Hunter Seefried, entered the Capitol

3    after the rally down near the White House for President

4    Trump.

5    Q.  During your interview with him, did you attempt to

6    determine whether he knew where he was, like the actual

7    physical building?

8    A.  I did.  I asked him:  Did he know what building it was

9    that he entered?

10           MS. REED:  If we could start what is Exhibit 302-A

11   at 18 minutes and 57 seconds.

12           (Whereupon, segments of Government's Exhibit No.

13   302-A were published in open court.)

14           MS. REED:  Pause it, please.

15   BY MS. REED:

16   Q.  So at some point, Mr. Kevin Seefried explains to you

17   that he's been inside of the Capitol.  Correct?

18   A.  Correct.

19   Q.  But he denies ever having been there before previously?

20   A.  He advised that if he had ever been there, it may have

21   been as a small child and he does not recall.

22   Q.  After that, did he indicate to you that he knew it was

23   wrong to be inside of the Capitol?

24   A.  That's correct.

25           MS. REED:  And if we could go, Mr. Leach, to

1     23:21.  We'll stop it at 23:48.

2              (Whereupon, segments of Government's Exhibit No.

3     302-A were published in open court.)

4     BY MS. REED:

5     Q.  Now, I'm going to jump around a little bit, Agent Lear,

6     so let me know if you can't keep up with me because I am --

7     how long was this interview?

8     A.  In sum, approximately one hour and 49 minutes.

9     Q.  Did Mr. Seefried -- again, Kevin Seefried -- explain to

10    you how he traveled from his home state to D.C.?

11    A.  Yes, ma'am.

12    Q.  And what did he tell you?

13    A.  He drove from his residence the morning of January the

14    6th from Laurel, Delaware, to Washington, D.C.

15    Q.  And did he tell you if any individuals traveled with

16    him?

17    A.  Yes.  In the same vehicle were Mr. Kevin Seefried, his

18    son Hunter and both of those gentlemen's respective

19    significant others, being Mrs. Seefried and Hunter's

20    girlfriend, Ms. Anastasia Cuff.

21    Q.  Did you ask him why he traveled to D.C.?

22    A.  Yes.

23    Q.  And what did he tell you?

24    A.  To attend the Trump rally.

25              MS. REED:  If we could go to 36:26.  Please stop

1   it at 36:48.  Again, just for the record, this is Exhibit

2   302-A.

3           (Whereupon, segments of Government's Exhibit No.

4   302-A were published in open court.)

5   BY MS. REED:

6   Q.  Now, Agent Lear, did you ask him who he was planning on

7   standing with that day when he mentioned that he planned to

8   stand with others?

9   A.  The only persons in attendance besides his son and their

10  significant others, I don't believe that Mr. Seefried knew

11  anyone else in particular.

12  Q.  To your knowledge, did he end up attending the Trump

13  rally?

14  A.  Yes.

15  Q.  And what did he explain to you about his attendance at

16  the rally?

17  A.  They went and heard the speakers, to include President

18  Trump.

19  Q.  Did you at any point ask Mr. Seefried, Kevin Seefried,

20  about his educational background?

21  A.  I did.

22  Q.  And what did he tell you?

23  A.  I believe he did not complete the ninth grade.

24  Q.  To your knowledge, did he provide you with information

25  that -- well, let me ask you:  Did he give you the name of

1    somebody by the name of Lauren Witzke?

2    A.  Yes.

3    Q.  And do you know who Ms. Witzke is?

4    A.  At the time I did not.

5    Q.  Do you know now who Ms. Witzke is?

6    A.  Yes.

7    Q.  And who is she?

8    A.  She is a Republican political activist, and I believe

9    she also ran for public office in Delaware a year or two

10   ago.

11   Q.  And what did Mr. Kevin Seefried tell you about his

12   knowledge about Ms. Lauren Witzke?

13   A.  She was one of the persons posting on Facebook about the

14   upcoming rally and so forth.  And Mr. Seefried was --

15   although he did not know Ms. Witzke per se, they were

16   Facebook friends.

17   Q.  Based on the information that you obtained from

18   Mr. Kevin Seefried in his interview, did you have reasons to

19   believe that he was politically engaged?

20   A.  Yes.

21   Q.  And other than Ms. Witzke, why would you say that?

22   A.  I would say when he mentioned listening to various media

23   outlets, the internet, radio and so forth, talking about

24   this event to occur at the rally coming up on January the

25   6th, that he felt it was important to go and be present to

1   support his fellow like-minded persons.

2          MS. REED:  If we could start the video at 37:28

3   and stop it at 38:22.

4          (Whereupon, segments of Government's Exhibit No.

5   302-A were published in open court.)

6   BY MS. REED:

7   Q.  So once Mr. Seefried and his son Hunter Seefried arrive

8   in D.C., did he walk you through where they went when they

9   arrived?

10  A.  Yes.

11  Q.  And can you tell the Court what he told you?

12  A.  They all arrived in the same vehicle and they parked in

13  the vicinity of the U.S. Capitol in a parking lot that was

14  near a pond.

15  Q.  Did he indicate who went to the rally with him?

16  A.  All four persons went to the rally together.

17  Q.  And did he tell you anything about what occurred at the

18  rally while he was at the rally?

19  A.  He and his son Hunter had both brought flags with them

20  to display while at the rally.

21  Q.  Do you know what flags each of them brought, starting

22  with Kevin Seefried?

23  A.  Kevin brought the Confederate battle flag.

24  Q.  And what about Hunter Seefried?

25  A.  A Trump flag.

Lear - DIRECT - By Ms. Reed

1   Q.  And do you know if they stayed at the rally for the full

2   duration of the rally?

3   A.  Yes, they did.

4   Q.  And do you recall asking him what he did after he

5   attended the rally?

6   A.  Sometime before the rally ended, Mr. Seefried advised

7   that an unknown individual with a bullhorn and another one

8   with a microphone announced to the crowd that at the

9   conclusion everyone was going to the Capitol.

10  Q.  And to your knowledge, he went to the Capitol.  Correct?

11  A.  That is correct.

12  Q.  Okay.

13          MS. REED:  If we could start the video at 39:50

14  and stop it at 40 minutes.

15          (Whereupon, segments of Government's Exhibit No.

16  302-A were published in open court.)

17          MS. REED:  Your Honor, at this time, the

18  Government and defense have entered into a stipulation which

19  is numbered Exhibit 707, which is actually a stipulation

20  about a subsection or -- a section of the speech that was

21  given by President Donald Trump on January 6 of 2021.

22          THE COURT:  Okay.

23          MS. REED:  We would ask that it be admitted, your

24  Honor.

25          MS. MULLIN:  No objection.

1          MR. BOSTIC:  No objection, your Honor.

2          THE COURT:  Without objection, 707 is in.

3          (Whereupon, Government's Exhibit No. 707 was

4     entered into evidence.)

5          MS. REED:  I know that your Honor can read.  Can I

6     read a small portion into the record, your Honor?

7          THE COURT:  Yes.

8          MS. REED:  Thank you.

9          On January 6th, 2021, then-President Donald J.

10    Trump spoke at the Stop the Steal Rally on the Ellipse.  The

11    speech began at 12:00 p.m.  Approximately 15 minutes into

12    the speech, former President Trump stated the following:

13          "Anyone you want, but I think right here we're

14    going to walk down to the Capitol and we're going to cheer

15    on our brave senators and congressmen and -women.  And we're

16    probably not going to be cheering so much for some of them,

17    because you'll never take back our country with weakness.

18    You have to show strength and you have to be strong.  We

19    have come to demand that Congress do the right thing and

20    only count the electors who have been lawfully slated,

21    lawfully slated.

22          "I know that everyone here will soon be marching

23    over to the Capitol Building to peacefully and patriotically

24    make your voices heard."

25

1     BY MS. REED:

2     Q.  Agent Lear, to the best of your knowledge, Mr. Hunter

3     Seefried and Kevin Seefried, would they have been at the

4     speech when this portion of the speech was stated?

5     A.  Yes.

6     Q.  Did Kevin Seefried indicate to you what happened after

7     they left the rally?

8     A.  They walked with the crowd towards the Capitol and

9     stopped their vehicle for food and refreshments for a period

10    of time.

11    Q.  And did he indicate to you what happened after they left

12    their vehicle?

13    A.  Yes.  They had placed the Trump flag in the vehicle and

14    then proceeded closer to the Capitol, at which time

15    Mr. Kevin and Hunter Seefried began the approach up the

16    steps to the Capitol, whereas their significant others

17    remained at street level.

18    Q.  To your knowledge, the ladies, Ms. Stephanie and -- did

19    you give us the name of the other individual?

20    A.  Ms. Anastasia Cuff.

21    Q.  Did either of those individuals go to the Capitol with

22    the Seefrieds?

23    A.  No, they did not.

24    Q.  And how is it that you know that?

25    A.  Well, so, from the statement that Mr. Seefried made, and

1    I do not believe any of the countless images and recordings

2    inside and out of the Capitol -- I do not recall having

3    received information that either of those ladies went up or

4    into the Capitol.

5    Q.  Jumping to the part of your interview where you talked

6    to him about approaching the building, why was it important

7    for you to ask him how he and Hunter approached the

8    building?

9    A.  We were trying to determine the ingress.  How did he get

10   in?  How did he make his physical approach?  As we saw from

11   various videos, persons who were heading up into the Capitol

12   did so by different means.  Some walked up steps.  Some

13   scaled walls.  Some had rappelling gear.  Some were using

14   scaffolding that had previously been installed.  So I was

15   trying to figure out for myself, for not being overly

16   familiar with the complete layout of the Capitol, it helped

17   me to better understand how the Seefrieds made their way up

18   and into the building itself.

19   Q.  You mentioned that he told you that after the rally they

20   went to eat lunch.  Is that correct?

21   A.  That's correct.

22   Q.  Do you recall where he told you they ate lunch?

23   A.  At the vehicle that was in the parking lot near the

24   Capitol.

25   Q.  Did he give you any indication about any -- actually,

1    strike that.

2              After he went to lunch with Hunter, it's your

3    testimony that they then went to the Capitol?

4    A.  Correct.

5              MS. REED:  If we could play 40:45.  We'll stop it

6    at 41:10.

7              (Whereupon, segments of Government's Exhibit No.

8    302-A were published in open court.)

9    BY MS. REED:

10   Q.  After Mr. Seefried went up the steps, did he indicate to

11   you how he actually entered the building itself?

12   A.  Yes, he did.

13   Q.  And what did he tell you?

14   A.  That one of the subjects in the crowd with them near a

15   window used a two-by-four to break out the portion or the

16   majority of the window, but there was a section of glass

17   still in the window frame that Hunter then came forward and

18   either punched or ripped out that remaining glass to allow

19   someone to go in.

20   Q.  Now, before this moment where he admits that he

21   approached the window, do you recall asking him if he saw

22   any law enforcement on his --

23             THE COURT:  Sorry.  Mr. Bostic, should I be

24   admitting that statement as to your client?

25             MR. BOSTIC:  No, your Honor.  We're not going to

 1     challenge that.

 2                    THE COURT:  All right.  You may continue.

 3                    MS. REED:  Thank you, your Honor.

 4     BY MS. REED:

 5     Q.  Do you recall him indicating if he saw police officers

 6     while he made his approach to the Capitol Building?

 7     A.  Yes.  I believe Mr. Seefried made a statement to the

 8     effect of he saw some law enforcement officers carrying a

 9     long gun-style rifle.

10                    MS. REED:  If we can start the video at 42:15 and

11     end it at 43 -- minute 43.  I'm sorry.

12                    (Whereupon, segments of Government's Exhibit No.

13     302-A were published in open court.)

14     BY MS. REED:

15     Q.  Now, Agent Lear, you testified that at some point

16     Mr. Kevin Seefried talks to you about how he and Hunter

17     Seefried actually entered the Capitol.  Correct?

18     A.  That's correct.

19     Q.  And you just testified that he indicated he saw

20     individuals break a window.  Right?

21     A.  Correct.

22     Q.  Can you please tell the Court what he told you about the

23     window breaking?

24     A.  An unknown subject had utilized what was reported as a

25     two-by-four, broke out some or the majority of the window,

```
 1    and a portion of the glass remained.  And that is when
 2    Mr. Hunter Biden -- sorry.  My apologies.  Mr. Hunter
 3    Seefried came forward because he was wearing gloves and
 4    either punched through or ripped out the remaining section
 5    of glass.
 6    Q.  Now, you've had a limited involvement in this
 7    investigation.  Correct?
 8    A.  That's correct.
 9    Q.  But have you seen the video where the window was broken?
10    A.  Yes.
11              MS. REED:  If we could start the video at 43
12    minutes and 44:01 to end it, Mr. Leach.
13              (Whereupon, segments of Government's Exhibit No.
14    302-A were published in open court.)
15    BY MS. REED:
16    Q.  Now, you've seen the video.  Correct?
17    A.  Yes, ma'am.
18    Q.  Was it fairly consistent with what Mr. Kevin Seefried
19    told you?
20    A.  That's correct.
21    Q.  Did Kevin tell you how he physically made his way into
22    the building?
23    A.  Yes, he did.
24    Q.  What did he tell you, Agent Lear?
25    A.  After his son Hunter went in, Mr. Kevin Seefried
```

Lear - DIRECT - By Ms. Reed

1    followed suit by going in through the same window.

2    Q.  And did you actually see the video where Hunter Seefried

3    entered the window?

4    A.  Yes.

5    Q.  And do you recall explaining to Hunter -- to Kevin your

6    feeling about how he and his son entered the window?

7    A.  Yes.

8    Q.  And what did you tell him?

9    A.  That it could have ended very badly.

10   Q.  And what was his response to you?

11   A.  He concurred.

12   Q.  And did he indicate to you why it could have ended badly

13   specifically?

14   A.  I don't know that we got into specifics.

15          MS. REED:  If we can start at 44:16 and stop at

16   44:27.

17          (Whereupon, segments of Government's Exhibit No.

18   302-A were published in open court.)

19   BY MS. REED:

20   Q.  Now, did you ask him what he meant by "He had one on

21   him, too"?

22   A.  Yes.  At that point in time, he went forward and

23   mentioned that, once inside the Capitol, he was confronted

24   with someone from law enforcement who had a stick.  I don't

25   know if that would be a baton or a riot stick.  But a law

1    enforcement officer had a stick.  And Mr. Seefried also had

2    a stick that was later described as the wooden dowel that

3    carried his Confederate flag.

4         And when he came close to this officer with this

5    stick, Mr. Seefried dropped his stick; and I believe that's

6    when he said he did so in part because the officer may have

7    put his or her hand on their service weapon.  That would

8    have potentially escalated into a deadly force incident.

9    Q.  Did he tell you if he spoke words to that officer at

10   that point?

11   A.  He had words to the effect of:  You can shoot me, but

12   we're still coming in.

13        MS. REED:  If we can start the video at 44:28 and

14   stop it at 45:03, please.

15        (Whereupon, segments of Government's Exhibit No.

16   302-A were published in open court.)

17   BY MS. REED:

18   Q.  Now, Agent Lear, did you ever learn who that individual

19   was?

20   A.  Who what individual was?

21   Q.  The police officer who Mr. Kevin Seefried was

22   referencing.

23   A.  No.

24   Q.  But it was clear from your interview that he was

25   speaking about an engagement with a police officer.

1    Correct?

2    A.  Correct.

3    Q.  To your knowledge, did he also have an altercation or, I

4    guess, engage with a second police officer inside of the

5    Capitol?

6    A.  Yes.

7    Q.  And what did he tell you about that encounter?

8    A.  Sometime after the first encounter, he had a

9    conversation with another law enforcement official who I

10   believe was checking someone's bag and maybe examining the

11   contents of it for contraband, perhaps.  And Mr. Kevin

12   Seefried said to this officer, you know:  How can you work

13   for liars and thieves?  This affects us all.  This affects,

14   you know, our children and so forth.

15          MS. REED:  If we could go to 48 minutes and six

16   seconds, Mr. Leach, and then stop it at 49 minutes and 30

17   seconds, please.

18          (Whereupon, segments of Government's Exhibit No.

19   302-A were published in open court.)

20   BY MS. REED:

21   Q.  Agent Lear, did you ask Mr. Seefried, Kevin Seefried,

22   what he meant by the phrase "liars and thieves"?

23   A.  No.

24   Q.  At the time, could you place any context to what he was

25   stating or what he meant?

1    A.   No.

2    Q.   Going back to the Seefrieds', both Kevin and Hunter's

3    conduct inside of the Capitol, did they tell you what they

4    did when they actually entered the building?

5    A.   I believe -- well, Hunter didn't tell me anything.

6    Q.   I'm sorry.  Yes.  That's correct.

7    A.   Mr. Kevin Seefried advised that they were running around

8    with everyone and he went up some stairs.  He didn't exactly

9    know where in the Capitol he had visited.

10              MS. REED:  If we could start it at 46 minutes and

11   38 seconds and then stop at 46:54, please.

12              (Whereupon, segments of Government's Exhibit No.

13   302-A were published in open court.)

14   BY MS. REED:

15   Q.   Have you seen any photographs in this case?

16   A.   From the interior?

17   Q.   Yes, sir.

18   A.   Yes.

19   Q.   Was it accurate that Mr. Kevin Seefried sort of did walk

20   around the Capitol along with Hunter Seefried?

21   A.   That's correct.

22   Q.   Now, you asked questions about social media.  What was

23   the purpose of asking him about his social media?

24   A.   In the event we needed to preserve it to use against him

25   later down in court.

1    Q.  What did he tell you as far as his social media?  First

2    of all, did he have any prior to January 6th?

3    A.  He had a Facebook account prior to January the 6th.

4    Q.  And did he tell you -- well, did he have one when he met

5    you days later?

6    A.  No, he did not.  He advised he had since deleted it.

7    Q.  During the interview, did you show him any photographs?

8    A.  Yes.

9    Q.  And what was the purpose of showing Kevin photographs?

10   A.  For him to positively identify not only himself, but

11   Hunter inside the U.S. Capitol.

12   Q.  And did he do that for you?

13   A.  Yes.

14          MS. REED:  If we could pull up Exhibits 204-A, B

15   and C, please.

16          THE COURT:  How much longer do you have?

17          MS. REED:  Maybe about five minutes, your Honor.

18   BY MS. REED:

19   Q.  Now, 204-A is a little turned.  Do you recognize 204-A,

20   Agent Lear?

21   A.  Yes, ma'am.

22   Q.  And what do you recognize that photo to be?

23   A.  I can see at what would be the top, how it's displayed,

24   in a brown Carhartt brand vest I can see Kevin Seefried.

25   And then after someone in between him I see Hunter Seefried

1    with a black baseball hat and tan brim.

2    Q.  And this photo was used for what purpose?

3    A.  These were part of a series of photos shown to the

4    Seefrieds during their interviews.

5    Q.  And what about 204-B?  Can you explain why you showed

6    that photograph to Mr. Kevin Seefried?

7    A.  Just a different image in a different location on the

8    steps, because Mr. Seefried had mentioned running up steps

9    and we were trying to determine his exact location, what

10   corridors or chambers that he may have gone into.

11            And so we are looking at a picture of what appears

12   to be on the left as we see it walking down the steps is

13   Mr. Kevin Seefried holding his Confederate battle flag.  In

14   the rear is Hunter Seefried.  And to the right, the

15   gentleman wearing some sort of a bearskin outfit appears to

16   be holding a clear acrylic police riot shield and wearing

17   some sort of a police tactical vest walking down the steps.

18   Q.  And 204-C, why was this picture shown to Mr. Kevin

19   Seefried?

20   A.  Well, that was important because that was a bulletin or

21   put out by the FBI.  So while we're seeing maybe some other

22   social media clippings, the bottom one, 204-C, that was

23   created by the FBI.  And that was widely disseminated across

24   the country seeking information on these individuals.

25            So I wanted in my interview with Kevin to have him

1   positively identify himself in all four of those images

2   within Exhibit 204-C.

3   Q.  And did he identify himself not only in 204-C, but also

4   in 204-A and 204-B?

5   A.  That's correct.

6   Q.  And did he identify Hunter as well?

7   A.  Yes.

8           MS. REED:  Your Honor, the Government would just

9   seek to introduce 204-A, B and C, please.

10          MS. MULLIN:  No objection.

11          MR. BOSTIC:  No objection, your Honor.

12          THE COURT:  Without objection, 204-A, B and C are

13   in.

14          (Whereupon, Government's Exhibit Nos. 204-A, B and

15   C were entered into evidence.)

16   BY MS. REED:

17   Q.  Now, I note that your interview was a lot more extensive

18   than I'm going to cover for right now, Agent Lear.  But

19   before I close, did you ask Mr. Seefried, Kevin Seefried,

20   about his possession of the Confederate flag inside of the

21   Capitol?

22   A.  Yes.

23   Q.  Why did you ask him questions about that?

24   A.  We were trying to determine if Mr. Seefried had further

25   connections to domestic terrorist organizations.

1    Q.  And to be clear, he did not, to your knowledge.

2    Correct?

3    A.  Correct.

4    Q.  Did you ask him or -- strike that.

5            At some point after this interview, did you meet

6    with Kevin Seefried?

7    A.  I did.

8    Q.  And what was the purpose of meeting with him a second

9    time?

10   A.  On the morning of January the 14th, 2021, I met the

11   Seefrieds at U.S. District Court for the District of

12   Delaware in Wilmington, Delaware, where they were to

13   surrender themselves to the Court.

14   Q.  Did they indeed surrender themselves?

15   A.  Yes.

16   Q.  Did he bring the Confederate flag with him?

17   A.  Yes, he did.  He voluntarily turned it over to me and it

18   was submitted to FBI evidence.

19   Q.  During your interview with Mr. Seefried, you asked him

20   if he was a part of any groups, and you specifically related

21   that to him having the Confederate flag in the Capitol.  Am

22   I correct about that?

23   A.  Yes.

24   Q.  And why did you associate the Confederate flag with an

25   extremist group?

 1   A.  Well, we've seen historically that that flag has been

 2   adopted by certain far-right extremist groups, the KKK and

 3   others -- and other organizations, outlaw motorcycle gangs

 4   and so forth.  So the Confederate flag has been used as a

 5   symbol for decades for certain extreme far-right agendas.

 6   Q.  If I were to show you the flag that Mr. Kevin Seefried

 7   tendered to you, would you be able to identify it?

 8   A.  Yes.

 9           MS. REED:  Your Honor, I believe that this is

10   Government's Exhibit No. 1.

11   BY MS. REED:

12   Q.  (Tenders item to the witness.)

13   A.  Thank you.  Yes.  That does appear to be the same flag

14   that I collected from Mr. Seefried on January the 14th of

15   2021.

16           MS. REED:  Thank you very much, Agent Lear.

17           We tender the witness.  Thank you, your Honor.

18           THE COURT:  Are you seeking to move 1 into

19   evidence?

20           MS. REED:  Yes, I am.

21           THE COURT:  Ms. Mullin?

22           MS. MULLIN:  No objection.

23           MR. BOSTIC:  No objection.

24           THE COURT:  Without objection, 1 is entered.

25           (Whereupon, Government's Exhibit No. 1 was entered

```
 1      into evidence.)

 2                 THE COURT:  Let's finish for the evening.

 3                 Agent Lear, you may step down.  I'll just ask you

 4      not to discuss the substance of your testimony with anyone

 5      until tomorrow.

 6                 How are we doing on your case, Ms. Reed?

 7                 MS. REED:  Your Honor, I believe that we only have

 8      one more witness after Agent Lear, so we should be able to

 9      finish fairly early tomorrow.

10                 THE COURT:  So why don't we resume at 10:00

11      tomorrow morning.

12                 Ms. Reed, anything else we should be discussing

13      this afternoon?

14                 MS. REED:  I don't believe so, your Honor.  I

15      don't want to speak too soon if defense counsel has

16      anything.  But nothing from the Government.

17                 THE COURT:  Mr. Ohm?

18                 MR. OHM:  I don't know if Ms. Reed has heard an

19      update from Capitol Police.

20                 MS. REED:  I have.  I can put it on the record if

21      you want me to.

22                 MR. OHM:  That's the only thing I'm concerned

23      about.

24                 MS. REED:  Mr. Ohm had addressed some concerns

25      this morning with a witness.  We've been able to contact
```

1      that person, and he will be here tomorrow.

2                  THE COURT:  Great.

3                  Mr. Bostic?

4                  MR. BOSTIC:  Nothing from me, your Honor.

5                  THE COURT:  Great.  See you all tomorrow at 10:00.

6                  (Proceedings concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4      certify that the foregoing constitutes a true and accurate

5      transcript of my stenographic notes, and is a full, true,

6      and complete transcript of the proceedings produced to the

7      best of my ability.

8

9

10                   Dated this 23rd day of June, 2022.

11

12            <u>/s/ Lisa Edwards, RDR, CRR</u>
              Official Court Reporter
13            United States District Court for the
                District of Columbia
14            333 Constitution Avenue, Northwest
              Washington, D.C. 20001
15            (202) 354-3269

16

17

18

19

20

21

22

23

24

25