```
 1                     UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2
       * * * * * * * * * * * * * * *   )
 3     UNITED STATES OF AMERICA,       )      Criminal Action
                                       )      No. 21-00287
 4                     Plaintiff,      )
                                       )
 5       vs.                           )
                                       )
 6     KEVIN SEEFRIED and              )      Washington, D.C.
       HUNTER SEEFRIED,                )      June 14, 2022
 7                                     )      10:04 a.m.
                       Defendants.     )
 8     * * * * * * * * * * * * * * *   )

 9

10                TRANSCRIPT OF BENCH TRIAL - DAY 2
              BEFORE THE HONORABLE TREVOR N. McFADDEN,
11                 UNITED STATES DISTRICT JUDGE

12

13     APPEARANCES:

14     FOR THE GOVERNMENT:        BRITTANY L. REED, ESQ.
                                  UNITED STATES ATTORNEY'S OFFICE
15                                650 Poydras Street
                                  Suite 1600
16                                New Orleans, Louisiana 70130

17                                BENET KEARNEY, ESQ.
                                  UNITED STATES ATTORNEY'S OFFICE
18                                One Saint Andrew's Plaza
                                  New York, New York 0007
19

20     FOR THE DEFENDANT          EUGENE OHM, ESQ.
          KEVIN SEEFRIED:         ELIZABETH A. MULLIN, ESQ.
21                                OFFICE OF THE FEDERAL PUBLIC
                                     DEFENDER
22                                625 Indiana Avenue, Northwest
                                  Suite 550
23                                Washington, D.C. 20004

24

25
```

1    <u>APPEARANCES, CONT'D:</u>

2    FOR THE DEFENDANT          EDSON BOSTIC, ESQ.
       HUNTER SEEFRIED:         THE BOSTIC LAW FIRM
3                               1700 Market Street
                                Suite 1005
4                               Philadelphia, Pennsylvania 19103

5
     REPORTED BY:              LISA EDWARDS, RDR, CRR
6                               Official Court Reporter
                                United States District Court for the
7                                District of Columbia
                                333 Constitution Avenue, Northwest
8                               Room 6706
                                Washington, D.C. 20001
9                               (202) 354-3269

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

3                                   Direct     Cross       Red.

4

   WITNESSES FOR THE GOVERNMENT:
5
   Joseph Lear                                  5         20
6                                              19

7  Ryan McCabe               24               55
                                             61
8
   WITNESSES FOR THE DEFENDANTS:
9
   Brian Dinkel              70               85          87
10
   Brandon Michael Kiely     88               96         103
11                                           104

12 Anastasia Cuff           105              120         143
                                            124
13

14 RULE 29 MOTIONS                       Pages 67 and 150

15

   EXHIBITS RECEIVED IN EVIDENCE                         PAGE
16
   Government's Exhibit No. 301                           28
17 Government's Exhibit No. 201                           29
   Government's Exhibit No. 202                           67
18
   Defendant's Exhibit No. 4                             109
19 Defendant's Exhibit Nos. 1, 6-31                      148

20
   Closing Arguments by the Government           Page 152
21
   Closing Arguments by Defendant Kevin Seefried   Page 185
22
   Closing Arguments by Defendant Hunter Seefried  Page 226
23
   Rebuttal Closing Arguments by the Government   Page 236
24

25

```
 1                    THE COURT:  Good morning.

 2                    MS. REED:  Good morning, your Honor.

 3                    MR. OHM:  Good morning, your Honor.

 4                    THE COURTROOM DEPUTY:  This is Criminal Case

 5      21-287, the United States of America versus Kevin Seefried

 6      and Hunter Seefried.

 7                    Counsel, please come forward to identify

 8      yourselves for the record, starting with the Government.

 9                    MS. REED:  Good morning, your Honor.  AUSA

10      Brittany Reed and Benet Kearney on behalf of the United

11      States.

12                    THE COURT:  Good morning, ladies.

13                    MR. OHM:  Eugene Ohm and Elizabeth Mullin on

14      behalf of Kevin Seefried.  Good morning, your Honor.

15                    THE COURT:  Good morning, folks.

16                    Good morning, Mr. Seefried.

17                    MR. BOSTIC:  Good morning, your Honor.  Edson

18      Bostic on behalf of Hunter Seefried.

19                    THE COURT:  Good morning, Mr. Bostic.

20                    Good morning, Mr. Hunter Seefried.

21                    We're ready to resume trial.  And I think we're

22      starting with cross-examination of Agent Lear.  Is that

23      correct?

24                    MS. REED:  Correct, your Honor.

25                    (Thereupon, the witness entered the courtroom and
```

 1    the following proceedings were had:)

 2              THE COURT:  Good morning, Agent Lear.

 3              THE WITNESS:  Good morning, your Honor.  Thank you

 4    for the Court's time.

 5              THE COURT:  Of course.

 6              I'll remind you you're still under oath.

 7              THE WITNESS:  Yes, your Honor.

 8              THE COURT:  Mr. Ohm.

 9              Ms. Mullin, am I right that you were at the

10    Alexandria Federal Public Defender's Office?

11              MS. MULLIN:  Yes.

12              THE COURT:  Virginia's loss is our gain.

13              MS. MULLIN:  I switched right -- a couple months

14    ago, just in time for all the January 6 cases to pile onto

15    my desk.

16              THE COURT:  Yes.  I didn't know if that was

17    intentional or not.

18              A.J. Kramer knows what he's doing.

19        (JOSEPH LEAR, GOVERNMENT WITNESS, PREVIOUSLY SWORN.)

20                        CROSS-EXAMINATION

21    BY MS. MULLIN:

22    Q.  Good morning, Agent Lear.

23    A.  Good morning.

24    Q.  You interviewed Kevin Seefried after he had contacted

25    your office.  Is that right?

1    A.  Kevin did not contact my office, but I did interview him

2    on the morning of January the 12th.

3    Q.  How did that come to be?

4    A.  Certainly.

5    Q.  Because I thought you testified on direct that he turned

6    himself in.

7    A.  He did.

8    Q.  Did he turn himself in prior to you interviewing him?

9    A.  No.  I would refer to it more so as a daisy chain of

10   phone calls and notifications, the end of which of that line

11   was the FBI.  I can further break it down, if you prefer.

12   Q.  Sure.  Thank you.

13   A.  So as it was explained by Mr. Kevin Seefried, his

14   brother-in-law is Buddy Tubbs.  Sometime after January the

15   6th of 2021, Mr. Tubbs got in contact with Kevin Seefried

16   and sent him a screenshot or an article of some sort from

17   online -- I think it was possibly from Fox News --

18   indicating that the FBI was seeking information for the

19   identity or whereabouts of someone who matched the

20   description of Kevin Seefried.

21           So then apparently, as Mr. Seefried told me, Buddy

22   Tubbs was friends with the brother of the Wicomico County

23   Sheriff's Office.  That's Wicomico County, Maryland.  The

24   brother then presumably called his brother, who is Sheriff

25   Mike Lewis, the current sheriff of the Wicomico County

1    Sheriff's Office.

2          Sheriff Lewis on the evening of the 11th contacted

3    likely my supervisor, who then called myself and/or my

4    partner at the time, Ryan McCabe, that the Seefrieds were

5    willing to come and turn themselves in and come talk to the

6    FBI on the morning of January the 12th.

7    Q.  And nothing about your investigation undermined or

8    contradicted Mr. Seefried's telling of that daisy chain of

9    events that led him to your office on January 11th, the day

10   you interviewed him?

11   A.  No.

12   Q.  Now, yesterday, the Government played a clip for you.

13          MS. MULLIN:  At this time, we're ready.  I'd play

14   it as Clip 4 of the interview the witness had with

15   Mr. Seefried.  It starts at 36:30.  It would be Defense

16   Exhibit 2.

17          THE COURT:  By the way, we never moved in Defense

18   1, did we?

19          MR. OHM:  I don't believe I did, your Honor.

20          THE COURT:  Was that intentional?

21          MR. OHM:  I think it was -- it had not been

22   thought about at the time.  I was surprised.

23          THE COURT:  It's not in.  So you can seek to move

24   it in later.

25          MR. OHM:  Okay.

 1              THE COURT:  Nor is 2.  But feel free to play this.

 2    BY MS. MULLIN:

 3    Q.  Again, this is a clip the Government played yesterday.

 4    It's a clip of your interview with Mr. Seefried.  I'll just

 5    have Mr. Ohm open it up, if we're connected.

 6              (Whereupon, segments of Defendant's Exhibit No. 2

 7    were published in open court.)

 8    BY MS. MULLIN:

 9    Q.  So in this clip, you ask Mr. Seefried what his intent

10    for that day was.  Right?

11    A.  Correct.

12    Q.  And he said that his intent was to stand for everyone

13    and show support for his president.  Right?

14    A.  Correct.

15    Q.  And your investigation didn't uncover anything to

16    contradict that his intent was to stand with everyone and

17    show support for his president.  Right?

18    A.  Correct.

19    Q.  You didn't find any social media posts about

20    Mr. Seefried saying that his intent was to disrupt the

21    certification of the vote, did you?

22    A.  No.

23    Q.  Or did you learn of any statements he made that day,

24    before that day or subsequent to that day, January 6th, that

25    is, in which he indicated that his intent was to disrupt the

1     certification of the vote?

2     A.  I did not.

3     Q.  You also asked him whether he participated in any

4     violence or vandalism.  Right?

5     A.  Yes.

6     Q.  And he said he didn't.  Right?

7     A.  That is what he said.  Yes.

8     Q.  And did you learn of anything in your investigation to

9     contradict his statement that he, Kevin Seefried, did not

10    participate in any violence or vandalism?

11    A.  That is correct.  I did not learn anything to the

12    contrary.

13    Q.  Now, yesterday, the Government played a clip where

14    Mr. Seefried talked about moving towards the Capitol and

15    hearing that Trump said people were going to the Capitol.

16              Do you remember that?

17    A.  I do.

18    Q.  And that he went because he heard Trump say people are

19    going to the Capitol and other people were saying, "We're

20    going to the Capitol"?

21    A.  Correct.

22    Q.  And then do you recall that Ms. Reed read into the

23    record a portion of President Trump's speech that he gave

24    that day?

25    A.  I do.

1  Q.  In that portion, he seems to encourage people to go to

2  the Capitol.  Right?

3  A.  Correct.

4  Q.  Do you know whether President Trump is being

5  investigated for conspiracy to commit obstruction of

6  justice?

7       MS. REED:  Your Honor, I'm going to object to the

8  relevance.

9       THE COURT:  Sustained.

10  BY MS. MULLIN:

11  Q.  At this time, I'd like to go ahead and play another clip

12  in which you discuss whether Mr. Seefried is part of any

13  extremist group.  That would be Clip 6.  It starts at 51:18.

14       (Whereupon, segments of Defendant's Exhibit No. 2

15  were published in open court.)

16  BY MS. MULLIN:

17  Q.  So in that clip, you can hear yourself asking

18  Mr. Seefried if he's ever been a member of or approached by

19  an extremist group like the Klan or the Proud Boys.  Right?

20  A.  That's correct.

21  Q.  And he said no?

22       THE COURT:  Actually, I had a hard time

23  understanding the very first part of the clip.

24       THE WITNESS:  I'm sorry, your Honor?

25       THE COURT:  What was he talking about at the very

1   first part of the clip?

2              THE WITNESS:  I believe he had mentioned he had to

3   use the restroom, is where the clip started.

4              THE COURT:  Oh, okay.

5   BY MS. MULLIN:

6   Q.  Then I think he talked about how he had been to one

7   Trump rally before, but nothing like anything at the

8   Capitol.  Right?

9   A.  I don't think it was a Trump rally.  I think what

10  Mr. Seefried advised me is that he had been to a rally

11  previously; and we believe through our conversations with

12  Kevin that he attended a rally circa 2020 in Richmond,

13  Virginia, that I believe was a pro-gun, pro-Second

14  Amendment-type rally.  I believe that is the one

15  Mr. Seefried advised he previously attended.

16  Q.  And he indicated that he had never been to any rally

17  that had, you know, quite the numbers or the significance of

18  the rally at the Capitol.  Right?

19  A.  I do not know how large the rally was in Richmond.

20  Q.  And then you went on to ask him whether he had been

21  affiliated with any extremist group, and he said no.  Right?

22  A.  Correct.

23  Q.  And nothing in your investigation that you uncovered

24  contradicted his statement that he was not a part of any

25  extremist group or hate group.  Right?

1    A.  That is correct.

2    Q.  And then at one point, you asked him about the people

3    inside the Capitol that he was standing around.  Right?

4    A.  Yes.

5    Q.  And he told you that he thought they were -- he later

6    came to think they were part of antifa, a different type of

7    group that was, I guess, people -- there was rumors that

8    antifa was going to be there that day.

9    A.  I can't speak to rumors.  But he -- Mr. Seefried did

10   mention that he thought he observed at least one individual

11   with a hand tattoo that was some sort of insignia or logo of

12   being a member of antifa.  And I believe Mr. Seefried

13   mentioned what we eventually came to agree was the hammer

14   and sickle.

15   Q.  And just to be clear, he indicated to you that the only

16   person he knew inside the Capitol was his son Hunter.

17   Right?

18   A.  Correct.

19   Q.  And everyone else around him was a stranger --

20   A.  Correct.

21   Q.  -- that he just encountered that day by happenstance

22   inside the Capitol?

23   A.  Correct.

24   Q.  Later he thought, Well, one of those guys was part of

25   antifa?

```
 1    A.  Correct.

 2    Q.  Have you investigated what antifa is?

 3    A.  No.

 4    Q.  Do you know if it's an organization that's typically

 5    supportive of president -- former President Trump?

 6    A.  I don't know.

 7              THE COURT:  You're not familiar with antifa?

 8              THE WITNESS:  It was long ago when I found -- I

 9    finally asked somebody:  What did that name mean?  At the

10    time, I thought it was more antipolice as in antifascism,

11    antifa.  My understanding a year or so ago was more so that

12    the antifa groups were more so against law enforcement,

13    primarily after there would be a use-of-force incident in

14    some community across the U.S., that antifa would show up to

15    protest.

16    BY MS. MULLIN:

17    Q.  In learning about antifa, did you learn that antifa was

18    a group that was understood to support then-President Trump

19    and his platform?

20    A.  I don't know that to be the case.

21    Q.  Now, yesterday, Ms. Reed asked you some questions about

22    what Mr. Seefried said when Mr. Seefried told you that he

23    engaged with the police officer and said something about

24    liars and thieves.  Right?

25    A.  Yes.
```

1    Q.  And when he was talking about his words, the words that

2    he used, that was in the context of him talking about seeing

3    an officer search another protester's bag.  Right?

4    A.  No.  I perceived it to be more so that Mr. Seefried was

5    venting displeasure or frustration that those officers were

6    working for Capitol Hill and certain persons on the Hill --

7    and during the joint session were there to steal the

8    election.  That was my take on when Mr. Seefried told the

9    officer that he, the officer, was working for liars and

10   thieves.

11   Q.  That was your take.  But he never said the words, "I

12   think that the officers were there to protect members who

13   were there to steal the election."  Right?

14   A.  That is correct.

15   Q.  He never used the words "steal the election."  Right?

16   A.  Correct.

17            MS. MULLIN:  Actually, let's just play the clip.

18   It's actually the main statement at 47:40.

19            (Whereupon, segments of Defendant's Exhibit No. 2

20   were published in open court.)

21   BY MS. MULLIN:

22   Q.  And so in that clip, he tells you candidly that he said,

23   "Why are you working for liars and thieves?" right after he

24   describes seeing an officer search another protester's bag.

25   Right?

1    A.  Correct.

2    Q.  And again, he never used the words "steal the election"

3    or anything of that nature during your entire interview with

4    him.  Right?

5    A.  Correct.

6    Q.  Now, you also asked him about his carrying the

7    Confederate flag.  Right?

8    A.  Yes.

9    Q.  And he was open with you about the fact that he carried

10   it to the Trump rally and inside the Capitol?

11   A.  Yes.

12   Q.  He also told you that he got through the ninth grade and

13   doesn't know much about history, so he was surprised to

14   learn, summarizing, surprised to learn that there was so

15   much anger over his carrying the flag into the Capitol?

16   A.  After the fact, yes.  I believe he started to see social

17   media and the news and so forth.

18   Q.  And in fact, he showed you an article that he found and

19   read it over with you and kind of expressed dismay and

20   surprise that, you know, this act had significance to so

21   many people?

22   A.  Yes, he did.

23   Q.  And he told you that the flag didn't mean for him a

24   symbol of hate.  Right?

25   A.  Correct.

1    Q.  And he told you that he doesn't hate anyone because of

2    the color of their skin?

3    A.  Correct.

4    Q.  And he told you that he never really was that good at

5    history and --

6          MS. REED:  Your Honor, I'm just going to object at

7    this point to defense -- the defense's attempt to get the

8    statement of Mr. Seefried in.  I believe that this is

9    improper.

10         MS. MULLIN:  We could play --

11         THE COURT:  Well, I think you're objecting to it

12   being played.  Is that correct?

13         MS. REED:  Yes, your Honor.

14         THE COURT:  Why isn't this hearsay, Ms. Mullin?

15         MS. MULLIN:  Your Honor, under Rule 106, it would

16   complete the picture of what was elicited yesterday.  And I

17   think it's important to put -- the Government is making much

18   ado of the fact that he carried a Confederate flag into the

19   Capitol.  And I think it's important to put what he said

20   about it in context.

21         MS. REED:  And actually, your Honor, if I can

22   respond to that:

23         The Government has used the flag to reference the

24   identification.  We actually have not gone into anything.

25   In my line of questioning with Agent Lear yesterday, I made

1   very clear that Mr. Seefried was not part of any groups that

2   may have been affiliated with that flag.  So I'm not even

3   sure why there's still a lot of questioning about the flag.

4            But aside from that, your Honor, this is an

5   improper attempt to get the statement in.  This is hearsay.

6   If they want to elicit this information, there is a way to

7   do that.  But it is not through the testimony of this agent.

8            THE COURT:  I'm going to overrule the objection.

9   I think the Government did bring in statements from --

10  through this agent from the Defendant yesterday about

11  bringing the Confederate flag to the rally.  I think this

12  does complete that statement.

13           You may proceed, Ms. Mullin.

14  BY MS. MULLIN:

15  Q.  And so he told you that he didn't view the flag as a

16  symbol of hate?

17  A.  That's correct.

18  Q.  And for him, it was more just something that he thought

19  represented heritage or history, but then realized that he

20  didn't -- he acknowledged that he didn't have a very good

21  sense of history, since he didn't get past the ninth grade?

22  A.  That's fair.

23  Q.  Is that a fair summary of what his statements were?

24  A.  Yes.

25  Q.  And in expressing to you that he doesn't have hate for

 1   any racial group, he told you that in fact his son-in-law is

 2   African-American and he has a biracial grandson?

 3            MS. REED:  Your Honor, I'm going to object to the

 4   relevance.

 5            THE COURT:  Sustained.

 6   BY MS. MULLIN:

 7   Q.  Now, nothing in your investigation contradicted what

 8   Mr. Seefried told you that day.  Right?

 9   A.  Correct.

10   Q.  And he was pretty candid with you.  Fair to say?

11   A.  Yes.

12   Q.  He told you that -- what words he used.  Right?  That

13   day, he told you about liars and thieves and different

14   things he did inside the Capitol?

15   A.  Correct.

16   Q.  And he told you that he regretted going inside the

17   Capitol?

18   A.  He did.

19   Q.  And after you spoke, he voluntarily turned his flag in

20   and told you that he had taken it down from his house?

21   A.  From the flagpole.

22   Q.  From the flagpole?

23   A.  In front of the house.  Yes, ma'am.

24   Q.  And so your assessment was that he was credible with you

25   that day?

```
 1    A.  Yes.

 2    Q.  And he never said anything during that -- I don't

 3    know -- hour-and-a-half interview about going there to stop

 4    the vote or to Stop the Steal or to prevent Congress from

 5    certifying the vote.  Right?

 6    A.  He did not.

 7    Q.  He did not say those words?

 8    A.  That's correct.

 9              MS. MULLIN:  No further questions, your Honor.

10              THE COURT:  Thank you.

11              Mr. Bostic, did you have any cross-examination?

12              MR. BOSTIC:  Just one question briefly, your

13    Honor.

14                       CROSS-EXAMINATION

15    BY MR. BOSTIC:

16    Q.  Agent Lear, good morning.

17    A.  Good morning, sir.

18    Q.  I recall yesterday that you spoke to the Government and

19    I believe saw part of a take that -- in which we had a

20    discussion with Kevin Seefried about who went to the Capitol

21    with him on January 6th.  Am I correct?

22    A.  Yes.

23    Q.  And as part of that conversation, he indicated that his

24    wife, his son Hunter and Hunter's girlfriend went with him?

25    A.  Up to the Capitol, it was Mr. Kevin and Mr. Hunter
```

 1   Seefried and their female significant others.

 2   Q.  Right.  But came to Washington, D.C.?

 3   A.  Correct.  All four came to Washington, D.C.

 4   Q.  Right.

 5           And he also indicated to you as part of your

 6   interview with him that he was the one that suggested to the

 7   family that they come to Washington, D.C., on January 6th?

 8   A.  Correct.

 9           MR. BOSTIC:  Thank you.  I have nothing else, your

10   Honor.

11           THE COURT:  Thank you.

12           Ms. Reed, any redirect?

13           MS. REED:  Briefly, your Honor.

14                    REDIRECT EXAMINATION

15   BY MS. REED:

16   Q.  Agent Lear, did you have the opportunity to search any

17   sort of social media for Mr. Kevin Seefried?

18   A.  No.  It was deleted before I met Mr. Seefried.

19   Q.  And did Mr. Seefried indicate to you that he deleted his

20   account?

21   A.  Yes.

22   Q.  Did he tell you when he deleted his account?

23   A.  Sometime after January the 6th but before our interview

24   on January the 12th.

25   Q.  He brought you the Confederate flag.  Correct?

```
1    A.  Yes, ma'am.

2    Q.  But is it accurate that the FBI did not have access to

3    his social media at that time?

4    A.  That is correct.

5    Q.  Ms. Mullin asked you about Mr. Seefried's education.

6              Do you recall that line of questioning?

7    A.  I do.

8    Q.  What did he tell you about the amount of education that

9    he had?

10   A.  I believe he told me he did not complete or graduate the

11   ninth grade.

12   Q.  Did he indicate to you that he watched the news?

13   A.  Ever?

14   Q.  Yes.

15   A.  Yes.

16   Q.  That he was avid with media?

17   A.  Slightly, yes.

18   Q.  What do you mean when you say "slightly"?

19   A.  I think he was just displeased with the portrayal of how

20   the election went and the results and his guy didn't win.

21   Q.  Well, what are you tying that to, Agent Lear?  Did he

22   specifically say that to you?

23   A.  Not specifically.  But that was more so what I got from

24   our conversations together.

25   Q.  Can you tell us what statements he made that gave you
```

```
 1    that impression?

 2    A.  In particular?

 3    Q.  Yes, sir.

 4    A.  It would have been when he was speaking with the police

 5    officer inside the Capitol and it was -- again, to

 6    reiterate, it was that the officer was working for liars and

 7    thieves and this affects all of us.  This affects our

 8    families and our grandchildren.  I took that -- I inferred

 9    it to mean if -- in candor, if President-Elect Biden became

10    president, that those things Mr. Seefried said to the

11    officer would come true.

12    Q.  Did he tell you about asking other people to go to D.C.

13    for the rally?

14    A.  Could you rephrase the question, please?

15    Q.  Did he ask you about other individuals who he was

16    encouraging to come to D.C. to attend the rally?

17    A.  I don't recall.

18    Q.  Do you know if he indicated that he -- how he and his

19    wife decided to come?

20    A.  I believe at first his wife didn't know if she could get

21    off of work.  But ultimately she did, and that allowed her

22    to travel to D.C. that morning.

23    Q.  Did he tell you that he asked her to take off from work

24    to come to D.C.?

25    A.  I don't know if he asked her to take off work or if she
```

 1    did that on her own.

 2    Q.  He indicated -- our did he indicate to you that he knew

 3    someone who was involved in Delaware politics?

 4    A.  That's correct.

 5    Q.  And I believe that you testified about this yesterday.

 6    Do you recall that individual's name?

 7    A.  Her name is Ms. Lauren Witzke.

 8    Q.  Did he indicate to you all of the methods that he

 9    learned -- or that he used to learn about this rally?

10    A.  Yes.

11    Q.  And what did he tell you?

12    A.  Facebook.  He was Facebook friends with Ms. Witzke.  He

13    also heard about it from the news and radio and other media

14    outlets, presumably from the internet.

15    Q.  So my last question.  I believe that Ms. Mullin asked

16    you some questions about the Confederate flag.

17         What did Mr. Seefried, Kevin Seefried, tell you

18    about what the flag meant to him?

19    A.  Mr. Seefried advised me that the Confederate flag was

20    about history and a way of life.

21    Q.  So the same history that he doesn't know anything about,

22    he indicated to you that it was about history?

23    A.  Perhaps.

24         MS. REED:  No further questions, your Honor.

25         THE COURT:  Thank you, Agent Lear.  You may step

```
 1    down.
 2              MS. MULLIN:  Your Honor, may I ask one followup
 3    question?
 4              THE COURT:  No.
 5              THE WITNESS:  Thank you, your Honor.
 6              (Witness excused.)
 7              THE COURT:  Ms. Reed?
 8              MS. KEARNEY:  The Government calls Special Agent
 9    Ryan McCabe.
10              (Thereupon, the witness entered the courtroom and
11    the following proceedings were had:)
12              RYAN McCABE, GOVERNMENT WITNESS, SWORN.
13              THE COURT:  Good morning, Agent.
14              THE WITNESS:  Good morning.
15                        DIRECT EXAMINATION
16    BY MS. KEARNEY:
17    Q.  Good morning.
18    A.  Good morning.
19    Q.  Could you please state and spell your name.
20    A.  Sure.  Ryan McCabe, R-Y-A-N M-C-C-A-B-E.
21    Q.  And, Special Agent McCabe, where do you work?
22    A.  Federal Bureau of Investigation, Baltimore division.
23    Q.  And where is your office located?
24    A.  Salisbury, Maryland.
25    Q.  How long have you been with the FBI?
```

1    A.   Since 2014.

2    Q.   What are your general responsibilities with the FBI?

3    A.   Investigating violations of federal laws, specifically

4    financial crimes, violent crimes, cybercrimes.

5    Q.   And does one of the activities that you perform include

6    interviewing witnesses and subjects of investigations?

7    A.   Yes.

8    Q.   Did there come a time when you became involved in the

9    investigation of Kevin Seefried and Hunter Seefried?

10   A.   Yes.

11   Q.   How did you become involved?

12   A.   I received a phone call one night asking me to show up

13   to do an interview of two subjects the next morning.

14   Q.   Do you remember what date that was?

15   A.   That was -- I received the call on January 11, 2021.

16   Q.   For an interview on January 12th?

17   A.   Correct.

18   Q.   And was this a request from your office or from another

19   office?

20   A.   It was a request from my supervisor; I think through the

21   Washington field office.

22   Q.   Had you ever met either Kevin Seefried or Hunter

23   Seefried before?

24   A.   No.

25   Q.   And prior to being asked to conduct an interview, did

1    you know anything about why they were being investigated?

2    A.  No.

3    Q.  Once you received the request, what information were you

4    given about why they were being investigated?

5    A.  I received information that they had entered the Capitol

6    Building and one of them had displayed a Confederate flag.

7    Q.  And at the time, did you know anything about what they

8    were suspected to have done either outside of or inside the

9    Capitol Building?

10   A.  No.

11   Q.  So let me direct your attention to the morning of

12   January 12th, 2021.  Where did you report for work that

13   morning?

14   A.  The Wicomico County Sheriff's Office.

15   Q.  Where is that?

16   A.  In Salisbury, Maryland.

17   Q.  And who else was there with you?

18   A.  My supervisor, special agent -- Supervisory Special

19   Agent Mike McIlhenny, Special Agent Joseph Lear, Special

20   Agent Brian Dinkel and then Sheriff Mike Lewis and a few

21   other of his deputies.

22   Q.  At some point, did Kevin and Hunter Seefried arrive?

23   A.  Yes.

24   Q.  And how did you know who they were?

25   A.  I didn't really know if it was them or not.  I saw when

McCabe - DIRECT - By Ms. Kearney

1    they got there they appeared to be there -- they didn't know

2    where to go.  So I assumed.

3    Q.  And did you interview them right when they arrived or

4    was there a sort of meeting first?

5    A.  No.  We had -- all the people I just mentioned, we all

6    met in a conference room.

7    Q.  With Kevin and Hunter Seefried?

8    A.  Correct.  With the Seefrieds.

9    Q.  And generally, what happened at that meeting?

10   A.  The sheriff introduced and explained the circumstances

11   of how he got there and we laid out what we were planning to

12   do for that day.

13   Q.  Did you interview Hunter Seefried, Kevin Seefried or

14   both?

15   A.  Hunter Seefried.

16   Q.  And did you ever interview Kevin Seefried?

17   A.  No, I did not.

18   Q.  So for purposes of our conversation today, when we talk

19   about Hunter Seefried, we'll call him Hunter Seefried or

20   Mr. Seefried; when we're talking about Kevin Seefried, we'll

21   call him Kevin Seefried or Kevin to distinguish.

22   A.  Okay.

23   Q.  So other than the meeting that we just discussed outside

24   and the -- the preinterview meeting, have you ever

25   interacted with Kevin Seefried?

```
 1    A.  No.

 2    Q.  Let's talk about your interview of Hunter Seefried.

 3              Was that audio- and video-recorded?

 4    A.  Yes, it was.

 5    Q.  Have you reviewed Government's Exhibit 301 prior to your

 6    testimony today?

 7    A.  Yes, I did.

 8    Q.  Is that a recording of the interview you conducted with

 9    Hunter Seefried?

10    A.  Yes.

11              MS. KEARNEY:  The Government offers Exhibit 301

12    into evidence.

13              THE COURT:  Any objection?

14              MR. BOSTIC:  No objection, your Honor.

15              THE COURT:  Mr. Ohm?

16              MS. MULLIN:  No objection, your Honor.

17              THE COURT:  Without objection, 301 is in.

18              (Whereupon, Government's Exhibit No. 301 was

19    entered into evidence.)

20              MS. KEARNEY:  Mr. Leach, can you actually pull up

21    Government's Exhibit 201?

22              I don't have it on my screen.  I'm sorry.

23              THE COURTROOM DEPUTY:  (Assists counsel with the

24    audiovisual equipment.)

25              MS. KEARNEY:  Thank you.
```

```
 1    BY MS. KEARNEY:

 2    Q.  Do you recognize that?

 3    A.  Yes, I do.

 4    Q.  And what is it?

 5    A.  It is an FD-395 advice-of-rights form.

 6    Q.  And was this the form that Hunter Seefried signed when

 7    you interviewed him?

 8    A.  Yes.

 9              MS. KEARNEY:  The Government offers Exhibit 201

10    into evidence.

11              MR. BOSTIC:  No objection, your Honor.

12              MS. MULLIN:  No objection.

13              THE COURT:  Without objection, 201 is in.

14              (Whereupon, Government's Exhibit No. 201 was

15    entered into evidence.)

16    BY MS. KEARNEY:

17    Q.  Very briefly, what is an advice of rights form?

18    A.  The advice of rights form advised Mr. Seefried of his

19    rights under the Constitution to have a lawyer and to

20    willingly answer questions from the Government and he was

21    free to stop at any time.

22    Q.  Was Mr. Hunter Seefried under arrest at that time?

23    A.  No, he was not.

24    Q.  So then why did you go over this form with Hunter

25    Seefried?
```

McCabe - DIRECT - By Ms. Kearney

1    A.  We were in a police station, audio- and video-recorded

2    in an interview room.  So there would be -- one could think

3    they were not free to leave.

4    Q.  And did Mr. Seefried indicate that he understood his

5    rights?

6    A.  Yes.

7    Q.  And did he sign this form?

8    A.  He did sign the form.

9    Q.  So prior to discussing the substance of your interview

10   with Mr. Seefried, have you received training in methods of

11   conducting interviews of witnesses or subjects?

12   A.  Yes.

13   Q.  And does that include ways to develop rapport with those

14   people?

15   A.  Yes.

16   Q.  What was your planned approach for the interview with

17   Hunter Seefried?

18   A.  My plan for interviewing Hunter Seefried was to try to

19   find -- try to be more relatable and find some things to

20   talk about that would show that we were kind of -- we

21   understood each other more than we may perceive each other.

22   Q.  To find some common ground, maybe?

23   A.  To find some common ground.  Yes.

24   Q.  So then let's go over some of the things that you and

25   Hunter Seefried discussed.

1    A.  Sure.

2    Q.  So first, did he admit that he had gone in the Capitol

3    Building on January 6th, 2021?

4    A.  Yes, he did.

5    Q.  And did you ask him how he traveled to Washington, D.C.?

6    A.  Yes, I did.

7            MS. KEARNEY:  Mr. Leach, could we please play

8    Government's Exhibit 301 from six minutes, 59 seconds to

9    seven minutes, 46 seconds.

10           (Whereupon, segments of Government's Exhibit

11   No. 301 were published in open court.)

12   BY MS. KEARNEY:

13   Q.  Now, Hunter Seefried's a little hard to hear in that

14   interview, so I want to go over some of the things that he

15   said to you.

16   A.  Okay.

17   Q.  So when you asked him, "How did you guys go there,"

18   where were you referring to?

19   A.  To Washington, D.C.

20   Q.  And did he say that they left on the Wednesday morning?

21   A.  Correct.

22   Q.  Was January 6, 2021, a Wednesday?

23   A.  Yes, it was.

24   Q.  And did you ask him how they got there and who he

25   traveled with?

McCabe - DIRECT - By Ms. Kearney

1    A.  Yes, I did.

2    Q.  What did he respond?

3    A.  He said they had driven there with his father, his

4    mother and his girlfriend.

5    Q.  Now, did you and Hunter Seefried discuss whether or not

6    he attended the Trump rally in Washington, D.C., on that

7    date?

8    A.  Yes, I did.

9            MS. KEARNEY:  Mr. Leach, could you please play

10   nine minutes, 26 seconds through nine minutes, 58 seconds.

11           (Whereupon, segments of Government's Exhibit

12   No. 301 were published in open court.)

13   BY MS. KEARNEY:

14   Q.  I want to go over a few of the things he said.

15           So you asked Hunter Seefried whether he attended

16   the Trump rally.  What were you referring to when you said

17   the Trump rally?

18   A.  I was referring to the Stop the Steal Rally that was

19   going on by the Washington Monument and the White House.

20   Q.  And did you have a general understanding of what the

21   Stop the Steal Rally was about?

22   A.  Yes.

23   Q.  And what is that?

24   A.  It was about overturning or demonstrating against

25   perceived election fraud.

McCabe - DIRECT - By Ms. Kearney

1    Q.  Was there something that was to be done about the fraud?

2    A.  To stop the certifying of the Electoral College.

3              MR. BOSTIC:  Your Honor, I'm going to object to

4    that.  I think that really calls for speculation on the part

5    of the agent at this point.

6              THE COURT:  How do you know that?

7              THE WITNESS:  Sorry.  I have to take a step back.

8    How do I know --

9              THE COURT:  What you just said.

10             THE WITNESS:  The Stop the Steal for --

11             THE COURT:  Yes.  Did you attend?

12             THE WITNESS:  I did not attend.

13             THE COURT:  Did you listen to it?

14             THE WITNESS:  I did not listen to the rally.

15             THE COURT:  I'm sustaining the objection.

16   BY MS. KEARNEY:

17   Q.  Did Hunter tell you how much of the rally he stayed for?

18   A.  Yes.

19   Q.  What was that?

20   A.  For the duration -- the whole rally.

21   Q.  Were you aware of statements that have been made by

22   then-President Trump regarding the validity of the 2020

23   election?

24   A.  I was aware of statements made by the president.

25   Q.  What was the general sentiment of those statements?

1    A.  The president made statements after the 2020 election

2    alleging that there was fraud in multiple states in the

3    voting systems that caused the outcome of the 2020 election.

4    Q.  And is that colloquially or for shorthand known as Stop

5    the Steal?

6    A.  Yes.

7    Q.  Did Hunter Seefried tell you how he learned about the

8    rally?

9    A.  Yes.

10              MS. KEARNEY:  Mr. Leach, could you please play

11   from six minutes, 20 seconds to six minutes, 59 seconds.

12              (Whereupon, segments of Government's Exhibit

13   No. 301 were published in open court.)

14   BY MS. KEARNEY:

15   Q.  So again, it's a little hard to hear there, so let's go

16   back over this.

17              How did he say he had learned about the rally on

18   January 6, 2021?

19   A.  From his father.

20   Q.  And did he understand how his father had learned of it?

21   A.  He stated that his father learned of it through

22   Facebook.

23   Q.  Did Hunter Seefried tell you why he traveled to

24   Washington, D.C., to attend the rally, like why he wanted to

25   attend the rally in Washington, D.C.?

 1    A.  Yes.

 2              MS. KEARNEY:  Mr. Leach, can you play 53 minutes,

 3    17 seconds to 53 minutes, 43 seconds.

 4              (Whereupon, segments of Government's Exhibit

 5    No. 301 were published in open court.)

 6    BY MS. KEARNEY:

 7    Q.  What was his answer then when you asked him what the

 8    concern he wanted to address by going to D.C. was?

 9    A.  Stop the Steal and to support the president.

10    Q.  What did you understand him to mean by "Stop the Steal"?

11    A.  Election fraud.

12    Q.  You testified earlier that Hunter Seefried admitted that

13    he had entered the Capitol Building on January 6th, 2021.

14    Did he tell you how and why he traveled from the rally, the

15    Stop the Steal Rally, to the Capitol Building?

16    A.  Yes.

17              MS. KEARNEY:  Mr. Leach, could you please play

18    Government's Exhibit 301 from seven minutes, 46 seconds to

19    eight minutes, 45 seconds.

20              (Whereupon, segments of Government's Exhibit

21    No. 301 were published in open court.)

22    BY MS. KEARNEY:

23    Q.  Again, he's a little muffled, so I want to go back over

24    what he was saying.

25              So did he tell you when it was decided that he

```
 1    would go to the Capitol?

 2    A.  Yes.

 3    Q.  What was that?

 4    A.  After the rally, they went to their car and they saw the

 5    groups of people going towards the Capitol.

 6    Q.  I'm sorry?

 7    A.  They saw groups of people walking towards the Capitol.

 8    Q.  And so he joined them?

 9    A.  Yes.

10    Q.  Did Hunter Seefried describe the atmosphere at the Trump

11    rally?

12    A.  Yes, he did.

13              MS. KEARNEY:  Mr. Leach, could you play Exhibit

14    301 from 25:24 to 25:51.

15              (Whereupon, segments of Government's Exhibit

16    No. 301 were published in open court.)

17    BY MS. KEARNEY:

18    Q.  So to be clear, how did he describe the rally up until

19    he got to the Capitol?

20    A.  Mr. Seefried described it as being fun and then --

21    Q.  Then once he got to the Capitol?

22    A.  Then once he got up close to the Capitol, it felt more

23    "heated," was the term he used.

24    Q.  Did he say why it felt heated?

25    A.  Yes, he did.
```

```
 1    Q.  And what was that?

 2    A.  He had said there were people, you know, yelling and

 3    kind of -- the energy was getting more aggressive.

 4    Q.  And did he use the phrase "What's going on in that room

 5    in that building affects my way of life"?

 6    A.  Yes.

 7    Q.  What did you think he meant by that?

 8    A.  The certifying --

 9              MR. BOSTIC:  Objection, your Honor.  Again, I

10    don't know what relevance is what the officer thought Hunter

11    meant at this point.  The question should be:  Did he ask

12    Hunter Seefried to explain what his words meant as opposed

13    to the officer -- the agent speculating as to what he

14    believed he meant.

15              THE COURT:  I'm going to overrule the objection.

16    BY MS. KEARNEY:

17    Q.  What did you understand Hunter Seefried to mean by

18    "What's going on in that room in that building affects my

19    way of living"?

20    A.  He was talking about the certifying of the election.

21    Q.  And was that one of the reasons he felt heated?

22    A.  Yes.

23    Q.  Did you show Hunter Seefried any photographs during the

24    interview?

25    A.  Yes, I did.
```

```
1              MS. KEARNEY:  Mr. Leach, can we please play

2    Government's Exhibit 301 from 16:28 through 16:36.

3              (Whereupon, segments of Government's Exhibit

4    No. 301 were published in open court.)

5              MS. KEARNEY:  Mr. Leach, could you pull up

6    Government's Exhibit 202, please.

7    BY MS. KEARNEY:

8    Q.  Now, in the video clip we just watched, Agent McCabe,

9    you're showing Hunter Seefried a piece of paper.  What is

10   this?

11   A.  This is the piece of paper I showed Mr. Seefried.

12   Q.  And the handwriting on that paper?

13   A.  That's my handwriting.

14   Q.  You were writing down what he was telling you?

15   A.  Correct.

16   Q.  So in addition to Hunter, is that a reference to

17   himself?

18   A.  I'm sorry?

19   Q.  You wrote "Hunter."  Is that a reference to himself, to

20   Hunter Seefried?

21   A.  Yes, it is.

22   Q.  And you wrote "father."  Who is that a reference to?

23   A.  Kevin Seefried.

24   Q.  And then there are two notations, "antifa."

25   A.  Correct.
```

McCabe - DIRECT - By Ms. Kearney

1    Q.  Why did you make those?

2    A.  Mr. Seefried, Hunter Seefried, identified those two

3    individuals as belonging to the group antifa.

4    Q.  Now, you testified earlier that Hunter Seefried admitted

5    to being in the Capitol Building.  Did he express any regret

6    about being in that building?

7    A.  Yes, he did.

8          MS. KEARNEY:  Mr. Leach, can you play from 11

9    minutes, 54 seconds to 12 minutes, 45 seconds, please.

10          (Whereupon, segments of Government's Exhibit

11   No. 301 were published in open court.)

12   BY MS. KEARNEY:

13   Q.  Hunter Seefried references jumping through a window.

14   Did you ask him about how he entered the Capitol Building?

15   A.  Yes, I did.

16   Q.  And how did he respond?

17   A.  That he went through a window.

18          MS. KEARNEY:  Mr. Leach, could you play

19   Government's Exhibit 301 from 13:26 to 14:20.

20          (Whereupon, segments of Government's Exhibit

21   No. 301 were published in open court.)

22   BY MS. KEARNEY:

23   Q.  So Hunter Seefried says he went through a window and

24   that it was broken before he got there.  Is that right?

25   A.  Correct.

McCabe - DIRECT - By Ms. Kearney

1          THE COURT:  I'm sorry.  Just a second.

2          Mr. Halther, can I ask you and your team to move

3      up inside the well.  Yes, sir.

4      BY MS. KEARNEY:

5      Q.  Had you previously asked Hunter Seefried about the

6      broken window at this point?

7      A.  At this point in the interview, I don't believe I had

8      asked him about the broken window.

9      Q.  In fact, did you know that he had -- was suspected of

10     breaking a window at this point?

11     A.  At this time in the interview, I don't believe I --

12     Q.  This was about 14, 15 minutes into the interview.

13     A.  I did not know.

14     Q.  And at the end of that segment, does he say that there

15     were other people in the building before he was?

16     A.  Yes.

17     Q.  Did you ask Hunter Seefried why he entered through the

18     window that he did?

19     A.  Yes, I did.

20          MS. KEARNEY:  Mr. Leach, could you please play

21     Government's Exhibit 301, from 55 minutes, 31 seconds

22     through 55 minutes, 43 seconds.

23          (Whereupon, segments of Government's Exhibit

24     No. 301 were published in open court.)

25          MS. KEARNEY:  Stop there.

1    BY MS. KEARNEY:

2    Q.  That's 55:55.  What was Hunter's response when you asked

3    why he was up front, up against that window?

4    A.  That was the easiest route to get up to the front.

5    Q.  And did he say that's where all the commotion was?

6    A.  Yes.

7    Q.  Over the course of this interview -- approximately how

8    long did you spend total interviewing Hunter Seefried?

9    A.  Approximately an hour and a half.

10   Q.  And were you in the room that whole time?

11   A.  I was not.

12   Q.  Did you take a break at certain points?

13   A.  Yes.

14   Q.  Over the course of this interview, though, did you

15   return to the topic of this broken window?

16   A.  I did.  Yes.

17   Q.  On one occasion or on several occasions?

18   A.  Several occasions.

19          MS. KEARNEY:  Mr. Leach, can you please play

20   Government's Exhibit 301 from one hour, 13 seconds to one

21   hour, one minute, 14 seconds.

22          (Whereupon, segments of Government's Exhibit

23   No. 301 were published in open court.)

24          MS. KEARNEY:  You can stop there, Mr. Leach.

25

1    BY MS. KEARNEY:

2    Q.  Again, it is a little soft and a little muffled, so I

3    want to go over what you asked him and how he responded.

4           Did you ask Hunter Seefried whether the glass was

5    totally removed from the window or whether he removed it?

6    A.  Yes.

7    Q.  And how did he respond?

8    A.  That it had been totally removed.

9    Q.  And that he didn't have to pull any glass out?

10   A.  Correct.

11   Q.  And did you ask him if he saw how the window got broken?

12   A.  Yes.

13   Q.  How did he respond?

14   A.  He didn't know.

15   Q.  Did you ask him if he saw anyone break the glass in the

16   window?

17   A.  Yes.

18   Q.  How did he respond?

19   A.  He didn't see anyone break the window.

20   Q.  At this point in the interview, did you leave the room?

21   A.  I believe so.  Around this point.

22   Q.  And why did you do that?

23   A.  I had concluded the interview and was stepping out to

24   see what was going on with the interview of Kevin Seefried.

25   Q.  And while you were out, did you receive any additional

 1    information?

 2    A.  I did, yes.

 3    Q.  What was that?

 4    A.  My supervisor had told me that Hunter Seefried was --

 5    there was information he had just got that Hunter Seefried

 6    had broken that window to enter through -- into the Capitol

 7    Building.

 8    Q.  And at that point, did you return to the interview room?

 9    A.  Yes, I did.

10    Q.  And when you returned, did you revisit how that window

11    got broken?

12    A.  Yes, I did.

13          MS. KEARNEY:  Mr. Leach, can you please play one

14    hour, 11 minutes, 36 seconds through one hour, 12 minutes,

15    59 seconds.

16          (Whereupon, segments of Government's Exhibit

17    No. 301 were published in open court.)

18    BY MS. KEARNEY:

19    Q.  Again, it's muffled, so I apologize that we have to walk

20    back through it.

21          So you revisited the topic of the window?

22    A.  Yes.

23    Q.  Did you ask him again how he got into the building?

24    A.  Yes, I did.

25    Q.  How did he respond?

```
 1    A.   He went through the window.

 2    Q.   Did you ask him how the window got opened?

 3    A.   Yes, I did.

 4    Q.   How did he respond?

 5    A.   That the glass had been broken.

 6    Q.   Did he use the phrase "It was busted"?

 7    A.   Yes.

 8    Q.   Did you ask him if he knew who busted the window?

 9    A.   Yes, I did.

10    Q.   And how did he respond?

11    A.   He said he didn't know how it was broken.

12              MS. KEARNEY:  Mr. Leach, could you please play one

13    hour, 15 minutes, 17 seconds through one hour, 15 minutes,

14    22 seconds.

15              (Whereupon, segments of Government's Exhibit

16    No. 301 were published in open court.)

17    BY MS. KEARNEY:

18    Q.   What did you ask him there?

19    A.   Sorry.  Could you play that again?

20    Q.   Sure.

21              MS. KEARNEY:  Can you play 1:15:17 through

22    1:15:22.

23              (Whereupon, segments of Government's Exhibit

24    No. 301 were published in open court.)

25              THE WITNESS:  So I clarified by asking again if --
```

```
1    that he had not seen the window being broken.
2    BY MS. KEARNEY:
3    Q.  And he responded:  Not even from far away?
4    A.  Correct.
5    Q.  That he had not seen it from far away?  You used those
6    words, not him?
7    A.  Correct.
8    Q.  So subsequent to the portion that we just watched, did
9    you leave the room again?
10   A.  Yes, I did.
11   Q.  And why?
12   A.  I ended my followup questioning and I left to see if
13   Kevin Seefried's interview was complete.
14   Q.  And did you return again?
15   A.  I did, yes.
16   Q.  And when you returned, did you again discuss how the
17   window got broken?
18   A.  Yes, I did.
19           MS. KEARNEY:  Mr. Leach, could you please play one
20   hour, 32 minutes, four seconds through one hour, 32 minutes,
21   27 seconds.
22           (Whereupon, segments of Government's Exhibit
23   No. 301 were published in open court.)
24   BY MS. KEARNEY:
25   Q.  Did Hunter tell you that he hoisted himself up onto the
```

1    window?

2    A.  Yes, he did.

3    Q.  And that the glass was broken when he got to the window?

4    A.  That's correct.

5          MS. KEARNEY:  Mr. Leach, could you please play one

6    hour, 33 minutes, 54 seconds through one hour, 35 minutes,

7    four seconds.

8          (Whereupon, segments of Government's Exhibit

9    No. 301 were published in open court.)

10   BY MS. KEARNEY:

11   Q.  Special Agent McCabe, you referenced a video in your

12   statement there.  What video are you referring to and when

13   did you watch it?

14   A.  When I stepped out of the interview for the second time,

15   my supervisor showed me a clip from CNN on his phone that

16   showed Mr. Seefried climbing through the window.

17         MS. KEARNEY:  Mr. Leach, could you pull up

18   Government's Exhibit 502 and play starting at 50 seconds

19   through one minute, 15 seconds.

20         (Whereupon, segments of Government's Exhibit

21   No. 502 were published in open court.)

22   BY MS. KEARNEY:

23   Q.  Is that a portion of the video that you watched?

24   A.  Yes, it is.

25   Q.  Now, just to go back over Hunter Seefried's answers, you

 1    asked again:  Did you touch any glass in the window?  Is
 2    that right?
 3    A.  That's correct.
 4    Q.  And he responded:  I don't remember.  Is that right?
 5    A.  That's correct.
 6    Q.  Did you ask him:  Did you have to remove glass?  Did you
 7    have to punch any glass out to get to the window?
 8    A.  Yes, I did.
 9    Q.  And does he say there may have been remnants of glass?
10    A.  Yes, he does.
11    Q.  So let's move on from the broken window.
12                We watched a portion of your interview earlier
13    where Hunter Seefried told you that he hoisted himself onto
14    the window ledge.
15    A.  Right.
16    Q.  Did you and Hunter Seefried discuss what he saw once he
17    got up there?
18    A.  Yes, we did.
19                MS. KEARNEY:  Mr. Leach, could you please play
20    Government's Exhibit 301 from one hour, 12 minutes, 59
21    seconds to one hour, 15 minutes, 17 seconds.
22                (Whereupon, segments of Government's Exhibit
23    No. 301 were published in open court.)
24                MS. KEARNEY:  Actually, Mr. Leach, stop there.
25    That's one minute, one hour, 14 minutes, 39 seconds.

pilar

1    BY MS. KEARNEY:

2    Q.  So again, to go back over, did Hunter Seefried tell you

3    that when he went through the window he saw a cop in the

4    hallway?

5    A.  Yes, he did.

6    Q.  And that that officer had placed his hand on his gun?

7    A.  Correct.

8    Q.  And at that point, he said he leaned back --

9    A.  Correct.

10   Q.  -- is that right?

11   A.  Yes.

12   Q.  In fact, he says he's had a gun pulled on him before, so

13   he leaned back before he leans back in?

14   A.  Correct.

15          MS. KEARNEY:  Mr. Leach, can you please play from

16   one hour, 37 minutes, five seconds through one hour, 37

17   minutes, 31 seconds.

18          (Whereupon, segments of Government's Exhibit

19   No. 301 were published in open court.)

20          MS. KEARNEY:  I'm sorry, Mr. Leach.  I meant to

21   say one hour, 37 minutes and five seconds to one hour, 37

22   minutes and 31 seconds.

23          (Whereupon, segments of Government's Exhibit

24   No. 301 were published in open court.)

25

1      BY MS. KEARNEY:

2      Q.  To be clear, you're talking about someone where Hunter

3      Seefried says he doesn't want to get shot.  Were you talking

4      about that same officer he saw in the window with his hand

5      on his gun?

6      A.  Yes, we were.

7      Q.  And when you say that Hunter Seefried was a perceived

8      threat, how does he respond?  How does Hunter Seefried

9      respond?

10     A.  Mr. Seefried says he was a threat.

11     Q.  Did you ask Mr. Seefried whether he spoke with any

12     police officers while he was in the Capitol Building?

13     A.  Yes, I did.

14     Q.  And the Court has heard some testimony that Hunter

15     Seefried was acting in an angry manner.  Did he give you any

16     indication as to why he was angry that day?

17     A.  Yes, he did.

18              MS. KEARNEY:  Mr. Leach, could you please play 21

19     minutes, 14 seconds through 23 minutes, 16 seconds.

20              (Whereupon, segments of Government's Exhibit

21     No. 301 were published in open court.)

22              THE COURT:  Could you play that very beginning

23     again.

24              MS. KEARNEY:  Sure.  21:14.

25              (Whereupon, segments of Government's Exhibit

1    No. 301 were published in open court.)

2              THE COURT:  Thank you, Mr. Leach.

3              MS. KEARNEY:  That's 21 minutes, 57 seconds.

4    BY MS. KEARNEY:

5    Q.  So just to be clear, you asked Hunter Seefried

6    whether -- about what topics he spoke to Capitol Police

7    officers about.  Is that right?

8    A.  Correct.

9    Q.  And he responded that he didn't remember verbatim what

10   he said.  Right?

11   A.  Correct.

12   Q.  But that in the heat of the moment he was asking about

13   what he believed to have been a fraud?

14   A.  Correct.

15   Q.  Did he clarify what he meant by "fraud"?

16   A.  Yes.

17   Q.  How so?

18   A.  He clarified talking about voting systems, and I think

19   he mentioned one specific voting system being left in the

20   bushes or something like that.

21   Q.  Is that Dominion?

22   A.  Dominion voting systems.

23   Q.  Do you know what Dominion refers to?

24   A.  After the 2020 election, it was the voting system that

25   was in question in multiple states for being tampered with.

1    Q.  Did he also refer to hearings on the Senate floor and in

2    courtrooms?

3    A.  Yes.

4    Q.  Did he also refer to the polls and counting?

5    A.  Yes, he did.

6    Q.  And a ballot box that he saw on the news in the bushes?

7    A.  Yes.

8    Q.  Now, you respond to him and you ask him a question.  You

9    say:  You have Rudy Giuliani; you have Sidney Powell.  Why

10   did you reference those people?

11   A.  Because they were filing lawsuits for election fraud in

12   multiple states at the time.

13   Q.  And did you have an understanding of what the purpose of

14   the suits was?

15   A.  To overturn the results of the 2020 election.

16   Q.  And did Hunter Seefried agree with you when he brought

17   up these theories of election fraud?

18   A.  Yes, he did.

19           MS. KEARNEY:  Let's continue.  Mr. Leach, could

20   you please play 23 minutes, 16 seconds to 24 minutes, 42

21   seconds.

22           (Whereupon, segments of Government's Exhibit

23   No. 301 were published in open court.)

24   BY MS. KEARNEY:

25   Q.  Special Agent McCabe, during that clip, did Hunter

1    Seefried tell you why he was in the Capitol Building?

2    A.  Yes.

3    Q.  And was that to express his opinion?

4    A.  Yes.

5    Q.  Now, based on where we are in the interview and the

6    topics that you're talking about, what was your

7    understanding of what the subject matter of that opinion

8    that he wanted to express was?

9    A.  About the election fraud.

10   Q.  Did you discuss with Hunter Seefried what other people

11   near him in the Capitol were saying to officers?

12   A.  Yes.

13          MS. KEARNEY:  Mr. Leach, could we please play

14   Government's Exhibit 301 from 46:57 to 47:37.

15          (Whereupon, segments of Government's Exhibit

16   No. 301 were published in open court.)

17   BY MS. KEARNEY:

18   Q.  So just to be clear, what did Hunter Seefried tell you

19   he heard other people asking in the Capitol?

20   A.  Why are they letting this go on?

21   Q.  And by "this," do you mean "that fraud shit"?

22   A.  Yes.

23   Q.  He says "in the building."  What building did you

24   understand him to be referring to?

25   A.  The Capitol Building.

1    Q.  Did Hunter Seefried describe the atmosphere of the

2    Capitol Building when he was inside?

3    A.  Yes.

4              MS. KEARNEY:  Mr. Leach, can we please play

5    Government's Exhibit 301 from 25:10 to 25:14.

6              (Whereupon, segments of Government's Exhibit

7    No. 301 were published in open court.)

8              MS. KEARNEY:  I'm sorry.  I think I may have given

9    you the wrong timestamp.  Play it again.  25:10 to 25:14.

10             (Whereupon, segments of Government's Exhibit

11   No. 301 were published in open court.)

12   BY MS. KEARNEY:

13   Q.  So he's saying that it was heated in the Capitol

14   Building.  Is that right?

15   A.  Correct.

16             MS. KEARNEY:  Mr. Leach, could you back up

17   slightly and then play through 25:24.

18             (Whereupon, segments of Government's Exhibit

19   No. 301 were published in open court.)

20             MS. KEARNEY:  25:24.

21             (Whereupon, segments of Government's Exhibit

22   No. 301 were published in open court.)

23   BY MS. KEARNEY:

24   Q.  To be clear, just because he sometimes is muffled, what

25   he said to you in that clip was that what's going on in that

1    building, in that room, affects my way of living?

2    A.  Correct.

3    Q.  Did Hunter Seefried tell you how long he spent in the

4    Capitol Building?

5    A.  Yes.

6            MS. KEARNEY:  Mr. Leach, could you please play

7    26:46 through 26:59.

8            (Whereupon, segments of Government's Exhibit

9    No. 301 were published in open court.)

10   BY MS. KEARNEY:

11   Q.  Did Hunter Seefried tell you why he decided to leave the

12   Capitol Building?

13   A.  Yes, he did.

14           MS. KEARNEY:  Mr. Leach, could you please play

15   301, 28:17 through 29:23.

16           (Whereupon, segments of Government's Exhibit

17   No. 301 were published in open court.)

18   BY MS. KEARNEY:

19   Q.  So in general terms, what was the reason that Hunter

20   Seefried decided to leave the building?

21   A.  He had heard through the crowd that the police were

22   going to -- there was a response force that was going to

23   come in and start removing people and possibly using teargas

24   or other means to get them out.

25   Q.  At the end of the clip, Hunter Seefried expresses to you

1    that he gets that it was wrong to be in the Capitol

2    Building.  Is that right?

3    A.  Yes.

4    Q.  And is one of the things that he says he came to the

5    Capitol Building to do to express his opinion?

6    A.  Yes.

7              MS. KEARNEY:  No further questions, your Honor.

8              THE COURT:  Thank you, Ms. Kearney.

9              Mr. Bostic?

10             MR. BOSTIC:  Thank you, your Honor.

11                       CROSS-EXAMINATION

12   BY MR. BOSTIC:

13   Q.  Good morning, Agent McCabe.

14   A.  Good morning.

15   Q.  How are you, sir?

16   A.  Good.

17   Q.  As I understand it, would it be fair to say Hunter

18   Seefried is not the first individual that you have

19   interviewed in connection with allegations that the person

20   did something wrong?  I correct?

21   A.  Did you say he's not the only individual?

22   Q.  He's not the first person that you interviewed who may

23   have been charged or a suspect in doing -- being involved in

24   some criminal activity?

25   A.  Correct.

1    Q.  How long have you been on the force -- I'm sorry -- with

2    the FBI?

3    A.  Since 2014.

4    Q.  And so it would be fair to say you've interviewed many

5    people over the course of those, what, seven years?

6    A.  Yes.  Correct.

7    Q.  And you talked about devising a system, a way, to

8    approach an individual so you can get answers that you

9    believe may be worthwhile as part of your investigation?

10   A.  Correct.

11   Q.  And to do that, you go about learning something about

12   the individual.  Right?

13   A.  Correct.

14   Q.  And in fact, you learned even within the course of the

15   interview of Hunter that he has a ninth grade education.  Am

16   I correct?

17   A.  I didn't know that.  I don't know that.

18   Q.  You don't know that?  You didn't ask him about his

19   education as he executed the waiver of rights form?

20   A.  I don't recall specifically.

21   Q.  But isn't that something that you are taught to do in

22   terms of when you're executing the waiver of rights form, to

23   make certain the person has a base of knowledge and

24   understanding to actually waive the rights to consent to a

25   voluntary interview?

1    A.  Yes.

2    Q.  But you're saying you didn't do it this time with Hunter

3    Seefried?

4    A.  I did not ask him his education.

5    Q.  And you felt from your background and investigation

6    about Hunter before going into the interview that you could

7    befriend him and lead him along to answer questions that you

8    were -- which answers you were looking for?

9    A.  Correct.

10   Q.  And in fact, you did that during the course of this

11   interview?

12   A.  Yes.

13   Q.  And during the course of this interview, you also cut

14   him off several times as he was trying to expand on certain

15   areas.  I think in the last clip the Government indicated --

16   showed you actually interrupted him to move him on to

17   another subject?

18   A.  (No verbal response.)

19   Q.  You're shaking your head.  Yes?

20   A.  Yes.

21   Q.  In fact, let's talk about the window and breaking or

22   removing glass from the window.

23           This is not the first time that -- strike that.

24   Let me go back.

25           When you started your interview with Hunter

McCabe - CROSS - By Mr. Bostic

1    Seefried, you were aware he had -- that he's never been

2    arrested before, never been interviewed by law enforcement

3    as far as you're aware?

4    A.  I was not aware of him being arrested.  Correct.

5    Q.  And would it be fair to say that over the course of your

6    interviewing subjects that on occasion individuals find it

7    difficult to admit where they actually did something wrong?

8    A.  Correct.

9    Q.  We've got that part.

10             And so when we talk about the window, Hunter

11   discussed it in a way that he tried to avoid admitting that

12   he had removed glass from the window?

13   A.  Correct.

14   Q.  And in fact, he talked to you about the fact that the

15   window was broken out when he got there.  Right?

16   A.  Correct.

17   Q.  And then the two of you started talking about the fact

18   that there was still glass remaining in the window?

19   A.  Correct.

20   Q.  And eventually, I think in one of the clips the

21   Government played, eventually he told you that he may have

22   removed some remnants that were -- of glass in the window.

23   Am I correct?

24   A.  Correct.  Correct.

25   Q.  Now, with respect to going to the Capitol Building, he

```
1    told you that he went into the building and he was going to
2    the building because he wanted to express his opinion?
3    A.  Correct.
4    Q.  And you did not follow up with him and say:  Was your
5    opinion or what you're seeking to do was to stop the
6    certification of the electoral vote count?  Right?
7    A.  I did not follow up.
8    Q.  You did not.  That was a question that you could have
9    asked him that would have clarified whether or not he had
10   any intent or interest in stopping the counting of the
11   electoral votes.  Would that be fair to say?
12   A.  Correct.
13   Q.  Now, during the course as you were talking about why he
14   went into the building, you got specific, however, and asked
15   him about:  Why do you believe the Capitol Building was
16   targeted?  Do you remember that?
17   A.  Yes, I do.
18   Q.  And he told you he had no idea why it was targeted?
19   A.  (No verbal response.)
20   Q.  You're shaking your head.  Is that yes?
21   A.  Yes.
22   Q.  And he told you that he was not certain what was going
23   on in there.  Am I correct?
24   A.  Yes.
25   Q.  And I know you don't have the tape, but if the Court
```

1    wishes me to play it, I think that's at 043.  I would have

2    to set up my computer.  But in any event, as part of the

3    investigation into Hunter Seefried and his activities, you

4    discussed with him whether or not he was a member of any

5    group.  Right?

6    A.  Correct.  Yes.

7    Q.  And any group you're talking about -- what type of

8    groups were you talking about?

9    A.  I was talking about specifically right-wing, alt-right,

10   extremist-type groups.

11   Q.  And he told you no?

12   A.  Correct.

13   Q.  And you haven't found as part of your investigation any

14   evidence to suggest that he -- that he was, am I correct,

15   part of any group?

16   A.  Correct.

17   Q.  Right.  And I think as part of your investigation that

18   day, if I'm correct, subsequently, Hunter Seefried gives you

19   his phone and gives you permission to search it.  Am I

20   correct?

21   A.  I believe he turned it over to the FBI, not me

22   specifically.

23   Q.  And consented to a search?

24   A.  I believe so.

25   Q.  A voluntary search.

```
1              And you would agree with me that his phone did not

2     contain any messages or any information about -- that would

3     connect him to any groups.  Right?

4     A.  I did not review any evidence.

5     Q.  You did not review it?

6     A.  I did not review any evidence or his phone.

7     Q.  Throughout the interview, several times during the

8     interview, Hunter Seefried acknowledged that he was wrong

9     for going into the Capitol Building.  Am I correct?

10    A.  Yes.

11    Q.  And he said that it happened in the heat of the moment

12    as the crowds were pushing forward?

13    A.  Yes.

14              MR. BOSTIC:  One moment, your Honor.

15              I have nothing else.  Thank you.

16              THE COURT:  Thank you, Mr. Bostic.

17              Ms. Mullin?

18                      CROSS-EXAMINATION

19    BY MS. MULLIN:

20    Q.  Good morning, Agent.

21    A.  Good morning.

22    Q.  Now, you talked about how Hunter Seefried told you that

23    he heard about the Trump rally through his father, who saw

24    it on Facebook.  Right?

25    A.  That's correct.
```

1    Q.  Did you as an FBI agent ever request a subpoena for the

2    historical records of Kevin Seefried's Facebook account?

3    A.  I did not request them.  No.

4    Q.  Do you know whether the FBI has the ability to subpoena

5    the historical records of someone's Facebook account even

6    after an account may be closed or deactivated?

7    A.  I believe that's possible.  Yes.

8    Q.  That's possible?

9    A.  Yes.

10   Q.  During your interview of Hunter Seefried, you showed him

11   some pictures of individuals who were in the Capitol near

12   Hunter Seefried.  And he identified those individuals as

13   people he believed to be antifa.

14           Do you remember telling the Government about that

15   on direct?

16   A.  Yes, I do.

17   Q.  Did your investigation reveal that in fact members of

18   antifa were in the Capitol Building near Hunter Seefried at

19   any time during the -- inside the Capitol?

20   A.  I don't know if that -- I don't know the details of that

21   part of the investigation.

22   Q.  So you don't know whether or not the people he

23   identified as being -- he thought were members of antifa

24   were actually members of antifa?

25   A.  I don't know if they are.

```
1    Q.  Now, you talked about how Hunter Seefried told you that

2    he had been at the Stop the Steal Rally prior to going to

3    the Capitol.

4              Do you remember that?

5    A.  Yes.

6    Q.  Are you aware as to whether any speaker at the rally,

7    including President Trump, specifically directed rally-goers

8    to go inside the Capitol and stop the certification of the

9    vote?

10   A.  I believe that that was said at the rally.  I don't know

11   for sure.

12   Q.  Do you believe that President Trump actually told his

13   supporters and followers to go inside the Capitol and

14   physically stop the certification of the vote?

15             MS. KEARNEY:  Objection.

16             THE COURT:  Again, I don't think he's listened to

17   it.  I'm not sure.

18   BY MS. MULLIN:

19   Q.  Did you review any -- did you review the speeches that

20   were given that day?

21   A.  Prior to this interview, I did not.

22   Q.  As an FBI agent investigating January 6, did you have an

23   opportunity to read the transcript of President Trump's

24   speech at the rally that day?

25   A.  I did not.  I have not.
```

1    Q.  Based on your investigation of the events of January 6,

2    did you ever learn that President Trump specifically

3    directed his followers to go inside the Capitol and stop the

4    certification of the vote, physically stop the certification

5    of the vote?

6    A.  I'm not certain if he did.  I believe that is the case

7    just from general awareness of the media.

8    Q.  If he did direct his followers to physically go stop the

9    certification of the vote, wouldn't that be a crime?

10                MS. KEARNEY:  Objection.

11                THE COURT:  Sustained.

12   BY MS. MULLIN:

13   Q.  Is it your understanding that generally members of

14   the -- that speakers at the rally were talking about

15   election fraud and things like that?

16   A.  Yes.  I believe that's what they were talking about.

17   Q.  I think you spoke with Hunter Seefried about how at the

18   time prominent lawyers and politicians like Rudy Giuliani

19   and others were promoting this idea that there were

20   irregularities and problems with the election.  Right?

21   A.  Yes.

22                MS. MULLIN:  No further questions.

23                THE COURT:  Thank you.

24                Ms. Kearney, any redirect?

25                MS. KEARNEY:  No redirect, your Honor.

1        THE COURT:  Thank you, Agent McCabe.  Thank you

2   for your presentation here.  You may step down.  You're free

3   to leave.

4        (Witness excused.)

5        THE COURT:  Any further evidence from the

6   Government?

7        MS. KEARNEY:  If we could have one moment, your

8   Honor.

9        MS. MULLIN:  Your Honor, while the Government's

10  conferring, we just wanted to make a general objection to

11  any of the statements as to Hunter Seefried made being used

12  against Mr. Kevin Seefried under *Bruton*.

13       THE COURT:  I believe the defense is correct, that

14  I need to segregate the statements.

15       Do you agree, Ms. Reed?

16       MS. REED:  Well, your Honor, obviously, this is a

17  judge trial; and the Government's position is that *Bruton* is

18  not applicable to a judge trial.  But obviously, your Honor,

19  what the Government submits is that we are asking you to

20  obviously consider the separate conduct of these

21  individuals, but we do believe that *Bruton* is not applicable

22  in a judge trial.  The consideration really is if a jury

23  would be able to make the assessment.  And I believe that

24  this Court would be able to do that.

25       I may have some case law on it, your Honor, that I

1    can point you to from this circuit that it's just not an

2    issue in a judge trial.

3              THE COURT:  So why don't we take this under

4    advisement.  I'd love to see that case law.  I certainly was

5    under the impression that the issue is more of a hearsay one

6    than a judge-versus-jury one.

7              But I'm happy to see any case law you have on

8    that.

9              MS. REED:  Your Honor, in hindsight, I've

10   conferred with Mr. Kearney and I understand your Honor

11   better.

12             Yes.  Your Honor is correct that you -- that there

13   is -- that the Court is in the position where it can

14   segregate the statements from each individual, and so this

15   is not something that we will need to be able to provide

16   research on.

17             THE COURT:  I'm going to grant the defense motion

18   and not take statements made by one Defendant against the

19   other.

20             MS. REED:  I heard *Bruton* and I was ready, your

21   Honor.

22             MS. KEARNEY:  We're ready, your Honor.

23             Just two points of clarification, your Honor.  One

24   is, I believe Exhibit 1 was admitted yesterday.  I want to

25   confirm.

```
 1                THE COURT:  Yes.

 2                MS. KEARNEY:  And then 202, if I neglected to

 3     offer it into evidence, the Government does so now.

 4                THE COURT:  Any objection, Mr. Bostic?

 5                MR. BOSTIC:  No, your Honor.

 6                THE COURT:  And Ms. Mullin?

 7                MS. MULLIN:  No, your Honor.

 8                THE COURT:  202 is in.

 9                (Whereupon, Government's Exhibit No. 202 was

10     entered into evidence.)

11                MS. KEARNEY:  Lastly, Government's Exhibit 423 is

12     footage that was an exhibit to Inspector Hawa's testimony,

13     which has been stipulated in.  So the Government offers that

14     now.

15                THE COURT:  I think that's already in.

16                MS. KEARNEY:  Thank you.

17                THE COURT:  With that?

18                MS. KEARNEY:  With that, the Government rests,

19     your Honor.

20                THE COURT:  Mr. Ohm, do you have a motion?

21                MR. OHM:  Yes, your Honor.

22                We move for judgment of acquittal under Rule 29.

23     We reserve on the record.

24                THE COURT:  Mr. Bostic, do you have a motion?

25                MR. BOSTIC:  Your Honor, yes.  Thank you.
```

1              Pursuant to Rule 29, we would move for the

2       judgment of acquittal as to Count 1 of the indictment

3       without any argument at this time.  Thank you.

4              THE COURT:  Ms. Reed?

5              MS. REED:  Your Honor, I'm not exactly sure how

6       much you want me to state on this.

7              I do believe that the Government has offered

8       sufficient evidence at this time to -- for this Court to

9       consider the intent of these individuals and their corrupt

10      wrongdoing under 1512 as relates to the other charges that

11      the individuals are facing, your Honor.

12             The Government believes that your Honor has heard

13      the fact that these individuals entered inside of the

14      Capitol Building, that there was property damage that was

15      alleged to have been conducted by Hunter Seefried.  Your

16      Honor has seen the video evidence that supports the

17      Government's case.

18             So, your Honor, at this point, the Government

19      believes that information has been submitted on each of the

20      charges and there is supporting elements for this Court to

21      consider the Government's case and its submission.

22             THE COURT:  Under Federal Rule of Criminal

23      Procedure 29(a), the Court must enter judgment of acquittal

24      for any offense for which the evidence is insufficient to

25      sustain a conviction.

1            In considering this motion, the Court should not

2      assess witness credibility, weigh evidence or draw

3      inferences of fact.

4            The applicable standard is whether the evidence

5      viewed in the light most favorable to the Government is

6      sufficient for any rational trier of fact to find the

7      essential elements of a crime beyond a reasonable doubt.

8            I do believe that based on the following evidence

9      viewed in the light most favorable to the Government a

10     rational jury or in this case Court could find guilt beyond

11     a reasonable doubt.

12           I think there are -- first, there's, I'd say,

13     overwhelming video evidence that what happened as the

14     Government says it did in fact happened.

15           I think probably the closest question there is on

16     the destruction of property charges against Defendant Hunter

17     Seefried; and even on those at this point, viewing the

18     evidence in the light most favorable to the Government, I do

19     think there's evidence that he destroyed at least part of

20     the window and/or committed an act of physical violence

21     against the property; that is, the window.

22           I think the main questions here in this case are

23     Defendants' intent and especially Defendant's intent on

24     Count 1.

25           Here, we have certainly statements both that were

1    being made in the Defendants' vicinity about stopping the

2    steal, vote fraud, where are the members at, where are they

3    hiding.  As to Defendant Kevin Seefried, there's also

4    evidence that he in fact made statements along those lines.

5           As to Hunter Seefried, there is evidence again

6    that he was in this group that is moving around the Capitol

7    Building, including outside the Senate chamber, while these

8    statements are being made, and his admission to the FBI

9    agent that he wanted to go to Stop the Steal and support the

10   president and that he did enter the building with other

11   people who are making these types of statements.

12          So for all these reasons, I'm going to deny the

13   defense motions for judgment as a matter of law.

14          Mr. Ohm, do you wish to present any evidence?

15          MR. OHM:  Yes, your Honor.

16          Your Honor, with the Court's permission, we would

17   like to start by calling Special Agent Brian Dinkel.

18          BRIAN DINKEL, DEFENSE WITNESS, SWORN.

19          THE COURT:  Good morning, Agent Dinkel.

20          THE WITNESS:  Good morning, your Honor.

21                    DIRECT EXAMINATION

22   BY MR. OHM:

23   Q.  Good morning, Agent Dinkel.  Could you start by just

24   saying your name and spelling it for the court reporter.

25   A.  Yes.  Brian Dinkel, B-R-I-A-N D-I-N-K-E-L.

```
1    Q.  Where are you currently employed?

2    A.  The FBI.

3    Q.  And how long have you worked for the FBI?

4    A.  Since January of 2018.

5    Q.  I'm sorry?

6    A.  January of 2018.

7    Q.  And what is your job for the FBI?

8    A.  I'm a special agent.

9    Q.  What do you do as a special agent?

10   A.  Investigate matters of federal violations.

11   Q.  And in your job as a special agent, have you worked on

12   any cases involving January 6th, 2021?

13   A.  I have, yes.

14   Q.  And how many of those cases are you working on?

15   A.  I don't have a number for you.

16   Q.  More than ten?

17   A.  No.

18   Q.  More than five?

19   A.  I don't have a recollection of how many cases I have.

20   Q.  You don't know how many cases that you're working on

21   generally or just --

22   A.  Just in general.

23   Q.  How many January 6 cases are you working on?

24   A.  I don't have a number for you.  These two, yes.

25   Q.  Can you give us a range?
```

1    A.   Between zero and ten.

2    Q.   Well, we know of at least one.   Right?

3    A.   Yes.   Two.   Yes.

4    Q.   And in the course of those investigations, how many

5    interviews would you say you've conducted?

6    A.   Many.

7    Q.   Over 50?

8    A.   Close to, yes.

9    Q.   And were a lot -- were any of those interviews with

10   officers who were present at the U.S. Capitol on January

11   6th?

12   A.   Yes.

13   Q.   What do you generally do to memorialize these

14   interviews?

15   A.   Well, generally you would take notes during the

16   interview and then we follow up with writing a document

17   summarizing or stating what you recall from the interview.

18   Q.   And is that summary something that you refer to as a

19   302?

20   A.   Yes.

21   Q.   Now, did you also work on the specific case of the

22   United States versus Kevin Seefried?

23   A.   Yes.

24   Q.   What was your role in that case?

25   A.   Well, administratively, I was on the case.  I was not

1    the lead until approximately maybe April.  Then I conducted

2    several interviews with officers.

3    Q.  So you knew of the case -- when did you learn of Kevin

4    Seefried?

5    A.  Approximately January 8th, 2021.

6    Q.  So would it be fair to say that you were assigned to the

7    January 6 cases pretty much immediately after the FBI became

8    involved?

9    A.  I wasn't assigned to it at that time.  But I was

10   involved, yes.

11   Q.  And when you became the lead agent in April of this

12   year, how did your responsibilities change?

13   A.  From there, I went from just interviewing all the

14   possible witnesses to working with the U.S. Attorney's

15   Office.

16   Q.  And when you became the lead agent in April of 2022,

17   were you aware that this case was headed for trial?

18   A.  I was, yes.

19   Q.  Now, as an agent who is working on January 6, 2022,

20   [sic] cases, did you familiarize yourself with the different

21   charges -- offenses that were part of the January 6

22   prosecutions?

23   A.  I was aware of some of them, yes.  Not all of them.

24   Q.  Were you aware of, for example, the disorderly charges?

25   A.  Yes.

```
 1    Q.  Were you aware of the entering and remaining charges?
 2    A.  Yes.
 3    Q.  Were you aware of the obstruction of justice charges?
 4    A.  Yes.
 5    Q.  Did you familiarize yourself with what the elements of
 6    those offenses were?
 7    A.  Not 100 percent, no.
 8    Q.  Well, did you at some point learn that intent was
 9    something that mattered in obstruction offenses?
10    A.  I knew that that was part of it, yes.
11    Q.  And did you also learn working -- as a lead agent, are
12    you on the prosecution team, essentially?
13    A.  I wouldn't say I'm on the team.  I just coordinate with
14    them when we need to do witness interviews.
15    Q.  And did you meet with the prosecutors in this case?
16    A.  I did, yes.
17    Q.  And prior to the interviews, did you have any
18    conversations or emails about what kind of information was
19    necessary to ask the witnesses about?
20    A.  I don't believe so.  We had no specifics.  No specific
21    details.
22    Q.  So in April, you become the lead agent.  And then you
23    have, it sounds like -- well, who directed you to conduct
24    the interviews that you conducted?
25    A.  Well, I had conversations with the U.S. Attorney's
```

1    Office.

2    Q.  And was that Ms. Reed and Ms. Kearney?

3    A.  Yes.

4    Q.  And they were part of the meetings that you had with --

5    in the officer interviews that you conducted?

6    A.  Yes.

7    Q.  And did you ultimately meet with Eugene Goodman, Officer

8    Eugene Goodman?

9    A.  Yes.

10   Q.  And did that meeting happen -- well, how many times have

11   you met with Officer Goodman?

12   A.  I know of once over the, like, telephonic conference

13   call and then most recently this past weekend at the U.S.

14   Attorney's Office here in D.C.

15   Q.  And in those -- what was the purpose of those two

16   meetings?

17   A.  To get his recollection of the events, the officer's,

18   and any witness information he could provide regarding

19   Hunter Seefried and Kevin Seefried.

20   Q.  So when you spoke with Officer Goodman, is it fair to

21   say that you recognized at that point that intent was an

22   important element that needed to be met at trial?

23   A.  I didn't know.

24   Q.  Did you recognize that intent was an element that was

25   important to meet at trial?

1    A.  Yes.

2    Q.  Okay.  And so when you talked with Officer Goodman and

3    even officers generally, you recognize that evidence --

4    there's evidence of intent --

5              THE COURT:  Sorry.  I got confused between those

6    two answers.  You said you did know that intent was --

7              THE WITNESS:  I knew there was intent to the

8    charges.  This wasn't -- it's not something I learned while

9    talking to Officer Goodman or right before then.

10             MR. OHM:  I'm sorry.  I thought I had asked you if

11   intent was an important element.  You said you didn't know.

12   Then I asked you if intent was an element.  And you said

13   yes, you knew that.

14             THE WITNESS:  Yes.  I did.

15             THE COURT:  So, yes, you knew it was an element?

16   No, you did not know it was an important element?

17             THE WITNESS:  I didn't know if it was any more

18   important than any other element.

19             THE COURT:  I see.  Thanks.

20   BY MR. OHM:

21   Q.  Did you know that elements are important?

22             MS. REED:  Your Honor, I'm going to object to this

23   question.

24             THE COURT:  Overruled.

25             THE WITNESS:  Yes.

```
 1    BY MR. OHM:

 2    Q.  And so as an agent, you know that there are different

 3    kinds of evidence that -- different kinds of evidence of

 4    intent.  Right?

 5    A.  Different kinds to every charge.  I guess there is, yes.

 6    Q.  So one example of evidence of intent is a person's

 7    statement.  Right?

 8    A.  Yes.

 9    Q.  As a lead agent, did you review Mr. Kevin Seefried's

10    statement in this case to the FBI?

11    A.  The interviews, yes.

12    Q.  And then you also know that statements made during the

13    course of a potential crime are also important to intent.

14    Right?

15    A.  Yes.

16    Q.  So when you -- knowing all this, the first time that you

17    met with Officer Goodman was on May 6, 2022.  Right?

18    A.  I don't recall the exact date.  But approximately, yes.

19    Q.  Would the 302 help refresh your recollection as to when

20    your meeting with Officer Goodman was?

21    A.  Yes.

22              MR. OHM:  May I approach, your Honor?

23              THE COURT:  You may.

24              MR. OHM:  I'm going to mark this as Defense 3.

25
```

 1    BY MR. OHM:

 2    Q.  (Tenders document to the witness.)

 3    A.  On March 6 -- or May 6.  Yes.

 4    Q.  It was drafted on May 6, but it was also conducted on

 5    May 6.  Right?

 6    A.  Yes.

 7    Q.  So in this meeting -- and do you remember who was

 8    present for that meeting?

 9    A.  Myself and a representative from the U.S. Attorney's

10    Office.

11    Q.  And who are they?

12    A.  It was either the Attorney Brittany Reed or Benet

13    Kearney or both.

14    Q.  Would looking at your notes from that day refresh your

15    recollection?

16    A.  Yes.

17            MR. OHM:  May I approach again, your Honor?

18            THE COURT:  You may.

19    BY MR. OHM:

20    Q.  I'm going to show you Defense 4.  Whose handwriting is

21    that?

22    A.  That's my handwriting.

23    Q.  Does that refresh your recollection as to who was

24    present for that meeting?

25    A.  Yes.

1    Q.  Who is that?

2    A.  U.S. attorney -- Assistant U.S. Attorney Brittany Reed,

3    Benet Kearney, Cindy Cho and Troy Edwards.

4    Q.  Who is Troy Edwards?

5    A.  I do not know, sir.

6    Q.  And do you know who Cindy Cho is?

7    A.  I just know that she was an attorney.

8    Q.  Now -- and she was an attorney on the prosecution side,

9    just to be clear.  Right?

10   A.  Not to the Seefrieds' case.  That's what I'm aware of.

11   Q.  Well, nobody from the defense side was present for this

12   May 6 meeting.  Right?

13   A.  No, sir.

14   Q.  Okay.  And so when you are preparing for -- Officer

15   Goodman for trial for an obstruction of justice count, do

16   you remember specifically what questions you asked him?

17   A.  I believe I asked very few.  The questions came from the

18   U.S. Attorney's Office.

19   Q.  So Ms. Kearney and Ms. Reed were the ones who were

20   mostly asking the questions?

21   A.  Yes, sir.

22   Q.  And it's fair to conclude that Ms. Kearney and Ms. Reed,

23   from your interactions with them, knew what the law for

24   obstruction of justice was.  Right?

25   A.  Yes.

1    Q.  And in this conversation, it sounds like you were taking

2    these handwritten notes?

3    A.  Yes.

4    Q.  And then after that, you wrote up a 302 based on those

5    notes?

6    A.  Yes.

7    Q.  And you wrote that on the same day, when your memory was

8    fresh.  Right?

9    A.  Yes.

10   Q.  Now, Mr. Seefried was asked questions -- I'm sorry --

11   Officer Goodman was asked questions about statements

12   regarding Mr. Seefried's intent.  Right?

13   A.  I believe so.  Yes.

14   Q.  And you were present for Officer Goodman's testimony

15   yesterday.  Right?

16   A.  Yes.

17   Q.  And you heard Officer Goodman say things that he heard

18   from the crowd generally and then also from Mr. Seefried

19   specifically.  Right?

20   A.  Yes.

21   Q.  Yesterday, he said -- Officer Goodman said that he gave

22   commands to Mr. Seefried specifically like "Get out," "You

23   need to leave" and "Back up."  Right?

24   A.  Yes.  Along those lines.

25   Q.  Back on May 22nd, when Officer Goodman described those

1     interactions, he actually attributed that to the crowd

2     generally.  Right?

3     A.  Yes.

4     Q.  And yesterday, Officer Goodman attributed statements

5     such as "Where are the members?" to Mr. Seefried.  Right?

6     A.  Yes.

7     Q.  When he spoke to you back in May 2022 and the

8     prosecution team, he attributed those kinds of statements to

9     the crowd generally.  Right?

10    A.  Yes.  I'm not sure if he didn't say it the other way as

11    well.  I'd have to read the 302, though.

12    Q.  Would you like to see the 302?

13    A.  Please.

14    Q.  Certainly.

15               (Tenders document to the witness.)

16               MR. OHM:  Sorry, your Honor.  May I approach

17    again?

18               THE COURT:  You may.

19               THE WITNESS:  Thank you.

20               THE COURT:  And you don't need to ask again.

21               MR. OHM:  Thank you.

22    BY MR. OHM:

23    Q.  So nowhere in the 302 did you report that Officer

24    Goodman said that Mr. Seefried mentioned anything about the

25    vote count or the congressmen in particular, right, or

1    congresspeople in particular?

2    A.  That's correct.

3    Q.  And you would have written that down because you knew

4    that that was important.  Right?

5    A.  Had I heard that, I would have recalled that and wrote

6    that down.  Yes.

7    Q.  And there was another point where in your interview with

8    Officer Goodman he attributed the "Where are they?"

9    statement to the man with the face paint.  Right?

10   A.  Yes.

11   Q.  And that man with the face paint is the shaman.  Right?

12   A.  Yes.

13   Q.  Also, Officer Goodman never said anything about

14   Mr. Seefried saying, "'F' you; I'm not leaving."  Right?

15   A.  To the best of my knowledge, he did not.

16   Q.  And the best of your knowledge includes your

17   contemporaneous notes and the 302 that you wrote shortly

18   after the meeting.  Right?

19   A.  Yes.

20   Q.  Officer Goodman also testified yesterday that he heard

21   the crowd say something like, "You'll have to shoot us to

22   stop us."  Right?

23   A.  Yes.

24   Q.  And he attributed that to the crowd when he testified

25   yesterday.  Right?

1   A.  I don't recall.

2   Q.  Well, when he spoke to you back in May 22, Officer

3   Goodman actually said that Mr. Seefried said, "You'll have

4   to shoot us to stop us."  Right?

5   A.  I don't recall that either.

6   Q.  I'll show you your notes.  I'm approaching once again

7   with Defense 4.  I'm going to direct you to right here.

8   A.  Yes.

9   Q.  So -- and then you also saw that in the statement of the

10  FBI that Mr. Seefried said that that's what he said.  Right?

11  A.  Yes.

12  Q.  But yesterday, Officer Goodman was -- had attributed

13  that comment to the crowd generally and didn't remember

14  accurately what -- who had made that statement.  Right?

15  A.  I don't exactly recall what he said yesterday.

16  Q.  So the -- and then you said that there was one

17  additional meeting that you had with Officer Goodman this

18  past weekend?

19  A.  Yes.

20  Q.  Was that in person?

21  A.  Yes.

22  Q.  All right.  And you didn't write a 302 for that meeting.

23  Right?

24  A.  I did not.

25  Q.  You write a 302 generally when something new or

1    something material is reported.  Right?

2    A.  Yes.  In almost every interview that we do.  Yes.

3    Q.  And this being -- well, nothing new or material having

4    come up in your conversations with Officer Goodman this past

5    weekend, you didn't write a new 302.  Right?

6    A.  I have not been to the office to write a 302.

7    Q.  There was no discussion between you and the other

8    attorneys about:  Wow, there's this new evidence here that

9    Officer Goodman is saying that is inconsistent with past

10   statements, so we need to make sure the defense knows?  You

11   weren't part of any conversations like that.  Right?

12   A.  I wasn't part of the conversations.  I also left during

13   the interview.

14   Q.  But as you have previously testified, there's nothing in

15   your recollection that Officer Goodman had previously said

16   that Kevin Seefried said that he was there to interrupt the

17   vote count or looking for congresspeople in particular.

18   Right?

19   A.  Yes.

20             MR. OHM:  Nothing further, your Honor.

21             THE COURT:  Thank you, Mr. Ohm.

22             Mr. Bostic?

23             MR. BOSTIC:  No questions, your Honor.

24             THE COURT:  Ms. Reed?

25             MS. REED:  Briefly, your Honor.

```
1                        CROSS-EXAMINATION
2    BY MS. REED:
3    Q.  Agent, can you explain how many times you've actually
4    participated in interviews with Mr. Goodman?
5    A.  How many times?
6    Q.  Yes.
7    A.  Two or three times.  Yes.
8    Q.  And during those two or three times, were you sort of
9    taking the lead of asking him questions or were those
10   questions sort of coming from myself and Ms. Kearney and
11   other AUSAs who were conducting this investigation?
12   A.  They were coming from the other attorneys.
13   Q.  You testified that you were not at the entirety of the
14   interview with Mr. Goodman on Sunday.  Correct?
15   A.  Yes.
16   Q.  As it relates to statements that were attributed to
17   Mr. Seefried, was he consistent specifically with the
18   statement that Mr. Seefried made about threatening to shoot
19   him to get into the Capitol?
20            THE COURT:  Why don't we specify Kevin Seefried.
21   BY MS. REED:
22   Q.  Kevin Seefried?
23   A.  Yes.
24   Q.  He told you that Kevin Seefried threatened him.
25   Correct?
```

```
 1              MR. OHM:  Objection to the term "threatened."  I
 2    don't believe that's...
 3    BY MS. REED:
 4    Q.  I'm sorry.  Said that he would "have to shoot me to keep
 5    me out of here."  Do you recall that line of questioning?
 6    A.  Yes.
 7    Q.  And was he consistent in his testimony when he testified
 8    on the stand?
 9    A.  Yes.
10    Q.  Did you ask or were you present during the interview
11    when he talked to you about his actual physical encounter
12    with Kevin Seefried?
13    A.  Could you repeat that?  Sorry.
14    Q.  What did he tell you about this movement, this joisting
15    movement that --
16    A.  The jabbing movement.
17    Q.  -- Kevin Seefried made towards him?
18    A.  Yes.  The jabbing movement.
19    Q.  Was he consistent that that was Kevin Seefried?
20    A.  Yes.
21    Q.  At any point in your communications or conversations,
22    your meetings with Officer Goodman, did you show him
23    pictures and ask him what each person either said and/or
24    did?
25    A.  Not each person.  No.
```

1    Q.  Were you present at every meeting when either

2    Ms. Kearney or myself or other AUSAs were showing him

3    pictures of individuals in the crowd when they were -- of

4    other individuals in the crowd?

5    A.  No, I was not.

6              MS. REED:  No further questions, your Honor.

7              THE COURT:  Thank you, Ms. Reed.

8              Any redirect, Mr. Ohm?

9              MR. OHM:  Very, very briefly.

10                    REDIRECT EXAMINATION

11   BY MR. OHM:

12   Q.  As the lead agent in this case, did the assistant U.S.

13   attorneys assigned to this case ever tell you that

14   Mr. Seefried -- or that Officer Goodman had reported that

15   Mr. Seefried said that he was looking for congressmen or

16   looking to obstruct the vote?

17   A.  No.

18              MR. OHM:  Nothing further.

19              THE COURT:  Thank you, Agent Dinkel.  You may step

20   down.

21              THE WITNESS:  Thank you, your Honor.

22              (Witness excused.)

23              THE COURT:  Mr. Ohm, do you have any further

24   evidence?

25              MR. OHM:  Your Honor, our next witness is a

```
1    Capitol Police officer that we have never met.  I guess I
2    would ask if Officer Kiely is in the building.
3              MS. REED:  He was in the hallway.  We saw him at
4    9:00 this morning.  I can check and see if he's out there.
5              MS. MULLIN:  Your Honor, may I step into the
6    hallway?
7              THE COURT:  You may.
8              MS. MULLIN:  Your Honor, Kevin Seefried calls
9    Sergeant Brendan Kiely.
10             THE COURT:  Good afternoon, Sergeant.
11             THE WITNESS:  Good afternoon, sir.
12             THE COURT:  Just remain standing right over there
13   for a moment.
14             THE WITNESS:  Yes, sir.
15        BRANDON MICHAEL KIELY, DEFENSE WITNESS, SWORN.
16                         DIRECT EXAMINATION
17   BY MS. MULLIN:
18   Q.  Good afternoon, Sergeant Kiely.  Just by way of
19   introduction, my name is Elizabeth Mullin.  I represent
20   Kevin Seefried in the case of United States versus Kevin
21   Seefried.
22             I just had a few questions --
23             THE COURT REPORTER:  Could I get the witness's
24   full name and the spelling, please?
25   BY MS. MULLIN:
```

1   Q.  Could you please state your name and spell it for the

2   record?

3   A.  My name is Brandon Michael Kiely.  The last name's

4   spelled K-I-E-L-Y.

5   Q.  Sergeant Kiely, I just have a few questions for you

6   about your participation and your role in the events of

7   January 6 at the United States Capitol.

8   A.  Okay.

9   Q.  First of all, how are you employed?

10  A.  I'm currently a sergeant with the United States Capitol

11  Police.

12  Q.  And were you working January 6, 2021?

13  A.  Yes.

14  Q.  Where were you working?

15  A.  At the time, I was a police officer assigned to the

16  first responders' unit with the Capitol Police.

17  Q.  At some point did you -- were you called to respond to

18  the Capitol?

19  A.  I wasn't called to respond; I responded in myself.

20  Q.  Approximately what time?

21  A.  I believe I responded in probably around 1300, 1:00 in

22  the afternoon, give or take.

23  Q.  I want to direct your attention to a relatively brief

24  time during that day after you responded at 1:00 p.m.  Okay?

25  A.  Okay.

1    Q.  Do you recall responding to the Ohio Clock Corridor as

2    it's called?

3    A.  Yes.

4    Q.  I'm going to show you what's been marked as Government's

5    Exhibit 401 and previously admitted.  This is at

6    approximately 11:33 minutes into the compilation.

7              (Whereupon, segments of Government's Exhibit No.

8    401 were published in open court.)

9    BY MS. MULLIN:

10   Q.  Do you recall being here in the Ohio Clock Corridor --

11   first of all, is this the Ohio Clock Corridor?

12   A.  Yes.

13   Q.  Now, do you recall being in the corridor at

14   approximately 2:00 to 2:17 p.m.?

15   A.  I wasn't keeping track of time.  But if that's what the

16   security camera footage showed, then yes.

17   Q.  Do you recall -- well, first of all, how did you come to

18   go to the Ohio Clock Corridor?

19   A.  Originally, I was making my way towards the west front

20   of the Capitol; and then I heard Officer Goodman's radio run

21   of rioters approaching the Senate floor, so I changed my

22   direction and went from the west front to the Ohio Clock

23   Corridor area outside the Senate chambers.

24   Q.  And do you recall what time it was that you responded to

25   Officer Goodman's call for backup at the Ohio Clock

 1    Corridor?

 2    A.  No, I do not.  I wasn't paying attention to the time, my

 3    watch, anything like that.

 4    Q.  Does this depiction on the screen of police officers and

 5    protesters at the Ohio Clock Corridor -- is that consistent

 6    with what your recollection is of what you saw in the Ohio

 7    Clock Corridor on January 6, 2021?

 8    A.  Yes.  When I first arrived on the scene, yes.

 9    Q.  Do you see yourself in that group of officers there?

10    A.  No.  I don't see myself in this image.

11             MS. MULLIN:  Do you want to fast-forward it?

12             (Whereupon, segments of Government's Exhibit No.

13    401 were published in open court.)

14    BY MS. MULLIN:

15    Q.  Do you see there's protesters there that are sort of

16    standing there next to the officers?  Do you recall seeing

17    those civilian protesters?

18    A.  Yes.  I do remember seeing protesters next to the

19    officers.

20    Q.  And do you recall these individuals in particular?

21    A.  Several of them stand out to me.  But as to each

22    individual person that was up there, no.

23    Q.  Do you recall seeing this gentleman over here?  He's

24    sort of standing over to the side in the tan vest with the

25    Confederate flag.

```
 1    A.  Yes.
 2    Q.  And how long did you -- how long were you in the same
 3    corridor as the gentleman with the tan vest and the
 4    Confederate flag?
 5    A.  Honestly, I can't tell you how long I was in there.  It
 6    could have been between 20 minutes.  It could have been four
 7    hours, for all I know.  Time was not something that I was
 8    keeping track of.
 9    Q.  Was it a pretty chaotic scene?
10    A.  Yes.
11    Q.  Now, backing up, did you respond immediately after you
12    received Officer Goodman's call to go to the Ohio Clock
13    Corridor?
14    A.  Yes.
15    Q.  And about how soon after you received the call did you
16    arrive?
17    A.  From where I was running through the Rotunda, probably
18    less than a minute.
19    Q.  Less than a minute.
20          Then did you stay in the corridor with Officer
21    Goodman and other officers until the crowd left?
22    A.  We stayed in the Ohio Clock Corridor until another group
23    of protesters overwhelmed us from the hallway leading from
24    the Rotunda.
25    Q.  Did you -- where did you go after you left the Ohio
```

1    Clock Corridor?

2    A.  After the Ohio Clock Corridor, myself and several other

3    officers went upstairs to the third floor to the Senate

4    galleries area to start looking for congressional staff.

5    They were still in the building.

6    Q.  And did you -- so you said you don't remember how long

7    you were in the corridor?

8    A.  No.

9    Q.  But you do remember this gentleman here in the tan vest

10   and the Confederate battle flag?

11   A.  Yes.

12   Q.  And do you recall him being hostile or violent during

13   the time that you were in the Ohio Clock Corridor?

14   A.  At the time I was in the Ohio Clock Corridor, the

15   individual seemed calm.

16   Q.  When you were in the Ohio Clock Corridor, where were you

17   positioned vis-à-vis Officer Goodman?

18   A.  When I first arrived, I was probably in the

19   one-and-a-half-to the second row of officers.  Officer

20   Goodman was right in front of me.  And a couple times he

21   would come up immediately to my left.  I was more or less

22   like the second row of officers.

23   Q.  So were you directly behind Officer Goodman?

24   A.  I constantly shifted -- we constantly shifted and moved

25   our position while in the Ohio Clock Corridor.  So at one

1   point I was next to him and at another point I was directly

2   behind him.

3   Q.  Would you say you were in close proximity to Officer

4   Goodman and the other officers while you were in the Ohio

5   Clock Corridor?

6   A.  Yes.

7   Q.  Is this a pretty small space, relatively narrow space

8   there?

9   A.  It's about an average -- it's probably maybe the same

10  width of the hallways out here in the courthouse.

11  Q.  How many officers were there?

12  A.  That I don't know.  I wasn't counting officer heads.

13  Probably about a dozen of us.

14  Q.  And would you say -- were you always within a foot or

15  two feet of Officer Goodman when you were in the Ohio Clock

16  Corridor?

17  A.  The entire time, no.  I can't say I was within the

18  immediate foot, foot and a half of him the entire time.

19  Q.  You can or you can't?

20  A.  I can't.  No.

21  Q.  Would you say that you ever got more than, say, 10 feet

22  away?

23  A.  It's possible.  Yes.

24  Q.  And would you say that -- did you ever leave the Ohio

25  Clock Corridor during the time that Officer Goodman and the

1    other officers were there?

2    A.  No.

3    Q.  Now, just going back to the gentleman in the tan vest

4    and the Confederate battle flag, what made you remember him?

5    A.  I remember him because -- because he had a flag in his

6    hands.  So at the time when I arrived on scene, I was

7    scanning the crowd, looking for individuals that had weapons

8    or items that could potentially be used as weapons against

9    us.

10    Q.  Did you see him do anything with the flag?

11    A.  No.

12    Q.  Did you see him say -- did you hear him say or do

13    anything threatening or violent?

14    A.  No.

15    Q.  And I think you said he was calm.  Right?

16    A.  Yes.

17    Q.  Was he calm throughout the time that you were in the

18    Ohio Clock Corridor and able to observe him?

19    A.  From what I was able to observe, yes.

20              MS. MULLIN:  Thank you.

21              THE COURT:  This is a good point for us to take

22    our lunch break.  Why don't we come back at 1:30.

23              Sergeant Kiely, I'll ask you not to discuss the

24    substance of your testimony with anyone during the lunch

25    break.

Kiely - DIRECT - By Ms. Mullin

1              THE WITNESS:  Okay.

2              THE COURT:  Thanks, folks.

3              Defense counsel, I guess I'll just remind you I'll

4     need to inquire of your clients if they're not testifying.

5     So just be prepared for that.

6              MR. OHM:  Yes, your Honor.

7              THE COURT:  Thank you.

8              (Thereupon, a luncheon recess was taken, after

9     which the following proceedings were had:)

10             THE COURT:  Mr. Bostic, I believe you're up.

11             MR. BOSTIC:  I have no questions, your Honor.

12             THE COURT:  Ms. Reed?  Or Ms. Kearney.

13             MS. KEARNEY:  Thank you, your Honor.

14             THE COURT:  Officer Kiely, I'll remind you you're

15    still under oath.

16             THE WITNESS:  Yes, sir.

17                         CROSS-EXAMINATION

18    BY MS. KEARNEY:

19    Q.  Good afternoon, Sergeant Kiely.

20    A.  Good afternoon.

21    Q.  Ms. Mullin on direct examination asked you some

22    questions about the time when you were in the Ohio Clock

23    Corridor.

24             Do you remember that?

25    A.  Yes.

```
 1    Q.  When you arrived in the Ohio Clock Corridor, the rioters
 2    had already entered that space.  Is that right?
 3    A.  Yes.
 4    Q.  And the atmosphere there when you entered, it was loud.
 5    Right?
 6    A.  Yes.
 7    Q.  It was chaotic?
 8    A.  Yes.
 9    Q.  The officers were outnumbered.  Fair to say?
10    A.  Yes.
11    Q.  And your primary concern at that time was safety.  Is
12    that correct?
13    A.  Yes.
14    Q.  Both your safety?
15    A.  Yes.
16    Q.  Safety of your fellow officers?
17    A.  Yes.
18    Q.  And the safety of the people who work in the Capitol
19    Building.  Is that correct?
20    A.  Yes.
21    Q.  So that includes senators.  Right?
22    A.  Yes.
23    Q.  Congress members.  Right?
24    A.  Yes.
25    Q.  And their staffs?
```

```
 1    A.  Yes.

 2    Q.  And various other folks who work there.  Right?

 3    A.  Yes.

 4    Q.  So when the rioters entered the Ohio Clock Corridor and

 5    you see them in the Ohio Clock Corridor, you're scanning for

 6    safety purposes.  Right?

 7    A.  Yes.

 8    Q.  You're looking for weapons.  Right?

 9    A.  Yes.

10    Q.  You're looking for where their hands are.  Right?

11    A.  Yes.

12    Q.  You're looking for if they're reaching for something.

13    Right?

14    A.  Yes.

15    Q.  And so is it fair to say having a conversation with

16    these individuals is not your primary concern?

17    A.  No.

18              MS. KEARNEY:  Mr. Leach, can we pull up

19    Government's Exhibit 511, please.

20    BY MS. KEARNEY:

21    Q.  This is a picture from the Ohio Clock Corridor.  Right?

22    A.  Yes.

23    Q.  And you remember seeing these folks in there.  Right?

24    A.  Yes.

25    Q.  So, for example, you remember seeing this man with the
```

Kiely - CROSS - By Ms. Kearney

 1    face paint and the headdress?

 2    A.  Yes.

 3    Q.  Do you remember him making any specific statements?

 4    A.  Yes, I do.

 5    Q.  Do you remember him yelling things like "Freedom"?

 6    A.  Yes.

 7    Q.  Do you remember him yelling things like "This is our

 8    House"?

 9    A.  Yes.

10    Q.  And what about things like "We want to speak with

11    members of Congress"?

12    A.  Yes.

13    Q.  This man, he's got a bullhorn.  Right?

14    A.  Yes.

15    Q.  And at times, he was using that in the Ohio Clock

16    Corridor?

17    A.  Yes.  Frequently.

18    Q.  So you said it was loud in there.  You could hear him

19    over the noise in the Ohio Clock Corridor.  Is that right?

20    A.  Yes.

21           MS. KEARNEY:  Mr. Leach, could you pull up

22    Government's Exhibit 514.

23    BY MS. KEARNEY:

24    Q.  I wanted to ask you about a couple folks in these

25    pictures, too.

```
 1              There's a man on the left-hand side.  He's wearing
 2   a camouflage Trump hat and a blue face mask.  Do you
 3   remember seeing him in the Ohio Clock Corridor?
 4   A.  Yes, I do.
 5   Q.  Fair to say he was aggressive?
 6   A.  Yes.
 7   Q.  He was using profanity?
 8   A.  Yes.
 9   Q.  He was trying to get up in the faces of officers?
10   A.  Yes.
11   Q.  Very agitated.  Fair to say?
12   A.  Yes.
13   Q.  Was that a concern to you?
14   A.  Yes, it was.
15   Q.  There's a man to his left, our right.  He's in a tan
16   vest, holding the flag.  I think you said on direct you
17   remember seeing him in the Ohio Clock Corridor.  Right?
18   A.  Yes.
19   Q.  You said he didn't strike you as overly hostile?
20   A.  No.
21   Q.  Was he animated?
22   A.  Not to my recollection.
23   Q.  Was he trying to engage with officers in the line --
24   A.  Yes.
25   Q.  -- in conversation?
```

```
 1    A.  Yes.
 2    Q.  And in fact, it seemed to you that he had something he
 3    wanted to say.  Right?
 4    A.  Yes.
 5    Q.  He had a message he wanted to get out?
 6    A.  Yes.
 7    Q.  He had some concerns that he wanted addressed?
 8    A.  Yes.
 9    Q.  And in the time you spent in the Ohio Clock Corridor, he
10    was moving about, milling around.  Right?
11    A.  Yes.
12    Q.  Sometimes he would engage with officers.  Right?
13    A.  Yes.
14    Q.  And sometimes he wouldn't.  He would retreat into the
15    background?
16    A.  Yes.
17    Q.  Let's talk about the man two people to his left, our
18    right, in the black baseball cap with the tan brim.  You
19    remember seeing him there, too.  Right?
20    A.  Yes.
21    Q.  And I think you also said he didn't strike you as
22    aggressive in comparison to the rest of the rioters.  Fair
23    to say?
24    A.  Yes.
25    Q.  Was he also moving around the Ohio Clock Corridor?
```

1   A.  Yes.

2   Q.  Was he also trying to engage in conversation with the

3   officers on the line?

4   A.  Yes.

5   Q.  And did he also appear animated about that?

6   A.  Yes.

7   Q.  Did it seem that he had some concerns he wanted

8   addressed?

9   A.  Yes.

10  Q.  Did it appear that he had something he wanted to say?

11  A.  Yes.

12  Q.  Now let's talk about some statements that you heard from

13  the crowd generally.

14          Did you hear statements such as "Where are the

15  senators?"

16  A.  Yes, I did.

17  Q.  Did you hear statements such as "This is our House"?

18  A.  Yes.

19  Q.  What about "We want to speak to members of Congress"?

20  A.  Yes.

21  Q.  Did there come a time when certain of the rioters

22  attempted to negotiate with Capitol Police officers?

23  A.  Yes.

24  Q.  And in fact, did some of them offer to leave if you

25  would let them speak with members of Congress?

```
 1   A.  Yes.

 2   Q.  I want to focus back on two of the individuals I asked

 3   you about, the man in the tan vest and the man in the black

 4   cap with the tan brim.

 5            At either point, did any of these guys ever say to

 6   you or near you, "We're here about the vaccine mandate"?

 7   A.  No, not to my recollection.

 8   Q.  Did they ever say, "These guys don't represent us"?

 9   A.  No.  I don't remember.

10            MS. KEARNEY:  No further questions.

11            THE COURT:  Ms. Mullin, any redirect?

12                      REDIRECT EXAMINATION

13   BY MS. MULLIN:

14   Q.  So just to be clear, you don't remember anything

15   specific that the man in the tan vest said.  Right?

16   A.  No, I don't.

17   Q.  You don't remember anything specific?

18   A.  No.

19   Q.  But you were able to recall specific things that other

20   people said?

21   A.  Yes.

22   Q.  But not him?

23   A.  No.

24            MS. MULLIN:  That's all I have, your Honor.  Thank

25   you.
```

```
 1                    MR. BOSTIC:  Your Honor, may I ask one question?

 2                    THE COURT:  Yes.

 3                              CROSS-EXAMINATION

 4      BY MR. BOSTIC:

 5      Q.  Officer, with respect to the young man in the tan and

 6      black hat, would it be fair to say your attention wasn't

 7      directed at him because he wasn't animated?

 8      A.  It was scanning the crowd throughout.

 9      Q.  You were scanning the crowd throughout.  Right?

10      A.  Yes.

11      Q.  But you didn't see him behave in a way, as you say,

12      animated, as others might have.  Right?

13      A.  No.

14                    MR. BOSTIC:  Thank you.

15                    THE COURT:  Thank you, Sergeant Kiely.  You may

16      step down.  You're free to leave.  Thank you for your

17      presence here today.

18                    THE WITNESS:  Thank you.

19                    (Witness excused.)

20                    THE COURT:  Mr. Ohm, anything further for --

21                    MR. OHM:  Yes, your Honor.  The defense calls

22      Anastasia Cuff.

23                    (Thereupon, the witness entered the courtroom and

24      the following proceedings were had:)

25                    THE COURT:  Good afternoon, ma'am.
```

```
 1                THE WITNESS:  Good afternoon.

 2                 ANASTASIA CUFF, DEFENSE WITNESS, SWORN.

 3                THE WITNESS:  Can I take my mask off?

 4                THE COURT:  Please do.  Yes.  Thank you.

 5                      DIRECT EXAMINATION

 6    BY MR. OHM:

 7    Q.  Hi.  Good afternoon.

 8    A.  Hello.

 9    Q.  Could you please state your name and spell it for the

10    court reporter.

11    A.  Anastasia Cuff, A-N-A-S-T-A-S-I-A C-U-F-F.

12    Q.  Ms. Cuff, where are you from?

13    A.  Delmar, Delaware.

14    Q.  And what do you do for a living?

15    A.  Parts coordinator at a body shop.

16    Q.  And are you familiar with a man named Kevin Seefried?

17    A.  Yes, sir.

18    Q.  Do you see him in the courtroom today?

19    A.  Yes, sir.

20    Q.  Could you just describe him or point to him?

21    A.  Yes.

22                MR. OHM:  Your Honor, if the record could reflect

23    an in-court identification.

24                THE COURT:  It will.

25
```

```
 1    BY MR. OHM:

 2    Q.  How long have you known Mr. Kevin Seefried?

 3    A.  About eight years.

 4    Q.  And how do you know him?

 5    A.  He's a good man, hardworking, loyal.

 6    Q.  I'm sorry.  How -- like in what manner --

 7    A.  I apologize.  I dated his son.

 8    Q.  And who is his son?

 9    A.  Hunter Seefried.

10    Q.  And knowing Kevin Seefried, do you know him to be part

11    of any extremist organizations, like QAnon, Proud Boys, Oath

12    Keepers?

13    A.  No, sir.

14    Q.  Would you over the last eight years say that you've

15    interacted with him much?

16    A.  Yes, sir.

17    Q.  Do you know him as a person that used racial epithets?

18    A.  No, sir.

19    Q.  Do you know him to get along with people of color?

20    A.  Yes, sir.

21    Q.  Have you seen him interact with people of color?

22    A.  I have.

23    Q.  And, like, can you give any examples?

24    A.  His grandson.

25    Q.  Okay.  What's your impression of his relationship with
```

1    his grandson?

2    A.  He loves his grandfather.

3    Q.  Does he spend a lot of time with his grandson?

4    A.  He does.

5    Q.  About how often?  Do you know?

6    A.  About every other weekend they get him.

7    Q.  Now, do you remember the events of January 6, 2021?

8    A.  Yes, sir.

9    Q.  Can we talk about that a little bit specifically?

10   A.  Sure.

11   Q.  Did you end up going with the Seefrieds to Washington,

12   D.C., on January 6, 2021?

13   A.  Yes, sir.

14   Q.  And when did you hear about -- when did you first hear

15   about plans to go to Washington, D.C.?

16   A.  A few days before.

17   Q.  And what was -- was there an agreement for you to -- how

18   did that all happen?

19   A.  Yes, sir.  We had kind of just all agreed that we're

20   going to go and watch Trump's speech.

21   Q.  And it sounds like you were about to -- you answered

22   this question already.  But what was the purpose of that

23   trip?

24   A.  To watch Trump's speech.

25   Q.  And when did you leave to go to Washington, D.C.?

1    A.   That morning.

2    Q.   And how did you get there?

3    A.   Stephanie's car.

4    Q.   Now, on the lead-up to the trip, did either -- did Kevin

5    Seefried ever talk to you about why they wanted to go to

6    Washington, D.C.?

7    A.   The only thing I knew we were going for was to watch

8    Trump's speech.

9    Q.   Did they talk to you about January 6 being a meaningful

10   date in terms of a certification of votes?

11   A.   No, sir.

12   Q.   How can you be so sure?

13   A.   We never spoke about it.   We only talked about going to

14   watch Trump's speech.

15   Q.   When you went to Washington, D.C., on January 6, did you

16   know that there was supposed to be a certification of the

17   electoral votes on that day?

18   A.   No, sir.

19   Q.   And you said that you were all in the car together

20   coming here?

21   A.   Yes, sir.

22   Q.   How long was that drive?

23   A.   About two hours.

24   Q.   And in that drive, was there any conversation about the

25   certification of electoral votes or what was going on at the

1    U.S. Capitol?

2    A.  No, sir.

3    Q.  Was there any conversation about going to the U.S.

4    Capitol at all?

5    A.  No, sir.

6    Q.  Now, did you end up parking -- well, where did you end

7    up parking when you all got here?

8    A.  The Capitol parking lot.

9    Q.  Now, you had mentioned Stephanie's car.  Who is

10   Stephanie?

11   A.  Hunter's mom, Kevin's wife.

12   Q.  And I'll show you what I'll mark as -- I'm just going to

13   call it Defense 5, I think.

14            MR. OHM:  Am I correct?

15            THE COURT:  You haven't hit 5 yet.  I'm not sure

16   that you hit 4 either, but 5 is 5.

17            MR. OHM:  I have a feeling your Honor knows, so

18   I'm going to call it Defendant's 4.  If I may show this.

19   This is a still, your Honor, that's going to come in as part

20   of the video that is stipulated to be admitted, one of the

21   CCTV Capitol videos.  So I guess I'd like to just move them

22   in.

23            MS. REED:  No objection, your Honor.

24            THE COURT:  Without objection, Defense 4 is in.

25            (Whereupon, Defendant's Exhibit No. 4 was entered

```
 1   into evidence.)

 2   BY MR. OHM:

 3   Q.  I'm showing you a still from a videocamera.  Does that

 4   look familiar to you at all?

 5   A.  Yes, sir.

 6   Q.  Where is that?

 7   A.  The parking lot we parked in.

 8   Q.  And do you see -- I'm going to try and blow it up for

 9   you a little bit.  Do you see the car that you came in?

10   A.  Yes, sir.  On the left.

11   Q.  Do you mind -- I think it's actually a touch screen up

12   there.  Do you mind pointing at the car or circling it?

13   A.  (Witness complies.)

14           MR. OHM:  Your Honor can see that?

15           THE COURT:  Yes.

16           MR. OHM:  Great.

17   BY MR. OHM:

18   Q.  So that is the car that you came in with Mr. Kevin

19   Seefried and Mr. Hunter Seefried and Ms. Stephanie Seefried?

20   A.  Yes, sir.

21   Q.  Do you remember when it was that you parked there?

22   A.  The morning.  I don't remember the time.

23   Q.  And was there a specific reason that you parked at the

24   Capitol parking lot?

25   A.  No, sir.
```

```
 1    Q.  Could you tell how familiar the Seefrieds were with the
 2    Washington, D.C., area in terms of where things were?
 3    A.  Not familiar at all to my knowledge.  That's why we
 4    parked where we found parking.
 5    Q.  And was that actually kind of far from where you were
 6    trying to go?
 7    A.  Not too far.  No, sir.
 8    Q.  But was that the closest place you could find parking?
 9    A.  Yes, sir.
10    Q.  So did you actually get to the speech?
11    A.  Yes, sir.
12    Q.  And did you get there before the speech had begun?
13    A.  Yes, sir.
14    Q.  And how good were your seats?  Let's put it that way.
15    A.  We were far in the back.  There was a lot of people
16    there.
17    Q.  Would you say you could hear everything that was being
18    said?
19    A.  Not really.  No, sir.
20    Q.  But how long did you feel like you stayed?
21    A.  We stayed there a while.  Until Trump was just about
22    done speaking.
23    Q.  Why was it that you decided to leave?
24    A.  We were hungry.  We went to go get food.
25    Q.  So did you decide to go get food?
```

1    A.  Yes, sir.

2    Q.  Was that sort of like a group decision between the four

3    of you?

4    A.  Yes, sir.

5    Q.  When there was a conversation about getting food, was

6    there anything that Mr. Kevin Seefried or Mr. Hunter

7    Seefried said about hurrying up because you needed to get to

8    the Capitol?

9    A.  No, sir.

10   Q.  Was there any conversation about the electoral count?

11   A.  No, sir.

12   Q.  During the course of the speeches, did you ever hear

13   Mr. Kevin Seefried say, "Hey, did you hear what that person

14   said?  We need to get over to the Capitol and stop this

15   count"?

16   A.  No, sir.

17   Q.  Anything remotely like that?

18   A.  No, sir.

19   Q.  Did you end up going to get food?

20   A.  Yes, sir.

21   Q.  Now, once you decided to leave to go get food, did you

22   end up going closer or farther away from where the speakers

23   were?

24   A.  Farther away.  We went down by the Capitol.  There was

25   food trucks parked there.

1   Q.  And were you able to hear President Trump speaking

2   during that -- well, during the time that he spoke?

3   A.  A little bit.  Not much.  We were so far back it was

4   hard to hear.

5   Q.  Was there a point in time where you could hear a little

6   bit better?

7   A.  When we were leaving, when we were walking out.  But I

8   don't remember what he was saying.

9   Q.  So once you leave and walk out, do you remember going to

10  the food trucks?

11  A.  Yes, sir.

12  Q.  And was there -- were most people leaving at that point

13  in time?

14  A.  Yes, sir.

15  Q.  And were you able to get to the food trucks?

16  A.  Yeah.  It took us a while.

17  Q.  Did you have to wait in line?

18  A.  Yes, sir.

19  Q.  And while you were in line, did Kevin Seefried say

20  anything like, you know, "Can we hurry up and get going?  We

21  need to get over to the Capitol.  We have work to do there"?

22  A.  No, sir.

23  Q.  Was there any mention of the Capitol at all when you

24  were in line for the food trucks?

25  A.  No.

1    Q.  Was there any mention of a certification vote?

2    A.  No.

3    Q.  When was the first time that you learned that January

4    6 -- I'm sorry -- that there was going to be a certification

5    vote?  When is the first time that you sort of processed

6    that?

7    A.  When I got on social media when we left.  I didn't know

8    that.

9    Q.  So when you get your food, do you end up eating at the

10   food trucks?

11   A.  No, sir.

12   Q.  Where did you end up eating?

13   A.  We walked back to the car.

14   Q.  When you walked back to the car, did you eat, like,

15   inside?  Outside?

16   A.  I don't remember.  I remember we ate out of the car.

17   Q.  I'm going to show you another picture that I'm going to

18   mark as Defense 5.  It's a blowup of a still shot.  Is that

19   the car that you walked back to?

20   A.  Yes, sir.

21   Q.  Is there anything there that tells you that you were

22   actually back at the car?

23   A.  You can see the blurry flag.

24           MR. OHM:  That's Defense 5, your Honor, for the

25   Court.

```
1              THE COURT:  You're not moving that in?

2              MR. OHM:  Pardon me?

3              THE COURT:  You're not moving that in?

4              MR. OHM:  It's part of what's already moved in as

5     Defense 4, which is the video of the whole thing, I believe.

6     BY MR. OHM:

7     Q.  So once you get to the car, how long did it take you to

8     eat?

9     A.  I don't know an exact time.  About the time that lunch

10    takes.  I'd say about a half-hour.

11    Q.  And while you're eating, is there any conversation about

12    hurrying up, we need to go inside the Capitol?

13    A.  No, sir.

14    Q.  Is there any conversation about hurrying up, we need to

15    go stop the vote?

16    A.  No, sir.

17    Q.  While you're eating, what was your impression of what

18    was going to happen after you finished eating?

19    A.  We were walking up to the Capitol because everyone else

20    was.

21    Q.  So prior to everybody else going to the Capitol, what

22    did you think was going to happen after you ate?

23    A.  I'm not really sure.  We didn't really have a plan after

24    we ate.

25    Q.  So then you said at some point you decided to go to the
```

```
 1   Capitol.  And why was that?

 2   A.  Everyone else was walking up there.  I think we just

 3   followed the crowd.

 4   Q.  Was there a point in time where you and Mrs. Seefried

 5   get separated with the two male Seefrieds?

 6   A.  Yes, sir.

 7   Q.  Explain to us how that happened.

 8   A.  When we got up to the Capitol, there was a larger

 9   gentleman trying to run over Stephanie.  I tried with

10   everything in me to try to pull her backwards and we finally

11   made it up.

12   Q.  Okay.  And what happened to Hunter and Kevin Seefried at

13   that time?

14   A.  I don't know.  We didn't see them.

15   Q.  Did you look for them?

16   A.  Yeah.  We looked for them, but we couldn't see them from

17   where we were.

18   Q.  You couldn't see the big flag even?

19   A.  No, sir.  I don't believe that was in the air that I

20   remember.

21   Q.  So was there a point in time when you reconnected with

22   Kevin and Hunter Seefried?

23   A.  Yes, sir.  When they came out.

24   Q.  Do you remember about how long that was?

25   A.  I don't remember exactly.  No, sir.
```

1    Q.  And when -- how did you find out -- or how did you

2    reconnect initially?

3    A.  We were steady trying to call each other, but there was

4    no service.  And finally, Kevin called Stephanie and said

5    they were walking out.

6    Q.  Did you try to figure out a place to meet?

7    A.  Yeah.  We explained where we were and we met up and

8    walked back to the car.

9    Q.  How long after the time that he said he was walking out

10   did you eventually meet up with him?

11   A.  I don't remember an exact time.  It wasn't long.  A few

12   minutes.

13   Q.  Could it have been like up to 15 or 20 minutes?

14   A.  Yes, sir.

15           MS. REED:  I'm going to object to the leading,

16   your Honor.

17           THE COURT:  Your witness.  I know you're used to

18   doing cross.

19   BY MR. OHM:

20   Q.  Okay.  So after the 15 or 20 minutes, where did you all

21   end up meeting?

22   A.  There was a building.  It was like a storage-type thing.

23   We were right by that.

24   Q.  I'm going to show you what I'm going to mark as Defense

25   6.

```
 1            Do you see the storage area that you were
 2   referring to just now?
 3   A.  Yes, sir.  On the left.
 4   Q.  Do you mind being more specific?
 5   A.  Yeah.  The buildings here on the left that people are
 6   standing on top of.
 7   Q.  And do you see actually the Confederate flag around
 8   there anyway?
 9   A.  Yes.  On the left of the buildings.
10   Q.  Is that about where you all met?
11   A.  I believe so.
12   Q.  After you meet, what do you do?
13   A.  Went back to the car.
14   Q.  And I'm going to show you Defense 7.
15            Is that an accurate representation of where the
16   car was when you went back there?
17   A.  Yes, sir.
18   Q.  Okay.  And then what did you do after you went back to
19   the car?
20   A.  We tried to leave.
21   Q.  Were you able to do that right away?
22   A.  Not right away.  No, sir.  The parking lot was packed.
23   Q.  Did you remember how long it took you?
24   A.  I don't remember an exact time.  No, sir.
25   Q.  And then after you left, where did you go?
```

```
1    A.  We headed home.
2    Q.  When you went home, was there a point -- well, was there
3    any conversation from Kevin Seefried or Hunter Seefried
4    initially about, you know, stopping the steal or stopping
5    the vote count or anything like that?
6    A.  No, sir.
7    Q.  When -- was there a point in time where you learned --
8    you all in the car learned about what was going on in the
9    Capitol?
10   A.  Yes, sir.  On social media.
11   Q.  And what did you learn?
12   A.  We seen everything that was happening in the Capitol.
13   Q.  And did Kevin Seefried express surprise about everything
14   that was happening at the Capitol?
15   A.  Yes, sir.
16   Q.  And what was -- did Kevin Seefried express regret about
17   everything that was happening at the Capitol?
18   A.  I believe so.  Yes, sir.
19   Q.  Again, at that point in time, did Kevin Seefried express
20   any pride that he had stopped any vote count or done
21   anything in terms of affecting what Congress was doing?
22   A.  No, sir.  I don't believe he ever did.
23           MR. OHM:  Your Honor, I have no further questions.
24           THE COURT:  Mr. Bostic?
25           MR. BOSTIC:  Thank you, your Honor.
```

```
 1                      CROSS-EXAMINATION
 2    BY MR. BOSTIC:
 3    Q.  Good afternoon, Ms. Cuff.
 4    A.  Good afternoon.
 5    Q.  Let me start where Mr. Ohm left off.
 6            He asked you about whether Kevin Seefried, as you
 7    saw the events coming up on social media, had any concern
 8    about what he saw.  Right?
 9    A.  Yes, sir.
10    Q.  It would be true to say that with respect to Hunter, he
11    was equally dismayed about what he saw coming up on social
12    media as to what was going on in the Capitol?
13    A.  Yes, sir.
14    Q.  And before that, the days and months leading up to
15    January 6, 2021, would it be fair to say that Hunter had no
16    discussions about going to the Capitol and trying to stop
17    the vote or anything like that?  Is that correct?
18    A.  No, sir.
19    Q.  In fact, Hunter wasn't that much engaged in politics
20    initially.  Would that be fair to say?
21    A.  That's fair to say.
22    Q.  Now, you've known Hunter going back to -- well, to the
23    present day over eight years?
24    A.  Yes, sir.
25    Q.  And you and he dated and went out together probably for
```

1    about seven and a half, eight.  Right?

2    A.  Yes.

3    Q.  You two are no longer together.  Right?

4    A.  Yes, sir.

5    Q.  Now, as I recall, you started dating him when you were

6    17 and he was about 16 and a half?

7    A.  Yeah.  I was about 16 and a half.  He's older than me.

8    Yes.

9    Q.  So he was about 17 and a half at the time?

10   A.  Yes, sir.

11   Q.  And you know that Hunter left school in the ninth grade?

12   A.  Yes, sir.

13   Q.  And you know he doesn't have his GED?

14   A.  Yes, sir.

15   Q.  And you know that, based upon living with him and his

16   parents, that every day he got up and went to work?

17   A.  Yes, sir.

18   Q.  And that he's a hard worker?

19   A.  I believe so.

20   Q.  And now, during the eight years of your relationship,

21   you and Hunter had friends in common.  Right?

22   A.  Yes, sir.

23   Q.  In fact, one of those friends that I think was Hunter's

24   friend was Ryan Kortum.  Right?

25   A.  Yes, sir.

1    Q.  And from time to time, you guys would get together with

2    your friends and talk about whatever you talk about.  Right?

3    A.  Yes.

4    Q.  Politics wasn't one of those conversations?

5              MS. REED:  Your Honor, I'm going to object to the

6    leading nature of the question.

7              THE WITNESS:  No, sir.

8              MR. BOSTIC:  That's not my witness, your Honor.

9              MS. REED:  I mean --

10             THE COURT:  I was actually thinking about this.

11   It's true it's not your witness.

12             MR. BOSTIC:  I will avoid the leading questions,

13   your Honor.

14             THE COURT:  I think -- let me say this:  It's

15   outside the scope of Mr. Kevin Seefried's direct.  So I

16   think it is appropriate to ask you to use nonleading

17   questions.

18             MR. BOSTIC:  Fair enough, your Honor.  I had her

19   in my witness list.  I'll not lead.

20   BY MR. BOSTIC:

21   Q.  Ms. Cuff, during the time that you and Kevin were

22   together, did you have any mutual friends?

23   A.  Yes, we did.

24   Q.  And on occasions, did you have conversations with these

25   friends or they in your presence about Hunter?

1    A.  Yes, sir.

2    Q.  Did they ever talk about the type of person he was?

3    A.  Yes, sir.

4    Q.  Now, would it be fair to say that, based upon knowing

5    these individuals who know Hunter and having engaged in

6    conversations with them about who -- the type of person he

7    was, that you have been able to form an opinion as to his

8    reputation in the community?

9    A.  Yes, sir.

10   Q.  And would it be fair -- can you tell the Court what that

11   opinion of his reputation is?

12   A.  He's a hardworking man.  He's very loyal and caring.

13   Q.  And do you have an opinion as to whether or not he's a

14   peaceful, law-abiding individual?

15   A.  I do agree.

16   Q.  So it would be your opinion based upon conversations

17   with others about his reputation that he has the reputation

18   for being a peaceful, law-abiding, hardworking individual?

19   A.  Yes, sir.

20           MR. BOSTIC:  I have nothing else, your Honor.

21   Thank you.

22           THE COURT:  Thank you.

23           Ms. Reed.

24           MS. REED:  Thank you, your Honor.

25                      CROSS-EXAMINATION

```
1    BY MS. REED:

2    Q.  All right, Ms. Cuff.  I just have a few questions for

3    you.

4              Just so that I'm clear, how long have you known

5    Hunter Seefried?

6    A.  About eight years.

7    Q.  So that's the same time that you've known Kevin?

8    A.  Yes.

9    Q.  And are the two of you currently in a relationship with

10   one another?

11   A.  No, ma'am.

12   Q.  So the last time that we had a court appearance here,

13   you weren't here.  Correct?

14   A.  No, ma'am.

15   Q.  Were you present in court yesterday when you heard the

16   testimony of the officers?

17   A.  No, ma'am.

18   Q.  So as far as where you're getting your information from

19   as to what happened in the Capitol -- let me ask, do you

20   know anything about what happened in the Capitol?

21   A.  From videos and social media.  That's about it.

22   Q.  So you've known these individuals for eight years.

23   Correct?

24   A.  Yes, ma'am.

25   Q.  And they brought you to this courtroom today.  They
```

```
 1    never talked to you about what happened in the Capitol?

 2    A.   I mean, of course they talked to me.  But --

 3    Q.   Let's talk about that and not the social media.

 4    A.   Yes, ma'am.

 5    Q.   When you drove back with them --

 6    A.   Yes, ma'am.

 7    Q.   Well, let me ask, before we talk about driving back,

 8    talk to us about the trip there.  What were the

 9    conversations that led to you even getting in a car with

10    them?

11    A.   The conversations before or in the car?

12    Q.   Before.

13    A.   Before, it was just that we were going to watch the

14    Trump speech.  During the car, we slept the whole way up, me

15    and Hunter did.

16    Q.   You and Hunter were in a relationship with each other at

17    that time?

18    A.   Yes, ma'am.

19    Q.   But you're no longer in a relationship?

20    A.   No, ma'am.

21    Q.   So how did you get invited on the trip?  Talk to us

22    about that.

23    A.   Kevin came home and told us that there was a Trump

24    speech January 6, and we all decided to go.

25    Q.   And did he tell you why he wanted to go on this trip?
```

1    A.  Just to watch the Trump speech.

2    Q.  Do you know if he was asking other people to go along as

3    well to go to see the Trump speech?

4    A.  No, ma'am.  Not that I'm aware of.

5    Q.  But he asked his wife.  Correct?

6    A.  Yeah.  We all lived in the same house.

7    Q.  So what was it that Kevin specifically said about the

8    Trump speech?  Just "We want to go to a rally"?

9    A.  I don't exactly remember.

10   Q.  And let me ask you:  Did you take off work that day to

11   go?

12   A.  Yes, ma'am.

13   Q.  So this was something that was important to you.

14   Correct?

15   A.  Yes, ma'am.

16   Q.  Why was it important for you to go?

17   A.  Because Hunter and Kevin were going and I didn't want

18   them to go by theirselves just because we wanted to go too,

19   so we joined them.

20   Q.  It was important for Stephanie to go also?

21   A.  I asked her to go myself because I wanted her to be

22   there.

23   Q.  Why was it important for her to be there?

24   A.  Because I don't -- I'm not -- I don't have an exact

25   answer for that.

1    Q.  So the two of you decide to go with these individuals,

2    and it was just by way of "Let's go see the Trump speech"?

3    A.  Yes, ma'am.  That's all I knew.

4    Q.  So how did you get to -- well, you lived with them.

5    Correct?

6    A.  Yes, ma'am.

7    Q.  My understanding is before you all got in the car, they

8    grabbed two flags.  Correct?

9    A.  Yes, ma'am.

10   Q.  Which flags did you see them grab?

11   A.  The -- I remember the Confederate flag and I believe the

12   other one was a Trump flag.  But I don't remember.

13   Q.  And did anyone talk about why they wanted to grab the

14   Confederate flag?

15   A.  No, ma'am.

16   Q.  Who grabbed the Confederate flag before you left?

17   A.  Kevin.

18   Q.  So it's your testimony that on a four-hour drive or a

19   three-hour drive --

20   A.  Two.

21   Q.  Two-hour drive?

22   A.  Yes, ma'am.

23   Q.  -- you did not hear any conversation at all about the

24   Trump rally?

25   A.  No, ma'am; because I fell asleep.

```
1    Q.  Okay.  You live in the same residence with them.
2    Correct?
3    A.  Yes, ma'am.  Not now, but I did.  Yes.
4    Q.  Tell us, what type of television shows do you like to
5    watch?  Is Fox something that's prominently featured at the
6    Seefried house?
7    A.  He watches the news.  But I mean, everybody does.
8    Q.  "He" who?
9    A.  Kevin.
10   Q.  Be specific.
11   A.  Kevin.
12   Q.  Have you ever seen Hunter watch the news with him?
13   A.  Yes, ma'am.  I think we've all watched the news together
14   at some point.
15   Q.  Were you watching the news close in time to January of
16   2021?
17   A.  I don't remember.
18   Q.  Okay.  Now, my understanding is that Hunter is someone
19   who actually does talk a lot about politics.  Would you
20   agree with me about that?
21   A.  No, ma'am.  Not much with me.
22   Q.  Not at all?  About voting?
23   A.  Not really.  I mean, we decided to vote for the first
24   time when Trump came in.  But talking about it, no, ma'am.
25   Q.  Election fraud?
```

```
 1    A.  Yeah.  Sometimes.  Just when it had happened with the

 2    Trump-Biden situation.  But that was it.

 3    Q.  Well, tell us about that time.  What do you know about

 4    how he felt about the Biden and Trump election?  And "he,"

 5    specifically Hunter.  Correct?

 6    A.  Yes, ma'am.

 7    Q.  Okay.

 8    A.  I don't remember much.  I just remember we all thought

 9    that the election didn't go the way it was supposed to, but

10    that was about it.  It's not like we just sat around and

11    always talked about it.  I don't really remember.

12    Q.  Well, tell me:  How close in time were you talking about

13    this to you all going on this two-hour drive to D.C.?

14    A.  I don't remember that either.  That was a while ago.  I

15    don't remember the exact timeframe there.

16    Q.  Do you remember what Hunter would tell you about his

17    thoughts about that election?

18    A.  No, ma'am.  I really don't.

19    Q.  Did he think it was stolen?

20    A.  I think we all thought that.  Yes, ma'am.

21    Q.  Was that something that you all, meaning that was

22    something that Kevin talked about as well?

23    A.  Yes, ma'am.

24    Q.  What did you hear Kevin say about the stolen election?

25    A.  I don't remember specifics.  I just remember it was a
```

1   conversation.

2   Q.  He just thought that it was stolen close in time to you

3   all going to D.C.?

4   A.  I don't remember exactly when that conversation was.

5   Q.  Let's talk about the Trump rally.  What do you remember

6   about the Trump rally?

7   A.  Just that we were there to listen to the Trump speech.

8   We were pretty far back.  We couldn't hear much.  When he

9   was done speaking -- just about done; he wasn't completely

10  done -- we started walking back to the Capitol to get food

11  at the food truck, because that's where we parked.

12  Q.  What are some things that you heard while you were at

13  the Trump rally?

14  A.  I don't remember.  I was asked that question.

15  Q.  You don't remember a single thing that President Trump

16  said?

17  A.  No, ma'am.  I do not.  That was so long ago.

18  Q.  So do you remember seeing things and people with signage

19  at the Trump rally?

20  A.  Yeah.  A bunch of people had signs and flags and things

21  like that.  But I don't remember what was being said.

22  Q.  So you took in no information at all from the rally?

23  A.  I'll be honest with you:  I've tried to block that day

24  out a lot.  It took a big impact on us.  No, ma'am.  I don't

25  remember what he was saying.

1   Q.  Well, you aren't trying to say that you know Kevin

2   didn't hear anything, because you're not Kevin.  Correct?

3   A.  No, ma'am.

4   Q.  And Hunter, you also can't say what he didn't hear at

5   the rally.  Correct?

6   A.  No, ma'am.  I can't speak for them.

7   Q.  When you all decide to leave the Trump rally, talk to us

8   about what Kevin's demeanor is.  Is he excited?  Is he happy

9   after he leaves --

10  A.  We were all hungry.  That was about it.  We were talking

11  about going to get food.

12  Q.  But that wasn't my question.

13          I asked:  What was his demeanor like when he left

14  the rally?  Was he happy?  Was he excited?  What was --

15  describe what he was --

16  A.  I think he was hungry.  I don't remember his demeanor.

17  We were all just talking about going to get food.

18  Q.  The same for Hunter?

19  A.  Yes, ma'am.

20  Q.  So no one was talking about anything that was said at

21  the Trump rally?

22  A.  No, ma'am.

23  Q.  You all just left this rally that you drove two hours to

24  go to, election fraud was a concern, and no one said

25  anything at all about President Trump talking about election

1    fraud?

2    A.  I couldn't hear much about what Trump was saying.  No,

3    ma'am.

4    Q.  Right.  But I'm talking now about what Kevin and Hunter

5    were saying about what President Trump stated.

6    A.  I understand.  That was so long ago, I don't remember

7    what was said.  I remember there was little, like, shops set

8    up outside.  We looked through that stuff.  I remember that.

9    Q.  At some point, they decide to go to the Capitol.

10   Correct?

11   A.  Yes, ma'am.  When we got down there.

12   Q.  Now, I understand that you said you couldn't hear -- let

13   me ask:  Why couldn't you hear at the Trump rally?

14   A.  We were so far back it was hard to hear.

15   Q.  There were people with blow horns, though.  Correct?

16   A.  Yes, ma'am.

17   Q.  And those people were near you.  Correct?

18   A.  At one point.

19   Q.  And what were the people saying in the blow horns?

20   A.  I don't remember.  I just remember they kept talking.

21   Q.  Do you recall anybody directing people to go to the

22   Capitol?

23   A.  I think I heard it.  Yeah.

24   Q.  Were Kevin and Hunter close to you when these blow

25   horns -- where people were blowing the blow horns were going

1    to the Capitol?

2    A.  Yeah.  We didn't separate until we got to the Capitol.

3    Q.  At that point, once people are talking about going to

4    the Capitol on the blow horns, do either Kevin or Hunter say

5    anything about, "We're going to go to the Capitol"?

6    A.  No, ma'am.

7    Q.  You just walk to a food truck?

8    A.  Yes, ma'am.

9    Q.  Now, at some point, you all decide to go back to the

10   vehicle.  Correct?

11   A.  Yes, ma'am.

12   Q.  Tell us about what happened at the vehicle.

13   A.  We ate our food.

14   Q.  And it's your testimony that there was still no

15   discussion at that time about what happened at the

16   Capitol -- I mean, what happened at the rally?

17   A.  No, ma'am.  There wasn't much happening at the rally.

18   They were talking, but I don't remember what they were

19   talking about.

20   Q.  How long did it take you all to eat lunch?

21   A.  About 20, 30 minutes.

22   Q.  And this was inside or outside the car?

23   A.  I don't remember that.

24   Q.  And so at some point, how does Hunter or Kevin tell you

25   that they decide that they are going to go to the Capitol?

1    What was that conversation like?

2    A.  We started walking up there with the other people.  I

3    don't remember what initiated it.  I believe just the people

4    walking, and we just followed the crowd.

5    Q.  So of all of the places in D.C. that one could want to

6    go to after a Trump rally, you all just decide to go with

7    the crowd to the Capitol?

8    A.  Yes, ma'am.

9    Q.  Not the Washington Monument, not the Lincoln monument,

10   none of these, like, famous landmarks.  Just the Capitol?

11   A.  No, ma'am.  Just the Capitol.

12   Q.  How do you get separated from these two?

13   A.  There was a larger gentleman behind me and Stephanie.

14   He was steady pushing her.  And I tried everything with my

15   might to push backwards because she was getting trampled.

16   We finally made it out.

17   Q.  And where are Kevin and Hunter when this is happening?

18   A.  They were ahead of us, but way ahead of us.  We weren't

19   with them anymore.

20   Q.  So at no point did they tell you, "We're, like,

21   distancing ourselves from you in a crowd"?

22   A.  No, ma'am.  You could not hear anything.  It was loud.

23   There was a lot of people.

24   Q.  So they just essentially walked off and you did not know

25   where they were --

1    A.  I wouldn't say walk.  People were shoving us.

2    Q.  Well --

3    A.  Yes, ma'am.

4    Q.  -- who was shoving?

5    A.  There was all the people that were surrounding us.

6    That's why me and Stephanie pulled out.

7    Q.  And so did you and Stephanie know anybody else who was,

8    like, in the crowd?  Did you have any other friends that

9    went?

10   A.  No, ma'am.

11   Q.  So Kevin and Hunter left their two female companions and

12   didn't say where they were going?

13   A.  No, ma'am.

14   Q.  They didn't say where they were going?

15   A.  No, ma'am.

16   Q.  So as far as what happened inside of the Capitol, you

17   have no knowledge of that.  Correct?

18   A.  No; except for, like I said, what was on social media.

19   Q.  And when you got back in the car, there was absolutely

20   no conversation about what happened inside of the Capitol

21   once you all are traveling back to Delaware?

22   A.  When we seen it on social media, you could see it on

23   their face that they regretted it.  We didn't talk much

24   about it.  No, ma'am.

25   Q.  On the way home, there was absolutely no remorse for

1    anything that happened inside of the Capitol?

2    A.  Yes.  That's what I'm saying.  On their face, I believe

3    so.  Yes, ma'am.

4    Q.  Okay.  So then let's break that down a little bit.

5    A.  Yes, ma'am.

6    Q.  They go to the Capitol.  You are not with them.

7    Correct?

8    A.  No, ma'am.  I was not.

9    Q.  At some point, you get separated from them.  Correct?

10   A.  Yes, ma'am.

11   Q.  How long were they away from you?

12   A.  Maybe 20 minutes.  I don't remember the exact time on

13   that.

14   Q.  And then at some point Kevin calls Stephanie, and that's

15   how you all end up reuniting?

16   A.  Yes, ma'am.

17   Q.  When you reunite with them, talk to us about their

18   demeanor.

19   A.  There wasn't one.  Kevin said they were trying to get

20   out of there because there was a bunch of people doing stuff

21   that he didn't agree with.  But that was about it.

22   Q.  Okay.  And did you ask him what the people were doing

23   inside?

24   A.  No, ma'am.  We were trying to get back to the car.

25   Q.  So you were not curious at all as to what happened

1    inside of that Capitol in this 20-minute gap that you had no

2    idea where they were?

3    A.  Ma'am, when all that stuff was happening, I just wanted

4    to get back in the car.

5    Q.  What stuff was happening?

6    A.  The teargas and all that stuff.  We were standing two

7    foot from it.  Me and Stephanie were.

8    Q.  And so with Hunter, Kevin or Hunter, no conversations at

9    all about that on the walk back?

10   A.  I don't remember any conversations.  No, ma'am.

11   Q.  Got you.

12        So then you get in the car.  And talk to us about

13   this social media piece.  What are you seeing on social

14   media about what happened inside the Capitol?

15   A.  There was just pictures and things like that.  I don't

16   remember exact pictures.

17   Q.  And so what were the pictures of?  You don't remember?

18   A.  Yeah.  Like inside the Capitol.

19   Q.  Well, you said that they expressed remorse.

20   A.  Uh-huh.

21   Q.  What was it in the pictures that made them remorseful?

22   A.  I guess the things that happened in the Capitol when

23   they were in there.  I'm not sure.

24   Q.  What are you guessing?

25   A.  Can you clarify that question?

1    Q.  You said, "I guess the things that happened inside of

2    the Capitol."  Do you know anything that happened inside of

3    the Capitol with these individuals?

4    A.  Not -- so the pictures that I seen on there was things

5    knocked over and things like that.  And when we all seen it,

6    that's when I seen remorse on their face.

7    Q.  Okay.  Because you think they felt bad for what happened

8    inside the Capitol?

9    A.  Yes, ma'am.

10   Q.  Do you still think they feel bad for what happened

11   inside the Capitol?

12   A.  I do.  Yes, ma'am.

13   Q.  Because you've described both of them as peaceful

14   persons or -- I'm sorry -- was it just one person that you

15   described as peaceful?

16   A.  I believe they both are.

17   Q.  So then let's talk about Kevin's peacefulness.

18   A.  Yes, ma'am.

19   Q.  It's my understanding from your testimony Kevin did not

20   talk to you at all about what happened inside of the

21   Capitol.  Correct?

22   A.  No, ma'am.  Not that I remember.

23   Q.  At any point, did you become aware that he climbed a

24   wall to get into the Capitol?

25   A.  When we stepped back, all the people were climbing the

Cuff - CROSS - By Ms. Reed

1    walls.  So I was sure that he was in that crowd.  Yes,

2    ma'am.

3    Q.  Did he talk to you about how he entered the Capitol?

4    A.  No.  But we -- when we seen the pictures, that's when

5    that was a conversation.

6    Q.  So you don't know anything about him watching two people

7    break into the Capitol by breaking a window?

8    A.  Not that I remember.

9    Q.  But would that be peaceful to you if you had known that

10   he had seen that?

11   A.  No, ma'am.

12   Q.  He climbed through a window.  Did he tell you how he got

13   into the Capitol?

14   A.  I don't remember that conversation.

15   Q.  What about inside of the Capitol?  If you were to find

16   out that he threatened a police officer inside of the

17   Capitol, would you still be telling this Court that he's a

18   peaceful person?

19   A.  Yes, ma'am, because one situation doesn't change who he

20   is.

21   Q.  I'm sorry.  Let me repeat my question.

22           If you were to know that he threatened a police

23   officer inside of the Capitol, you would still call him a

24   peaceful person?

25   A.  Yes, ma'am.  I've known him for eight years.  That's one

1    situation.  I would agree that he is still a peaceful

2    person.

3    Q.  You would agree with me, though, that the police officer

4    had a right to be in the building and he didn't?

5    A.  I agree.

6    Q.  But that's still peaceful to you?

7    A.  I believe that he's a peaceful person.

8             MR. OHM:  Objection.  Argumentative.

9             THE COURT:  Overruled.

10   BY MS. REED:

11   Q.  I want to talk about Hunter now.

12             Have you seen the video footage of Hunter breaking

13   out the portion of the window so that he could jump into the

14   window?

15   A.  Yes, ma'am.  I seen the video of him clearing the glass.

16   Q.  Does that change your opinion about him being peaceful?

17   A.  No, ma'am.

18   Q.  You still think that he's a high moral/ethical standards

19   person.  Correct?

20   A.  I do.  That's one situation of eight years.

21   Q.  So then at what point, can I ask you, did he express

22   remorse to you about what happened --

23   A.  Of course.

24   Q.  -- in that situation?

25   A.  Yes, ma'am.

1          THE COURT:  Ma'am, let me just ask you to wait

2     until the prosecutor finishes her question so we can get a

3     full transcript.

4          THE WITNESS:  Yes, sir.

5     BY MS. REED:

6     Q.  What did Hunter tell you about his remorse that he felt

7     for breaking the window?

8     A.  I think he felt bad about doing it because he didn't

9     realize what he was doing at the time.

10    Q.  He told you that he didn't realize that he punched his

11    fist through a window?

12    A.  I think he was acting out of -- I don't know what the

13    word is for it, but everything happening so fast.  I believe

14    that's what made that happen.  I'm not really sure.

15    Q.  You think that's a sign of anger?

16    A.  No, ma'am.  I don't think he was angry.

17    Q.  You think that it's a sign that somebody has a real

18    reason for wanting to get into that building?

19    A.  Maybe.

20    Q.  Like election fraud?

21    A.  I think he was following the crowd.

22    Q.  The crowd of people who were upset about election fraud.

23    Correct?

24    A.  I believe so.

25    Q.  And he was one of those individuals.  Correct?

1    A.  At some point, yes.  But I don't think that's why he did

2    that.

3    Q.  Is it fair to say that he was one of those persons

4    before January 6?  Because you just told us he was upset

5    about election fraud.

6    A.  Yes, ma'am.

7    Q.  Correct?

8    A.  Yes, ma'am.

9    Q.  That's what the rally was about.  Correct?

10   A.  Yeah.  For se [sic], yes, ma'am.

11   Q.  At any point since this has happened, has Kevin

12   expressed any remorse?

13   A.  I believe they were both remorseful.  Yes, ma'am.

14   Q.  You keep saying that you believe.  Can you tell me, did

15   they use the words?  Did Kevin use the words to you "I'm

16   remorseful"?

17   A.  I wouldn't say he came out and said that word, but I've

18   seen them cry many times over it.

19   Q.  And you said they're not into politics.  Correct?

20   A.  I said Hunter was not.

21   Q.  Okay.  Do you know about Kevin in terms of whether he's

22   into politics?

23   A.  I just know that he watches the news.

24   Q.  And Hunter watches the news, too?

25   A.  Every now and then.

```
 1    Q.  And did --
 2    A.  He didn't really watch the news.
 3    Q.  But everyone knew about the election fraud?
 4    A.  Of course.  Yes, ma'am.
 5    Q.  All of you were upset about it when you went to D.C.?
 6    A.  I wouldn't for se [sic] that.  That's not what we went
 7    there for that I remember.  No, ma'am.
 8              MS. REED:  One moment, your Honor.
 9              No further questions, your Honor.
10              THE COURT:  Thank you, ma'am.
11              Mr. Ohm, any redirect?
12              MR. OHM:  Briefly, your Honor.
13                        REDIRECT EXAMINATION
14    BY MR. OHM:
15    Q.  Ms. Cuff, Ms. Reed just asked you a question about what
16    Kevin said when you first met back up after they left the
17    Capitol.
18    A.  Yes, sir.
19    Q.  Could you repeat what he said?
20    A.  (Witness crying) I don't remember what I said.
21    Q.  Do you need a moment?
22    A.  What he said when -- what?  I'm sorry.
23    Q.  Do you want a tissue or anything?
24    A.  What was that?
25    Q.  Do you want a tissue or anything?
```

1               When you first met back up with them after he had

2      left the Capitol, do you remember what Mr. Seefried told

3      you?

4      A.  I do not.  I don't remember what I just said, Mr. Ohm.

5      Q.  Well, when you said a bunch -- that he said a bunch of

6      people were doing stuff he didn't agree with, is that what

7      you recall him saying?

8      A.  Yes.  In the car, yes.

9      Q.  Ms. Reed asked you a bunch of questions about whether

10     Hunter and Kevin just left you and Mrs. Seefried, the two

11     women, behind and didn't say where they were going.  Do you

12     remember that?

13     A.  Yes, sir.

14     Q.  Did they leave you behind or were you separated because

15     of the crowd?

16     A.  We were separated because of the crowd.

17     Q.  And Ms. Reed asked you questions about whether you went

18     to the Washington Monument or the Lincoln Memorial.  Do you

19     remember those?

20     A.  Yes, sir.

21     Q.  Was there a crowd going to the Washington Monument for

22     you to follow?

23     A.  No, sir.

24     Q.  Was there a crowd going to the Lincoln Memorial for you

25     to follow?

```
 1    A.  No, sir.

 2    Q.  And would Kevin and Hunter have brought you to

 3    Washington, D.C., if they were planning on storming the

 4    Capitol?

 5    A.  No, sir.

 6    Q.  Would Kevin and Hunter have brought Stephanie to D.C. if

 7    they were planning on storming the Capitol?

 8    A.  No, sir.

 9    Q.  After you ate, would Kevin and Hunter have brought you

10    to the Capitol if they were planning on storming the

11    Capitol?

12    A.  No, sir.

13    Q.  After you ate, would Kevin and Hunter have brought

14    Stephanie to the Capitol if they were planning on storming

15    the Capitol?

16    A.  No, sir.

17    Q.  When was the last time that you talked to Kevin

18    Seefried?

19    A.  About two months ago.

20              MR. OHM:  I have nothing further, your Honor.

21              THE COURT:  Mr. Bostic, any --

22              MR. BOSTIC:  Very briefly.

23                        RECROSS-EXAMINATION

24    BY MR. BOSTIC:

25    Q.  Ms. Cuff, you mentioned that you saw Kevin cry several
```

```
 1    times over being in the Capitol.

 2    A.  Yes, sir.

 3    Q.  Am I correct that the same is true for Hunter?

 4    A.  Yes, sir.

 5    Q.  Hunter was a basket case over this, wasn't he?

 6    A.  Yes, sir.

 7    Q.  And he told you that he regretted removing the glass

 8    from the window?

 9    A.  He sure did.

10    Q.  And similarly, with respect to Hunter, you haven't

11    talked to him over several months now.  Right?

12    A.  No, sir.

13    Q.  You and he broke up several months ago.  Right?

14    A.  Yes, sir.

15              MR. BOSTIC:  Thank you.  Nothing else.

16              THE COURT:  Thank you, ma'am.  You may step down.

17    I appreciate your testimony here.  You're free to go.

18              THE WITNESS:  Thank you.

19              (Witness excused.)

20              THE COURT:  Mr. Ohm, any further evidence for your

21    client?

22              MR. OHM:  Your Honor, we would like to move in

23    Defense Exhibit 1, which is the impeachment completion --

24    I'm sorry -- the impeaching document for Officer Goodman

25    from yesterday.
```

```
1              I understand that the Government has some concerns
2    about the sealing aspect of it.  I don't know if --
3              THE COURT:  That's the victim impact statement?
4              MR. OHM:  Yes.
5              THE COURT:  Okay.
6              MR. OHM:  I don't know how the Court wants to deal
7    with that, but we do want to move that in.
8              And then we have also Exhibits 6 through 31, video
9    clips we'd like to move in.  They're all closed-circuit
10   Capitol footage.  I can read them and identify them in the
11   record or I can just send an email to the Court.  Whatever
12   is easier for the Court.
13             THE COURT:  Well, am I supposed to watch these?
14             MR. OHM:  They'll be referred to in closing.
15             THE COURT:  But I haven't seen them yet?
16             MR. OHM:  You haven't seen them yet.  I mean, it's
17   not necessary for your Honor to see every frame of all of
18   them.
19             I think the Court will see in closing what --
20   essentially, it shows the Seefrieds' route throughout the
21   day from the time where they get back to the car to the time
22   they go to the Capitol to the time they return to the car.
23   So I think it's spelled out pretty clearly in the way I'll
24   close on it.  But I obviously can't close on it unless I put
25   in the evidence.  If the Court had other aspects of it that
```

1    it wanted to watch, that would be more inclusive.

2            THE COURT:  Ms. Reed, what's your position on the

3    victim impact statement?

4            MS. REED:  Your Honor, Mr. Ohm has sent us the

5    list, and so we would have no objection to the video

6    exhibits.

7            I do raise the same concern that I raised

8    yesterday about Officer Goodman's statement.  We do believe

9    that it is sensitive.  While it should come in, I think it's

10   evidence -- if there is a way that we could still seal it to

11   the public, that would be appreciated.

12           THE COURT:  I don't think these things are put on

13   ECF.

14           MS. REED:  That's correct.  I do believe that as

15   well, your Honor.  I'm just being cautious about it because

16   it was an order from another judge and it was sealed --

17           THE COURT:  I agree.

18           MS. REED:  -- and unsealed for this purpose.

19           THE COURT:  So I'm going to admit in Defense 1 and

20   Defense 6 through 31.

21           MS. REED:  Yes, your Honor.

22           (Whereupon, Defendant's Exhibit Nos. 1 and 6

23   through 31 were entered into evidence.)

24           THE COURT:  I would direct that -- I don't think

25   you are disclosing the victim impact statement, but I direct

 1    you not to.  I think you can refer to it, but it should not

 2    be publicly disseminated without my authorization.

 3              MS. REED:  Thank you, your Honor.

 4              THE COURT:  Thank you.

 5              MR. OHM:  With that, your Honor, Kevin Seefried

 6    rests.

 7              THE COURT:  Mr. Bostic?

 8              MR. BOSTIC:  Your Honor, we have both Ms. Cuff and

 9    another witness on our witness list.

10              But the defense for Hunter Seefried would rest the

11    case at this point.

12              THE COURT:  Could both Defendants approach the

13    podium, please.

14              Do you understand that you have an unconditional

15    right to testify or not to testify at trial?

16              Mr. Kevin Seefried?

17              DEFENDANT KEVIN SEEFRIED:  Yes.

18              THE COURT:  And Mr. Hunter Seefried?

19              DEFENDANT HUNTER SEEFRIED:  Yes, your Honor.

20              THE COURT:  Do you understand that you alone

21    control this decision whether to testify?

22              Mr. Kevin Seefried?

23              DEFENDANT KEVIN SEEFRIED:  Yes.

24              THE COURT:  Mr. Hunter Seefried?

25              DEFENDANT HUNTER SEEFRIED:  Yes, your Honor.

```
 1                THE COURT:  Have you had adequate time to discuss

 2      this decision with your attorney?  Mr. Kevin Seefried?

 3                DEFENDANT KEVIN SEEFRIED:  Yes, your Honor.

 4                THE COURT:  Mr. Hunter Seefried?

 5                DEFENDANT HUNTER SEEFRIED:  Yes, your Honor.

 6                THE COURT:  And, Mr. Kevin Seefried, have you

 7      voluntarily decided not to testify?

 8                DEFENDANT KEVIN SEEFRIED:  Yes, your Honor.

 9                THE COURT:  Do you have any questions about that?

10                DEFENDANT KEVIN SEEFRIED:  No, your Honor.

11                THE COURT:  You don't want to testify; is that

12      correct?

13                DEFENDANT KEVIN SEEFRIED:  No, sir.

14                THE COURT:  And, Mr. Hunter Seefried, have you

15      voluntarily decided not to testify?

16                DEFENDANT HUNTER SEEFRIED:  Yes, sir.

17                THE COURT:  Thank you, gentlemen.  You may be

18      seated.

19                I guess I'd propose taking about a 15-minute break

20      and then doing closings.  Does that make sense to you,

21      Ms. Reed?

22                MS. REED:  Yes, your Honor.

23                THE COURT:  Mr. Ohm?

24                MR. OHM:  Yes, your Honor.  I was going to renew

25      the JOA for the same reasons.
```

```
1              THE COURT:  Mr. Bostic, do you wish to do the
2      same?
3              MR. BOSTIC:  I'm sorry, your Honor?
4              THE COURT:  Do you wish to renew your JOA?
5              MR. BOSTIC:  Yes, I would, your Honor.  Thank you.
6              THE COURT:  I'll deny them for the reasons I
7      previously stated.
8              Mr. Bostic, can you be ready for closings in about
9      15 minutes?
10             MR. BOSTIC:  Yes, your Honor.
11             THE COURT:  Great.  Thanks, folks.
12             (Thereupon a recess was taken, after which the
13     following proceedings were had:)
14             THE COURT:  Ms. Reed, I realized I should have
15     asked you if you had rebuttal.  Sorry about that.  Do you
16     have a rebuttal case?
17             MS. REED:  I do not.  No, your Honor.
18             THE COURT:  And I have before me forms waiving the
19     right to testify.
20             Mr. Hunter Seefried, is that your signature there?
21             DEFENDANT HUNTER SEEFRIED:  Yes, your Honor.
22             THE COURT:  And, Mr. Kevin Seefried, is that your
23     signature there?
24             DEFENDANT KEVIN SEEFRIED:  Yes, your Honor.
25             THE COURT:  So I'll sign both of those.
```

1          Ms. Reed, I'll hear from you -- or Ms. Kearney.

2     Sorry.

3          MS. KEARNEY:  Thank you, your Honor.

4          Before I begin, we'd like to split between closing

5     and rebuttal.  It will be myself and then Ms. Reed.

6          THE COURT:  Okay.

7          MS. KEARNEY:  Thank you, your Honor.

8          Your Honor, the evidence in this case proves

9     beyond a reasonable doubt that on January 6, 2021, each

10    Defendant, Kevin Seefried and Hunter Seefried, entered the

11    Capitol Building without authorization; that each Defendant

12    obstructed and impeded Congress's certification of the

13    Electoral College vote; and aided and abetted others in so

14    doing.

15          And Hunter --

16          THE COURT:  Sorry.  I should have checked before

17    you proceed.  I think it'll be easier for us both.

18          Mr. Ohm, does your client agree with the

19    Government's proposed elements of the offense that they laid

20    out in their trial brief?  It's from *Hale-Cusanelli*.  I know

21    you cited them in this filing you just made.

22          MR. OHM:  I think the only tinker that we would

23    request is the *Rosemond* language that we referenced in the

24    pleading we filed around lunch.

25          THE COURT:  Right.  That's for the aiding and

1      abetting?

2              MR. OHM:  Yes.

3              THE COURT:  Okay.  And, Mr. Bostic, do you agree

4      with the Government's recitation of the elements of each

5      offense?

6              MR. BOSTIC:  I take the same exception as Mr. Ohm

7      did as well.

8              THE COURT:  Okay.  Ms. Kearney, would you wish to

9      be heard on that?  Do you agree we would need to show

10     advance knowledge of what the others would be doing on the

11     aiding and abetting?

12             MS. KEARNEY:  No, your Honor.  I think that reads

13     a requirement into the law that is not present for purposes

14     of aiding and abetting.  *Rosemond* involves a Title 18

15     1924(c) case, which requires knowledge of the use of a

16     firearm.

17             In this case, there's no requirement of advance

18     notice of others' intent.  If the others had that intent and

19     if each Defendant had their own intent to aid and abet them,

20     that is sufficient.

21             THE COURT:  I'm not sure if you've had a chance to

22     look at this, but Mr. Ohm cites to child pornography

23     accomplice liability and accomplice liability for robbery as

24     well.

25             MS. KEARNEY:  I have not had a chance to read

1    those cases, your Honor.  I have read *Rosemond*, and that

2    involves knowledge of the possession of a firearm and the

3    use of a firearm.

4           In this case, there's no such attendant knowledge

5    that attaches to the crime.

6           THE COURT:  But for the aiding and abetting, you

7    need to show this kind of heightened intent.  Right?

8           MS. KEARNEY:  What you need to show, your Honor,

9    is that the principal had the intent and that the aider and

10   abettor understood that intent and had the intent.

11          But it doesn't mean that the aider and abettor has

12   to have had advance warning.  Once they understand, that is

13   sufficient.  They don't have to know going into the

14   situation what the intent is.

15          The issue in *Rosemond*, your Honor, was whether or

16   not the accomplice had brought the firearm to the drug

17   transaction.  And there's no such analogous prerequisite

18   here.

19          THE COURT:  I don't think I can try to resolve

20   this right now.

21          But sorry to interrupt you.

22          MS. KEARNEY:  That's fine.

23          THE COURT:  You can proceed with your closing.

24          MS. KEARNEY:  Thank you.

25          I guess where I started was the evidence in this

1   case proves beyond a reasonable doubt that on January 6,

2   2021, each Defendant entered the Capitol Building without

3   authorization.

4          Each Defendant obstructed and impeded Congress's

5   certification of the Electoral College vote, and they aided

6   and abetted others in so doing that.

7          And Hunter Seefried in furtherance of this

8   obstruction, and in and of itself, he participated in the

9   breaking of a window to enter the Capitol Building.

10         So I want to clear the way as to what's not in

11  dispute.  I think the parties have come to an agreement on

12  some issues and then have not seriously disputed others.

13         So first, there's no dispute that on January 6,

14  the Secret Service had established a restricted perimeter on

15  the Capitol Building and the surrounding grounds.  Our

16  exhibits demonstrate where that perimeter was.  The Capitol

17  Building itself is well within that perimeter.  You have

18  Inspector Hawa's testimony on that point and you have

19  Inspector Loyd's testimony on that point.

20         Second, there's no dispute that Congress commenced

21  the process of certifying the Electoral College votes on

22  January 6.  Your Honor has Mr. Schwager's testimony in the

23  *Hale-Cusanelli* trial for that regarding the process, its

24  constitutional and statutory requirements and the actual

25  events that occurred in the House and Senate that day.

1        And third, there's no real dispute that each

2   Defendant was present in the Capitol Building on January 6,

3   2021.  The parties have stipulated that and this Court has

4   seen dozens of videos demonstrating that.

5        So what's really in dispute here, as defense

6   counsel has indicated and I think your Honor indicated in

7   your prior rulings, is the Defendants' intent.  Proving

8   intent in an obstruction case, your Honor, is no different

9   from proving intent in any other criminal case.  And your

10  Honor instructs juries all the time that someone's intent or

11  their knowledge ordinarily cannot be proved directly.  And

12  that's because there's no way of getting inside someone's

13  head and knowing what they're actually thinking.  But jurors

14  and this Court can infer someone's intent or their knowledge

15  from the surrounding circumstances.

16        You can consider their statements that are made,

17  the acts that they do and any other facts and circumstances

18  received in evidence.

19        And these Defendants, Kevin Seefried and Hunter

20  Seefried, have made their intent crystal clear through their

21  conduct and through their statements.

22        So let's start with Kevin Seefried.

23        What does the evidence show that he did on January

24  6, 2021?  So first, early in the morning on that date, he

25  drove with his family from their home in Delaware to

1    Washington, D.C.  You heard testimony from Ms. Cuff that

2    that's a several-hour trip.  The purpose of that trip was to

3    attend then-President Trump's rally near the White House.

4    They parked in the parking lot near the Capitol grounds.

5            And Kevin Seefried attended that rally.  He heard

6    President Trump encourage the crowd to walk down to the

7    Capitol and cheer on the senators and the Congress members

8    and demand that Congress prevent the fraudulent slate of

9    electors from being seated.

10           When Trump's speech ends, he and others in the

11   crowd -- and by "he," I mean Kevin Seefried -- walk towards

12   the Capitol Building.

13           I want to pause there, your Honor, because even

14   these actions are telling.  So first, Kevin Seefried made

15   the decision to go to Washington, D.C., on January 6.  He

16   didn't go to the Delaware State Capitol.  He didn't go on

17   January 5th.  He didn't go in December.  There's a

18   significance to that date and to that location.  That's

19   where the Capitol is.  That's the date when Congress

20   certifies the electoral vote.  And that's why the Trump

21   rally is scheduled for that date.

22           This isn't a farewell tour for an outgoing

23   president.  This isn't a Second Amendment rally.  You've

24   heard the rally referred to as Stop the Steal.  Ms. Cuff

25   told you what that rally was about.  It was about election

1    fraud, allegations of a fraudulent election that was being

2    certified by the Congress that day.

3           That phrase signifies that the motivation behind

4    the rally is to prevent that certification from going

5    forward and, in the minds of many attendees there, to stop

6    the election from being stolen.

7           When that rally wraps up, Kevin Seefried takes

8    action.  He doesn't get in his car and go home.  He goes to

9    the Capitol Building.  He doesn't go to the Supreme Court.

10   He doesn't go to the CDC.  He goes to the Capitol.  That's

11   where the proceedings to certify the election are taking

12   place.

13          THE COURT:  But all of these things are also true

14   of Ms. Cuff.  Right?  I mean, obviously, you haven't tried

15   to make a case against her.

16          MS. KEARNEY:  That's very true, your Honor.

17          But what they do is they set the stage for what is

18   in Kevin Seefried's mind when he's making that journey, when

19   he is approaching that Capitol Building.  So in his mind are

20   allegations of election fraud, the fact that an election is

21   being stolen and the fact that some sort of proceeding is

22   occurring at the Capitol that involves the certification of

23   that election.  There's something going on in the Capitol

24   Building that day.

25          And so what he gets -- once he gets to the Capitol

1    grounds, what does he do?  Well, he surmounts multiple

2    barriers to get into that building.  First, he must have

3    passed fencing and signs stating that that area was closed

4    that day.  You've seen Government's Exhibits 525 and 526.

5    That's the multiple rows of snow fencing that Inspector Loyd

6    testified about and the signs that are hanging on that

7    fencing.

8              And you've seen Government's Exhibit 524, where

9    Kevin Seefried and Hunter Seefried are standing on top of

10   that snow fencing that's been pulled down inside the Olmsted

11   wall.

12             As you heard from Ms. Cuff, he leaves his wife and

13   his son's significant other without knowing where they've

14   gone.  He forges ahead without knowing where they are and

15   continues to the Capitol grounds.

16             Once he gets close to the building, he climbs over

17   a stone wall to reach the stairs on the north side of the

18   inauguration stage.  And that's evident, your Honor, in

19   Government's Exhibit 501, which is the brief video of the

20   northwest lawn.  When you watch those last few seconds,

21   you'll see Hunter Seefried helping Kevin Seefried climb over

22   that wall.

23             Kevin Seefried also saw police officers stationed

24   at the top of those stairs on the north side of the stage.

25   Those are the officers that the line breaks through at

1     approximately 2:09.  And that's in Government's Exhibits 403

2     and 404.  He saw the mob break through them.  He told

3     Special Agent Lear that himself.  He said that he and Hunter

4     were standing partway down the steps a ways down from where

5     those cops were when the crowd broke through.

6          And he follows them.  When he reaches the

7     building, he sees other rioters breaking out a window.  He

8     sees someone with a two-by-four break through one of the

9     panes and he sees his son clear the glass out of that window

10    frame.  He watches as other rioters climb through and then

11    he climbs through right after them.

12         So by the time he gets to the Capitol Building, he

13    has climbed over a wall; he has been part of a group that

14    has mounted the stairs after seeing a police line breached;

15    and he has jumped through a broken-out window.

16         And it's worth noting, your Honor, that despite

17    the fact that when he's on those stairs he's about a minute

18    behind that first group of rioters, the first group to

19    breach the police line there, he's up in the front of the

20    group of rioters when he gets to the windows at the Senate

21    Wing doors.  So by my count he's the 13th one through that

22    window.  He's intent on getting inside that building.

23         Once inside the building, what does he do?  Well,

24    he doesn't look around.  He doesn't wander the hallways.  He

25    proceeds with purpose down that corridor pointing down the

 1      hallway.

 2              And, Mr. Leach, here I'm going to ask you to pull

 3      up Government's Exhibit 407 and just go to minute 1:25 and

 4      play the next ten seconds.

 5              (Whereupon, segment of Government's Exhibit No.

 6      407 were published in open court.)

 7              MS. KEARNEY:  Your Honor, Kevin Seefried is at the

 8      front of that group when they leave that area and he is at

 9      the front of the pack when they encounter Officer Goodman at

10      the base of the Senate east grand staircase.

11              Now, we spent a lot of time talking about who said

12      what in that area and who did what in that landing area at

13      the bottom of the staircase.

14              Officer Goodman testified, and he testified

15      candidly and he testified credibly, that Kevin Seefried said

16      to him, "Where are they counting the votes?"

17              But at the end of the day, your Honor, there are a

18      couple things that are clear and really not in dispute.

19      They're in the video.  Officer Goodman was issuing commands

20      to Kevin Seefried and the rioters behind him to back up,

21      which Kevin Seefried and the rioters did not do.

22              During the course of his interaction with Officer

23      Goodman, Kevin Seefried jabs the Confederate battle flag

24      that he's carrying at the officer.  And that's Government's

25      Exhibit 504 at about 50 seconds in.

1          And Kevin Seefried told the FBI what he said to

2     Officer Goodman.  He said, "You can shoot me, man, but we're

3     coming in.  We're coming in here, man."

4          So let's pause here again.  What does all of this

5     conduct show?  Kevin Seefried was determined to get inside

6     the Capitol Building.  He crossed fence lines; he went

7     through breached police lines; he left his wife God knows

8     where.  He climbs through a broken window.  He challenged an

9     officer to shoot him.

10          If I were in front of a jury right now, your

11     Honor, this is one of those moments where I would remind

12     them that they're not supposed to leave their common sense

13     at the courthouse door.  And that applies just as much in

14     this bench trial as in the jury trial.

15          Common sense tells you that a man does not go

16     through all that effort, take all that risk, drive through

17     the dark, climb walls, go through broken windows, yell and

18     threaten to keep going even after he is shot if he does not

19     have any idea what he's doing.

20          It is clear from all of this that Kevin Seefried

21     was a man on a mission.  He was determined to get inside

22     that building.

23          Now, we've heard several United States Capitol

24     Police witnesses tell you that Kevin Seefried was angry when

25     they encountered him in that building.  They've described

1     his demeanor as angry, as aggressive.  They've described him

2     yelling at officers in the Ohio Clock Corridor, as walking

3     up and down the line of officers there.

4          And the footage in Government's Exhibit 414, that

5     corroborates this.  It shows Kevin Seefried engaging with

6     officers in that line, and he's clearly agitated about

7     something.

8          What is he angry about?  What is driving him to

9     violently breach the Capitol Building?

10         Well, Officer Morgan testified that he heard Kevin

11    Seefried ask:  Why are you protecting them?  And by "them,"

12    he understood Kevin Seefried to mean members of Congress.

13         And that's another commonsense point, your Honor.

14    Who else would the United States Capitol Police be

15    protecting if not the people who work in the building?

16         THE COURT:  Sorry.  Officer Morgan said that?

17         MS. KEARNEY:  Yes.

18         THE COURT:  He said that specifically about

19    Defendant Kevin Seefried?

20         MS. KEARNEY:  Yes, your Honor.  And he also

21    testified that he heard a reference from Kevin Seefried to

22    liars and thieves.

23         Now, Kevin Seefried told you exactly what he meant

24    by that, your Honor.  He told the FBI what he was upset

25    about.  He said that right around the time that some

1    officers were searching another rioter's bag -- and that's

2    Officer Morgan and his partner, Officer Gelfand -- he asked

3    why they wanted to work for people who are liars and

4    thieves.

5              He went on to say:  This affects all of us; your

6    mom, your kids, et cetera.

7              Kevin Seefried's not upset because Officer Morgan

8    is rifling through a bag when he's not supposed to.  He is

9    not in the Capitol Building to protest fiscal policy.  He is

10   upset about lies and about theft.  He is upset about

11   election fraud and a stolen election.  He is upset about

12   something that he believes is being perpetrated by the

13   members of Congress who will be certifying the electoral

14   count.

15             So now let me turn to Hunter Seefried.  His

16   knowledge and intent are clear from his words and his

17   actions as well.

18             What does the evidence show that he did on January

19   6, 2021?  Well, like his father, he traveled with his family

20   from Delaware to D.C. for the purpose of attending the Stop

21   the Steal Rally.  They parked in that parking lot and they

22   attended the rally and stayed for the whole thing.

23             And the conclusions that are to be drawn by that

24   set of facts, your Honor, are the same as for Kevin

25   Seefried.  Hunter Seefried traveled on January 6, 2021.  Not

1          another date; not another location.  He's there for the Stop

2          the Steal Rally, where there's discussion of election fraud,

3          electoral certification and Congress.  And Ms. Cuff even

4          told you what was on their mind when they went down:  They

5          thought that the election had been stolen and they were

6          upset about it.

7                  Like his father, Hunter Seefried doesn't get in

8          his car and go home when the rally's over or he doesn't wait

9          in the car.  Instead, he goes to the Capitol Building.

10                 In fact, Hunter Seefried told the FBI what his

11         intention was when he went to that rally.  He was going for

12         Stop the Steal.  He was going to try and prevent what he

13         viewed as a fraudulent election result from being certified.

14         That was what was on his mind.

15                 Once he gets to the Capitol grounds, he encounters

16         and pushes through those same barriers, those same

17         obstacles, leaving his girlfriend and his mother behind.  He

18         sees the signs in the fencing; he climbs up that same wall

19         that Kevin Seefried climbed up; and then he reaches the

20         building.

21                 THE COURT:  Can I ask you, regarding Ms. Cuff, I

22         got the impression she kind of suggested that Kevin Seefried

23         was the prime mover here in the rally or going down to D.C.

24         Do you agree with that?

25                 MS. KEARNEY:  I think that's a fair assessment,

1    your Honor.  But I don't think it changes what Hunter

2    Seefried's intentions were in going.  It may be his father

3    who had the idea.  It may be his father who suggested that

4    they go.  But it is clear from what Hunter Seefried says

5    that what was on his mind was the Stop the Steal Rally,

6    stopping election fraud.

7            And then later, during his FBI interview, he

8    explains what he said to officers when he was in the

9    building.  He explains that he was upset about what he

10   believed to be fraud.  He explains that he wanted to talk to

11   "them people."  And by "them people" I submit, your Honor,

12   he means Congress members, people who work in Congress, but

13   that because the cops were preventing him, he was asking his

14   questions to the cops instead.

15           And so the fact that his father suggested that

16   they go, was the one who coordinated the logistics that they

17   go, makes no difference to his state of mind and his

18   intention to be there and what he intended to do that day.

19           THE COURT:  Thank you.

20           MS. KEARNEY:  So Hunter Seefried, having passed

21   all those same obstacles, those same barriers, reaches the

22   Capitol Building.  And now he claimed multiple times to the

23   FBI that the window was already broken out when he got

24   there, and the agents revisited that over and over again.

25   And I submit, your Honor, that he was cognizant of not

1    crossing a line and admitting certain conduct until the

2    agent confronted him with the video.

3              Your Honor has seen that video.  The video speaks

4    for itself.

5              But putting that aside, your Honor, the speed with

6    which he arrives off the scene as that window is being

7    broken weighs heavily in his determination to get into that

8    building.  There is someone breaking a window with a riot

9    shield.  There is someone wielding a two-by-four.  And as

10   soon as they make significant progress on that window,

11   Hunter Seefried is there.  He is there with gloves on to

12   clear the glass out of that frame.

13             And he eventually admits as much, your Honor,

14   although it took several rounds of questioning.  And then he

15   climbs up on a ledge.  And so at this point, he's climbed

16   over the wall, he's broken out part of the window and he

17   jumps through that window.

18             And that's exactly where he wanted to be, your

19   Honor.  As he told Special Agent McCabe, he went to that

20   window because that's where the commotion was.  That's where

21   the breach was.  And he was rushing to get to the front

22   there to be a part of it.

23             Once he's up on that window ledge, he, too, has a

24   dangerous confrontation with a police officer.  It's not

25   Officer Goodman.  It's the officer who responds to the

1    Senate Wing doors and tries to deploy his pepper spray.  And

2    when Hunter Seefried sees that officer, he thinks the

3    officer's reaching for a gun.  The officer goes for his

4    belt.

5              And so he swings back out of the building to try

6    and shield himself.  But that doesn't deter him from

7    climbing through that window as soon as the officer is out

8    of the way.  And so, like Kevin Seefried, he is intensely

9    determined to get inside that building and he's one of the

10   first people to do so.  He is on the front of that line and

11   he is the fourth person through that window.

12             So, your Honor, the same common sense that tells

13   you why Kevin Seefried was so intent on being inside, that

14   reasoning applies to Hunter Seefried, too.  He set out in

15   the early-morning hours; he's crossed all those barriers and

16   fences; he's climbed up that wall; he's joined a mob in

17   breaking through a window; and he persists through what he

18   thinks is a grave threat to his life.  This is someone with

19   a clear idea of what is inside that building who has the

20   drive to get in there.

21             And so why was he there?  We spoke about this a

22   little bit earlier, your Honor.  Why was he so motivated to

23   get inside that building?  The video footage from

24   Government's Exhibit 414 -- that's of the Ohio Clock

25   Corridor -- it shows him getting up to the police line,

1     shows him engaging in a heated conversation with officers.

2            And now no witness has testified -- no United

3     States Capitol Police witness has testified about what

4     Hunter Seefried said to them.  They don't remember.

5            He wasn't as loud or as aggressive as some folks

6     in that corridor, and so they were less focused on him.  But

7     Officer Morgan notes that he's angry, that he's worked up,

8     he's clenching his fists.

9            And so what was he so worked up about?  He told us

10    that.  He told us that himself.  He was heated, as he

11    described to Special Agent McCabe, about what he believed

12    was fraud in the voting process.

13           Now, it's hard to hear, your Honor.  I suggest

14    that you go back and watch it carefully.  But he starts

15    talking to Special Agent McCabe about fraud in the voting

16    process at around 21 minutes and 14 seconds of Government's

17    Exhibit 301.

18           And he's there because he wants to talk to

19    Congress members about this fraud, about why the senators

20    and the representatives aren't concerned about it like he is

21    and are going to certify the electoral vote.

22           As he told Special Agent McCabe, he wanted to ask

23    "them people about why that stuff's allowed to be happening

24    in America."

25           But it was the Capitol Police officers he

1    encountered, so that's who he engaged with.  And that's at

2    21:40 in the same exhibit.

3              THE COURT:  Can you actually just pull that up?

4              MS. KEARNEY:  Sure.

5              Mr. Leach, could you pull up Government's Exhibit

6    301 at 21:40.

7              THE COURT:  Maybe 14 first.

8              MS. KEARNEY:  21:14, then.

9              (Whereupon, segments of Government's Exhibit

10   No. 301 were published in open court.)

11             THE COURT:  Thank you.

12             MS. KEARNEY:  That's at 22:50.

13             So he wants to talk to them people, your Honor.

14   And that's the people who are supposed to be in that Capitol

15   Building.  That's the senators and the representatives.  And

16   those are the people with the power to do something about

17   his concerns by refusing to certify the electoral vote.

18             As your Honor has seen in the clip we just played,

19   during his interview, Hunter Seefried doesn't always use

20   complete sentences.  There are times where the agent and he

21   are talking over each other.  But he makes it clear that it

22   was these allegations of election fraud that he was

23   concerned about.

24             He references seeing news reports about hearings

25   in the Senate and in courtrooms where people were claiming

1    to know about fraud at the polls and the counting of votes.

2    And it's obvious to the agent who's interviewing him what

3    he's talking about.  That's why he brings up Rudy Giuliani

4    and Sidney Powell and the lawsuits that they're filing.

5            Hunter Seefried also references seeing ballot

6    boxes and Dominion voting machines lying in the bushes, and

7    he's concerned that those are votes that aren't being

8    counted and those are voting machines that were used to

9    throw the election so that President Trump lost.

10           That's why he's at the Capitol, your Honor.  He is

11    not there to protest the vaccine mandate.  He is not there

12    to protest immigration policy.  He is in the Capitol because

13    he thinks the election is being stolen.  And January 6,

14    2021, is the day that Congress will be certifying the

15    election.

16           THE COURT:  So you don't believe what Ms. Cuff

17    said about them not even knowing that certification was

18    occurring that day?

19           MS. KEARNEY:  Your Honor, what he has to know is

20    that there's something happening in that building.  And it's

21    clear from the speech that Trump gave and it's clear from

22    Hunter's own statements that he knows that something in that

23    building is happening that will finalize the electoral

24    count.  He doesn't have to know specifically that it is the

25    certification of the Electoral College vote.  But what he

1    knows is that there is a proceeding happening in that

2    building and that if it is not put a stop to, the election

3    will be certified so that Donald Trump loses.

4         THE COURT:  So obviously, people go and illegally

5    protest in the Capitol quite frequently on whatever cause

6    célèbre, wanting to be heard on an issue.  All of that may

7    be -- you know, these misdemeanors.  But it isn't this

8    obstruction.  So how do I get there?  In other words, from

9    that he's going, wanting to make his voice heard, what have

10   you, to wanting to stop that proceeding from occurring?

11        MS. KEARNEY:  Your Honor, so what he needs is the

12   corrupt intent, which is established through his actions and

13   through his own admissions that he knew it was wrong.  So

14   he's breaching a building.  He's passing police barriers.

15   He's disregarding orders from officers to leave the

16   building.

17        And then he needs that intent to obstruct, as you

18   flagged.  And you can infer that intent, your Honor, by what

19   is on his mind when he goes into that building.  So he's

20   upset about election fraud.  He is upset about a stolen

21   election.  He's attended a rally, the purpose of which is to

22   refute the credibility of the election.  And then he goes to

23   the Capitol Building where that proceeding is taking place.

24        Now, at the speech on the Ellipse, Donald Trump

25   has encouraged the folks in attendance to go to the Capitol,

1     referencing talking to senators, talking to congresspeople

2     and telling them not to seat the slate of electors of what

3     he claims is a fraudulent election.

4          So the obstruction piece is in that he knows that

5     there's a proceeding happening, and that's why he's in the

6     building.  He's not simply standing on the lawn protesting,

7     chanting about how the election has been stolen, writing

8     letters to his congressman, his newspaper, what have you.

9     It's that proceeding that he needs to interfere with.

10          THE COURT:  Okay.  Thank you.  You may continue.

11          MS. KEARNEY:  Thank you.

12          As your Honor flagged, he is there to express his

13     opinion.  Right?  He says that a couple times in his

14     interview.  He's there to get answers about what he thinks

15     is fraud in that voting process.  And the folks who can give

16     him those answers are congresspeople.  It's not White House

17     staff; it's not the Cabinet.  It's Congress.

18          And so that's why he's there.  That's why he goes

19     to such great lengths and puts himself at risk to get in

20     there.

21          So to circle back on your Honor's question about

22     how is this distinct from just someone who is unauthorizedly

23     protesting in a building, it's the drive to get in that

24     building and it's the drive to get further in the building.

25          So once he gets in, he didn't just kind of wander

1    the hallways.  Right?  He joins a mob that's pursuing an

2    officer up the stairs.  He confronts a line of police

3    officers lined up outside the Senate door.  He's not content

4    to kind of say his piece and get out.  This is about pushing

5    further.

6               THE COURT:  Watching that video, you kind of get

7    the impression that, like you say, they're kind of chasing

8    Officer Goodman.  And it just so happens that -- he says

9    he's going to find backup.  And obviously, I don't think

10   there's any reason to discredit that.  But it just so

11   happens the place where the backup was is outside the Senate

12   chamber and that, had backup been in the basement and had

13   they followed him there, it could be a very different

14   situation.

15              MS. KEARNEY:  That's a fair point, your Honor.

16   I'm not asking you to infer his intent from his actual

17   proximity to the Senate.  What I'm pointing out is that

18   their goal is to get further into the building.  Right?

19   They pursue this officer into the building wherever he may

20   take them.  Their drive is not to simply display a sign or

21   to make their voice heard.  Their drive is to get close to

22   the people who are making the decision that they disagreed

23   with.

24              It's also telling, your Honor, why Hunter Seefried

25   tells us that he leaves the Capitol Building.  And it's not

1     because he realized that he was in the Capitol and not some

2     other building.  And it's not because it dawned on him that

3     it was the electoral certification that was happening and

4     not some other congressional proceeding.

5             It's because he thought he was going to get

6     arrested.  He told that to Special Agent McCabe, that he

7     heard over an officer's radio that reenforcements were

8     coming and that officers were going to corner the rioters.

9             And so this isn't a case where he mistakenly

10    entered a building or he was unclear about what the purpose

11    that he and Kevin Seefried and the other folks in that

12    breaching group had.  He leaves because he realizes that he

13    might get in trouble.  And that's something that stopped him

14    when he was trying to break in.  The fact of an officer's

15    presence at the window didn't stop him.  It's only when

16    there's a very real possibility that he might be physically

17    apprehended that he gets out of that building.

18            So I just want to talk for a second about the

19    breaking of the window that's relevant to the charges

20    against just Hunter Seefried.  And the clearest view of that

21    video is Government's Exhibit 502.  I've directed your Honor

22    to approximately a second 50.

23            THE COURT:  Could we watch that again?

24            MS. KEARNEY:  Sure.

25            Mr. Leach, could you maybe start at 45 seconds of

1     502.

2                    (Whereupon, segments of Government's Exhibit

3     No. 502 were published in open court.)

4                    THE COURT:  Replay that part, please.

5                    (Whereupon, segments of Government's Exhibit

6     No. 502 were published in open court.)

7                    THE COURT:  You can stop.

8              So it looks to me like that big shard had already

9     been kind of knocked out by the two-by-four, kind of falls

10    into place and then he pushes it out.  Right?

11                   MS. KEARNEY:  It --

12                   THE COURT:  Do you disagree with that?

13                   MS. KEARNEY:  There's that large chunk, your

14    Honor, and it appears there's also a shard kind of sticking

15    out and that he clears it to clear the way for rioters to

16    pass.

17                   THE COURT:  But I guess that's the part I'm

18    talking about, that it looked like it had kind of got

19    knocked out by the two-by-four, falls back there and then he

20    pushes that out.  Is that how you read that?

21                   MS. KEARNEY:  I think it's clear, your Honor, that

22    the majority of the damage is caused by the riot shields and

23    the two-by-four.  The riot shield makes the initial impact

24    and causes kind of the spider web shattering.  The

25    two-by-four is what punches out the bulk of the window, and

1    so a large amount of destruction has already occurred.  But

2    it's Hunter Seefried who finishes the job.  And he pushes

3    that glass out.

4              I think it's clear that it's still in the frame.

5    But your Honor has the video and you can watch that.

6              THE COURT:  Okay.

7              MS. KEARNEY:  And just to respond to a point that

8    I think Mr. Bostic is going to make based on his opening,

9    Hunter Seefried isn't relieved of responsibility because

10   someone else was also trying to break that window.  So in

11   the same way that the man with the two-by-four isn't

12   relieved of responsibility because the guy with the riot

13   shield already spider-webbed it, Hunter Seefried is still on

14   the hook for that window because he finishes the job.

15             THE COURT:  I think there's like three destruction

16   charges.  Right?

17             MS. KEARNEY:  That's correct.

18             THE COURT:  Do you believe they rise and fall

19   together or could there be a difference between destruction

20   of property and physical violence to property?

21             MS. KEARNEY:  I think -- well, just to be clear,

22   the only act of physical violence that we're alleging is the

23   destruction of the window.  There's not a separate incident

24   that we haven't specified.

25             THE COURT:  Understood.

1          MS. KEARNEY:  Yes.  I think it's that one

2     activity.  So yes.  I think the breaking and clearing of the

3     glass is that act of violence.

4          THE COURT:  I get that.

5          I guess I'm wondering, could the window already be

6     destroyed such that he would not be liable for destruction

7     of property, but it is still an act of physical violence?

8          MS. KEARNEY:  I see.

9          Legally, I don't know, your Honor.  But I think

10    they group together.

11         THE COURT:  So I guess I'm wondering, it feels

12    like in many ways as a practical matter the window was

13    destroyed.  It's going to need to be replaced had he been

14    there or not.

15         MS. KEARNEY:  Frankly, your Honor, the window was

16    going to need to be replaced whether the guy with the

17    two-by-four was there or not.  Right?  It's still broken

18    out.  That pane is still destroyed.  But the two-by-four

19    does further damage.

20         THE COURT:  You don't think that the other two

21    were acting in concert in a way that he wasn't?

22         MS. KEARNEY:  I think it's clear that he's close

23    to those rioters when the initial breaking is taking place.

24    And despite his disavowal of any knowledge of what's

25    happening, he is on the spot so quickly when it's time to

1     clear that glass that in the same way that the man with the

2     riot shield and the man with the two-by-four know exactly

3     what each other are doing, Hunter Seefried knows exactly

4     what those two are doing.  And so if the man with the shield

5     and the man with the wood are acting in concert, Hunter

6     Seefried is acting in concert with them.

7          THE COURT:  Do you think his strong denials of

8     knowing anything about that help you?

9          MS. KEARNEY:  Because he clearly knows he did

10     something wrong, your Honor.  You know, there's a lot that

11     he is willing to admit to in that interview.  He admits to

12     being in the building.  He apologizes.  He says he knows it

13     was wrong and that he regrets it.

14          But breaking a window, your Honor, that's physical

15     destruction.  And that's of a different caliber.  And so he

16     is reticent to even admit that he knew it was happening

17     because in his mind it's a lesser crime to enter through a

18     broken window if he didn't see it get busted out and if he

19     didn't participate in it being busted out.

20          THE COURT:  You didn't find any case law on this,

21     did you?  Just kind of this idea of different people acting

22     together or this physical violence is kind of an unusual

23     statute.

24          MS. KEARNEY:  No, your Honor.  But I do think it's

25     clear that his efforts to clear the glass are also aiding

1    and abetting the efforts to open that window.  Right?  So

2    you can't get through that window if there's still glass in

3    it.  And so the efforts by potentially two principals, the

4    man with the shield and the man with the two-by-four, to

5    break open that window are furthered by Hunter Seefried's

6    efforts to clear that glass out of the window.

7              THE COURT:  So you're saying I could find him

8    guilty for aiding and abetting those three destruction

9    charges?

10             MS. KEARNEY:  Yes, your Honor.

11             THE COURT:  Okay.

12             MS. KEARNEY:  While we're on aiding and abetting,

13   I want to address that in connection with the 1512 charge,

14   your Honor.

15             To kind of address the point of the intention of

16   the other rioters in this group that they're moving through

17   the building, that's the folks that they come through the

18   window with, the folks that they confront Officer Goodman at

19   the base of the stairs with, the folks they climb those

20   stairs with and the folks who are in the Ohio Clock

21   Corridor:  Kevin Seefried's intent and Hunter Seefried's

22   intent are clear for all of the reasons why they are liable

23   as a principal.  And the intent of other people who they are

24   acting in concert with, who they are furthering, are also

25   clear.

1         And that's for a couple of reasons:  First, all of

2    those folks also -- not all of those folks; many of those

3    folks also came from the rally.  They had heard Trump's

4    discussion of election fraud, stopping the certification,

5    his instruction to go to the Capitol.

6         And you've heard testimony and evidence about

7    statements that other people in those areas were making.  So

8    you've heard the Capitol Police officers testify about

9    statements that they heard people making, that the rioters

10   were looking for Vice President Pence, that they wanted to

11   know where the votes were being counted, that they were

12   looking for members of Congress, that they were there for

13   Stop the Steal.  And these officers, despite the noise in

14   the Ohio Clock Corridor and at the base of the Senate east

15   grand staircase, these officers could hear what those

16   rioters were saying.

17        And Kevin Seefried and Hunter Seefried in many

18   respects were even closer to those people.  It's got to be

19   clear to them what those rioters are announcing that their

20   intentions are.

21        This is clear from the video footage as well, your

22   Honor.  If you look at Government's Exhibit 504, which is

23   one view of the altercation with Officer Goodman, and then

24   505, which is the 180-degree view of that, there's a man in

25   the red hat that I think Officer Goodman testified about.

1    And he's standing next to Kevin Seefried and he's yelling:

2    Where are they counting the votes at?

3          And it's audible from the view behind Kevin

4    Seefried and it's audible from the view in front of Kevin

5    Seefried.  So it is clear from the things that are being

6    shouted in that building what the intention of the other

7    rioters in that building are.

8          And it's clear that Kevin Seefried and Hunter

9    Seefried share that intent for all of the reasons we've

10   discussed earlier.

11         Now, there are some distinct affirmative actions

12   that they each take to aid and abet this obstruction effort.

13   So, for example, Hunter Seefried clearing the window out so

14   that others can enter.  For example, Kevin Seefried

15   encountering Officer Goodman at the base of that staircase

16   and engaging with him, holding him off from other rioters.

17   And there are key decision points where they affirm over and

18   over again that they are with this group, that they are in

19   agreement with this group, and that they are taking action

20   with this group.

21         When they come through the window, they decide to

22   travel in the same direction with them.  In fact, Kevin

23   Seefried is one of the ones leading that pack.  At the base

24   of the staircase, Hunter Seefried makes the decision to

25   climb the staircase with those rioters and he is at the

1       front of the pack.

2                   And in the Ohio Clock Corridor, your Honor, they

3       make the decision to engage with officers in that line, to

4       stay in that corridor for maybe 20 minutes, drawing

5       officers' attention to themselves, engaging with officers

6       and generally preventing the officers from clearing the

7       building so the official proceeding can resume, from

8       engaging with other rioters at other breach points.  And

9       they are in effect lending their number to what is a mob.

10                  The nature of a mob, your Honor, is the looming

11      threat of violence of a group of individuals against an

12      outnumbered opponent; in this case, the Capitol Police

13      officers.  And so in lending their number and their might

14      and their aggression to this mob, they are also aiding and

15      abetting the folks with the intention to obstruct the

16      proceeding in that mob.

17                  THE COURT:  Doesn't that assume a degree of

18      sophistication or intentionality that might be difficult to

19      ascribe to these Defendants?

20                  MS. KEARNEY:  I think the number of that mob is

21      clear to these Defendants, your Honor.  The intention of

22      that mob is announced over and over again in the hallways.

23      They are announcing:  Where are they counting the votes at?

24      This is our House.  Where is Mike Pence?  Where are the

25      members?

1          I think those are very clear statements, your

2    Honor, that it doesn't require a Ph.D. in political science

3    to figure out what those people are after.  And these

4    Defendants signed on to that.

5          THE COURT:  So it sounds like Hunter Seefried,

6    anyway, has suggested that there were a couple members of

7    antifa there in the back of the Ohio Clock Corridor.  Let's

8    say that he's right.  Do you think they would be guilty of

9    aiding and abetting obstruction of an official proceeding

10   even though they are just -- let's say they're there to --

11   they just want to create mayhem?

12         MS. KEARNEY:  I don't want to engage in an

13   exegesis on what antifa is and is not.

14         But my understanding is that in the conception of

15   the Defendants, your Honor, they were agitators.  They are

16   people who are there to rile things up.  And so they have

17   the intention to encourage these folks to obstruct, right?

18   Because their goal is to create chaos.  And if that requires

19   interfering with a proceeding, with preventing it from

20   happening, then yes.  It doesn't matter that they don't

21   necessarily align themselves politically with the outcome of

22   the failure or success of the certification.  What matters

23   is the obstruction of that proceeding.

24         THE COURT:  Okay.

25         MS. KEARNEY:  Unless your Honor has any further

Closing Arguments by Ms. Kearney

1    questions, I've run through my chronology of kind of how we

2    know what we know.  So if you have further questions on

3    intent, I'm happy to engage, or points that you haven't

4    considered yet.

5           THE COURT:  No.  I don't think so.

6           MS. KEARNEY:  Well, thank you, your Honor.

7           THE COURT:  Thank you, ma'am.

8           Mr. Ohm?

9           MR. OHM:  Your Honor, I think one thing that we

10   can all agree upon after a year and a half of working

11   through these cases is that there are several categories of

12   people who went into the Capitol on January 6, 2021.

13           And in broad terms, sort of mirroring the

14   Department of Justice's charging decisions, there are those

15   who assaulted people both inside and outside the Capitol;

16   there are the people who are considered seditionists, like

17   the Oath Keepers and the Proud Boys; there are the

18   trespassers who mostly walked through, chanted and took some

19   photos; and then there are those who went into the Capitol

20   with the intent to stop Congress from -- stopping the

21   electoral vote and the orderly transition of presidential

22   power.

23           And, your Honor, the lines between the last two

24   categories have been sometimes blurred.  And it's our

25   position that the Government is further blurring those lines

1    in prosecuting Kevin Seefried for the conduct here.

2            One actually telling point that Ms. Kearney just

3    made, which I think is a further blurring of the lines, is

4    when she says that all the Government needs to prove is that

5    the Defendants knew that something was happening in that

6    building.

7            Well, your Honor, it's an important concession by

8    the Government that the evidence as a whole demonstrates

9    that Mr. Seefried did not know about the electoral

10   certification and the counting of votes.  And it's important

11   that the Government appears to also credit Ms. Cuff.

12           And it's important because the knowledge

13   requirement of what the Government is required to prove goes

14   beyond that, that there has to be an official proceeding and

15   it has to be what is indicted, which is a certification of

16   the votes.  And the Government has not proven, and there

17   frankly is very little evidence that identifies that.

18           What the Government points to are things that

19   include the third category for the most part.  The first, I

20   think, five minutes of Ms. Kearney's closing talked about

21   driving to D.C. and not Dover, parking near Capitol grounds,

22   hearing presidential -- President Trump, going to D.C., not

23   going on the 5th, not going on the 7th, but going on the

24   6th, going to a rally about election fraud.

25           Your Honor, that applies to everybody that was

1   inside the building on January 6.

2          The things that the Government is asking you to

3   draw an inference of does not rise to the level of the

4   specific intent that the Government needs to prove to show

5   that the intention was to stop Congress from voting on the

6   electoral count.

7          And other than Officer Goodman's statement, which

8   I'll address in a few minutes, the entire argument is about

9   what Kevin Seefried did.  The fact of the matter is, what

10  Kevin Seefried did cannot rise to the level of demonstrating

11  that specific intent.

12         If an individual went into the Capitol Building

13  having no idea that an obstruction -- that an electoral

14  count vote was happening, but wanted to pillage, wanted to

15  vandalize, wanted to riot, wanted to talk to a congressman

16  about their opinion, that person is not guilty of

17  obstruction.

18         Even if a person decides:  I'm going to go in, set

19  a fire in the middle of the Rotunda, but that person doesn't

20  know that there's an electoral count going on, that person

21  is not guilty of obstruction of justice.  That is one

22  particular category, one charge, which is a unique charge, I

23  think we can all agree, because it really does prosecute

24  what is going on in somebody's mind.

25         And if we're going to prosecute those kind of

1     cases, then we actually have to know what is going on in

2     somebody's mind.  And the Government has not shown any

3     evidence that Mr. Seefried knew that there was anything to

4     obstruct.

5           And all of the things that he is attributed to

6     saying --

7           THE COURT:  Isn't just the timing pretty strong

8     circumstantial evidence, though?  I recognize that that

9     would apply to any of the January 6 rioters.  But

10    nonetheless, it --

11          MR. OHM:  Your Honor, if there was no rally, then

12    yes.  But the fact of the matter is, the rally brought

13    individuals here for a completely innocent reason.

14          THE COURT:  But a very related reason.  Right?

15          MR. OHM:  For a very related reason, your Honor.

16    But, your Honor, if President Trump said, "We're all going

17    to meet at the Washington Monument," is there any doubt that

18    Mr. Seefried wouldn't have gone to the Washington Monument

19    or, if his car was parked by the Washington Monument, he

20    would have gone there?

21          If everybody was going in that direction, do you

22    think Mr. Seefried would have been, like:  Oh, you know

23    what?  I don't care where all those people are going.  I'm

24    going to go to the Capitol to obstruct this vote?

25          There has to be evidence that demonstrates that

1    that's what he wanted to do.  And the Government hasn't

2    presented any.

3              So yes.

4              THE COURT:  But I think they did present the

5    statement that during the rally the president said:  Let's

6    all go to your brave senators or those who are counting the

7    votes or something.  And I realize your position probably is

8    that he didn't hear that.  But --

9              MR. OHM:  Well, your Honor, what he said was, I

10   think, that somebody with a bullhorn was shouting, "Let's go

11   to the Capitol."  I don't believe that that was attributed

12   by the -- in the statement as to timing.  But that occurred

13   after they were eating and they were already at the car.

14   They had already decided to have lunch and then go home.

15   And then they hear the statement "Let's go to the Capitol"

16   from somebody in a bullhorn or "Everybody's going to the

17   Capitol" or something like that.

18             THE COURT:  I thought maybe you all had a

19   stipulation on that point, a stipulation regarding a speech

20   given by former President Donald J. Trump.  I --

21             MR. OHM:  Yes.

22             THE COURT:  -- think it's 707.

23             MR. OHM:  Yes.  He gave that speech.  And

24   Mr. Seefried said that he heard the speech.

25             But in terms of why he decided to follow the crowd

1    and go to the Capitol, it was because I believe the

2    statement said that he had heard the person with the

3    bullhorn talk about the Capitol specifically at that time.

4         And I think the evidence demonstrates that,

5    because he doesn't -- they go to eat lunch.  They don't go

6    to the Capitol right away.  There's a line of Proud Boys

7    that are there I think 30 minutes earlier.  It's not like

8    he's following them.  He's going -- and he doesn't actually

9    go towards the Capitol until everybody's already at the

10   Capitol.

11        So his specific intent, which is what we're

12   talking about here, can't believe that he is being directed

13   by President Trump.

14        Frankly, your Honor, I mean, this argument is sort

15   of uncomfortable.  We actually asked the Government prior to

16   this trial whether this is the argument that they were going

17   to make that somehow President Trump was the person who

18   organized this rally, organized this idea that everybody's

19   going to go to the Capitol in hopes that some obstruction of

20   Congress would happen.

21        And we were told that that was not going to be

22   their theory.  And there is some sort of inclination that

23   that might be what was going on, or at least they're trying

24   to attribute Mr. Seefried -- or President Trump's intent

25   onto Mr. Seefried, which is frankly just unfair.  There has

1    to be evidence of Mr. Seefried's intent that's independent

2    of a speech that's going on for a rally.

3            Certainly he can be against -- he can believe that

4    there was election fraud.  Certainly he can believe that he

5    is here legitimately.  He can even believe that he was going

6    to Congress in order to find his congressman.  And he might

7    even want to break into the windows in order to find that

8    congressman.

9            But there has to be more than that for this

10   particular charge.  This charge requires a specific intent

11   to stop the voting that was happening.

12           THE COURT:  I understand that.  I don't think the

13   Government is suggesting this was the president's idea to

14   break in.  What I understand is the president's speech kind

15   of mentioned "Let's go to the Capitol" and mentions this

16   counting of the votes.

17           And so I think the Government is saying, you know,

18   there's kind of a two plus two equals four here, that your

19   client does go to the Capitol; he's learned that the votes

20   are going on from what the president had said; and he

21   actually breaks in to try to stop the voting.

22           MR. OHM:  Your Honor, I would suggest it's more

23   like two plus one plus blank equals four, because

24   Mr. Seefried does not say that he hears that the vote

25   counting is going on at that time.  There's no evidence of

1       that.

2               And so there is no reason to believe that that's

3       what Mr. Seefried -- and also, Ms. Cuff said they were at

4       that point -- I mean, they were apparently so interested in

5       the president's speech that they decided to leave and get

6       food.  And also, at that point that they were not in such

7       great earshot that they could hear every word that the

8       president said.

9               So I think the good evidence that the Court has on

10      Mr. Seefried's intent is what's in the statement.  The fact

11      that it was said, there are probably a lot of things said

12      that day, your Honor, that Mr. Seefried did not digest, did

13      not incorporate into his thinking.  And I don't think it's

14      fair to attribute that the one that happens to be what the

15      Government needs to prove is the thing that he actually --

16      that he actually -- that formed his intent.

17              What the Government has proved and what the

18      Government talks about is essentially that he had a specific

19      intent to go into the building, yell, protest, I think we

20      will even say make his voice heard, but not to -- but the

21      circumstantial evidence that they are saying that he was

22      there to obstruct the count requires the Court to make a

23      finding specifically that he heard that there was a count

24      going on and that that is why he went into the building and

25      that is why he did what he did, which the Government has not

1        proven.

2                I was going to talk about the evidence that the

3        Government was relying upon in terms of the location.  But

4        it sounds like the Government is sort of backing off that

5        theory as to their location being in the Senate chambers, so

6        I'm not going to go further on that.

7                But they do still say --

8                THE COURT:  Is your position that your client and

9        the crowd were just kind of following Officer Goodman

10       wherever he went?

11               MR. OHM:  Yes.  I think Officer Goodman basically

12       said that also, that he -- that there was -- I think the

13       evidence in total shows that there was no indication that

14       that's where the Senate chamber was.  There was no signage

15       and there was -- and there were no questions.  There was

16       nobody saying that that's where the Senate chamber was.

17               And I think, given that everybody was yelling and

18       given what the officers were focused on, that if people were

19       saying, "We're going to that chamber, we're going right

20       there; that's where the senators are," that the officers

21       would have remembered it and that that would be evidence in

22       this case.

23               So the lack of that combined with the fact that

24       there is no evidence that anybody knew where they were going

25       and combined with the evidence that -- well, there was that

1      one individual who was obviously following Officer Goodman.

2      And then it seems like the crowd, including Mr. Seefried,

3      who was at the rear of that crowd, was following the rest of

4      them.

5             So the Government seems to also rely upon the -- I

6      think it's the primacy of Mr. Seefried entering into the

7      building as evidence of intent.  And it's, I think, a fine

8      line that the Government is trying to walk there.

9             It would be one thing, I think, to be the first

10     person in; but to be the first 10 or 15 people or the 16th

11     person, where you can no longer infer that it's somebody's

12     intent to obstruct justice, if they go in through the

13     window, the 17th person -- you know, are we talking about

14     that particular breach because it's more significant?  But

15     people on the other side who were breaching another wing,

16     they don't know that anybody else has breached.

17            So is it the first 15 people there that are

18     automatically convicted of obstruction of justice because

19     their intent you can infer, that they're one of the first 15

20     people into the building from their perspective?

21            Again, your Honor, a lot of this prosecution

22     offers a slippery slope.  And that cannot be conclusive

23     evidence that Mr. Kevin Seefried intended to obstruct

24     justice just because he happened to be in an area where

25     people got in earlier than others.

1          The other evidence that they were talking about is

2     essentially what was being shouted.  The "liars and thieves"

3     statement, again, even if this happened on -- if

4     Mr. Seefried was looking -- even if he did believe that --

5     if he was referring to congresspeople when he was saying

6     "liars and thieves," then we would not -- we would suggest

7     that that still doesn't demonstrate a specific intent to

8     obstruct Congress.

9          I forget which officer -- I think it was Officer

10    Morgan -- who was talking about:  Well, they were talking

11    about congresspeople because we are inside the Capitol.  And

12    it's perfectly reasonable to infer that individuals were

13    looking to protest Congress.  But again, that is separate

14    and apart from people who are intending to obstruct a vote.

15         There might be somebody who wants to go and chain

16    themselves to a statue in the Rotunda.  That person might

17    have the exact same opinions, that congresspeople are liars

18    and thieves.  They might have come to the Capitol for that

19    particular purpose.  But that still doesn't prove the

20    specific intent to obstruct.

21         And that is why your Honor should find Mr. Kevin

22    Seefried not guilty.

23         THE COURT:  Don't you think the "liars and

24    thieves" goes specifically to this idea of stealing an

25    election, that it does seem very related to the

1    certification?

2              MR. OHM:  The certification is so -- I don't know

3    that we watch the news all the time.  In the spirit of

4    time -- I stopped watching the news after --

5              THE COURT:  You're an optimistic person.

6              MR. OHM:  And in the news inside the Beltway,

7    obviously, it talks about the certification and talks about

8    fraud.

9              This was set up to be in the mind of people who

10   were thinking about this stuff this day.  This certification

11   process was set up to be this big event.  If that is not

12   where your mindset is, then this big event was the day that

13   Donald Trump was going to reveal the evidence that he had

14   that the election was stolen.

15             That is what I think -- that is a completely

16   reasonable alternative as to what individuals were thinking

17   when they convened on the capital -- the capital, being

18   Washington D.C. -- on January 6.  They were there because

19   President Trump told them to come.  And they were there for

20   a speech and a protest.  But that was it.

21             The fact that -- the idea that, from that, we can

22   automatically just infer that they knew -- that Mr. Seefried

23   knew that it was a certification vote, that that was even a

24   thing -- I mean, I don't know that most Americans knew that

25   this was a thing until sometime around December 2020, when

1    we started talking about this.

2              I don't know if Officer Goodman remembers it, but

3    I don't remember this for any other election.  This isn't

4    something that -- I remember there was Election Day and

5    there was January 20.  I don't remember anything in between

6    in any of these other elections.  It became a thing because

7    it was a thing in this election.

8              But I don't think that it's fair to say that

9    somebody from Laurel, Delaware -- that we can automatically

10   assume that they understood that supporting President Trump

11   in this situation has anything to do with some sort of

12   certifying vote that happened in Congress.  It's an opaque

13   concept to people outside of the Washington, D.C., area and

14   especially in Delaware, which is two hours away, but still

15   in a sense is also miles and eons away.

16             I wanted to use the "liars and thieves" part to

17   talk about misremembering, because that is what Officer

18   Morgan did.  And Officer Morgan said that he was called a

19   liar and a thief while he was searching this bag by

20   Mr. Seefried because he was, I guess, violating his Fourth

21   Amendment rights, or that was the perception that Officer

22   Morgan had.

23             I think we can conclude that that was incorrect,

24   that he had misremembered that statement, misattributed it

25   in terms of what happened, because Mr. Seefried himself

1   acknowledged that he said something in a completely

2   different context about liars and thieves.  And that appears

3   to be what the Court is crediting.

4         So I'm going to use that opportunity to start

5   talking about -- well, before I do that, we'll come back to

6   Ms. Cuff.  I don't know if the Court wants me to discuss

7   that any further.

8         But Officer Goodman's testimony, which obviously

9   was a big surprise I think for everybody here -- the opening

10  statements by the Government would have covered or would

11  have been the most significant evidence of intent as a

12  principle for Mr. Kevin Seefried if that had been stated

13  before.

14        And so as the Court probably could predict, we are

15  now in a position of asking the Court to not discredit

16  Officer Goodman, but recognize that it is -- it was a

17  chaotic day out there and that minds do not remember things

18  in the way that lawyers and testimony sort of warrant.

19        And so the first thing we could talk about is that

20  that is a very chaotic day.  I don't know if the Court can

21  see what's on my screen.

22        THE COURT:  Not yet.

23        MR. OHM:  Let's see.

24        THE COURT:  There we go.

25        MR. OHM:  It was an extremely chaotic day.  It was

1    a traumatic day for Officer Goodman.  I could just say that

2    if -- I mean, if I had a client who had gone through the

3    kind of day that he had gone through, I would assume that he

4    had some sort of PTSD and that he would have -- that there

5    would be some effects of that.

6          And then there were factually things that he

7    seemed to have gotten wrong.  It seems like by the timing of

8    the video -- and I'll show the whole video in the next

9    slide -- but that he had met three people at least at the

10   bottom of the stairs other than Mr. Seefried.  We have the

11   man in the red hat here.  There's the man in the black shirt

12   there and a guy in combat gear behind him.

13         So by the timing, it seems that when Officer

14   Goodman comes down you can sort of see Officer Goodman

15   actually off on the right there, that there were four people

16   actually down there.

17         The jabbing of the flag:  Whatever Officer Goodman

18   perceived, it wasn't what he described, because he actually

19   made this motion about using the butt of the flag, I think,

20   jabbing towards him.

21         But the other things that he said, which is that

22   while it was happening he was in arm's reach, that he was

23   continuing to advance as it was going on, it doesn't

24   really -- at least it doesn't make sense in terms of an

25   assaultive intent, because if somebody's in arm's length and

1    is advancing and you have a big long dowel, then if somebody

2    wanted to, then one would think that that would have

3    happened.

4          So there was some inaccuracy, I think, about what

5    Officer Goodman was inferring there.

6          The other thing is Officer Goodman, he

7    acknowledges, unlike Officer Morgan, that he watched these

8    videos over and over and over again.  And I think we can all

9    agree that it is very difficult to keep your memory pure

10   when you're watching videos of things.

11          And when we're specifically talking about these

12   sorts of things, when there are statements that are being

13   made that you hear over and over and over again, that might

14   seep into your conscience as to when something might have

15   happened.

16          So I'd like the Court just to take another look at

17   the video now.

18          THE COURT REPORTER:  Counsel, for the record, can

19   I have an indication of what's being published?

20          MR. OHM:  This is 505.

21          (Whereupon, segments of Government's Exhibit

22   No. 505 were published in open court.)

23          MR. OHM:  And if your Honor recalls, Officer

24   Goodman says that about when he's halfway down that last

25   flight, that's when he -- when the camera is halfway down

1     the last flight is when he believes he started interacting

2     with Mr. Seefried.

3                THE COURT:  But he really wouldn't -- I realize

4     that's what he said to you.  I don't know how he would know

5     that.  Right?  I mean, this is somebody coming down the

6     stairs --

7                MR. OHM:  Sure.

8                THE COURT:  -- behind the back and around the

9     corner from --

10               MR. OHM:  He would only know from looking at the

11    video over and over and over again.

12               But I would suggest that -- I mean, Officer

13    Goodman was praised.  He was at the inauguration because of

14    the video that was published here.  I would suggest that

15    he's probably seen this video a lot.

16               THE COURT:  He said that he did.

17               (Whereupon, segments of Government's Exhibit

18    No. 505 were published in open court.)

19               MR. OHM:  And so at that point, your Honor can see

20    the QAnon fellow.  The person with the black Q shirt and the

21    beanie comes forward.  It's only a couple seconds into when

22    Officer Goodman would have been down there.

23               So in terms of the timestamps on this particular

24    video, his confrontation with Mr. Seefried -- well, the

25    beginning of the middle of the stairs is around 6.87.

1          And I could take the Court's point.  That's

2     probably -- you know, it's give or take a second or two.

3     But I don't know that it could be more significant than

4     that.

5          THE COURT:  I guess I'm wondering why I should

6     believe that there wasn't an earlier confrontation.  I mean,

7     his testimony, as I understood his testimony, was that there

8     was some sort of confrontation between him and your client

9     when nobody is there.  Obviously, there are a lot of people

10    there.

11         So why didn't that happen well before this?

12         MR. OHM:  Well, I'm going to go to my next slide.

13         THE COURT:  I hear you that he said this happened

14    when he was coming down the stairs.  But I'm trying to sort

15    of harmonize testimony and videos.  It would be surprising

16    if he would know when this video started.

17         MR. OHM:  Since your Honor asked, I guess what I'm

18    going to do is play the ProPublica video again, which I

19    think sort of eliminates the possibility that it could have

20    been an extended period of time that Mr. Seefried was in

21    there and then also having this encounter.

22         And the ProPublica video is 504.

23         (Whereupon, segments of Government's Exhibit

24    No. 504 were published in open court.)

25         MR. OHM:  So, your Honor, we're now like 20

Closing Arguments by Mr. Ohm

1      seconds in from the initial breach, essentially, but even

2      less than that.

3                  THE COURT:  Help me with that.

4                  MR. OHM:  Okay.  So --

5                  THE COURT:  How do you know that's the start?

6                  MR. OHM:  Because this camera angle also picks up

7      the archway video with Officer Goodman there, which also

8      correlates to the 504 Igor Bobic video.  So what we can tell

9      from that is that there couldn't have been that much time

10     between the Igor Bobic video from behind Officer Goodman and

11     when the breach actually occurred, because Mr. Seefried

12     wouldn't have been in the building for more than a few

13     seconds.  That shows when the breach occurred.

14                 THE COURT:  Okay.

15                 MR. OHM:  Okay?  So I think that -- it looks like

16     people are starting to enter at around eight seconds on this

17     video.

18                 (Whereupon, segments of Government's Exhibit

19     No. 504 were published in open court.)

20                 MR. OHM:  The Court can see at 16 seconds that's

21     Dominic Pezzola, the person who actually used the shield to

22     break in the glass at the beginning.  He's right at the

23     middle of the exhibit.

24                 (Whereupon, segments of Government's Exhibit

25     No. 504 were published in open court.)

1              THE COURT:  We haven't seen either of the

2      Seefrieds yet.  Right?

3              MR. OHM:  We have not, your Honor.  We are

4      experiencing the same technical difficulties.

5              (Whereupon, segments of Government's Exhibit

6      No. 504 were published in open court.)

7              MR. OHM:  So that's where -- Kevin Seefried is

8      behind that column there to the right.

9              So we're about 45 seconds in from when anybody

10     went in, so it couldn't have been a particularly lengthy

11     period of time.

12             I guess the primary answer to your Honor's

13     question, though, is the only testimony the Court has about

14     any of this is Officer Goodman.  And Officer Goodman is the

15     one that said that it was a very short period of time where

16     he had come down the stairs and he had seen sort of people

17     almost immediately.

18             So I don't think that -- well, I would ask the

19     Court not to resolve whatever ambiguity there is there in

20     favor of the Government when it's obviously the Government's

21     burden of proof to determine or to demonstrate that there

22     would have been enough time for this additional

23     confrontation with Mr. Seefried.

24             In that period of time -- and, you know, I take

25     the Court's point.  It could be more than 3.6 seconds.  But

1     I would suggest that it couldn't have been much longer than

2     that.

3              Officer Goodman tells Kevin Seefried to leave.

4     Kevin Seefried refuses.  There's the jabbing of the butt of

5     the Confederate flag.  And then he's screaming:  Where are

6     the members at?  Where do they count the votes?  He's giving

7     me commands in return.  Officer Goodman held his ground and

8     backed up.

9              So the question -- in terms of the things that

10    Officer Goodman attributed to Kevin Seefried, it's

11    interesting that -- the words that he chose, because those

12    are words that you actually hear on the video.  And I

13    will -- I made the effort of putting subtitles together

14    based upon what appears to be heard.

15             (Whereupon, segments of Government's Exhibit

16    No. 504 were published in open court.)

17             MR. OHM:  As the Court heard today --

18             MS. KEARNEY:  Your Honor, I don't want to

19    interrupt.  This exhibit has captions and it is not

20    Government's Exhibit 504.

21             MR. OHM:  That's true.

22             THE COURT:  Is this --

23             MR. OHM:  It's a demonstrative.

24             THE COURT:  -- one of the 31 --

25             MR. OHM:  No.  It's just my demonstrative off of a

1    Government's exhibit.  Like I said, it's based upon what I

2    could hear.  I think the Court could hear it, too.  I didn't

3    pick anything that was controversial.  It's what I think was

4    obviously audible in the Government's exhibit.

5            So what does that mean?  The idea that -- it's

6    possible that Officer Goodman remembered everything, that he

7    has this encyclopedic memory where he can remember exactly

8    what people said at what time and what place in one of the

9    most stressful days a person could have.

10           But we already know that it's not the case.  We

11   know that when he talked to Agent Dinkel and the Government

12   here that he did not remember -- or he did not say anything

13   about these words, which I think the Court can infer that

14   these prosecutors, knowing that we are doing a bench trial

15   and specific intent was going to be the primary issue, that

16   they asked questions that were relevant to Mr. Seefried's

17   intent of Officer Goodman and that that was not something he

18   remembered at the time.

19           And I would suggest that perhaps in May of 2022 he

20   had taken a break from looking at those videos and hadn't

21   thought about what Mr. Seefried could have said, that that

22   was something later that sort of seeped into his memory and

23   his understanding of what happened, but that that's not

24   reliable evidence of Mr. Seefried actually saying those

25   things.

1          He also -- and exactly like the "liars and

2     thieves" comment.

3          "Where are they?"  You can hear later on the

4     shaman yelling, "Where are they?"  Well, no.  That was

5     actually a statement made by Officer Goodman.  The "Where

6     are they?" statement he attributed to the shaman, which

7     again is another example of Officer Goodman conflating

8     things, which again, it's completely understandable.  I'm

9     not being critical at all, especially in a case like this.

10    We're asking an officer in this situation to be the main, if

11    not sole, source of evidence for an obstruction charge that

12    requires him to remember these words exactly.

13          And, you know, we're lawyers.  Words matter,

14    especially when words are demonstrating intent.  The

15    exactitude of words matter.

16          And then we're asking Officer Goodman to act as if

17    he's a court reporter, to repeat what it was that he heard

18    when he's getting yelled at by like 15 different people over

19    the course of 45 minutes in an exact spot.  It's just not a

20    reasonable thing to expect of Officer Goodman.

21          And, your Honor, we submit that does not -- it is

22    not demonstrated beyond a reasonable doubt, particularly

23    when we know that he's made some other mistakes in terms of

24    identifying things and in terms of making statements.

25          THE COURT:  Run through with me again what you

1    believe those are.

2            MR. OHM:  So he had said to Special Agent Dinkel

3    that we are -- he attributed the "Where are they?" and

4    "Where are the members?" to the crowd and not to anybody

5    specifically.  He had attributed the "You're going to have

6    to shoot us" statement to the crowd when it was actually

7    Mr. Seefried.

8            And I believe that that statement -- the

9    Government's theory is that that happened in that individual

10   confrontation, you know, that lasted somewhere between half

11   a second or however.  But the Government hasn't proven

12   however long that would be.

13           And I was about to show the "We're ready for war"

14   individual because the Government, I think, was trying to

15   elicit that as aiding and abetting evidence because Officer

16   Goodman remembered that he was right behind Mr. Seefried or

17   he was -- I think he said that that individual had walked up

18   to the front lines, so he would have been next to

19   Mr. Seefried when he was making that statement.

20           And the video that he would not -- that I wanted

21   to show yesterday, but we couldn't point that individual

22   out, shows that conversation where that individual's most

23   animated; and he's at the front of the line that

24   Mr. Seefried had already walked back towards the rear of the

25   building.  So I was going to show that for the Court.

1          THE COURT REPORTER:  Counsel, could I have an

2     indication of what's being published?

3          MR. OHM:  This was Exhibit 401.

4          (Whereupon, segments of Government's Exhibit

5     No. 401 were published in open court.)

6          MR. OHM:  If your Honor can see --

7          MS. KEARNEY:  Again, I don't want to interrupt,

8     because Government's Exhibit 401 contains timestamping, so

9     this is not Government's Exhibit 401.

10          THE COURT:  It's the same camera, though?

11          MS. KEARNEY:  It's that same angle.  But there's

12     no timestamps associated with it.  Off the top of my head, I

13     can't say what time this is at.

14          MR. OHM:  Your Honor, we were supposed to receive

15     from the Government time-stamped versions of the exhibits.

16     So we were intending to use --

17          MS. KEARNEY:  This is the Government's exhibit.

18     So it -- our exhibit has the timestamps.  You were provided

19     with the Government's time-stamped exhibits.

20          MR. OHM:  Fair enough.

21          But in terms of -- generally, in terms of the

22     exhibits that we're using, we don't have the same accesses

23     to the timestamps that the Government does.

24          So if your Honor can see towards the left, the man

25     with the hat and the flag, that's the camouflage marine --

1     the camouflage Trump hat individual that Officer Goodman was

2     referring to.

3               THE COURT:  Can you just show me with your mouse?

4               MR. OHM:  Yes.

5               THE COURT:  Okay.

6               MR. OHM:  Then we have Mr. Seefried off to the

7     left of him.

8               (Whereupon, segments of Government's Exhibit

9     No. 401 were published in open court.)

10              MR. OHM:  You can see that man becoming

11    exceptionally animated at that point and Mr. Seefried

12    looking over and then just disengaging, walking to the back,

13    looking at his phone.  And I don't know if the Court can see

14    just how animated this individual is, but it seems

15    consistent with a "We're ready for war" statement.

16              So my point being that, again, nothing against

17    Officer Goodman.  I don't think anybody expects anybody to

18    remember things specifically.  And the video was an aid for

19    him.  I'm sure it helped refresh certain things that he

20    said.  But there's no sound on the video.  He's trying to

21    remember things and when things were said.  It's an

22    impossible task.  It's impossible to say that you can

23    reliably remember those things as if he was a videocamera

24    with audio.

25              And that's what the Government is relying upon in

1     their argument that Mr. Kevin Seefried is a principal.  And

2     they're saying that they're proving it beyond a reasonable

3     doubt.  And that's just simply not so.

4               THE COURT:  So what's the conflict here?  You're

5     saying that Officer Goodman said they were next to each

6     other --

7               MR. OHM:  Yes, your Honor.

8               THE COURT:  -- when this happened?

9               MR. OHM:  Yes.

10              THE COURT:  It looks to me like they were

11    initially, and then your client walks away.

12              MR. OHM:  Yes.  He's there from the beginning, but

13    not for, I think, the majority of that interaction.  I would

14    say he's there for, like, a fraction of that interaction.

15    If the Court wants, I can rewind it.

16              THE COURT:  Sure.

17              (Whereupon, segments of Government's Exhibit

18    No. 401 were published in open court.)

19              THE COURT:  So about eight seconds.  Then he turns

20    away.

21              MR. OHM:  Yes.  But what we are talking about,

22    though -- well, I'm talking about this not in the aiding and

23    abetting so much as Officer Goodman's perception.  And you

24    can see that the man is still carrying on another 20 seconds

25    later.  He's -- I'm stopping it -- yeah -- about 23 seconds

1      later.

2              On top of that, the fact that Mr. Seefried is

3      walking away, I think, corroborates Ms. Cuff's testimony

4      that there is stuff that was going on in there that didn't

5      sit well with Mr. Seefried.

6              And again, the Court has to determine what that

7      would be because that was unimpeached, unbiased testimony

8      that Ms. Cuff gave that Mr. Seefried said that he was

9      leaving because there was stuff in there that he didn't want

10     to be any part of.

11             THE COURT:  So on Ms. Cuff's testimony, maybe you

12     should give me your thoughts about her, because my guess is

13     Ms. Reed is not going to agree that she's unbiased.

14             MR. OHM:  Well, there's no real theory of bias

15     that I heard the Government articulate.  I mean, this is a

16     woman who hasn't spoken to my client in a couple of months.

17     She doesn't -- she lived there, but they broke up.

18             Generally speaking, recent ex-girlfriends when

19     you're at the age of 22 are not typically biased for you.

20     That might be expert testimony from me.  But I don't think

21     that there's objective evidence of bias just because they

22     used to be together, are no longer together, and are in the

23     state where they're so no longer together that they haven't

24     spoken in two months.  I think that demonstrates a lack of

25     bias.

```
 1              And I'm trying to think of what other -- on
 2    cross-examination, what other general bias theory there was.
 3    But I think Mr. Cuff actually, her demeanor, her honest
 4    answers, both about what she can remember, what she didn't
 5    remember -- I mean, she didn't hide from things like, you
 6    know, that Mr. Kevin Seefried watched the news.  She didn't
 7    hide that he watched Fox News because, you know, that's not
 8    a crime and it doesn't automatically make you somebody who
 9    wants to obstruct justice.
10              Her testimony is very credible.  And I think the
11    thing that actually mattered the most in terms of --
12              THE COURT:  You didn't think it was odd that she
13    had such vague recollections of most of what happened on
14    that day?  My guess is that Ms. Reed is going to say
15    something along the lines of she had very precise memories
16    of them not discussing this, not discussing that, but
17    basically could say very little about what they did talk
18    about or what did occur.
19              MR. OHM:  Well, she certainly should now.
20              But --
21              THE COURT:  I just want to give you a chance to
22    respond.
23              MR. OHM:  Sure.  And I appreciate that.
24              I actually think it's consistent with what this
25    day is about.  For anybody who was at January 6, whether you
```

1    were arrested or not, I think individuals are piecing

2    together what it was that this day was for them and what it

3    was that they did and whether they contributed to what

4    happened.

5            And certainly and clearly this was an event that

6    made its mark on this household, where I don't think

7    Ms. Cuff was misremembering that she saw both Mr. Seefrieds

8    crying when thinking and talking about what happened that

9    day.

10           And I think one of the first things that an

11   individual would think about after finding out all that had

12   happened was:  Did I know that that was going to happen?  I

13   think it's completely reasonable that that would be

14   something that would stick out in her mind, because that's

15   something that you would review early on.

16           And she lived in the household, you know.  There

17   was talk about going.  There was not that much talk about

18   going -- in terms of going there, but one can assume that

19   they didn't fall asleep the second they got there.  And

20   there was no talk about the certification or the electoral

21   count.

22           And so if the Government's theory is that they

23   only went to go to the rally and the intent was formed

24   sometime after President Trump said there's an electoral

25   count, with an assumption that they must have digested that,

1    processed that and realized that that's something that they

2    could somehow stop, I mean, I think it's unfair to assume

3    that individuals knew that this vote was happening in person

4    unless you knew a lot about Congress.

5         I mean, there was virtual votes happening just

6    several months before that.  So they have to know all that

7    if they want to stop it.  They have to know that a

8    certification process is happening.  The things we've all

9    seen on TV over and over again, they have to know that

10   that's what's going on.  They can't just know what the

11   Government is now switching up their theory on, just know

12   that there's something that's of significance that might be

13   happening in the Capitol that day.

14        And I'm not even -- I wouldn't even concede that

15   they've proven that.

16        So Ms. Cuff, as she has said, she's tried to block

17   out certain things about that day.  I don't think --

18   frankly, I think the people who are at the back of that

19   crowd listening to the speech, I think those folks probably

20   were not -- did not hear a lot of the speeches and I would

21   guess that most of those people do not remember what the

22   substance of those speeches were.

23        She remembered the things that mattered, which is

24   that they went there.  They parked at the Capitol.  She

25   remembers the car they went in.  She remembers they ate

1   hotdogs.  She remembered the food truck, the food truck

2   line, going back to the car, eating.

3           And then going to them, she remembers this

4   incident with, I guess, some bigger individual who separated

5   her from Ms. -- her and Mrs. Seefried from Mr. Hunter

6   Seefried and Mr. Kevin Seefried.

7           And she remembered meeting up with them and where

8   she met up with them, which are significant details and I

9   would say the major points of what happened that day from

10  her perspective.

11          One other thing about her testimony which I think

12  is important is, you know, not just in terms of character

13  and of itself, but her knowledge of Hunter and Kevin

14  Seefried, at least, I think, tells the Court that when these

15  decision points were made, that they would not have involved

16  Stephanie Seefried and Anastasia Cuff in some sort of

17  storming-the-Capitol kind of situation.  If there was

18  anything that would put them in harm's way, especially in

19  the kind of harm's way that I think people would have

20  envisioned, that they would not have had them accompany

21  them.  And then there's just no evidence that would

22  suggest --

23          THE COURT:  I don't take the Government to be

24  suggesting that there's some sort of grand plan here.

25          MR. OHM:  Even if there wasn't grand planning,

1    even if there was an in-the-moment decision, if they were

2    planning on going in when they left that car, they would

3    have left Stephanie and Anastasia Cuff behind.

4           And so because the Government's theory of

5    knowledge and intent seems to start at the Trump speech,

6    because they seem to at least not -- or at least acknowledge

7    that there is no intent -- no evidence of intent before

8    that, then if that's when the knowledge of the certification

9    votes happened, then that must mean the intent was somehow

10   formed between that last part of the president's speech and

11   the time that they decided to move towards the Capitol,

12   which is probably about 45 minutes to an hour later.  And

13   there's -- so it's relevant that they went along with

14   Stephanie Seefried and Anastasia Cuff because that window of

15   this intent forming is just shrinking smaller and smaller.

16          I know the Court's heard this within the crosses a

17   hundred times, so I'm not going to focus on this.  But

18   unlike, I think, in many of the other cases where the

19   Government can demonstrate intent beyond a reasonable doubt,

20   it's actually not that difficult in these cases to

21   demonstrate intent, because most people Facebooked about it

22   beforehand and then bragged about it afterhand [sic].  So

23   the intent is very clear in those cases.

24          And there's no statements about obstructing the

25   vote, no knowledge of the certification, the fact that he

1   doesn't know much about history, talked about bringing his

2   wife and then the preparation that the Government -- the

3   preparation that did not occur before this that would be

4   indicated by somebody who, if they're going to Stop the

5   Steal, storming the Capitol kind of thing, that they

6   wouldn't dress up in, you know, a vest, a hat and jeans.

7           THE COURT:  Didn't your client delete his

8   Facebook?

9           MR. OHM:  Yes, your Honor.  And I think a lot of

10  people did because there was a lot of concern that

11  individuals would use Facebook to, I guess, further

12  prophesize about the election steal.

13          THE COURT REPORTER:  "Prophesy"?

14          MR. OHM:  "Prophesize."

15          I mean, I know that when I got my first clients, I

16  told them, I said, "Don't delete it because you don't want

17  to look like you're obstructing anything.  But freeze it and

18  don't delete evidence inside it.  But if you can remove

19  yourself -- remove the account from the internet, then you

20  should."

21          But I think what's also very important if we're

22  going to talk about that is the fact that the FBI has free

23  access to Facebook and can subpoena deleted accounts

24  whenever they want to.  And the Government did not present

25  any evidence.

1          So just in terms of the burden question, I don't

2    think that it's -- I think that the Government has not met

3    its burden to say that Facebook is something that's helpful

4    to them.

5          Okay.  I'm going to run through these very

6    quickly.  These are what we talked about in terms of the

7    exhibits, which are mislabeled here in this PowerPoint,

8    because they are.  But my understanding is that the

9    Government is not really questioning the sort of movement

10   and the timeline in terms of what these -- what the

11   Seefrieds were doing.

12         So at 12:33 -- this is the earliest that was

13   provided -- you can see that the cars are already parked in

14   the parking lot on Capitol grounds.

15         At 1:24 is when they come back.

16         It the Court looks very closely -- I can try and

17   help -- there is --

18         THE COURT:  The blurry picture with the flag.

19         MR. OHM:  Yes.  There it is.

20         You can also see the flag sitting there while

21   they're eating by the car for, as Ms. Cuff said -- to

22   remember that the lunch outside the car was about 20 to 30

23   minutes is a pretty significant detail.  And it shows at

24   1:44 is when they started to -- 1:52 is when they started to

25   leave the car.

1          They reach Peace Circle at 1:58.  As the Court

2     knows, that is the northern -- I guess northwest of the

3     Capitol.

4          Then this is the timeline.  And so at 2:02 -- I'm

5     sorry -- 2:38, that is when Mr. Seefried is outside of the

6     building.  And then the Court can see that it actually takes

7     a long time to sort of find his way.  These are all videos

8     where the Court can actually see him asking for directions

9     on the east side, but at some point he realized that his car

10    is on the west side and then goes not back through the

11    Capitol, but around the Capitol, and walks back towards his

12    car.

13         This is where the trolley stop is on the east

14    side.

15              THE COURT:  Wait.  Do you see him here?

16              MR. OHM:  No.  Here we are.

17              THE COURT:  Oh, okay.

18              MR. OHM:  And then they are slowly making their

19    way.  He's on the north side here walking against the stream

20    of the crowd, which is all going towards the building at

21    this point in time.

22         So the other aspect of the Government inferring

23    intent like this is intent apparently disappeared in terms

24    of Mr. Kevin Seefried because he's leaving before any of

25    these things really occurred.

1          And the Court will recall that he left the Senate

2     chamber well before anybody else did, and the individuals

3     who stayed are the ones that actually went inside the Senate

4     chamber, which I think when you're talking about intent

5     that's demonstrated by actions, that's intent demonstrated

6     by actions.  Somebody who's standing there and leaving, it

7     doesn't tell you anything.

8          At 2:48, he's looking for his car.  That's when

9     they meet up again somewhere around the containers where

10    individuals were standing up, according to Ms. Cuff.  Then

11    they leave the car.

12         They get to the parking lot around 2:57 and they

13    find the car at 2:59.  And then they're gone.

14         And at the time that they are gone, this is --

15    these are other photos of things that are happening around

16    the Capitol, which is to show that things are really just

17    sort of getting started at the time that Mr. Kevin Seefried

18    decides that he's going to exit himself from this situation.

19         It takes them about 20 minutes to actually get

20    through the crowd of people in the parking lot.  They do

21    manage to get out of there.

22         The Court has the statement -- I'm not going to

23    play it again unless the Court wants me to -- where he says

24    the reason he is here is to support President Trump.

25         And I think Special Agent Near said --

1              THE COURT:  "Lear."

2              MR. OHM:  -- Lear, Special Agent Lear, agreed that

3    Mr. Seefried was actually very honest.  And I would suggest

4    that that's consistent with what we heard from Ms. Cuff.

5    He's not a sophisticated lawyer or the kind of person who's

6    going to take on a special agent and come up with stories.

7    And he was honest about what his intent was and he was

8    honest about what he did.

9              And if the Court does review the statement, I

10   think it will see something that's reflective about what

11   his actions were, what his actions meant and what his

12   actions were perceived to mean.

13             And your Honor might have noticed that I paid a

14   lot of attention to the Confederate flag in my crosses even

15   though it wasn't -- it didn't play a particularly

16   significant part in the Government's case.

17             And one of the reasons I did so is because I know

18   that it's -- that Mr. Seefried, that it's hurtful to him --

19   I'm not saying he's a victim in any way, but he doesn't like

20   the idea that the world is portraying him as a racist, that

21   he worries about his grandson, you know, growing up looking

22   at the internet and seeing that he has this racist

23   grandfather.  And it's important to him that he doesn't

24   see -- he isn't seen as a person who is walking around,

25   marching around, trying to spread hate, because that's not

1    who he is.

2         And so, you know, this is six days after.  He's

3    one of the first people arrested.  He's one of the first

4    people to turn himself in, which I think is not -- was

5    something that the Court should consider when determining

6    what his intent was when determining what his intent was in

7    a case where the Government is sort of piecing together bits

8    of information and trying to say, Well, this is how we can

9    infer intent.

10        Well, him turning himself in and him saying what

11   his intent was when he is being reflective and thinking and

12   talking about what it meant that day in terms of what he did

13   is evidence of what his intent was.  The Court has

14   affirmative evidence of intent.  It's not -- you don't have

15   to piece it together when you have a statement where the

16   agent agrees that what he said was true and that he was

17   candid and accurate about what he had reported, when you

18   have Ms. Cuff who, again, largely unbiased and largely

19   unimpeached, is saying what his intent was and how he

20   reacted, both immediately afterwards and for weeks and

21   months afterwards.  And that's what Mr. Seefried's intent

22   was.

23        I have -- before yesterday, your Honor, I had this

24   whole thing about aiding and abetting that I wanted to argue

25   to the Court.  But I'm not going to do it unless the Court

1    wants me to.  But I do have -- I did want to talk about the

2    aiding and abetting instruction and the Government's aiding

3    and abetting theory.

4              THE COURT:  You can give me the highlights.

5              MR. OHM:  The highlights.  Okay.  I have

6    highlights.

7              So the second -- this is from the *Hale-Cusanelli*

8    instruction.  And these are the elements, which obviously

9    requires that he knew that the obstruction was going to

10   happen and was going to be committed by others; that he did

11   some in furtherance of the offense.

12             Now, the Government's theory of "in furtherance of

13   the offense" is mere presence.  That's essentially what

14   Ms. Kearney articulated in her closing.

15             Mere presence, as we know from the rest of the

16   instruction, is not sufficient to demonstrate aiding and

17   abetting.  Evidence that the Defendant merely associated

18   with persons involved in a criminal venture or was merely

19   present or was merely a knowing spectator during the

20   commission of the offense is not enough for you to find the

21   Defendant guilty as an aider and abettor.

22             That's precisely what the Government just argued

23   here.  They said that his presence -- because he's in some

24   mob, that his presence was sufficient to demonstrate the

25   additional action required by the element.  And that just

1     isn't the case under the law.

2              And then of course there's that he knowingly

3     performed the act for purpose of aiding and abetting.  I

4     mean, if the Court looks at that, the Government is

5     obviously relying upon mostly the Ohio Clock Corridor

6     encounter.  That's what it sounded like in her closing.

7              If the Court looks at that, it seems very clear

8     that he's -- I mean, he's looking at his phone, walking

9     around, drinking water, going off into the other hallways.

10    If that was what he was knowingly doing, that's not --

11    that -- he didn't understand his importance in this mob role

12    of intimidating officers.  And that's because that's not

13    what he was doing.  He was just being present, as the aiding

14    and abetting instruction describes.

15             And the same of course goes with the intent.

16    Because intent is our primary argument for him being the

17    principal, it's also our primary argument for him being an

18    aider and abettor.  If they're not demonstrating that he's

19    there to actually obstruct an actual official proceeding,

20    that is, the vote count, then that aiding and abetting

21    theory does not help the Government.

22             Just a very brief word on *Rosemond*, your Honor:

23    The language used in *Rosemond* is that there's requisite

24    knowledge.  So if you're aiding and abetting and you're not

25    a mere spectator and you're not merely present, there has to

1    be requisite knowledge that the person that you're aiding

2    and abetting is actually doing something.  And if --

3    actually, it's a very reasonable concept.  If you're not --

4    if somebody's doing something right next to you and you're

5    aware of that, it doesn't make sense that you're in trouble

6    for that unless you knew that that was going to happen.

7           So the *Rosemond* -- the theory behind *Rosemond* is

8    not cabined to, you know, a particular case.  It makes

9    entire sense within the context of aiding and abetting law.

10   That is part of the Court's instruction.

11          Let me make sure there's nothing else, if the

12   Court doesn't have any questions.  I'm happy to answer

13   anything the Court wants.

14          THE COURT:  No.  Thank you.

15          MR. OHM:  Thank you, your Honor.

16          We would ask the Court to find Mr. Seefried not

17   guilty of the 1512 charge.

18          THE COURT:  Thank you.

19          Ms. Bostic?

20          MR. BOSTIC:  Thank you, your Honor.

21          I think that the evidence is pretty clear from the

22   defense perspective that the Government has not met its

23   burden with respect to the obstruction of an official

24   proceeding charge as to Hunter Seefried.

25          And a lot of things are telling in terms of how

1    the Government goes about attempting to prove its case with

2    respect to Hunter Seefried.

3            If we look and start at the -- you know, let me

4    sidetrack and say this:  The Court had a discussion with the

5    Government with respect to Counts 6, 7 and 8.  And I, like

6    the Court, agree they can be separated out and that the

7    Court can find that there was a violation of Count 6 and 8

8    without finding Hunter Seefried guilty of destruction of

9    government property.

10           Focusing on that for a minute, there is no doubt

11   that -- from the video that Hunter removed a small piece of

12   glass.  But if you look at the window and as you look at the

13   video -- and the Court picked this up -- the entire pane of

14   glass was knocked out by the two-by-four.  It hit it several

15   times.  And then the piece fell back in and Hunter in his

16   decision to keep going into the building removed it.  But

17   clearly, given the small nature of that piece of glass,

18   there was access to and through that window.  And there's no

19   evidence, as the Government suggests, that Hunter removed

20   that piece of glass for anyone else, to assist or aid anyone

21   else in getting into the window.

22           THE COURT:  Why not?  Why doesn't that show three

23   people working in concert to get in?

24           MR. BOSTIC:  I think that we know that Hunter had

25   no knowledge or involvement with these individuals

1    beforehand.  And I think that in his statement -- not "I

2    think"; in his statement, he said in the heat of the moment

3    he did something that he should not have done.  And that was

4    removing the glass and going into the building.

5            I don't think that his thoughts were, I'm trying

6    to assist or aid these individuals to get in the building

7    themselves.  But I believe that he clearly had the intent to

8    go in personally, but I don't know that that carries over as

9    to what others were doing.

10           THE COURT:  It's not really relevant to getting in

11   the building.  I think the Government's theory was he was

12   aiding the destruction of this window and that two of them

13   did most of the job and he, to quote Ms. Kearney, finished

14   it off.

15           MR. BOSTIC:  Your Honor, I said from the

16   beginning -- and it depends on how the Court views this -- I

17   believe that the window for all intents and purposes was

18   destroyed at that point in time when he finally removed that

19   small piece of glass.  The destruction had already occurred

20   in total, from my perspective.

21           But I'm not going to belabor that because -- and I

22   believe the Government has attempted to do this.  Even

23   assuming that the Court finds that he was aiding and

24   abetting with the destruction of the federal property there,

25   that does not -- that intent does not necessarily carry over

1    as to anything else that he did that afternoon.

2                THE COURT:  Yes.  I would agree with you on that.

3                MR. BOSTIC:  And if we talk about intent, you

4    know, and we talk about starting where it all began, let's

5    break it into pieces.  The pretrip to the Capitol:  Hunter's

6    not on social media talking about stop the vote.  He's not

7    on social media talking about blocking certification of the

8    electoral vote.  No media presence whatsoever.

9                He went to the Capitol after his father talked

10   about it and suggested they go.  And they all went as a

11   family.

12               And what he does is suggest that he went to

13   support his president and that only.  He took the Trump

14   flag.  Right?  During the car ride, he's not aware of any

15   conversation that was had because Ms. Cuff testified she and

16   Hunter fell asleep on the ride down to the Capitol.

17               And so I think the intent there is clear, the

18   purpose of his trip.  And I'll get to this later on.  But I

19   believe that he also shared that intent with Agent McCabe

20   during the conversation.  But I'll come back to that.

21               Now, when we get to the window, as I said,

22   clearly, there is an intent to enter the building by him.

23               But the Government has not presented any evidence

24   to show that his intent in terms of coming to the Capitol to

25   support the president changed when he entered the building.

1          He denied any knowledge of the certification of

2     the electoral vote being -- taking place in that building.

3     And again, I'll come back to that.

4          But now when he gets inside the building, inside

5     the Capitol Building, if you look at what he does, his

6     presence there seems to be merely that of being present and

7     not engaging in a way that would suggest to anyone that this

8     is a young man that has the internet to stop the

9     electoral -- certification of electoral votes.

10          Every -- I think there were, like, four officers

11     that -- three plus the inspector, I should say, who talked

12     about Hunter being inside of the building and his demeanor

13     and his behavior there.

14          We know that Officer Morgan said:  Well, Hunter

15     had this thousand-yard stare or something like that and that

16     he had clenched fists at some point.  But that runs afoul of

17     what Officer Goodman and the other officer and Inspector

18     Loyd said about Hunter.

19          They all said -- Goodman said he wasn't

20     aggressive.  He wasn't shouting.  He wasn't yelling.  He had

21     no weapons.

22          I believe the inspector, who has over 30 years and

23     manages, supervises, three captains and their squads, said

24     that his only concern about Hunter was the fact that he was

25     present inside a restricted area without previously being

1     screened to be there.

2          While inside of the Capitol Building, he did not

3     destroy anything.  And he was not confrontational with any

4     of the police officers.

5          Now, the Government talks about the fact that -- I

6     remember this question as to -- actually, I don't remember

7     this, but the Government asked a question about the fact

8     that, Well, when Hunter was in the line and this person came

9     up and was highly upset and another individual present

10    removed that person to the back and talked to him,

11    apparently, that whether or not Hunter attempted to calm or

12    help anyone calm down, ratchet down their behavior.

13          And the answer was no.

14          And the fact is that his failure to intervene with

15    someone else does not in any way rise to the level of

16    specific intent to impede or obstruct an official

17    proceeding.

18          Rather, I think it speaks to the fact that he

19    really only got caught up, as he said, in something and was

20    present and then realized that, Well, I'm not going to do

21    anything else in here.  And he left because he was there

22    with his father when his father said it was time to go.

23          So I think that Hunter's intent never morphed into

24    any specific intent to block the electoral -- count of the

25    electoral votes, as is alleged in Count 1 by the Government.

1           When we look at the evidence the Government has,

2      the Government is asking this Court to take a lot of leaps

3      and jump forward because they don't have any evidence of any

4      specific intent on Hunter's part to obstruct the proceeding.

5           There was an hour and almost an-hour-and-a-half,

6      maybe two-hour interview that Hunter had with Agent McCabe.

7      And Agent McCabe told this Court that he designed a method

8      to try to get a person say what he wanted to and that he did

9      some research to make sure who he knew he was talking to and

10     whatever.

11          But what we know is that -- and I think the

12     Government said it several times -- Hunter was cut off.  And

13     we know that Hunter said that he was there to support

14     President Trump.  And we know that even in the conversation

15     where the agents ask questions about, "Was it fun," I think

16     Hunter said:  No, it wasn't fun, that it got heated.  Right?

17          And he continued to express that, that he knows

18     that being there was wrong in hindsight, but he was caught

19     up in the moment.

20          THE COURT:  Didn't he tell the agent, "I wanted to

21     go to ask them people:  Why is this stuff going on?  Why are

22     they allowing this to happen?"  I mean, this seems pretty

23     tied to the certification process.  Right?

24          MR. BOSTIC:  I don't know necessarily that it's

25     tied to the certification process.  But we have to

```
1    distinguish between asking a question of a senator or a

2    legislator.  Many people have done this over the years, gone

3    into the Congress and confronted their senator or

4    congressman:  Well, why are you doing this?  Why are you

5    doing that?

6              THE COURT:  Not busting through the window,

7    though.

8              MR. BOSTIC:  The Court is right about that.  But

9    as I said, in terms of the intent to get into the building

10   to ask those questions does not necessarily mean that the

11   person has the intent to obstruct whatever proceeding is

12   going on in there.

13             And the Court will remember I asked the agent

14   about a question that he asked Hunter about whether --

15   why -- did you know why the Capitol was targeted?

16             And the agent said that Hunter said, No, he did

17   not, and that as I recall he said that Hunter indicated --

18   because I asked him -- that he didn't know what was going on

19   in there.

20             And there's no evidence that -- to the contrary,

21   because having a concern about the potential fraud and the

22   election does not necessarily mean that a person intends,

23   has a specific intent, to block or impede the official

24   proceeding of counting the electoral votes.

25             I would suggest to the Court that most of the
```

1    people that were there at that rally or went into the

2    building had concerns from their perspective that maybe

3    there was something wrong with respect to the outcome of the

4    election.

5           But you cannot jump from that to, Well, just

6    because a person is present in this building and may have

7    gone through a window to get into this building that that

8    person intends to block or impede the counting of the -- the

9    certification of the electoral votes, and especially when

10   the person's activity within the hall bespeaks of otherwise.

11   No one in there said that he was confrontational with them.

12   No one said that he was angry.  No one said that he was

13   hostile or aggressive in his interaction with the Capitol

14   Police.

15          And I suggest to the Court that if the intent were

16   to do what the Government claimed, then you would have seen

17   actions within the -- by Hunter within the Capitol Building

18   to -- that were different from what everyone testifies to.

19          The fact is here that there is a sense that -- and

20   this Court asked, I think -- there is a separation of the

21   type of charges the Government brought as to Hunter here

22   when you get to the obstruction of justice part.  And that

23   requires specific intent.  And it seems that with respect to

24   Hunter that all the evidence, all the evidence that doesn't

25   call for this Court to accept innuendo or speculation,

1     suggests that he didn't have that specific intent.

2          The Court remembers, I asked the officer when he

3     was talking to Hunter about, well, why he went there; and he

4     said he thought that Hunter's answers were indicative that

5     he went to stop the vote or something like that.

6          I think I asked him specifically:  Did you ask him

7     what he meant or if he had any intentions to stop the count

8     of the -- or the certification of the Electoral College

9     vote?  And he said he did not.

10         And that would have clarified it.  And he doesn't

11    have to, but if you're at the point where you're in your

12    mind as an agent who's experienced believing that in the

13    two-hour interview that a person is saying to you something

14    that he has not said, the easiest question is to -- the

15    easiest thing is to ask that question, especially -- well,

16    he would not have known this at this time, but especially if

17    this Court looks over at the actions of Hunter Seefried on

18    the day in question, it's a question that would have ended

19    the speculation or the issue of what his specific intent

20    was.

21         Now, the Court has heard testimony from Ms. Cuff

22    about Hunter's qualities and character.  And you've heard

23    her answer the Government as to, well, the fact that he may

24    have broken out a window or -- strike that -- may have

25    removed glass from the window to enter the building, whether

1    that is indicative of who he is.

2          And then she said it is not.  Eight years of an

3    individual living a peaceful, law-abiding life, an

4    individual who was 22 years, approximately, at the time,

5    that got caught up in following the crowd but did not in his

6    mind form the intent or had the specific intent to aid and

7    abet any person in stopping the certification of the

8    electoral vote.

9          In fact, everything here should suggest otherwise

10   to this Court.  Everything that you know about Hunter

11   Seefried and everything that occurred that day.

12         So I'm asking this Court not to be swayed by

13   actually lack of evidence and not to jump on the

14   Government's ship of innuendo or speculation, because they

15   just have not reached or carried a heavy burden of proving

16   Hunter guilty beyond a reasonable doubt of obstruction of

17   justice.

18         Thank you, your Honor.

19         THE COURT:  Thank you, Mr. Bostic.

20         Ms. Reed?

21         MS. REED:  Yes, your Honor.

22         So, your Honor, I'm going to try not to be too

23   repetitive of everything that Ms. Kearney stated.

24         THE COURT:  Yes.

25         MS. REED:  I'm going to try to work backwards from

1    defense counsel.

2                THE COURT:  Why don't we focus on obstruction and

3    particularly Officer Goodman.

4                MS. REED:  Well, thank you, your Honor.

5                Before I get to that, can I just state something

6    briefly?

7                Your Honor, I can tell you that there has been a

8    lot of testimony about motivations and intentions of each of

9    the Seefrieds.  And I can tell you, first of all, what this

10   case is not about.  This case is not an effort to charge

11   individuals who are supportive of the president and went to

12   D.C. on January 6, 2021, simply because they were Trump

13   supporters.  Certainly I think that the Court is well aware

14   that that is not why we are here.

15               But certainly when we talk about obstructive

16   conduct and what happened with each of the individual

17   Seefrieds' actions that were demonstrated as it relates

18   specifically to Kevin Seefried and Officer Goodman, that is

19   a prime example of the obstructive conduct and the reason

20   why these individuals should be held responsible for it.

21               So to jump to Officer Goodman:  Your Honor, there

22   really is no reason for this Court, I think, based on

23   Officer Goodman's testimony to disregard anything that the

24   officer stated.  At best, what defense is asking is that you

25   disregard what he stated because of timing, because there

1    was so much chaos that day that he can't simply remember

2    individuals.

3          Well, let's start with what he can remember and

4    his ability to perceive what happened that day.

5          First of all, yes, we will concede that Officer

6    Goodman came into contact with a number of individuals.  But

7    just like Officer Morgan and other officers that came into

8    this courtroom, there was something unique about all of

9    these individuals that these officers were able to say:  I

10   have a precise memory of what happened with that individual.

11         So we started off with people like shaman, who had

12   characteristics about himself that one could never forget.

13   And I think that Hunter Seefried and -- well, specifically

14   Kevin Seefried falls directly into that category for a

15   couple of reasons:  First of all, a large Confederate flag

16   inside of the United States Capitol is something that I'm

17   sure most people will never forget that experience of

18   seeing.  And that is something that Officer Goodman was able

19   to tie specifically to Kevin Seefried.  But also, his

20   opportunity to have one-on-one engagement with Officer

21   Goodman and Kevin Seefried.

22         So there has been much made, and I can't say that

23   I am not confused by some of the videos that were shown by

24   defense counsel.  And hopefully, we can clarify that in a

25   second.

```
 1              But let's talk about what Officer Goodman says.

 2     He says he comes down around the corner and all of a sudden

 3     there's one person who is in this archway.  That person is

 4     Kevin Seefried.  He has a clear path of one person in front

 5     of him.  That is before the rioters came.  And the video

 6     that was shown to you by defense counsel, they would have

 7     you believe, your Honor, that that was like a second or two

 8     seconds; and then obviously Officer Goodman has his whole, I

 9     guess, view obstructed by a mob of rioters that are coming

10     at him.

11              Let's think about what happened in that time

12     sequence, not only based off the video evidence, but also

13     based on Kevin Seefried's words, because you can't consider

14     what Officer Goodman says about that situation without also

15     considering what Mr. Seefried himself stated about what

16     happened.

17              So Mr. Seefried says that he sees this officer.

18     The officer has his stick and he has his stick.  He

19     threatens Officer Goodman at that point.  That is his

20     statement.  He tells him:  We are going in here.  You cannot

21     stop me from coming in.  Those were the statements that

22     Kevin Seefried stated.

23              And I can play it for your Honor, if you would

24     like me to.  I know you've heard a lot of snippets here,

25     your Honor.
```

1          THE COURT:  That would be helpful, actually.  Yes.

2     Thanks.

3          MS. REED:  I have a lot of pages to work through,

4     your Honor.  So let me see if I can find where I have it

5     marked.  We're getting that up, your Honor.  I might have it

6     right here, actually, your Honor.

7          This is Government's Exhibit 302-A.  Starting at

8     42:28 and stopping at 45:03.

9          (Whereupon, segments of Government's Exhibit

10    No. 302-A were published in open court.)

11         MS. REED:  "You can shoot me.  I'm coming in."

12    Those were the words that Kevin Seefried stated.

13         Now, if we could go to -- I believe that it is

14    504-E and F.  Please, before we show the Court, because this

15    is a photograph, I believe, if the Court recalls when

16    Officer Goodman stated -- he says that he sees Kevin

17    Seefried in the archway.  When he is approaching Kevin

18    Seefried and asking him to back up, Mr. Seefried is not

19    listening to that direction.  What does he do?  He takes his

20    Confederate flag and he jabs multiple times at that officer.

21         Now, obviously, we don't have a great picture of

22    that, your Honor.  But I think that you can see when you're

23    looking at 504-E at least, why would this Court disregard

24    what Officer Goodman states?  I can understand, your Honor,

25    that we don't have a complete view of it; and I believe that

1    what you're seeing would be when individuals have already

2    arrived.  But that doesn't mean that that action did not

3    start before this video would have been taken, before this

4    footage would have happened.

5           So if you look at Kevin Seefried's statement, it

6    is consistent with Officer Goodman's statement.

7           So there is absolutely no reason for you to

8    disregard that because, even if your Honor were to believe

9    that there was some things about what Officer Goodman does

10   not recall about this particular incident, certainly we are

11   not denying that the conduct happened based upon Kevin

12   Seefried's statement.

13          THE COURT:  So I think at this point Officer

14   Goodman's asp, baton, is back on the floor, right back by

15   the staircase.

16          MS. REED:  That is correct, your Honor.

17          THE COURT:  And so the Defendant is saying that

18   they both had their sticks, which is kind of making me think

19   that it was more than a few seconds that we're missing here

20   on the videos.  Is that possible?  I mean, Mr. Ohm suggests

21   that the chronology is such that we know the Defendant had

22   only been in there for a few seconds before this footage is

23   shown.

24          MS. REED:  Your Honor, I'm not exactly sure what

25   Mr. Ohm's statement was only because I'm not sure what

1   actual footage he was showing.  I don't know that it was the

2   Government's exhibit that he was actually utilizing.  I

3   think there was some confusion about what was actually being

4   shown.

5           THE COURT:  So as I understood Mr. Ohm, he says

6   you've got the -- is it the Copic video, the Copic video

7   coming down the stairs?

8           MS. REED:  The ProPublica video.  It's Bobic.

9   Those are the two videos.  Yes.  The Bobic video.

10          THE COURT:  The Bobic video and the ProPublica

11  video.  And we can sync those to the security footage to

12  know that those are both happening more or less

13  simultaneously.

14          MS. REED:  So, your Honor, here's my position on

15  this:  First of all, I think that even if the Court were to

16  give credence to defense's argument, how in any way does

17  that negate the obstructive conduct that would have occurred

18  at that moment?

19          Even if we --

20          THE COURT:  Well, I think it does.  I mean,

21  Mr. Ohm's point is there actually wasn't enough time for all

22  this to happen that Officer Goodman said that occurred there

23  in the doorway.

24          MS. REED:  So, your Honor, I think that we have

25  the best evidence of this in 504 and 504-F, where it's

1    demonstrated based on Officer Goodman's conduct about what

2    he actually observes.

3            He says that he sees Mr. Seefried position his

4    flag in a way that he is able to jab at him multiple times;

5    and individuals come up very shortly in sequence thereafter.

6            So I understand that the timing may be of some

7    concern.  However, your Honor, I don't think that there is

8    any dispute that the acts actually happened when the

9    Defendant himself is saying that it happened.

10           And I can agree with the Court perhaps that maybe

11   we don't have the sequence timed up properly.  But what we

12   do know is that when Mr. Seefried enters, he does engage

13   directly with Officer Goodman.  That is a fact.  That is a

14   fact that is proven by his statement, your Honor.

15           And even if the timing is off on that, there's no

16   reason to believe that that act of jabbing was something

17   that compels these other individuals who were therefore able

18   to come after the officer and help them advance that officer

19   and put him in a position where he was, just as he stated,

20   one against thousands, it felt like.

21           THE COURT:  Yes.  I guess I don't take the defense

22   to be disputing that the jabbing occurred.  Maybe they are.

23   I think you certainly have shown that.

24           But it seems like the most important thing for

25   your case that allegedly happened in that doorway was the

1   Defendant's statements to the officer.  And Mr. Ohm is

2   suggesting it couldn't possibly have happened the way that

3   the officer is remembering and that rather he's ascribing

4   statements that he heard from the crowd to statements by

5   Mr. Kevin Seefried.

6            MS. REED:  Well, your Honor, maybe the best way

7   for us to do it is just to see the video in its entirety.

8            Can we pull that up, please.  I believe this

9   should be 407.

10           (Whereupon, segments of Government's Exhibit

11  No. 407 were published in open court.)

12           MS. REED:  Stop the video there.  That is at one

13  minute and 27 seconds.

14           And that point is where Mr. Kevin Seefried enters.

15           If we could continue, please.

16           (Whereupon, segments of Government's Exhibit

17  No. 407 were published in open court.)

18           MS. REED:  Your Honor, as you can see,

19  Mr. Seefried goes off on his own and the rioters are still

20  entering.

21           Can we stop it at 1:34.

22           THE COURT:  Can you tell when the ProPublica

23  person comes in?

24           MS. REED:  I don't know that I have that.

25           If we could go to the ProPublica video.

```
1              THE COURT:  I was more wondering if you can keep
2     playing this until we can see the guy with the video.
3              MS. REED:  We can, your Honor.
4              (Whereupon, segments of Government's Exhibit
5     No. 407 were published in open court.)
6              THE COURT:  Is that the guy, then?
7              MS. REED:  If we could back up a little bit,
8     please, about ten seconds.
9              (Whereupon, segments of Government's Exhibit
10    No. 407 were published in open court.)
11             MS. REED:  So, your Honor, that individual, the
12    ProPublica breach of the door, it didn't happen until -- I'm
13    sorry, your Honor.  Ms. Kearney has passed me a note and I
14    can't read her penmanship.
15             THE COURT:  She should have been a doctor.
16             MS. REED:  I know.  We talked about that earlier.
17             Your Honor, let me say this:  I do believe, your
18    Honor, that the evidence is sufficient that Officer
19    Goodman's testimony is corroborated by the video evidence in
20    this case.  And if you give me a few minutes, I'll come back
21    to that in my argument, your Honor.
22             THE COURT:  Okay.  Yes.  I think basically I want
23    you guys to give me these videos, and I'll take a look at
24    them back in chambers.
25             MS. REED:  We will make sure to do that, your
```

1    Honor.

2           The only reason they're asking you to disregard

3    Officer Goodman's statement is, in addition to the fact that

4    it was just a chaotic day and that this was a traumatic

5    experience, they also, your Honor, are asking you to

6    disregard his statement that he made by their account for

7    the first time.

8           So, your Honor, first of all, Officer Goodman has

9    met with the Government on a number of occasions.  We have

10   actually shown him this video only a few times.  But no

11   matter how many times we would have met with him, no matter

12   how many times, your Honor, he would have had the

13   opportunity to view the video, the best evidence of what

14   happened on that day was Officer Goodman's personal

15   experience.  And that is something that he has been able to

16   testify to in this courtroom, your Honor, separate and apart

17   and independent of any -- I'm sorry, your Honor.  Let me

18   just have a moment.

19          This is what happens when you're in court for

20   days.  So I apologize.  Let me back up --

21          THE COURT:  It's late, I know.

22          MS. REED:  -- and calm myself.

23          Your Honor, as far as the statement that defense

24   counsel is alleging that Officer Goodman made here for the

25   first time, there truly is no evidence whatsoever that that

 1     was the first time that he even made that statement.  On

 2     every single occasion when Officer Goodman has been asked to

 3     provide information about this, he has been consistent as it

 4     relates to the evidence against Kevin Seefried and Hunter

 5     Seefried.

 6            Yes, Officer Goodman was able to hear a lot of

 7     statements that day.  But whenever he is asked about Kevin

 8     Seefried, he's able to properly attribute the statements to

 9     Kevin Seefried.

10            When --

11            THE COURT:  Is that right?  I mean, my guess is

12     it's probably pretty similar, you know, in your court down

13     in New Orleans.

14            I have seen Mr. Ohm very effectively undermine

15     officer credibility where there's kind of ostensibly a new

16     statement.  It'd probably get on the Lewis list over in

17     Superior Court.  And I mean, he brought up your lead agent

18     to say that this was basically the first time he'd heard

19     about a statement attributed to specifically his client.

20            MS. REED:  In fairness to Officer Goodman, the

21     agent wasn't there for the duration of the interview that

22     recently happened with Officer Goodman.  But what Officer

23     Goodman was able to say is that he remembered Kevin

24     Seefried.  He remembers statements that he can attribute to

25     Kevin Seefried.  And he does that.

1          He remembers this one-on-one conversation with him

2     where Mr. Seefried confronts him with the stick and he says:

3     I know what he said to me.  And he was able to give that

4     back to the Court.

5          In addition, not only was he able to remember

6     Kevin Seefried; he is also able to remember a number of

7     other individuals.  The individual who -- with the Q shirt.

8     He engaged directly with that individual.  He's also engaged

9     with other individuals who he can give specific information

10    to.

11         So the only reason that defense is asking you,

12    your Honor, to disregard Officer Goodman is because they

13    believe that he is attributing statements.

14         Well, first of all, I believe that he has given

15    direct statements as to what Kevin Seefried said.  But we

16    are also talking --

17              THE COURT:  When?

18              MS. REED:  -- about obstructive conduct.

19              THE COURT:  Sorry.  When?

20              MS. REED:  Your Honor, one of the statements

21    obviously occurred with the stick incident where Kevin

22    Seefried is approaching Officer Goodman and he's engaging

23    directly with him.

24              He also --

25              THE COURT:  I guess I thought you were saying

Rebuttal Closing Arguments by Ms. Reed

1    Officer Goodman has made statements about what Kevin

2    Seefried said before this trial.  Was that what you were

3    saying?

4              MS. REED:  No, your Honor.

5              THE COURT:  I'm sorry.  I misunderstood you.

6              MS. REED:  So, your Honor, because your Honor

7    started with Officer Goodman, I will just move on.  But what

8    I will say is that Officer Goodman is somebody who has come

9    into this courtroom and he has testified about his memory.

10   Although there was a lot that was going on that day, are we

11   supposed to disregard the fact that this is a man who served

12   time in Iraq?  I mean, this is not the first chaotic

13   situation that he has dealt with.

14             But when it was confined to a specific area and he

15   could give his specific intentions and attention to an

16   individual, that is what he did.  And he remembers these

17   individuals because of that.

18             And going to also what Officer Goodman said, let's

19   go into that archway and think about what else he heard all

20   of these other individuals saying when we talk about

21   obstructive conduct, because this is an aiding and abetting

22   charge as well.

23             And while the Government will seek to offer

24   additional information in closing about what happened in

25   terms of aiding and abetting and I guess the conduct of

 1    other individuals, what we can say, your Honor, is that as

 2    it relates to the crowd of individuals, why would we not

 3    hold Kevin Seefried and Hunter Seefried -- at least consider

 4    what they were hearing in that day?  And it doesn't match

 5    with their own conduct?  So let me go back, your Honor.

 6              I believe that centrally what this case is about

 7    is individuals who went to D.C. on January 6 to Stop the

 8    Steal.

 9              What defense counsel is asking this Court to do is

10    to disregard these individuals for reasons that are really

11    silly that I know that your Honor does not find to be

12    persuasive.

13              You're asked to disregard these individuals

14    because they have allegedly a ninth grade education.  Well,

15    let's talk about what we know about Kevin Seefried.

16    Mr. Seefried is somebody who is politically engaged.  He is

17    somebody who watched Fox News.  He is somebody who

18    befriended individuals on Facebook.  He is somebody who was

19    asking individuals to come to D.C. with him to attend this

20    rally.  He is somebody who is not I guess what I would say a

21    novice at all in politics.  He knows enough to say that

22    there are liars and thieves in that building and that he

23    wants to get to these individuals to make sure that they do

24    not certify this vote count.

25              Now, obviously, we don't have a direct statement

1    from him saying anything other than "liars and thieves."

2    But, your Honor, all you have to do is look at his

3    motivations to go to the circumstances of what he intended

4    to do there on that day.

5         He admits it himself.  He also goes there with

6    Kevin -- with Hunter Seefried.  My apologies.  And it is

7    very, very clear, your Honor, from the evidence that Hunter

8    also had his own intent for going there on that day.

9         Ans what do we know about this?  Stop the Steal.

10   That's what brought them there.  This is someone who talked

11   about election proceedings and voting ballots being stolen.

12   This is not somebody who's not engaged in politics.  And

13   when you look at the general scope of everything, that is

14   what brought them to D.C. on January 6.

15        And when we talk about their intent to disrupt

16   this proceeding, your Honor, look at the evidence that shows

17   how they both entered this building.  Ms. Kearney

18   highlighted it very well.  They scaled a wall -- I'm

19   sorry -- climbed a wall to get to where they needed to get.

20   They went around a crowd of people very aggressively to get

21   to where they wanted to get.

22        We look at Hunter Seefried's entry into the

23   Capitol.  Your Honor, this was somebody who was determined.

24   We see that in the evidence.  We see that in the videos.  He

25   was determined to get in there, and he did.

1          You have two individuals, your Honor, who had

2     already broken this window.  And that's not enough for him

3     to say:  You know what?  Let me disengage.  Whatever I came

4     here for, it isn't worth it, because if I just came here

5     just to express myself and to protest, like defense is

6     asking you to believe, do we really think, your Honor, that

7     he would have used his fist to break into this window and to

8     then confront individuals inside of the Capitol?

9          That is what he did, which shows his intent.  Yes,

10    it is circumstantial, your Honor.  But that is what shows or

11    one of the ways that shows that the motivation for Hunter

12    Seefried as well as Kevin, but specifically focused on

13    Hunter, was the fact, your Honor, that he knew that there

14    was a process that was going on inside of that building.

15         What defense is asking you to do is disregard

16    common sense.  And you should not do that when there is

17    sufficient evidence in this case, your Honor, that shows and

18    proves that Hunter knew what was going on inside of that

19    building that day.

20         He says that, quote, "Things were heated because

21    of what's going on in that room.  And what happens in that

22    building affects my way of life."

23         What is he asking this Court to believe?  That he

24    just does not have any idea whatsoever what goes on inside

25    of the building?

1          You have his father separately -- because that is

2     the conduct that your Honor has to consider, their separate

3     conduct -- stating that there are liars and thieves inside

4     of the Capitol Building.

5          Your Honor, these are two individuals who do have

6     sufficient knowledge for this Court to believe that they

7     knew everything about that certification proceeding.  And

8     let me be clear about that:  Do I know that they knew how

9     the votes were actually counted and tallied and that they

10    knew where the votes were counted and -- no.  I don't know

11    that they knew all those details.

12         And you know what, your Honor?  That's not what

13    the Government has to prove here.  What the Government has

14    to prove is that they intended to obstruct a proceeding.

15    And what we are asking this Court to consider is the

16    circumstantial evidence that gets us there.

17         Your Honor, not only were they sufficient with

18    their own principal behavior, but it was not enough for them

19    to stand alone.  They stood with the group of individuals.

20    And that is the aiding and abetting.  When we talk about a

21    mob of individuals who attacked these officers inside of the

22    building, we are talking about the joint effort that

23    collectively obstructed the official proceeding.

24         And, your Honor, I believe that the evidence is

25    sufficient here for this Court to be satisfied that these

1    individuals' intent was there.

2         Like I said, your Honor, you could disregard

3    Officer Goodman if you would want to.  I don't think that

4    you should, because I think that the evidence supports what

5    he states.  But, your Honor, look at the words and the

6    actions of these individuals.  They are telling you why they

7    were there.  Their actions are showing why they needed to go

8    inside of that building.  And I believe that their

9    individual conduct is sufficient for this Court to find that

10   they obstructed these proceedings.

11        You know, your Honor, I have a number of January 6

12   cases.  And I have to tell you that there is a distinguisher

13   here when we talk about the conduct of Hunter Seefried and

14   Kevin Seefried from other individuals who were inside of the

15   Capitol that day.

16        This is not individuals who just decided to go in

17   and walk and parade or take pictures.  This isn't that.

18        Look at the conduct that these two used.  We're

19   talking about the number-four person who was in there,

20   Hunter Seefried, and we're talking about number thirteen who

21   was in there, Kevin Seefried.

22        They are at the front of this line making their

23   way into a building after they leave a Trump rally, after

24   they have been talked to about where the congressmen and

25   their senators are.  And they know this process.  They know

1   this process, your Honor, from what knowledge they had

2   before they even came to D.C. that day.

3           They get in -- they join with a mob of rioters

4   first in this archway.  And, your Honor, I'll ask you to go

5   back and look at the video.  You can hear multiple times an

6   individual in a red hat who is standing right next to Hunter

7   Seefried asking:  Where are the votes being counted?  He

8   asks it repeatedly.  At any point, does Hunter Seefried

9   retreat and say:  No, now my fatherly instincts kick in?

10  Because that's not when he says the fatherly instincts kick

11  in at that moment.

12          He decides to stay with that person.  And that

13  person, along with other individuals who were shouting

14  multiple things at Officer Goodman as he stood there, all of

15  them asking where the votes are counted, where the meetings

16  are being held, they are standing there.  And the only

17  person who was stopping them from stopping this proceeding

18  is Officer Goodman.

19          And he leads them up the stairwell, your Honor,

20  obviously because he is looking for a line of officers to

21  assist him against this mob riot.

22          The official proceedings could not go on at that

23  point.  They didn't.  They stopped because of individuals

24  like Mr. Hunter Seefried and Kevin Seefried, even though

25  they may not have even known the details about that official

1    proceeding and what was going on at certain times in the

2    proceeding.

3          All we need to know is that they had an intent

4    when they went in to obstruct.  They're not asked to know

5    the particulars and the details about what that meant and

6    where the vice president was going to have to be taken when

7    this certification proceeding stopped.  They knew that if

8    they made their way into that building that their actions

9    would stop that proceeding from happening.  And that is

10   exactly what happened.

11         And then when we get to the question as to whether

12   Kevin Seefried himself can be held responsible for the

13   damage to the property, your Honor, I think it is very clear

14   as what the law states on this, is that you can consider him

15   as an aider and abettor.  And why wouldn't you, your Honor,

16   with the video evidence that stands here?

17         So he's outside of the window.  He sees two

18   individuals breaking a window.  At any point then does he

19   decide to retreat?  He doesn't.  They had every single

20   opportunity at some point in that day to decide that

21   whatever was happening in that -- in the Capitol that they

22   claim that they didn't know, it didn't apply to them.

23         But what they did was they further aggressed every

24   way that they could.  And what you saw is Kevin Seefried

25   stands there, sees an individual break a window and does

1    nothing.  He sees his son advance the window and Hunter

2    Seefried knocks out that remaining portion of that pane.

3            And there is no case law that defense has

4    certainly offered in their filing of earlier today that the

5    Government didn't even get an opportunity to look at that

6    shows that he can't be held responsible for that.  As an

7    aider and abettor, he absolutely can.  And those charges can

8    be grouped together and this Court can hold him responsible

9    for the conduct of anybody else who would have participated

10   in the breaking of that window.

11           THE COURT:  Sorry.  Are you talking about Kevin or

12   Hunter at this point?

13           MS. REED:  I'm talking about Hunter Seefried, your

14   Honor.

15           THE COURT:  Okay.  That's what I thought.

16           Ms. Reed, back to the FBI interviews:  The

17   Defendants talk about various reasons why they went down to

18   the Capitol, why they went into the Capitol.  Hunter

19   Seefried says, "I get that going into the Capitol to express

20   my opinion is wrong."

21           There's not a lot about the certification of the

22   votes or that type of thing.  I mean, I'm honestly inclined

23   to think at that point they probably don't -- they're not

24   probably aware of obstruction of an official proceeding

25   being the big crime that they're facing.  I mean, I think

1      Hunter Seefried is pretty clearly trying to hide his

2      involvement in the destruction of property and that his

3      statements are very consistent with that.

4           But you've got agents trying to tease this out,

5      and yet they don't talk about the proceeding.  And I agree.

6      There's not necessarily magic words that I need to be

7      looking for.  But it's much more this idea about standing

8      with the president, expressing my views, that type of thing.

9           What do I do with that?

10          MS. REED:  Well, your Honor, I think that what

11     Hunter states is about the certification proceeding without

12     saying that it is about the certification proceeding.

13          I think that what he tells Agent McCabe is that

14     what he knows happens in that building is going to affect

15     his way of life.

16          And he very much ties that to the concerns that he

17     has about fraud and voting and how he feels that this has

18     been a fraudulent election.

19          And so, your Honor, I think that the evidence

20     certainly is there that this is not just about an

21     obstruction without the necessary official proceeding.  I

22     think that although he's not -- I don't want to offer that

23     he's not a sophisticated person to know about an election

24     proceeding.  But because he doesn't use the words

25     "certification process" or "Electoral College," I don't

1      think that the Court should disregard his statement as being

2      about the certification process.

3              I think that he offers sufficient evidence to

4      Agent McCabe that we should be able to infer from his

5      statement that those were the reasons -- that that was the

6      sole reason why he decided to enter the Capitol on that day.

7              So, your Honor, I think that the entirety of the

8      statement and the way that the statement is conducted is for

9      the purpose of getting Hunter Seefried to talk.

10             Now, there's nothing wrong with the agent

11     offering, I think, what he thinks Mr. Hunter Seefried wants

12     to talk about.  I think that he understands that when he is

13     in this --

14             THE COURT:  I'm not suggesting that there is.  I'm

15     saying that even with the agent doing everything he can to

16     kind of elicit incriminating testimony, that doesn't feel to

17     me like where the Defendant goes.

18             MS. REED:  Well, your Honor, I remember it as

19     being that in fact I think he does go there, because as

20     Agent McCabe is continuing the conversation, the

21     conversation seems to centrally focus on election fraud and

22     why they were there.

23             Agent McCabe gives a number of names of

24     individuals who are, for lack of a better word, the classic

25     characters in this election fraud controversy.  And

1    Mr. Seefried acknowledges that he associates those

2    individuals with election fraud.

3           And so I think, your Honor, that if you do watch

4    the video again, you will see, your Honor, in that interview

5    that that is the sole consideration for why Hunter Seefried

6    says that he enters that building.

7           When he talks about confronting "them people about

8    the things that are happening," I guess I can pull from

9    something that I think one of the officers said:  We do have

10   to use our inferences to understand what he was speaking

11   about.

12          So I believe that it may have been Sergeant

13   Kiely -- or "Kiely" -- I'm not exactly sure about how he

14   states his last name.  But I do believe that he stated

15   something to the effect of:  Well, I thought that they were

16   there because they knew about the certification proceeding;

17   and he goes on to tell us why he thinks that.

18          Who else is in the building?  And if, your Honor,

19   I can recall correctly, I believe that Kevin Seefried --

20   Hunter Seefried states:  I wasn't talking about the cops

21   when I was asking them about how they were doing their jobs.

22          So then if we're talking about individuals who

23   were making day-to-day considerations about things that are

24   happening in our daily lives, I guess the question begs:

25   Who else would it have been?

1        And I do believe that when you put this in the

2   proper context, your Honor, of them going to the rally and

3   hearing the speech, just think about this, your Honor.  The

4   last thing that they hear before they, I guess, go back to

5   their vehicles to eat lunch is a command from the president

6   that they should peacefully go down to the Capitol -- and

7   it's not the president's words, but it's my words that I'm

8   using -- and confront the individuals who are making a

9   day-to-day impact in their lives and the decisions that

10  impact them.

11       That is what Hunter's interview touches on and

12  that is also what Kevin Seefried's interview touches on as

13  well.

14       It's more this conversation about what is

15  impacting my day-to-day life.  Kevin Seefried says the same

16  thing when he talks about liars and thieves in the

17  conversation that he has with Officer Morgan.  He stops

18  Officer Morgan while he is doing a search of a person who is

19  believed and found to have a weapon on him.

20       That is just -- that shows the intent and the

21  aggressiveness that these two individuals had to make sure

22  that their point was had.

23       But I want to stick to Kevin Seefried on this

24  point, because he engaged with Officer Morgan.  And what is

25  it that he asks Officer Morgan or really tells him?  "How is

1    it that you can work for these liars and thieves?"

2          So once again, there's a separation from police

3    officers and other people in the building.  The liars and

4    thieves are the ones that are making the decision.  And the

5    statement is something to the effect of:  The decisions that

6    are being made by the liars and thieves, that's impacting my

7    life; that's impacting our women and our children.  That is

8    the statement that is made by Kevin Seefried.

9          So, your Honor, when we talk about the

10   circumstances that surround this, you cannot divorce the

11   fact that these individuals want to Stop the Steal.  That is

12   what that rally was about.  It is what it represented to

13   them, was that they had to go into that building to do what

14   they could to thwart this finalization for them of this

15   election proceeding.

16         This was something that they definitely were

17   engaged in on a day-to-day basis.  Listen to the evidence

18   that we heard about what Kevin Seefried and Hunter Seefried

19   did before they even got to D.C. that day.  We know that

20   Hunter was very much engaged in politics.

21         Anastasia Cuff tells us that he was not; but, your

22   Honor, when we talk about disregarding people's testimony, I

23   think that you can disregard hers, because certainly she is

24   somebody who was biased.  Certainly she is someone who has a

25   motive here.  Even though she's not in a romantic

1   relationship anymore with Hunter Seefried, look at what she

2   was offering.  She herself says that they did have concerns

3   about the electoral proceeding and that's why they all went

4   that day.

5            So she's telling you about all of them.  And I

6   know we're looking at individual conduct, but she rode

7   together with these individuals.

8            Now, the Court can regard or disregard whether

9   there was a conversation before they left.  But we certainly

10  know that everyone had the intention that day of going for

11  one reason; and it was to Stop the Steal.

12           These individuals leave off.  They go.  They break

13  windows.  They confront officers.  And she is still, I

14  guess, maintaining the fact that both of these people are

15  peaceful individuals.

16           So just to jump to her very quickly, your Honor, I

17  would ask the Court to disregard some of her testimony to

18  the extent that it certainly goes towards a bias and a favor

19  to Hunter and Kevin Seefried.  But even if you want to

20  disregard some of her testimony, she still tells us that

21  that was the motive for them going.

22           And I believe, your Honor, that all of their acts

23  from the time that they got to that window shows that they

24  were -- "hellbent" is the word that I will use -- to get

25  inside of that Capitol to stop the proceeding.

1          What else is there, your Honor, when they are

2    clustered with a group of individuals who are asking things

3    like:  Where are the votes?  Where are the members?  Where

4    are these people?  Telling Officer Goodman to back up.  They

5    were advancing towards him.  We are here for you.  We're

6    here for the corrupt government, is what the Q person says

7    who again directly engages with Officer Goodman.

8          It is very clear what the intent of all of these

9    individuals was.  It is very clear what the intent of Kevin

10   Seefried and Hunter Seefried was on January 6.

11         And because of that, your Honor, I believe that

12   there is sufficient evidence here for you to find them

13   guilty for the obstruction count.

14         And like I said, your Honor, this is not about the

15   conduct of everybody else who went in that day.  This is

16   about their conduct and what they did.  They took a step in

17   furtherance.  If they had just gone inside, it still would

18   be a crime.  But this isn't just going inside.  What makes

19   it a difference is that they actively take steps forward to

20   make sure that the certification process does not happen in

21   numerous ways.

22         Not only do they do it on the first floor.  They

23   go up to the second floor and continue the same rhetoric

24   with a line of police officers by asking them to essentially

25   stand down so that they can get their point across of

1      stopping this proceeding.

2              So no matter how many officers have come into this

3      courtroom, what is clear is that this Court did not hear an

4      officer saying:  Well, no one was saying that stuff that

5      day.  I don't recall anybody saying anything about elected

6      officials or vote count.  No one says that.  They all say

7      the same thing, your Honor, that there were numerous people

8      who were in that group of which Kevin and Hunter Seefried

9      were in when they were making statements about the election

10     proceeding, when they were asking these officers to let them

11     in.

12             Kevin Seefried says that in his own words:  "We

13     are coming in" to Officer Goodman.  And I understand that

14     there is some controversy about the timing of when that

15     happened.  His words, your Honor:  "You cannot stop me.

16     We're coming in."  Coming in for what, is the question.  You

17     are already in the building.  So what else was there to come

18     in for?

19             And I believe that the evidence is sufficient here

20     to show that it was because they knew, they had the intent

21     of stopping that proceeding.

22             You know, Mr. Ohm has said something today that I

23     think is a little silly because I remember watching very

24     vividly how many news shows were actively talking about this

25     electoral process, every day since the election.  You had

1     Hunter and Kevin Seefried who stated -- Hunter specifically:

2     In my 22 to 23 years of life, I have never seen this much

3     election fraud.  Listen to that kind of statement that he

4     makes.

5           You've got Kevin Seefried saying that he's

6     befriending people on Facebook, talking to them about going.

7     And what happens?  He deleted his Facebook page.

8           The irony in that, the fact that you delete your

9     Facebook page before you go to meet with officers, I think

10     that Mr. Ohm is offering that as this Court should see that

11     as a lack of his intent.

12           It goes directly towards his intent.  The fact

13     that he brings a Confederate flag, well, we'll trade you,

14     Mr. Seefried.  You can keep the Confederate flag.  We would

15     have taken the Facebook.

16           And, yes, the agents could have gone back and

17     probably should have gone back.  I would love to have

18     additional evidence for you about what statements were made

19     by Mr. Seefried.  But the fact is, your Honor, that I don't

20     even think that we need that here, because what Mr. Hunter

21     Seefried and Kevin Seefried tell you individually in their

22     own statements is why they were there that day.

23           And that is what I think should inform this

24     Court's decision as to why these individuals had the intent,

25     the corrupt intent, to stop the proceedings that day.

```
 1                THE COURT:  Thank you, ma'am.

 2                MS. REED:  Thank you, your Honor.

 3                THE COURT:  Very well-argued by all the attorneys.

 4                MR. OHM:  Does the Court want any answer to the

 5      timing question?

 6                MS. REED:  Actually, I can provide an answer at

 7      this point, your Honor.  I've been talking long enough

 8      around it.

 9                THE COURT:  Very quickly, Mr. Ohm.  I think I do

10      just want to go through and look at the videos myself.  But

11      if you think you've got a chronology here.

12                MR. OHM:  Sure.  Because it takes a little bit of

13      mental gymnastics.

14                Your Honor, the Court can see the ProPublica

15      cameraman in the brown.  That is the ProPublica cameraman

16      here.  And that's in camera 123, which is Government's 405.

17      And that lines up with --

18                MS. REED:  That video is not in.

19                MS. KEARNEY:  407?

20                MR. OHM:  I'm sorry.  No.  407 is the one he

21      enters in.

22                MS. REED:  So --

23                MS. KEARNEY:  The video you have on your screen

24      right now is not in.

25                THE COURT:  I have 405 in.
```

1           MR. OHM:  That lines up with 46 seconds of

2    ProPublica video.  The Court can see where he's turning

3    around at that hallway.

4           THE COURT:  I can't see anything.

5           MR. OHM:  Sorry.  That lines up, if the Court

6    looks at the picture on the right on my screen --

7           THE COURT:  No.  It's not showing.

8           MS. MULLIN:  It's not showing on the shared

9    screen.

10          MR. OHM:  There we go.

11          So if the Court -- at 34 seconds in the ProPublica

12   video, the Court will see the reverse of what the Court

13   could see on Government's 405 at -- which is time-stamped at

14   2:13:56.  That demonstrates that the ProPublica video where

15   the confrontation with Officer Goodman is at 2:14:18,

16   because of the time that elapses on the ProPublica video, is

17   56 seconds on the ProPublica video, which is 20 seconds

18   after the ProPublica video that we can line up with the

19   timestamps, if that makes sense.

20          The conclusion would be, your Honor, that this

21   part of the video where Officer Goodman is pointing at

22   Mr. Seefried is at 2:14:18, which is about 55 seconds after

23   Mr. Seefried enters as per Government's Exhibit 407.

24          THE COURT:  You said about 55 seconds?

25          MR. OHM:  2:13:23 is when he enters, according to

1    the timestamp in Government's Exhibit 407.  That would be

2    2:14:18.  So that would be 55 seconds.

3              THE COURT:  All right.  Thanks, folks.  Again,

4    very well-handled by all the attorneys.  I appreciate your

5    work.

6              I'll ask the Government, I particularly want to

7    see the interviews with the FBI agents and these videos from

8    downstairs and the breaking of the glass.  So if we can just

9    make sure all of those get to my law clerk; and obviously,

10   copy Mr. Ohm.

11             MR. OHM:  Your Honor, I just want to let --

12             THE COURT:  Mr. Bostic, too.

13             MR. OHM:  I wanted to let the Court know that I

14   used box.com to deliver the exhibits, but the Government

15   hasn't looked at them yet.  So I just wanted that to be

16   clear before the Court goes back.

17             THE COURT:  Thank you.

18             Why don't we resume at 3:00 p.m. tomorrow.  And I

19   hope to have a verdict for you at that point.

20             Anything else we should be discussing this

21   evening, Ms. Reed?

22             MS. REED:  I'm sorry, your Honor?

23             THE COURT:  Anything else we should be discussing

24   this evening?

25             MS. REED:  No, your Honor.  Thank you.

```
1              THE COURT:  Mr. Ohm?

2              MR. OHM:  No, your Honor.  Thank you.

3              THE COURT:  Mr. Bostic?

4              MR. BOSTIC:  No, your Honor.  Thank you.

5              THE COURT:  Thanks, folks.  See you tomorrow.

6              (Proceedings concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4        certify that the foregoing constitutes a true and accurate

5        transcript of my stenographic notes, and is a full, true,

6        and complete transcript of the proceedings produced to the

7        best of my ability.

8

9

10                   Dated this 23rd day of June, 2022.

11

12              <u>/s/ Lisa Edwards, RDR, CRR</u>
                Official Court Reporter
13              United States District Court for the
                  District of Columbia
14              333 Constitution Avenue, Northwest
                Washington, D.C. 20001
15              (202) 354-3269

16

17

18

19

20

21

22

23

24

25

**'**

**'F'** [1] - 82:14

**/**

**/s** [1] - 271:12

**0**

**0007** [1] - 1:18
**043** [1] - 60:1

**1**

**1** [9] - 3:19, 7:18, 66:24, 68:2, 69:24, 146:23, 148:19, 148:22, 231:25
**10** [2] - 94:21, 194:10
**100** [1] - 74:7
**1005** [1] - 2:3
**103** [1] - 3:10
**104** [1] - 3:11
**105** [1] - 3:12
**106** [1] - 16:15
**109** [1] - 3:18
**10:04** [1] - 1:7
**11** [3] - 25:15, 39:8, 43:14
**11:33** [1] - 90:6
**11th** [2] - 7:2, 7:9
**12** [3] - 39:9, 43:14, 47:20
**120** [1] - 3:12
**123** [1] - 267:16
**124** [1] - 3:12
**12:33** [1] - 219:12
**12th** [5] - 6:2, 7:6, 20:24, 25:16, 26:12
**13** [1] - 41:20
**1300** [1] - 89:21
**13:26** [1] - 39:19
**13th** [1] - 160:21
**14** [7] - 1:6, 40:12, 41:21, 47:25, 49:19, 169:16, 170:7
**143** [1] - 3:12
**148** [1] - 3:19
**14:20** [1] - 39:19
**15** [12] - 40:12, 44:13, 46:19, 47:21, 117:13, 117:20, 151:9, 194:10, 194:17, 194:19, 207:18
**15-minute** [1] -

150:19
**150** [1] - 3:14
**1512** [1] - 68:10, 180:13, 226:17
**152** [1] - 3:20
**16** [5] - 49:19, 51:20, 121:6, 121:7, 203:20
**1600** [1] - 1:15
**16:28** [1] - 38:2
**16:36** [1] - 38:2
**16th** [1] - 194:10
**17** [5] - 35:3, 44:13, 47:21, 121:6, 121:9
**1700** [1] - 2:3
**17th** [1] - 194:13
**18** [1] - 153:14
**180-degree** [1] - 181:24
**185** [1] - 3:21
**19** [1] - 3:6
**19103** [1] - 2:4
**1924(c** [1] - 153:15
**1:00** [2] - 89:21, 89:24
**1:15:17** [1] - 44:21
**1:15:22** [1] - 44:22
**1:24** [1] - 219:15
**1:25** [1] - 161:3
**1:30** [1] - 95:22
**1:34** [1] - 244:21
**1:44** [1] - 219:24
**1:52** [1] - 219:24
**1:58** [1] - 220:1

**2**

**2** [6] - 1:10, 7:16, 8:1, 8:6, 10:14, 14:19
**20** [14] - 3:5, 34:11, 92:6, 117:13, 117:20, 133:21, 136:12, 183:4, 197:5, 202:25, 211:24, 219:22, 221:19, 268:17
**20-minute** [1] - 137:1
**20001** [2] - 2:8, 271:14
**20004** [1] - 1:23
**201** [5] - 3:17, 28:21, 29:9, 29:13, 29:14
**2014** [2] - 25:1, 56:3
**2018** [2] - 71:4, 71:6
**202** [7] - 2:9, 3:17, 38:6, 67:2, 67:8, 67:9, 271:15
**2020** [7] - 11:12, 33:22, 34:1, 34:3, 50:24, 51:15, 196:25
**2021** [24] - 6:15,

25:15, 26:12, 31:3, 31:22, 34:18, 35:13, 71:12, 73:5, 89:12, 91:7, 107:7, 107:12, 120:15, 128:16, 152:9, 155:2, 156:3, 156:24, 164:19, 164:25, 171:14, 185:12, 237:12
**2022** [7] - 1:6, 73:16, 73:19, 77:17, 81:7, 206:19, 271:10
**21** [3] - 49:18, 50:3, 169:16
**21-00287** [1] - 1:3
**21-287** [1] - 4:5
**21:14** [2] - 49:24, 170:8
**21:40** [2] - 170:2, 170:6
**22** [5] - 44:14, 83:2, 212:19, 236:4, 266:2
**226** [1] - 3:22
**22:50** [1] - 170:12
**22nd** [1] - 80:25
**23** [4] - 49:19, 51:20, 211:25, 266:2
**236** [1] - 3:23
**23rd** [1] - 271:10
**24** [2] - 3:7, 51:20
**25:10** [2] - 53:5, 53:9
**25:14** [2] - 53:5, 53:9
**25:24** [3] - 36:14, 53:17, 53:20
**25:51** [1] - 36:14
**26** [1] - 32:10
**26:46** [1] - 54:7
**26:59** [1] - 54:7
**27** [2] - 45:21, 244:13
**28** [1] - 3:16
**28:17** [1] - 54:15
**29** [4] - 3:14, 3:17, 67:22, 68:1
**29(a** [1] - 68:23
**29:23** [1] - 54:15
**2:00** [1] - 90:14
**2:02** [1] - 220:4
**2:09** [1] - 160:1
**2:13:23** [1] - 268:25
**2:13:56** [1] - 268:14
**2:14:18** [3] - 268:15, 268:22, 269:2
**2:17** [1] - 90:14
**2:38** [1] - 220:5
**2:48** [1] - 221:8
**2:57** [1] - 221:12
**2:59** [1] - 221:13

**3**

**3** [1] - 77:24
**3.6** [1] - 204:25
**30** [4] - 133:21, 190:7, 219:22, 230:22
**301** [48] - 3:16, 28:5, 28:11, 28:17, 28:18, 31:8, 31:11, 32:12, 34:13, 35:5, 35:18, 35:21, 36:14, 36:16, 38:2, 38:4, 39:11, 39:19, 39:21, 40:21, 40:24, 41:20, 41:23, 43:17, 44:16, 44:24, 45:23, 46:9, 47:20, 47:23, 48:19, 48:24, 49:21, 50:1, 51:23, 52:14, 52:16, 53:5, 53:7, 53:11, 53:19, 53:22, 54:9, 54:15, 54:17, 169:17, 170:6, 170:10
**302** [1] - 72:19, 77:19, 80:4, 81:11, 81:12, 81:23, 82:17, 83:22, 83:25, 84:5, 84:6
**302-A** [2] - 240:7, 240:10
**31** [7] - 40:21, 48:17, 48:22, 147:8, 148:20, 148:23, 205:24
**32** [2] - 45:20
**33** [1] - 46:6
**333** [2] - 2:7, 271:14
**34** [1] - 268:11
**35** [1] - 46:6
**354-3269** [2] - 2:9, 271:15
**36** [1] - 43:14
**36:30** [1] - 7:15
**37** [4] - 48:16, 48:21
**39** [1] - 47:25
**3:00** [1] - 269:18

**4**

**4** [9] - 3:18, 7:14, 78:20, 83:7, 109:16, 109:18, 109:24, 109:25, 115:5
**401** [9] - 90:5, 90:8, 91:13, 209:3, 209:5, 209:8, 209:9, 210:9, 211:18
**403** [1] - 160:1
**404** [1] - 160:2

**405** [3] - 267:16, 267:25, 268:13
**407** [11] - 161:3, 161:6, 244:9, 244:11, 244:17, 245:5, 245:10, 267:19, 267:20, 268:23, 269:1
**414** [2] - 163:4, 168:24
**42** [1] - 51:20
**423** [1] - 67:11
**42:28** [1] - 240:8
**43** [2] - 35:3, 40:22
**45** [6] - 35:19, 39:9, 175:25, 204:9, 207:19, 217:12
**45:03** [1] - 240:8
**46** [3] - 31:9, 35:18, 268:1
**46:57** [1] - 52:14
**47:37** [1] - 52:14
**47:40** [1] - 14:18

**5**

**5** [7] - 3:5, 109:13, 109:15, 109:16, 114:18, 114:24
**50** [4] - 46:18, 72:7, 161:25, 175:22
**501** [1] - 159:19
**502** [6] - 46:18, 46:21, 175:21, 176:1, 176:3, 176:6
**504** [11] - 161:25, 181:22, 202:22, 202:24, 203:8, 203:19, 203:25, 204:6, 205:16, 205:20, 242:25
**504-E** [2] - 240:14, 240:23
**504-F** [1] - 242:25
**505** [4] - 181:24, 200:20, 200:22, 201:18
**511** [1] - 98:19
**514** [1] - 99:22
**51:18** [1] - 10:13
**524** [1] - 159:8
**525** [1] - 159:4
**526** [1] - 159:4
**53** [2] - 35:2, 35:3
**54** [2] - 39:9, 46:6
**55** [6] - 3:7, 40:21, 40:22, 268:22, 268:24, 269:2
**550** [1] - 1:22
**55:55** [1] - 41:2

**56** [1] - 268:17
**57** [1] - 50:3
**58** [1] - 32:10
**59** [4] - 31:8, 34:11, 43:15, 47:20
**5th** [2] - 157:17, 186:23

**6**

**6** [53] - 5:14, 10:13, 31:22, 34:18, 63:22, 64:1, 71:23, 73:7, 73:19, 73:21, 77:17, 78:3, 78:4, 78:5, 79:12, 89:7, 89:12, 91:7, 107:7, 107:12, 108:9, 108:15, 114:4, 117:25, 120:15, 125:24, 142:4, 147:8, 148:20, 148:22, 152:9, 155:1, 155:13, 155:22, 156:2, 156:24, 157:15, 164:19, 164:25, 171:13, 185:12, 187:1, 188:9, 196:18, 213:25, 227:5, 227:7, 237:12, 250:7, 251:14, 254:11, 264:10
**6-31** [1] - 3:19
**6.87** [1] - 201:25
**61** [1] - 3:7
**625** [1] - 1:22
**650** [1] - 1:15
**67** [2] - 3:14, 3:17
**6706** [1] - 2:8
**6th** [10] - 6:15, 8:24, 19:21, 20:7, 20:23, 31:3, 35:13, 71:12, 72:11, 186:24

**7**

**7** [2] - 118:14, 227:5
**70** [1] - 3:9
**70130** [1] - 1:16
**707** [1] - 189:22
**7th** [1] - 186:23

**8**

**8** [2] - 227:5, 227:7
**85** [1] - 3:9
**87** [1] - 3:9
**88** [1] - 3:10
**8th** [1] - 73:5

**9**

**96** [1] - 3:10
**9:00** [1] - 88:4

**A**

**A.J** [1] - 5:18
**a.m** [1] - 1:7
**abet** [3] - 153:19, 182:12, 236:7
**abetted** [2] - 152:13, 155:6
**abetting** [25] - 153:1, 153:11, 153:14, 154:6, 180:1, 180:8, 180:12, 183:15, 184:9, 208:15, 211:23, 223:24, 224:2, 224:3, 224:17, 225:3, 225:14, 225:20, 225:24, 226:2, 226:9, 228:24, 249:21, 249:25, 253:20
**abettor** [6] - 154:10, 154:11, 224:21, 225:18, 256:15, 257:7
**abiding** [3] - 123:14, 123:18, 236:3
**ability** [3] - 62:4, 238:4, 271:7
**able** [22] - 65:23, 65:24, 66:15, 95:18, 95:19, 103:19, 113:1, 113:15, 118:21, 123:7, 238:9, 238:18, 243:4, 243:17, 246:15, 247:6, 247:8, 247:23, 248:3, 248:5, 248:6, 259:4
**absolutely** [4] - 135:19, 135:25, 241:7, 257:7
**accept** [1] - 234:25
**access** [3] - 21:2, 218:23, 227:18
**accesses** [1] - 209:22
**accompany** [1] - 216:20
**accomplice** [3] - 153:23, 154:16
**according** [2] - 221:10, 268:25
**account** [7] - 20:20, 20:22, 62:2, 62:5, 62:6, 218:19, 246:6
**accounts** [1] -

218:23
**accurate** [4] - 21:2, 118:15, 223:17, 271:4
**accurately** [1] - 83:14
**acknowledge** [1] - 217:6
**acknowledged** [3] - 17:20, 61:8, 198:1
**acknowledges** [2] - 200:7, 260:1
**acquittal** [3] - 67:22, 68:2, 68:23
**act** [8] - 15:20, 69:20, 177:22, 178:3, 178:7, 207:16, 225:3, 243:16
**acting** [7] - 49:15, 141:12, 178:21, 179:5, 179:6, 179:21, 180:24
**action** [4] - 158:8, 182:19, 224:25, 241:2
**Action** [1] - 1:3
**actions** [15] - 157:14, 164:17, 172:12, 182:11, 221:5, 221:6, 222:11, 222:12, 234:17, 235:17, 237:17, 254:6, 254:7, 256:8
**actively** [2] - 264:19, 265:24
**activities** [2] - 25:5, 60:3
**activity** [3] - 55:24, 178:2, 234:10
**acts** [3] - 156:17, 243:8, 263:22
**actual** [5] - 86:11, 155:24, 174:16, 225:19, 242:1
**addition** [3] - 38:16, 246:3, 248:5
**additional** [6] - 42:25, 83:17, 204:22, 224:25, 249:24, 266:18
**address** [4] - 35:8, 180:13, 180:15, 187:8
**addressed** [2] - 101:7, 102:8
**adequate** [1] - 150:1
**administratively** [1] - 72:25
**admission** [1] - 70:8
**admissions** [1] - 172:13
**admit** [3] - 31:2, 58:7, 148:19, 179:11, 179:16

**admits** [3] - 167:13, 179:11, 251:5
**admitted** [5] - 35:12, 39:4, 66:24, 90:5, 109:20
**admitting** [2] - 58:11, 167:1
**ado** [1] - 16:18
**advance** [6] - 153:10, 153:17, 154:12, 199:23, 243:18, 257:1
**advancing** [2] - 200:1, 264:5
**advice** [3] - 29:5, 29:17, 29:18
**advice-of-rights** [1] - 29:5
**advised** [4] - 11:10, 11:15, 23:19, 29:18
**advisement** [1] - 66:4
**affect** [1] - 258:14
**affecting** [1] - 119:21
**affects** [7] - 22:7, 37:5, 37:18, 54:1, 164:5, 252:22
**affiliated** [2] - 11:21, 17:2
**affirm** [1] - 182:17
**afoul** [1] - 230:16
**African** [1] - 18:2
**African-American** - 18:2
**afterhand** [1] - 217:22
**afternoon** [12] - 88:10, 88:11, 88:18, 89:22, 96:19, 96:20, 104:25, 105:1, 105:7, 120:3, 120:4, 229:1
**afterwards** [2] - 223:20, 223:21
**age** [1] - 212:19
**agent** [33] - 17:7, 17:10, 26:18, 33:5, 37:13, 62:1, 63:22, 70:9, 71:8, 71:9, 71:11, 73:11, 73:16, 73:19, 74:11, 74:22, 77:2, 77:9, 85:3, 87:12, 167:2, 170:20, 171:2, 222:6, 223:16, 232:20, 233:13, 233:16, 235:12, 247:17, 247:21, 259:10, 259:15
**Agent** [41] - 4:22, 5:2, 5:22, 16:25, 19:16, 20:16, 21:21,

23:25, 24:8, 24:13, 24:21, 26:19, 26:20, 38:8, 46:11, 51:25, 55:13, 61:20, 65:1, 70:17, 70:19, 70:23, 87:19, 160:3, 167:19, 169:11, 169:15, 169:22, 175:6, 206:11, 208:2, 221:25, 222:2, 229:19, 232:6, 232:7, 258:13, 259:4, 259:20, 259:23
**agents** [5] - 166:24, 232:15, 258:4, 266:16, 269:7
**aggressed** [1] - 256:23
**aggression** [1] - 183:14
**aggressive** [7] - 37:3, 100:5, 101:22, 163:1, 169:5, 230:20, 234:13
**aggressively** [1] - 251:20
**aggressiveness** [1] - 261:21
**agitated** [2] - 100:11, 163:6
**agitators** [1] - 184:15
**ago** [8] - 5:14, 13:8, 13:11, 129:14, 130:17, 132:6, 145:19, 146:13
**agree** [24] - 12:13, 51:16, 61:1, 65:15, 123:15, 128:20, 136:21, 140:1, 140:3, 140:5, 144:6, 148:17, 152:18, 153:3, 153:9, 165:24, 185:10, 187:23, 200:9, 212:13, 227:6, 229:2, 243:10, 258:5
**agreed** [2] - 107:19, 222:2
**agreement** [3] - 107:17, 155:11, 182:19
**agrees** [1] - 223:16
**ahead** [4] - 10:11, 134:18, 159:14
**aid** [6] - 153:19, 182:12, 210:18, 227:20, 228:6, 236:6
**aided** [2] - 152:13, 155:5
**aider** [6] - 154:9, 154:11, 224:21,

225:18, 256:15, 257:7
**aiding** [26] - 152:25,
153:11, 153:14,
154:6, 179:25, 180:8,
180:12, 183:14,
184:9, 208:15,
211:22, 223:24,
224:2, 224:16, 225:3,
225:13, 225:20,
225:24, 226:1, 226:9,
228:12, 228:23,
249:21, 249:25,
253:20
**air** [1] - 116:19
**Alexandria** [1] - 5:10
**align** [1] - 184:21
**allegations** [4] -
55:19, 158:1, 158:20,
170:22
**alleged** [2] - 68:15,
231:25
**allegedly** [2] -
243:25, 250:14
**alleging** [3] - 34:2,
177:22, 246:24
**allowed** [2] - 22:21,
169:23
**allowing** [1] - 232:22
**almost** [3] - 84:2,
204:17, 232:5
**alone** [2] - 149:20,
253:19
**alt** [1] - 60:9
**alt-right** [1] - 60:9
**altercation** [1] -
181:23
**alternative** [1] -
196:16
**ambiguity** [1] -
204:19
**Amendment** [3] -
11:14, 157:23, 197:21
**Amendment-type** [1]
- 11:14
**America** [2] - 4:5,
169:24
**AMERICA** [1] - 1:3
**American** [1] - 18:2
**Americans** [1] -
196:24
**amount** [2] - 21:8,
177:1
**an-hour-and-a-half**
[1] - 232:5
**analogous** [1] -
154:17
**ANASTASIA** [2] -
105:2, 105:11
**Anastasia** [7] - 3:12,
104:22, 105:11,

216:16, 217:3,
217:14, 262:21
**Andrew's** [1] - 1:18
**anger** [2] - 15:15,
141:15
**angle** [2] - 203:6,
209:11
**angry** [8] - 49:15,
49:16, 141:16,
162:24, 163:1, 163:8,
169:7, 234:12
**animated** [7] -
100:21, 102:5, 104:7,
104:12, 208:23,
210:11, 210:14
**announced** [1] -
183:22
**announcing** [2] -
181:19, 183:23
**ans** [1] - 251:9
**answer** [10] - 29:20,
35:7, 57:7, 126:25,
204:12, 226:12,
231:13, 235:23,
267:4, 267:6
**answered** [1] -
107:21
**answers** [8] - 46:25,
56:8, 57:8, 76:6,
173:14, 173:16,
213:4, 235:4
**antifa** [19] - 12:6,
12:8, 12:12, 12:25,
13:2, 13:7, 13:11,
13:12, 13:14, 13:17,
38:24, 39:3, 62:13,
62:18, 62:23, 62:24,
184:7, 184:13
**antifascism** [1] -
13:10
**antipolice** [1] - 13:10
**anyway** [2] - 118:8,
184:6
**apart** [2] - 195:14,
246:16
**apologies** [1] - 251:6
**apologize** [3] -
43:19, 106:7, 246:20
**apologizes** [1] -
179:12
**appear** [2] - 102:5,
102:10
**appearance** [1] -
124:12
**APPEARANCES** [1] -
2:1
**aPPEARANCES** [1] -
1:13
**appeared** [1] - 27:1
**applicable** [3] -

65:18, 65:21, 69:4
**applies** [3] - 162:13,
168:14, 186:25
**apply** [2] - 188:9,
256:22
**appreciate** [3] -
146:17, 213:23, 269:4
**appreciated** [1] -
148:11
**apprehended** [1] -
175:17
**approach** [6] - 30:16,
56:8, 77:22, 78:17,
81:16, 149:12
**approached** [1] -
10:18
**approaching** [5] -
83:6, 90:21, 158:19,
240:17, 248:22
**appropriate** [1] -
122:16
**April** [4] - 73:1,
73:11, 73:16, 74:22
**archway** [5] - 203:7,
239:3, 240:17,
249:19, 255:4
**area** [12] - 90:23,
93:4, 111:2, 118:1,
159:3, 161:8, 161:12,
194:24, 197:13,
230:25, 249:14
**areas** [2] - 57:15,
181:7
**argue** [1] - 223:24
**argued** [2] - 224:22,
267:3
**argument** [9] - 68:3,
187:8, 190:14,
190:16, 211:1,
225:16, 225:17,
242:16, 245:21
**argumentative** [1] -
140:8
**Arguments** [4] -
3:20, 3:21, 3:22, 3:23
**arm's** [2] - 199:22,
199:25
**arrest** [1] - 29:22
**arrested** [5] - 58:2,
58:4, 175:6, 214:1,
223:3
**arrive** [2] - 26:22,
92:16
**arrived** [6] - 27:3,
91:8, 93:18, 95:6,
97:1, 241:2
**arrives** [1] - 167:6
**article** [2] - 6:16,
15:18
**articulate** [1] -

212:15
**articulated** [1] -
224:14
**ascribe** [1] - 183:19
**ascribing** [1] - 244:3
**aside** [2] - 17:4,
167:5
**asleep** [3] - 127:25,
214:19, 229:16
**asp** [1] - 241:14
**aspect** [2] - 147:2,
220:22
**aspects** [1] - 147:25
**assaulted** [1] -
185:15
**assaultive** [1] -
199:25
**assess** [1] - 69:2
**assessment** [3] -
18:24, 65:23, 165:25
**assigned** [4] - 73:6,
73:9, 87:13, 89:15
**assist** [3] - 227:20,
228:6, 255:21
**assistant** [1] - 87:12
**Assistant** [1] - 79:2
**assists** [1] - 28:23
**associated** [2] -
209:12, 224:17
**associates** [1] -
260:1
**assume** [5] - 183:17,
197:10, 199:3,
214:18, 215:2
**assumed** [1] - 27:2
**assuming** [1] -
228:23
**assumption** [1] -
214:25
**ate** [7] - 114:16,
115:22, 115:24,
133:13, 145:9,
145:13, 215:25
**atmosphere** [3] -
36:10, 53:1, 97:4
**attaches** [1] - 154:5
**attacked** [1] - 253:21
**attempt** [2] - 16:7,
17:5
**attempted** [3] -
102:22, 228:22,
231:11
**attempting** [1] -
227:1
**attend** [7] - 22:16,
33:11, 33:12, 34:24,
34:25, 157:3, 250:19
**attendance** [1] -
172:25
**attendant** [1] - 154:4

**attended** [7] - 11:12,
11:15, 32:6, 32:15,
157:5, 164:22, 172:21
**attendees** [1] - 158:5
**attending** [1] -
164:20
**attention** [7] - 26:11,
89:23, 91:2, 104:6,
183:5, 222:14, 249:15
**Attorney** [2] - 78:12,
79:2
**attorney** [4] - 79:2,
79:7, 79:8, 150:2
**ATTORNEY'S** [2] -
1:14, 1:17
**Attorney's** [5] -
73:14, 74:25, 75:14,
78:9, 79:18
**attorneys** [5] - 84:8,
85:12, 87:13, 267:3,
269:4
**attribute** [4] -
190:24, 192:14,
247:8, 247:24
**attributed** [14] - 81:1,
81:4, 81:8, 82:8,
82:24, 83:12, 85:16,
188:5, 189:11,
205:10, 207:6, 208:3,
208:5, 247:19
**attributing** [1] -
248:13
**audible** [3] - 182:3,
182:4, 206:4
**audio** [3] - 28:3,
30:1, 210:24
**audiovisual** [1] -
28:24
**AUSA** [1] - 4:9
**AUSAs** [2] - 85:11,
87:2
**authorization** [3] -
149:2, 152:11, 155:3
**automatically** [4] -
194:18, 196:22,
197:9, 213:8
**Avenue** [3] - 1:22,
2:7, 271:14
**average** [1] - 94:9
**avid** [1] - 21:16
**avoid** [2] - 58:11,
122:12
**aware** [18] - 33:21,
33:24, 58:1, 58:3,
58:4, 63:6, 73:17,
73:23, 73:24, 74:1,
74:3, 79:10, 126:4,
138:23, 226:5,
229:14, 237:13,
257:24

**awareness** [1] - 64:7

## B

**backed** [1] - 205:8
**background** [2] - 57:5, 101:15
**backing** [2] - 92:11, 193:4
**backup** [4] - 90:25, 174:9, 174:11, 174:12
**backwards** [3] - 116:10, 134:15, 236:25
**bad** [3] - 138:7, 138:10, 141:8
**bag** [5] - 14:3, 14:24, 164:1, 164:8, 197:19
**ballot** [2] - 51:6, 171:5
**ballots** [1] - 251:11
**Baltimore** [1] - 24:22
**barriers** [5] - 159:2, 165:16, 166:21, 168:15, 172:14
**base** [6] - 56:23, 161:10, 180:19, 181:14, 182:15, 182:23
**baseball** [1] - 101:18
**based** [15] - 52:5, 64:1, 69:8, 80:4, 121:15, 123:4, 123:16, 177:8, 205:14, 206:1, 237:22, 239:12, 239:13, 241:11, 243:1
**basement** [1] - 174:12
**basis** [1] - 262:17
**basket** [1] - 146:5
**baton** [1] - 241:14
**battle** [3] - 93:10, 95:4, 161:23
**beanie** [1] - 201:21
**became** [6] - 22:9, 25:8, 73:7, 73:11, 73:16, 197:6
**become** [3] - 25:11, 74:22, 138:23
**becoming** [1] - 210:10
**BEFORE** [1] - 1:10
**beforehand** [2] - 217:22, 228:1
**befriend** [1] - 57:7
**befriended** [1] - 250:18
**befriending** [1] -

266:6
**began** [1] - 229:4
**begin** [1] - 152:4
**beginning** [5] - 49:22, 201:25, 203:22, 211:12, 228:16
**begs** [1] - 260:24
**begun** [1] - 111:12
**behalf** [3] - 4:10, 4:14, 4:18
**behave** [1] - 104:11
**behavior** [3] - 230:13, 231:12, 253:18
**behind** [17] - 93:23, 94:2, 134:13, 144:11, 144:14, 158:3, 160:18, 161:20, 165:17, 182:3, 199:12, 201:8, 203:10, 204:8, 208:16, 217:3, 226:7
**belabor** [1] - 228:21
**believes** [4] - 68:12, 68:19, 164:12, 201:1
**belonging** [1] - 39:3
**belt** [1] - 168:4
**Beltway** [1] - 196:6
**bench** [2] - 162:14, 206:14
**BENCH** [1] - 1:10
**Benet** [3] - 4:10, 78:12, 79:3
**BENET** [1] - 1:17
**bespeaks** [1] - 234:10
**best** [7] - 82:15, 82:16, 237:24, 242:25, 244:6, 246:13, 271:7
**better** [3] - 66:11, 113:6, 259:24
**between** [14] - 72:1, 76:5, 84:7, 92:6, 112:2, 152:4, 177:19, 185:23, 197:5, 202:8, 203:10, 208:10, 217:10, 233:1
**beyond** [9] - 69:7, 69:10, 152:9, 155:1, 186:14, 207:22, 211:2, 217:19, 236:16
**bias** [5] - 212:14, 212:21, 212:25, 213:2, 263:18
**biased** [2] - 212:19, 262:24
**Biden** [3] - 22:9, 129:2, 129:4

**big** [8] - 116:18, 130:24, 176:8, 196:11, 196:12, 198:9, 200:1, 257:25
**bigger** [1] - 216:4
**biracial** [1] - 18:2
**bit** [8] - 107:9, 110:9, 113:3, 113:6, 136:4, 168:22, 245:7, 267:12
**bits** [1] - 223:7
**black** [5] - 101:18, 103:3, 104:6, 199:11, 201:20
**blank** [1] - 191:23
**block** [5] - 130:23, 215:16, 231:24, 233:23, 234:8
**blocking** [1] - 229:7
**blow** [6] - 110:8, 132:15, 132:19, 132:24, 132:25, 133:4
**blowing** [1] - 132:25
**blowup** [1] - 114:18
**blue** [1] - 100:2
**blurred** [1] - 185:24
**blurring** [2] - 185:25, 186:3
**blurry** [2] - 114:23, 219:18
**Bobic** [5] - 203:8, 203:10, 242:8, 242:9, 242:10
**body** [1] - 105:15
**bOSTIC** [1] - 270:4
**BOSTIC** [41] - 2:2, 2:2, 4:17, 19:12, 19:15, 20:9, 28:14, 29:11, 33:3, 37:9, 55:10, 55:12, 61:14, 67:5, 67:25, 84:23, 96:11, 104:1, 104:4, 104:14, 119:25, 120:2, 122:8, 122:12, 122:18, 122:20, 123:20, 145:22, 145:24, 146:15, 149:8, 151:3, 151:5, 151:10, 153:6, 226:20, 227:24, 228:15, 229:3, 232:24, 233:8
**Bostic** [20] - 4:18, 4:19, 19:11, 55:9, 61:16, 67:4, 67:24, 84:22, 96:10, 119:24, 145:21, 149:7, 151:1, 151:8, 153:3, 177:8, 226:19, 236:19, 269:12, 270:3
**bottom** [2] - 161:13,

199:10
**box** [1] - 51:6
**box.com** [1] - 269:14
**boxes** [1] - 171:6
**Boys** [4] - 10:19, 106:11, 185:17, 190:6
**bragged** [1] - 217:22
**BRANDON** [1] - 88:15
**Brandon** [2] - 3:10, 89:3
**brave** [1] - 189:6
**breach** [9] - 160:19, 163:9, 167:21, 183:8, 194:14, 203:1, 203:11, 203:13, 245:12
**breached** [3] - 160:14, 162:7, 194:16
**breaching** [3] - 172:14, 175:12, 194:15
**break** [22] - 6:11, 41:12, 42:15, 42:19, 95:22, 95:25, 136:4, 139:7, 150:19, 160:2, 160:8, 175:14, 177:10, 180:5, 191:7, 191:14, 203:22, 206:20, 229:5, 252:7, 256:25, 263:12
**breaking** [16] - 40:10, 57:21, 139:7, 140:12, 141:7, 155:9, 160:7, 167:8, 168:17, 175:19, 178:2, 178:23, 179:14, 256:18, 257:10, 269:8
**breaks** [2] - 159:25, 191:21
**Brendan** [1] - 88:9
**BRIAN** [2] - 70:18, 70:25
**Brian** [4] - 3:9, 26:20, 70:17, 70:25
**brief** [4] - 89:23, 152:20, 159:19, 225:22
**briefly** [8] - 19:12, 20:13, 29:17, 84:25, 87:9, 143:12, 145:22, 237:6
**brim** [2] - 101:18, 103:4
**bring** [1] - 17:9
**bringing** [2] - 17:11, 218:1
**brings** [2] - 171:3, 266:13
**BRITTANY** [1] - 1:14

**Brittany** [3] - 4:10, 78:12, 79:2
**broad** [1] - 185:13
**broke** [3] - 146:13, 160:5, 212:17
**broken** [24] - 39:24, 40:6, 40:8, 41:15, 42:11, 43:6, 43:11, 44:5, 44:11, 45:1, 45:17, 46:3, 47:11, 58:15, 160:15, 162:8, 162:17, 166:23, 167:7, 167:16, 178:17, 179:18, 235:24, 252:2
**broken-out** [1] - 160:15
**brother** [4] - 6:14, 6:22, 6:24
**brother-in-law** [1] - 6:14
**brought** [13] - 20:25, 51:16, 124:25, 145:2, 145:6, 145:9, 145:13, 154:16, 188:12, 234:21, 247:17, 251:10, 251:14
**brown** [1] - 267:15
**Bruton** [4] - 65:12, 65:17, 65:21, 66:20
**Buddy** [2] - 6:14, 6:21
**Building** [48] - 26:6, 26:9, 31:3, 35:13, 35:15, 39:5, 39:14, 43:7, 49:12, 52:1, 52:25, 53:2, 53:14, 54:4, 54:12, 55:2, 55:5, 58:25, 59:15, 61:9, 62:18, 68:14, 70:7, 97:19, 152:11, 155:2, 155:9, 155:15, 155:17, 156:2, 157:12, 158:9, 158:19, 158:24, 160:12, 162:6, 163:9, 164:9, 165:9, 166:22, 170:15, 172:23, 174:25, 187:12, 230:5, 231:2, 234:17, 253:4
**building** [93] - 37:5, 37:18, 39:6, 40:15, 43:23, 52:23, 54:1, 54:20, 59:1, 59:2, 59:14, 70:10, 88:2, 93:5, 117:22, 140:4, 141:18, 159:2, 159:16, 160:7, 160:22, 160:23,

162:22, 162:25,
163:15, 165:20,
166:9, 167:8, 168:5,
168:9, 168:19,
168:23, 171:20,
171:23, 172:2,
172:14, 172:16,
172:19, 173:6,
173:23, 173:24,
174:18, 174:19,
175:2, 175:10,
175:17, 179:12,
180:17, 182:6, 182:7,
183:7, 186:6, 187:1,
192:19, 192:24,
194:7, 194:20,
203:12, 208:25,
220:6, 220:20,
227:16, 228:4, 228:6,
228:11, 229:22,
229:25, 230:2, 230:4,
230:12, 233:9, 234:2,
234:6, 234:7, 235:25,
250:22, 251:17,
252:14, 252:19,
252:22, 252:25,
253:22, 254:8,
254:23, 256:8,
258:14, 260:6,
260:18, 262:3,
262:13, 265:17
   **buildings** [2] - 118:5,
118:9
   **bulk** [1] - 176:25
   **bullhorn** [4] - 99:13,
189:10, 189:16, 190:3
   **bunch** [5] - 130:20,
136:20, 144:5, 144:9
   **burden** [5] - 204:21,
219:1, 219:3, 226:23,
236:15
   **Bureau** [1] - 24:22
   **bushes** [3] - 50:20,
51:6, 171:6
   **busted** [4] - 44:6,
44:8, 179:18, 179:19
   **busting** [1] - 233:6
   **butt** [2] - 199:19,
205:4
   **BY** [81] - 2:5, 5:21,
8:2, 8:8, 10:10, 10:16,
11:5, 13:16, 14:21,
17:14, 18:6, 19:15,
20:15, 24:16, 29:1,
29:16, 31:12, 32:13,
33:16, 34:14, 35:6,
35:22, 36:17, 37:16,
38:7, 39:12, 39:22,
40:4, 41:1, 42:1,
43:18, 44:17, 45:2,

45:24, 46:10, 46:22,
48:1, 49:1, 50:4,
51:24, 52:17, 53:12,
53:23, 54:10, 54:18,
55:12, 61:19, 63:18,
64:12, 70:22, 76:20,
77:1, 78:1, 78:19,
81:22, 85:2, 85:21,
86:3, 87:11, 88:17,
88:25, 90:9, 91:14,
96:18, 98:20, 99:23,
103:13, 104:4, 105:6,
106:1, 110:2, 110:17,
115:6, 117:19, 120:2,
122:20, 124:1,
140:10, 141:5,
143:14, 145:24

## C

   **C-U-F-F** [1] - 105:11
   **cabined** [1] - 226:8
   **Cabinet** [1] - 173:17
   **caliber** [1] - 179:15
   **calm** [6] - 93:15,
95:15, 95:17, 231:11,
231:12, 246:22
   **camera** [5] - 90:16,
200:25, 203:6,
209:10, 267:16
   **cameraman** [2] -
267:15
   **camouflage** [3] -
100:2, 209:25, 210:1
   **candid** [2] - 18:10,
223:17
   **candidly** [2] - 14:22,
161:15
   **candor** [1] - 22:9
   **cannot** [7] - 156:11,
187:10, 194:22,
234:5, 239:20,
262:10, 265:15
   **cap** [2] - 101:18,
103:4
   **capital** [2] - 196:17
   **Capitol** [224] - 9:14,
9:15, 9:19, 9:20, 10:2,
11:8, 11:18, 12:3,
12:16, 12:22, 14:6,
15:10, 15:15, 16:19,
18:14, 18:17, 19:20,
19:25, 22:5, 26:5,
26:9, 31:2, 35:13,
35:15, 36:1, 36:5,
36:7, 36:19, 36:21,
36:22, 39:5, 39:14,
43:6, 49:12, 50:6,
52:1, 52:11, 52:19,
52:25, 53:2, 53:13,

54:4, 54:12, 55:1,
55:5, 58:25, 59:15,
61:9, 62:11, 62:18,
62:19, 63:3, 63:8,
63:13, 64:3, 68:14,
70:6, 72:10, 85:19,
88:1, 89:7, 89:10,
89:16, 89:18, 90:20,
97:18, 102:22, 109:1,
109:4, 109:8, 109:21,
110:24, 112:8,
112:14, 112:24,
113:21, 113:23,
115:12, 115:19,
115:21, 116:1, 116:8,
119:9, 119:12,
119:14, 119:17,
120:12, 120:16,
124:19, 124:20,
125:1, 130:10, 132:9,
132:22, 133:1, 133:2,
133:4, 133:5, 133:16,
133:25, 134:7,
134:10, 134:11,
135:16, 135:20,
136:1, 136:6, 137:1,
137:14, 137:18,
137:22, 138:2, 138:3,
138:8, 138:11,
138:21, 138:24,
139:3, 139:7, 139:13,
139:15, 139:17,
139:23, 143:17,
144:2, 145:4, 145:7,
145:10, 145:11,
145:14, 145:15,
146:1, 147:10,
147:22, 152:11,
155:2, 155:9, 155:15,
155:16, 156:2, 157:4,
157:7, 157:12,
157:16, 157:19,
158:9, 158:10,
158:19, 158:22,
158:23, 158:25,
159:15, 160:12,
162:6, 162:23, 163:9,
163:14, 164:9, 165:9,
165:15, 166:22,
169:3, 169:25,
170:14, 171:10,
171:12, 172:5,
172:23, 172:25,
174:25, 175:1, 181:5,
181:8, 183:12,
185:12, 185:15,
185:19, 186:21,
187:12, 188:24,
189:11, 189:15,
189:17, 190:1, 190:3,
190:6, 190:9, 190:10,

190:19, 191:15,
191:19, 195:11,
195:18, 215:13,
215:24, 216:17,
217:11, 218:5,
219:14, 220:3,
220:11, 221:16,
229:5, 229:9, 229:16,
229:24, 230:5, 231:2,
233:15, 234:13,
234:17, 238:16,
251:23, 252:8, 253:4,
254:15, 256:21,
257:18, 257:19,
259:6, 261:6, 263:25
   **captains** [1] - 230:23
   **captions** [1] - 205:19
   **car** [47] - 36:4, 108:3,
108:19, 109:9, 110:9,
110:12, 110:18,
114:13, 114:14,
114:16, 114:19,
114:22, 115:7, 117:8,
118:13, 118:16,
118:19, 119:8, 125:9,
125:11, 125:14,
127:7, 133:22,
135:19, 136:24,
137:4, 137:12, 144:8,
147:21, 147:22,
158:8, 165:8, 165:9,
188:19, 189:13,
215:25, 216:2, 217:2,
219:21, 219:22,
219:25, 220:9,
220:12, 221:8,
221:11, 221:13,
229:14
   **care** [1] - 188:23
   **carefully** [1] - 169:14
   **caring** [1] - 123:12
   **carried** [3] - 15:9,
16:18, 236:15
   **carries** [1] - 228:8
   **carry** [1] - 228:25
   **carrying** [4] - 15:6,
15:15, 161:24, 211:24
   **cars** [1] - 219:13
   **case** [49] - 13:20,
64:6, 65:25, 66:4,
66:7, 68:17, 68:21,
69:10, 69:22, 72:21,
72:24, 72:25, 73:3,
73:17, 74:15, 77:10,
79:10, 87:12, 87:13,
88:20, 146:5, 149:11,
151:16, 152:8,
153:15, 153:17,
154:4, 155:1, 156:8,
156:9, 158:15, 175:9,

179:20, 183:12,
193:22, 206:10,
207:9, 222:16, 223:7,
225:1, 226:8, 227:1,
237:10, 243:25,
245:20, 250:6,
252:17, 257:3
   **Case** [1] - 4:4
   **cases** [15] - 5:14,
71:12, 71:14, 71:19,
71:20, 71:23, 73:7,
73:20, 154:1, 185:11,
188:1, 217:18,
217:20, 217:23,
254:12
   **categories** [2] -
185:11, 185:24
   **category** [3] -
186:19, 187:22,
238:14
   **caught** [3] - 231:19,
232:18, 236:5
   **caused** [2] - 34:3,
176:22
   **causes** [1] - 176:24
   **cautious** [1] - 148:15
   **CCTV** [1] - 109:21
   **CDC** [1] - 158:10
   **centrally** [2] - 250:6,
259:21
   **certain** [11] - 14:6,
41:12, 56:23, 57:14,
59:22, 64:6, 102:21,
167:1, 210:19,
215:17, 256:1
   **certainly** [18] - 6:4,
66:4, 69:25, 81:14,
191:3, 191:4, 213:19,
214:5, 237:13,
237:15, 241:10,
243:23, 257:4,
258:20, 262:23,
262:24, 263:9, 263:18
   **CERTIFICATE** [1] -
271:1
   **certification** [51] -
8:21, 9:1, 59:6, 63:8,
63:14, 64:4, 64:9,
108:10, 108:16,
108:25, 114:1, 114:4,
152:12, 155:5, 158:4,
158:22, 165:3,
171:17, 171:25,
175:3, 181:4, 184:22,
186:10, 186:15,
196:1, 196:2, 196:7,
196:10, 196:23,
214:20, 215:8, 217:8,
217:25, 229:7, 230:1,
230:9, 232:23,

232:25, 234:9, 235:8,
236:7, 253:7, 256:7,
257:21, 258:11,
258:12, 258:25,
259:2, 260:16, 264:20
**certified** [3] - 158:2,
165:13, 172:3
**certifies** [1] - 157:20
**certify** [5] - 158:11,
169:21, 170:17,
250:24, 271:4
**certifying** [8] - 19:5,
33:2, 37:8, 37:20,
155:21, 164:13,
171:14, 197:12
**cetera** [1] - 164:6
**chain** [3] - 6:9, 7:8,
195:15
**challenged** [1] -
162:8
**chamber** [7] - 70:7,
174:12, 193:14,
193:16, 193:19,
221:2, 221:4
**chambers** [3] -
90:23, 193:5, 245:24
**chance** [3] - 153:21,
153:25, 213:21
**change** [3] - 73:12,
139:19, 140:16
**changed** [2] - 90:21,
229:25
**changes** [1] - 166:1
**chanted** [1] - 185:18
**chanting** [1] - 173:7
**chaos** [2] - 184:18,
238:1
**chaotic** [7] - 92:9,
97:7, 198:17, 198:20,
198:25, 246:4, 249:12
**character** [2] -
216:12, 235:22
**characteristics** [1] -
238:12
**characters** [1] -
259:25
**charge** [11] - 77:5,
180:13, 187:22,
191:10, 207:11,
226:17, 226:24,
237:10, 249:22
**charged** [1] - 55:23
**charges** [13] - 68:10,
68:20, 69:16, 73:21,
73:24, 74:1, 74:3,
76:8, 175:19, 177:16,
180:9, 234:21, 257:7
**charging** [1] - 185:14
**chasing** [1] - 174:7
**check** [1] - 88:4

**checked** [1] - 152:16
**cheer** [1] - 157:7
**child** [1] - 153:22
**children** [1] - 262:7
**Cho** [2] - 79:3, 79:6
**chose** [1] - 205:11
**chronology** [3] -
185:1, 241:21, 267:11
**chunk** [1] - 176:13
**Cindy** [2] - 79:3, 79:6
**circa** [1] - 11:12
**Circle** [1] - 220:1
**circle** [1] - 173:21
**circling** [1] - 110:12
**circuit** [2] - 66:1,
147:9
**circumstances** [5] -
27:10, 156:15,
156:17, 251:3, 262:10
**circumstantial** [4] -
188:8, 192:21,
252:10, 253:16
**cited** [1] - 152:21
**cites** [1] - 153:22
**civilian** [1] - 91:17
**claim** [1] - 256:22
**claimed** [2] - 166:22,
234:16
**claiming** [1] - 170:25
**claims** [1] - 173:3
**clarification** [1] -
66:23
**clarified** [4] - 44:25,
50:18, 59:9, 235:10
**clarify** [3] - 50:15,
137:25, 238:24
**classic** [1] - 259:24
**clear** [51] - 12:15,
17:1, 36:18, 49:2,
50:5, 52:18, 53:24,
79:9, 103:14, 124:4,
155:10, 156:20,
160:9, 161:18,
162:20, 164:16,
166:4, 167:12,
168:19, 170:21,
171:21, 176:15,
176:21, 177:4,
177:21, 178:22,
179:1, 179:25, 180:6,
180:22, 180:25,
181:19, 181:21,
182:5, 182:8, 183:21,
184:1, 217:23, 225:7,
226:21, 229:17,
239:4, 251:7, 253:8,
256:13, 264:8, 264:9,
265:3, 269:16
**clearest** [1] - 175:20
**clearing** [4] - 140:15,

178:2, 182:13, 183:6
**clearly** [8] - 147:23,
163:6, 179:9, 214:5,
227:17, 228:7,
229:22, 258:1
**clears** [1] - 176:15
**clenched** [1] -
230:16
**clenching** [1] - 169:8
**clerk** [1] - 269:9
**client** [10] - 146:21,
152:18, 191:19,
193:8, 199:2, 202:8,
211:11, 212:16,
218:7, 247:19
**clients** [2] - 96:4,
218:15
**climb** [5] - 159:21,
160:10, 162:17,
180:19, 182:25
**climbed** [7] - 138:23,
139:12, 160:13,
165:19, 167:15,
168:16, 251:19
**climbing** [3] - 46:16,
138:25, 168:7
**climbs** [5] - 159:16,
160:11, 162:8,
165:18, 167:15
**clip** [19] - 7:12, 8:3,
8:4, 8:9, 9:13, 10:11,
10:17, 10:23, 11:1,
11:3, 14:17, 14:22,
38:8, 46:15, 51:25,
53:25, 54:25, 57:15,
70:18
**Clip** [2] - 7:14, 10:13
**clips** [2] - 58:20,
147:9
**Clock** [38] - 90:1,
90:10, 90:11, 90:18,
90:22, 90:25, 91:5,
91:7, 92:12, 92:22,
93:1, 93:2, 93:13,
93:14, 93:16, 93:25,
94:5, 94:15, 94:25,
95:18, 96:22, 97:1,
98:4, 98:5, 98:21,
99:15, 99:19, 100:3,
100:17, 101:9,
101:25, 163:2,
168:24, 180:20,
181:14, 183:2, 184:7,
225:5
**close** [12] - 36:22,
72:8, 94:3, 128:15,
129:12, 130:2,
132:24, 147:24,
159:16, 174:21,
178:22

**closed** [3] - 62:6,
147:9, 159:3
**closed-circuit** [1] -
147:9
**closely** [1] - 219:16
**closer** [2] - 112:22,
181:18
**closest** [2] - 69:15,
111:8
**closing** [8] - 147:14,
147:19, 152:4,
154:23, 186:20,
224:14, 225:6, 249:24
**Closing** [4] - 3:20,
3:21, 3:22, 3:23
**closings** [2] -
150:20, 151:8
**clustered** [1] - 264:2
**CNN** [1] - 46:15
**cognizant** [1] -
166:25
**collectively** [1] -
253:23
**College** [7] - 33:2,
152:13, 155:5,
155:21, 171:25,
235:8, 258:25
**colloquially** [1] -
34:4
**color** [3] - 16:2,
106:19, 106:21
**COLUMBIA** [1] - 1:1
**Columbia** [2] - 2:7,
271:13
**column** [1] - 204:8
**combat** [1] - 199:12
**combined** [2] -
193:23, 193:25
**coming** [18] - 85:10,
85:12, 108:20, 120:7,
120:11, 162:3, 175:8,
201:5, 202:14,
229:24, 239:9,
239:21, 240:11,
242:7, 265:13, 265:16
**command** [1] - 261:5
**commands** [3] -
80:22, 161:19, 205:7
**commenced** [1] -
155:20
**comment** [2] - 83:13,
207:2
**commission** [1] -
224:20
**commit** [1] - 10:5
**committed** [2] -
69:20, 224:10
**common** [7] - 30:22,
30:23, 121:21,
162:12, 162:15,

168:12, 252:16
**commonsense** [1] -
163:13
**commotion** [2] -
41:5, 167:20
**communications** [1]
- 86:21
**community** [2] -
13:14, 123:8
**companions** [1] -
135:11
**comparison** [1] -
101:22
**compels** [1] - 243:17
**compilation** [1] -
90:6
**complete** [7] - 16:16,
17:12, 21:10, 45:13,
170:20, 240:25, 271:6
**completely** [6] -
130:9, 188:13,
196:15, 198:1, 207:8,
214:13
**completion** [1] -
146:23
**complies** [1] -
110:13
**computer** [1] - 60:2
**concede** [2] -
215:14, 238:5
**concept** [2] - 197:13,
226:3
**conception** [1] -
184:14
**concern** [11] - 35:8,
97:11, 98:16, 100:13,
120:7, 131:24, 148:7,
218:10, 230:24,
233:21, 243:7
**concerned** [3] -
169:20, 170:23, 171:7
**concerns** [7] - 101:7,
102:7, 147:1, 170:17,
234:2, 258:16, 263:2
**concert** [5] - 178:21,
179:5, 179:6, 180:24,
227:23
**concession** [1] -
186:7
**conclude** [2] - 79:22,
197:23
**concluded** [2] -
42:23, 270:6
**conclusion** [1] -
268:20
**conclusions** [1] -
164:23
**conclusive** [1] -
194:22
**conduct** [25] - 25:25,

65:20, 74:23, 156:21,
162:5, 167:1, 186:1,
237:16, 237:19,
241:11, 242:17,
243:1, 248:18,
249:21, 249:25,
250:5, 253:2, 253:3,
254:9, 254:13,
254:18, 257:9, 263:6,
264:15, 264:16
**conducted** [8] - 28:8,
68:15, 72:5, 73:1,
74:24, 75:5, 78:4,
259:8
**conducting** [2] -
30:11, 85:11
**Confederate** [22] -
15:7, 16:18, 17:11,
20:25, 23:16, 23:19,
26:6, 91:25, 92:4,
93:10, 95:4, 118:7,
127:11, 127:14,
127:16, 161:23,
205:5, 222:14,
238:15, 240:20,
266:13, 266:14
**conference** [2] -
27:6, 75:12
**conferred** [1] - 66:10
**conferring** [1] -
65:10
**confined** [1] - 249:14
**confirm** [1] - 66:25
**conflating** [1] - 207:7
**conflict** [1] - 211:4
**confront** [4] -
180:18, 252:8, 261:8,
263:13
**confrontation** [7] -
167:24, 201:24,
202:6, 202:8, 204:23,
208:10, 268:15
**confrontational** [2] -
231:3, 234:11
**confronted** [2] -
167:2, 233:3
**confronting** [1] -
260:7
**confronts** [2] -
174:2, 248:2
**confused** [2] - 76:5,
238:23
**confusion** [1] - 242:3
**Congress** [29] - 19:4,
97:23, 99:11, 102:19,
102:25, 119:21,
155:20, 157:7, 157:8,
157:19, 158:2,
163:12, 164:13,
165:3, 166:12,

169:19, 171:14,
173:17, 181:12,
185:20, 187:5,
190:20, 191:6, 195:8,
195:13, 197:12,
215:4, 233:3
**Congress's** [2] -
152:12, 155:4
**congressional** [2] -
93:4, 175:4
**congressman** [5] -
173:8, 187:15, 191:6,
191:8, 233:4
**congressmen** [3] -
81:25, 87:15, 254:24
**congresspeople** [7]
- 82:1, 84:17, 173:1,
173:16, 195:5,
195:11, 195:17
**connect** [1] - 61:3
**connected** [1] - 8:5
**connection** [2] -
55:19, 180:13
**conscience** [1] -
200:14
**consent** [1] - 56:24
**consented** [1] -
60:23
**consider** [10] -
65:20, 68:9, 68:21,
156:16, 223:5,
239:13, 250:3, 253:2,
253:15, 256:14
**consideration** [2] -
65:22, 260:5
**considerations** [1] -
260:23
**considered** [2] -
185:4, 185:16
**considering** [2] -
69:1, 239:15
**consistent** [10] -
85:17, 86:7, 86:19,
91:5, 210:15, 213:24,
222:4, 241:6, 247:3,
258:3
**conspiracy** [1] - 10:5
**constantly** [2] -
93:24
**constitutes** [1] -
271:4
**Constitution** [3] -
2:7, 29:19, 271:14
**constitutional** [1] -
155:24
**CONT'D** [1] - 2:1
**contact** [3] - 6:1,
6:15, 238:6
**contacted** [2] - 5:24,
7:2

**contain** [1] - 61:2
**containers** [1] -
221:9
**contains** [1] - 209:8
**contemporaneous**
[1] - 82:17
**content** [1] - 174:3
**context** [5] - 14:2,
16:20, 198:2, 226:9,
261:2
**continue** [4] - 51:19,
173:10, 244:15,
264:23
**continued** [1] -
232:17
**continues** [1] -
159:15
**continuing** [2] -
199:23, 259:20
**contradict** [2] - 8:16,
9:9
**contradicted** [3] -
7:8, 11:24, 18:7
**contrary** [2] - 9:12,
233:20
**contributed** [1] -
214:3
**control** [1] - 149:21
**controversial** [1] -
206:3
**controversy** [2] -
259:25, 265:14
**convened** [1] -
196:17
**conversation** [31] -
19:23, 27:18, 80:1,
98:15, 100:25, 102:2,
108:24, 109:3, 112:5,
112:10, 115:11,
115:14, 119:3,
127:23, 130:1, 130:4,
134:1, 135:20, 139:5,
139:14, 169:1,
208:22, 229:15,
229:20, 232:14,
248:1, 259:20,
259:21, 261:14,
261:17, 263:9
**conversations** [16] -
11:11, 21:24, 74:18,
74:25, 84:4, 84:11,
84:12, 86:21, 122:4,
122:24, 123:6,
123:16, 125:9,
125:11, 137:8, 137:10
**convicted** [1] -
194:18
**conviction** [1] -
68:25
**coordinate** [1] -

74:13
**coordinated** [1] -
166:16
**coordinator** [1] -
105:15
**cop** [1] - 48:3
**Copic** [2] - 242:6
**cops** [4] - 160:5,
166:13, 166:14,
260:20
**copy** [1] - 269:10
**corner** [3] - 175:8,
201:9, 239:2
**correct** [116] - 4:23,
4:24, 8:11, 8:14, 8:18,
9:11, 9:21, 10:3,
10:20, 11:22, 12:1,
12:18, 12:20, 12:23,
13:1, 14:14, 14:16,
15:1, 15:5, 15:25,
16:3, 16:12, 17:17,
18:9, 18:15, 19:8,
19:21, 20:3, 20:8,
20:25, 21:4, 23:4,
25:17, 27:8, 31:21,
38:15, 38:25, 39:25,
42:10, 45:4, 45:7,
46:4, 47:3, 47:5, 48:7,
48:9, 48:14, 50:8,
50:11, 50:14, 53:15,
54:2, 55:20, 55:25,
56:6, 56:10, 56:13,
56:16, 57:9, 58:4,
58:8, 58:13, 58:16,
58:19, 58:23, 58:24,
59:3, 59:12, 59:23,
60:6, 60:12, 60:14,
60:16, 60:18, 60:20,
61:9, 61:25, 65:13,
66:12, 82:2, 85:14,
85:25, 97:12, 97:19,
109:14, 120:17,
124:13, 124:23,
126:5, 126:14, 127:5,
127:8, 128:2, 129:5,
131:2, 131:5, 132:10,
132:15, 132:17,
133:10, 135:17,
136:7, 136:9, 138:21,
140:19, 141:23,
141:25, 142:7, 142:9,
142:19, 146:3,
148:14, 150:12,
177:17, 241:16
**correctly** [1] - 260:19
**correlates** [1] - 203:8
**Corridor** [38] - 90:1,
90:10, 90:11, 90:18,
90:23, 91:1, 91:5,
91:7, 92:13, 92:22,

93:1, 93:2, 93:13,
93:14, 93:16, 93:25,
94:5, 94:16, 94:25,
95:18, 96:23, 97:1,
98:4, 98:5, 98:21,
99:16, 99:19, 100:3,
100:17, 101:9,
101:25, 163:2,
168:25, 180:21,
181:14, 183:2, 184:7,
225:5
**corridor** [7] - 90:13,
92:3, 92:20, 93:7,
160:25, 169:6, 183:4
**corroborated** [1] -
245:19
**corroborates** [2] -
163:5, 212:3
**corrupt** [4] - 68:9,
172:12, 264:6, 266:25
**Counsel** [1] - 209:1
**counsel** [10] - 4:7,
28:23, 96:3, 156:6,
200:18, 237:1,
238:24, 239:6,
246:24, 250:9
**count** [25] - 59:6,
79:15, 81:25, 84:17,
112:10, 112:15,
119:5, 119:20,
160:21, 164:14,
171:24, 187:6,
187:14, 187:20,
192:22, 192:23,
205:6, 214:21,
214:25, 225:20,
231:24, 235:7,
250:24, 264:13, 265:6
**Count** [4] - 68:2,
69:24, 227:7, 231:25
**counted** [6] - 171:8,
181:11, 253:9,
253:10, 255:7, 255:15
**counting** [13] - 51:4,
59:10, 94:12, 161:16,
171:1, 182:2, 183:23,
186:10, 189:6,
191:16, 191:25,
233:24, 234:8
**Counts** [1] - 227:5
**County** [4] - 6:22,
6:23, 6:25, 26:14
**couple** [10] - 5:13,
93:20, 99:24, 161:18,
173:13, 181:1, 184:6,
201:21, 212:16,
238:15
**course** [19] - 5:5,
41:7, 41:14, 56:5,
56:14, 57:10, 57:13,

58:5, 59:13, 72:4, 77:13, 112:12, 125:2, 140:23, 143:4, 161:22, 207:19, 225:2, 225:15

**COURT** [272] - 1:1, 4:1, 4:12, 4:15, 4:19, 5:2, 5:5, 5:8, 5:12, 5:16, 7:17, 7:20, 7:23, 8:1, 10:9, 10:22, 10:25, 11:4, 13:7, 16:11, 16:14, 17:8, 18:5, 19:10, 20:11, 23:25, 24:4, 24:7, 24:13, 28:13, 28:15, 28:17, 29:13, 33:6, 33:9, 33:11, 33:13, 33:15, 37:15, 40:1, 49:22, 50:2, 55:8, 61:16, 63:16, 64:11, 64:23, 65:1, 65:5, 65:13, 66:3, 66:17, 67:1, 67:4, 67:6, 67:8, 67:15, 67:17, 67:20, 67:24, 68:4, 68:22, 70:19, 76:5, 76:15, 76:19, 76:24, 77:23, 78:18, 81:18, 81:20, 84:21, 84:24, 85:20, 87:7, 87:19, 87:23, 88:7, 88:10, 88:12, 88:23, 95:21, 96:2, 96:7, 96:10, 96:12, 96:14, 103:11, 104:2, 104:15, 104:20, 104:25, 105:4, 105:24, 109:15, 109:24, 110:15, 115:1, 115:3, 117:17, 119:24, 122:10, 122:14, 123:22, 140:9, 141:1, 143:10, 145:21, 146:16, 146:20, 147:3, 147:5, 147:13, 147:15, 148:2, 148:12, 148:17, 148:19, 148:24, 149:4, 149:7, 149:12, 149:18, 149:20, 149:24, 150:1, 150:4, 150:6, 150:9, 150:11, 150:14, 150:17, 150:23, 151:1, 151:4, 151:6, 151:11, 151:14, 151:18, 151:22, 151:25, 152:6, 152:16, 152:25, 153:3, 153:8, 153:21, 154:6, 154:19, 154:23,

158:13, 163:16, 163:18, 165:21, 166:19, 170:3, 170:7, 170:11, 171:16, 172:4, 173:10, 174:6, 175:23, 176:4, 176:7, 176:12, 176:17, 177:6, 177:15, 177:18, 177:25, 178:4, 178:11, 178:20, 179:7, 179:20, 180:7, 180:11, 183:17, 184:5, 184:24, 185:5, 185:7, 188:7, 188:14, 189:4, 189:18, 189:22, 191:12, 193:8, 195:23, 196:5, 198:22, 198:24, 200:18, 201:3, 201:8, 201:16, 202:5, 202:13, 203:3, 203:5, 203:14, 204:1, 205:22, 205:24, 207:25, 209:1, 209:10, 210:3, 210:5, 211:4, 211:8, 211:10, 211:16, 211:19, 212:11, 213:12, 213:21, 216:23, 218:7, 218:13, 219:18, 220:15, 220:17, 222:1, 224:4, 226:14, 226:18, 227:22, 228:10, 229:2, 232:20, 233:6, 236:19, 236:24, 237:2, 240:1, 241:13, 241:17, 242:5, 242:10, 242:20, 243:21, 244:22, 245:1, 245:6, 245:15, 245:22, 246:21, 247:11, 248:17, 248:19, 248:25, 249:5, 257:11, 257:15, 259:14, 267:1, 267:3, 267:9, 267:25, 268:4, 268:7, 268:24, 269:3, 269:12, 269:17, 269:23, 270:1, 270:3, 270:5

**court** [62] - 8:7, 10:15, 14:20, 31:11, 32:12, 34:13, 35:5, 35:21, 36:16, 38:4, 39:11, 39:21, 40:24, 41:23, 43:17, 44:16, 44:24, 45:23, 46:9, 46:21, 47:23, 48:19,

48:24, 49:21, 50:1, 51:23, 52:16, 53:7, 53:11, 53:19, 53:22, 54:9, 54:17, 70:24, 90:8, 91:13, 105:10, 105:23, 124:12, 124:15, 161:6, 170:10, 176:3, 176:6, 200:22, 201:18, 202:24, 203:19, 203:25, 204:6, 205:16, 207:17, 209:5, 210:9, 211:18, 240:10, 244:11, 244:17, 245:5, 245:10, 246:19, 247:12

**Court** [109] - 2:6, 2:6, 49:14, 59:25, 65:24, 66:13, 68:8, 68:20, 68:23, 69:1, 69:10, 114:25, 123:10, 139:17, 147:6, 147:11, 147:12, 147:19, 147:25, 156:3, 156:14, 158:9, 192:9, 192:22, 198:3, 198:6, 198:14, 198:15, 198:20, 200:16, 203:20, 204:13, 204:19, 205:17, 206:2, 206:13, 208:25, 210:13, 211:15, 212:6, 216:14, 219:16, 220:1, 220:6, 220:8, 221:1, 221:22, 221:23, 222:9, 223:5, 223:13, 223:25, 225:4, 225:7, 226:12, 226:13, 226:16, 227:4, 227:6, 227:7, 227:13, 228:16, 228:23, 232:2, 232:7, 233:8, 233:13, 233:25, 234:15, 234:20, 234:25, 235:2, 235:17, 235:21, 236:10, 236:12, 237:13, 237:22, 240:14, 240:15, 240:23, 242:15, 243:10, 247:17, 248:4, 250:9, 252:23, 253:6, 253:15, 253:25, 254:9, 257:8, 259:1, 263:8, 263:17, 265:3, 266:10, 267:4, 267:14, 268:2, 268:5, 268:11, 268:12,

269:13, 269:16, 271:12, 271:13

**Court's** [7] - 5:4, 70:16, 202:1, 204:25, 217:16, 226:10, 266:24

**courthouse** [2] - 94:10, 162:13

**COURTROOM** [2] - 4:4, 28:23

**courtroom** [9] - 4:25, 24:10, 104:23, 105:18, 124:25, 238:8, 246:16, 249:9, 265:3

**courtrooms** [2] - 51:2, 170:25

**covered** [1] - 198:10

**create** [2] - 184:11, 184:18

**credence** [1] - 242:16

**credibility** [3] - 69:2, 172:22, 247:15

**credible** [2] - 18:24, 213:10

**credibly** [1] - 161:15

**credit** [1] - 186:11

**crediting** [1] - 198:3

**crime** [8] - 64:9, 69:7, 77:13, 154:5, 179:17, 213:8, 257:25, 264:18

**crimes** [2] - 25:4

**Criminal** [3] - 1:3, 4:4, 68:22

**criminal** [3] - 55:24, 156:9, 224:18

**critical** [1] - 207:9

**cross** [4] - 4:22, 19:11, 117:18, 213:2

**Cross** [1] - 3:3

**CROSS** [9] - 5:20, 19:14, 55:11, 61:18, 85:1, 96:17, 104:3, 120:1, 123:25

**cross-examination** [3] - 4:22, 19:11, 213:2

**CROSS-EXAMINATION** [9] - 5:20, 19:14, 55:11, 61:18, 85:1, 96:17, 104:3, 120:1, 123:25

**crossed** [2] - 162:6, 168:15

**crosses** [2] - 217:16, 222:14

**crossing** [1] - 167:1

**crowd** [42] - 54:21, 80:18, 81:1, 81:9,

82:21, 82:24, 83:13, 87:3, 87:4, 92:21, 95:7, 102:13, 104:8, 104:9, 116:3, 134:4, 134:7, 134:21, 135:8, 139:1, 141:21, 141:22, 144:15, 144:16, 144:21, 144:24, 157:6, 157:11, 160:5, 189:25, 193:9, 194:2, 194:3, 208:4, 208:6, 215:19, 220:20, 221:20, 236:5, 244:4, 250:2, 251:20

**crowds** [1] - 61:12

**CRR** [3] - 2:5, 271:3, 271:12

**cry** [2] - 142:18, 145:25

**crying** [1] - 143:20, 214:8

**crystal** [1] - 156:20

**CUFF** [1] - 105:2

**Cuff** [28] - 3:12, 104:22, 105:11, 105:12, 122:21, 145:25, 149:8, 157:1, 158:14, 159:12, 165:3, 165:21, 171:16, 186:11, 192:3, 198:6, 212:8, 213:3, 214:7, 215:16, 216:16, 217:3, 217:14, 221:10, 223:18, 229:15, 235:21, 262:21

**cuff** [6] - 120:3, 124:2, 143:15, 157:24, 219:21, 222:4

**Cuff's** [2] - 212:3, 212:11

**curious** [1] - 136:25

**current** [1] - 6:25

**Cusanelli** [3] - 152:20, 155:23, 224:7

**cut** [2] - 57:13, 232:12

**cybercrimes** [1] - 25:4

**célèbre** [1] - 172:6

# D

**D-I-N-K-E-L** [1] - 70:25

**D.C** [44] - 1:6, 1:23, 2:8, 20:2, 20:3, 20:7, 22:12, 22:16, 22:22,

22:24, 31:5, 31:19, 32:6, 34:24, 34:25, 35:8, 75:14, 107:12, 107:15, 107:25, 108:6, 108:15, 111:2, 129:13, 130:3, 134:5, 143:5, 145:3, 145:6, 157:1, 157:15, 164:20, 165:23, 186:21, 186:22, 196:18, 197:13, 237:12, 250:7, 250:19, 251:14, 255:2, 262:19, 271:14
**daily** [1] - 260:24
**daisy** [2] - 6:9, 7:8
**damage** [4] - 68:14, 176:22, 178:19, 256:13
**dangerous** [1] - 167:24
**dark** [1] - 162:17
**date** [9] - 25:14, 32:7, 77:18, 108:10, 156:24, 157:18, 157:19, 157:21, 165:1
**Dated** [1] - 271:10
**dated** [2] - 106:7, 120:25
**dating** [1] - 121:5
**dawned** [1] - 175:2
**DAY** [1] - 1:10
**day-to-day** [4] - 260:23, 261:9, 261:15, 262:17
**days** [5] - 107:16, 120:14, 206:9, 223:2, 246:20
**deactivated** [1] - 62:6
**deal** [1] - 147:6
**dealt** [1] - 249:13
**December** [2] - 157:17, 196:25
**decide** [10] - 111:25, 127:1, 131:7, 132:9, 133:9, 133:25, 134:6, 182:21, 256:19, 256:20
**decided** [17] - 22:19, 35:25, 54:11, 54:20, 111:23, 112:21, 115:25, 125:24, 128:23, 150:7, 150:15, 189:14, 189:25, 192:5, 217:11, 254:16, 259:6
**decides** [3] - 187:18, 221:18, 255:12
**decision** [13] - 112:2,

149:21, 150:2, 157:15, 174:22, 182:17, 182:24, 183:3, 216:15, 217:1, 227:16, 262:4, 266:24
**decisions** [3] - 185:14, 261:9, 262:5
**Defendant** [19] - 3:21, 3:22, 17:10, 66:18, 69:16, 70:3, 152:10, 152:11, 153:19, 155:2, 155:4, 156:2, 163:19, 224:17, 224:21, 241:17, 241:21, 243:9, 259:17
**DEFENDANT** [14] - 1:20, 2:2, 149:17, 149:19, 149:23, 149:25, 150:3, 150:5, 150:8, 150:10, 150:13, 150:16, 151:21, 151:24
**Defendant's** [10] - 3:18, 3:19, 8:6, 10:14, 14:19, 69:23, 109:18, 109:25, 148:22, 244:1
**DEFENDANTS** [1] - 3:8
**Defendants** [9] - 1:7, 149:12, 156:19, 183:19, 183:21, 184:4, 184:15, 186:5, 257:17
**Defendants'** [3] - 69:23, 70:1, 156:7
**DEFENDER** [1] - 1:21
**Defender's** [1] - 5:10
**defense** [22] - 16:7, 65:13, 66:17, 70:13, 79:11, 84:10, 96:3, 104:21, 149:10, 156:5, 226:22, 237:1, 237:24, 238:24, 239:6, 243:21, 246:23, 248:11, 250:9, 252:5, 252:15, 257:3
**DEFENSE** [3] - 70:18, 88:15, 105:2
**Defense** [15] - 7:15, 7:17, 77:24, 78:20, 83:7, 109:13, 109:24, 114:18, 114:24, 115:5, 117:24, 118:14, 146:23, 148:19, 148:20
**defense's** [2] - 16:7, 242:16

**definitely** [1] - 262:16
**degree** [1] - 183:17
**Delaware** [8] - 23:3, 105:13, 135:21, 156:25, 157:16, 164:20, 197:9, 197:14
**delete** [4] - 218:7, 218:16, 218:18, 266:8
**deleted** [5] - 20:18, 20:19, 20:22, 218:23, 266:7
**deliver** [1] - 269:14
**Delmar** [1] - 105:13
**demand** [1] - 157:8
**demeanor** [7] - 131:8, 131:13, 131:16, 136:18, 163:1, 213:3, 230:12
**demonstrate** [7] - 155:16, 195:7, 204:21, 217:19, 217:21, 224:16, 224:24
**demonstrated** [5] - 207:22, 221:5, 237:17, 243:1
**demonstrates** [5] - 186:8, 188:25, 190:4, 212:24, 268:14
**demonstrating** [5] - 32:24, 156:4, 187:10, 207:14, 225:18
**demonstrative** [2] - 205:23, 205:25
**denials** [1] - 179:7
**denied** [1] - 230:1
**deny** [2] - 70:12, 151:6
**denying** [1] - 241:11
**Department** [1] - 185:14
**depiction** [1] - 91:4
**deploy** [1] - 168:1
**deputies** [1] - 26:21
**DEPUTY** [2] - 4:4, 28:23
**describe** [5] - 36:10, 36:18, 53:1, 105:20, 131:15
**described** [8] - 36:20, 80:25, 138:13, 138:15, 162:25, 163:1, 169:11, 199:18
**describes** [2] - 14:24, 225:14
**description** [1] - 6:20
**designed** [1] - 232:7
**desk** [1] - 5:15

**despite** [3] - 160:16, 178:24, 181:13
**destroy** [1] - 231:3
**destroyed** [5] - 69:19, 178:6, 178:13, 178:18, 228:18
**destruction** [13] - 69:16, 177:1, 177:15, 177:19, 177:23, 178:6, 179:15, 180:8, 227:8, 228:12, 228:19, 228:24, 258:2
**detail** [1] - 219:23
**details** [6] - 62:20, 74:21, 216:8, 253:11, 255:25, 256:5
**deter** [1] - 168:6
**determination** [1] - 167:7
**determine** [2] - 204:21, 212:6
**determined** [5] - 162:5, 162:21, 168:9, 251:23, 251:25
**determining** [2] - 223:5, 223:6
**develop** [1] - 30:13
**devising** [1] - 56:7
**difference** [3] - 166:17, 177:19, 264:19
**different** [13] - 12:6, 18:13, 73:20, 77:2, 77:3, 77:5, 156:8, 174:13, 179:15, 179:21, 198:2, 207:18, 234:18
**difficult** [4] - 58:7, 183:18, 200:9, 217:20
**difficulties** [1] - 204:4
**digest** [1] - 192:12
**digested** [1] - 214:25
**DINKEL** [1] - 70:18
**Dinkel** [9] - 3:9, 26:20, 70:17, 70:19, 70:23, 70:25, 87:19, 206:11, 208:2
**DIRECT** [4] - 24:15, 70:21, 88:16, 105:5
**direct** [13] - 6:5, 26:11, 62:15, 64:8, 83:7, 89:23, 96:21, 100:16, 122:15, 148:24, 148:25, 248:15, 250:25
**Direct** [1] - 3:3
**directed** [6] - 63:7, 64:3, 74:23, 104:7, 175:21, 190:12

**directing** [1] - 132:21
**direction** [4] - 90:22, 182:22, 188:21, 240:19
**directions** [1] - 220:8
**directly** [9] - 93:23, 94:1, 156:11, 238:14, 243:13, 248:8, 248:23, 264:7, 266:12
**disagree** [1] - 176:12
**disagreed** [1] - 174:22
**disappeared** [1] - 220:23
**disavowal** [1] - 178:24
**disclosing** [1] - 148:25
**discredit** [2] - 174:10, 198:15
**discuss** [8] - 10:12, 32:5, 45:16, 47:16, 52:10, 95:23, 150:1, 198:6
**discussed** [5] - 27:23, 30:25, 58:11, 60:4, 182:10
**discussing** [5] - 30:9, 213:16, 269:20, 269:23
**discussion** [6] - 19:20, 84:7, 133:15, 165:2, 181:4, 227:4
**discussions** [1] - 120:16
**disengage** [1] - 252:3
**disengaging** [1] - 210:12
**dismay** [1] - 15:19
**dismayed** [1] - 120:11
**disorderly** [1] - 73:24
**display** [1] - 174:20
**displayed** [1] - 26:6
**displeased** [1] - 21:19
**displeasure** [1] - 14:5
**dispute** [7] - 155:11, 155:13, 155:20, 156:1, 156:5, 161:18, 243:8
**disputed** [1] - 155:12
**disputing** [1] - 243:22
**disregard** [17] - 237:23, 237:25, 240:23, 241:8, 246:2,

246:6, 248:12, 249:11, 250:10, 250:13, 252:15, 254:2, 259:1, 262:23, 263:8, 263:17, 263:20
**disregarding** [2] - 172:15, 262:22
**disrupt** [3] - 8:20, 8:25, 251:15
**disseminated** [1] - 149:2
**distancing** [1] - 134:21
**distinct** [2] - 173:22, 182:11
**distinguish** [2] - 27:21, 233:1
**distinguisher** [1] - 254:12
**district** [1] - 271:13
**District** [3] - 2:6, 2:7, 271:13
**DISTRICT** [3] - 1:1, 1:1, 1:11
**division** [1] - 24:22
**divorce** [1] - 262:10
**doctor** [1] - 245:15
**document** [4] - 72:16, 78:2, 81:15, 146:24
**Dominic** [1] - 203:21
**Dominion** [4] - 50:21, 50:22, 50:23, 171:6
**Donald** [4] - 172:3, 172:24, 189:20, 196:13
**done** [9] - 26:8, 33:1, 111:22, 119:20, 130:9, 130:10, 228:3, 233:2
**door** [3] - 162:13, 174:3, 245:12
**doors** [2] - 160:21, 168:1
**doorway** [2] - 242:23, 243:25
**doubt** [10] - 69:7, 69:11, 152:9, 155:1, 188:17, 207:22, 211:3, 217:19, 227:10, 236:16
**Dover** [1] - 186:21
**dowel** [1] - 200:1
**down** [39] - 6:11, 18:20, 24:1, 38:14, 65:2, 82:3, 82:6, 87:20, 104:16, 112:24, 132:11, 136:4, 146:16, 157:6,

159:10, 160:4, 160:25, 163:3, 165:4, 165:23, 199:14, 199:16, 200:24, 200:25, 201:5, 201:22, 202:14, 204:16, 229:16, 231:12, 239:2, 242:7, 247:12, 257:17, 261:6, 264:25
**downstairs** [1] - 269:8
**dozen** [1] - 94:13
**dozens** [1] - 156:4
**drafted** [1] - 78:4
**draw** [2] - 69:2, 187:3
**drawing** [1] - 183:4
**drawn** [1] - 164:23
**dress** [1] - 218:6
**drinking** [1] - 225:9
**drive** [12] - 108:22, 108:24, 127:18, 127:19, 127:21, 129:13, 162:16, 168:20, 173:23, 173:24, 174:20, 174:21
**driven** [1] - 32:3
**driving** [3] - 125:7, 163:8, 186:21
**drove** [3] - 125:5, 131:23, 156:25
**drug** [1] - 154:16
**duration** [2] - 33:20, 247:21
**during** [33] - 14:7, 15:3, 19:2, 37:23, 51:25, 57:10, 57:13, 59:13, 61:7, 62:10, 62:19, 72:15, 77:12, 84:12, 85:8, 86:10, 89:24, 93:12, 94:25, 95:24, 112:12, 113:2, 121:20, 122:21, 125:14, 161:22, 166:7, 170:19, 189:5, 224:19, 229:14, 229:20

**E**

**earliest** [1] - 219:12
**early** [3] - 156:24, 168:15, 214:15
**early-morning** [1] - 168:15
**earshot** [1] - 192:7
**easier** [2] - 147:12,

152:17
**easiest** [3] - 41:4, 235:14, 235:15
**east** [4] - 161:10, 181:14, 220:9, 220:13
**eat** [5] - 114:14, 115:8, 133:20, 190:5, 261:5
**eating** [8] - 114:9, 114:12, 115:11, 115:17, 115:18, 189:13, 216:2, 219:21
**ECF** [1] - 148:13
**Edson** [1] - 4:17
**EDSON** [1] - 2:2
**education** [6] - 21:5, 21:8, 56:15, 56:19, 57:4, 250:14
**Edwards** [3] - 79:3, 79:4, 271:12
**EDWARDS** [2] - 2:5, 271:3
**effect** [3] - 183:9, 260:15, 262:5
**effectively** [1] - 247:14
**effects** [1] - 199:5
**effort** [5] - 162:16, 182:12, 205:13, 237:10, 253:22
**efforts** [4] - 179:25, 180:1, 180:3, 180:6
**eight** [13] - 35:19, 106:3, 106:14, 120:23, 121:1, 121:20, 124:6, 124:22, 139:25, 140:20, 203:16, 211:19, 236:2
**either** [12] - 25:22, 26:8, 78:12, 83:5, 86:23, 87:1, 103:5, 108:4, 109:16, 129:14, 133:4, 204:1
**elapses** [1] - 268:16
**Elect** [1] - 22:9
**elected** [1] - 265:5
**election** [72] - 14:8, 14:13, 14:15, 15:2, 21:20, 32:25, 33:23, 34:1, 34:3, 35:11, 37:20, 50:24, 51:11, 51:15, 51:17, 52:9, 64:15, 64:20, 128:25, 129:4, 129:9, 129:17, 129:24, 131:24, 131:25, 141:20, 141:22, 142:5, 143:3, 157:25, 158:1, 158:6, 158:11, 158:20,

158:23, 164:11, 165:2, 165:5, 165:13, 166:6, 170:22, 171:9, 171:13, 171:15, 172:2, 172:20, 172:21, 172:22, 173:3, 173:7, 181:4, 186:24, 191:4, 195:25, 196:14, 197:3, 197:7, 218:12, 233:22, 234:4, 251:11, 258:18, 258:23, 259:21, 259:25, 260:2, 262:15, 265:9, 265:25, 266:3
**Election** [1] - 197:4
**elections** [1] - 197:6
**Electoral** [7] - 33:2, 152:13, 155:5, 155:21, 171:25, 235:8, 258:25
**electoral** [30] - 59:6, 59:11, 108:17, 108:25, 112:10, 157:20, 164:13, 165:3, 169:21, 170:17, 171:23, 175:3, 185:21, 186:9, 187:6, 187:13, 187:20, 214:20, 214:24, 229:8, 230:2, 230:9, 231:24, 231:25, 233:24, 234:9, 236:8, 263:3, 265:25
**electors** [2] - 157:9, 173:2
**element** [8] - 75:22, 75:24, 76:11, 76:12, 76:15, 76:16, 76:18, 224:25
**elements** [7] - 68:20, 69:7, 74:5, 76:21, 152:19, 153:4, 224:8
**elicit** [3] - 17:6, 208:15, 259:16
**elicited** [1] - 16:16
**eliminates** [1] - 202:19
**Elizabeth** [2] - 4:13, 88:19
**ELIZABETH** [1] - 1:20
**Ellipse** [1] - 172:24
**email** [1] - 147:11
**emails** [1] - 74:18
**employed** [2] - 71:1, 89:9
**encounter** [4] -

86:11, 161:9, 202:21, 225:6
**encountered** [3] - 12:21, 162:25, 170:1
**encountering** [1] - 182:15
**encounters** [1] - 165:15
**encourage** [3] - 10:1, 157:6, 184:17
**encouraged** [1] - 172:25
**encouraging** [1] - 22:16
**encyclopedic** [1] - 206:7
**end** [13] - 6:10, 40:14, 54:25, 107:11, 109:6, 112:19, 112:22, 114:9, 114:12, 117:21, 136:15, 161:17
**ended** [2] - 45:12, 235:18
**ends** [1] - 157:10
**energy** [1] - 37:3
**enforcement** [2] - 13:12, 58:2
**engage** [7] - 100:23, 101:12, 102:2, 183:3, 184:12, 185:3, 243:12
**engaged** [11] - 13:23, 120:19, 123:5, 170:1, 248:8, 250:16, 251:12, 261:24, 262:17, 262:20
**engagement** [1] - 238:20
**engages** [1] - 264:7
**engaging** [7] - 163:5, 169:1, 182:16, 183:5, 183:8, 230:7, 248:22
**enter** [10] - 43:6, 68:23, 70:10, 155:9, 179:17, 182:14, 203:16, 229:22, 235:25, 259:6
**entered** [22] - 4:25, 24:10, 26:5, 28:19, 29:15, 35:13, 39:14, 40:17, 67:10, 68:13, 97:2, 97:4, 98:4, 104:23, 109:25, 139:3, 148:23, 152:10, 155:2, 175:10, 229:25, 251:17
**entering** [3] - 74:1, 194:6, 244:20
**enters** [6] - 243:12,

244:14, 260:6,
267:21, 268:23,
268:25
  **entire** [6] - 15:3,
94:17, 94:18, 187:8,
226:9, 227:13
  **entirety** [3] - 85:13,
244:7, 259:7
  **entry** [1] - 251:22
  **envisioned** [1] -
216:20
  **eons** [1] - 197:15
  **epithets** [1] - 106:17
  **equally** [1] - 120:11
  **equals** [2] - 191:18,
191:23
  **equipment** [1] -
28:24
  **especially** [8] -
69:23, 197:14, 207:9,
207:14, 216:18,
234:9, 235:15, 235:16
  **ESQ** [5] - 1:14, 1:17,
1:20, 1:20, 2:2
  **essential** [1] - 69:7
  **essentially** [8] -
74:12, 134:24,
147:20, 192:18,
195:2, 203:1, 224:13,
264:24
  **established** [2] -
155:14, 172:12
  **et** [1] - 164:6
  **EUGENE** [1] - 1:20
  **Eugene** [3] - 4:13,
75:7, 75:8
  **evening** [3] - 7:2,
269:21, 269:24
  **event** [4] - 60:2,
196:11, 196:12, 214:5
  **events** [7] - 7:9,
64:1, 75:17, 89:6,
107:7, 120:7, 155:25
  **eventually** [5] -
12:13, 58:20, 58:21,
117:10, 167:13
  **EVIDENCE** [1] - 3:15
  **evidence** [101] -
28:12, 28:19, 29:10,
29:15, 60:14, 61:4,
61:6, 65:5, 67:3,
67:10, 68:8, 68:16,
68:24, 69:2, 69:4,
69:8, 69:13, 69:18,
69:19, 70:4, 70:5,
70:14, 76:3, 76:4,
77:3, 77:6, 84:8,
87:24, 110:1, 146:20,
147:25, 148:10,
148:23, 152:8,

154:25, 156:18,
156:23, 164:18,
181:6, 186:8, 186:17,
188:3, 188:8, 188:25,
190:4, 191:1, 191:25,
192:9, 192:21, 193:2,
193:13, 193:21,
193:24, 193:25,
194:7, 194:23, 195:1,
196:13, 198:11,
206:24, 207:11,
208:15, 212:21,
216:21, 217:7,
218:18, 218:25,
223:13, 223:14,
224:17, 226:21,
227:19, 229:23,
232:1, 232:3, 233:20,
234:24, 236:13,
239:12, 242:25,
245:18, 245:19,
246:13, 246:25,
247:4, 251:7, 251:16,
251:24, 252:17,
253:16, 253:24,
254:4, 256:16,
258:19, 259:3,
262:17, 264:12,
265:19, 266:18
  **evident** [1] - 159:18
  **ex** [1] - 212:18
  **ex-girlfriends** [1] -
212:18
  **exact** [10] - 77:18,
115:9, 117:11,
118:24, 126:24,
129:15, 136:12,
137:16, 195:17,
207:19
  **exactitude** [1] -
207:15
  **exactly** [15] - 68:5,
83:15, 116:25, 126:9,
130:4, 163:23,
167:18, 179:2, 179:3,
206:7, 207:1, 207:12,
241:24, 256:10,
260:13
  **examination** [4] -
4:22, 19:11, 96:21,
213:2
  **EXAMINATION** [18] -
5:20, 19:14, 20:14,
24:15, 55:11, 61:18,
70:21, 85:1, 87:10,
88:16, 96:17, 103:12,
104:3, 105:5, 120:1,
123:25, 143:13,
145:23
  **example** [7] - 73:24,

77:6, 98:25, 182:13,
182:14, 207:7, 237:19
  **examples** [1] -
106:23
  **except** [1] - 135:18
  **exception** [1] - 153:6
  **exceptionally** [1] -
210:11
  **excited** [2] - 131:8,
131:14
  **excused** [5] - 24:6,
65:4, 87:22, 104:19,
146:19
  **executed** [1] - 56:19
  **executing** [1] - 56:22
  **exegesis** [1] - 184:13
  **Exhibit** [104] - 3:16,
3:17, 3:17, 3:18, 3:19,
7:16, 8:6, 10:14,
14:19, 28:5, 28:11,
28:18, 28:21, 29:9,
29:14, 31:8, 31:10,
32:11, 34:12, 35:4,
35:18, 35:20, 36:13,
36:15, 38:2, 38:3,
38:6, 39:10, 39:19,
39:20, 40:21, 40:23,
41:20, 41:22, 43:16,
44:15, 44:23, 45:22,
46:8, 46:18, 46:20,
47:20, 47:22, 48:18,
48:23, 49:20, 49:25,
51:22, 52:14, 52:15,
53:5, 53:6, 53:10,
53:18, 53:21, 54:8,
54:16, 66:24, 67:9,
67:11, 90:5, 90:7,
91:12, 98:19, 99:22,
109:25, 146:23,
148:22, 159:8,
159:19, 161:3, 161:5,
161:25, 163:4,
168:24, 169:17,
170:5, 170:9, 175:21,
176:2, 176:5, 181:22,
200:21, 201:17,
202:23, 203:18,
203:24, 204:5,
205:15, 205:20,
209:3, 209:4, 209:8,
209:9, 210:8, 211:17,
240:7, 240:9, 244:10,
244:16, 245:4, 245:9,
268:23, 269:1
  **exhibit** [9] - 67:12,
170:2, 203:23,
205:19, 206:1, 206:4,
209:17, 209:18, 242:2
  **Exhibits** [3] - 147:8,
159:4, 160:1

**EXHIBITS** [1] - 3:15
  **exhibits** [7] - 148:6,
155:16, 209:15,
209:19, 209:22,
219:7, 269:14
  **exit** [1] - 221:18
  **expand** [1] - 57:14
  **expect** [1] - 207:20
  **expects** [1] - 210:17
  **experience** [3] -
238:17, 246:5, 246:15
  **experienced** [1] -
235:12
  **experiencing** [1] -
204:4
  **expert** [1] - 212:20
  **explain** [3] - 37:12,
85:3, 116:7
  **explained** [3] - 6:13,
27:10, 117:7
  **explains** [3] - 166:8,
166:9, 166:10
  **express** [13] - 39:5,
52:3, 52:8, 55:5, 59:2,
119:13, 119:16,
119:19, 140:21,
173:12, 232:17,
252:5, 257:19
  **expressed** [3] -
15:19, 137:19, 142:12
  **expresses** [1] -
54:25
  **expressing** [2] -
17:25, 258:8
  **extended** [1] -
202:20
  **extent** [1] - 263:18
  **extremely** [1] -
198:25
  **extremist** [6] - 10:13,
10:19, 11:21, 11:25,
60:10, 106:11
  **extremist-type** [1] -
60:10

## F

  **face** [7] - 82:9, 82:11,
99:1, 100:2, 135:23,
136:2, 138:6
  **Facebook** [15] -
23:12, 34:22, 61:24,
62:2, 62:5, 218:8,
218:11, 218:23,
219:3, 250:18, 266:6,
266:7, 266:9, 266:15
  **Facebooked** [1] -
217:21
  **faces** [1] - 100:9

**facing** [2] - 68:11,
257:25
  **fact** [57] - 15:9,
15:16, 15:18, 16:18,
18:1, 40:9, 48:12,
56:14, 57:10, 57:21,
58:14, 58:17, 62:17,
68:13, 69:3, 69:6,
69:14, 70:4, 101:2,
102:24, 120:19,
121:23, 158:20,
158:21, 160:17,
165:10, 166:15,
175:14, 182:22,
187:9, 188:12,
192:10, 193:23,
196:21, 212:2,
217:25, 218:22,
230:24, 231:5, 231:7,
231:14, 231:18,
234:19, 235:23,
236:9, 243:13,
243:14, 246:3,
249:11, 252:13,
259:19, 262:11,
263:14, 266:8,
266:12, 266:19
  **facts** [2] - 156:17,
164:24
  **factually** [1] - 199:6
  **failure** [2] - 184:22,
231:14
  **fair** [28] - 17:22,
17:23, 18:10, 55:17,
56:4, 58:5, 59:11,
73:6, 75:20, 79:22,
97:9, 98:15, 100:5,
100:11, 101:22,
104:6, 120:15,
120:20, 120:21,
122:18, 123:4,
123:10, 142:3,
165:25, 174:15,
192:14, 197:8, 209:20
  **fairness** [1] - 247:20
  **fall** [2] - 177:18,
214:19
  **falls** [3] - 176:9,
176:19, 238:14
  **familiar** [5] - 13:7,
105:16, 110:4, 111:1,
111:3
  **familiarize** [2] -
73:20, 74:5
  **families** [1] - 22:8
  **family** [4] - 20:7,
156:25, 164:19,
229:11
  **famous** [1] - 134:10
  **far** [12] - 45:3, 45:5,

58:3, 111:5, 111:7,
111:15, 113:3,
124:18, 130:8,
132:14, 135:16,
246:23
**farewell** [1] - 157:22
**fast** [2] - 91:11,
141:13
**fast-forward** [1] -
91:11
**father** [15] - 32:3,
34:19, 34:20, 34:21,
38:22, 61:23, 164:19,
165:7, 166:2, 166:3,
166:15, 229:9,
231:22, 253:1
**fatherly** [2] - 255:9,
255:10
**favor** [2] - 204:20,
263:18
**favorable** [3] - 69:5,
69:9, 69:18
**FBI** [26] - 6:11, 6:18,
7:6, 21:2, 24:25, 25:2,
56:2, 60:21, 62:1,
62:4, 63:22, 70:8,
71:2, 71:3, 71:7, 73:7,
77:10, 83:10, 162:1,
163:24, 165:10,
166:7, 166:23,
218:22, 257:16, 269:7
**FD-395** [1] - 29:5
**featured** [1] - 128:5
**Federal** [3] - 5:10,
24:22, 68:22
**FEDERAL** [1] - 1:21
**federal** [3] - 25:3,
71:10, 228:24
**feet** [2] - 94:15,
94:21
**fell** [3] - 127:25,
227:15, 229:16
**fellow** [2] - 97:16,
201:20
**felt** [9] - 36:22,
36:24, 37:21, 57:5,
129:4, 138:7, 141:6,
141:8, 243:20
**female** [2] - 20:1,
135:11
**fence** [1] - 162:6
**fences** [1] - 168:16
**fencing** [5] - 159:3,
159:5, 159:7, 159:10,
165:18
**few** [15] - 26:20,
32:14, 79:17, 88:22,
89:5, 107:16, 117:11,
124:2, 159:20, 187:8,
203:12, 241:19,

241:22, 245:20,
246:10
**field** [1] - 25:21
**figure** [2] - 117:6,
184:3
**filed** [1] - 152:24
**filing** [4] - 51:11,
152:21, 171:4, 257:4
**finalization** [1] -
262:14
**finalize** [1] - 171:23
**finally** [5] - 13:9,
116:10, 117:4,
134:16, 228:18
**financial** [1] - 25:4
**fine** [2] - 154:22,
194:7
**finished** [2] - 115:18,
228:13
**finishes** [3] - 141:2,
177:2, 177:14
**fire** [1] - 187:19
**firearm** [4] - 153:16,
154:2, 154:3, 154:16
**FIRM** [1] - 2:2
**first** [54] - 10:23,
11:1, 22:20, 27:4,
31:2, 55:18, 55:22,
57:23, 69:12, 77:16,
89:9, 89:16, 90:11,
90:17, 91:8, 93:18,
107:14, 114:3, 114:5,
128:23, 143:16,
144:1, 155:13,
156:24, 157:14,
159:2, 160:18,
168:10, 170:7, 181:1,
186:19, 194:9,
194:10, 194:17,
194:19, 198:19,
214:10, 218:15,
223:3, 237:9, 238:5,
238:15, 242:15,
246:7, 246:8, 246:25,
247:1, 247:18,
248:14, 249:12,
255:4, 264:22
**fiscal** [1] - 164:9
**fist** [2] - 141:11,
252:7
**fists** [2] - 169:8,
230:16
**five** [4] - 48:16,
48:21, 71:18, 186:20
**flag** [43] - 15:7,
15:15, 15:23, 16:18,
16:23, 17:2, 17:3,
17:11, 17:15, 18:19,
20:25, 23:16, 23:18,
23:19, 26:6, 91:25,

92:4, 93:10, 95:4,
95:5, 95:10, 100:16,
114:23, 116:18,
118:7, 127:11,
127:12, 127:14,
127:16, 161:23,
199:17, 199:19,
205:5, 209:25,
219:18, 219:20,
222:14, 229:14,
230:15, 240:20,
243:4, 266:13, 266:14
**flagged** [2] - 172:18,
173:12
**flagpole** [2] - 18:21,
18:22
**flags** [3] - 127:8,
127:10, 130:20
**flight** [2] - 200:25,
201:1
**floor** [6] - 51:1,
90:21, 93:3, 241:14,
264:22, 264:23
**focus** [4] - 103:2,
217:17, 237:2, 259:21
**focused** [3] - 169:6,
193:18, 252:12
**focusing** [1] - 227:10
**folks** [22] - 4:15,
96:2, 98:2, 98:23,
99:24, 151:11, 169:5,
172:25, 173:15,
175:11, 180:17,
180:18, 180:19,
180:20, 181:2, 181:3,
183:15, 184:17,
215:19, 269:3, 270:5
**follow** [6] - 59:4,
59:7, 72:16, 144:22,
144:25, 189:25
**followed** [3] - 116:3,
134:4, 174:13
**followers** [3] - 63:13,
64:3, 64:8
**following** [12] - 5:1,
24:11, 69:8, 96:9,
104:24, 141:21,
151:13, 190:8, 193:9,
194:1, 194:3, 236:5
**follows** [1] - 160:6
**followup** [2] - 24:2,
45:12
**food** [20] - 111:24,
111:25, 112:5,
112:19, 112:21,
112:25, 113:10,
113:15, 113:24,
114:9, 114:10,
130:10, 130:11,
131:11, 131:17,

133:7, 133:13, 192:6,
216:1
**foot** [4] - 94:14,
94:18, 137:7
**footage** [11] - 67:12,
90:16, 140:12,
147:10, 163:4,
168:23, 181:21,
241:4, 241:22, 242:1,
242:11
**FOR** [6] - 1:1, 1:14,
1:20, 2:2, 3:4, 3:8
**force** [3] - 13:13,
54:22, 56:1
**foregoing** [1] - 271:4
**forges** [1] - 159:14
**forget** [2] - 195:9,
238:12, 238:17
**form** [11] - 29:5,
29:6, 29:17, 29:18,
29:24, 30:7, 30:8,
56:19, 56:22, 123:7,
236:6
**formed** [2] - 192:16,
214:23, 217:10
**former** [2] - 13:5,
189:20
**forming** [1] - 217:15
**forms** [1] - 151:18
**forth** [1] - 15:17
**forward** [7] - 4:7,
61:12, 91:11, 158:5,
201:21, 232:3, 264:19
**four** [2] - 20:3,
45:20, 46:7, 92:6,
112:2, 127:18, 160:8,
167:9, 176:9, 176:19,
176:23, 176:25,
177:11, 178:17,
178:18, 179:2, 180:4,
191:18, 191:23,
199:15, 227:14,
230:10, 254:19
**four-hour** [1] -
127:18
**Fourth** [1] - 197:20
**fourth** [1] - 168:11
**Fox** [4] - 6:17, 128:5,
213:7, 250:17
**fraction** [1] - 211:14
**frame** [4] - 147:17,
160:10, 167:12, 177:4
**frankly** [3] - 178:15,
186:17, 190:14,
190:25, 215:18
**fraud** [42] - 32:25,
33:1, 34:2, 35:11,
50:13, 50:15, 51:11,
51:17, 52:9, 52:21,
64:15, 70:2, 128:25,

131:24, 132:1,
141:20, 141:22,
142:5, 143:3, 158:1,
158:20, 164:11,
165:2, 166:6, 166:10,
169:12, 169:15,
169:19, 170:22,
171:1, 172:20,
173:15, 181:4,
186:24, 191:4, 196:8,
233:21, 258:17,
259:21, 259:25,
260:2, 266:3
**fraudulent** [5] -
157:8, 158:1, 165:13,
173:3, 258:18
**free** [7] - 8:1, 29:21,
30:3, 65:2, 104:16,
146:17, 218:22
**freedom** [1] - 99:5
**freeze** [1] - 218:17
**frequently** [2] -
99:17, 172:5
**fresh** [1] - 80:8
**friend** [1] - 121:24
**friends** [8] - 6:22,
23:12, 121:21,
121:23, 122:2,
122:22, 122:25, 135:8
**front** [18] - 18:23,
41:3, 41:4, 90:19,
90:22, 93:20, 160:19,
161:8, 161:9, 162:10,
167:21, 168:10,
182:4, 183:1, 208:18,
208:23, 239:4, 254:22
**frustration** [1] - 14:5
**full** [3] - 88:24,
141:3, 271:5
**fun** [3] - 36:20,
232:15, 232:16
**furtherance** [4] -
155:7, 224:11,
224:12, 264:17
**furthered** [1] - 180:5
**furthering** [1] -
180:24

## G

**gain** [1] - 5:12
**galleries** [1] - 93:4
**gap** [1] - 137:1
**gear** [1] - 199:12
**GED** [1] - 121:13
**Gelfand** [1] - 164:2
**general** [9] - 25:2,
32:20, 33:25, 54:19,
64:7, 65:10, 71:22,

213:2, 251:13
**generally** [15] - 27:9, 64:13, 71:21, 72:13, 72:15, 76:3, 80:18, 81:2, 81:9, 83:13, 83:25, 102:13, 183:6, 209:21, 212:18
**gentleman** [6] - 91:23, 92:3, 93:9, 95:3, 116:9, 134:13
**gentlemen** [1] - 150:17
**girlfriend** [3] - 19:24, 32:4, 165:17
**girlfriends** [1] - 212:18
**Giuliani** [3] - 51:9, 64:18, 171:3
**given** [8] - 26:4, 53:8, 63:20, 189:20, 193:17, 193:18, 227:17, 248:14
**glass** [32] - 42:4, 42:9, 42:15, 44:5, 46:3, 47:1, 47:6, 47:7, 47:9, 57:22, 58:12, 58:18, 58:22, 140:15, 146:7, 160:9, 167:12, 177:3, 178:3, 179:1, 179:25, 180:2, 180:6, 203:22, 227:12, 227:14, 227:17, 227:20, 228:4, 228:19, 235:25, 269:8
**gloves** [1] - 167:11
**goal** [2] - 174:18, 184:18
**God** [1] - 162:7
**goers** [1] - 63:7
**Goodman** [116] - 75:7, 75:8, 75:11, 75:20, 76:2, 76:9, 77:17, 77:20, 79:15, 80:11, 80:17, 80:21, 80:25, 81:4, 81:24, 82:8, 82:13, 82:20, 83:3, 83:12, 83:17, 84:4, 84:9, 84:15, 85:4, 85:14, 86:22, 87:14, 92:21, 93:17, 93:20, 93:23, 94:4, 94:15, 94:25, 146:24, 161:9, 161:14, 161:19, 161:23, 162:2, 167:25, 174:8, 180:18, 181:23, 181:25, 182:15, 193:9, 193:11, 194:1, 197:2, 198:16, 199:1, 199:14, 199:17,

200:5, 200:6, 200:24, 201:13, 201:22, 203:7, 203:10, 204:14, 205:3, 205:7, 205:10, 206:6, 206:17, 207:5, 207:7, 207:16, 207:20, 208:16, 210:1, 210:17, 211:5, 230:17, 230:19, 237:3, 237:18, 237:21, 238:6, 238:18, 238:21, 239:1, 239:8, 239:14, 239:19, 240:16, 240:24, 241:9, 242:22, 243:13, 246:8, 246:24, 247:2, 247:6, 247:20, 247:22, 247:23, 248:12, 248:22, 249:1, 249:7, 249:8, 249:18, 254:3, 255:14, 255:18, 264:4, 264:7, 265:13, 268:15, 268:21
**Goodman's** [15] - 80:14, 90:20, 90:25, 92:12, 148:8, 187:7, 198:8, 211:23, 237:23, 241:6, 241:14, 243:1, 245:19, 246:3, 246:14
**government** [2] - 227:9, 264:6
**Government** [95] - 3:20, 3:23, 4:8, 7:12, 8:3, 9:13, 16:17, 16:23, 17:9, 19:18, 24:8, 28:11, 29:9, 29:20, 57:15, 58:21, 62:14, 65:6, 65:19, 67:3, 67:13, 67:18, 68:7, 68:12, 68:18, 69:5, 69:9, 69:14, 69:18, 147:1, 185:25, 186:4, 186:8, 186:11, 186:13, 186:16, 186:18, 187:2, 187:4, 188:2, 189:1, 190:15, 191:13, 191:17, 192:15, 192:17, 192:18, 192:25, 193:3, 193:4, 194:5, 194:8, 198:10, 204:20, 206:11, 208:11, 208:14, 209:15, 209:23, 210:25, 212:15, 215:11, 216:23, 217:19, 218:2,

218:24, 219:2, 219:9, 220:22, 223:7, 224:22, 225:4, 225:21, 226:22, 227:1, 227:5, 227:19, 228:22, 229:23, 231:5, 231:7, 231:25, 232:1, 232:2, 232:12, 234:16, 234:21, 235:23, 246:9, 249:23, 253:13, 257:5, 269:6, 269:14
**GOVERNMENT** [4] - 1:14, 3:4, 5:19, 24:12
**government's** [1] - 3:16
**Government's** [113] - 3:17, 3:17, 28:5, 28:18, 28:21, 29:14, 31:8, 31:10, 32:11, 34:12, 35:4, 35:18, 35:20, 36:15, 38:2, 38:3, 38:6, 39:10, 39:19, 39:20, 40:21, 40:23, 41:20, 41:22, 43:16, 44:15, 44:23, 45:22, 46:8, 46:18, 46:20, 47:20, 47:22, 48:18, 48:23, 49:20, 49:25, 51:22, 52:14, 52:15, 53:5, 53:6, 53:10, 53:18, 53:21, 54:8, 54:16, 65:9, 65:17, 67:9, 67:11, 68:17, 68:21, 90:4, 90:7, 91:12, 98:19, 99:22, 152:19, 153:4, 159:4, 159:8, 159:19, 160:1, 161:3, 161:5, 161:24, 163:4, 168:24, 169:16, 170:5, 170:9, 175:21, 176:2, 176:5, 181:22, 200:21, 201:17, 202:23, 203:18, 203:24, 204:5, 204:20, 205:15, 205:20, 206:1, 206:4, 208:9, 209:4, 209:8, 209:9, 209:17, 209:19, 210:8, 211:17, 214:22, 217:4, 222:16, 224:2, 224:12, 228:11, 236:14, 240:7, 240:9, 242:2, 244:10, 244:16, 245:4, 245:9, 267:16, 268:13, 268:23, 269:1
**grab** [2] - 127:10, 127:13

**grabbed** [2] - 127:8, 127:16
**grade** [6] - 15:12, 17:21, 21:11, 56:15, 121:11, 250:14
**graduate** [1] - 21:10
**grand** [4] - 161:10, 181:15, 216:24, 216:25
**grandchildren** [1] - 22:8
**grandfather** [2] - 107:2, 222:23
**grandson** [5] - 18:2, 106:24, 107:1, 107:3, 222:21
**grant** [1] - 66:17
**grave** [1] - 168:18
**great** [5] - 110:16, 151:11, 173:19, 192:7, 240:21
**ground** [3] - 30:22, 30:23, 205:7
**grounds** [7] - 155:15, 157:4, 159:1, 159:15, 165:15, 186:21, 219:14
**group** [31] - 10:13, 10:19, 11:21, 11:25, 12:7, 13:18, 18:1, 39:3, 60:5, 60:7, 60:15, 70:6, 91:9, 92:22, 112:2, 160:13, 160:18, 160:20, 161:8, 175:12, 178:10, 180:16, 182:18, 182:19, 182:20, 183:11, 253:19, 264:2, 265:8
**grouped** [1] - 257:8
**groups** [7] - 13:12, 17:1, 36:5, 36:7, 60:8, 60:10, 61:3
**growing** [1] - 222:21
**guess** [32] - 12:7, 77:5, 88:1, 96:3, 109:21, 137:22, 138:1, 150:19, 154:25, 176:17, 178:5, 178:11, 197:20, 202:5, 202:17, 204:12, 212:12, 213:14, 215:21, 216:4, 218:11, 220:2, 239:9, 243:21, 247:11, 248:25, 249:25, 250:20, 260:8, 260:24, 261:4, 263:14
**guessing** [1] -

137:24
**guilt** [1] - 69:10
**guilty** [10] - 180:8, 184:8, 187:16, 187:21, 195:22, 224:21, 226:17, 227:8, 236:16, 264:13
**gun** [5] - 11:13, 48:6, 48:12, 49:5, 168:3
**guy** [6] - 21:20, 177:12, 178:16, 199:12, 245:2, 245:6
**guys** [6] - 12:24, 31:17, 103:5, 103:8, 122:1, 245:23
**gymnastics** [1] - 267:13

## H

**Hale** [3] - 152:20, 155:23, 224:7
**Hale-Cusanelli** [3] - 152:20, 155:23, 224:7
**half** [12] - 19:3, 41:9, 93:19, 94:18, 115:10, 121:1, 121:6, 121:7, 121:9, 185:10, 208:10, 232:5
**half-hour** [1] - 115:10
**halfway** [2] - 200:24, 200:25
**hall** [1] - 234:10
**hallway** [6] - 48:4, 88:3, 88:6, 92:23, 161:1, 268:3
**hallways** [5] - 94:10, 160:24, 174:1, 183:22, 225:9
**halther** [1] - 40:2
**hammer** [1] - 12:13
**hand** [4] - 12:11, 48:6, 49:4, 100:1
**handled** [1] - 269:4
**hands** [2] - 95:6, 98:10
**handwriting** [4] - 38:12, 38:13, 78:20, 78:22
**handwritten** [1] - 80:2
**hanging** [1] - 159:6
**happenstance** [1] - 12:21
**happy** [6] - 66:7, 131:8, 131:14, 185:3, 226:12
**hard** [7] - 10:22,

31:13, 34:15, 113:4, 121:18, 132:14, 169:13
**hardworking** [3] - 106:5, 123:12, 123:18
**harm's** [2] - 216:18, 216:19
**harmonize** [1] - 202:15
**hat** [8] - 100:2, 104:6, 181:25, 199:11, 209:25, 210:1, 218:6, 255:6
**hate** [6] - 11:25, 15:24, 16:1, 17:16, 17:25, 222:25
**Hawa's** [2] - 67:12, 155:18
**head** [4] - 57:19, 59:20, 156:13, 209:12
**headdress** [1] - 99:1
**headed** [2] - 73:17, 119:1
**heads** [1] - 94:12
**hear** [42] - 10:17, 31:13, 34:15, 95:12, 99:18, 102:14, 102:17, 107:14, 111:17, 112:12, 112:13, 113:1, 113:4, 113:5, 127:23, 129:24, 130:8, 131:2, 131:4, 132:2, 132:12, 132:13, 132:14, 134:22, 152:1, 169:13, 181:15, 189:8, 189:15, 192:7, 200:13, 202:13, 205:12, 206:2, 207:3, 215:20, 247:6, 255:5, 261:4, 265:3
**heard** [50] - 9:18, 23:13, 49:14, 52:19, 54:21, 61:23, 66:20, 68:12, 80:17, 82:5, 82:20, 90:20, 102:12, 124:15, 130:12, 132:23, 153:9, 157:1, 157:5, 157:24, 159:12, 162:23, 163:10, 163:21, 172:6, 172:9, 174:21, 175:7, 181:3, 181:6, 181:8, 181:9, 189:24, 190:2, 192:20, 192:23, 205:14, 205:17, 207:17, 212:15, 217:16, 222:4, 235:21, 235:22, 239:24,

244:4, 247:18, 249:19, 262:18
**hearing** [4] - 9:15, 186:22, 250:4, 261:3
**hearings** [2] - 51:1, 170:24
**hears** [1] - 191:24
**hearsay** [3] - 16:14, 17:5, 66:5
**heat** [3] - 50:12, 61:11, 228:2
**heated** [8] - 36:23, 36:24, 37:21, 53:13, 169:1, 169:10, 232:16, 252:20
**heavily** [1] - 167:7
**heavy** [1] - 236:15
**heightened** [1] - 154:7
**held** [5] - 205:7, 237:20, 255:16, 256:12, 257:6
**hellbent** [1] - 263:24
**hello** [1] - 105:8
**help** [7] - 77:19, 179:8, 203:3, 219:17, 225:21, 231:12, 243:18
**helped** [1] - 210:19
**helpful** [2] - 219:3, 240:1
**helping** [1] - 159:21
**hereby** [1] - 271:3
**heritage** [1] - 17:19
**herself** [1] - 263:2
**hi** [1] - 105:7
**hide** [3] - 213:5, 213:7, 258:1
**hiding** [1] - 70:3
**high** [1] - 140:18
**highlighted** [1] - 251:18
**highlights** [3] - 224:4, 224:5, 224:6
**highly** [1] - 231:9
**Hill** [2] - 14:6
**himself** [19] - 6:6, 6:8, 38:17, 38:19, 45:25, 47:13, 160:3, 168:6, 169:10, 173:19, 197:25, 221:18, 223:4, 223:10, 238:12, 239:15, 243:9, 251:5, 256:12
**hindsight** [2] - 66:9, 232:18
**historical** [2] - 62:2, 62:5
**history** [8] - 15:13,

16:5, 17:19, 17:21, 23:20, 23:21, 23:22, 218:1
**hit** [3] - 109:15, 109:16, 227:14
**hoisted** [2] - 45:25, 47:13
**hold** [2] - 250:3, 257:8
**holding** [2] - 100:16, 182:16
**home** [8] - 119:1, 119:2, 125:23, 135:25, 156:25, 158:8, 165:8, 189:14
**honest** [5] - 130:23, 213:3, 222:3, 222:7, 222:8
**honestly** [2] - 92:5, 257:22
**Honor** [302] - 4:2, 4:3, 4:9, 4:14, 4:17, 4:24, 5:3, 5:7, 7:19, 10:7, 10:24, 16:6, 16:13, 16:15, 16:21, 17:4, 18:3, 19:9, 19:13, 20:10, 20:13, 23:24, 24:2, 24:5, 28:14, 28:16, 29:11, 33:3, 37:9, 55:7, 55:10, 61:14, 64:25, 65:8, 65:9, 65:16, 65:18, 65:25, 66:9, 66:10, 66:12, 66:21, 66:22, 66:23, 67:5, 67:7, 67:19, 67:21, 67:25, 68:5, 68:11, 68:12, 68:16, 68:18, 70:15, 70:16, 70:20, 76:22, 77:22, 78:17, 81:16, 84:20, 84:23, 84:25, 87:6, 87:21, 87:25, 88:5, 88:8, 96:6, 96:11, 96:13, 103:24, 104:1, 104:21, 105:22, 109:17, 109:19, 109:23, 110:14, 114:24, 117:16, 119:23, 119:25, 122:5, 122:8, 122:13, 122:18, 123:20, 123:24, 143:8, 143:9, 143:12, 145:20, 146:22, 147:17, 148:4, 148:15, 148:21, 149:3, 149:5, 149:8, 149:19, 149:25, 150:3, 150:5, 150:8, 150:10,

150:22, 150:24, 151:3, 151:5, 151:10, 151:17, 151:21, 151:24, 152:3, 152:7, 152:8, 153:12, 154:1, 154:8, 154:15, 155:22, 156:6, 156:8, 156:10, 157:13, 158:16, 159:18, 160:16, 161:7, 161:17, 162:11, 163:13, 163:20, 163:24, 164:24, 166:1, 166:11, 166:25, 167:3, 167:5, 167:13, 167:19, 168:12, 168:22, 169:13, 170:13, 170:18, 171:10, 171:19, 172:11, 172:18, 173:12, 174:15, 174:24, 175:21, 176:14, 176:21, 177:5, 178:9, 178:15, 179:10, 179:14, 179:24, 180:10, 180:14, 181:22, 183:2, 183:10, 183:21, 184:2, 184:15, 184:25, 185:6, 185:9, 185:23, 186:7, 186:25, 188:11, 188:15, 188:16, 189:9, 190:14, 191:22, 192:12, 194:21, 195:21, 200:23, 201:19, 202:17, 202:25, 204:3, 205:18, 207:21, 209:6, 209:14, 209:24, 211:7, 218:9, 222:13, 223:23, 225:22, 226:15, 226:20, 228:15, 236:18, 236:21, 236:22, 237:4, 237:7, 237:21, 239:7, 239:23, 239:25, 240:4, 240:5, 240:6, 240:22, 240:24, 241:8, 241:16, 241:24, 242:14, 242:24, 243:7, 243:14, 244:6, 244:18, 245:3, 245:11, 245:13, 245:17, 245:18, 245:21, 246:1, 246:5, 246:8, 246:12, 246:16, 246:17,

246:23, 248:12, 248:20, 249:4, 249:6, 250:1, 250:5, 250:11, 251:2, 251:7, 251:16, 251:23, 252:1, 252:6, 252:10, 252:13, 252:17, 253:2, 253:5, 253:12, 253:17, 253:24, 254:2, 254:5, 254:11, 255:1, 255:4, 255:19, 256:13, 256:15, 257:14, 258:10, 258:19, 259:7, 259:18, 260:3, 260:4, 260:18, 261:2, 261:3, 262:9, 262:22, 263:16, 263:22, 264:1, 264:11, 264:14, 265:7, 265:15, 266:19, 267:2, 267:7, 267:14, 268:20, 269:11, 269:22, 269:25, 270:2, 270:4
**Honor's** [2] - 173:21, 204:12
**HONORABLE** [1] - 1:10
**hook** [1] - 177:14
**hope** [1] - 269:19
**hopefully** [1] - 238:24
**hopes** [1] - 190:19
**horns** [5] - 132:15, 132:19, 132:25, 133:4
**hostile** [3] - 93:12, 100:19, 234:13
**hotdogs** [1] - 216:1
**hour** [30] - 19:3, 41:9, 41:20, 41:21, 43:14, 44:13, 45:20, 46:6, 47:20, 47:21, 47:25, 48:16, 48:21, 115:10, 127:18, 127:19, 127:21, 129:13, 157:2, 217:12, 232:5, 232:6, 235:13
**hour-and-a-half** [1] - 19:3
**hours** [5] - 92:7, 108:23, 131:23, 168:15, 197:14
**House** [7] - 32:19, 99:8, 102:17, 155:25, 157:3, 173:16, 183:24
**house** [4] - 18:20, 18:23, 126:6, 128:6
**household** [2] - 214:6, 214:16

**hundred** [1] - 217:17
**hungry** [3] - 111:24, 131:10, 131:16
**HUNTER** [7] - 1:6, 2:2, 149:19, 149:25, 150:5, 150:16, 151:21
**hunter** [1] - 146:5
**Hunter** [235] - 3:22, 4:6, 4:18, 4:20, 12:16, 19:24, 19:25, 25:9, 25:22, 26:22, 27:7, 27:13, 27:15, 27:19, 28:2, 28:9, 29:6, 29:22, 29:24, 30:17, 30:18, 30:25, 31:13, 32:5, 32:15, 33:17, 34:7, 34:23, 35:12, 36:10, 37:10, 37:12, 37:17, 37:23, 38:9, 38:16, 38:19, 38:20, 39:2, 39:4, 39:13, 39:23, 40:5, 40:17, 41:8, 42:4, 43:4, 43:5, 45:25, 46:25, 47:13, 47:16, 48:2, 49:2, 49:7, 49:8, 49:14, 50:5, 51:16, 51:25, 52:10, 52:18, 53:1, 54:3, 54:11, 54:19, 54:25, 55:17, 56:15, 57:2, 57:6, 57:25, 58:10, 60:3, 60:18, 61:8, 61:22, 62:10, 62:12, 62:18, 63:1, 64:17, 65:11, 68:15, 69:16, 70:5, 75:19, 106:9, 110:19, 112:6, 116:12, 116:22, 119:3, 120:10, 120:15, 120:19, 120:22, 121:11, 121:21, 122:25, 123:5, 124:5, 125:15, 125:16, 126:17, 128:12, 128:18, 129:5, 129:16, 131:4, 131:18, 132:4, 132:24, 133:4, 133:24, 134:17, 135:11, 137:8, 140:11, 140:12, 141:6, 142:20, 142:24, 144:10, 145:2, 145:6, 145:9, 145:13, 146:3, 146:10, 149:10, 149:18, 149:24, 150:4, 150:14, 151:20, 152:10, 152:15, 155:7,

156:19, 159:9, 159:21, 160:3, 164:15, 164:25, 165:7, 165:10, 166:1, 166:4, 166:20, 167:11, 168:2, 168:14, 169:4, 170:19, 171:5, 174:24, 175:20, 177:2, 177:9, 177:13, 179:3, 179:5, 180:5, 180:21, 181:17, 182:8, 182:13, 182:24, 184:5, 216:5, 216:13, 226:24, 227:2, 227:8, 227:11, 227:15, 227:19, 227:24, 229:16, 230:12, 230:14, 230:18, 230:24, 231:8, 231:11, 232:6, 232:12, 232:13, 232:16, 233:14, 233:16, 233:17, 234:17, 234:21, 234:24, 235:3, 235:17, 236:10, 236:16, 238:13, 247:4, 250:3, 251:6, 251:7, 251:22, 252:11, 252:13, 252:18, 254:13, 254:20, 255:6, 255:8, 255:24, 257:1, 257:12, 257:13, 257:18, 258:1, 258:11, 259:9, 259:11, 260:5, 260:20, 262:18, 262:20, 263:1, 263:19, 264:10, 265:8, 266:1, 266:20
**Hunter's** [11] - 19:24, 41:2, 109:11, 121:23, 171:22, 229:5, 231:23, 232:4, 235:4, 235:22, 261:11
**hurry** [1] - 113:20
**hurrying** [3] - 112:7, 115:12, 115:14
**hurtful** [1] - 222:18

---

**I**

**idea** [16] - 59:18, 64:19, 137:2, 162:19, 166:3, 168:19, 179:21, 187:13, 190:18, 191:13, 195:24, 196:21,

206:5, 222:20, 252:24, 258:7
**identification** [2] - 16:24, 105:23
**identified** [3] - 39:2, 62:12, 62:23
**identifies** [1] - 186:17
**identify** [2] - 4:7, 147:10
**identifying** [1] - 207:24
**identity** [1] - 6:19
**Igor** [2] - 203:8, 203:10
**illegally** [1] - 172:4
**image** [1] - 91:10
**immediate** [1] - 94:18
**immediately** [5] - 73:7, 92:11, 93:21, 204:17, 223:20
**immigration** [1] - 171:12
**impact** [7] - 130:24, 147:3, 148:3, 148:25, 176:23, 261:9, 261:10
**impacting** [3] - 261:15, 262:6, 262:7
**impeaching** [1] - 146:24
**impeachment** [1] - 146:23
**impede** [3] - 231:16, 233:23, 234:8
**impeded** [2] - 152:12, 155:4
**importance** [1] - 225:11
**important** [21] - 16:17, 16:19, 75:22, 75:25, 76:11, 76:16, 76:18, 76:21, 77:13, 82:4, 126:13, 126:16, 126:20, 126:23, 186:7, 186:10, 186:12, 216:12, 218:21, 222:23, 243:24
**impossible** [2] - 210:22
**impression** [6] - 22:1, 66:5, 106:25, 115:17, 165:22, 174:7
**improper** [2] - 16:9, 17:5
**IN** [1] - 3:15
**in-court** [1] - 105:23
**in-the-moment** [1] - 217:1

**inaccuracy** [1] - 200:4
**inauguration** [2] - 159:18, 201:13
**incident** [5] - 13:13, 177:23, 216:4, 241:10, 248:21
**inclination** [1] - 190:22
**inclined** [1] - 257:22
**include** [3] - 25:5, 30:13, 186:19
**includes** [2] - 82:16, 97:21
**including** [3] - 63:7, 70:7, 194:2
**inclusive** [1] - 148:1
**inconsistent** [1] - 84:9
**incorporate** [1] - 192:13
**incorrect** [1] - 197:23
**incriminating** [1] - 259:16
**independent** [2] - 191:1, 246:17
**Indiana** [1] - 1:22
**indicate** [5] - 20:19, 21:12, 23:2, 23:8, 30:4
**indicated** [13] - 8:25, 11:16, 12:15, 19:23, 20:5, 22:18, 23:2, 23:22, 57:15, 156:6, 218:4, 233:17
**indicating** [1] - 6:18
**indication** [4] - 49:16, 193:13, 200:19, 209:2
**indicative** [2] - 235:4, 236:1
**indicted** [1] - 186:15
**indictment** [1] - 68:2
**individual** [33] - 12:10, 55:18, 55:21, 56:8, 56:12, 66:14, 91:22, 93:15, 123:14, 123:18, 187:12, 194:1, 208:9, 208:14, 208:17, 208:21, 210:1, 210:14, 214:11, 216:4, 231:9, 236:3, 236:4, 237:16, 238:10, 245:11, 248:7, 248:8, 249:16, 254:9, 255:6, 256:25, 263:6
**individual's** [2] - 23:6, 208:22

**individually** [1] - 266:21
**individuals** [74] - 22:15, 39:3, 58:6, 62:11, 62:12, 65:21, 68:9, 68:11, 68:13, 87:3, 87:4, 91:20, 95:7, 98:16, 103:2, 123:5, 124:22, 127:1, 138:3, 141:25, 183:11, 188:13, 195:12, 196:16, 214:1, 215:3, 218:11, 221:2, 221:10, 227:25, 228:6, 237:11, 237:20, 238:2, 238:6, 238:9, 241:1, 243:5, 243:17, 248:7, 248:9, 249:17, 249:20, 250:1, 250:2, 250:7, 250:10, 250:13, 250:18, 250:19, 250:23, 252:1, 252:8, 253:5, 253:19, 253:21, 254:6, 254:14, 254:16, 255:13, 255:23, 256:18, 259:24, 260:2, 260:22, 261:8, 261:21, 262:11, 263:7, 263:12, 263:15, 264:2, 264:9, 266:24
**individuals'** [1] - 254:1
**infer** [10] - 156:14, 172:18, 174:16, 194:11, 194:19, 195:12, 196:22, 206:13, 223:9, 259:4
**inference** [1] - 187:3
**inferences** [2] - 69:3, 260:10
**inferred** [1] - 22:8
**inferring** [2] - 200:5, 220:22
**inform** [1] - 266:23
**information** [16] - 6:18, 17:6, 26:3, 26:5, 43:1, 43:5, 61:2, 68:19, 74:18, 75:18, 124:18, 130:22, 223:8, 247:3, 248:9, 249:24
**initial** [3] - 176:23, 178:23, 203:1
**initiated** [1] - 134:3
**innocent** [1] - 188:13
**innuendo** [2] -

234:25, 236:14
**inquire** [1] - 96:4
**inside** [66] - 12:3,
12:16, 12:22, 15:10,
18:14, 18:16, 22:5,
26:8, 40:3, 53:2,
62:19, 63:8, 63:13,
64:3, 68:13, 114:15,
115:12, 133:22,
135:16, 135:20,
136:1, 136:23, 137:1,
137:14, 137:18,
138:1, 138:2, 138:8,
138:11, 138:20,
139:15, 139:16,
139:23, 156:12,
159:10, 160:22,
160:23, 162:5,
162:21, 168:9,
168:13, 168:19,
168:23, 185:15,
187:1, 195:11, 196:6,
218:18, 221:3, 230:4,
230:12, 230:25,
231:2, 238:16, 252:8,
252:14, 252:18,
252:24, 253:3,
253:21, 254:8,
254:14, 263:25,
264:17, 264:18
**insignia** [1] - 12:11
**inspector** [2] -
230:11, 230:22
**Inspector** [5] - 67:12,
155:18, 155:19,
159:5, 230:17
**instead** [2] - 165:9,
166:14
**instincts** [2] - 255:9,
255:10
**instruction** [6] -
181:5, 224:2, 224:8,
224:16, 225:14,
226:10
**instructs** [1] - 156:10
**insufficient** [1] -
68:24
**intended** [4] -
166:18, 194:23,
251:3, 253:14
**intending** [2] -
195:14, 209:16
**intends** [2] - 233:22,
234:8
**intensely** [1] - 168:8
**intent** [124] - 8:9,
8:12, 8:16, 8:20, 8:25,
59:10, 68:9, 69:23,
74:8, 75:21, 75:24,
76:4, 76:6, 76:7,

76:11, 76:12, 77:4,
77:6, 77:13, 80:12,
153:18, 153:19,
154:7, 154:9, 154:10,
154:14, 156:7, 156:8,
156:9, 156:10,
156:14, 156:20,
160:22, 164:16,
168:13, 172:12,
172:17, 172:18,
174:6, 180:21,
180:22, 180:23,
182:9, 185:3, 185:20,
187:4, 187:11,
190:11, 190:24,
191:1, 191:10,
192:10, 192:16,
192:19, 194:7,
194:12, 194:19,
195:7, 195:20,
198:11, 199:25,
206:15, 206:17,
207:14, 214:23,
217:5, 217:7, 217:9,
217:15, 217:19,
217:21, 217:23,
220:23, 221:4, 221:5,
222:7, 223:6, 223:9,
223:11, 223:13,
223:14, 223:19,
223:21, 225:15,
225:16, 228:7,
228:25, 229:3,
229:17, 229:19,
229:22, 229:24,
231:16, 231:23,
231:24, 232:4, 233:9,
233:11, 233:23,
234:15, 234:23,
235:1, 235:19, 236:6,
251:8, 251:15, 252:9,
254:1, 256:3, 261:20,
264:8, 264:9, 265:20,
266:11, 266:12,
266:24, 266:25
**intention** [9] -
165:11, 166:18,
180:15, 182:6,
183:15, 183:21,
184:17, 187:5, 263:10
**intentional** [2] - 5:17,
7:20
**intentionality** [1] -
183:18
**intentions** [5] -
166:2, 181:20, 235:7,
237:8, 249:15
**intents** [1] - 228:17
**interact** [1] - 106:21
**interacted** [2] -

27:25, 106:15
**interacting** [1] -
201:1
**interaction** [4] -
161:22, 211:13,
211:14, 234:13
**interactions** [2] -
79:23, 81:1
**interest** [1] - 59:10
**interested** [1] - 192:4
**interesting** [1] -
205:11
**interfere** [1] - 173:9
**interfering** [1] -
184:19
**internet** [4] - 23:14,
218:19, 222:22, 230:8
**interrupt** [4] - 84:16,
154:21, 205:19, 209:7
**interrupted** [1] -
57:16
**intervene** [1] -
231:14
**interview** [60] - 6:1,
7:14, 8:4, 15:3, 19:3,
20:6, 20:23, 25:13,
25:16, 25:25, 27:3,
27:13, 27:16, 28:2,
28:8, 30:2, 30:9,
30:16, 31:14, 37:24,
40:7, 40:11, 40:12,
41:7, 41:14, 42:20,
42:23, 42:24, 43:8,
45:13, 46:14, 47:12,
52:5, 56:15, 56:25,
57:6, 57:11, 57:13,
57:25, 61:7, 61:8,
62:10, 63:21, 72:16,
72:17, 82:7, 84:2,
84:13, 85:14, 86:10,
166:7, 170:19,
173:14, 179:11,
232:6, 235:13,
247:21, 260:4,
261:11, 261:12
**interviewed** [7] -
5:24, 7:10, 29:7,
55:19, 55:22, 56:4,
58:2
**interviewing** [7] -
6:8, 25:6, 30:18, 41:8,
58:6, 73:13, 171:2
**interviews** [13] -
30:11, 72:5, 72:9,
72:14, 73:2, 74:14,
74:17, 74:24, 75:5,
77:11, 85:4, 257:16,
269:7
**intimidating** [1] -
225:12

**introduced** [1] -
27:10
**introduction** [1] -
88:19
**investigate** [1] -
71:10
**investigated** [4] -
10:5, 13:2, 26:1, 26:4
**investigating** [2] -
25:3, 63:22
**investigation** [15] -
7:7, 8:15, 9:8, 11:23,
18:7, 25:9, 56:9, 57:5,
60:3, 60:13, 60:17,
62:17, 62:21, 64:1,
85:11
**Investigation** [1] -
24:22
**investigations** [2] -
25:6, 72:4
**invited** [1] - 125:21
**involved** [8] - 23:3,
25:8, 25:11, 55:23,
73:8, 73:10, 216:15,
224:18
**involvement** [2] -
227:25, 258:2
**involves** [3] -
153:14, 154:2, 158:22
**involving** [1] - 71:12
**Iraq** [1] - 249:12
**irony** [1] - 266:8
**irregularities** [1] -
64:20
**issue** [6] - 66:2, 66:5,
154:15, 172:6,
206:15, 235:19
**issues** [1] - 155:12
**issuing** [1] - 161:19
**it'd** [1] - 247:16
**it'll** [1] - 152:17
**items** [1] - 95:8
**itself** [4] - 155:8,
155:17, 167:4, 216:13

## J

**jab** [1] - 243:4
**jabbing** [7] - 86:16,
86:18, 199:17,
199:20, 205:4,
243:16, 243:22
**jabs** [2] - 161:23,
240:20
**January** [62] - 5:14,
6:2, 6:14, 7:6, 7:9,
8:24, 19:21, 20:7,
20:23, 20:24, 25:15,
25:16, 26:12, 31:3,

31:22, 34:18, 35:13,
63:22, 64:1, 71:4,
71:6, 71:12, 71:23,
72:10, 73:5, 73:7,
73:19, 73:21, 89:7,
89:12, 91:7, 107:7,
107:12, 108:9,
108:15, 114:3,
120:15, 125:24,
128:15, 142:4, 152:9,
155:1, 155:13,
155:22, 156:2,
156:23, 157:15,
157:17, 164:18,
164:25, 171:13,
185:12, 187:1, 188:9,
196:18, 197:5,
213:25, 237:12,
250:7, 251:14,
254:11, 264:10
**jeans** [1] - 218:6
**JOA** [2] - 150:25,
151:4
**job** [5] - 71:7, 71:11,
177:2, 177:14, 228:13
**jobs** [1] - 260:21
**join** [1] - 255:3
**joined** [3] - 36:8,
126:19, 168:16
**joins** [1] - 174:1
**joint** [2] - 14:7,
253:22
**joisting** [1] - 86:14
**Joseph** [2] - 3:5,
26:19
**JOSEPH** [1] - 5:19
**journey** [1] - 158:18
**JUDGE** [1] - 1:11
**judge** [6] - 65:17,
65:18, 65:22, 66:2,
66:6, 148:16
**judge-versus-jury**
[1] - 66:6
**judgment** [4] - 67:22,
68:2, 68:23, 70:13
**jump** [6] - 140:13,
232:3, 234:5, 236:13,
237:21, 263:16
**jumped** [1] - 160:15
**jumping** [1] - 39:13
**jumps** [1] - 167:17
**June** [2] - 1:6,
271:10
**juries** [1] - 156:10
**jurors** [1] - 156:13
**jury** [5] - 65:22, 66:6,
69:10, 162:10, 162:14
**justice** [1] - 10:6,
74:3, 79:15, 79:24,
187:21, 194:12,

194:18, 194:24,
213:9, 234:22, 236:17
**Justice's** [1] - 185:14

## K

K-I-E-L-Y [1] - 89:4
**KEARNEY** [135] -
1:17, 24:8, 24:16,
28:11, 28:20, 28:25,
29:1, 29:9, 29:16,
31:7, 31:12, 32:9,
32:13, 33:16, 34:10,
34:14, 35:2, 35:6,
35:17, 35:22, 36:13,
36:17, 37:16, 38:1,
38:5, 38:7, 39:8,
39:12, 39:18, 39:22,
40:4, 40:20, 40:25,
41:1, 41:19, 41:24,
42:1, 43:13, 43:18,
44:12, 44:17, 44:21,
45:2, 45:19, 45:24,
46:5, 46:10, 46:17,
46:22, 47:19, 47:24,
48:1, 48:15, 48:20,
49:1, 49:18, 49:24,
50:3, 50:4, 51:19,
51:24, 52:13, 52:17,
53:4, 53:8, 53:12,
53:16, 53:20, 53:23,
54:6, 54:10, 54:14,
54:18, 55:7, 63:15,
64:10, 64:25, 65:7,
66:22, 67:2, 67:11,
67:16, 67:18, 96:13,
96:18, 98:18, 98:20,
99:21, 99:23, 103:10,
152:3, 152:7, 153:12,
153:25, 154:8,
154:22, 154:24,
158:16, 161:7,
163:17, 163:20,
165:25, 166:20,
170:4, 170:8, 170:12,
171:19, 172:11,
173:11, 174:15,
175:24, 176:11,
176:13, 176:21,
177:7, 177:17,
177:21, 178:1, 178:8,
178:15, 178:22,
179:9, 179:24,
180:10, 180:12,
183:20, 184:12,
184:25, 185:6,
205:18, 209:7,
209:11, 209:17,
267:19, 267:23
**Kearney** [20] - 4:10,

55:8, 64:24, 66:10,
75:2, 78:13, 79:3,
79:19, 79:22, 85:10,
87:2, 96:12, 152:1,
153:8, 186:2, 224:14,
228:13, 236:23,
245:13, 251:17
**Kearney's** [1] -
186:20
**keep** [7] - 86:4,
142:14, 162:18,
200:9, 227:16, 245:1,
266:14
**Keepers** [2] - 106:12,
185:17
**keeping** [2] - 90:15,
92:8
**kept** [1] - 132:20
**Kevin** [203] - 3:21,
4:5, 4:14, 5:24, 6:1,
6:13, 6:15, 6:20, 9:9,
11:12, 19:20, 19:25,
20:17, 23:17, 25:9,
25:22, 26:22, 27:7,
27:13, 27:16, 27:20,
27:21, 27:25, 38:23,
42:24, 45:13, 62:2,
65:12, 70:3, 72:22,
73:3, 75:19, 77:9,
84:16, 85:20, 85:22,
85:24, 86:12, 86:17,
86:19, 88:8, 88:20,
105:16, 106:2,
106:10, 108:4,
110:18, 112:6,
112:13, 113:19,
116:12, 116:22,
117:4, 119:3, 119:13,
119:16, 119:19,
120:6, 122:15,
122:21, 124:7,
125:23, 126:7,
126:17, 127:17,
128:9, 128:11,
129:22, 129:24,
131:1, 131:2, 132:4,
132:24, 133:4,
133:24, 134:17,
135:11, 136:14,
136:19, 137:8,
138:19, 142:11,
142:15, 142:21,
143:16, 144:10,
145:2, 145:6, 145:9,
145:13, 145:17,
145:25, 149:5,
149:16, 149:22,
150:2, 150:6, 151:22,
152:10, 156:19,
156:22, 157:5,

157:11, 157:14,
158:7, 158:18, 159:9,
159:21, 159:23,
161:7, 161:15,
161:20, 161:21,
161:23, 162:1, 162:5,
162:20, 162:24,
163:5, 163:10,
163:12, 163:19,
163:21, 163:23,
164:7, 164:24,
165:19, 165:22,
168:8, 168:13,
175:11, 180:21,
181:17, 182:1, 182:3,
182:4, 182:8, 182:14,
182:22, 186:1, 187:9,
187:10, 194:23,
195:21, 198:12,
204:7, 205:3, 205:4,
205:10, 211:1, 213:6,
216:6, 216:13,
220:24, 221:17,
237:18, 238:14,
238:19, 238:21,
239:4, 239:13,
239:22, 240:12,
240:16, 240:17,
241:5, 241:11, 244:5,
244:14, 247:4, 247:7,
247:9, 247:23,
247:25, 248:6,
248:15, 248:21,
249:1, 250:3, 250:15,
251:6, 252:12,
254:14, 254:21,
255:24, 256:12,
256:24, 257:11,
260:19, 261:12,
261:15, 261:23,
262:8, 262:18,
263:19, 264:9, 265:8,
265:12, 266:1, 266:5,
266:21
**KEVIN** [9] - 1:6, 1:20,
149:17, 149:23,
150:3, 150:8, 150:10,
150:13, 151:24
**Kevin's** [3] - 109:11,
131:8, 138:17
**key** [1] - 182:17
**kick** [2] - 255:9,
255:10
**kids** [1] - 164:6
**KIELY** [1] - 88:15
**Kiely** [12] - 3:10,
88:2, 88:9, 88:18,
89:3, 89:5, 95:23,
96:14, 96:19, 104:15,
260:13

**kind** [34] - 15:19,
30:20, 37:3, 74:18,
107:19, 111:5, 154:7,
165:22, 173:25,
174:4, 174:6, 174:7,
176:9, 176:14,
176:18, 176:24,
179:21, 179:22,
180:15, 185:1,
187:25, 191:14,
191:18, 193:9, 199:3,
216:17, 216:19,
218:5, 222:5, 241:18,
247:15, 259:16, 266:3
**kinds** [4] - 77:3,
77:5, 81:8
**Klan** [1] - 10:19
**knocked** [4] - 138:5,
176:9, 176:19, 227:14
**knocks** [1] - 257:2
**knowing** [10] - 77:16,
106:10, 123:4,
156:13, 159:13,
159:14, 171:17,
179:8, 206:14, 224:19
**knowingly** [2] -
225:2, 225:10
**knowledge** [24] -
56:23, 82:15, 82:16,
111:3, 135:17,
153:10, 153:15,
154:2, 154:4, 156:11,
156:14, 164:16,
178:24, 186:12,
216:13, 217:5, 217:8,
217:25, 225:24,
226:1, 227:25, 230:1,
253:6, 255:1
**known** [10] - 34:4,
106:2, 120:22, 124:4,
124:7, 124:22, 139:9,
139:25, 235:16,
255:25
**knows** [14] - 5:18,
84:10, 109:17, 162:7,
171:22, 172:1, 173:4,
179:3, 179:9, 179:12,
220:2, 232:17,
250:21, 258:14
**Kortum** [1] - 121:24
**Kramer** [1] - 5:18

## L

**lack** [5] - 193:23,
212:24, 236:13,
259:24, 266:11
**ladies** [1] - 4:12
**laid** [2] - 27:11,
152:19

**landing** [1] - 161:12
**landmarks** [1] -
134:10
**language** [2] -
152:23, 225:23
**large** [4] - 11:19,
176:13, 177:1, 238:15
**largely** [2] - 223:18
**larger** [2] - 116:8,
134:13
**last** [13] - 23:15,
57:15, 89:3, 106:14,
124:12, 145:17,
159:20, 185:23,
200:24, 201:1,
217:10, 260:14, 261:4
**lasted** [1] - 208:10
**lastly** [1] - 67:11
**late** [1] - 246:21
**Laurel** [1] - 197:9
**Lauren** [1] - 23:7
**law** [19] - 6:14,
13:12, 18:1, 58:2,
65:25, 66:4, 66:7,
70:13, 79:23, 123:14,
123:18, 153:13,
179:20, 225:1, 226:9,
236:3, 256:14, 257:3,
269:9
**LAW** [1] - 2:2
**law-abiding** [3] -
123:14, 123:18, 236:3
**lawn** [2] - 159:20,
173:6
**laws** [1] - 25:3
**lawsuits** [2] - 51:11,
171:4
**lawyer** [2] - 29:19,
222:5
**lawyers** [3] - 64:18,
198:18, 207:13
**Leach** [36] - 28:20,
31:7, 32:9, 34:10,
35:2, 35:17, 36:13,
38:1, 38:5, 39:8,
39:18, 40:20, 41:19,
41:24, 43:13, 44:12,
45:19, 46:5, 46:17,
47:19, 47:24, 48:15,
48:20, 49:18, 50:2,
51:19, 52:13, 53:4,
53:16, 54:6, 54:14,
98:18, 99:21, 161:2,
170:5, 175:25
**lead** [12] - 57:7, 73:1,
73:11, 73:16, 74:11,
74:22, 77:9, 85:9,
87:12, 108:4, 122:19,
247:17
**lead-up** [1] - 108:4

**leading** [6] - 92:23, 117:15, 120:14, 122:6, 122:12, 182:23
**leads** [1] - 255:19
**leaned** [2] - 48:8, 48:13
**leans** [1] - 48:13
**leaps** [1] - 232:2
**Lear** [14] - 3:5, 4:22, 5:2, 5:22, 16:25, 19:16, 20:16, 21:21, 23:25, 26:19, 160:3, 222:1, 222:2
**LEAR** [1] - 5:19
**learn** [12] - 8:23, 9:8, 9:11, 13:17, 15:14, 23:9, 64:2, 73:3, 74:8, 74:11, 119:11
**learned** [11] - 23:9, 34:7, 34:17, 34:20, 34:21, 56:14, 76:8, 114:3, 119:7, 119:8, 191:19
**learning** [2] - 13:17, 56:11
**least** [11] - 12:10, 69:19, 72:2, 190:23, 199:9, 199:24, 216:14, 217:6, 240:23, 250:3
**leave** [26] - 30:3, 42:20, 45:9, 54:11, 54:20, 65:3, 80:23, 94:24, 102:24, 104:16, 107:25, 111:23, 112:21, 113:9, 118:20, 131:7, 144:14, 161:8, 162:12, 172:15, 192:5, 205:3, 219:25, 221:11, 254:23, 263:12
**leaves** [4] - 131:9, 159:12, 174:25, 175:12
**leaving** [7] - 82:14, 113:7, 113:12, 165:17, 212:9, 220:24, 221:6
**led** [2] - 7:9, 125:9
**ledge** [3] - 47:14, 167:15, 167:23
**left** [33] - 31:20, 45:12, 50:19, 84:12, 92:21, 92:25, 93:21, 100:1, 100:15, 101:17, 110:10, 114:7, 118:3, 118:5, 118:9, 118:25, 120:5, 121:11, 127:16,

131:13, 131:23, 135:11, 143:16, 144:2, 144:10, 162:7, 209:24, 210:7, 217:2, 217:3, 221:1, 231:21, 263:9
**left-hand** [1] - 100:1
**legally** [1] - 178:9
**legislator** [1] - 233:2
**legitimately** [1] - 191:5
**lending** [2] - 183:9, 183:13
**length** [1] - 199:25
**lengths** [1] - 173:19
**lengthy** [1] - 204:10
**less** [6] - 92:18, 92:19, 93:21, 169:6, 203:2, 242:12
**lesser** [1] - 179:17
**letters** [1] - 173:8
**letting** [1] - 52:20
**level** [3] - 187:3, 187:10, 231:15
**Lewis** [4] - 6:25, 7:2, 26:20, 247:16
**liability** [2] - 153:23
**liable** [2] - 178:6, 180:22
**liar** [1] - 197:19
**liars** [21] - 13:24, 14:9, 14:23, 18:13, 22:6, 163:22, 164:3, 195:2, 195:6, 195:17, 195:23, 197:16, 198:2, 207:1, 250:22, 251:1, 253:3, 261:16, 262:1, 262:3, 262:6
**lies** [1] - 164:10
**life** [9] - 23:20, 37:5, 168:18, 236:3, 252:22, 258:15, 261:15, 262:7, 266:2
**light** [3] - 69:5, 69:9, 69:18
**likely** [1] - 7:3
**Lincoln** [3] - 134:9, 144:18, 144:24
**line** [28] - 6:10, 16:25, 21:6, 86:5, 100:23, 102:3, 113:17, 113:19, 113:24, 159:25, 160:14, 160:19, 163:3, 163:6, 167:1, 168:10, 168:25, 174:2, 183:3, 190:6, 194:8, 208:23, 216:2, 231:8, 254:22, 255:20, 264:24,

268:18
**lined** [1] - 174:3
**lines** [12] - 70:4, 80:24, 162:6, 162:7, 185:23, 185:25, 186:3, 208:18, 213:15, 267:17, 268:1, 268:5
**Lisa** [1] - 271:12
**LISA** [2] - 2:5, 271:3
**list** [4] - 122:19, 148:5, 149:9, 247:16
**listen** [5] - 33:13, 33:14, 130:7, 262:17, 266:3
**listened** [1] - 63:16
**listening** [2] - 215:19, 240:19
**live** [1] - 128:1
**lived** [4] - 126:6, 127:4, 212:17, 214:16
**lives** [2] - 260:24, 261:9
**living** [5] - 37:19, 54:1, 105:14, 121:15, 236:3
**located** [1] - 24:23
**location** [4] - 157:18, 165:1, 193:3, 193:5
**logistics** [1] - 166:16
**logo** [1] - 12:11
**look** [24] - 110:4, 116:15, 153:22, 160:24, 181:22, 200:16, 218:17, 227:3, 227:12, 230:5, 232:1, 241:5, 245:23, 251:2, 251:13, 251:16, 251:22, 254:5, 254:18, 255:5, 257:5, 263:1, 267:10
**looked** [4] - 116:16, 132:8, 176:18, 269:15
**looking** [25] - 57:8, 78:14, 84:17, 87:15, 87:16, 93:4, 95:7, 98:8, 98:10, 98:12, 181:10, 181:12, 195:4, 195:13, 201:10, 206:20, 210:12, 210:13, 221:8, 222:21, 225:8, 240:23, 255:20, 258:7, 263:6
**looks** [8] - 176:8, 203:15, 211:10, 219:16, 225:4, 225:7, 235:17, 268:6
**looming** [1] - 183:10
**loses** [1] - 172:3

**loss** [1] - 5:12
**lost** [1] - 171:9
**loud** [4] - 97:4, 99:18, 134:22, 169:5
**Louisiana** [1] - 1:16
**love** [2] - 66:4, 266:17
**loves** [1] - 107:2
**loyal** [2] - 106:5, 123:12
**Loyd** [2] - 159:5, 230:18
**Loyd's** [1] - 155:19
**lunch** [1] - 95:22, 95:24, 115:9, 133:20, 152:24, 189:14, 190:5, 219:22, 261:5
**luncheon** [1] - 96:8
**lying** [1] - 171:6

# M

**M-C-C-A-B-E** [1] - 24:20
**ma'am** [80] - 18:23, 21:1, 104:25, 124:11, 124:14, 124:17, 124:24, 125:4, 125:6, 125:18, 125:20, 126:4, 126:12, 126:15, 127:3, 127:6, 127:9, 127:15, 127:22, 127:25, 128:3, 128:13, 128:21, 128:24, 129:6, 129:18, 129:20, 129:23, 130:17, 130:24, 131:3, 131:6, 131:19, 131:22, 132:3, 132:11, 132:16, 133:6, 133:8, 133:11, 133:17, 134:8, 134:11, 134:22, 135:3, 135:10, 135:13, 135:15, 135:24, 136:3, 136:5, 136:8, 136:10, 136:16, 136:24, 137:3, 137:10, 138:9, 138:12, 138:18, 138:22, 139:2, 139:11, 139:19, 139:25, 140:15, 140:17, 140:25, 141:1, 141:16, 142:6, 142:8, 142:10, 142:13, 143:4, 143:7, 143:10, 146:16, 185:7, 267:1

**machines** [2] - 171:6, 171:8
**magic** [1] - 258:6
**main** [3] - 14:18, 69:22, 207:10
**maintaining** [1] - 263:14
**major** [1] - 216:9
**majority** [2] - 176:22, 211:13
**male** [1] - 116:5
**man** [33] - 82:9, 82:11, 98:25, 99:13, 100:1, 100:15, 101:17, 103:3, 103:15, 104:5, 105:16, 106:5, 123:12, 162:2, 162:3, 162:15, 162:21, 177:11, 179:1, 179:2, 179:4, 179:5, 180:4, 181:24, 199:11, 209:24, 210:10, 211:24, 230:8, 249:11
**manage** [1] - 221:21
**manages** [1] - 230:23
**mandate** [2] - 103:6, 171:11
**manner** [2] - 49:15, 106:6
**March** [1] - 78:3
**marching** [1] - 222:25
**marine** [1] - 209:25
**mark** [5] - 77:24, 109:12, 114:18, 117:24, 214:6
**marked** [2] - 90:4, 240:5
**Market** [1] - 2:3
**Maryland** [3] - 6:23, 24:24, 26:16
**mask** [2] - 100:2, 105:3
**match** [1] - 250:4
**matched** [1] - 6:19
**material** [2] - 84:1, 84:3
**matter** [11] - 52:7, 70:13, 178:12, 184:20, 187:9, 188:12, 207:13, 207:15, 246:11, 265:2
**mattered** [3] - 74:9, 213:11, 215:23
**matters** [2] - 71:10, 184:22
**mayhem** [1] - 184:11
**McCabe** [23] - 3:7,

7:4, 24:9, 24:12,
24:20, 24:21, 38:8,
46:11, 51:25, 55:13,
65:1, 167:19, 169:11,
169:15, 169:22,
175:6, 229:19, 232:6,
232:7, 258:13, 259:4,
259:20, 259:23

**McFADDEN** [1] -
1:10

**McIlhenny** [1] -
26:19

**mean** [45] - 13:9,
15:23, 21:18, 22:9,
35:10, 37:17, 52:21,
122:9, 125:2, 128:7,
128:23, 133:16,
147:16, 154:11,
157:11, 158:14,
163:12, 190:14,
192:4, 196:24, 199:2,
201:5, 201:12, 202:6,
206:5, 212:15, 213:5,
215:2, 215:5, 217:9,
218:15, 222:12,
225:4, 225:8, 232:22,
233:10, 233:22,
241:2, 241:20,
242:20, 247:11,
247:17, 249:12,
257:22, 257:25

**meaning** [1] - 129:21

**meaningful** [1] -
108:9

**means** [2] - 54:24,
166:12

**meant** [12] - 23:18,
37:7, 37:11, 37:12,
37:14, 48:20, 50:15,
163:23, 222:11,
223:12, 235:7, 256:5

**media** [20] - 8:19,
15:17, 20:17, 21:3,
21:16, 23:13, 64:7,
114:7, 119:10, 120:7,
120:12, 124:21,
125:3, 135:18,
135:22, 137:13,
137:14, 229:6, 229:7,
229:8

**meet** [9] - 74:15,
75:7, 75:25, 117:6,
117:10, 118:12,
188:17, 221:9, 266:9

**meeting** [16] - 27:4,
27:9, 27:23, 27:24,
75:10, 77:20, 78:7,
78:8, 78:24, 79:12,
82:18, 83:17, 83:22,
87:1, 117:21, 216:7

**meetings** [4] - 75:4,
75:16, 86:22, 255:15

**member** [3] - 10:18,
12:12, 60:4

**members** [22] -
14:12, 62:17, 62:23,
62:24, 64:13, 70:2,
81:5, 97:23, 99:11,
102:19, 102:25,
157:7, 163:12,
164:13, 166:12,
169:19, 181:12,
183:25, 184:6, 205:6,
208:4, 264:3

**Memorial** [2] -
144:18, 144:24

**memorialize** [1] -
72:13

**memories** [1] -
213:15

**memory** [6] - 80:7,
200:9, 206:7, 206:22,
238:10, 249:9

**mental** [1] - 267:13

**mention** [3] - 12:10,
113:23, 114:1

**mentioned** [8] - 11:2,
12:13, 27:5, 50:19,
81:24, 109:9, 145:25,
191:15

**mentions** [1] -
191:15

**mere** [3] - 224:13,
224:15, 225:25

**merely** [5] - 224:17,
224:18, 224:19,
225:25, 230:6

**message** [1] - 101:5

**messages** [1] - 61:2

**met** [17] - 20:18,
25:22, 27:6, 75:11,
75:22, 77:17, 88:1,
117:7, 118:10,
143:16, 144:1, 199:9,
216:8, 219:2, 226:22,
246:9, 246:11

**method** [1] - 232:7

**methods** [2] - 23:8,
30:10

**Michael** [2] - 3:10,
89:3

**MICHAEL** [1] - 88:15

**middle** [3] - 187:19,
201:25, 203:23

**might** [17] - 104:12,
134:15, 175:13,
175:16, 183:13,
183:18, 190:23,
191:6, 195:15,
195:16, 195:18,

200:13, 200:14,
212:20, 215:12,
222:13, 240:5

**Mike** [4] - 6:25,
26:19, 26:20, 183:24

**miles** [1] - 197:15

**milling** [1] - 101:10

**mind** [17] - 110:11,
110:12, 118:4,
158:18, 158:19,
165:4, 165:14, 166:5,
166:17, 172:19,
179:17, 187:24,
188:2, 196:9, 214:14,
235:12, 236:6

**minds** [2] - 158:5,
198:17

**mindset** [1] - 196:12

**minute** [9] - 41:21,
46:19, 47:25, 92:18,
92:19, 160:17, 161:3,
227:10, 244:13

**minutes** [53] - 31:8,
31:9, 32:10, 34:11,
35:2, 35:3, 35:18,
35:19, 39:9, 40:12,
40:21, 40:22, 43:14,
44:13, 45:20, 46:6,
47:20, 47:21, 47:25,
48:16, 48:17, 48:21,
48:22, 49:19, 50:3,
51:20, 90:6, 92:6,
117:12, 117:13,
117:20, 133:21,
136:12, 151:9,
169:16, 183:4,
186:20, 187:8, 190:7,
207:19, 217:12,
219:23, 221:19,
245:20

**mirroring** [1] -
185:13

**misattributed** [1] -
197:24

**misdemeanors** [1] -
172:7

**mislabeled** [1] -
219:7

**misremembered** [1]
- 197:24

**misremembering** [2]
- 197:17, 214:7

**missing** [1] - 241:19

**mission** [1] - 162:21

**mistakenly** [1] -
175:9

**mistakes** [1] -
207:23

**misunderstood** [1] -
249:5

**mob** [15] - 160:2,
168:16, 174:1, 183:9,
183:10, 183:14,
183:16, 183:20,
183:22, 224:24,
225:11, 239:9,
253:21, 255:3, 255:21

**mom** [2] - 109:11,
164:6

**moment** [13] - 50:12,
61:11, 61:14, 65:7,
88:13, 143:8, 143:21,
217:1, 228:2, 232:19,
242:18, 246:18,
255:11

**moments** [1] -
162:11

**months** [9] - 5:13,
120:14, 145:19,
146:11, 146:13,
212:16, 212:24,
215:6, 223:21

**Monument** [7] -
32:19, 134:9, 144:18,
144:21, 188:17,
188:18, 188:19

**monument** [1] -
134:9

**moral/ethical** [1] -
140:18

**Morgan** [16] -
163:10, 163:16,
164:2, 164:7, 169:7,
195:10, 197:18,
197:22, 200:7,
230:14, 238:7,
261:17, 261:18,
261:24, 261:25

**morning** [40] - 4:1,
4:2, 4:3, 4:9, 4:12,
4:14, 4:15, 4:16, 4:17,
4:19, 4:20, 5:2, 5:3,
5:22, 5:23, 6:2, 7:6,
19:16, 19:17, 22:22,
24:13, 24:14, 24:17,
24:18, 25:13, 26:11,
26:13, 31:20, 55:13,
55:14, 61:20, 61:21,
70:19, 70:20, 70:23,
88:4, 108:1, 110:22,
156:24, 168:15

**morphed** [1] -
231:23

**most** [18] - 69:5,
69:9, 69:18, 75:13,
113:12, 186:19,
196:24, 198:11,
206:9, 208:22,
213:11, 213:13,
215:21, 217:21,

228:13, 233:25,
238:17, 243:24

**mostly** [3] - 79:20,
185:18, 225:5

**mother** [2] - 32:4,
165:17

**motion** [5] - 66:17,
67:20, 67:24, 69:1,
199:19

**MOTIONS** [1] - 3:14

**motions** [1] - 70:13

**motivated** [1] -
168:22

**motivation** [2] -
158:3, 252:11

**motivations** [2] -
237:8, 251:3

**motive** [2] - 262:25,
263:21

**mounted** [1] - 160:14

**mouse** [1] - 210:3

**move** [12] - 7:23,
40:2, 47:11, 57:16,
67:22, 68:1, 109:21,
146:22, 147:7, 147:9,
217:11, 249:7

**moved** [3] - 7:17,
93:24, 115:4

**movement** [5] -
86:14, 86:15, 86:16,
86:18, 219:9

**mover** [1] - 165:23

**moving** [7] - 9:14,
70:6, 101:10, 101:25,
115:1, 115:3, 180:16

**MR** [159] - 4:3, 4:13,
4:17, 7:19, 7:21, 7:25,
19:12, 19:15, 20:9,
28:14, 29:11, 33:3,
37:9, 55:10, 55:12,
61:14, 67:5, 67:21,
67:25, 70:15, 70:22,
76:10, 76:20, 77:1,
77:22, 77:24, 78:1,
78:17, 78:19, 81:16,
81:21, 81:22, 84:20,
84:23, 86:1, 87:9,
87:11, 87:18, 87:25,
96:6, 96:11, 104:1,
104:4, 104:14,
104:21, 105:6,
105:22, 106:1,
109:14, 109:17,
110:2, 110:14,
110:16, 110:17,
114:24, 115:2, 115:4,
115:6, 117:19,
119:23, 119:25,
120:2, 122:8, 122:12,
122:18, 122:20,

123:20, 140:8,
143:12, 143:14,
145:20, 145:22,
145:24, 146:15,
146:22, 147:4, 147:6,
147:14, 147:16,
149:5, 149:8, 150:24,
151:3, 151:5, 151:10,
152:22, 153:2, 153:6,
185:9, 188:11,
188:15, 189:9,
189:21, 189:23,
191:22, 193:11,
196:2, 196:6, 198:23,
198:25, 200:20,
200:23, 201:7,
201:10, 201:19,
202:12, 202:17,
202:25, 203:4, 203:6,
203:15, 203:20,
204:3, 204:7, 205:17,
205:21, 205:23,
205:25, 208:2, 209:3,
209:6, 209:14,
209:20, 210:4, 210:6,
210:10, 211:7, 211:9,
211:12, 211:21,
212:14, 213:19,
213:23, 216:25,
218:9, 218:14,
219:19, 220:16,
220:18, 222:2, 224:5,
226:15, 226:20,
227:24, 228:15,
229:3, 232:24, 233:8,
267:4, 267:12,
267:20, 268:1, 268:5,
268:10, 268:25,
269:11, 269:13,
270:2, 270:4
  **MS** [243] - 4:2, 4:9,
4:24, 5:11, 5:13, 5:21,
7:13, 8:2, 8:8, 10:7,
10:10, 10:16, 11:5,
13:16, 14:17, 14:21,
16:6, 16:10, 16:13,
16:15, 16:21, 17:14,
18:3, 18:6, 19:9,
20:13, 20:15, 23:24,
24:2, 24:8, 24:16,
28:11, 28:16, 28:20,
28:25, 29:1, 29:9,
29:12, 29:16, 31:7,
31:12, 32:9, 32:13,
33:16, 34:10, 34:14,
35:2, 35:6, 35:17,
35:22, 36:13, 36:17,
37:16, 38:1, 38:5,
38:7, 39:8, 39:12,
39:18, 39:22, 40:4,
40:20, 40:25, 41:1,

41:19, 41:24, 42:1,
43:13, 43:18, 44:12,
44:17, 44:21, 45:2,
45:19, 45:24, 46:5,
46:10, 46:17, 46:22,
47:19, 47:24, 48:1,
48:15, 48:20, 49:1,
49:18, 49:24, 50:3,
50:4, 51:19, 51:24,
52:13, 52:17, 53:4,
53:8, 53:12, 53:16,
53:20, 53:23, 54:6,
54:10, 54:14, 54:18,
55:7, 61:19, 63:15,
63:18, 64:10, 64:12,
64:22, 64:25, 65:7,
65:9, 65:16, 66:9,
66:20, 66:22, 67:2,
67:7, 67:11, 67:16,
67:18, 68:5, 76:22,
84:25, 85:2, 85:21,
86:3, 87:6, 88:3, 88:5,
88:8, 88:17, 88:25,
90:9, 91:11, 91:14,
95:20, 96:13, 96:18,
98:18, 98:20, 99:21,
99:23, 103:10,
103:13, 103:24,
109:23, 117:15,
122:5, 122:9, 123:24,
124:1, 140:10, 141:5,
143:8, 148:4, 148:14,
148:18, 148:21,
149:3, 150:22,
151:17, 152:3, 152:7,
153:12, 153:25,
154:8, 154:22,
154:24, 158:16,
161:7, 163:17,
163:20, 165:25,
166:20, 170:4, 170:8,
170:12, 171:19,
172:11, 173:11,
174:15, 175:24,
176:11, 176:13,
176:21, 177:7,
177:17, 177:21,
178:1, 178:8, 178:15,
178:22, 179:9,
179:24, 180:10,
180:12, 183:20,
184:12, 184:25,
185:6, 205:18, 209:7,
209:11, 209:17,
236:21, 236:25,
237:4, 240:3, 240:11,
241:16, 241:24,
242:8, 242:14,
242:24, 244:6,
244:12, 244:18,
244:24, 245:3, 245:7,

245:11, 245:16,
245:25, 246:22,
247:20, 248:18,
248:20, 249:4, 249:6,
257:13, 258:10,
259:18, 267:2, 267:6,
267:18, 267:19,
267:22, 267:23,
268:8, 269:22, 269:25
  **muffled** [4] - 35:23,
42:2, 43:19, 53:24
  **MULLIN** [38] - 1:20,
5:11, 5:13, 5:21, 7:13,
8:2, 8:8, 10:10, 10:16,
11:5, 13:16, 14:17,
14:21, 16:10, 16:15,
17:14, 18:6, 19:9,
24:2, 28:16, 29:12,
61:19, 63:18, 64:12,
64:22, 65:9, 67:7,
88:5, 88:8, 88:17,
88:25, 90:9, 91:11,
91:14, 95:20, 103:13,
103:24, 268:8
  **Mullin** [11] - 4:13,
5:9, 16:14, 17:13,
21:5, 23:15, 61:17,
67:6, 88:19, 96:21,
103:11
  **multiple** [10] - 34:2,
50:25, 51:12, 159:1,
159:5, 166:22,
240:20, 243:4, 255:5,
255:14
  **must** [4] - 68:23,
159:2, 214:25, 217:9
  **mutual** [1] - 122:22

## N

  **name** [11] - 13:9,
23:6, 23:7, 24:19,
70:24, 88:19, 88:24,
89:1, 89:3, 105:9,
260:14
  **name's** [1] - 89:3
  **named** [1] - 105:16
  **names** [1] - 259:23
  **narrow** [1] - 94:7
  **nature** [4] - 15:3,
122:6, 183:10, 227:17
  **near** [8] - 52:11,
62:11, 62:18, 103:6,
132:17, 157:3, 157:4,
186:21
  **Near** [1] - 221:25
  **necessarily** [6] -
184:21, 228:25,
232:24, 233:10,
233:22, 258:6

  **necessary** [3] -
74:19, 147:17, 258:21
  **need** [20] - 65:14,
66:15, 74:14, 80:23,
81:20, 84:10, 96:4,
112:14, 113:21,
115:12, 115:14,
143:21, 153:9, 154:7,
154:8, 178:13,
178:16, 256:3, 258:6,
266:20
  **needed** [4] - 75:22,
112:7, 251:19, 254:7
  **needs** [6] - 172:11,
172:17, 173:9, 186:4,
187:4, 192:15
  **negate** [1] - 242:17
  **neglected** [1] - 67:2
  **negotiate** [1] -
102:22
  **never** [17] - 7:17,
11:16, 14:11, 14:15,
15:2, 16:4, 19:2, 58:1,
58:2, 82:13, 88:1,
108:13, 125:1,
231:23, 238:12,
238:17, 266:2
  **New** [4] - 1:16, 1:18,
247:13
  **new** [5] - 83:25, 84:3,
84:5, 84:8, 247:15
  **news** [17] - 15:17,
21:12, 23:13, 51:6,
128:7, 128:12,
128:13, 128:15,
142:23, 142:24,
143:2, 170:24, 196:3,
196:4, 196:6, 213:6,
265:24
  **News** [3] - 6:17,
213:7, 250:17
  **newspaper** [1] -
173:8
  **next** [13] - 25:13,
87:25, 91:16, 91:18,
94:1, 161:4, 182:1,
199:8, 202:12,
208:18, 211:5, 226:4,
255:6
  **night** [1] - 25:12
  **nine** [2] - 32:10
  **ninth** [6] - 15:12,
17:21, 21:11, 56:15,
121:11, 250:14
  **nobody** [3] - 79:11,
193:16, 202:9
  **noise** [2] - 99:19,
181:13
  **none** [1] - 134:10
  **nonetheless** [1] -

188:10
  **nonleading** [1] -
122:16
  **north** [3] - 159:17,
159:24, 220:19
  **northern** [1] - 220:2
  **Northwest** [3] - 1:22,
2:7, 271:14
  **northwest** [2] -
159:20, 220:2
  **Nos** [2] - 3:19,
148:22
  **notations** [1] - 38:24
  **note** [1] - 245:13
  **notes** [8] - 72:15,
78:14, 80:2, 80:5,
82:17, 83:6, 169:7,
271:5
  **nothing** [17] - 7:7,
11:7, 11:23, 18:7,
20:9, 61:15, 84:3,
84:14, 84:20, 87:18,
123:20, 145:20,
146:15, 210:16,
226:11, 257:1, 259:10
  **notice** [1] - 153:18
  **noticed** [1] - 222:13
  **notifications** [1] -
6:10
  **noting** [1] - 160:16
  **novice** [1] - 250:21
  **nowhere** [1] - 81:23
  **number** [17] - 71:15,
71:24, 183:9, 183:13,
183:20, 238:6, 246:9,
248:6, 254:11,
254:19, 254:20,
259:23
  **number-four** [1] -
254:19
  **numbers** [1] - 11:17
  **numerous** [2] -
264:21, 265:7

## O

  **oath** [2] - 5:6, 96:15
  **Oath** [2] - 106:11,
185:17
  **object** [7] - 10:7,
16:6, 18:3, 33:3,
76:22, 117:15, 122:5
  **objecting** [1] - 16:11
  **objection** [20] - 17:8,
28:13, 28:14, 28:16,
28:17, 29:11, 29:12,
29:13, 33:15, 37:9,
37:15, 63:15, 64:10,
65:10, 67:4, 86:1,

109:23, 109:24,
140:8, 148:5
  **objective** [1] -
212:21
  **observe** [2] - 95:18,
95:19
  **observed** [1] - 12:10
  **observes** [1] - 243:2
  **obstacles** [2] -
165:17, 166:21
  **obstruct** [19] - 87:16,
172:17, 183:15,
184:17, 188:4,
188:24, 192:22,
194:12, 194:23,
195:8, 195:14,
195:20, 213:9,
225:19, 231:16,
232:4, 233:11,
253:14, 256:4
  **obstructed** [5] -
152:12, 155:4, 239:9,
253:23, 254:10
  **obstructing** [2] -
217:24, 218:17
  **obstruction** [26] -
10:5, 74:3, 74:9,
79:15, 79:24, 155:8,
156:8, 172:8, 173:4,
182:12, 184:9,
184:23, 187:13,
187:17, 187:21,
190:19, 194:18,
207:11, 224:9,
226:23, 234:22,
236:16, 237:2,
257:24, 258:21,
264:13
  **obstructive** [5] -
237:15, 237:19,
242:17, 248:18,
249:21
  **obvious** [1] - 171:2
  **obviously** [21] -
65:16, 65:18, 65:20,
147:24, 158:14,
172:4, 174:9, 194:1,
196:7, 198:8, 202:9,
204:20, 206:4, 224:8,
225:5, 239:8, 240:21,
248:21, 250:25,
255:20, 269:9
  **occasion** [3] - 41:17,
58:6, 247:2
  **occasions** [4] -
41:17, 41:18, 122:24,
246:9
  **occur** [2] - 213:18,
218:3
  **occurred** [12] -

155:25, 177:1,
189:12, 203:11,
203:13, 220:25,
228:19, 236:11,
242:17, 242:22,
243:22, 248:21
  **occurring** [3] -
158:22, 171:18,
172:10
  **odd** [1] - 213:12
  **OF** [4] - 1:1, 1:3,
1:10, 1:21
  **offense** [6] - 68:24,
152:19, 153:5,
224:11, 224:13,
224:20
  **offenses** [3] - 73:21,
74:6, 74:9
  **offer** [4] - 67:3,
102:24, 249:23,
258:22
  **offered** [2] - 68:7,
257:4
  **offering** [3] - 259:11,
263:2, 266:10
  **offers** [5] - 28:11,
29:9, 67:13, 194:22,
259:3
  **office** [8] - 5:25, 6:1,
7:9, 24:23, 25:18,
25:19, 25:21, 84:6
  **OFFICE** [3] - 1:14,
1:17, 1:21
  **Office** [9] - 5:10,
6:23, 7:1, 26:14,
73:15, 75:1, 75:14,
78:10, 79:18
  **officer** [45] - 13:23,
14:3, 14:9, 14:24,
22:5, 22:6, 22:11,
37:10, 37:13, 48:6,
49:4, 75:5, 88:1,
89:15, 94:12, 96:14,
104:5, 139:16,
139:23, 140:3,
161:24, 162:9,
163:16, 167:24,
167:25, 168:2, 168:3,
168:7, 174:2, 174:19,
195:9, 207:10,
230:17, 235:2,
237:24, 239:17,
239:18, 240:20,
243:18, 244:1, 244:3,
247:15, 265:4
  **Officer** [144] - 75:7,
75:11, 75:20, 76:2,
76:9, 77:17, 77:20,
79:14, 80:11, 80:14,
80:17, 80:21, 80:25,

81:4, 81:23, 82:8,
82:13, 82:20, 83:2,
83:12, 83:17, 84:4,
84:9, 84:15, 86:22,
87:14, 88:2, 90:20,
90:25, 92:12, 92:20,
93:17, 93:19, 93:23,
94:3, 94:15, 94:25,
146:24, 148:8, 161:9,
161:14, 161:19,
161:22, 162:2,
163:10, 164:2, 164:7,
167:25, 169:7, 174:8,
180:18, 181:23,
181:25, 182:15,
187:7, 193:9, 193:11,
194:1, 195:9, 197:2,
197:17, 197:18,
197:21, 198:8,
198:16, 199:1,
199:13, 199:14,
199:17, 200:5, 200:6,
200:7, 200:23,
201:12, 201:22,
203:7, 203:10,
204:14, 205:3, 205:7,
205:10, 206:6,
206:17, 207:5, 207:7,
207:16, 207:20,
208:15, 210:1,
210:17, 211:5,
211:23, 230:14,
230:17, 237:3,
237:18, 237:21,
237:23, 238:5, 238:7,
238:18, 238:20,
239:1, 239:8, 239:14,
239:19, 240:16,
240:24, 241:6, 241:9,
241:13, 242:22,
243:1, 243:13,
245:18, 246:3, 246:8,
246:14, 246:24,
247:2, 247:6, 247:20,
247:22, 248:12,
248:22, 249:1, 249:7,
249:8, 249:18, 254:3,
255:14, 255:18,
261:17, 261:18,
261:24, 261:25,
264:4, 264:7, 265:13,
268:15, 268:21
  **officer's** [4] - 75:17,
168:3, 175:7, 175:14
  **officers** [62] - 14:5,
14:12, 49:12, 50:7,
52:11, 72:10, 73:2,
76:3, 91:4, 91:9,
91:16, 91:19, 92:21,
93:3, 93:19, 93:22,
94:4, 94:11, 95:1,

97:9, 97:16, 100:9,
100:23, 101:12,
102:3, 102:22,
124:16, 159:23,
159:25, 163:2, 163:3,
163:6, 164:1, 166:8,
169:1, 169:25,
172:15, 174:3, 175:8,
181:8, 181:13,
181:15, 183:3, 183:5,
183:6, 183:13,
193:18, 193:20,
225:12, 230:10,
231:4, 238:7, 238:9,
253:21, 255:20,
260:9, 262:3, 263:13,
264:24, 265:2,
265:10, 266:9
  **officers'** [1] - 183:5
  **Official** [1] - 2:6
  **official** [13] - 183:7,
184:9, 186:14,
225:19, 226:23,
231:16, 233:23,
253:23, 255:22,
255:25, 257:24,
258:21, 271:12
  **officials** [1] - 265:6
  **often** [1] - 107:5
  **Ohio** [38] - 90:1,
90:10, 90:11, 90:18,
90:22, 90:25, 91:5,
91:6, 92:12, 92:22,
92:25, 93:2, 93:13,
93:14, 93:16, 93:25,
94:4, 94:15, 94:24,
95:18, 96:22, 97:1,
98:4, 98:5, 98:21,
99:15, 99:19, 100:3,
100:17, 101:9,
101:25, 163:2,
168:24, 180:20,
181:14, 183:2, 184:7,
225:5
  **Ohm** [29] - 4:13, 5:8,
8:5, 28:15, 67:20,
70:14, 84:21, 87:8,
87:23, 104:20, 120:5,
143:11, 144:4,
146:20, 148:4,
150:23, 152:18,
153:6, 153:22, 185:8,
241:20, 242:5, 244:1,
247:14, 265:22,
266:10, 267:9,
269:10, 270:1
  **OHM** [120] - 1:20,
4:3, 4:13, 7:19, 7:21,
7:25, 67:21, 70:15,
70:22, 76:10, 76:20,

77:1, 77:22, 77:24,
78:1, 78:17, 78:19,
81:16, 81:21, 81:22,
84:20, 86:1, 87:9,
87:11, 87:18, 87:25,
96:6, 104:21, 105:6,
105:22, 106:1,
109:14, 109:17,
110:2, 110:14,
110:16, 110:17,
114:24, 115:2, 115:4,
115:6, 117:19,
119:23, 140:8,
143:12, 143:14,
145:20, 146:22,
147:4, 147:6, 147:14,
147:16, 149:5,
150:24, 152:22,
153:2, 185:9, 188:11,
188:15, 189:9,
189:21, 189:23,
191:22, 193:11,
196:2, 196:6, 198:23,
198:25, 200:20,
200:23, 201:7,
201:10, 201:19,
202:12, 202:17,
202:25, 203:4, 203:6,
203:15, 203:20,
204:3, 204:7, 205:17,
205:21, 205:23,
205:25, 208:2, 209:3,
209:6, 209:14,
209:20, 210:4, 210:6,
210:10, 211:7, 211:9,
211:12, 211:21,
212:14, 213:19,
213:23, 216:25,
218:9, 218:14,
219:19, 220:16,
220:18, 222:2, 224:5,
226:15, 267:4,
267:12, 267:20,
268:1, 268:5, 268:10,
268:25, 269:11,
269:13, 270:2
  **Ohm's** [2] - 241:25,
242:21
  **older** [1] - 121:7
  **Olmsted** [1] - 159:10
  **once** [19] - 26:3,
36:21, 36:22, 47:16,
75:12, 83:6, 112:21,
113:9, 115:7, 133:3,
135:21, 154:12,
158:25, 159:16,
160:23, 165:15,
167:23, 173:25, 262:2
  **one** [113] - 1:18,
11:6, 11:14, 12:2,

12:10, 12:24, 19:12,
20:6, 24:2, 25:5,
25:12, 26:6, 30:2,
37:21, 41:17, 41:20,
41:21, 43:13, 43:14,
44:12, 44:13, 45:19,
45:20, 46:5, 46:6,
46:19, 47:20, 47:21,
47:25, 48:16, 48:21,
50:19, 55:4, 58:20,
61:14, 65:7, 66:5,
66:6, 66:18, 66:23,
72:2, 77:6, 83:16,
93:19, 93:25, 104:1,
109:20, 121:23,
122:4, 124:10,
127:12, 131:20,
131:24, 132:18,
134:5, 136:19,
138:14, 139:19,
139:25, 140:20,
141:25, 142:3, 143:8,
160:8, 160:21,
162:11, 166:16,
168:9, 178:1, 181:23,
182:23, 185:9, 186:2,
187:21, 187:22,
191:23, 192:14,
194:1, 194:9, 194:19,
200:2, 204:15,
205:24, 206:8,
214:10, 214:18,
216:11, 222:17,
223:3, 234:11,
234:12, 238:12,
238:20, 239:3, 239:4,
243:20, 244:12,
248:1, 248:20,
252:11, 260:9,
263:11, 265:4, 265:6,
267:20
  **one-and-a-half-to** [1]
- 93:19
  **one-on-one** [2] -
238:20, 248:1
  **ones** [4] - 79:19,
182:23, 221:3, 262:4
  **online** [1] - 6:17
  **opaque** [1] - 197:12
  **open** [58] - 8:5, 8:7,
10:15, 14:20, 15:9,
31:11, 32:12, 34:13,
35:5, 35:21, 36:16,
38:4, 39:11, 39:21,
40:24, 41:23, 43:17,
44:16, 44:24, 45:23,
46:9, 46:21, 47:23,
48:19, 48:24, 49:21,
50:1, 51:23, 52:16,
53:7, 53:11, 53:19,

53:22, 54:9, 54:17,
90:8, 91:13, 161:6,
170:10, 176:3, 176:6,
180:1, 180:5, 200:22,
201:18, 202:24,
203:19, 203:25,
204:6, 205:16, 209:5,
210:9, 211:18,
240:10, 244:11,
244:17, 245:5, 245:10
  **opened** [1] - 44:2
  **opening** [2] - 177:8,
198:9
  **opinion** [13] - 52:3,
52:7, 55:5, 59:2, 59:5,
123:7, 123:11,
123:13, 123:16,
140:16, 173:13,
187:16, 257:20
  **opinions** [1] - 195:17
  **opponent** [1] -
183:12
  **opportunity** [7] -
20:16, 63:23, 198:4,
238:20, 246:13,
256:20, 257:5
  **opposed** [1] - 37:12
  **optimistic** [1] - 196:5
  **order** [3] - 148:16,
191:6, 191:7
  **orderly** [1] - 185:21
  **orders** [1] - 172:15
  **ordinarily** [1] -
156:11
  **organization** [1] -
13:4
  **organizations** [1] -
106:11
  **organized** [2] -
190:18
  **originally** [1] - 90:19
  **Orleans** [2] - 1:16,
247:13
  **ostensibly** [1] -
247:15
  **others'** [1] - 153:18
  **otherwise** [2] -
234:10, 236:9
  **ourselves** [1] -
134:21
  **outcome** [3] - 34:3,
184:21, 234:3
  **outgoing** [1] -
157:22
  **outlets** [1] - 23:14
  **outnumbered** [2] -
97:9, 183:12
  **outside** [15] - 26:8,
27:23, 70:7, 90:23,
114:15, 122:15,

132:8, 133:22, 174:3,
174:11, 185:15,
197:13, 219:22,
220:5, 256:17
  **overly** [1] - 100:19
  **overrule** [2] - 17:8,
37:15
  **overruled** [2] -
76:24, 140:9
  **overturn** [1] - 51:15
  **overturning** [1] -
32:24
  **overwhelmed** [1] -
92:23
  **overwhelming** [1] -
69:13
  **own** [10] - 23:1,
153:19, 171:22,
172:13, 244:19,
250:5, 251:8, 253:18,
265:12, 266:22

**P**

  **p.m** [3] - 89:24,
90:14, 269:18
  **pack** [3] - 161:9,
182:23, 183:1
  **packed** [1] - 118:22
  **PAGE** [1] - 3:15
  **page** [2] - 266:7,
266:9
  **Page** [4] - 3:20, 3:21,
3:22, 3:23
  **pages** [1] - 240:3
  **Pages** [1] - 3:14
  **paid** [1] - 222:17
  **paint** [3] - 82:9,
82:11, 99:1
  **pane** [3] - 178:18,
227:13, 257:2
  **panes** [1] - 160:9
  **paper** [3] - 38:9,
38:11, 38:12
  **parade** [1] - 254:17
  **pardon** [1] - 115:2
  **parents** [1] - 121:16
  **parked** [11] - 110:7,
110:21, 110:23,
111:4, 112:25,
130:11, 157:4,
164:21, 188:19,
215:24, 219:13
  **parking** [14] - 109:6,
109:7, 109:8, 110:7,
110:24, 111:4, 111:8,
118:22, 157:4,
164:21, 186:21,
219:14, 221:12,

221:20
  **part** [41] - 10:12,
10:23, 11:1, 11:24,
12:6, 12:24, 17:1,
19:19, 19:23, 20:5,
33:4, 56:9, 58:9, 60:2,
60:13, 60:15, 60:17,
62:21, 69:19, 73:21,
74:10, 75:4, 84:11,
84:12, 106:10,
109:19, 115:4,
160:13, 167:16,
167:22, 176:4,
176:17, 186:19,
197:16, 212:10,
217:10, 222:16,
226:10, 232:4,
234:22, 268:21
  **participate** [2] - 9:10,
179:19
  **participated** [4] -
9:3, 85:4, 155:8,
257:9
  **participation** [1] -
89:6
  **particular** [12] - 22:2,
81:25, 82:1, 84:17,
91:20, 187:22,
191:10, 194:14,
195:19, 201:23,
226:8, 241:10
  **particularly** [5] -
204:10, 207:22,
222:15, 237:3, 269:6
  **particulars** [1] -
256:5
  **parties** [2] - 155:11,
156:3
  **partner** [2] - 7:4,
164:2
  **parts** [1] - 105:15
  **partway** [1] - 160:4
  **pass** [1] - 176:16
  **passed** [3] - 159:3,
166:20, 245:13
  **passing** [1] - 172:14
  **past** [5] - 17:21,
75:13, 83:18, 84:4,
84:9
  **path** [1] - 239:4
  **pause** [2] - 157:13,
162:4
  **paying** [1] - 91:2
  **Peace** [1] - 220:1
  **peaceful** [13] -
123:14, 123:18,
138:13, 138:15,
139:9, 139:18,
139:24, 140:1, 140:6,
140:7, 140:16, 236:3,

263:15
  **peacefully** [1] -
261:6
  **peacefulness** [1] -
138:17
  **Pence** [2] - 181:10,
183:24
  **penmanship** [1] -
245:14
  **Pennsylvania** [1] -
2:4
  **people** [111] - 9:15,
9:18, 9:19, 10:1, 12:2,
12:7, 15:21, 22:12,
27:5, 30:14, 36:5,
36:7, 37:2, 40:15,
51:10, 52:10, 52:19,
54:23, 56:5, 62:13,
62:22, 70:11, 97:18,
101:17, 103:20,
106:19, 106:21,
111:15, 113:12,
118:5, 126:2, 130:18,
130:20, 132:15,
132:17, 132:19,
132:21, 132:25,
133:3, 134:2, 134:3,
134:23, 135:1, 135:5,
136:20, 136:22,
138:25, 139:6,
141:22, 144:6,
163:15, 164:3,
166:11, 166:12,
168:10, 169:23,
170:13, 170:14,
170:16, 170:25,
172:4, 174:22,
179:21, 180:23,
181:7, 181:9, 181:18,
184:3, 184:16,
185:12, 185:15,
185:16, 188:23,
193:18, 194:10,
194:15, 194:17,
194:20, 194:25,
195:14, 196:9,
197:13, 199:9,
199:15, 202:9,
203:16, 204:16,
206:8, 207:18,
215:18, 215:21,
216:19, 217:21,
218:10, 221:20,
223:3, 223:4, 227:23,
232:21, 233:2, 234:1,
238:11, 238:17,
251:20, 260:7, 262:3,
263:14, 264:4, 265:7,
266:6
  **people's** [1] - 262:22

**pepper** [1] - 168:1

**per** [1] - 268:23

**perceive** [2] - 30:21, 238:4

**perceived** [5] - 14:4, 32:25, 49:7, 199:18, 222:12

**percent** [1] - 74:7

**perception** [2] - 197:21, 211:23

**perfectly** [1] - 195:12

**perform** [1] - 25:5

**performed** [1] - 225:3

**perhaps** [3] - 23:23, 206:19, 243:10

**perimeter** [3] - 155:14, 155:16, 155:17

**period** [4] - 202:20, 204:11, 204:15, 204:24

**permission** [2] - 60:19, 70:16

**perpetrated** [1] - 164:12

**persists** [1] - 168:17

**person** [57] - 12:16, 55:19, 55:22, 56:23, 83:20, 86:23, 86:25, 91:22, 106:17, 112:13, 123:2, 123:6, 138:14, 139:18, 139:24, 140:2, 140:7, 140:19, 168:11, 187:16, 187:18, 187:19, 187:20, 190:2, 190:17, 194:10, 194:11, 194:13, 195:16, 196:5, 201:20, 203:21, 206:9, 215:3, 222:5, 222:24, 226:1, 231:8, 231:10, 232:8, 233:11, 233:22, 234:6, 234:8, 235:13, 236:7, 239:3, 239:4, 244:23, 254:19, 255:12, 255:13, 255:17, 258:23, 261:18, 264:6

**person's** [2] - 77:6, 234:10

**personal** [1] - 246:14

**personally** [1] - 228:8

**persons** [4] - 14:6, 138:14, 142:3, 224:18

**perspective** [5] - 194:20, 216:10,

226:22, 228:20, 234:2

**persuasive** [1] - 250:12

**Pezzola** [1] - 203:21

**Ph.D** [1] - 184:2

**Philadelphia** [1] - 2:4

**phone** [8] - 6:10, 25:12, 46:15, 60:19, 61:1, 61:6, 210:13, 225:8

**photograph** [1] - 240:15

**photographs** [1] - 37:23

**photos** [2] - 185:19, 221:15

**phrase** [3] - 37:4, 44:6, 158:3

**physical** [7] - 69:20, 86:11, 177:20, 177:22, 178:7, 179:14, 179:22

**physically** [4] - 63:14, 64:4, 64:8, 175:16

**pick** [1] - 206:3

**picked** [1] - 227:13

**picks** [1] - 203:6

**picture** [6] - 16:16, 98:21, 114:17, 219:18, 240:21, 268:6

**pictures** [11] - 62:11, 86:23, 87:3, 99:25, 137:15, 137:16, 137:17, 137:21, 138:4, 139:4, 254:17

**piece** [11] - 38:9, 38:11, 137:13, 173:4, 174:4, 223:15, 227:11, 227:15, 227:17, 227:20, 228:19

**pieces** [1] - 229:5

**piecing** [2] - 214:1, 223:7

**pile** [1] - 5:14

**pillage** [1] - 187:14

**place** [8] - 111:8, 117:6, 158:12, 172:23, 174:11, 176:10, 178:23, 206:8, 230:2

**placed** [1] - 48:6

**places** [1] - 134:5

**Plaintiff** [1] - 1:4

**plan** [3] - 30:18, 115:23, 216:24

**planned** [1] - 30:16

**planning** [7] - 27:11, 145:3, 145:7, 145:10,

145:14, 216:25, 217:2

**plans** [1] - 107:15

**platform** [1] - 13:19

**play** [40] - 7:13, 8:1, 10:11, 14:17, 16:10, 31:7, 32:9, 34:10, 35:2, 35:17, 36:13, 38:1, 39:8, 39:18, 40:20, 41:19, 43:13, 44:12, 44:19, 44:21, 45:19, 46:5, 46:18, 47:19, 48:15, 49:18, 49:22, 51:20, 52:13, 53:4, 53:9, 53:17, 54:6, 54:14, 60:1, 161:4, 202:18, 221:23, 222:15, 239:23

**played** [6] - 7:12, 8:3, 9:13, 16:12, 58:21, 170:18

**playing** [1] - 245:2

**Plaza** [1] - 1:18

**pleading** [1] - 152:24

**plus** [4] - 191:18, 191:23, 230:11

**podium** [1] - 149:13

**point** [84] - 12:2, 16:7, 26:22, 33:5, 37:11, 40:6, 40:7, 40:10, 42:20, 42:21, 43:8, 48:8, 66:1, 68:18, 69:17, 74:8, 75:21, 82:7, 86:21, 89:17, 94:1, 95:21, 103:5, 105:20, 113:5, 113:12, 115:25, 116:4, 116:21, 119:2, 119:7, 119:19, 128:14, 132:9, 132:18, 133:3, 133:9, 133:24, 134:20, 136:9, 136:14, 138:23, 140:21, 142:1, 142:11, 149:11, 155:18, 155:19, 163:13, 167:15, 174:15, 177:7, 180:15, 186:2, 189:19, 192:4, 192:6, 201:19, 202:1, 204:25, 208:21, 210:11, 210:16, 220:9, 220:21, 228:18, 230:16, 235:11, 239:19, 241:13, 242:21, 244:14, 255:8, 255:23, 256:18, 256:20, 257:12,

257:23, 261:22, 261:24, 264:25, 267:7, 269:19

**pointing** [4] - 110:12, 160:25, 174:17, 268:21

**points** [8] - 41:12, 66:23, 182:17, 183:8, 185:3, 186:18, 216:9, 216:15

**Police** [12] - 50:6, 88:1, 89:11, 89:16, 102:22, 162:24, 163:14, 169:3, 169:25, 181:8, 183:12, 234:14

**police** [21] - 13:23, 22:4, 30:1, 49:12, 54:21, 89:15, 91:4, 139:16, 139:22, 140:3, 159:23, 160:14, 160:19, 162:7, 167:24, 168:25, 172:14, 174:2, 231:4, 262:2, 264:24

**policy** [2] - 164:9, 171:12

**political** [1] - 184:2

**politically** [2] - 184:21, 250:16

**politicians** [1] - 64:18

**politics** [9] - 23:3, 120:19, 122:4, 128:19, 142:19, 142:22, 250:21, 251:12, 262:20

**polls** [2] - 51:4, 171:1

**pornography** [1] - 153:22

**portion** [7] - 9:23, 10:1, 45:8, 46:23, 47:12, 140:13, 257:2

**portrayal** [1] - 21:19

**portraying** [1] - 222:20

**position** [11] - 65:17, 66:13, 93:25, 148:2, 185:25, 189:7, 193:8, 198:15, 242:14, 243:3, 243:19

**positioned** [1] - 93:17

**possession** [1] - 154:2

**possibility** [2] - 175:16, 202:19

**possible** [6] - 62:7,

62:8, 73:14, 94:23, 206:6, 241:20

**possibly** [3] - 6:17, 54:23, 244:2

**posts** [1] - 8:19

**potential** [2] - 77:13, 233:21

**potentially** [2] - 95:8, 180:3

**Powell** [2] - 51:9, 171:4

**power** [2] - 170:16, 185:22

**PowerPoint** [1] - 219:7

**Poydras** [1] - 1:15

**practical** [1] - 178:12

**praised** [1] - 201:13

**precise** [2] - 213:15, 238:10

**precisely** [1] - 224:22

**predict** [1] - 198:14

**prefer** [1] - 6:11

**preinterview** [1] - 27:24

**preparation** [2] - 218:2, 218:3

**prepared** [1] - 96:5

**preparing** [1] - 79:14

**prerequisite** [1] - 154:17

**presence** [9] - 104:17, 122:25, 175:15, 224:13, 224:15, 224:23, 224:24, 229:8, 230:6

**present** [22] - 70:14, 72:10, 78:8, 78:24, 79:11, 80:14, 86:10, 87:1, 120:23, 124:15, 153:13, 156:2, 189:4, 218:24, 224:19, 225:13, 225:25, 230:6, 230:25, 231:9, 231:20, 234:6

**presentation** [1] - 65:2

**presented** [2] - 189:2, 229:23

**president** [18] - 8:13, 8:17, 13:5, 22:10, 33:24, 34:1, 35:9, 70:10, 157:23, 189:5, 191:20, 192:8, 229:13, 229:25, 237:11, 256:6, 258:8, 261:5

**President** [29] - 9:23, 10:4, 13:5, 13:18,

22:9, 33:22, 63:7,
63:12, 63:23, 64:2,
113:1, 130:15,
131:25, 132:5, 157:3,
157:6, 171:9, 181:10,
186:22, 188:16,
189:20, 190:13,
190:17, 190:24,
196:19, 197:10,
214:24, 221:24,
232:14
  **president's** [5] -
191:13, 191:14,
192:5, 217:10, 261:7
  **President-Elect** [1] -
22:9
  **presidential** [2] -
185:21, 186:22
  **presumably** [2] -
6:24, 23:14
  **pretrip** [1] - 229:5
  **pretty** [12] - 18:10,
73:7, 92:9, 94:7,
130:8, 147:23, 188:7,
219:23, 226:21,
232:22, 247:12, 258:1
  **prevent** [4] - 19:4,
157:8, 158:4, 165:12
  **preventing** [3] -
166:13, 183:6, 184:19
  **previously** [8] -
11:11, 11:15, 40:5,
84:14, 84:15, 90:5,
151:7, 230:25
  **PREVIOUSLY** [1] -
5:19
  **pride** [1] - 119:20
  **primacy** [1] - 194:6
  **primarily** [1] - 13:13
  **primary** [6] - 97:11,
98:16, 204:12,
206:15, 225:16,
225:17
  **prime** [2] - 165:23,
237:19
  **principal** [5] - 154:9,
180:23, 211:1,
225:17, 253:18
  **principals** [1] - 180:3
  **principle** [1] - 198:12
  **pro** [2] - 11:13
  **pro-gun** [1] - 11:13
  **pro-Second** [1] -
11:13
  **problems** [1] - 64:20
  **Procedure** [1] -
68:23
  **proceed** [3] - 17:13,
152:17, 154:23
  **proceeding** [41] -

158:21, 172:1,
172:10, 172:23,
173:5, 173:9, 175:4,
183:7, 183:16, 184:9,
184:19, 184:23,
186:14, 225:19,
226:24, 231:17,
232:4, 233:11,
233:24, 251:16,
253:7, 253:14,
253:23, 255:17,
256:1, 256:2, 256:7,
256:9, 257:24, 258:5,
258:11, 258:12,
258:21, 258:24,
260:16, 262:15,
263:3, 263:25, 265:1,
265:10, 265:21
  **proceedings** [11] -
5:1, 24:11, 96:9,
104:24, 151:13,
158:11, 251:11,
254:10, 255:22,
266:25, 271:6
  **Proceedings** [1] -
270:6
  **proceeds** [1] -
160:25
  **process** [16] -
155:21, 155:23,
169:12, 169:16,
173:15, 196:11,
215:8, 232:23,
232:25, 252:14,
254:25, 255:1,
258:25, 259:2,
264:20, 265:25
  **processed** [2] -
114:5, 215:1
  **produced** [1] - 271:6
  **profanity** [1] - 100:7
  **progress** [1] -
167:10
  **prominent** [1] -
64:18
  **prominently** [1] -
128:5
  **promoting** [1] -
64:19
  **proof** [1] - 204:21
  **proper** [1] - 261:2
  **properly** [2] -
243:11, 247:8
  **property** [10] - 68:14,
69:16, 69:21, 177:20,
178:7, 227:9, 228:24,
256:13, 258:2
  **prophesize** [1] -
218:12
  **Prophesize** [1] -

218:14
  **prophesy** [1] -
218:13
  **propose** [1] - 150:19
  **proposed** [1] -
152:19
  **ProPublica** [15] -
202:18, 202:22,
242:8, 242:10,
244:22, 244:25,
245:12, 267:14,
267:15, 268:2,
268:11, 268:14,
268:16, 268:17,
268:18
  **prosecute** [2] -
187:23, 187:25
  **prosecuting** [1] -
186:1
  **prosecution** [4] -
74:12, 79:8, 81:8,
194:21
  **prosecutions** [1] -
73:22
  **prosecutor** [1] -
141:2
  **prosecutors** [2] -
74:15, 206:14
  **protect** [1] - 14:12
  **protecting** [2] -
163:11, 163:15
  **protest** [9] - 13:15,
164:9, 171:11,
171:12, 172:5,
192:19, 195:13,
196:20, 252:5
  **protester's** [2] -
14:3, 14:24
  **protesters** [5] - 91:5,
91:15, 91:17, 91:18,
92:23
  **protesting** [2] -
173:6, 173:23
  **Proud** [4] - 10:19,
106:11, 185:17, 190:6
  **prove** [8] - 186:4,
186:13, 187:4,
192:15, 195:19,
227:1, 253:13, 253:14
  **proved** [2] - 156:11,
192:17
  **proven** [5] - 186:16,
193:1, 208:11,
215:15, 243:14
  **proves** [3] - 152:8,
155:1, 252:18
  **provide** [4] - 66:15,
75:18, 247:3, 267:6
  **provided** [2] -
209:18, 219:13

  **proving** [4] - 156:7,
156:9, 211:2, 236:15
  **proximity** [2] - 94:3,
174:17
  **PTSD** [1] - 199:4
  **Public** [1] - 5:10
  **public** [1] - 148:11
  **PUBLIC** [1] - 1:21
  **publicly** [1] - 149:2
  **published** [57] - 8:7,
10:15, 14:20, 31:11,
32:12, 34:13, 35:5,
35:21, 36:16, 38:4,
39:11, 39:21, 40:24,
41:23, 43:17, 44:16,
44:24, 45:23, 46:9,
46:21, 47:23, 48:19,
48:24, 49:21, 50:1,
51:23, 52:16, 53:7,
53:11, 53:19, 53:22,
54:9, 54:17, 90:8,
91:13, 161:6, 170:10,
176:3, 176:6, 200:19,
200:22, 201:14,
201:18, 202:24,
203:19, 203:25,
204:6, 205:16, 209:2,
209:5, 210:9, 211:18,
240:10, 244:11,
244:17, 245:5, 245:10
  **pull** [12] - 28:20,
38:5, 42:9, 46:17,
98:18, 99:21, 116:10,
161:2, 170:3, 170:5,
244:8, 260:8
  **pulled** [3] - 48:12,
135:6, 159:10
  **punch** [1] - 47:7
  **punched** [1] - 141:10
  **punches** [1] - 176:25
  **pure** [1] - 200:9
  **purpose** [13] - 51:13,
75:15, 107:22,
148:18, 157:2,
160:25, 164:20,
172:21, 175:10,
195:19, 225:3,
229:18, 259:9
  **purposes** [4] - 27:18,
98:6, 153:13, 228:17
  **pursuant** [1] - 68:1
  **pursue** [1] - 174:19
  **pursuing** [1] - 174:1
  **push** [1] - 134:15
  **pushes** [4] - 165:16,
176:10, 176:20, 177:2
  **pushing** [3] - 61:12,
134:14, 174:4
  **put** [9] - 16:17,
16:19, 111:14,

147:24, 148:12,
172:2, 216:18,
243:19, 261:1
  **puts** [1] - 173:19
  **putting** [2] - 167:5,
205:13

---

## Q

  **QAnon** [2] - 106:11,
201:20
  **qualities** [1] - 235:22
  **questioning** [7] -
16:25, 17:3, 21:6,
45:12, 86:5, 167:14,
219:9
  **questions** [39] -
13:21, 19:9, 23:16,
23:24, 29:20, 55:7,
57:7, 64:22, 69:22,
79:16, 79:17, 79:20,
80:10, 80:11, 84:23,
85:9, 85:10, 87:6,
88:22, 89:5, 96:11,
96:22, 103:10,
119:23, 122:12,
122:17, 124:2, 143:9,
144:9, 144:17, 150:9,
166:14, 185:1, 185:2,
193:15, 206:16,
226:12, 232:15,
233:10
  **quickly** [4] - 178:25,
219:6, 263:16, 267:9
  **quite** [2] - 11:17,
172:5
  **quote** [2] - 228:13,
252:20

---

## R

  **racial** [2] - 18:1,
106:17
  **racist** [2] - 222:20,
222:22
  **radio** [3] - 23:13,
90:20, 175:7
  **raise** [1] - 148:7
  **raised** [1] - 148:7
  **Rally** [7] - 32:18,
32:21, 35:15, 63:2,
164:21, 165:2, 166:5
  **rally** [75] - 11:7, 11:9,
11:10, 11:12, 11:14,
11:16, 11:18, 11:19,
15:10, 17:11, 22:13,
22:16, 23:9, 32:6,
32:16, 32:17, 33:14,
33:17, 33:20, 34:8,

34:17, 34:24, 34:25, 35:14, 36:4, 36:11, 36:18, 61:23, 63:6, 63:7, 63:10, 63:24, 64:14, 126:8, 127:24, 130:5, 130:6, 130:13, 130:19, 130:22, 131:5, 131:7, 131:14, 131:21, 131:23, 132:13, 133:16, 133:17, 134:6, 142:9, 157:3, 157:5, 157:21, 157:23, 157:24, 157:25, 158:4, 158:7, 164:22, 165:11, 165:23, 172:21, 181:3, 186:24, 188:11, 188:12, 189:5, 190:18, 191:2, 214:23, 234:1, 250:20, 254:23, 261:2, 262:12

**rally's** [1] - 165:8
**rally-goers** [1] - 63:7
**range** [1] - 71:25
**rapport** [1] - 30:13
**ratchet** [1] - 231:12
**rather** [2] - 231:18, 244:3
**rational** [2] - 69:6, 69:10
**RDR** [3] - 2:5, 271:3, 271:12
**reach** [3] - 159:17, 199:22, 220:1
**reached** [1] - 236:15
**reaches** [3] - 160:6, 165:19, 166:21
**reaching** [2] - 98:12, 168:3
**reacted** [1] - 223:20
**read** [9] - 9:22, 15:19, 63:23, 81:11, 147:10, 153:25, 154:1, 176:20, 245:14
**reads** [1] - 153:12
**ready** [7] - 4:21, 7:13, 66:20, 66:22, 151:8, 208:13, 210:15
**real** [4] - 141:17, 156:1, 175:16, 212:14
**realize** [4] - 141:9, 141:10, 189:7, 201:3
**realized** [6] - 17:19, 151:14, 175:1, 215:1, 220:9, 231:20
**realizes** [1] - 175:12
**really** [26] - 16:4, 26:25, 33:4, 65:22, 111:19, 115:23,

128:23, 129:11, 129:18, 141:14, 143:2, 156:5, 161:18, 187:23, 199:24, 201:3, 219:9, 220:25, 221:16, 228:10, 231:19, 237:22, 250:10, 252:6, 261:25
**rear** [2] - 194:3, 208:24
**reason** [17] - 54:19, 110:23, 141:18, 174:10, 188:13, 188:14, 188:15, 192:2, 221:24, 237:19, 237:22, 241:7, 243:16, 246:2, 248:11, 259:6, 263:11
**reasonable** [13] - 69:7, 69:11, 152:9, 155:1, 195:12, 196:16, 207:20, 207:22, 211:2, 214:13, 217:19, 226:3, 236:16
**reasoning** [1] - 168:14
**reasons** [12] - 37:21, 70:12, 150:25, 151:6, 180:22, 181:1, 182:9, 222:17, 238:15, 250:10, 257:17, 259:5
**rebuttal** [3] - 151:15, 151:16, 152:5
**Rebuttal** [1] - 3:23
**recalled** [1] - 82:5
**receive** [2] - 42:25, 209:14
**RECEIVED** [1] - 3:15
**received** [8] - 25:12, 25:15, 26:3, 26:5, 30:10, 92:12, 92:15, 156:18
**recent** [1] - 212:18
**recently** [2] - 75:13, 247:22
**recess** [2] - 96:8, 151:12
**recitation** [1] - 153:4
**recognize** [5] - 29:2, 75:24, 76:3, 188:8, 198:16
**recognized** [1] - 75:21
**recollection** [9] - 71:19, 75:17, 77:19, 78:15, 78:23, 84:15, 91:6, 100:22, 103:7
**recollections** [1] - 213:13

**reconnect** [1] - 117:2
**reconnected** [1] - 116:21
**record** [7] - 4:8, 9:23, 67:23, 89:2, 105:22, 147:11, 200:18
**recorded** [2] - 28:3, 30:1
**recording** [1] - 28:8
**records** [2] - 62:2, 62:5
**RECROSS** [1] - 145:23
**RECROSS-EXAMINATION** [1] - 145:23
**red** [3] - 181:25, 199:11, 255:6
**Red** [1] - 3:3
**redirect** [6] - 20:12, 64:24, 64:25, 87:8, 103:11, 143:11
**REDIRECT** [4] - 20:14, 87:10, 103:12, 143:13
**Reed** [28] - 4:10, 9:22, 13:21, 24:7, 65:15, 68:4, 75:2, 78:12, 79:2, 79:19, 79:22, 84:24, 87:7, 96:12, 123:23, 143:15, 144:9, 144:17, 148:2, 150:21, 151:14, 152:1, 152:5, 212:13, 213:14, 236:20, 257:16, 269:21
**reed** [1] - 20:12
**REED** [73] - 1:14, 4:2, 4:9, 4:24, 10:7, 16:6, 16:13, 16:21, 18:3, 20:13, 20:15, 23:24, 65:16, 66:9, 66:20, 68:5, 76:22, 84:25, 85:2, 85:21, 86:3, 87:6, 88:3, 109:23, 117:15, 122:5, 122:9, 123:24, 124:1, 140:10, 141:5, 143:8, 148:4, 148:14, 148:18, 148:21, 149:3, 150:22, 151:17, 236:21, 236:25, 237:4, 240:3, 240:11, 241:16, 241:24, 242:8, 242:14, 242:24, 244:6, 244:12, 244:18, 244:24, 245:3, 245:7, 245:11,

245:16, 245:25, 246:22, 247:20, 248:18, 248:20, 249:4, 249:6, 257:13, 258:10, 259:18, 267:2, 267:6, 267:18, 267:22, 269:22, 269:25
**reenforcements** [1] - 175:7
**refer** [5] - 6:9, 51:1, 51:4, 72:18, 149:1
**reference** [6] - 16:23, 38:16, 38:19, 38:22, 51:10, 163:21
**referenced** [2] - 46:11, 152:23
**references** [3] - 39:13, 170:24, 171:5
**referencing** [1] - 173:1
**referred** [2] - 147:14, 157:24
**referring** [8] - 31:18, 32:16, 32:18, 46:12, 52:24, 118:2, 195:5, 210:2
**refers** [1] - 50:23
**reflect** [1] - 105:22
**reflective** [1] - 222:10, 223:11
**refresh** [4] - 77:19, 78:14, 78:23, 210:19
**refuses** [1] - 205:4
**refusing** [1] - 170:17
**refute** [1] - 172:22
**regard** [1] - 263:8
**regarding** [6] - 33:22, 75:18, 80:12, 155:23, 165:21, 189:19
**regret** [2] - 39:5, 119:16
**regrets** [1] - 179:13
**regretted** [3] - 18:16, 135:23, 146:7
**reiterate** [1] - 22:6
**relatable** [1] - 30:19
**related** [3] - 188:14, 188:15, 195:25
**relates** [5] - 68:10, 85:16, 237:17, 247:4, 250:2
**relationship** [6] - 106:25, 121:20, 124:9, 125:16, 125:19, 263:1
**relatively** [2] - 89:23, 94:7
**relevance** [3] - 10:8,

18:4, 37:10
**relevant** [4] - 175:19, 206:16, 217:13, 228:10
**reliable** [1] - 206:24
**reliably** [1] - 210:23
**relieved** [2] - 177:9, 177:12
**rely** [1] - 194:5
**relying** [3] - 193:3, 210:25, 225:5
**remain** [1] - 88:12
**remaining** [3] - 58:18, 74:1, 257:2
**remember** [105] - 9:16, 25:14, 47:4, 50:9, 59:16, 62:14, 63:4, 78:7, 79:16, 83:13, 91:18, 93:6, 93:9, 95:4, 95:5, 96:24, 98:23, 98:25, 99:3, 99:5, 99:7, 100:3, 100:17, 101:19, 103:9, 103:14, 103:17, 107:7, 110:21, 110:22, 113:8, 113:9, 114:16, 116:20, 116:24, 116:25, 117:11, 118:23, 118:24, 126:9, 127:11, 127:12, 128:17, 129:8, 129:11, 129:14, 129:15, 129:16, 129:25, 130:4, 130:5, 130:14, 130:15, 130:18, 130:21, 130:25, 131:16, 132:6, 132:7, 132:8, 132:20, 133:18, 133:23, 134:3, 136:12, 137:10, 137:16, 137:17, 138:22, 139:8, 139:14, 143:7, 143:20, 144:2, 144:4, 144:12, 144:19, 169:4, 197:3, 197:4, 197:5, 198:17, 206:7, 206:12, 207:12, 210:18, 210:21, 210:23, 213:4, 213:5, 215:21, 219:22, 231:6, 233:13, 238:1, 238:3, 248:5, 248:6, 259:18, 265:23
**remembered** [8] - 193:21, 206:6, 206:18, 208:16,

215:23, 216:1, 216:7, 247:23

**remembering** [1] - 244:3

**remembers** [8] - 197:2, 215:25, 216:3, 235:2, 247:24, 248:1, 249:16

**remind** [4] - 5:6, 96:3, 96:14, 162:11

**remnants** [2] - 47:9, 58:22

**remorse** [6] - 135:25, 137:19, 138:6, 140:22, 141:6, 142:12

**remorseful** [3] - 137:21, 142:13, 142:16

**remotely** [1] - 112:17

**remove** [3] - 47:6, 218:18, 218:19

**removed** [11] - 42:5, 42:8, 58:12, 58:22, 227:11, 227:16, 227:19, 228:18, 231:10, 235:25

**removing** [4] - 54:23, 57:22, 146:7, 228:4

**renew** [2] - 150:24, 151:4

**repeat** [4] - 86:13, 139:21, 143:19, 207:17

**repeatedly** [1] - 255:8

**repetitive** [1] - 236:23

**rephrase** [1] - 22:14

**replaced** [2] - 178:13, 178:16

**replay** [1] - 176:4

**report** [2] - 26:12, 81:23

**reported** [3] - 84:1, 87:14, 223:17

**REPORTED** [1] - 2:5

**reporter** [3] - 70:24, 105:10, 207:17

**Reporter** [2] - 2:6, 271:12

**REPORTER** [4] - 88:23, 200:18, 209:1, 218:13

**reports** [1] - 170:24

**represent** [2] - 88:19, 103:8

**representation** [1] - 118:15

**representative** [1] - 78:9

**representatives** [2] - 169:20, 170:15

**represented** [2] - 17:19, 262:12

**reputation** [4] - 123:8, 123:11, 123:17

**request** [6] - 25:18, 25:20, 26:3, 62:1, 62:3, 152:23

**require** [1] - 184:2

**required** [2] - 186:13, 224:25

**requirement** [3] - 153:13, 153:17, 186:13

**requirements** [1] - 155:24

**requires** [7] - 153:15, 184:18, 191:10, 192:22, 207:12, 224:9, 234:23

**requisite** [2] - 225:23, 226:1

**research** [2] - 66:16, 232:9

**reserve** [1] - 67:23

**residence** [1] - 128:1

**resolve** [2] - 154:19, 204:19

**respect** [9] - 58:25, 104:5, 120:10, 146:10, 226:23, 227:2, 227:5, 234:3, 234:23

**respects** [1] - 181:18

**respond** [17] - 16:22, 32:2, 39:16, 42:7, 42:13, 42:18, 43:25, 44:4, 44:10, 49:8, 49:9, 51:8, 89:17, 89:19, 92:11, 177:7, 213:22

**responded** [8] - 42:3, 45:3, 47:4, 50:9, 89:19, 89:21, 89:24, 90:24

**responders'** [1] - 89:16

**responding** [1] - 90:1

**responds** [1] - 167:25

**response** [4] - 41:2, 54:22, 57:18, 59:19

**responsibilities** [2] - 25:2, 73:12

**responsibility** [2] - 177:9, 177:12

**responsible** [4] - 237:20, 256:12,

257:6, 257:8

**rest** [4] - 101:22, 149:10, 194:3, 224:15

**restricted** [2] - 155:14, 230:25

**restroom** [1] - 11:3

**rests** [2] - 67:18, 149:6

**result** [1] - 165:13

**results** [2] - 21:20, 51:15

**resume** [3] - 4:21, 183:7, 269:18

**reticent** [1] - 179:16

**retreat** [3] - 101:14, 255:9, 256:19

**return** [5] - 41:15, 43:8, 45:14, 147:22, 205:7

**returned** [2] - 43:10, 45:16

**reunite** [1] - 136:17

**reuniting** [1] - 136:15

**reveal** [2] - 62:17, 196:13

**reverse** [1] - 268:12

**review** [8] - 61:4, 61:5, 61:6, 63:19, 77:9, 214:15, 222:9

**reviewed** [1] - 28:5

**revisit** [1] - 43:10

**revisited** [2] - 43:21, 166:24

**rewind** [1] - 211:15

**rhetoric** [1] - 264:23

**Richmond** [2] - 11:12, 11:19

**ride** [2] - 229:14, 229:16

**rifling** [1] - 164:8

**right-wing** [1] - 60:9

**rights** [9] - 29:5, 29:17, 29:18, 29:19, 30:5, 56:19, 56:22, 56:24, 197:21

**rile** [1] - 184:16

**riot** [7] - 167:8, 176:22, 176:23, 177:12, 179:2, 187:15, 255:21

**rioter's** [1] - 164:1

**rioters** [27] - 90:21, 97:1, 98:4, 101:22, 102:21, 160:7, 160:10, 160:18, 160:20, 161:20, 161:21, 175:8, 176:15, 178:23, 180:16, 181:9,

181:16, 181:19, 182:7, 182:16, 182:25, 183:8, 188:9, 239:5, 239:9, 244:19, 255:3

**rise** [4] - 177:18, 187:3, 187:10, 231:15

**risk** [2] - 162:16, 173:19

**robbery** [1] - 153:23

**rode** [1] - 263:6

**role** [3] - 72:24, 89:6, 225:11

**romantic** [1] - 262:25

**room** [10] - 27:6, 30:2, 37:4, 37:18, 41:10, 42:20, 43:8, 45:9, 54:1, 252:21

**Room** [1] - 2:8

**Rosemond** [8] - 152:23, 153:14, 154:1, 154:15, 225:22, 225:23, 226:7

**Rotunda** [4] - 92:17, 92:24, 187:19, 195:16

**rounds** [1] - 167:14

**route** [2] - 41:4, 147:20

**row** [2] - 93:19, 93:22

**rows** [1] - 159:5

**Rudy** [3] - 51:9, 64:18, 171:3

**Rule** [4] - 16:15, 67:22, 68:1, 68:22

**RULE** [1] - 3:14

**rulings** [1] - 156:7

**rumors** [2] - 12:7, 12:9

**run** [5] - 90:20, 116:9, 185:1, 207:25, 219:5

**running** [1] - 92:17

**runs** [1] - 230:16

**rushing** [1] - 167:21

**Ryan** [5] - 3:7, 7:4, 24:9, 24:20, 121:24

**RYAN** [2] - 24:12, 24:20

## S

**safety** [5] - 97:11, 97:14, 97:16, 97:18, 98:6

**Saint** [1] - 1:18

**Salisbury** [2] - 24:24, 26:16

**sat** [1] - 129:10

**satisfied** [1] - 253:25

**saw** [22] - 19:19, 26:25, 36:4, 36:7, 42:11, 42:15, 47:16, 48:3, 49:4, 51:6, 61:23, 83:9, 88:3, 91:6, 120:7, 120:8, 120:11, 145:25, 159:23, 160:2, 214:7, 256:24

**scaled** [1] - 251:18

**scanning** [4] - 95:7, 98:5, 104:8, 104:9

**scene** [4] - 91:8, 92:9, 95:6, 167:6

**scheduled** [1] - 157:21

**school** [1] - 121:11

**Schwager's** [1] - 155:22

**science** [1] - 184:2

**scope** [2] - 122:15, 251:13

**screaming** [1] - 205:5

**screen** [7] - 28:22, 91:4, 110:11, 198:21, 267:23, 268:6, 268:9

**screened** [1] - 231:1

**screenshot** [1] - 6:16

**se** [2] - 142:10, 143:6

**seal** [1] - 148:10

**sealed** [1] - 148:16

**sealing** [1] - 147:2

**search** [7] - 14:3, 14:24, 20:16, 60:19, 60:23, 60:25, 261:18

**searching** [2] - 164:1, 197:19

**seat** [1] - 173:2

**seated** [2] - 150:18, 157:9

**seats** [1] - 111:14

**Second** [2] - 11:13, 157:23

**second** [14] - 40:1, 46:14, 93:19, 93:22, 155:20, 175:18, 175:22, 202:2, 208:11, 214:19, 224:7, 238:25, 239:7, 264:23

**seconds** [65] - 31:8, 31:9, 32:10, 34:11, 35:3, 35:18, 35:19, 39:9, 40:21, 40:22, 41:20, 41:21, 43:14, 43:15, 44:13, 44:14, 45:20, 45:21, 46:6, 46:7, 46:18, 46:19,

47:21, 47:25, 48:16,
48:17, 48:21, 48:22,
49:19, 50:3, 51:20,
51:21, 159:20, 161:4,
161:25, 169:16,
175:25, 201:21,
203:1, 203:13,
203:16, 203:20,
204:9, 204:25,
211:19, 211:24,
211:25, 239:8,
241:19, 241:22,
244:13, 245:8, 268:1,
268:11, 268:17,
268:22, 268:24, 269:2
 **Secret** [1] - 155:14
 **security** [2] - 90:16,
242:11
 **seditionists** [1] -
185:16
 **see** [68] - 15:16,
42:19, 42:24, 45:12,
66:4, 66:7, 76:19,
81:12, 88:4, 91:9,
91:10, 91:15, 95:10,
95:12, 98:5, 104:11,
105:18, 110:8, 110:9,
110:14, 114:23,
116:14, 116:16,
116:18, 118:1, 118:7,
126:3, 127:2, 127:10,
135:22, 147:17,
147:19, 159:21,
178:8, 179:18,
198:21, 198:23,
199:14, 201:19,
203:20, 209:6,
209:24, 210:10,
210:13, 211:24,
219:13, 219:20,
220:6, 220:8, 220:15,
222:10, 222:24,
240:4, 240:22, 244:7,
244:18, 245:2,
251:24, 260:4,
266:10, 267:14,
268:2, 268:4, 268:12,
268:13, 269:7, 270:5
 **SEEFRIED** [16] - 1:6,
1:6, 1:20, 2:2, 149:17,
149:19, 149:23,
149:25, 150:3, 150:5,
150:8, 150:10,
150:13, 150:16,
151:21, 151:24
 **Seefried** [399] - 3:21,
3:22, 4:5, 4:6, 4:14,
4:16, 4:18, 4:20, 5:24,
6:13, 6:15, 6:20, 6:21,
7:15, 8:4, 8:9, 8:20,

9:9, 9:14, 10:12,
10:18, 11:10, 11:15,
12:9, 12:12, 13:22,
14:4, 14:8, 16:8, 17:1,
18:8, 19:20, 20:1,
20:17, 20:18, 20:19,
22:10, 23:17, 23:19,
25:9, 25:22, 25:23,
26:22, 27:7, 27:13,
27:15, 27:16, 27:19,
27:20, 27:21, 27:25,
28:2, 28:9, 29:6,
29:18, 29:22, 29:25,
30:4, 30:10, 30:17,
30:18, 30:25, 32:5,
32:15, 34:7, 34:23,
35:12, 36:10, 36:20,
37:12, 37:17, 37:23,
38:9, 38:11, 38:20,
38:23, 39:2, 39:4,
39:13, 39:23, 40:5,
40:17, 41:8, 42:4,
42:24, 43:4, 43:5,
46:16, 47:13, 47:16,
48:2, 49:3, 49:7, 49:8,
49:10, 49:11, 49:15,
50:5, 51:16, 52:1,
52:10, 52:18, 53:1,
54:3, 54:11, 54:20,
54:25, 55:18, 57:3,
58:1, 60:3, 60:18,
61:8, 61:22, 62:10,
62:12, 62:18, 63:1,
64:17, 65:11, 65:12,
68:15, 69:17, 70:3,
70:5, 72:22, 73:4,
75:19, 80:10, 80:18,
80:22, 81:5, 81:24,
82:14, 83:3, 83:10,
84:16, 85:17, 85:18,
85:20, 85:22, 85:24,
86:12, 86:17, 86:19,
87:14, 87:15, 88:8,
88:20, 88:21, 105:16,
106:2, 106:9, 106:10,
108:5, 110:19, 112:6,
112:7, 112:13,
113:19, 116:4,
116:12, 116:22,
119:3, 119:13,
119:16, 119:19,
120:6, 124:5, 128:6,
144:2, 144:10,
145:18, 149:5,
149:10, 149:16,
149:18, 149:22,
149:24, 150:2, 150:4,
150:6, 150:14,
151:20, 151:22,
152:10, 155:7,
156:19, 156:20,

156:22, 157:5,
157:11, 157:14,
158:7, 159:9, 159:21,
159:23, 161:7,
161:15, 161:20,
161:21, 161:23,
162:1, 162:5, 162:20,
162:24, 163:5,
163:11, 163:12,
163:19, 163:21,
163:23, 164:15,
164:25, 165:7,
165:10, 165:19,
165:22, 166:4,
166:20, 167:11,
168:2, 168:8, 168:13,
168:14, 169:4,
170:19, 171:5,
174:24, 175:11,
175:20, 177:2, 177:9,
177:13, 179:3, 179:6,
181:17, 182:1, 182:4,
182:5, 182:8, 182:9,
182:13, 182:14,
182:23, 182:24,
184:5, 186:1, 186:9,
187:9, 187:10, 188:3,
188:18, 188:22,
189:24, 190:24,
190:25, 191:24,
192:3, 192:12, 194:2,
194:6, 194:23, 195:4,
195:22, 196:22,
197:20, 197:25,
198:12, 199:10,
201:2, 201:24,
202:20, 203:11,
204:7, 204:23, 205:3,
205:4, 205:10,
206:21, 206:24,
208:7, 208:16,
208:19, 208:24,
210:6, 210:11, 211:1,
212:2, 212:5, 212:8,
213:6, 216:5, 216:6,
216:14, 216:16,
217:14, 220:5,
220:24, 221:17,
222:3, 222:18,
226:16, 226:24,
227:2, 227:8, 235:17,
236:11, 237:18,
238:13, 238:14,
238:19, 238:21,
239:4, 239:15,
239:17, 239:22,
240:12, 240:17,
240:18, 243:3,
243:12, 244:5,
244:14, 244:19,
247:4, 247:5, 247:8,

247:9, 247:24,
247:25, 248:2, 248:6,
248:15, 248:22,
249:2, 250:3, 250:15,
250:16, 251:6,
252:12, 254:13,
254:14, 254:20,
254:21, 255:7, 255:8,
255:24, 256:12,
256:24, 257:2,
257:13, 257:19,
258:1, 259:9, 259:11,
260:1, 260:5, 260:19,
260:20, 261:15,
261:23, 262:8,
262:18, 263:1,
263:19, 264:10,
265:8, 265:12, 266:1,
266:5, 266:14,
266:19, 266:21,
268:22, 268:23
 **Seefried's** [24] - 7:8,
21:5, 31:13, 45:13,
46:25, 62:2, 77:9,
80:12, 122:15,
158:18, 164:7, 166:2,
180:5, 180:21, 191:1,
192:10, 206:16,
223:21, 239:13,
241:5, 241:12,
251:22, 261:12
 **Seefrieds** [9] - 7:4,
27:8, 107:11, 111:1,
116:5, 204:2, 214:7,
219:11, 237:9
 **Seefrieds'** [3] -
79:10, 147:20, 237:17
 **seeing** [18] - 14:2,
14:24, 91:16, 91:18,
91:23, 98:23, 98:25,
100:3, 100:17,
101:19, 130:18,
137:13, 160:14,
170:24, 171:5,
222:22, 238:18, 241:1
 **seek** [2] - 7:23,
249:23
 **seeking** [2] - 6:18,
59:5
 **seem** [3] - 102:7,
195:25, 217:6
 **seep** [1] - 200:14
 **seeped** [1] - 206:22
 **sees** [11] - 160:7,
160:8, 160:9, 165:18,
168:2, 239:17,
240:16, 243:3,
256:17, 256:25, 257:1
 **segment** [2] - 40:14,
161:5

 **segments** [53] - 8:6,
10:14, 14:19, 31:10,
32:11, 34:12, 35:4,
35:20, 36:15, 38:3,
39:10, 39:20, 40:23,
41:22, 43:16, 44:15,
44:23, 45:22, 46:8,
46:20, 47:22, 48:18,
48:23, 49:20, 49:25,
51:22, 52:15, 53:6,
53:10, 53:18, 53:21,
54:8, 54:16, 90:7,
91:12, 170:9, 176:2,
176:5, 200:21,
201:17, 202:23,
203:18, 203:24,
204:5, 205:15, 209:4,
210:8, 211:17, 240:9,
244:10, 244:16,
245:4, 245:9
 **segregate** [2] -
65:14, 66:14
 **Senate** [19] - 51:1,
70:7, 90:21, 90:23,
93:3, 155:25, 160:20,
161:10, 168:1,
170:25, 174:3,
174:11, 174:17,
181:14, 193:5,
193:14, 193:16,
221:1, 221:3
 **senator** [2] - 233:1,
233:3
 **senators** [9] - 97:21,
102:15, 157:7,
169:19, 170:15,
173:1, 189:6, 193:20,
254:25
 **send** [1] - 147:11
 **sense** [12] - 17:21,
150:20, 162:12,
162:15, 168:12,
197:15, 199:24,
226:5, 226:9, 234:19,
252:16, 268:19
 **sensitive** [1] - 148:9
 **sent** [2] - 6:16, 148:4
 **sentences** [1] -
170:20
 **sentiment** [1] - 33:25
 **separate** [6] - 65:20,
133:2, 177:23,
195:13, 246:16, 253:2
 **separated** [7] -
116:5, 134:12, 136:9,
144:14, 144:16,
216:4, 227:6
 **separately** [1] -
253:1
 **separation** [2] -

234:20, 262:2
**sequence** [3] -
239:12, 243:5, 243:11
**sergeant** [3] - 89:5,
89:10, 95:23
**Sergeant** [6] - 88:9,
88:10, 88:18, 96:19,
104:15, 260:12
**seriously** [1] -
155:12
**served** [1] - 249:11
**Service** [1] - 155:14
**service** [1] - 117:4
**session** [1] - 14:7
**set** [8] - 60:2, 132:7,
158:17, 164:24,
168:14, 187:18,
196:9, 196:11
**seven** [4] - 31:9,
35:18, 56:5, 121:1
**several** [17] - 41:17,
41:18, 57:14, 61:7,
73:2, 91:21, 93:2,
145:25, 146:11,
146:13, 157:2,
162:23, 167:14,
185:11, 215:6,
227:14, 232:12
**several-hour** [1] -
157:2
**shaking** [2] - 57:19,
59:20
**shaman** [4] - 82:11,
207:4, 207:6, 238:11
**shard** [2] - 176:8,
176:14
**share** [1] - 182:9
**shared** [2] - 229:19,
268:8
**shattering** [1] -
176:24
**Sheriff** [2] - 6:24,
26:20
**sheriff** [3] - 6:25, 7:2,
27:10
**Sheriff's** [3] - 6:23,
7:1, 26:14
**shield** [8] - 167:9,
168:6, 176:23,
177:13, 179:2, 179:4,
180:4, 203:21
**shields** [1] - 176:22
**shifted** [2] - 93:24
**ship** [1] - 236:14
**shirt** [3] - 199:11,
201:20, 248:7
**shit** [1] - 52:21
**shoot** [8] - 82:21,
83:4, 85:18, 86:4,
162:2, 162:9, 208:6,

240:11
**shop** [1] - 105:15
**shops** [1] - 132:7
**short** [1] - 204:15
**shorthand** [1] - 34:4
**shortly** [2] - 82:17,
243:5
**shot** [3] - 49:3,
114:18, 162:18
**shouted** [2] - 182:6,
195:2
**shouting** [3] -
189:10, 230:20,
255:13
**shoving** [2] - 135:1,
135:4
**show** [32] - 8:13,
8:17, 13:14, 25:12,
30:20, 37:23, 78:20,
83:6, 86:22, 90:4,
109:12, 109:18,
114:17, 117:24,
118:14, 153:9, 154:7,
154:8, 156:23, 162:5,
164:18, 187:4, 199:8,
208:13, 208:21,
208:25, 210:3,
221:16, 227:22,
229:24, 240:14,
265:20
**showed** [7] - 15:18,
38:11, 46:15, 46:16,
57:16, 62:10, 90:16
**showing** [7] - 38:9,
87:2, 110:3, 242:1,
254:7, 268:7, 268:8
**shown** [7] - 188:2,
238:23, 239:6,
241:23, 242:4,
243:23, 246:10
**shows** [18] - 128:4,
147:20, 163:5,
168:25, 169:1,
193:13, 203:13,
208:22, 219:23,
251:16, 252:9,
252:10, 252:11,
252:17, 257:6,
261:20, 263:23,
265:24
**shrinking** [1] -
217:15
**sic** [3] - 73:20,
142:10, 143:6
**sic]** [1] - 217:22
**sickle** [1] - 12:14
**side** [11] - 79:8,
79:11, 91:24, 100:1,
159:17, 159:24,
194:15, 220:9,

220:10, 220:14,
220:19
**sidetrack** [1] - 227:4
**Sidney** [2] - 51:9,
171:4
**sign** [6] - 30:7, 30:8,
141:15, 141:17,
151:25, 174:20
**signage** [2] - 130:18,
193:14
**signature** [2] -
151:20, 151:23
**signed** [2] - 29:6,
184:4
**significance** [4] -
11:17, 15:20, 157:18,
215:12
**significant** [9] - 20:1,
159:13, 167:10,
194:14, 198:11,
202:3, 216:8, 219:23,
222:16
**signifies** [1] - 158:3
**signs** [4] - 130:20,
159:3, 159:6, 165:18
**silly** [2] - 250:11,
265:23
**similar** [1] - 247:12
**similarly** [1] - 146:10
**simply** [5] - 173:6,
174:20, 211:3,
237:12, 238:1
**simultaneously** [1] -
242:13
**single** [3] - 130:15,
247:2, 256:19
**sit** [1] - 212:5
**sitting** [1] - 219:20
**situation** [13] -
129:2, 139:19, 140:1,
140:20, 140:24,
154:14, 174:14,
197:11, 207:10,
216:17, 221:18,
239:14, 249:13
**six** [4] - 31:8, 34:11,
223:2
**skin** [1] - 16:2
**slate** [2] - 157:8,
173:2
**slept** [1] - 125:14
**slide** [2] - 199:9,
202:12
**slightly** [3] - 21:17,
21:18, 53:17
**slippery** [1] - 194:22
**slope** [1] - 194:22
**slowly** [1] - 220:18
**small** [4] - 94:7,
227:11, 227:17,

228:19
**smaller** [2] - 217:15
**snippets** [1] - 239:24
**snow** [2] - 159:5,
159:10
**social** [16] - 8:19,
15:16, 20:17, 21:3,
114:7, 119:10, 120:7,
120:11, 124:21,
125:3, 135:18,
135:22, 137:13,
229:6, 229:7
**soft** [1] - 42:2
**sole** [3] - 207:11,
259:6, 260:5
**someone** [13] - 6:19,
23:3, 49:2, 128:18,
160:8, 167:8, 167:9,
168:18, 173:22,
177:10, 231:15,
251:10, 262:24
**sometime** [4] - 6:14,
20:23, 196:25, 214:24
**sometimes** [5] -
53:24, 101:12,
101:14, 129:1, 185:24
**somewhere** [2] -
208:10, 221:9
**son** [7] - 12:16, 18:1,
19:24, 106:7, 106:8,
160:9, 257:1
**son's** [1] - 159:13
**son-in-law** [1] - 18:1
**soon** [3] - 92:15,
167:10, 168:7
**sophisticated** [2] -
222:5, 258:23
**sophistication** [1] -
183:18
**sorry** [39] - 10:24,
28:22, 33:7, 36:6,
38:18, 40:1, 44:19,
48:20, 53:8, 56:1,
71:5, 76:5, 76:10,
80:10, 81:16, 86:4,
86:13, 106:6, 114:4,
138:14, 139:21,
143:22, 146:24,
151:3, 151:15, 152:2,
152:16, 154:21,
163:16, 220:5,
245:13, 246:17,
248:19, 249:5,
251:19, 257:11,
267:20, 268:5, 269:22
**sort** [30] - 6:16,
12:11, 20:17, 27:4,
85:8, 85:10, 91:15,
91:24, 112:2, 114:5,
158:21, 185:13,

190:14, 190:22,
193:4, 197:11,
198:18, 199:4,
199:14, 202:8,
202:14, 202:19,
204:16, 206:22,
216:16, 216:24,
219:9, 220:7, 221:17,
223:7
**sorts** [1] - 200:12
**sound** [1] - 210:20
**sounded** [1] - 225:6
**sounds** [5] - 74:23,
80:1, 107:21, 184:5,
193:4
**source** [1] - 207:11
**space** [3] - 94:7, 97:2
**speaker** [1] - 63:6
**speakers** [2] - 64:14,
112:22
**speaking** [6] - 22:4,
111:22, 113:1, 130:9,
212:18, 260:10
**speaks** [2] - 167:3,
231:18
**Special** [17] - 24:8,
24:21, 26:18, 26:19,
46:11, 51:25, 70:17,
160:3, 167:19,
169:11, 169:15,
169:22, 175:6, 208:2,
221:25, 222:2
**special** [5] - 26:18,
71:8, 71:9, 71:11,
222:6
**specific** [30] - 50:19,
59:14, 72:21, 74:20,
99:3, 103:15, 103:17,
103:19, 110:23,
118:4, 128:10, 187:4,
187:11, 190:11,
191:10, 192:18,
195:7, 195:20,
206:15, 231:16,
231:24, 232:4,
233:23, 234:23,
235:1, 235:19, 236:6,
248:9, 249:14, 249:15
**specifically** [30] -
21:22, 21:23, 25:3,
56:20, 60:9, 60:22,
63:7, 64:2, 79:16,
80:19, 80:22, 85:17,
107:9, 126:7, 129:5,
163:18, 171:24,
190:3, 192:23,
195:24, 200:11,
208:5, 210:18, 235:6,
237:18, 238:13,
238:19, 247:19,

252:12, 266:1
**specifics** [2] - 74:20, 129:25
**specified** [1] - 177:24
**specify** [1] - 85:20
**spectator** [2] - 224:19, 225:25
**speculating** [1] - 37:13
**speculation** [4] - 33:4, 234:25, 235:19, 236:14
**speech** [29] - 9:23, 63:24, 107:20, 107:24, 108:8, 108:14, 111:10, 111:12, 125:14, 125:24, 126:1, 126:3, 126:8, 127:2, 130:7, 157:10, 171:21, 172:24, 189:19, 189:23, 189:24, 191:2, 191:14, 192:5, 196:20, 215:19, 217:5, 217:10, 261:3
**speeches** [4] - 63:19, 112:12, 215:20, 215:22
**speed** [1] - 167:5
**spell** [3] - 24:19, 89:1, 105:9
**spelled** [2] - 89:4, 147:23
**spelling** [2] - 70:24, 88:24
**spend** [2] - 41:8, 107:3
**spent** [3] - 54:3, 101:9, 161:11
**spider** [2] - 176:24, 177:13
**spider-webbed** [1] - 177:13
**spirit** [1] - 196:3
**split** [1] - 152:4
**spoken** [2] - 212:16, 212:24
**spot** [2] - 178:25, 207:19
**spray** [1] - 168:1
**spread** [1] - 222:25
**squads** [1] - 230:23
**staff** [2] - 93:4, 173:17
**staffs** [1] - 97:25
**stage** [3] - 158:17, 159:18, 159:24
**staircase** [7] - 161:10, 161:13,

181:15, 182:15, 182:24, 182:25, 241:15
**stairs** [13] - 159:17, 159:24, 160:14, 160:17, 174:2, 180:19, 180:20, 199:10, 201:6, 201:25, 202:14, 204:16, 242:7
**stairwell** [1] - 255:19
**stamped** [3] - 209:15, 209:19, 268:13
**stand** [6] - 8:12, 8:16, 86:8, 91:21, 253:19, 264:25
**standard** [1] - 69:4
**standards** [1] - 140:18
**standing** [15] - 12:3, 88:12, 91:16, 91:24, 118:6, 137:6, 159:9, 160:4, 173:6, 182:1, 221:6, 221:10, 255:6, 255:16, 258:7
**stands** [2] - 256:16, 256:25
**stare** [1] - 230:15
**start** [13] - 54:23, 70:17, 70:23, 93:4, 120:5, 156:22, 175:25, 198:4, 203:5, 217:5, 227:3, 238:3, 241:3
**started** [16] - 11:3, 15:16, 57:25, 58:17, 121:5, 130:10, 134:2, 154:25, 197:1, 201:1, 202:16, 219:24, 221:17, 238:11, 249:7
**starting** [6] - 4:8, 4:22, 46:18, 203:16, 229:4, 240:7
**starts** [3] - 7:15, 10:13, 169:14
**State** [1] - 157:16
**state** [7] - 24:19, 68:6, 89:1, 105:9, 166:17, 212:23, 237:5
**statement** [56] - 9:9, 11:24, 14:18, 16:8, 17:5, 17:12, 46:12, 77:7, 77:10, 82:9, 83:9, 83:14, 85:18, 147:3, 148:3, 148:8, 148:25, 187:7, 189:5, 189:12, 189:15, 190:2, 192:10, 195:3, 197:24, 207:5, 207:6,

208:6, 208:8, 208:19, 210:15, 221:22, 222:9, 223:15, 228:1, 228:2, 239:20, 241:5, 241:6, 241:12, 241:25, 243:14, 246:3, 246:6, 246:23, 247:1, 247:16, 247:19, 250:25, 259:1, 259:5, 259:8, 262:5, 262:8, 266:3
**statements** [51] - 8:23, 17:9, 17:23, 21:25, 33:21, 33:24, 33:25, 34:1, 65:11, 65:14, 66:14, 66:18, 69:25, 70:4, 70:8, 70:11, 77:12, 80:11, 81:4, 81:8, 84:10, 85:16, 99:3, 102:12, 102:14, 102:17, 156:16, 156:21, 171:22, 181:7, 181:9, 184:1, 198:10, 200:12, 207:24, 217:24, 239:21, 244:1, 244:4, 247:7, 247:8, 247:24, 248:13, 248:15, 248:20, 249:1, 258:3, 265:9, 266:18, 266:22
**states** [9] - 34:2, 50:25, 51:12, 240:24, 254:5, 256:14, 258:11, 260:14, 260:20
**STATES** [5] - 1:1, 1:3, 1:11, 1:14, 1:17
**States** [12] - 2:6, 4:5, 4:11, 72:22, 88:20, 89:7, 89:10, 162:23, 163:14, 169:3, 238:16, 271:13
**stating** [3] - 72:17, 159:3, 253:3
**station** [1] - 30:1
**stationed** [1] - 159:23
**statue** [1] - 195:16
**statute** [1] - 179:23
**statutory** [1] - 155:24
**stay** [3] - 92:20, 183:4, 255:12
**stayed** [6] - 33:17, 92:22, 111:20, 111:21, 164:22, 221:3
**steady** [2] - 117:3, 134:14
**steal** [7] - 14:7, 14:13, 14:15, 15:2,

70:2, 119:4, 218:12
**Steal** [21] - 19:4, 32:18, 32:21, 33:10, 34:5, 35:9, 35:10, 35:15, 63:2, 70:9, 157:24, 164:21, 165:2, 165:12, 166:5, 181:13, 218:5, 250:8, 251:9, 262:11, 263:11
**stealing** [1] - 195:24
**stenographic** [1] - 271:5
**step** [8] - 23:25, 33:7, 65:2, 87:19, 88:5, 104:16, 146:16, 264:16
**Stephanie** [15] - 109:10, 110:19, 116:9, 117:4, 126:20, 134:13, 135:6, 135:7, 136:14, 137:7, 145:6, 145:14, 216:16, 217:3, 217:14
**Stephanie's** [2] - 108:3, 109:9
**stepped** [2] - 46:14, 138:25
**stepping** [1] - 42:23
**steps** [2] - 160:4, 264:19
**stick** [6] - 214:14, 239:18, 248:2, 248:21, 261:23
**sticking** [1] - 176:14
**sticks** [1] - 241:18
**still** [31] - 5:6, 17:3, 58:18, 93:5, 96:15, 109:19, 110:3, 114:18, 133:14, 138:10, 139:17, 139:23, 140:1, 140:6, 140:18, 148:10, 177:4, 177:13, 178:7, 178:17, 178:18, 180:2, 193:7, 195:7, 195:19, 197:14, 211:24, 244:19, 263:13, 263:20, 264:17
**stipulated** [3] - 67:13, 109:20, 156:3
**stipulation** [2] - 189:19
**stolen** [12] - 129:19, 129:24, 130:2, 158:6, 158:21, 164:11, 165:5, 171:13, 172:20, 173:7, 196:14, 251:11
**stone** [1] - 159:17

**stood** [2] - 253:19, 255:14
**stop** [40] - 19:3, 29:21, 33:2, 40:25, 41:24, 47:24, 59:5, 63:8, 63:14, 64:3, 64:4, 64:8, 82:22, 83:4, 112:14, 115:15, 120:16, 158:5, 172:2, 172:10, 175:15, 176:7, 185:20, 187:5, 191:11, 191:21, 215:2, 215:7, 220:13, 229:6, 230:8, 235:5, 235:7, 239:21, 244:12, 244:21, 256:9, 263:25, 265:15, 266:25
**Stop** [21] - 19:4, 32:18, 32:21, 33:10, 34:4, 35:9, 35:10, 35:15, 63:2, 70:9, 157:24, 164:20, 165:1, 165:12, 166:5, 181:13, 218:4, 250:7, 251:9, 262:11, 263:11
**stopped** [5] - 119:20, 175:13, 196:4, 255:23, 256:7
**stopping** [14] - 59:10, 70:1, 119:4, 166:6, 181:4, 185:20, 211:25, 236:7, 240:8, 255:17, 265:1, 265:21
**stops** [1] - 261:17
**storage** [2] - 117:22, 118:1
**storage-type** [1] - 117:22
**stories** [1] - 222:6
**storming** [6] - 145:3, 145:7, 145:10, 145:14, 216:17, 218:5
**storming-the-Capitol** [1] - 216:17
**stranger** [1] - 12:19
**stream** [1] - 220:19
**Street** [2] - 1:15, 2:3
**stressful** [1] - 206:9
**strike** [4] - 57:23, 100:19, 101:21, 235:24
**strong** [2] - 179:7, 188:7
**stuff** [11] - 132:8, 136:20, 137:3, 137:5, 137:6, 144:6, 196:10, 212:4, 212:9, 232:21, 265:4
**stuff's** [1] - 169:23

**subject** [2] - 52:7, 57:17

**subjects** [4] - 25:6, 25:13, 30:11, 58:6

**submission** [1] - 68:21

**submit** [3] - 166:11, 166:25, 207:21

**submits** [1] - 65:19

**submitted** [1] - 68:19

**subpoena** [3] - 62:1, 62:4, 218:23

**subsequent** [2] - 8:24, 45:8

**subsequently** [1] - 60:18

**substance** [3] - 30:9, 95:24, 215:22

**subtitles** [1] - 205:13

**success** [1] - 184:22

**sudden** [1] - 239:2

**sufficient** [15] - 68:8, 69:6, 153:20, 154:13, 224:16, 224:24, 245:18, 252:17, 253:6, 253:17, 253:25, 254:9, 259:3, 264:12, 265:19

**suggest** [15] - 60:14, 169:13, 191:22, 195:6, 201:12, 201:14, 205:1, 206:19, 216:22, 222:3, 229:12, 230:7, 233:25, 234:15, 236:9

**suggested** [6] - 20:6, 165:22, 166:3, 166:15, 184:6, 229:10

**suggesting** [4] - 191:13, 216:24, 244:2, 259:14

**suggests** [3] - 227:19, 235:1, 241:20

**Suite** [3] - 1:15, 1:22, 2:3

**suits** [1] - 51:14

**summarizing** [2] - 15:14, 72:17

**summary** [2] - 17:23, 72:18

**Sunday** [1] - 85:14

**Superior** [1] - 247:17

**supervises** [1] - 230:23

**supervisor** [5] - 7:3, 25:20, 26:18, 43:4, 46:15

**Supervisory** [1] - 26:18

**support** [9] - 8:13,

8:17, 13:18, 35:9, 70:9, 221:24, 229:13, 229:25, 232:13

**supporters** [2] - 63:13, 237:13

**supporting** [2] - 68:20, 197:10

**supportive** [2] - 13:5, 237:11

**supports** [2] - 68:16, 254:4

**supposed** [8] - 108:16, 129:9, 147:13, 162:12, 164:8, 170:14, 209:14, 249:11

**Supreme** [1] - 158:9

**surmounts** [1] - 159:1

**surprise** [3] - 15:20, 119:13, 198:9

**surprised** [3] - 7:22, 15:13, 15:14

**surprising** [1] - 202:15

**surround** [1] - 262:10

**surrounding** [3] - 135:5, 155:15, 156:15

**suspect** [1] - 55:23

**suspected** [2] - 26:8, 40:9

**sustain** [1] - 68:25

**sustained** [3] - 10:9, 18:5, 64:11

**sustaining** [1] - 33:15

**swayed** [1] - 236:12

**swings** [1] - 168:5

**switched** [1] - 5:13

**switching** [1] - 215:11

**SWORN** [5] - 5:19, 24:12, 70:18, 88:15, 105:2

**symbol** [2] - 15:24, 17:16

**sync** [1] - 242:11

**system** [3] - 50:19, 50:24, 56:7

**systems** [3] - 34:3, 50:18, 50:22

---

**T**

**talks** [6] - 192:18, 196:7, 231:5, 260:7, 261:16

**tallied** [1] - 253:9

**tampered** [1] - 50:25

**tan** [10] - 91:24, 92:3, 93:9, 95:3, 100:15, 101:18, 103:3, 103:4, 103:15, 104:5

**tape** [1] - 59:25

**targeted** [3] - 59:16, 59:18, 233:15

**task** [1] - 210:22

**tattoo** [1] - 12:11

**taught** [1] - 56:21

**team** [4] - 40:2, 74:12, 74:13, 81:8

**teargas** [2] - 54:23, 137:6

**tease** [1] - 258:4

**technical** [1] - 204:4

**telephonic** [1] - 75:12

**television** [1] - 128:4

**ten** [4] - 71:16, 72:1, 161:4, 245:8

**tenders** [2] - 78:2, 81:15

**term** [2] - 36:23, 86:1

**terms** [29] - 54:19, 56:22, 108:10, 111:2, 119:21, 142:21, 185:13, 189:25, 193:3, 197:25, 199:24, 201:23, 205:9, 207:23, 207:24, 209:21, 213:11, 214:18, 216:12, 219:1, 219:6, 219:10, 220:23, 223:12, 226:25, 229:24, 233:9, 249:25

**testified** [20] - 6:5, 23:5, 35:12, 39:4, 82:20, 82:24, 84:14, 85:13, 86:7, 159:6, 161:14, 161:15, 163:10, 163:21, 169:2, 169:3, 181:25, 229:15, 249:9

**testifies** [1] - 234:18

**testify** [9] - 149:15, 149:21, 150:7, 150:11, 150:15, 151:19, 181:8, 246:16

**testifying** [1] - 96:4

**testimony** [37] - 17:7, 28:6, 49:14, 67:12, 80:14, 86:7, 95:24, 124:16, 127:18, 133:14, 138:19, 146:17, 155:18, 155:19, 155:22, 157:1, 181:6,

198:8, 198:18, 202:7, 202:15, 204:13, 212:3, 212:7, 212:11, 212:20, 213:10, 216:11, 235:21, 237:8, 237:23, 245:19, 259:16, 262:22, 263:17, 263:20

**that's..** [1] - 86:2

**THE** [311] - 1:1, 1:10, 1:14, 1:20, 1:21, 2:2, 2:2, 3:4, 3:8, 4:1, 4:4, 4:12, 4:15, 4:19, 5:2, 5:3, 5:5, 5:7, 5:8, 5:12, 5:16, 7:17, 7:20, 7:23, 8:1, 10:9, 10:22, 10:24, 10:25, 11:2, 11:4, 13:7, 13:8, 16:11, 16:14, 17:8, 18:5, 19:10, 20:11, 23:25, 24:4, 24:5, 24:7, 24:13, 24:14, 28:13, 28:15, 28:17, 28:23, 29:13, 33:6, 33:7, 33:9, 33:10, 33:11, 33:12, 33:13, 33:14, 33:15, 37:15, 40:1, 44:25, 49:22, 50:2, 55:8, 61:16, 63:16, 64:11, 64:23, 65:1, 65:5, 65:13, 66:3, 66:17, 67:1, 67:4, 67:6, 67:8, 67:15, 67:17, 67:20, 67:24, 68:4, 68:22, 70:19, 70:20, 76:5, 76:7, 76:14, 76:15, 76:17, 76:19, 76:24, 76:25, 77:23, 78:18, 81:18, 81:19, 81:20, 84:21, 84:24, 85:20, 87:7, 87:19, 87:21, 87:23, 88:7, 88:10, 88:11, 88:12, 88:14, 88:23, 95:21, 96:1, 96:2, 96:7, 96:10, 96:12, 96:14, 96:16, 103:11, 104:2, 104:15, 104:18, 104:20, 104:25, 105:1, 105:3, 105:4, 105:24, 109:15, 109:24, 110:15, 115:1, 115:3, 117:17, 119:24, 122:7, 122:10, 122:14, 123:22, 140:9, 141:1, 141:4, 143:10, 145:21, 146:16, 146:18, 146:20,

147:3, 147:5, 147:13, 147:15, 148:2, 148:12, 148:17, 148:19, 148:24, 149:4, 149:7, 149:12, 149:18, 149:20, 149:24, 150:1, 150:4, 150:6, 150:9, 150:11, 150:14, 150:17, 150:23, 151:1, 151:4, 151:6, 151:11, 151:14, 151:18, 151:22, 151:25, 152:6, 152:16, 152:25, 153:3, 153:8, 153:21, 154:6, 154:19, 154:23, 158:13, 163:16, 163:18, 165:21, 166:19, 170:3, 170:7, 170:11, 171:16, 172:4, 173:10, 174:6, 175:23, 176:4, 176:7, 176:12, 176:17, 177:6, 177:15, 177:18, 177:25, 178:4, 178:11, 178:20, 179:7, 179:20, 180:7, 180:11, 183:17, 184:5, 184:24, 185:5, 185:7, 188:7, 188:14, 189:4, 189:18, 189:22, 191:12, 193:8, 195:23, 196:5, 198:22, 198:24, 200:18, 201:3, 201:8, 201:16, 202:5, 202:13, 203:3, 203:5, 203:14, 204:1, 205:22, 205:24, 207:25, 209:1, 209:10, 210:3, 210:5, 211:4, 211:8, 211:10, 211:16, 211:19, 212:11, 213:12, 213:21, 216:23, 218:7, 218:13, 219:18, 220:15, 220:17, 222:1, 224:4, 226:14, 226:18, 227:22, 228:10, 229:2, 232:20, 233:6, 236:19, 236:24, 237:2, 240:1, 241:13, 241:17, 242:5, 242:10, 242:20, 243:21, 244:22, 245:1, 245:6, 245:15, 245:22, 246:21, 247:11, 248:17,

248:19, 248:25, 249:5, 257:11, 257:15, 259:14, 267:1, 267:3, 267:9, 267:25, 268:4, 268:7, 268:24, 269:3, 269:12, 269:17, 269:23, 270:1, 270:3, 270:5

**theft** [1] - 164:10
**theirselves** [1] - 126:18
**themselves** [1] - 7:5, 183:5, 184:21, 195:16, 228:7
**then-President** [3] - 13:18, 33:22, 157:3
**theories** [1] - 51:17
**theory** [13] - 190:22, 193:5, 208:9, 212:14, 213:2, 214:22, 215:11, 217:4, 224:3, 224:12, 225:21, 226:7, 228:11
**thereafter** [1] - 243:5
**therefore** [1] - 243:17
**Thereupon** [5] - 4:25, 24:10, 96:8, 104:23, 151:12
**they've** [4] - 159:13, 162:25, 163:1, 215:15
**thief** [1] - 197:19
**thieves** [21] - 13:24, 14:10, 14:23, 18:13, 22:7, 163:22, 164:4, 195:2, 195:6, 195:18, 195:24, 197:16, 198:2, 207:2, 250:22, 251:1, 253:3, 261:16, 262:1, 262:4, 262:6
**thinking** [7] - 122:10, 156:13, 192:13, 196:10, 196:16, 214:8, 223:11
**thinks** [6] - 168:2, 168:18, 171:13, 173:14, 259:11, 260:17
**third** [3] - 93:3, 156:1, 186:19
**thirteen** [1] - 254:20
**thoughts** [3] - 129:17, 212:12, 228:5
**thousand** [1] - 230:15
**thousand-yard** [1] - 230:15
**thousands** [1] - 243:20

**threat** [4] - 49:8, 49:10, 168:18, 183:11
**threaten** [1] - 162:18
**threatened** [4] - 85:24, 86:1, 139:16, 139:22
**threatening** [2] - 85:18, 95:13
**threatens** [1] - 239:19
**three** [9] - 85:7, 85:8, 127:19, 177:15, 180:8, 199:9, 227:22, 230:11, 230:23
**three-hour** [1] - 127:19
**throughout** [5] - 61:7, 95:17, 104:8, 104:9, 147:20
**throw** [1] - 171:9
**thwart** [1] - 262:14
**tie** [1] - 238:19
**tied** [2] - 232:23, 232:25
**ties** [1] - 258:16
**time-stamped** [3] - 209:15, 209:19, 268:13
**timed** [1] - 243:11
**timeframe** [1] - 129:15
**timeline** [2] - 219:10, 220:4
**timestamp** [2] - 53:9, 269:1
**timestamping** [1] - 209:8
**timestamps** [5] - 201:23, 209:12, 209:18, 209:23, 268:19
**timing** [9] - 188:7, 189:12, 199:7, 199:13, 237:25, 243:6, 243:15, 265:14, 267:5
**tinker** [1] - 152:22
**tissue** [2] - 143:23, 143:25
**Title** [1] - 153:14
**today** [8] - 27:18, 28:6, 104:17, 105:18, 124:25, 205:17, 257:4, 265:22
**together** [19] - 21:24, 108:19, 120:25, 121:3, 122:1, 122:22, 128:13, 177:19, 178:10, 179:22, 205:13, 212:22,

212:23, 214:2, 223:7, 223:15, 257:8, 263:7
**tomorrow** [2] - 269:18, 270:5
**took** [9] - 22:8, 113:16, 118:23, 130:22, 130:24, 167:14, 185:18, 229:13, 264:16
**top** [5] - 118:6, 159:9, 159:24, 209:12, 212:2
**topic** [2] - 41:15, 43:21
**topics** [2] - 50:6, 52:6
**total** [3] - 41:8, 193:13, 228:20
**totally** [2] - 42:5, 42:8
**touch** [2] - 47:1, 110:11
**touches** [2] - 261:11, 261:12
**tour** [1] - 157:22
**towards** [16] - 9:14, 36:5, 36:7, 86:17, 90:19, 157:11, 190:9, 199:20, 208:24, 209:24, 217:11, 220:11, 220:20, 263:18, 264:5, 266:12
**track** [2] - 90:15, 92:8
**trade** [1] - 266:13
**training** [1] - 30:10
**trampled** [1] - 134:15
**transaction** [1] - 154:17
**TRANSCRIPT** [1] - 1:10
**transcript** [4] - 63:23, 141:3, 271:5, 271:6
**transition** [1] - 185:21
**traumatic** [2] - 199:1, 246:4
**travel** [2] - 22:22, 182:22
**traveled** [6] - 31:5, 31:25, 34:23, 35:14, 164:19, 164:25
**traveling** [1] - 135:21
**trespassers** [1] - 185:18
**TREVOR** [1] - 1:10
**trial** [17] - 4:21, 65:17, 65:18, 65:22, 66:2, 73:17, 75:22,

75:25, 79:15, 149:15, 152:20, 155:23, 162:14, 190:16, 206:14, 249:2
**TRIAL** [1] - 1:10
**tried** [7] - 58:11, 116:9, 118:20, 130:23, 134:14, 158:14, 215:16
**trier** [1] - 69:6
**tries** [1] - 168:1
**trip** [8] - 107:23, 108:4, 125:8, 125:21, 125:25, 157:2, 229:18
**trolley** [1] - 220:13
**trouble** [2] - 175:13, 226:5
**Troy** [2] - 79:3, 79:4
**truck** [4] - 130:11, 133:7, 216:1
**trucks** [5] - 112:25, 113:10, 113:15, 113:24, 114:10
**true** [10] - 22:11, 120:10, 122:11, 146:3, 158:13, 158:16, 205:21, 223:16, 271:4, 271:5
**truly** [2] - 246:25
**Trump** [66] - 9:15, 9:18, 10:4, 11:7, 11:9, 13:5, 13:18, 15:10, 32:6, 32:16, 32:17, 33:22, 36:10, 61:23, 63:7, 63:12, 64:2, 100:2, 111:21, 113:1, 125:14, 125:23, 126:1, 126:3, 126:8, 127:2, 127:12, 127:24, 128:24, 129:2, 129:4, 130:5, 130:6, 130:7, 130:13, 130:15, 130:19, 131:7, 131:21, 131:25, 132:2, 132:5, 132:13, 134:6, 157:6, 157:20, 171:9, 171:21, 172:3, 172:24, 186:22, 188:16, 189:20, 190:13, 190:17, 196:13, 196:19, 197:10, 210:1, 214:24, 217:5, 221:24, 229:13, 232:14, 237:12, 254:23
**Trump's** [10] - 9:23, 63:23, 107:20, 107:24, 108:8,

108:14, 157:3, 157:10, 181:3, 190:24
**Trump-Biden** [1] - 129:2
**try** [13] - 30:18, 30:19, 110:8, 116:10, 117:6, 154:19, 165:12, 168:5, 191:21, 219:16, 232:8, 236:22, 236:25
**trying** [24] - 57:14, 100:9, 100:23, 102:2, 111:6, 116:9, 117:3, 120:16, 131:1, 136:19, 136:24, 175:14, 177:10, 190:23, 194:8, 202:14, 208:14, 210:20, 213:1, 222:25, 223:8, 228:5, 258:1, 258:4
**Tubbs** [3] - 6:14, 6:15, 6:22
**turn** [4] - 6:8, 7:5, 164:15, 223:4
**turned** [3] - 6:5, 18:19, 60:21
**turning** [2] - 223:10, 268:2
**turns** [1] - 211:19
**TV** [1] - 215:9
**two** [62] - 25:13, 38:24, 39:2, 58:17, 66:23, 71:24, 72:3, 75:15, 76:6, 85:7, 85:8, 94:15, 101:17, 103:2, 108:23, 116:5, 121:3, 124:9, 127:1, 127:8, 127:20, 127:21, 129:13, 131:23, 134:12, 135:11, 137:6, 139:6, 144:10, 145:19, 160:8, 167:9, 176:9, 176:19, 176:23, 176:25, 177:11, 178:17, 178:18, 178:20, 179:2, 179:4, 180:3, 180:4, 185:23, 191:18, 191:23, 197:14, 202:2, 212:24, 227:14, 228:12, 232:6, 235:13, 239:7, 242:9, 252:1, 253:5, 254:18, 256:17, 261:21
**two-by-four** [12] - 160:8, 167:9, 176:9, 176:19, 176:23, 176:25, 177:11,

178:17, 178:18, 179:2, 180:4, 227:14
**two-hour** [4] - 127:21, 129:13, 232:6, 235:13
**tying** [1] - 21:21
**type** [11] - 11:14, 12:6, 60:7, 60:10, 117:22, 123:2, 123:6, 128:4, 234:21, 257:22, 258:8
**types** [1] - 70:11
**typically** [2] - 13:4, 212:19

## U

**U.S** [12] - 13:14, 72:10, 73:14, 74:25, 75:13, 78:9, 79:2, 79:18, 87:12, 109:1, 109:3
**ultimately** [2] - 22:21, 75:7
**unauthorizedly** [1] - 173:22
**unbiased** [3] - 212:7, 212:13, 223:18
**unclear** [1] - 175:10
**uncomfortable** [1] - 190:15
**unconditional** [1] - 149:14
**uncover** [1] - 8:15
**uncovered** [1] - 11:23
**under** [12] - 5:6, 16:15, 29:19, 29:22, 65:12, 66:3, 66:5, 67:22, 68:10, 68:22, 96:15, 225:1
**undermine** [1] - 247:14
**undermined** [1] - 7:7
**understandable** [1] - 207:8
**understood** [9] - 13:18, 30:4, 30:21, 154:10, 163:12, 177:25, 197:10, 202:7, 242:5
**unfair** [2] - 190:25, 215:2
**unimpeached** [2] - 212:7, 223:19
**unique** [2] - 187:22, 238:8
**unit** [1] - 89:16
**United** [11] - 4:5,

4:10, 72:22, 88:20, 89:7, 89:10, 162:23, 163:14, 169:2, 238:16, 271:13
**united** [1] - 2:6
**UNITED** [5] - 1:1, 1:3, 1:11, 1:14, 1:17
**unless** [6] - 147:24, 184:25, 215:4, 221:23, 223:25, 226:6
**unlike** [2] - 200:7, 217:18
**unsealed** [1] - 148:18
**unusual** [1] - 179:22
**up** [117] - 8:5, 13:14, 19:25, 25:12, 28:20, 36:18, 36:22, 38:5, 40:3, 41:3, 41:4, 45:25, 46:17, 47:17, 51:17, 53:16, 59:4, 59:7, 60:2, 72:16, 80:4, 80:23, 84:4, 91:22, 92:11, 93:21, 96:10, 98:18, 99:21, 100:9, 107:11, 108:4, 109:6, 109:7, 110:8, 110:11, 112:7, 112:19, 112:22, 113:20, 114:9, 114:12, 115:12, 115:14, 115:19, 116:2, 116:8, 116:11, 117:7, 117:10, 117:13, 117:21, 120:7, 120:11, 120:14, 121:16, 125:14, 132:8, 134:2, 136:15, 143:16, 144:1, 146:13, 158:7, 160:19, 161:3, 161:20, 163:3, 165:18, 165:19, 167:15, 167:23, 168:16, 168:25, 169:7, 169:9, 170:3, 170:5, 171:3, 174:2, 174:3, 184:16, 196:9, 196:11, 203:6, 205:8, 208:17, 212:17, 215:11, 216:7, 216:8, 218:6, 221:9, 221:10, 222:6, 222:21, 227:13, 231:9, 231:19, 232:19, 236:5, 240:5, 240:18, 243:5, 243:11, 244:8, 245:7, 246:20, 247:17, 255:19, 264:4, 264:23,

267:17, 268:1, 268:5, 268:18
**upset** [13] - 141:22, 142:4, 143:5, 163:24, 164:7, 164:10, 164:11, 165:6, 166:9, 172:20, 231:9
**upstairs** [1] - 93:3
**use-of-force** [1] - 13:13
**utilizing** [1] - 242:2

## V

**vaccine** [1] - 103:6, 171:11
**vague** [1] - 213:13
**validity** [1] - 33:22
**vandalism** [2] - 9:4, 9:10
**vandalize** [1] - 187:15
**various** [2] - 98:2, 257:17
**vehicle** [2] - 133:10, 133:12
**vehicles** [1] - 261:5
**venting** [1] - 14:5
**venture** [1] - 224:18
**verbal** [2] - 57:18, 59:19
**verbatim** [1] - 50:9
**verdict** [1] - 269:19
**versions** [1] - 209:15
**versus** [4] - 4:5, 66:6, 72:22, 88:20
**vest** [8] - 91:24, 92:3, 93:9, 95:3, 100:16, 103:3, 103:15, 218:6
**Vice** [1] - 181:10
**vice** [1] - 256:6
**vicinity** [1] - 70:1
**victim** [4] - 147:3, 148:3, 148:25, 222:19
**video** [72] - 28:3, 30:1, 38:8, 46:11, 46:12, 46:23, 68:16, 69:13, 109:20, 115:5, 140:12, 140:15, 147:8, 148:5, 159:19, 161:19, 167:2, 167:3, 168:23, 174:6, 175:21, 177:5, 181:21, 199:8, 200:17, 201:11, 201:14, 201:15, 201:24, 202:16, 202:18, 202:22, 203:7, 203:8, 203:10,

203:17, 205:12, 208:20, 210:18, 210:20, 227:11, 227:13, 239:5, 239:12, 241:3, 242:6, 242:8, 242:9, 242:10, 242:11, 244:7, 244:12, 244:25, 245:2, 245:19, 246:10, 246:13, 255:5, 256:16, 260:4, 267:18, 267:23, 268:2, 268:12, 268:14, 268:16, 268:17, 268:18, 268:21
**video-recorded** [2] - 28:3, 30:1
**videocamera** [2] - 110:3, 210:23
**videos** [15] - 109:21, 124:21, 156:4, 200:8, 200:10, 202:15, 206:20, 220:7, 238:23, 241:20, 242:9, 245:23, 251:24, 267:10, 269:7
**view** [9] - 17:15, 175:20, 181:23, 181:24, 182:3, 182:4, 239:9, 240:25, 246:13
**viewed** [3] - 69:5, 69:9, 165:13
**viewing** [1] - 69:17
**views** [2] - 228:16, 258:8
**violating** [1] - 197:20
**violation** [1] - 227:7
**violations** [2] - 25:3, 71:10
**violence** [9] - 9:4, 9:10, 69:20, 177:20, 177:22, 178:3, 178:7, 179:22, 183:11
**violent** [3] - 25:4, 93:12, 95:13
**violently** [1] - 163:9
**Virginia** [1] - 11:13
**Virginia's** [1] - 5:12
**virtual** [1] - 215:5
**vis-à-vis** [1] - 93:17
**vividly** [1] - 265:24
**voice** [3] - 172:9, 174:21, 192:20
**voluntarily** [3] - 18:19, 150:7, 150:15
**voluntary** [2] - 56:25, 60:25
**vote** [45] - 8:21, 9:1, 19:4, 19:5, 59:6, 63:9,

63:14, 64:4, 64:5, 64:9, 70:2, 81:25, 84:17, 87:16, 114:1, 114:5, 115:15, 119:5, 119:20, 120:17, 128:23, 152:13, 155:5, 157:20, 169:21, 170:17, 171:25, 185:21, 187:14, 188:24, 191:24, 195:14, 196:23, 197:12, 215:3, 217:25, 225:20, 229:6, 229:8, 230:2, 235:5, 235:9, 236:8, 250:24, 265:6
**votes** [29] - 59:11, 108:10, 108:17, 108:25, 155:21, 161:16, 171:1, 171:7, 181:11, 182:2, 183:23, 186:10, 186:16, 189:7, 191:16, 191:19, 205:6, 215:5, 217:9, 230:9, 231:25, 233:24, 234:9, 253:9, 253:10, 255:7, 255:15, 257:22, 264:3
**voting** [11] - 34:3, 50:18, 50:19, 50:22, 50:24, 128:22, 169:12, 169:15, 171:6, 171:8, 173:15, 187:5, 191:11, 191:21, 251:11, 258:17
**vs** [1] - 1:5

## W

**wait** [4] - 113:17, 141:1, 165:8, 220:15
**waive** [1] - 56:24
**waiver** [2] - 56:19, 56:22
**waiving** [1] - 151:18
**walk** [9] - 43:19, 113:9, 133:7, 135:1, 137:9, 157:6, 157:11, 194:8, 254:17
**walked** [8] - 114:13, 114:14, 114:19, 117:8, 134:24, 185:18, 208:17, 208:24
**walking** [15] - 36:7, 113:7, 115:19, 116:2, 117:5, 117:9, 130:10, 134:2, 134:4, 163:2,

210:12, 212:3, 220:19, 222:24, 225:8
**walks** [2] - 211:11, 220:11
**wall** [10] - 138:24, 159:11, 159:17, 159:22, 160:13, 165:18, 167:16, 168:16, 251:18, 251:19
**walls** [2] - 139:1, 162:17
**wander** [2] - 160:24, 173:25
**wants** [12] - 147:6, 169:18, 170:13, 195:15, 198:6, 211:15, 213:9, 221:23, 224:1, 226:13, 250:23, 259:11
**war** [2] - 208:13, 210:15
**warning** [1] - 154:12
**warrant** [1] - 198:18
**Washington** [31] - 1:6, 1:23, 2:8, 20:2, 20:3, 20:7, 25:21, 31:5, 31:19, 32:6, 32:19, 34:24, 34:25, 107:11, 107:15, 107:25, 108:6, 108:15, 111:2, 134:9, 144:18, 144:21, 145:3, 157:1, 157:15, 188:17, 188:18, 188:19, 196:18, 197:13, 271:14
**watch** [19] - 46:13, 91:3, 107:20, 107:24, 108:7, 108:14, 125:13, 126:1, 128:5, 128:12, 143:2, 147:13, 148:1, 159:20, 169:14, 175:23, 177:5, 196:3, 260:3
**watched** [10] - 21:12, 38:8, 45:8, 46:23, 47:12, 128:13, 200:7, 213:6, 213:7, 250:17
**watches** [4] - 128:7, 142:23, 142:24, 160:10
**watching** [6] - 128:15, 139:6, 174:6, 196:4, 200:10, 265:23
**water** [1] - 225:9
**ways** [5] - 30:13, 160:4, 178:12,

252:11, 264:21
**weapon** [1] - 261:19
**weapons** [4] - 95:7, 95:8, 98:8, 230:21
**wearing** [1] - 100:1
**web** [1] - 176:24
**webbed** [1] - 177:13
**Wednesday** [2] - 31:20, 31:22
**weekend** [4] - 75:13, 83:18, 84:5, 107:6
**weeks** [1] - 223:20
**weigh** [1] - 69:2
**weighs** [1] - 167:7
**well-argued** [1] - 267:3
**well-handled** [1] - 269:4
**west** [3] - 90:19, 90:22, 220:10
**whatsoever** [1] - 229:8, 246:25, 252:24
**whereabouts** [1] - 6:19
**White** [3] - 32:19, 157:3, 173:16
**whole** [9] - 33:20, 41:10, 115:5, 125:14, 164:22, 186:8, 199:8, 223:24, 239:8
**Wicomico** [4] - 6:22, 6:23, 6:25, 26:14
**width** [1] - 94:10
**wielding** [1] - 167:9
**wife** [8] - 19:24, 22:19, 22:20, 109:11, 126:5, 159:12, 162:7, 218:2
**willing** [2] - 7:5, 179:11
**willingly** [1] - 29:20
**win** [1] - 21:20
**window** [101] - 39:13, 39:17, 39:23, 40:6, 40:8, 40:10, 40:18, 41:3, 41:15, 42:5, 42:11, 42:16, 42:19, 43:6, 43:10, 43:21, 44:1, 44:2, 44:8, 45:1, 45:17, 46:1, 46:3, 46:16, 47:1, 47:7, 47:11, 47:14, 48:3, 49:4, 57:21, 57:22, 58:10, 58:12, 58:15, 58:18, 58:22, 69:20, 69:21, 139:7, 139:12, 140:13, 140:14, 141:7, 141:11, 146:8, 155:9, 160:7, 160:9,

160:15, 160:22, 162:8, 166:23, 167:6, 167:8, 167:10, 167:16, 167:17, 167:20, 167:23, 168:7, 168:11, 168:17, 175:15, 175:19, 176:25, 177:10, 177:14, 177:23, 178:5, 178:12, 178:15, 179:14, 179:18, 180:1, 180:2, 180:5, 180:6, 180:18, 182:13, 182:21, 194:13, 217:14, 227:12, 227:18, 227:21, 228:12, 228:17, 229:21, 233:6, 234:7, 235:24, 235:25, 252:2, 252:7, 256:17, 256:18, 256:25, 257:1, 257:10, 263:23
**windows** [4] - 160:20, 162:17, 191:7, 263:13
**wing** [2] - 60:9, 194:15
**Wing** [2] - 160:21, 168:1
**wish** [4] - 70:14, 151:1, 151:4, 153:8
**wishes** [1] - 60:1
**Witness** [2] - 110:13, 143:20
**witness** [23] - 4:25, 7:14, 24:6, 24:10, 65:4, 69:2, 74:14, 75:18, 78:2, 81:15, 87:22, 87:25, 104:19, 104:23, 117:17, 122:8, 122:11, 122:19, 146:19, 149:9, 169:2, 169:3
**WITNESS** [34] - 5:3, 5:7, 5:19, 10:24, 11:2, 13:8, 24:5, 24:12, 24:14, 33:7, 33:10, 33:12, 33:14, 44:25, 70:18, 70:20, 76:7, 76:14, 76:17, 76:25, 81:19, 87:21, 88:11, 88:14, 88:15, 96:1, 96:16, 104:18, 105:1, 105:2, 105:3, 122:7, 141:4, 146:18
**witness's** [1] - 88:23
**witnesses** [5] - 25:6, 30:11, 73:14, 74:19,

162:24
**WITNESSES** [2] - 3:4, 3:8
**Witzke** [2] - 23:7, 23:12
**woman** [1] - 212:16
**women** [2] - 144:11, 262:7
**wondering** [4] - 178:5, 178:11, 202:5, 245:1
**wood** [1] - 179:5
**word** [6] - 141:13, 142:17, 192:7, 225:22, 259:24, 263:24
**words** [29] - 14:1, 14:11, 14:15, 15:2, 18:12, 19:7, 37:12, 45:6, 142:15, 164:16, 172:8, 205:11, 205:12, 206:13, 207:12, 207:13, 207:14, 207:15, 239:13, 240:12, 254:5, 258:6, 258:24, 261:7, 265:12, 265:15
**worker** [1] - 121:18
**world** [1] - 222:20
**worries** [1] - 222:21
**worth** [2] - 160:16, 252:4
**worthwhile** [1] - 56:9
**wow** [1] - 84:8
**wraps** [1] - 158:7
**write** [4] - 83:22, 83:25, 84:5, 84:6
**writing** [3] - 38:14, 72:16, 173:7
**written** [1] - 82:3
**wrongdoing** [1] - 68:10
**wrote** [6] - 38:19, 38:22, 80:4, 80:7, 82:5, 82:17

### Y

**yard** [1] - 230:15
**year** [3] - 13:11, 73:12, 185:10
**years** [14] - 56:5, 106:3, 106:14, 120:23, 121:20, 124:6, 124:22, 139:25, 140:20, 230:22, 233:2, 236:2, 236:4, 266:2
**yell** [2] - 162:17,

192:19
**yelled** [1] - 207:18
**yelling** [8] - 37:2, 99:5, 99:7, 163:2, 182:1, 193:17, 207:4, 230:20
**yesterday** [22] - 7:12, 8:3, 9:13, 13:21, 16:16, 16:25, 17:10, 19:18, 23:5, 66:24, 80:15, 80:21, 81:4, 82:20, 82:25, 83:12, 83:15, 124:15, 146:25, 148:8, 208:21, 223:23
**York** [2] - 1:18
**young** [2] - 104:5, 230:8
**yourself** [5] - 10:17, 73:20, 74:5, 91:9, 218:19
**yourselves** [1] - 4:8

### Z

**zero** [1] - 72:1