**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-287 (TNM)** |
| **KEVIN SEEFRIED,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kevin Seefried to 70 months' incarceration, the upper end of the sentencing guidelines range of 57-71 months as calculated by the government and the Probation Office, three years of supervised release, $2,000 in restitution, and the mandatory $170 special assessment for the five counts of conviction.

## I.    INTRODUCTION

Kevin Seefried ("Seefried"), a 53-year-old drywall mechanic who resides in Laurel, Delaware, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On January 6, Kevin Seefried traveled with his family, including his son and co-defendant, Hunter Seefried, and a Confederate Battle flag from his home in Laurel, Delaware to Washington, D.C.   After attending the Stop the Steal rally, Seefried and his son Hunter, along with thousands of others, entered the restricted Capitol grounds.   There, Kevin and Hunter Seefried climbed over a wall near scaffolding and an external staircase of Capitol building, on the landing of which police officers were attempting to maintain a barrier to protect the Capitol building.   After rioters breached that barrier, Seefried and his son joined a large mob of rioters who were attempting to make entry into the building, near the Senate Wing Door.   Seefried watched as the rioters violently broke a window near the Senate Wing Door and his son cleared out the remaining glass shards and jumped through the window.   Seefried followed shortly thereafter and, within a minute of entering the Capitol building, placed himself at the front of the mob where he jabbed at a lone United States Capitol Police ("USCP") officer with the flagpole of his Confederate Battle flag and chased the officer up a flight of stairs.   Additionally, along with other rioters, Seefried berated and harassed numerous USCP officers who had arrived to prevent the mob from advancing further.   Seefried stood resolute with the rioters, who demanded to know the location of the United States senators and representatives who gathered to certify the votes of the Electoral College.   Seefried himself attempted to engage with one of the police officers asking him why he wanted to work for "liars and thieves."   During the 25 minutes that he remained inside of the Capitol building, Seefried repeatedly ignored the officers' orders to leave the building.

The government recommends that the Court sentence Seefried to 70 months' incarceration, the upper end of the advisory Guidelines' range of 57-71 months, which the government submits is the correct Guidelines calculation.   Such a sentence reflects the gravity of Seefried's conduct.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Facts filed in this case, ECF 1-1 at 1, and the government's sentencing memorandum regarding Hunter Seefried, ECF 119 at 305, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. *See also* Government's Trial Exhibits 401, 403, 404, 605, and 705A.

### B.    Kevin Seefried's Role in the January 6, 2021 Attack on the Capitol

#### *Approach to and Breach of the Capitol*

The evidence at trial showed that, after learning about the planned "Stop the Steal" rally from the news and on social media, Seefried encouraged his family members to take off work in order to attend the rally and hear former-President Trump speak.   Seefried and his family, including his son and co-defendant Hunter Seefried, left their residence in Laurel, Delaware early in the morning on January 6, 2021, and drove to Washington, D.C., bringing with them two flags – a "Trump" flag and a Confederate Battle flag that Seefried had displayed on the front of his home.   After attending the entire rally, the family stopped at their vehicle before continuing to the Capitol building along Pennsylvania Avenue.

Shortly before 2:00 p.m., along with thousands of others, Seefried entered the Capitol grounds and approached the Capitol building from the northwest. Approximately one hour earlier, at 12:52 p.m., rioters had first breached the outer perimeter of the grounds,[2] near the Peace Circle

---

[2] The outer perimeter of the Capitol grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" *See* Trial Tr. at 29-31, 06/13/202; Government Trial Exhibits 525 and 526.

at the end of Pennsylvania Avenue (Area A in Exhibit 1, below), shoving the handful of USCP officers stationed at the barriers there out of the way and flooding onto the Lower West Plaza of the Capitol building (Area C in Government Exhibit 1, below). *See* Government Trial Exhibit 401.



*Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

Seefried and his son climbed up a short wall in order to access a stairwell running alongside scaffolding in the Northwest section of the U.S. Capitol building and grounds – Area D in Exhibit 1, above. *See* Government Trial Exhibit 501. At approximately 2:09 p.m., rioters broke through a line of USCP officers on the landing of that stairwell and the mob surged towards the Capitol building. *See* Government Trial Exhibits 403 and 404. Slightly more than a minute later, Seefried – carrying the Confederate Battle flag – and his son ascended the stairwell and marched with the

mob of rioters to the Capitol building. *Id.*



*Government Trial Exhibit 403A*
*(Kevin Seefried circled in red)*

Seefried was intent on making his way into the Capitol building in order to disrupt the certification of the Electorical College vote count.   Although he was approximately one minute behind the first rioters to breach the police line on the northwest stairs, Seefried moved deliberately past other rioters toward the Sentate Wing Door, such that he was in the group of rioters immediately outside of the building as it was being breached at approximately 2:12 p.m. *See* Government Trial Exhibit 503 at 00:43-00:49.   Seefried witnessed other rioters use various objects—including a police riot shield and a 2x4 piece of lumber—to break the large windows just to the right of the Senate Wing Door.   Then, he watched as his son, who was wearing gloves, cleared the remaining glass out of the way, jumped up onto the window's ledge, and climbed through the window.   *See* Government Trial Exhibits 302A at 43:02-44:23, 504, 527.

Seefried himself jumped up to the window's ledge and climbed through the window less than ten seconds after his son.  *See* Government Trial Exhibits 407, 502, 504, 527.   Seefried was the twelfth rioter to set foot inside the building, thereby making him one of the first of as many as two thousand rioters who would enter the Capitol building on January 6.



*Still from Government Trial Exhibit 527*
*(Keving Seefried indicated with yellow arrow; Hunter Seefried indicated with green arrow)*



*Still from Government Trial Exhibit 527*
*(Keving Seefried indicated with yellow arrow; Hunter Seefried indicated with green arrow)*

Immediately after coming through the broken window, Seefried rushed down the hallway, pointing, as other rioters followed, yelling phrases such as "Where they meeting at?" "You work for us!" and "Where are they counting the fucking votes?"   *See* Government Trial Exhibit 504; Trial Tr. at 112-114, 06/13/022.



*Still from Government Trial Exhibit 527*
*(Keving Seefried indicated with yellow arrow)*

At this time, the Joint Session was underway, and Senators were in the Senate chamber debating an objection to Arizona's electoral votes. Shortly after the building was breached, United States Secret Service agents ushered Vice President Pence and his family members from the Senate Chamber and directed them to a secure location within the Capitol.

### Seefried Confronts USCP Officer Eugene Goodman

Seefried was the first rioter to encounter USCP Officer Eugene Goodman in a doorway near the base of the Senate East Grand Staircase.   Earlier in the day on January 6, 2021, Officer Goodman had responded to the crowd of rioters on the West Front of the Capitol building.   Trial Tr. at 93-97, 06/13/2022. After being teargassed multiple times while assisting his fellow officers, Officer Goodman went inside of the Capitol building to respond to a report of a breach occurring inside of the Rotunda. Trial Tr. at 95-97, 06/13/2022.   After leaving the Rotunda, Officer Goodman heard via radio dispatch that the Senate had been breached. Trial Tr. at 101, 06/13/2022.

He cautioned individuals outside of the Senate chamber to get inside, then went down the Senate East Grand Staircase, into a small hallway where he was confronted by Seefried. *Id.* at 101-103.

At that point, Seefried, who was still holding his Confederate Battle flag, was at the front of the mob, and for a time, appeared to Officer Goodman to be the only rioter in the area.   When Officer Goodman commanded Seefried to leave, Seefried jabbed the base of the flagpole at him. Officer Goodman recalled that Seefried was very angry and made statements such as "I'm not leaving," "Where are the members at?" and "Where are they counting the votes at?"   *Id.* at 105-106.   Seefried also told Officer Goodman, "You can shoot me man, but we're coming in." Government Exhibit 302A at 44:35-44:43.





*Still Images from Government Trial Exhibit 504 (at 00:51, 01:03)*
*(Seefried circled in red; Officer Goodman circled in blue)*

Seefried was soon joined by other rioters and the mob advanced towards Officer Goodman, yelling threats such as, "We're here for you," "Keep running, motherfucker," and "He's one person. We're thousands." Government Trial Exhibit 504; Trial Tr. at 116-121, 06/13/2022.

### *The Ohio Clock Corridor*

As the mob chased Officer Goodman, he led them up the Senate East Grand Staircase, past the Republican entrance to the Senate chamber, and into the Ohio Clock Corridor .   Trial Tr. at 120-122, 06/13/2022.   Other USCP officers joined him there and formed a line between the mob and the main entrance to the Senate chamber, yards away.   Trial Tr. at 64-68, 121-124, 203, 06/13/2022.   As he entered the Ohio Clock Corridor, Seefried placed himself close to the officers, aggressively gestured at them, and appears to have been yelling.   *See* Government Trial Exhibit 414 at 01:03 (2:16:03 p.m.)-01:10 (2:16:10 p.m.).



*Still from Government Trial Exhibit 414*
*(Kevin Seefried circled in red; Officer Goodman circled in blue)*



*Government Trial Exhibit 521*

Seefried continued to berate the officers, Officer Goodman in particular, and ignored

their commands to leave.   Trial Tr. at 72-74, 130-131, 06/13/2022.



*Still from Government Trial Exhibit 414*
*(Kevin Seefried circled in red; Officer Goodman circled in blue)*



*Government Trial Exhibit 514*

Seefried remained in the Ohio Clock Corridor for approximately twenty minutes.   Officer Brian Morgan recalled that, during that time, Seefried approached multiple officers asking "why are you protecting them" – a reference to Congress members.   Trial Tr. at 207-209, 06/13/2022. In his FBI interview, Seefried described his encounter with Officer Morgan.   Seefried recounted asking the officer, "what would you want to work for people who are liars and thieves?"   Seefried also told Officer Morgan, "This affects us all." *See* Government Trial Exhibit 302A at 48:20-49:20. These statements corroborate Officer Morgan's testimony, in that Seefried was referring to Congress members as "liars and thieves," and that Seefried knew the work that was being conducted by the members of Congress inside of the Capitol on January 6.

Seefried and his son remained inside of the Capitol for twenty-five minutes before making their exit.   In his interview with the FBI, Seefried stated that after being inside of the Ohio Clock Corridor for "what seemed like two or three minutes," his "fatherly instincts started kicking in." According to Seefried, it was at this point that he knew what he was doing was "wrong" and when he knew that it was "wrong" for he and his son to be in the building. *See* Government Trial Exhibit 302A at 23:20-23:49. In his FBI interview, Hunter Seefried stated that he and his father left the Capitol because he had heard that the rioters inside of the building would be teargassed and arrested. *See* Government Trial Exhibit 301 at 28:25-28:56.

### *Seefried's Statement to the FBI*

Shortly after January 6, the FBI released "Be On the Lookout" or "BOLO" alerts for Kevin and Hunter Seefried. On January 11, 2021, having seen his picture in internet news articles, Kevin Seefried, through a third party, contacted the FBI so that he and Hunter Seefried could turn themselves in. Both Kevin and Hunter Seefried were interviewed the next morning by FBI agents.

During his interview, Seefried admitted to entering the Capitol and acknowledged that it was wrong for him to have done so.  He described watching rioters break the windows by the Senate Wing Door and seeing his son clear the glass from one of them and climbing through. Seefried maintained, however, that he only entered and traveled through the Capitol building because he was looking for his son, an assertion that is belied by the assertiveness and direction with which Seefried moved forward, after climbing through the window only a few seconds behind his son.

Seefried also recalled his altercation with Officer Goodman in the doorway and described seeing the officer put his hand on his gun.   This prompted Seefried to "thr[ow] [his] stick down" and say "you can shoot me man but we're coming in.   We're coming in here man."   Consistent with the testimony of Officer Morgan, Seefried also described confronting an officer who was searching a rioter's bag and asking the officer why he would want to work for people "that are liars and . . . thieves."   Seefried also recalled telling the officer that "it affects us all man" – referring to the certification of the election.

## III.   THE CHARGES

On April 27, 2022, a federal grand jury returned a superseding indictment charging Kevin Seefried and Hunter Seefried with the following: Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count 1); Entering or Remaining in any Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count 2); Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2) (Count 3), Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 4); and Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 5). Hunter Seefried was also charged

with Entering or Remaining in any Restricted Building or Grounds with Physical Violence Against Property, in violation of 18 U.S.C. § 1752(a)(4) (Count 6); Destruction of Government Property and Aiding and Abetting, in violation of 18 U.S.C. §§ 1361 and 2 (Count 7); and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count 8).

On June 15, 2022, Kevin and Hunter Seefried were each convicted of Counts 1 through 5 following a bench trial.[3]

## IV.   STATUTORY PENALTIES

Seefried now faces sentencing on those five counts of conviction. As noted in the Pre-Sentence Investigation Report ("PSR"), Seefried is subject to a combined maximum prison term of twenty-three years in custody (20 years for violation of 18 U.S.C. 1512(c)(2), a Class C felony; one year for each of the two Class A misdemeanors and six months for each of the two Class B misdemeanors); a term of probation of not more than five years for each of the two Class B misdemeanors pursuant to 18 U.S.C. § 3561(c); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2), for the Class C felony and one year for each of the two Class A misdemeanors; a fine of not more than a total of $460,000 ($250,000 for the Class C felony pursuant to 18 U.S.C. § 3571(b)(3) and (d), $100,000 for each of the two Class A misdemeanors pursuant to 18 U.S.C. § 3571(b)(5) and $5,000 for each of the two Class B misdemeanors pursuant to 18 U.S.C. § 3571(b)(6)); and special assessments totaling $170 ($100 for the Class C felony, $25 for each of the two class A misdemeanors pursuant to 18 U.S.C. § 3013(a)(1)(A)(iii), and $10 for each of the class B misdemeanor pursuant to 18 U.S.C.

---

[3] For Count One, this Court convicted Kevin Seefried as a principal, and so did not have to determine rt whether he was also guilty as an aider or abettor.  *See* Trial Verdict Tr., 6/15/2022, ECF 109 at 16.

16

§ 3013(a)(1)(A)(ii)). *See* PSR ¶¶94-109, 116-120.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government concurs with the United States Probation Office that the Sentencing Guidelines offense level is 25 but disagrees with Probation about how that offense level is calculated. The Guidelines set out the specific "order" of the analysis: first, determine the offense guideline; second, determine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3. U.S.S.G. § 1B1.1(a)(1)-(3). Then, repeat each step for each count. U.S.S.G. § 1B1.1(a)(4). Finally, perform the grouping analysis in Part D of Chapter 3. *Id*.

In the PSR, the Probation Office did not employ this specified procedure in determining the total combined offense level. Rather, Probation started with the grouping analysis in Part D of Chapter 3, PSR ¶¶ 39-41, then did the Guidelines analysis in U.S.S.G. § 1B1.1(a)(1)-(3), but only for Count One, PSR ¶¶ 42-51. The appropriate offense level computations for Counts One, Two, and Three prior to any grouping analysis under Part D of Chapter 3, are as follows:

**Count One: 18 U.S.C. § 1512(c)(2)—obstruction of an official proceeding before Congress**

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Causing or Threatening to Cause Physical Injury to a Person, or Property Damage, in Order to Obstruct the Administration of Justice | +8 |

| U.S.S.G. § 2J1.2(b)(2) | Substantial Interference with the Administration of Justice | +3 |
| | **Total** | **25** |

### Count Two: 18 U.S.C. § 1752(a)(1)—entering and remaining in a restricted building or grounds

| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Restricted Building or Grounds | +2 |
| U.S.S.G. § 2B2.3(b)(2) | Trespass with a Dangerous Weapon | +2 |
| U.S.S.G. § 2B2.3(c) | *Cross Reference to U.S.S.G. § 2X1.1* | |
| U.S.S.G. § 2X1.1(a) | Base Offense Level for violation of 18 U.S.C. § 1512(c)(2), plus adjustments (U.S.S.G. § 2J1.2) | 25 |
| | **Total** | **25** |

### Count Three: 18 U.S.C. § 1752(a)(2)—Disorderly and Disruptive Conduct in a Restricted Building or Grounds[4]

| U.S.S.G. §2A2.4(a) | Base Offense Level | 10 |

---

[4] As it relates to 18 U.S.C. § 1752(a)(2), the government recognizes that a three-point enhancement pursuant to U.S.S.G. §2A2.4(b)(1)(B) is appropriate when a dangerous weapon (including a firearm) was possessed, and its use was threatened. The Application Notes of U.S.S.G. §1B1.1 define a dangerous weapon as (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument. Kevin Seefried's hard, long, and easily manipulated  wooden flag- pole was a dangerous weapon under (i) because it "was capable of inflicting serious bodily injury" if used to strike a person in a vulnerable part of the body.  By jabbing at Officer Goodman with the flagpole,  Seefried also used it "in a manner that created the impression that the object was" a dangerous weapon.  The government failed to mention the application of this enhancement in its correspondence to U.S. Probation addressing the government's Sentencing Guidelines calculations for this case. Nevertheless, the government acknowledges that its failure to address the Guidelines application does not affect the Combined Offense Level because Counts Three and One group.

| U.S.S.G. §2A2.4(b)(1)(B) | Specific Offense Characteristic | +3 |
|---|---|---|
| | **Total** | **13** |

### Counts Four and Five: 40 U.S.C. § 5104(e)(2)(D) and (G)—Disorderly conduct in a Capitol building and parading, demonstrating, or picketing in a Capitol building

Counts 4 and 5 are Class B misdemeanors to which the Sentencing Guidelines do not apply.

Counts One through Three group because all involve the same victim: Congress. U.S.S.G. § 3D1.2(a) and (b).[5] The offense level for that Group is the level "for the most serious of the counts comprising the Group, *i.e.*, the highest offense level of the counts in the Group." U.S.S.G. § 3D1.3(a). Since Counts One and Two have the highest offense levels for any count in the group, the offense level for the group is 25. Although the Probation Office did not perform all of the foregoing calculations, it accurately concluded that the combined total offense level in this case is 25. PSR ¶ 51.

Seefried has no juvenile adjudications or adult criminal convictions. PSR ¶¶ 52, 53. The U.S. Probation Office calculated Seefried's criminal history as category I, which is not disputed. PSR ¶ 54. Accordingly, based on the government's calculation of the defendant's total offense level, at 25, Seefried's Guidelines imprisonment range is 57 to 71 months' imprisonment. PSR ¶ 99.

---

[5] As it relates to Count Two, the violation of 18 U.S.C. § 1752(a)(1), and the application of U.S.S.G. §2B2.3(a), the Guidelines require a cross reference to U.S.S.G. §2B2.3(c)(1), "if the offense was committed with the intent to commit a felony offense…" Here, the trespass was committed with the intent to commit a felony, the violation of 18 U.S.C.  1512(c)(2). Therefore, the government contends that Counts One and Two would also group pursuant to U.S.S.G. § 3D1.2(c).

Seefried raises two objections to this Guidelines calculation.   The Court should reject them both.

### A.  Enhancements Regarding the Administration of Justice Should Apply.

U.S.S.G. § 2J1.2, which applies to "Obstruction of Justice" offenses, provides for an eight-level increase if the offense involved causing or threatening injury to a person or damage to property "in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B). It also provides for a three-level increase "if the offense resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2). Seefried has argued that, for the reasons set forth by this Court in connection with the sentencing of Hunter Seefried, neither of these specific offense characteristics is applicable to his conduct in this case.

The Government acknowledges the Court's rulings in *United States v. Hunter Seefried*, No. 21-cr- 287, Doc. 123 (D.D.C. Oct. 29, 2022) (TNM), *United States v. Rodean*, No. 21-cr-57, Doc. 76 (restricted statement of reasons) (D.D.C. Oct. 26, 2022), *United States v. Secor*, No. 21-cr-157, Doc. 56 at 17-20 (Oct. 24, 2022) (TNM), and *United States v. Hale-Cusanelli*, No. 21-cr-37, Doc. 120 at 50-55 (D.D.C. Sep. 27, 2022) concluding that "administration of justice" in § 2J1.2 is limited to "a judicial or related proceeding that determines rights or obligations."   For the reasons set forth below, the Government respectfully disagrees with the Court's analysis in those cases.

*First*, neither dictionary definitions nor usage analysis dictate that the term "administration of justice" be limited to a judicial or quasi-judicial proceeding.   The Court was correct to note that that the Black's Law Dictionary definitions of "administration of justice" and "due administration of justice" "suggest that the 'administration of justice' involves a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights," *Seefried*, Doc. 123 at 4.   However,

Black's Law Dictionary also contains broader definitions of "justice" and "obstruction of justice," which relate to the orderly administration of the law more generally.   For example, Black's Law Dictionary defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as "[i]nterference with the orderly administration of law and justice." Black's Law Dictionary (11th ed. 2019).   *See also* Ballentine's Law Dictionary 696 (3d ed. 1969) (defining justice to include "exact conformity to some obligatory law").   Indeed, Black's Law Dictionary recognizes that "[c]onduct that defies the authority or dignity of a court *or legislature* . . . . interferes with the administration of justice."   Black's Law Dictionary (11th ed. 2019) (emphasis added).

Similarly, while the Court's survey of uses of the term "administration of justice" in legal usage does suggest that the phrase is frequently (and perhaps predominantly) used to refer to "a judicial proceeding deciding legal rights," and to lesser extent, to "law enforcement activities," *Seefried*, Doc. 123 at 11-13, the simple fact that the term *usually* bears judicial connotations does not mean that it *must*, particularly where, as here, the guideline's context, purpose, and commentary point in a different direction.   Like all words, legal terms often bear multiple meanings.   For example, the term "suppression of evidence" can refer either to a court's exclusion of evidence from trial or to the prosecution's withholding of favorable evidence from the defense. Which meaning the term bears in a particular instance cannot be determined by the frequency of each meaning within the legal corpus.   And in this case, the frequent use of other meanings is no reason to reject a broader meaning of "administration of justice" that gives full effect to the guideline and its commentary.   *See* U.S.S.G. § 2J1.2 cmt. n.1 (defining "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false

testimony, or other false evidence; *or the unnecessary expenditure of substantial governmental or court resources*") (emphasis added).

*Second*, Section 2J1.2's inclusion of definitions in the commentary that undoubtedly relate to "investigations, verdicts, and judicial determinations" does not support a definition that excludes congressional proceedings.   The commentary's use of the word "includes" indicates that the definition is not an exhaustive list.   *See* Antonin Scalia & Bryan A Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012).   And the inclusion of the "premature or improper termination of a felony investigation" indicates that the definition applies to executive-branch investigations that are not yet before a grand jury or court.

Nor does reading the commentary's use of the word "governmental . . . resources" [6] to include congressional resources would not "render[ ] the phrase 'or court' superfluous."   *Seefried*, Doc. 123 at 17.   Although a "broad definition" of "governmental" could "include court resources," *id.*, using both terms in an attempt to sweep in all three branches of government is not a superfluity.   The Sentencing Commission could have added the word "court" to clarify that the term "governmental" did not exclude courts.   And the purported superfluity could be avoided by reading "governmental . . . resources" to refer to the resources of both the executive and legislative branches (as opposed to the judicial).   The superfluity canon provides no basis to limit the term

---

[6]  The government's position that the events of January 6, 2021 caused the unnecessary expenditure of substantial governmental or court resources is based not on the number of defendants charged or prosecutions commenced, but on extensive expenditure of government resources in an effort to quell the breach – including the deployment of the USCP, the Metropolitan Police Department ("MPD"), the National Guard, and various other state and federal law enforcement agencies – and to clean up and repair the damage done to the Capitol building and grounds by the rioters. *Compare Seefried*, Doc. 123 at 16-17, *with Seefried*, Gov't Mem. in Aid of Sentencing, Doc. 115 at 29.   The enhancement is best read as applying where the obstructive conduct itself—not the later prosecution of that conduct—caused the unnecessary expenditure of substantial governmental or court resources.

to "*prosecutorial* resources." *Id.*   Indeed, if the term "administration of justice" in § 2J1.2 refers only to "a judicial or related proceeding," *id.* at 1, then the word "governmental" is itself superfluous.

*Third*, there is no conflict between the government's interpretation of "administration of justice" in § 2J1.2 and the same term in 18 U.S.C. § 1503, which contains a catchall provision prohibiting obstruction of "the due administration of justice."   The Supreme Court has made clear that a term can have a different meaning in the Sentencing Guidelines than it does in a statute. *DePierre v. United States*, 564 U.S. 70, 87 (2011).   And there are at least three differences between § 1503 and § 2J1.2 that counsel in favor of reading them differently.   First, unlike § 1503, § 2J1.2 includes its own definition of the "administration of justice," which covers the expenditure of "governmental *or* court" resources.   Second, § 1503 appears in the context of a statute that applies to jurors, court officers, and judges, which may favor a narrower reading of the catchall provision for interference with the "due administration of justice."   And, third, § 2J1.2's entire purpose is to distinguish between levels of culpability for those who violate a wide variety of obstruction statutes, many of which are not limited to judicial or quasi-judicial proceedings.

*Fourth*, the application of subsections (b)(1)(B) and (b)(2) only to offenses where the obstructed proceedings were "judicial" or "quasi-judicial" in nature itself creates line drawing problems.   Those descriptors themselves raise difficult questions about how closely the obstructive conduct must "relate[]" to a judicial proceeding or what proceedings can be said to "determine[] rights or obligations." *Seefried*, Doc. 123 at 1.   For example, 18 U.S.C. § 1505 applies to obstruction of an investigation by the House Ethics Committee, which has the power to discipline current members of Congress.   That inquiry would seem to be "quasi-judicial" and one that "determines rights or obligations," *id.* at 1, 4, yet it does not involve the "possibility of

23

punishment by the state," *id.* at 4.   The government's broader reading of "administration of justice," by contrast, would apply to all the obstruction offenses covered by § 2J1.2.   Under the government's reading, therefore, a sentencing court need not answer difficult questions about whether a proceeding is sufficiently "judicial" or "quasi-judicial" to trigger subsections (b)(1)(B) and (b)(2).

Should the Court decline to apply either adjustment, the government will seek an upward variance to offense level 25 and ask the Court to impose a sentence of 70 months.   The very conduct that supports the application of these enhancements warrants such a variance.    In his quest to disrupt the certification of the electoral college vote count, Seefried certainly constituted a threat to Officer Goodman.   During their confrontation, Seefried thrust the butt of his flagpole at Officer Goodman.   That flagpole was not only a weapon capable of causing serious injury; a Confederate Battle flag was affixed to it and it was brandished by a man standing at the front of a volatile, growing mob towards a solitary, Black police officer.   Seefried was then part of the mob that pursued Officer Goodman up the East Grand Staircase, and aggressively confronted police officers in the Ohio Clock Corridor.   And there is no doubt that the interference with the congressional proceeding that resulted from Seefried's breach was substantial.   As the Court noted in connection with the sentencing of Hunter Seefried, the Seefrieds "and [their] fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources."   *United States v. Seefried*, 21-cr-287 (TNM), Sentencing Tr. at 54.

### B.  No Credit for Acceptance of Responsibility is Warranted.

An adjustment under U.S.S.G. § 3E1.1 "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is

convicted, and only then admits guilt and expresses remorse," U.S.S.G. § 3E1.1 comment (n.2). Seefried nevertheless asserts, without explanation, that he is the "rare" defendant who should receive such an adjustment.   ECF No. 132-1.

Application Note 2 to Section 3E1.1 provides that, "[c]onviction by trial, however, does not automatically preclude a defendant from consideration for . . . a reduction" pursuant to Section 3E1.1.   U.S.S.G. § 3E1.1 comment (n.2).   Indeed, "[i]n rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercised his constitutional right to a trial," for example when a defendant went to trial in order to preserve issues unrelated to factual guilt, to make a constitutional challenge to a statue, or to concede the accuracy of the prosecution's evidence but claim the statute does not apply to that conduct.   *Id.* In this case, however, Seefried denied that he had the *mens rea* comprising essential elements of guilt, for example his knowledge that the certification of the electoral college vote count was occurring at the Capitol on January 6, 2021 and his intent to disrupt that proceeding.   Trial Tr. at 9, 11-12, 06/13/2022.   He also attempted to discredit the testimony of Officer Goodman, refuting the officer's account of their interaction at the base of the Senate East Grand Staircase.

Moreover, while the Government is not seeking an enhancement for obstruction pursuant to U.S.S.G. § 3C1.1, Seefried did deactivate his Facebook account in the days following January 6.   *See* Government Trial Exhibit 302A at 55:40-55:48; U.S.S.G. § 3E1.1 comment (n. 4) ("Conduct resulting in an enhancement under §3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct.").

Seefried is not the "rare" defendant contemplated by this application note.   He has not accepted responsibility for his conduct and the adjustment should not be applied.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

Sentencing is guided by 18 U.S.C. § 3553(a), which mandates consideration not only of the Sentencing Guidelines range but various other factors as well. In this case, as described below, all of the Section 3553(a) factors weigh in favor of the government's recommended sentence of 70 months. That sentence is appropriate under § 3553(a) even if the Court does not apply the two enhancements discussed above.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Kevin Seefried's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the Certification Vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Seefried was part of the tip of the spear in the January 6 assault on the Capitol. He raced to the front lines of that effort.   He observed as rioters smashed through the windows by the Senate Wing Door.   He jumped through one of those broken windows, becoming the twelfth rioter to enter the Capitol building.   He aggressively confronted USCP Officer Goodman, jabbing at him with his flagpole, yelling threats, and stating that he was willing to be shot.   He then joined in the mob that chased Officer Goodman up the Senate East Grand Staircase and he confronted the line of USCP officers in the Ohio Clock Corridor, demanding to know why the officers were protecting the Congress members.

The nature and circumstances of Seefried's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 70 months.

### B.  The History and Characteristics of the Defendant

Seefried is 53 years old and resides in Laurel, Delaware. PSR ¶¶ 60, 67.   He has no juvenile adjudications or criminal convictions. PSR ¶¶ 52-53.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Seefried was at the forefront of the first wave of rioters to breach the Capitol building.   Among an agitated, chanting crowd, he watched as other rioters broke the windows by the Senate Wing Door and as his son cleared the glass from the window and climbed through. Carrying a Confederate Battle flag, Seefried followed through the broken window and purposefully sped through the Capitol's hallways until he encountered Officer Goodman.   As Officer Goodman commanded him to leave, Seefried jabbed at him with his flagpole and yelled, asking where the votes were being counted and issuing threats.   Seefried joined the crowd that chased Officer Goodman to the Ohio Clock Corridor, where he continued to angrily, and aggressively, engage with the officers there.   Seefried and his son stayed in the Capitol building for approximately 25 minutes.   This conduct was the epitome of disrespect for the law.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

weighs heavily in favor of a lengthy term of incarceration.

Unlike many January 6 defendants, the government is not aware of any social media posts (or statements other than his FBI interview) by Seefried regarding his actions that day.   (This may be, in part, due to Seefried's deactivation of his Facebook account in the days following January 6, 2021).   Nevertheless, it is clear that, when faced with a political outcome with which he disagreed, Seefried chose to go beyond discourse or protest.   Seefried's actions on January 6, 2021 were deliberate and dangerous.   Even a confrontation with an armed USCP Officer did not deter Seefried from infiltrating further into the building.   And as this Court noted in delivering its verdict, "the senators had to shelter in place in the U.S. Senate Chamber, just feet from where the defendants were, in part because of the mob – the mob's illegal actions and presence."   *United States v. Seefried*, 21 Cr. 287 (TNM), June 15, 2022 Transcript at 8-9.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

28

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."    So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the

29

offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases, in which defendants were convicted of Obstructing an Official Proceeding in violation of 18 U.S.C. § 1512(c), provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Hunter Seefried*, 21-cr-1287 (TNM), this Court sentenced Seefried to serve a term of 24 months' incarceration. At sentencing, the Court highlighted that Seefried was one of the first rioters to break into the Capitol, having observed rioters breaking windows near

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

the Senate Wing Door. Other factors considered in the Court's sentencing included Seefried ignoring the presence of the officer who attempted to stop him from entering the Capitol, and joining with a mob of rioters who confronted Officer Goodman, ultimately chasing him through the halls of the Capitol. Oct. 24, 2022 Sent. Hrg. Tr. at 50-51. Seefried's lack of a criminal history, good employment, letters of support, and Seefried's youthfulness were mitigating factors considered by the Court. Oct. 24, 2022 Sent. Hrg. Tr. at 51.

While Hunter Seefried and Kevin Seefried's actions were quite similar on January 6, there are factors that are distinguishable and which justify a more severe sentence for Kevin Seefried, than the 24-month sentence given to Hunter Seefried.    Notably, this Court has drawn distinctions between the defendants. First, the Court considered the age and maturity of father and son. This Court addressed the influence that Kevin Seefried had over Hunter Seefried, while acknowledging that Hunter Seefried was mature enough to understand the consequences of his actions. Oct. 24, 2022 Sent. Hrg. Tr. at 51. Second, the Court also considered that Kevin Seefried demonstrated a "background awareness of the political situation." Trial Verdict Tr., ECF 109 at 12.   The Court stated: "Finally, I consider Count 1 as to Hunter Seefried. I believe this is a closer question than his father's guilt, as his father was generally the prime mover in the decision to go to D.C. He apparently has a greater knowledge and interest in politics. Trial Verdict Tr., ECF 109 at 13. Third, the Court highlighted the statements that Kevin Seefried made statements to Officer Eugene Goodman and Officer Brian Morgan. Kevin Seefried had direct contact with both officers, while Hunter Seefried did not engage directly with any officer. Relating to Goodman, Kevin Seefried threatened Officer Goodman with his flagpole, later chasing Officer Goodman up the stairs.   At trial, Officer Goodman testified that Kevin Seefried asked him, "Where are the members at?" and "Where are they counting the votes at? I'm not leaving!" and "You can shoot me, but we're coming

in." While the government acknowledged that Officer Goodman only mentioned these statements for the first time at trial, the Court found that Kevin Seefried did make these statements during the confrontation with Officer Goodman near the base of the Senate East Grand Staircase. Trial Verdict Tr., ECF 109 at 9.   At sentencing, the Court stated the following while comparing Kevin Seefried and Hunter Seefried, "He made more explicit statements regarding the certification, *and he engaged in more aggravated conduct while in the Capitol*." Trial Verdict Tr., ECF 109 at 13 (emphasis added).

As it relates to Hunter Seefried, the government requested a sentence of 64 months of sentencing.   The Court sentenced Hunter Seefried to 24 months.   Because Kevin Seefried's conduct consists of more aggravating factors than Hunter Seefried's, a sentence of 70 months is appropriate.

In *United States v. Anthony Williams*, 21-cr-377 (BAH), the defendant joined a group of rioters on the West Front where he helped them climb bicycle racks that were repurposed by the rioters as ladders to climb the foundational walls of the Capitol building to flank and overrun the police on the Northwest stairs. Williams recorded himself on those stairs and bragged, "[w]e just stormed the stairs of the Capitol, pushed the cops back and were maced and pepper-sprayed, and hit everybody. Fuck that, we took this fucking building." He then stole water bottles that USCP officers had stored on the Upper West Terrace of the Capitol building to be used for decontamination if USCP officers were hit with chemical irritants.

Williams, like Seefried, was one of the first rioters to enter the Capitol and did so via the Senate Wing doors only six minutes after the doors were initially breached. While inside the Capitol, Williams overran the police in the Crypt with other rioters. Williams advanced to the Rotunda where he celebrated with other rioters and smoked marijuana. When the police tried to

32

force Williams out of the Rotunda, he joined with other rioters and actively resisted and mocked the police. Williams followed his rioting at the Capitol by bragging on social media about his actions, expressing no remorse, and proclaiming that January 6 was the proudest day of his life. In that case, following Williams's conviction at trial, the Government and Probation both calculated the defendant's total offense level as 25 and criminal history category as I,[9] resulting in a Guidelines range of 57 to 71 months' imprisonment. The Court applied both the eight-point enhancement pursuant to U.S.S.G. § 2J1.2(b)(1)(B) and the three-point enhancement pursuant to U.S.S.G. § 2J1.2(b)(2). The Government recommended a sentence of 64 months' imprisonment. The Court imposed a 60-month sentence, citing the defendant's active participation in events on the West Front prior to his entry into the Capitol building, his inclusion in the first wave of rioters to breach via the Senate Wing Door, his active seeking of confrontation with police officers, his celebration of his presence in the Capitol, and his "militaristic online posts" about the election.

In *United States v. Erik Herrera*, 21-cr-619 (BAH), the defendant wore a respirator mask, ski goggles, and a bulletproof vest to the Capitol on January 6. He witnessed other rioters battling police officers on the West Front of the Capitol building, then scaled the scaffolding over the Northwest stairs. Just before 3:00 p.m., Herrera entered the Senate Parliamentarian's Office as police officers were attempting to expel rioters from the area. There, he contributed to the chaos and disarray by throwing a stack of papers (which he filmed and posted to Instagram) and stealing a bottle of alcohol. He left via the Parliamentarian doors and re-entered only a few minutes later via the nearby Senate Wing Door. He entered a senator's "hideaway" office, smoked marijuana

---

[9] Williams had an extensive criminal history, with 8 adult criminal convictions and 3 juvenile adjudications. Nevertheless, because of the advanced age and/or minor nature of his convictions, his criminal history category was I.

there, then continued through other areas of the Capitol.   In total, Herrera spent just under 35 minutes inside the Capitol building.   In that case, following Herrera's conviction at trial, the Government and Probation both calculated the defendant's total offense level as 27 and criminal history category as I, resulting in a Guidelines range of 70 to 87 months' imprisonment. The Court applied both the eight-point enhancement pursuant to U.S.S.G. § 2J1.2(b)(1)(B) and the three-point enhancement pursuant to U.S.S.G. § 2J1.2(b)(2). [10] The Government recommended a sentence of 78 months' imprisonment. The Court imposed a 48-month sentence.

This Court is well-versed in the cases of *United States v. Timothy Hale-Cusanelli*, 21-cr-32 (TNM) and *United States v. Christian Secor*, 21-cr-157 (TNM).   In *Hale-Cusanelli*, the defendant entered the Capitol as a result of the initial breach of the Senate Wing Door at approximately 2:14 p.m., approximately one minute after Seefried. After entering, Hale-Cusanelli entered the Capitol Crypt and the Capitol Visitor's Center (CVC) where he and other rioters overwhelmed officers attempting to keep the rioters from making entry. After successfully aiding the effort to thwart the officers' attempts to manage the growing crowd of rioters, including by interfering in the arrest of a fellow rioter, Hale-Cusanelli made his way back to the Senate Wing Door and eventually climbed out a window to exit the building. In that case, following Hale-Cusanelli's conviction at trial, the Government and Probation both calculated the defendant's total offense level as 27 and criminal history level as I, resulting in a Guidelines range of 70 to 87 months' imprisonment. This Court declined to apply the enhancements under U.S.S.G. § 2J1.2(b)(1)(B) and (b)(2) and determined that the defendant's total offense level was 16[11] and

---

[10]  Herrera also received a two-point enhancement pursuant to U.S.S.G. § 3C1.1 due to his untruthful testimony at trial.

[11]  Hale-Cusanelli also received a two-point enhancement pursuant to U.S.S.G. § 3C1.1 due to his

criminal history category was I, resulting in a Guidelines range of 21 to 27 months' imprisonment. The Government recommended a sentence of 78 months' imprisonment. The Court imposed a 48-month sentence, citing the defendant's taunting of police officers, "deep hostility" and degrading statements towards racial and religious minorities that reflected his motivation to obstruct the Congressional certification of the electoral college vote count on January 6, and untruthful testimony as aggravating factors.

In *Secor*, the defendant approached the Senate Wing Door and entered through the broken door approximately 13 minutes after Seefried had entered.   He crossed through the Crypt, to the House side of the building and walked through Speaker Nancy Pelosi's office suite.   From there, he traveled through the Rotunda to the East Rotunda doors, where he helped a group of rioters push open the doors, trapping the three USCP officers guarding them.   Secor then went to the Senate Gallery, where he took pictures, and to the Senate Floor, where he sat in the Vice President's seat on the Dias.   On the evening of January 6, Secor posted tweets demonstrating his pride in participating in the breach of the Capitol, then deleted his accounts sometime after January 8, 2021.   In that case, the parties plea agreement stipulated U.S.S.G. § 2J1.2(b)(2) was applicable but left open the question of whether U.S.S.G. § 2J1.2(b)(1)(B) should be applied.   At sentencing, the Court declined to apply either enhancement and determined that the defendant's total offense level was 13[12] and criminal history category was I, resulting in a Guidelines range of 12 to 18 months' imprisonment. The Government recommended a sentence of 57 months' imprisonment. The Court imposed a 42-month sentence, citing his participation in efforts to overpower USCP

untruthful testimony at trial.

[12] Secor also received a two-point enhancement pursuant to U.S.S.G. § 3C1.1 because he deleted social media accounts prior to his arrest.

officers who had been trapped against the East Rotunda doors, his entry into the Senate Chamber and onto the Senate Floor, and his efforts to delete evidence, as well as his age, employment history and lack of a criminal record.

Seefried shares some but not all of the features of those cases.   His conduct is worse than theirs in one important respect: his confrontation with Officer Goodman at the bottom of the East Grand Staircase ignited a mob pursuit of the officer that was one of the most chilling encounters between rioters and police during January 6, and could have turned out much more tragically than it did. While the other defendants' engagement with police as part of a group is certainly serious, Seefried's one-on-one confrontation suggests a certain level of brazenness and motivation.   And, while the Ohio Clock Corridor – the area to where Seefried and other rioters followed Officer Goodman -- is not of the same private nature as the Speaker's suite or other Congress members' offices, Seefried's proximity to the Senate, where Senators were locked down, underscores the seriousness of his conduct that day.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution

Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. See 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under Hughey).[13]   Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[14]   *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004).

---

[13] While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.  *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United States v. Zerba,* 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice,* 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.

[14] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA.  *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[15] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

---

[15] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513. Here, the Court should find that Seefried's conduct in entering the Capitol building as part of a mob caused damage to that building.

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[16]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter

---

[16] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. See 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

approach is appropriate here.

Applying these principles to this case leads to the conclusion that Seefried should be required to pay $2,000 in restitution. One of the offenses for which he was found guilty, 18 U.S.C. § 1752(a)(1), triggers mandatory restitution under the MVRA as an "offense against property" that resulted in pecuniary loss for the Architect of the Capitol, *see* 18 U.S.C. § 3663A(c)(1)(A)(ii). Moreover, Seefried's additional convictions under Title 18, *see* Count 1 (18 U.S.C. § 1512(c)(2)) and Count 3 (18 U.S.C. § 1752(a)(2)), fall within the VWPA. As of October 13, 2022, several victims in this case, including the Architect of the Capitol, the Officer of the Chief Administrative Officer of the United States House of Representatives, and the Officer of the Secretary of the United States Senate, estimated approximate losses from the siege at the United States Capitol at $2,881,360,20. Attached as Exhibits A, B, and C are letters from representatives of the Architect of the Capitol, the Office of the Chief Administrative Officer of the United States House of Representatives, and the Office of the Secretary of the United States Senate, attesting to the pecuniary damages each suffered as a result of the attach on the Capitol on January 6, 2021: $1,717,254.03, $547,411.27, and $32,075.00, respectively. Those amounts do not account for the damages suffered by the USCP, MPD, or myriad other law enforcement agencies.[17] January 6 defendants who have pled guilty to one or more felony offenses have uniformly agreed to pay $2,000 in restitution. *See, e.g. United States v. Cody Mattice and James Mault*, D.D.C., 1:21-cr-00657 (BAH), ECF 43 and 47 (plea agreements). Moreover, in cases

---

[17] The Government estimates that, as of October 13, 2022, the approximate total losses suffered as a result of the siege of the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and losses suffered by law enforcement officers deployed to protect Members of Congress, their staff, and other Capitol.

where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, the Court should require Seefried to pay $2,000 in restitution for his convictions on Counts One through Five. This amount fairly reflects Seefried's role in the offense and the damages resulting from his conduct. Recognizing the practical and legal difficulties in allocating loss amounts across all January 6 defendants, including many who will be charged in the future, judges of this Court have likewise imposed restitution in the amount of $2000 on defendants convicted of one or more felonies following trial. *See, e.g., United States v. Hale-Cusanelli* (TNM), 21-cr-037 ECF 118 (judgment). Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 70 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $170 special assessment for the five counts of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:      */s/ Brittany L. Reed*
BRITTANY L. REED
Assistant United States Attorney
LA Bar No. 31299
650 Poydras Street, Ste. 1600
New Orleans, LA 70130
Brittany.Reed2@usdoj.gov
(504) 680-3031

*/s/ Benet J. Kearney*
BENET J. KEARNEY
Assistant United States Attorney
NY Bar No. 4774048
1 Saint Andrew's Plaza
New York, New York 10007
BKearney@usa.doj.gov
(212) 637-2260

42