**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. Action No. 1:21CR287 |
| KEVIN SEEFRIED, | |
| Defendant. | |

**MEMORANDUM IN AID OF SENTENCING**

Kevin Seefried will be before the Court for sentencing on February 9, 2023, having been convicted by this Court of all counts in the Indictment against him. At trial, Mr. Seefried did not dispute that he knowingly entered a restricted building, the U.S. Capitol, on January 6, 2021. Indeed, the only fact that defense counsel meaningfully disputed at trial was whether there was proof beyond a reasonable doubt that Mr. Seefried had the requisite intent to obstruct the certification of the vote.

In the days that followed January 6, Mr. Seefried expressed his remorse for his conduct to his family, his friends, and to agents that interviewed him on January 12, 2021. His remorse was immediate and unwavering. He knows that he had no business entering the Capitol and he was wrong to join a crowd that threatened police officers. He has also come to appreciate the extent to which that the Confederate battle flag is viewed as a symbol of hate by many. He had brought the flag as a symbol of protest, but had not considered the logic of those who see the flag as a symbol of American racism. Now that photos of him with the flag have become iconic symbols of the horror

of January 6, Mr. Seefried completely understands the harm he has caused. He is embarrassed that many of his fellow Americans perceive him to be intentionally making a statement that he truly did not intend. He is ashamed, mindful that the community and even history, may view him as a racist. And he knows that he must be punished for his role in the events of that infamous day.

That said, the Pre-Sentence Report (PSR) guideline range is excessive and Mr. Seefried's conduct, while regrettable, is nowhere near warranting the 70 month sentence the government requests. Pursuant to 18 U.S.C. § 3553(a), Rule 32 of the Federal Rules of Criminal Procedure, and Section 6A1.3 of the advisory United States Sentencing Guidelines ("USSG"), Mr. Seefried, through counsel, states that he has reviewed the PSR and offers the following objections: First, he should receive an adjustment for acceptance of responsibility under § 3E1.1 because this is a rare situation in which Mr. Seefried has demonstrated his acceptance of responsibility despite having exercised his constitutional right to a trial. Second, for the reasons this Court articulated in Hunter Seefried's case, the PSR wrongly assesses a total 11-level increase under § 2J1.2 because Mr. Seefried's conduct did not involve the substantial interference with the "administration of justice."

Therefore, Mr. Seefried respectfully submits that the correctly-calculated offense level is 12, resulting in a guideline range of 10 to 16 months[1]. Application of

---

[1] Under §3D1.1(b), Counts One, Two and Three group. Under the applicable guideline—2J1.2—the base offense level is 14, reduced to 12 should the Court grant Mr. Seefried's request to find that an "acceptance" adjustment is warranted pursuant to §3E1.1.

the sentencing factors demonstrate that a sentence of no more than 12 months and one day is sufficient but no greater than necessary to achieve the goals of sentencing.

## I.  Procedural History

A few days after he returned from attending the "Stop the Steal" rally, Kevin Seefried learned that law enforcement wanted to question him. He immediately turned himself in and submitted to questioning by FBI agents at the sheriff's office near his home in Laurel, Delaware. Mr. Seefried gave a lengthy, recorded interview in which he admitted that he traveled to the "Stop the Steal" rally with his son, Hunter, Hunter's girlfriend, and his wife, Stephanie. He admitted to entering the Capitol through a broken window and remaining in the building for some time.[2] He further told agents that he "regretted going into the Capitol"[3] and that he would not attend any more rallies or return to Washington, D.C. During the interview, he truthfully denied being a member of any organized group or otherwise aligned with any radical ideologies. The evidence at trial supported Mr. Seefried's statements: he traveled to D.C. with his family members and they had no designs to go to the Capitol, much less into the building. There was no evidence that Mr. Seefried was a member of any extremist or even political organization. Nor was there evidence in the PSR that Mr. Seefried has affiliation with any such organization.

---

[2] Trial Trx, June 14, 2022, p. 17

[3] Trial Trx, June 14, 2022, p. 17 (during the cross-examination of Agent Lear, defense counsel asked, "and he told you that he regretted going inside the Capitol?" to which Agent Lear responded "he did.").

On January 19, 2021, a warrant was issued for Mr. Seefried's arrest and he promptly surrendered to it. He was placed on conditions of supervision, with which he has fully complied. An eight-count Indictment was returned on April 27, 2022, charging Kevin Seefried with 5 counts: Obstruction of an Official Proceeding and Aiding and Abetting under 18 U.S.C. § 1512(c)(2) (Count One), Entering and Remaining in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(1) (Count Two), Disorderly and Disruptive Conduct in a Restricted Building or Grounds under 18 U.S.C. § 1752(2) (Count Three), Disorderly Conduct in a Capitol Building under 18 U.S.C. § 5104(e)(2)(D) (Count Four), and Parading, Demonstrating, or Picketing in a Capitol Building under 18 U.S.C. § 5104(e)(2)(G) (Count Five).[4] Prior to trial, Mr. Seefried, through counsel, represented that he wished to plead guilty to several counts. However, the government opposed the proposed resolution. Only then did defense counsel file pre-trial motions, including a motion to dismiss count one, arguing that the Court should follow the reasoning applied by the Honorable Judge Nichols in *United States v. Miller*.[5] The Court held a two-day bench trial that commenced on June 13, 2022, and found Mr. Seefried guilty of all counts.

---

[4] Kevin Seefried was charged alongside his son, Hunter Seefried. Hunter was charged with three additional counts of destruction of property.

[5] As the Court is by now well aware, the Honorable Judge Nichols held that Mr. Seefried's conduct on January 6 cannot qualify as conduct that "otherwise obstructs, influences, or impedes" an official proceeding, within the meaning of Section 1512(c)(2) because it did not involve the destruction of evidence or documents. The government has appealed Judge Nichols's opinion in *United States v. Miller*, 1:21-CR-119 (CJN), 2022 WL 823070 (D.D.C. March 7, 2022), and the case was recently argued before the D.C. Circuit.

At trial, Mr. Seefried, through counsel, did not dispute that he knowingly entered a restricted building and limited argument to whether the government could establish that Mr. Seefried had the specific intent to disrupt the certification of the vote, as was required under this Court's application of 18 U.S.C. §1512.[6] Throughout the two years Mr. Seefried has been on pretrial release, Mr. Seefried has been perfectly compliant and following his conviction, Mr. Seefried cooperated with Probation in the Pre-Sentence Interview process.

## II.     Objections to PSR

### A. Mr. Seefried should receive a two-level adjustment under USSG 3E1.1.

Pursuant to USSG 3E1.1 "if the defendant clearly demonstrates acceptance of responsibility for his offense," the offense level is decreased by 2 levels. The commentary to the guideline recognizes that, ordinarily, the adjustment is not intended to apply to a "defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted and then only admits guilt and expresses remorse." Cmt. 2. In that same comment, the Commission explicitly recognized that conviction by trial does not automatically preclude a defendant from receiving the adjustment. For example, a defendant who goes to trial "to preserve issues that do not relate to factual guilt," may warrant granting the adjustment. That example is not exhaustive and where a defendant goes to trial, "a

---

[6] *See* Trial Trx. June 13, 2022 p. 10-11 (Defense opening statement, conceding guilt as to counts 2 and 5, and only disputing that Mr. Seefried intended to disrupt the certification of the vote, "disrupt governmental business," as required by Counts 1, 3 and 4).

determination that a defendant has accepted responsibility *will be based primarily on pre-trial statements and conduct.*" *Id*; *See also United States. v. Shires*, 1999 U.S. App. LEXIS 9027* (4th Cir. 1999)(affirming sentence because adjustment for acceptance of responsibility was permissible where defendant had exercised his right to a jury trial and the evidence showed that he had at all times cooperated with investigating officers and admitted to possessing a firearm and only disputed his intent to violate the law.)(emphasis added). Because this Court is in a unique position to assess Mr. Seefried's acceptance of responsibility, "the determination of the sentencing judge is entitled to great deference on review." Cmt. 5.

Mr. Seefried should be afforded a two-level adjustment because the following pre-trial conduct clearly demonstrates that he has accepted responsibility: 1) turning himself immediately; 2) immediately confessing his wrongdoing to agents and expressing his remorse in an uncounseled interview on January 12, 2022; 3) complying with all conditions of pre-trial release; 4) expressing a willingness to plead guilty to several counts of the Indictment; 5) waiving his right to a jury trial; 6) declining to contest the majority of material facts offered by the government at trial; and 7) limiting his factual dispute to the narrow issue as to whether he had the intent to disrupt the certification of the vote.

While the Court convicted Mr. Seefried after trial, in light of the discovery provided prior to trial[7], it was reasonable for counsel to conclude that the government

---

[7] At trial, for the first time, Officer Goodman stated that Mr. Seefried made statements such as "Where are the members at.?" *See* Trial Trx. June 15, 2022, p. (In

did not have proof beyond a reasonable doubt that Mr. Seefried intended to obstruct the certification of the vote. Indeed, during his lengthy interview with agents—in which he discussed his motivations for attending the rally and his actions in the building—Mr. Seefried never once mentioned the certification of the vote.[8] Nor did any officer report that Mr. Seefried said anything about the vote count on or before January 6.

In any event, Mr. Seefried did not and does not dispute the vast majority of the facts presented at trial and he respects the Court's verdict. In light of his conduct before trial and after, counsel respectfully submit that this Court should exercise its considerable discretion and apply a two-level adjustment for Mr. Seefried's early and consistent acceptance of responsibility.

## B. The PSR incorrectly applied the U.S.S.G. §2J1.2 specific offense characteristics.

The PSR added eleven levels to Mr. Seefried's total offense level for two instances of interference with the "administration of justice" under U.S.S.G. §2J1.2(b). In Hunter Seefried's case, this Court has already held that these specific offense characteristics do not apply because the certification of the vote does not involve the "administration of justice." The Court's ruling applies with equal force to Kevin Seefried's case. For the reasons set forth in this Court's opinion in Hunter Seefried's case[9], which Kevin Seefried respectfully adopts by reference, the

---

rendering its verdict, the Court acknowledged that Officer Goodman "did not previously attribute some of these statements specifically to Kevin Seefried.").

[8] Trial Trx, June 14, 2022, p. 17.

[9] *See* Memorandum Opinion re: sentencing enhancements, ECF. No. 123.

application of these enhancements is a legal error and should not be applied in this case as well.

### III.    Application of the Sentencing Factors

### A. Mr. Seefried's history and characteristics demonstrate that a 12-month and one day sentence is appropriate.

Kevin Seefried was born in Salisbury, Maryland in 1969. He was raised in a working class neighborhood in western Maryland until the family moved to Delaware, where Kevin's stepfather lived. Kevin's parents divorced when he was very young and throughout his life, he had a strained, chilly relationship with his father. Though he does not like to talk about it, in her letter to the Court, Mr. Seefried's daughter writes that Kevin's father "beat the crap out of him."[10] After the divorce, Kevin's father did not financially or emotionally support Kevin in any way. His father's abuse and subsequent absence impacted Kevin in myriad untold ways and he never received professional help to assess the impact of his father's abandonment. Fortunately, Kevin enjoyed a stable relationship his stepfather. Kevin's mother and stepfather were able to provide the family with basic necessities but the family was, as Kevin describes it, "dirt floor poor." His mother often had to borrow money from extended family to feed the family. Kevin did not have things like books or toys, beyond life's basic necessities.  The family never had any disposable income for family vacations or extra-curricular activities for the children.

---

[10] Letter of Elysia Seefried, attached as part of Exhibit 1.

8

Growing up, Kevin struggled in school, though he was not afforded special education services or even basic assessments to identify issues with cognitive functioning. When his high school girlfriend became pregnant, not wanting to be like his own father, Kevin dropped out of school to work to provide for the baby. Kevin dropped out of school when he was in just the ninth grade – at 16 years old. No one— from school administrators to his parents—tried to stop him. Just a teenager and without an adult counseling him otherwise, Kevin had no idea then that not having a high school diploma would impede his economic advancement for years to come. Mr. Seefried himself saw schooling as a continuing and frustrating obstacle – a story completed by Dr. DeRight's evaluation that finally identified issues that have followed Mr. Seefried throughout his life.[11]

Indeed, since dropping out, Mr. Seefried has been limited to hourly-wage labor jobs. This is not to say that Mr. Seefried does not take great pride in his work—he does. He enjoys working on construction sites and he is skilled at it. He has consistently been employed, most recently (for the past ten years), installing dry wall. Prior to working with drywall, Mr. Seefried installed power lines. When Hurricane Katrina hit, he offered to work in New Orleans to restore power to the most affected areas.

After leaving high school, Mr. Seefried married his high school girlfriend and mother of his first child. Only teenagers when they married, they divorced after trying to make it work for ten years. They had two children together, both now adults.

---

[11] *See* Report of Dr. DeRight, filed under seal, Exhibit 3.

In 2004, Mr. Seefried married Stephanie Seefried. They have one son, Hunter, whom this Court has already sentenced for his conduct on January 6. Unfortunately, the stress the family endured in the aftermath of January 6 was too much for the family to bear. Shortly after the trial, Stephanie left Mr. Seefried and is planning to file for divorce. When Stephanie broke the news to him, Kevin was devastated. He is slowly recovering from the shock of his impending divorce, but the news that Stephanie is leaving him along with his son's legal troubles, was too much for him to bear in the moment. When he did not return from work the day that Stephanie broke the news to him, his son Hunter called the police concerned. A day later, Kevin was located in a depressed state and taken to a hospital for a mental health evaluation. He was released after doctors determined he was not suicidal. With Hunter in prison and his wife gone, Kevin feels like his life has been shattered into pieces. Fortunately, his grandchildren, ages 3, 14, and 15, keep him going. Indeed, Mr. Seefried's grandchildren are his pride and joy. Pictures of Kevin Seefried and his grandchildren:



Mr. Seefried's youngest grandchild stays with Mr. Seefried, "pop pop," every other weekend so his parents can have a break. Mr. Seefried's daughter writes that she is "dreading the thought of looking at his little face and tell him that pop pop is not going to be around for a while."[12] Mr. Seefried treasures his time with his grandchildren. He recently remarked to counsel that he is determined to stay strong for them and though he knows he "messed up," he wants to be a good example for them going forward.

i.    **Mr. Seefried's physical health**

In 2015, Mr. Seefried began feeling that something was wrong. He was always tired and his GI system was acting up. At first, he chalked it up to being tired from work and aging. Finally, Stephanie forced him to go to the doctor. Doctors quickly diagnosed him with Stage 4 rectal cancer. The situation was dire. Thereafter, Mr. Seefried underwent three months of radiation and chemotherapy to slow the growth of the malignant tumor. Following that, he had surgery to remove his rectum.  Since then, he has required a colostomy bag. He has since had to maintain the colostomy bag every day. Following the surgery, he had three more months of chemotherapy. During this time, he had reduced hours at work which caused the family to struggle financially. In addition, according to Dr. DeRight, the chemotherapy and radiation likely contributed to further cognitive decline, from a baseline that was already below

---

[12] Letter of Elysia Seefried, attached as Exhibit 1.

average.[13] Mr. Seefried completed his treatment in late 2016 and attended yearly screens until the COVID pandemic hit.

**B. The nature and circumstances of the offense support a sentence of 12 months and one day.**

Mr. Seefried is lifelong conservative though he was not interested or involved in politics until President Trump exploded onto the scene in 2015. Mr. Seefried thought that Mr. Trump was the first politician he had seen who was not pretentious and he felt that Mr. Trump truly cared about the plight of working class Americans like himself. Mr. Seefried was not a regular presence at rallies but supported the President in other ways such as posting on pro-Trump messages on social media and hanging a Trump flag on his home. When the President invited his followers to attend the "Stop the Steal" rally, Kevin, Hunter, and Stephanie Seefried decided to go to support the president. Hunter's then-girlfriend, Ms. Cuff went with them. As Ms. Cuff credibly testified at trial, she and the Seefrieds "agreed they would go and watch Trump's speech."[14] On the ride down to D.C., the group did not discuss the certification of the vote and only talked about watching Mr. Trump's speech.[15] The group did not travel with any weapons of any kind. Mr. Seefried brought his Trump flag and the Confederate battle flag. Unfamiliar with downtown D.C., when they arrived they parked at the first open spot they found – immediately adjacent to the Capitol - and followed the crowd to the Ellipse to hear the speech. Mr. Trump urged

---

[13] DeRight Report, p. 2.
[14] Trial Trx. June 13, 2022, p. 107.
[15] Id. at 108.

his followers to "walk down to the Capitol" to "demand that Congress do the right thing and only count electors who have been lawfully slated."[16] After the speech, the Seefrieds and Ms. Cuff followed the crowds to the Capitol, which was also the direction their car was parked. The crowd was boisterous and excited. Crowds around the Seefrieds were shouting that the President was going to meet them at the Capitol. During the walk back to the car, the family got separated and Kevin and Hunter continued to follow the swelling crowds to the Capitol. As the Court learned at trial, Hunter and Kevin entered the building through the broken Senate Wing window. Once inside, Mr. Seefried did not assault any officers or enter any sensitive areas like members' offices or the Senate Chamber. They were inside the Capitol for approximately 25 minutes. After leaving the building, Hunter and Kevin rejoined the women and drove back to Delaware. In the car, as the events of the day dawned upon them, Kevin and Hunter Seefried expressed regret for what happened inside the Capitol.[17]

The next day, Kevin Seefried learned that photos of him inside the Capitol with the Confederate flag went viral and that there had been a strong reaction to the photos. Mr. Seefried's southern relatives had always had the flag and he grew up around it. He was taught that the flag was a symbol of an idealized view of southern life and southern heritage. Lacking an education beyond the ninth grade and lacking even average intellectual capacity, Mr. Seefried did not appreciate the complex and,

---

[16] The government admitted this portion of the President's speech as Gov. Exh. 707. Trial Trx. June 13, 2022, p. 241.

[17] Trial Trx. June 14, 2022, p. 137.

for many, painful, history behind the Confederate battle flag. It was difficult for Mr. Seefried to recognize the extent to which the flag is a controversial symbol and while some view the flag as a symbol of southern heritage as he had been taught, opponents see it as a symbol of racism and slavery.[18] As Mr. Seefried told the agents who interviewed him, he does not know much about history and did not understand the deeper historical significance behind the flag. The government and FBI's investigation into Mr. Seefried demonstrates that he does not subscribe to messages of hate, has never harbored animosity towards any particular group, and has never intended to send that message. He unequivocally regrets the emotions that he elicited by carrying the flag on January 6th. Now, fully appreciating the deeper context behind the flag, he is horrified that his image is out there on the internet in perpetuity for his grandchildren to potentially witness one day.

### C. A sentence of 12 months and one day will avoid unwarranted disparities.

Of course, no two cases—even among those that arise from January 6—are identical. Counsel could parse through every case and find similarities and differences between Mr. Seefried's conduct and others on Jan 6. Undersigned counsel is aware that this Court imposed a 24-month sentence on Hunter Seefried, who of course, entered the Capitol with Kevin and engaged in similar conduct. That said, a slightly lower sentence is appropriate for Kevin for the following reasons: First, Hunter was the first inside; it was only after Hunter cleared the way by removing the

---

[18] *Id.* at 15.

broken glass, Kevin followed his son inside the building. There had been no plan between Hunter and Kevin to enter the building and once Hunter entered, Kevin had little choice but to follow his son. Second, while their conduct once inside was similar, a 24-month sentence for Kevin Seefried—who is a cancer survivor and wears a colostomy bag—will be far more punitive for him that it would be for a young, healthy defendant. The following cases further show that the defense request is warranted when compared to the sentences upon similarly situated defendants:

*United States v. Michetti*, 1:21CR232 (CRC): Defendant convicted by plea of obstruction and sentenced to 9 months incarceration, 36 months of supervised release for entering the Capitol two minutes after the breach. Defendant was part of a mob trying to force its way past a line of police officers in the hallway by the Senate Chamber. He was captured on video yelling various insults at officers including, "we pay you," and calling police "fucking animals." MPD officers used tear gas to push Michetti out of the hallway after which he returned and shouted, "you are starting a civil war," at the officers. Michetti left only after officers deployed tear gas on him Prior to and after attending the rally, Michetti texted messages such as "Gotta stop the vote it's fraud this is our country." While in the building, he posted on social media that "we had breached the building." *See* Gov. Sentencing Memo, ECF. No. 46.

*United States v. Christine Priola*, 1:22CR242(TSC):  Priola, who had earned a master of science, was one of a small number of rioters to reach the Senate Chamber Floor. There, she called an associate and encouraged him to enter. Once inside the Chamber, she stood close to the dais holding a large sign that read "the children cry

out for justice" on side and "we the people take back our country." After January 6, Priola deleted evidence of her participation. *See* Government Sentencing Memo, ECF. No. 56. The Honorable Judge Chutkan imposed a sentence of 15 months.

The government unpersuasively argues that Mr. Seefried's conduct was worse than all other 1512 cases "in one important respect: his confrontation with Officer Goodman at the bottom of the East Grand Staircase ignited a mob pursuit…." Gov. Memo, ECF No. 136 at 35.  First, as was clear in the video, Mr. Seefried in fact quickly dropped the flag to the ground and stepped aside as others followed Officer Goodman up the stairs.  Second, Mr. Seefried actually left the group following Officer Goodman and went down another hallway before he was led upstairs by another individual. Third, the government requested a lesser sentence for Doug Jensen, who was the man in the Q shirt who led the charge to pursue Officer Goodman up the stairs.  *United States v. Doug Jensen¸*21-cr-6 (TJK) ECF No. 107.

In contrast to the other individuals sentenced for the same offense, Mr. Seefried was in the building for a short period of time, did not enter any sensitive areas or a private office,[19] did not bear witness to any violence with police officers, did not threaten or use abusive language towards any officers, did not destroy any property, did not steal any property, did not demean the Capitol with drug or alcohol

---

[19] *Cf. United States v. Herrerra,* 21CR69(BAH), where the defendant, wearing goggles and a bulletproof vest, entered the Senate Parliamentarian Office and threw a stack of papers. Herrerra also entered a senator's "hideaway office" and smoked marijuana there. *See* Gov. Sentencing Memo, at 33.

use, did not post inflammatory or braggadocios commentary on social media,[20] and immediately showed remorse within days of January 6 when he spoke to the FBI. Moreover, he did not dress in anticipation of violence, did not bring weapons, did not go directly to the Capitol after President's speech and had no plans other than to listen to the speech. As the evidence at the trial demonstrated, if the Seefrieds had parked their car west of the White House, they would never have entered the Capitol at all.

As to the encounter with Officer Goodman, Mr. Seefried acknowledges but respectfully disagrees with the Court's conclusions. Still, Mr. Seefried contends that whatever actions Officer Goodman perceived, he was close enough to Officer Goodman to strike him if he wanted to and did not; that the encounter was not so egregious that Officer Goodman recalled the flag-jabbing in any of his written and interview statements, including the prep sessions for his testimony; and that within seconds of seeing Officer Goodman, Mr. Seefried dropped the flag to the ground.

Finally, the Court's verdict appeared, in part, to rely upon the idea that Mr. Seefried's intent would have shifted while on Capitol grounds – that he may not have had the requisite intent while driving to the District or while eating lunch and walking to his car, but that he would have formed that intent at some point. Given the evidence of Mr. Seefried's now documented cognitive limitations, counsel respectfully requests that in assessing his culpability, the Court take into

---

[20] *Cf. United States v. Anthony Williams*, 21CR377(BAH)(defendant actively sought confrontation with police officers and celebrated his presence at the Capitol and posted "militaristic" posts about the election. *See* Gov. Sentencing Memo at 33.

consideration the outsized influence that an emotional crowd would have upon Mr. Seefried.

### i.     The Court should consider the dispositions in the "Portland Riot" cases.

In sentencing Mr. Seefried, counsel respectfully submits that the Court should also consider the government's charging decisions and sentences imposed on rioters who attempted to breach a federal building in protest during the summer of 2020. Indeed, following the murder of George Floyd, protestors descended on the Federal Courthouse in Portland, Oregon. According to the government, the protests in Portland were followed by "nightly criminal activity in the form of vandalism, destruction of property, looting, arson, and assault. . . the Courthouse has experienced significant damage to the façade, glass, and building fixtures during the weeks following this incident."[21] The majority of those protestors received diversionary agreements or their cases were outright dismissed by the government. Prison sentences were imposed only in cases where protestors physically assaulted and injured officers.[22] In response to defense motions alleging selective prosecution, the government has argued that the Portland riot cases are categorically different then the January 6 cases. But that the defendants have not been found to meet the high standard to prevail on a claim of selective prosecution, should not preclude the Court from considering the sentences imposed in those cases, which also involved the

---

[21] *United States v. Bouchard*, case no. 3:20-mj-00165 (D. Ore. July 24, 2020), ECF 1-1 at 4-5.

[22] *See* Chart assembling dispositions in Portland Riot cases, attached hereto as Exhibit 2.

destruction of property, vandalism, and assault on police officers carried out during a political protest in a federal building.[23] The disposition of those cases show that a sentence of 12 months for Mr. Seefried's conduct would come closer to avoiding unwarranted disparity with other cases involving vandalism of a federal building and other offenses that occurred during politically charged protests.

### D. The other sentencing factors are met by a sentence of 12 months and one day.

Twelve months in prison will serve as a just punishment and adequate deterrent. Mr. Seefried has never before spent time in prison. Prison is, by design, uncomfortable, and often unsanitary.[24] Mr. Seefried's colostomy bag, already an uncomfortable aspect of his life he must manage, will be even more challenging to deal with in prison.[25] Beyond the physical discomfort he will certainly encounter, he will be separated from his grandchildren, whom he affectionately calls "his little lights." This impending separation is even more painful to him in the wake of his separation from Stephanie and Hunter's imprisonment. To make matters worse,

---

[23] *See* Order denying Motion for Discovery on Selective Prosecution because defendant had "failed to make a credible showing of different treatment of similarly situated persons" but finding that "disparate charging decisions in similar circumstances may be relevant at sentencing." (internal citations omitted). *United States v. David Judd*, 1:21CR40(TNM) ECF. No. 203 at 12.

[24] *See e.g.*, David Montgomery, *'Prisons are Bacteria Factories'; Elderly Most at Risk*, Stateline, PewTrusts (Mar. 25, 2020), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2020/03/25/prisons-are-bacteria-factories-elderly-most-at-risk.

[25] Kevin Seefried was troubled to learn that Hunter is only permitted three showers per week in prison. He needs to clean the area around his colostomy bag every day with hot water, which will apparently be a challenge in prison. If the area is not clean, it could become infected.

while Mr. Seefried is incarcerated, he will lose much-needed income. As is laid bare in the PSR, when he is released from prison and without Stephanie's support, he will be destitute.[26] These consequence are more than sufficient punishment to deter Mr. Seefried from ever offending again. He needs no additional specific deterrence.

As for general deterrence, sentencing Mr. Seefried to years in prison for entering the Capitol at what he perceived to be the President's urging is not the salve the country needs to ensure that January 6 was as isolated horror. An event like January 6 is unlikely to happen to again[27] and even if it did, the public will not be deterred by the prison sentence imposed on an obscure, impoverished man from Delaware. Further, even if future, hypothetical political protestors were capable of such deductive reasoning, empirical evidence proves that the certainty of prosecution, rather than the severity of punishment is the greater deterrent.[28]

Finally, prison time is not necessary to protect the public from Mr. Seefried. There is no argument that Mr. Seefried *generally* presents a threat to the public, beyond the isolated events of January 6. While the events of January 6 are unique

---

[26] Mr. Seefried is an hourly-wage employee. In 2021, he earned $24,730. He has a joint bank account with approximately $450 in it. PSR ¶ 81. On February 2, 2023, counsel submitted his Net Worth Statement reflecting that his total assets include the $450 and a truck valued at approximately $3000. The PSR documents that he owes debt for medical services in the amount of $2614. PSR¶ 89.

[27] *See* transcript of video sentencing in *United States v. Douglas Sweet*, 21CR41-3 (The Honorable Judge Nichols states, "It is unlikely that the circumstances of led to their actions on January 6 will occur again. It is unlikely that the sitting President will invite them, as part of a large crowd, to protest and demonstrate, even fight at the Capitol. . . ").

[28] *See* National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), full article available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence

and hopefully never replicated, even if the former President were to invite his supporters to a campaign rally in the future, Mr. Seefried would have no desire to attend. His brief foray into political engagement started with President Trump's campaign in 2015 and ended on January 6, 2021. The fallout for heeding Mr. Trump's call has been devastating: Mr. Seefried's wife has left him, he is headed to prison and he will be destitute when he is released. Worst of all, his beloved son is in prison. While he knows he brought this devastating cascade of consequences on to himself, he cannot help but be afraid to ever trust a politician again. As he told agents days after January 6, Kevin Seefried will never again attend another political rally. Because he is not a *general* threat to the public—to the contrary, he is a hardworking father and doting grandfather—prison is not necessary to protect the public from further crimes of Mr. Seefried. Instead, the community will be better off if Mr. Seefried returns quickly to earn his subsistent income and help raise the grandchildren he adores.

## Conclusion

For the reasons stated herein and any others that appear to the Court, Kevin Seefried respectfully submits that a sentence of no more than 12 months and 1 day is sufficient but not greater than necessary to achieve the goals of sentencing. He further submits that due the financial condition described herein and in the PSR, he is not in a position to pay a fine.

Respectfully Submitted,

A.J. KRAMER

Federal Public Defender for the

21

District of Columbia

by:_____s/_____
Eugene Ohm
Elizabeth Mullin
Assistant Federal Public Defenders
625 Indiana Avenue, NW
Washington D.C. 20004
 202 208-7500