<pre>
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
        * * * * * * * * * * * * * * *   )
 3      UNITED STATES OF AMERICA,       )     Criminal Action
                                        )     No. 21-00287-1
 4                    Plaintiff,        )
                                        )
 5         vs.                          )
                                        )
 6      KEVIN SEEFRIED,                 )     Washington, D.C.
                                        )     February 9, 2023
 7                    Defendant.        )     1:22 p.m.
                                        )
 8      * * * * * * * * * * * * * * *   )

 9

10                  TRANSCRIPT OF SENTENCING HEARING
               BEFORE THE HONORABLE TREVOR N. McFADDEN,
11                   UNITED STATES DISTRICT JUDGE

12

13      APPEARANCES:

14      FOR THE GOVERNMENT:      BRITTANY L. REED, ESQ.
                                 UNITED STATES ATTORNEY'S OFFICE
15                               650 Poydras Street
                                 Suite 1600
16                               New Orleans, Louisiana 70130

17                               BENET KEARNEY, ESQ.
                                 UNITED STATES ATTORNEY'S OFFICE
18                               One Saint Andrew's Plaza
                                 New York, New York 0007
19

20      FOR THE DEFENDANT        EUGENE OHM, ESQ.
           KEVIN SEEFRIED:       ELIZABETH A. MULLIN, ESQ.
21                               OFFICE OF THE FEDERAL PUBLIC
                                    DEFENDER
22                               625 Indiana Avenue, Northwest
                                 Suite 550
23                               Washington, D.C. 20004

24

25
</pre>

```
 1    REPORTED BY:              LISA EDWARDS, RDR, CRR
                                Official Court Reporter
 2                              United States District Court for the
                                  District of Columbia
 3                              333 Constitution Avenue, Northwest
                                Room 6706
 4                              Washington, D.C. 20001
                                (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                THE COURTROOM DEPUTY:  Your Honor, this is
 2       Criminal Case 21-287-1, the United States of America versus
 3       Kevin Seefried.
 4                From Probation, Officer Crystal Lustig.
 5                Counsel, please come forward to identify
 6       yourselves for the record, starting with the Government.
 7                MS. REED:  Good afternoon, your Honor.  AUSA
 8       Brittany Reed and Benet Kearney on behalf of the United
 9       States.
10                THE COURT:  Good afternoon, ladies.
11                MR. OHM:  Eugene Ohm and Elizabeth Mullin on
12       behalf of Mr. Seefried.
13                Your Honor, I apologize.  We looked at the wrong
14       entry and saw that 2:00.  We were actually waiting
15       downstairs.  We apologize.  I just wanted to assure the
16       Court it was not Mr. Seefried's fault.  He was here an hour
17       and a half ago.
18                THE COURT:  I heard he was here.  I heard the
19       courtroom was full of people except for his attorneys.
20                We're here for sentencing of the Defendant, Kevin
21       Seefried, who was found guilty by bench trial as to Counts 1
22       through 5 of the superseding indictment.
23                Those counts are obstruction of an official
24       proceeding and aiding and abetting; entering and remaining
25       in a restricted building or grounds; disorderly and
```

1    disruptive conduct in a restricted building or grounds;

2    disorderly conduct in a Capitol building; and parading,

3    demonstrating or picketing in a Capitol building.

4           I've received and reviewed the presentence

5    investigation report and sentencing recommendation from the

6    probation office as well as sentencing memoranda from the

7    Government and the defense.  I've also reviewed the letters

8    attached to the Defendant's memorandum, the Defendant's

9    sealed filing and the supplement the Defendant filed

10   yesterday.

11          Are there any other documents or materials that I

12   should have reviewed?  Ms. Reed?

13          MS. REED:  None from the Government, your Honor.

14          THE COURT:  And Mr. Ohm?

15          MR. OHM:  No, your Honor.

16          THE COURT:  Mr. Seefried, this sentencing hearing

17   will proceed in four steps, some of which may seem

18   mechanical to you.  But I want you to keep in mind why we're

19   here today and the gravity of the situation:  You've

20   committed a federal crime.  Today's proceeding is a serious

21   matter, as it is about the consequences that you will face

22   because of your decision to engage in criminal behavior in

23   violation of federal law.

24          Sir, the first step of today's hearing is for me

25   to determine whether you've reviewed the presentence report

1    and whether there are any outstanding objections to it and,

2    if so, to resolve those objections.

3              The second step is to calculate your recommended

4    sentence under the sentencing guidelines.

5              The third step is to hear from the Government,

6    from your attorney and you, sir, if you wish to be heard

7    about sentencing in this case.

8              And the last step requires the Court to fashion a

9    just and fair sentence in light of the factors Congress set

10   forth in 18 USC 3553(a).

11             As part of this last step, the Court will actually

12   impose a sentence along with the other required consequences

13   of the offense.

14             So turning to that first step, the final

15   presentence investigation report was filed on January 31st,

16   2023.  The probation office filed its final sentencing

17   recommendation on the same day.  The Government filed its

18   memorandum in aid of sentencing on February 2nd, as did

19   Mr. Seefried.

20             Does the Government have any objection to any of

21   the factual determinations set forth in the presentence

22   report?  Ms. Reed?

23             MS. REED:  No factual objections, your Honor.

24             THE COURT:  Mr. Ohm, have you and Mr. Seefried

25   read and discussed the presentence report?

1          MR. OHM:  We have, your Honor.

2          THE COURT:  Does the Defendant have any objection

3     to any factual determinations set forth in it?

4          MR. OHM:  Factually, no, your Honor.

5          THE COURT:  Mr. Seefried, approach the podium,

6     please, sir.

7          Sir, are you fully satisfied with the services of

8     your attorney in this matter -- your attorneys, I should

9     say?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  Do you feel you've had enough time to

12     talk with them about the probation office's presentence

13     report and the papers the Government filed in connection

14     with the sentencing?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  Thank you, sir.  You may have a seat.

17          The Court will accept the facts as stated in the

18     presentence report.  The presentence report will serve as my

19     findings of fact for purposes of this sentencing.

20          And my thanks to Ms. Lustig for her work on it.

21          The presentence report lays out the probation

22     office's calculation of the advisory guideline range that

23     applies in this case.  I'll attempt to summarize the

24     calculation as follows:

25          The guideline 2J1.2 provides the base offense

1   level for a violation of obstruction of an official

2   proceeding is 14.  The probation office has grouped Counts 2

3   and 3 for guideline calculation purposes because they

4   involve the same victim and the same act or transaction.

5   And the guidelines do not apply to Counts 4 and 5, because

6   they are Class B or C misdemeanors.

7           According to the probation office, the offenses

8   carry with them two enhancements:  First, the probation

9   office finds the Defendant caused or threatened physical

10  injury to a person in order to obstruct the administration

11  of justice.  For this, the probation office and the

12  Government submit that the guideline imposes an eight-level

13  enhancement.

14          Second, the probation office and the Government

15  submit that the Defendant's offenses resulted in substantial

16  interference with the administration of justice,

17  specifically the Electoral College certification.  For that

18  substantial interference, the guideline imposes a

19  three-level enhancement.

20          All told, the total offense level is 25.

21          Mr. Seefried has some prior criminal history, but

22  zero criminal history points, placing him in Criminal

23  History Category I.

24          So based on a total offense level of 25 and a

25  criminal history category of I, the guideline range

1    applicable to the Defendant is 57 to 71 months for Count 1,

2    12 months for Counts 2 and 3, and there's no guideline range

3    for Counts 4 and 5.

4            The guideline fine range is $20,000 to $200,000.

5            I know the defense objects to those guidelines.

6    Do you wish to be heard briefly on that, Mr. Ohm?

7            MR. OHM:  Your Honor, obviously, the Court has

8    ruled on similar circumstances.  If the Court has no

9    questions on it, then we'll submit on our briefing.

10           THE COURT:  Ms. Reed?

11           MS. REED:  Same, your Honor.

12           Obviously, this Court has stated numerous times

13   its application or lack thereof of those enhancements.  So I

14   don't think that there is anything that I can say to change

15   the Court's opinion on that.  So I'll defer to my briefing,

16   your Honor.

17           THE COURT:  For the reasons I've previously

18   stated, and most fulsomely in the memorandum opinion in the

19   companion case, *United States versus Hunter Seefried*, I

20   disagree with the probation office's calculation of the two

21   enhancements.  And therefore, I find that the base offense

22   level is the appropriate offense level at least under the

23   guidelines with a 15- to 21-month range.

24           Of course, I think the parties are free to argue

25   for variances, including in reference to those guidelines,

1     and perhaps they'd be appropriate.  But at least in terms of

2     a guideline calculation, I think the 15- to 21-month range

3     is the appropriate one.

4             The Court will now discuss the remaining

5     applicable penalties, which include imprisonment, probation,

6     fines and restitution under the statute.

7             For Count 1, obstruction of an official

8     proceeding, the maximum prison term the Court may impose is

9     20 years.  For Counts 2 and 3, those are each one-year

10    maximum offenses.  And Counts 4 and 5, the disorderly

11    conduct in a Capitol building and parading misdemeanors each

12    carry a maximum of six months' imprisonment.

13            Turning to fines, the obstruction of an official

14    proceeding carries a statutory maximum fine of $250,000.

15    For Counts 2 and 3, entering and remaining in a restricted

16    building or grounds and disorderly conduct in a restricted

17    building or grounds, those carry $100,000 maximum fines.

18    Counts 4 and 5 carry $5,000 maximum fines.

19            There's also a mandatory special assessment of

20    $100 for Count 1, $25 each for Counts 2 and 3 and $10 each

21    for Counts 4 and 5.

22            Turning to supervised release, for Count 1, the

23    Court may impose a term of supervised release of not more

24    than three years.  For Counts 2 and 3, the Court can impose

25    up to one year of supervised release.  And supervised

1    release is not applicable to Counts 4 and 5.

2              Under the guidelines, the guideline range is in

3    Zone D of the sentencing table, and therefore the Defendant

4    is ineligible for probation under the guidelines.

5              There's also mandatory restitution under 18 USC

6    3663A, and the Government has provided documentation

7    proposing a $2,000 assessment for restitution here.

8              Have I stated accurately the statutory framework

9    under which we are operating in regard to this case?

10   Ms. Reed?

11             MS. REED:  Yes, your Honor.

12             THE COURT:  And Mr. Ohm?

13             MR. OHM:  Yes, your Honor.

14             THE COURT:  Before I discuss the other sentencing

15   factors that will bear on the Court's final decision, I will

16   at this point share with the parties the particular sentence

17   the probation office has recommended, taking into account

18   the advisory guidelines sentence, the available sentences

19   and all of the factors listed in Section 3553(a):  The

20   probation office has recommended a sentence of 24 months on

21   Count 1, 12 months on Counts 2 and 3, six months on Counts 4

22   and 5, all to run concurrently.

23             Probation also recommends 12 months of supervised

24   release on Counts 1, 2 and 3, to run concurrently, plus a

25   special assessment of $170 and $2,000 in restitution.

1            The recommendation of the probation office is

2       based solely on the facts and circumstances contained in the

3       presentence report.

4            I must now consider the relevant factors that

5       Congress set out in 18 USC 3553(a) to ensure that the Court

6       imposes a sentence that is sufficient but not greater than

7       necessary to comply with the purposes of sentencing.

8            These purposes include the need for the sentence

9       imposed to reflect the seriousness of the offense, to

10      promote respect for the law and to provide just punishment

11      for the offense.  The sentence should also afford adequate

12      deterrence to criminal conduct, protect the public from

13      future crimes of the Defendant and promote rehabilitation.

14            In addition to the guidelines and the policy

15      statements, I must consider the nature and circumstances of

16      the offense, the history and characteristics of the

17      Defendant, the need for the sentence imposed, the guideline

18      ranges, the need to avoid unwarranted sentence disparities

19      among defendants with similar records who have been found

20      guilty of similar conduct and the types of sentences

21      available.

22            Does the Government wish to be heard on the

23      application of the factors set forth in 3553(a), request a

24      variance or otherwise make a sentencing recommendation?

25            MS. REED:  Yes, your Honor.

 1            THE COURT:  Go ahead, ma'am.

 2            MS. REED:  So at the outset, your Honor, the

 3    Government will be requesting an upward variance in this

 4    matter.

 5            The Court has had the opportunity to read the

 6    Government's sentencing memo and knows that the Government

 7    is asking for a sentence of 70 months in this case.

 8            I'm not going to belabor the Court with a complete

 9    recitation of everything that happened on January 6th, as I

10    know that you have heard that from numerous Defendants who

11    have come into this courtroom and particularly in this case.

12            One of the things, your Honor, that I think sets

13    Mr. Seefried apart from a number of Defendants in this case

14    was that there were numerous opportunities for Mr. Seefried

15    to make different decisions about his conduct on

16    January 6th.  First, your Honor heard that it wasn't

17    necessarily his intention to go into the Capitol Building on

18    January 6th when he traveled with his family from Delaware.

19            We don't dispute that.  You know, he along with

20    other protestors protested what they thought was a stolen

21    election.  They indeed wanted to go to the rally to support

22    President Trump.  That is what Mr. Seefried has stated in

23    his statement to the FBI.

24            But somewhere along the way, things changed that

25    day.  Your Honor heard that Mr. Seefried left that rally

1    after hearing that other individuals would be walking to the

2    Capitol.  He stopped over at his car.  At that point, he

3    didn't make a determination that it was unwise to go to the

4    Capitol.  I think you heard a lot about maybe how he and

5    other Defendants who have come before this Court were

6    energized in a way that they hadn't been before, given the

7    particular political circumstances and that led him to go to

8    the Capitol Building.

9        But it was his conduct when he went to the Capitol

10   that changed things.

11       Going back to Mr. Seefried's statement, he talked

12   a lot about his fatherly instincts that day before he

13   ushered himself inside the Capitol and watched as his son,

14   Hunter Seefried, entered the Capitol as well.

15       Before he entered that Capitol, no fatherly

16   instinct kicked in for him to not enter after seeing two

17   rioters break the windows outside of the Senate wing doors.

18   His own son helped to clear out the glass.  Obviously, we

19   don't advocate that he damaged that property.  But

20   Mr. Seefried's son was maybe the second or third individual

21   to enter inside of the Capitol Building.

22       And at no point did Mr. Seefried, Kevin Seefried

23   himself, say, This has gone too far.  He jumped in behind

24   him.  And in jumping in behind him, we see what makes him

25   distinguishable from other Defendants in this case, is the

1    one-on-one interaction that he had with Officer Goodman.

2         Now, I know that your Honor has heard a number of

3    cases come before it where there are Defendants who have

4    engaged in somewhat -- you can call it battles with

5    officers.  There are clusters of officers who Defendants

6    meet with.  They are yelling profanities at those officers.

7    They are throwing things, some of them even assaulting

8    officers.

9         But Mr. Seefried stands uniquely positioned

10   because of the one-on-one encounter that he had with Officer

11   Goodman.

12        Your Honor had the opportunity to see still photos

13   from the encounter with Mr. Goodman.  We saw the video.  In

14   his statement to FBI, noticeably, Mr. Seefried never talked

15   about the full extent of his encounter with Officer Goodman.

16   Indeed, he stated that he encountered Officer Goodman.  He

17   saw Officer Goodman with his stick.

18        He, Mr. Seefried, said that he had his own stick

19   that day:  your Honor knows, a wooden dowel with a

20   Confederate flag on it.  And I don't want to belabor too

21   much on this point.  I know that it is something that

22   defense counsel has brought up in their submission.  We've

23   never made this case, and it still is not, about

24   Mr. Seefried's right to be in possession of that flag and to

25   express whatever views that he believes that flag expresses.

1          But I do want this Court to take into

2    consideration the fact that this Black officer, who was

3    serving his country, who had served his country in the

4    military, was faced with this Confederate flag being jabbed

5    at him by Kevin Seefried on multiple occasions.

6          That's not something that Mr. Seefried talked

7    about openly in his FBI statement.  In fact, he made it

8    sound like it was a second encounter with an officer where

9    he threw down his stick and he went about his way.  But if

10   your Honor goes back and listens to that FBI interview, you

11   will hear something that is particularly interesting to

12   Mr. Seefried, which is that he could not be stopped that

13   day.  His words to Officer Goodman was, "You will have to

14   shoot me to stop me from coming in here."

15          And that is the time when he decided to drop his

16   stick.  He said, "We are coming in," which brings me to my

17   second point, your Honor, the fact that Mr. Seefried went in

18   with his son but certainly he was emboldened by the time

19   that he gathered with a mob of people.

20          Now, I know that there was some discussion at

21   trial as to whether Officer Goodman correctly remembered his

22   encounter as it relates to the verbal encounter that he had

23   with Mr. Seefried.

24          But Officer Goodman also attributes particular

25   statements to Kevin Seefried.  He remembered Mr. Seefried

1    long before he joined with the mob asking:  Where are the

2    senators and where are the votes being counted?  That is not

3    in dispute, according to what the Court's record said about

4    your finding of credibility for Officer Goodman.

5           So Mr. Seefried is unique in his encounter with

6    Officer Goodman.  And I think that that sets him apart from

7    some of the other individuals who have come before this

8    Court.

9           Not only did he continue his encounter with

10   Officer Goodman; he follows him over with a mob of

11   individuals, and they all land at the stairwell at the east

12   grand staircase.  It's there that Mr. Seefried is emboldened

13   with this mob of rioters who are again yelling these

14   statements, that are making their intent very clear about

15   why he could not stop himself from entering the Capitol on

16   January 6th.

17          He needed to know where the senators were.  He

18   needed to know where the votes were being counted to stop

19   the electoral certification count from happening.

20          And despite the fact that Officer Goodman was

21   telling those individuals he was giving them every

22   opportunity to leave, to not approach him, to get back, they

23   continued to advance and move forward.  And Kevin Seefried

24   was in that group at the front of the line leading the

25   charge up the stairwell.

1        I know that Officer Goodman has sort of identified

2   his own system for identifying the individuals who he

3   remembered on that day.  Kevin Seefried is somebody who he

4   remembered.  And so that shows the significance of

5   Mr. Seefried's actions.

6        As your Honor knows, Mr. Seefried's conduct did

7   not stop there.  He continued to follow Officer Goodman up

8   the stairs, go into the Ohio Clock Corridor, where he

9   continued to focus his intentions -- or attentions; excuse

10  me -- on Officer Goodman.

11        The Court has had the opportunity to see the

12  videos and the photographs that we submitted at trial where

13  Officer Goodman is now in a line of officers and Kevin

14  Seefried seems to be approaching him directly with a water

15  bottle in his hand, still armed with a Confederate flag,

16  seemingly giving all of his attention to Officer Goodman,

17  who at this point had the opportunity to at least get the

18  support that he did not have when he first encountered

19  Mr. Seefried when Mr. Seefried first entered the Capitol.

20        And again, your Honor, there's another opportunity

21  to disabuse that situation.  The fatherly instinct should

22  have told him that now he and his son are now in a terrible

23  situation that clearly has spun out of control.  And

24  Mr. Seefried does not do that.

25        You heard the testimony from Officer Morgan at

1    trial.  You yourself, your Honor, are familiar with the

2    *Rubenacker* case where Mr. Morgan -- or Officer Morgan says

3    that he was in the course and scope of trying to decide or

4    learn whether an individual was in possession of a weapon.

5    We know now that he was not.  But he was searching the bag.

6    And it was Kevin Seefried who went over to him.

7           And instead of letting another officer do his job,

8    instead of letting already the exorbitant amount of

9    resources that were being given to this situation sort of

10   play out, Mr. Seefried has to interject himself again.  And

11   on this occasion, he particularly asks Officer Morgan how is

12   it that he can work for these liars and these thieves.

13          And in this context, your Honor knows at this

14   point Mr. Seefried was referencing the members of Congress

15   who were there that day doing their job.

16           So, your Honor, Mr. Seefried does not stand like

17   some of the other individuals who I know we've cited in our

18   memos and some of which the Defendant has cited in theirs.

19   There are a number of individuals who entered into sensitive

20   spaces that day.  We had an individual who entered the

21   Senate floor.  We had individuals who were right outside of

22   then-Speaker Pelosi's office.

23          We certainly do not indicate or offer to the Court

24   that Mr. Seefried was one of those individuals, but his

25   conduct was no less dangerous on that day.  His actions were

1    significant, your Honor.  And we believe that, given the

2    nature of his -- his conduct alone that it is befitting that

3    a sentence of 70 months be offered -- or be given in this

4    case.

5              Now, I know one thing that is significant is the

6    fact that his Co-Defendant has been sentenced to 24 months.

7    But I would like to recall that this Court was able to

8    somewhat distinguish both itself.  And while we have always

9    made it clear that we believe that Hunter Seefried's actions

10   are those of an adult man, we can't help but face the

11   reality that what brought Hunter Seefried to -- from Laurel,

12   Delaware, to Washington, D.C., that day was his father.  His

13   father was the one who decided to take the trip.  Of course,

14   he went along with him.  But he was following along with his

15   father.

16             And his father did not do what a father should

17   have done, which was to make himself and his son do

18   something different on that day.

19             And so your Honor sentenced Mr. Hunter Seefried to

20   24 months also based on his age.  You also factored in the

21   fact that he had very limited, I guess, experience with

22   politics or knowledge about politics.  Your Honor did hear

23   some testimony about the fact that Mr. Seefried does have a

24   limited education.  He still had a sufficient understanding

25   of what was bringing him into the Capitol on that day.

1        And so, your Honor, there is a distinguishing

2   factor between these individuals, although they are in the

3   same case with one another.

4        One other point that the Court -- that the

5   Government wishes to bring to the Court's attention is the

6   fact that Kevin Seefried stands different from Hunter

7   because Kevin Seefried had specific direct contact with

8   officers that Hunter did not have.

9        If I remember correctly, there was a lot of

10   testimony about menacing behavior that Hunter was

11   exhibiting, the balled-up fists.  Those were nonverbals.

12   And we know that his father, Kevin Seefried, exhibited

13   verbals.  We know that officers had a particular memory of

14   Kevin Seefried when they really did not have a significant

15   memory of Hunter Seefried.

16        While Hunter's conduct was no less serious than

17   his father's, we are to believe that comparably Kevin

18   Seefried's should be higher because of his conduct on this

19   day, particularly as I've already highlighted with Officer

20   Goodman.

21        I know that this Court has to take a number of

22   factors into consideration.  Ms. Kearney and I were in a

23   very long discussion about the fact that Mr. Seefried does

24   have some health challenges, and we certainly know that that

25   will factor into the Court's determination as well.

1          But I do want to point out, your Honor, that

2    throughout his time having recovered from Stage 4 cancer and

3    having had the situation that he had with the colostomy bag,

4    he has been employed.  He certainly had those conditions

5    minus the cancer when he went into the Capitol on

6    January 6th.  So while that should be a factor that should

7    be considered, it shouldn't be a significant factor that

8    would significantly mitigate his behavior on January 6th.

9          So taking all of that into consideration, your

10   Honor, as well as some of the other Defendants who we

11   believe are similarly situated with Mr. Seefried, the

12   Government requests a sentence of 70 months for an upward

13   variance in this case.

14          THE COURT:  Thank you, Ms. Reed.

15          Mr. Ohm, do you wish to be heard on the

16   application of the factors set forth in 3553(a), request a

17   variance or otherwise make a sentencing recommendation?

18          MR. OHM:  Yes, your Honor.  Thank you.

19          Your Honor, as the Court knows, we are asking the

20   Court to sentence Mr. Seefried to a period of incarceration

21   of one year and one day.

22          Before I talk about the 3553 factors, I do want to

23   recognize Mr. Seefried's family members and his close

24   friends:  His son Kevin, Jr., and his daughter Elisa are

25   here, as is Tatum Motwell and his wife, Stephanie Seefried.

1              Your Honor, I think both the Court and I and the

2       Government here, too, have met many of the folks who were

3       involved in January 6th.  And I just want to start by

4       pointing out who Kevin is.  He's not one of the individuals

5       who wanted to overthrow the government, a true believe who

6       needed to get on the stand and shout out their beliefs.

7       Frankly, your Honor, those folks have paid lawyers and they

8       have GoFundMe pages.

9              Mr. Seefried is not one of these people.  In fact,

10      in terms of profile, he is much more like the individuals

11      who are charged with the misdemeanor offenses.

12             Of course, the Government charged him with the

13      obstruction charge; and Mr. Seefried certainly respects the

14      Court's verdict.

15             But as the Government just acknowledged, we've

16      learned that the intent that Mr. Seefried -- that the Court

17      found that Mr. Seefried had when he was inside the building

18      was not the intent that Mr. Seefried had up until the moment

19      that he approached the building.  We've learned that from

20      Anastasia Cuff, who the Court credited and the Government

21      seems to agree that in terms of before, in terms of after,

22      none of the intent that is associated with the worst

23      offenders of January 6th -- Mr. Seefried didn't have any of

24      that intent.

25             Furthermore -- and I think this is in contrast to

1    Hunter Seefried -- he didn't post any social media

2    afterwards or before encouraging other people to go.  He

3    didn't brag to other people.  None of that conduct existed.

4    In fact, the Court heard from Anastasia Cuff that while the

5    Seefrieds were heading back home, while they were

6    recognizing on their phones and social media all the things

7    that had transpired, that Mr. Seefried automatically and

8    immediately felt regret.

9            That's actually borne out by everything that

10   Mr. Seefried did.  I know that we -- I'd like to incorporate

11   my discussion of acceptance of responsibility at this point.

12           Mr. Seefried very shortly after -- I think he was

13   one of the first people -- he turned himself in in Delaware.

14   He spoke to the police or the FBI voluntarily and gave

15   essentially the account that we've all sort of been basing

16   our case upon.  I think the Court noted at trial there

17   actually weren't any factual disputes in this case.  There

18   was one that arose because of Officer Goodman's testimony,

19   which I would note the defense did not know that Officer

20   Goodman was going to say that.  I think the Government

21   didn't know either.

22           But in terms of the factors as we understood them

23   through discovery, there was no dispute.  We essentially

24   said, and Mr. Seefried said many times, that he'd be

25   completely willing and was entirely regretful and remorseful

1    of the offenses that made him -- inculpated him on his

2    presence in the Capitol Building.  He was ashamed of that

3    from the start.  And he was ashamed of being associated with

4    and knowing that he -- whether he wanted to or not, that his

5    presence aided others who had different feelings.  He

6    recognized that from the start.

7            But what he didn't do or what he did not want --

8    what he did not plead guilty to was the things that are

9    being challenged now in the D.C. Circuit:  the 1512, the

10   legitimacy of that statute in this context, and the idea of

11   corrupt intent.

12           And frankly, your Honor, things have percolated

13   since then; but back when this case was tried, it was one of

14   the first 1512 trials.  I don't believe -- this sort of

15   trend of stipulated trials hadn't come about yet.  The

16   Government hadn't offered that as an option.  And there was

17   a lot of discussion about whether Mr. Seefried's conduct

18   amounted to the 1512 with the Government; and in the end,

19   the Government declined to give him an offer.  And so we

20   came here before your Honor essentially conceding the counts

21   and pointing out that Mr. Seefried was accepting

22   responsibility.

23           We would point out still now that in the -- within

24   the guideline application notes, that Mr. Seefried did

25   truthfully admit his conduct both at -- at the FBI and

1    really never contested any of the facts that the Government

2    had presented in discovery; that he, I think -- the

3    equivalence of voluntarily terminated or withdrew from his

4    criminal conduct.  He surrendered to authorities promptly.

5    I believe he gave up his phone without a search warrant.  So

6    he voluntarily assisted the authorities.

7         So this does fall into the category of the rare

8    situations where he clearly demonstrated his acceptance of

9    responsibility as a factual matter.  The only thing we were

10   really arguing was the obstruction charge.

11        So we would ask the Court to find that he accepted

12   responsibility.  And if the Court does not do so, we would

13   ask the Court to vary its sentence downward in order to

14   incorporate that fact.

15        So it seems like we all agree that when

16   Mr. Seefried came, he was essentially one of the individuals

17   who were planning on going to the rally.  And I think

18   factually the Court knows that after the rally, they left

19   early because they got hungry and then they went to a food

20   truck.  They took the food to the car.

21        The car -- as the Court knows, there's some

22   parking spaces by the Capitol area that aren't manned.  So

23   that's where they had parked.  They went and ate lunch

24   literally outside the car.  And the Court has seen the video

25   and seen that -- that drew the crowd, that they had stood by

1    the car for some period of time and heard from Anastasia

2    Cuff that it wasn't until the crowd passed them and people

3    were encouraging them to go that they decided to go to the

4    Capitol Building.

5           So I know that the Court -- the Government seems

6    to agree -- that the intent must have been sometime -- had

7    formed at some point between the time that they approached

8    the Capitol Building and then -- or sometime inside the

9    building.

10          That intent may not matter -- or when that intent

11    was formed may not matter for purposes of trial.  But, your

12    Honor, we would submit that it certainly matters for

13    purposes of sentencing.  Mr. Seefried certainly is not as

14    culpable as those individuals who were -- and we've talked

15    about this in our briefing -- there are some individuals who

16    are rallying others to come to the Capitol, who were talking

17    openly about civil war, talking openly about storming the

18    Capitol.  There was none of that from Mr. Seefried.

19          And when we are discussing Mr. Seefried

20    individually and his nature and characteristics, we would

21    point the Court to our sealed exhibit because, again, in

22    terms of mitigators, your Honor, and in terms of mitigators

23    in a situation where an individual is frankly caught up in

24    the moment of what the crowd is doing, cognitive

25    deficiencies are extremely and inordinately relevant.  And

1    the Court -- I know the Court has heard from me many times

2    trying to argue mitigation, trying to argue mitigators in

3    much more -- well, let's just say street crime offenses

4    where individuals were sort of caught up in what other

5    people were doing.  And one of the most reliable predictors

6    or one of the most mitigating factors is the cognitive

7    issues of the individual.  I argue them with your Honor in

8    terms of people's youth.

9         But when we're talking about Mr. Seefried, make no

10   mistake, your Honor:  The findings mean that if Mr. Seefried

11   was in a room of 100 people that -- at the time of the

12   incident, that 95 of those individuals were -- would have

13   scored higher in the testing.  That's a significant and

14   substantial factor for the Court's consideration.

15        And it would be one thing if he had had the

16   preconceived intent, if he was coming to the District to go

17   inside the Capitol.  But when you have the Government

18   agreeing that that's not what happened and then somebody who

19   has these sorts of limitations, the Court should consider

20   that his culpability is mitigated substantially, given what

21   he was dealing with and who he was at the time that this

22   incident occurred.

23        And of course, predictably, your Honor, as soon as

24   he figured out what it is he had done, he acted

25   remorsefully.  He showed contrition and he did what he was

1    supposed to do.

2             I would note, I know that the Government just

3    talked about Mr. Hunter Seefried.  And certainly the

4    Government has good arguments that Mr. Kevin Seefried should

5    have made better decisions that day.  But when he had time

6    to reflect upon it, one of the things that he did do was

7    encourage Hunter to join him when he went to the FBI

8    building in Delaware to turn themselves in.

9             This is an individual who, while he was eating

10   lunch -- a food truck sandwich by his car did not have the

11   intent to commit this felony.  And somewhere in the next 20

12   minutes, as the Court found, he did.

13            And so we have to look deeply into why it is that

14   he went -- that he turned from his conduct, which is

15   essentially that of one of hundreds of thousands of people

16   who rallied in support of President Trump, or who he ended

17   up being, which is as we know now a bit of a poster child

18   for January 6th.

19            After the Government decided not to make him the

20   plea offer -- and I would note also that the Government did

21   not offer conditional pleas, and I don't believe still are

22   offering conditional pleas as to the obstruction offense --

23   he waived jury.  He did not contest any misdemeanors.  We

24   indicated to the Court from opening statement that there was

25   no plan to contest any facts.

1          In that regard, Mr. Seefried has always shown his

2     acceptance of responsibility and has shown who he is when he

3     has time to think and he's not reacting to -- whether it be

4     energy or whether it be mob mentality, the actions of the

5     crowd.

6          The Government's entire basis for their variance

7     request relies, it seems, on the encounter, as the Court

8     called it, with Officer Goodman on January 6th.

9          Let us start by saying that I can't imagine what

10    Officer Goodman was going through that day and what it would

11    be like to sort of recall the events that he had.  If the

12    Court recalls, this incident or this face-to-face meeting

13    was the second at least or -- if not more -- that there were

14    additional very traumatizing events that Officer Goodman

15    went through even before he came back into the building.  He

16    said he was outside.  That was what he described as worse

17    than -- or as bad as Iraq, what was going on outside.

18         So he was already actually traumatized when he

19    came in.  And as the Court might recall, this is when

20    Mr. Seefried -- I don't think he'd been in the building for

21    more than a minute at that point.  It was down the hallway

22    from the window and into that vestibule.

23         And the Court ultimately found that there was

24    essentially a ten-second period or up to ten-second period

25    that wasn't accounted for by the video, and within that

1    ten-second period that Officer Goodman correctly recalled

2    that Mr. Seefried had jabbed his flag towards him.

3           Your Honor, we would submit -- and of course

4    Mr. Seefried does not agree with that, but obviously

5    respects the Court's finding.  We would respectfully submit

6    that if -- it is possible for Officer Goodman to recall what

7    he recalled and seen it correctly, but that Mr. Seefried did

8    not intentionally intend to either frighten or ward off

9    Officer Goodman in whatever seconds occurred at that time.

10           We would point again to Mr. Seefried's actions.

11   Number one, I think from the distance that Officer Goodman

12   was describing, if Mr. Seefried's intent was to assault him,

13   that's what would have happened.

14           Number two -- and I know the Court remembers the

15   sound that we attempted to point out to the Court -- but I'm

16   assuming the Court eventually heard it, because I know the

17   Court reviewed it many times.  But that was -- it was

18   dropped almost immediately.  It was dropped onto the ground

19   several seconds later.  So again, the intention is

20   demonstrated by the actions.  If he wanted to assault, there

21   would have been conduct and he wouldn't have dropped his

22   flag to the ground.

23           The Government also says that he joined this mob.

24   And while the facts I think can arguably support that, what

25   actually happened is that Mr. Seefried stepped to the side

1    and then trailed the group that had gone up the stairs.

2           And then while the rest of them went up the

3    stairs, he alone actually took a detour, if the Court

4    remembers in that stairs video, to the right, spent like 20,

5    30 seconds there until he was retrieved; and that's when he

6    headed up the stairs.  So I think it's a mischaracterization

7    to say that he joined the mob.

8           If you had -- for example, I think Doug Jensen,

9    who I believe the Government asked for less time than

10   Mr. Seefried -- he's one I think that you would -- was

11   clearly chasing after Officer Goodman.  Mr. Seefried again

12   had not yet been in the building, didn't know where he was

13   going, and so he ended up there.  But I don't think that

14   there's any -- that there's any evidence that that's what he

15   was trying to do.  In fact, he went in a different direction

16   initially.

17          Then of course he was part of the group that was

18   upstairs in the Ohio Clock Corridor.  There's no evidence,

19   no indication, really no reason to think that Mr. Seefried

20   knew what was on the other side of the doors very close to

21   him.

22          There's no -- and while there was arguing,

23   shouting, again, I would submit to the Court that whatever

24   it was that was heard and repeated were things that

25   Mr. Seefried -- that he had -- he was repeating the words

1          that others around him were saying.

2                    Because up until that point -- and again, as

3          Ms. Cuff said, he had never talked about the certification.

4          He had never talked about what was going on in the Capitol.

5          He had never talked about this procedural vote that was

6          supposed to happen that we have no reason to think that

7          Mr. Seefried really understood the significance of.

8                    Your Honor, because the Government has focused on

9          that confrontation, we would ask the Court to seriously

10         consider the sentence in the case of David Blair, which we

11         pointed to in our supplemental briefing.  Mr. Blair actually

12         saw a rioter who was acting out of control and an officer

13         attempted to apprehend that person.  Mr. Blair, who was

14         carrying a Lacrosse stick as well as a flag, assaulted the

15         officer, pushed him with his Lacrosse stick away.  And the

16         Government allowed him to plead to the lesser felony of

17         civil disorder and he was sentenced to a period of five

18         months of incarceration.

19                   Mr. Blair was not a cancer survivor.  He did not

20         have the substantial mitigators that Mr. Seefried has.  And

21         factually, especially in terms of what the Government has

22         focused the Court upon as to what makes Mr. Seefried

23         different, he is among the closest comparisons to

24         Mr. Seefried even in the light most favorable, I guess,

25         against Mr. Seefried.

1          The other factors that the Court should consider

2     is Mr. Seefried has no history.  There haven't -- he has

3     never been part of any sort of organization, whether it be

4     right wing, whether it be extremist, whether it be

5     particularly political.

6          And frankly, when thinking about the sentencing,

7     because as the Court knows I was just here a little bit ago,

8     I was thinking about the similarities that individuals like

9     Mr. Seefried have with a lot of my other clients.  And there

10    are so many different factors, your Honor, that merge.  And

11    perhaps not coincidentally, but Mr. Seefried, like many

12    others, did not have any particular advantages.  He had a

13    difficult upbringing.  He had an abusive father who was

14    absent after a little while.  He was self-described

15    dirt-poor poor.  He had a ninth-grade education.  And unlike

16    some that I represent, he actually did not have any access

17    to special education.  There was no testing that was done

18    within the public school system where he grew up.

19         And this -- these issues, which -- and I would

20    point out, your Honor, I have represented lots of folks in

21    January 6th.  This is the first time we've asked for the

22    evaluation that we did.  So it was based on fact and based

23    on perception.  But that was the first time that he had been

24    evaluated.

25         He has had already substantial consequences that

1  are either around the corner or have already happened.

2  We've talked about his relationship with his wife.  Along

3  with that, your Honor, Mr. Seefried does not have currently

4  healthcare that he can turn to to continue to treat his

5  cancer.  He has annual screenings to make sure it hasn't

6  come back.

7       He certainly will miss seeing his grandson, which

8  he saw on a weekly and stayed with on a biweekly basis.  And

9  he also has to live with the knowledge that because of the

10  poor judgment that he had that day, that his son is

11  incarcerated, sort of beginning the cycle that we often see

12  in a lot of our other cases.

13       And certainly, your Honor, the Court knows that

14  he's in a little bit of -- he's in an enhanced level of

15  danger when you're talking about entering into the Bureau of

16  Prisons.  He will lose his job and his subsistent income.

17       When comparing Mr. Seefried with all of those

18  mitigators, I also want to point out one last time that he

19  did not go into any sensitive areas in the Capitol, and

20  certainly not knowingly.  There was no preparation for

21  battle.  There was no flak jacket, helmets, a lot of other

22  things that we've seen.  We've talked about the lack of

23  social media posts, the immediate regret, not bragging after

24  the fact.

25       Although he was animated, there was no abusive

1    language towards the police.  He did not use drugs or

2    alcohol and disrespect the Capitol.  He did not destroy any

3    property.

4            He does not have -- the PSR said, your Honor, the

5    only -- it noted one arrest.  But I don't think that there

6    was any conviction to -- even older convictions.  And he did

7    not intend to go into the Capitol until he did.  He's been

8    entirely compliant on pretrial release with zero violations

9    throughout the course of this case.

10           Lastly, your Honor, I do want to point out around

11   the country there have been other cases that have been --

12   resulted in both physical damage, destruction of property,

13   arson, federal buildings that relate to political protests;

14   and there certainly has been some question as to whether

15   there's been equal justice amongst the prosecution of

16   individuals across political lines.

17           Your Honor, we have included in our submission the

18   Portland riot cases, the vast majority of which were

19   dismissed or diverted, and would like to point out that not

20   a single person that I understand in this courthouse charged

21   with any circumstances has had their case dismissed or

22   diverted, and that this is certainly something that the

23   Court should consider for sentencing.

24           And the Court should consider that if Mr. Seefried

25   with all of his mitigating factors and what he actually did,

1    if he had been arrested in Portland, Minnesota, if the

2    Government would be seeking this much prison time or if he

3    would have even been prosecuted.

4          Finally, your Honor -- well, I know the Court will

5    let me have an opportunity at the end.  So I just wanted to

6    summarize and say that the Court that the sentence -- the

7    appropriate sentence that is no greater than necessary but

8    is sufficient to address what Mr. Seefried has done, his

9    remorse, his acceptance of responsibility and all of the

10   mitigating factors that he has, that the appropriate

11   sentence would be one year and one day.

12         THE COURT:  Thank you, Mr. Ohm.

13         Mr. Seefried, you have the right to make a

14   statement or present any information to mitigate the

15   sentence.  Would you like to say anything that you would

16   like me to consider before imposing sentence?

17         THE DEFENDANT:  Yes, your Honor.

18         THE COURT:  All right, sir.  You may approach the

19   podium.

20         THE DEFENDANT:  Dear Honorable Judge McFadden, I

21   am deeply sorry for my part in January 6th, 2021.  My

22   intention on that day were to -- my intention on that day

23   were to go to the Trump speech.  I never had any plans on

24   going in the Capitol.  I got caught up in the crowd and

25   momentum of everything else going on.

1          I know that I made a terrible mistake, and my

2     family is suffering because of it.  Through all this, I have

3     lost my son and I have lost my wife.  On that day I entered

4     the Capitol, I had no idea that any of this would ever

5     happen.  If I had any idea that I would be facing prison

6     time and taken away from my family, I never would have gone.

7     I knew going through the window of the Capitol was wrong,

8     and I never should have entered the window of the -- I never

9     should have entered -- never should have entered the Capitol

10    through that window.

11         Going through there, my intention was to use my

12    voice and not stop the vote or anyone who was voting.  I

13    thought that standing there and using my voice was protected

14    under freedom of speech.  But I know that I crossed the

15    line.

16         I am sorry to the officers and their families that

17    were there on that day -- that were there January 26,

18    2021 -- or January 6.  Excuse me.

19         I am deeply sorry for my part in that day, and I

20    had no idea that it would turn out this way.  I never wanted

21    to send a message of hate.

22         THE COURT:  Thank you, sir.

23         I'm going to take about a five-minute break.

24         (Thereupon a recess was taken, after which the

25    following proceedings were had:)

1          THE COURT:  Mr. Seefried, could you approach the

2     podium, sir.

3          I've assessed the particular facts of this case in

4     light of the relevant 3553(a) factors and I now want to

5     provide remarks for the record and for you, sir, about my

6     considerations in regard to the nature of the offense, your

7     history and characteristics and the other statutory

8     considerations.

9          On January 6th, 2021, you participated in a

10    national embarrassment.  Not only did you engage in a riot

11    that obstructed the certification of the electoral count and

12    caused hundreds of injuries to law enforcement officers and

13    millions of dollars in damage to one of our nation's most

14    sacred buildings, but you were one of the very first rioters

15    to break into the Capitol.

16         You were right there when the rioters broke the

17    windows beside the Senate wing door.  You had every reason

18    to know you shouldn't be there, as you admit today, that you

19    shouldn't be doing this.  And yet you continued.

20         You were then part of the mob that confronted and

21    ultimately chased Officer Goodman through the halls of the

22    Capitol, ending just outside the Senate chamber.  I can't

23    tell you how appalling it was to watch video of a US Capitol

24    Police officer being chased through those hallways.  That

25    was a demeaning, humiliating moment for anyone who cares

1     about law and order; and you participated in that mob.

2            When the officers asked you to leave, you refused.

3     Your actions on January 6th were a flagrant affront to our

4     system of government.

5            Your decision to take a Confederate battle flag

6     into the U.S. Capitol was especially shocking.  It was,

7     after all, the symbol of the seceding states that warred

8     against the Union.  Even putting aside the flag's racist

9     connotations that you say you didn't intend, bringing the

10    Confederate flag into one of our nation's most sacred halls

11    was outrageous.  And then, as if that wasn't bad enough, you

12    used it to jab at an African-American police officer who was

13    guarding the Senate.

14           Sir, I hope you realize how deeply offensive, how

15    troubling it is that you used a Confederate flag as a weapon

16    against Officer Goodman.

17           He also testified that you angrily said things

18    like, "I'm not leaving.  Where are the members at?  Where

19    are they counting the votes at?  You can shoot me, but we're

20    coming in."

21           In short, among the January 6th rioters I've

22    sentenced thus far for nonassaultive conduct, your actions

23    are at the most egregious end.

24           I've also considered the fact that it was because

25    of your influence that your son Hunter was there and inside

1    the Capitol Building on that day.  To be sure, he is

2    responsible for his own actions; but rather than being a

3    source of fatherly wisdom and discretion on that day, you

4    were the instigator.

5        Against all of that, you have no criminal history,

6    which is notable for a criminal defendant at your age.  I

7    also believe that you had just been planning to go to the

8    rally.  There's no evidence that you'd planned to breach the

9    Capitol beforehand, and the Government doesn't argue

10   otherwise.  It looks to me like you got caught up in the

11   moment.

12       I also note your good employment record and the

13   letters submitted on your behalf that testify to your good

14   character.

15       I've also considered your personal health

16   difficulties and your childhood circumstances.  I am sorry

17   for you, particularly what you've been going through in the

18   last few years.  I think that is certainly difficult.  But I

19   disagree with your attorneys that those would justify a

20   downward variance.

21       I've considered the fact that you've turned

22   yourself in to authorities.  I realize you did this only

23   after you knew you were likely to be arrested and that you

24   minimized your conduct in your interview with the FBI.  But

25   still, your decision to surrender to authorities is quite

1    unusual and merits consideration in sentencing.

2           Similarly, I note that you've had no issues while

3    on pretrial release, which is another factor in your favor.

4           I've also considered Mr. Ohm's argument and the

5    sealed memorandum.  Ultimately, I disagree that mental

6    acuity could be a mitigating circumstance here.  I think the

7    issues that really drive this sentence are things like

8    entering through a broken window, threatening an officer

9    with a flagpole, chasing an officer through a corridor,

10   looking for senators.  These are statements, these are

11   actions that you fully knew were wrong that are not

12   sophisticated issues that you might not have known what you

13   were doing.  I think you did know what you were doing and

14   the fact that they were wrong.

15          I do credit your remorse.  I appreciate your

16   letter and your statements just now, and I think that is

17   genuine and is certainly relevant at sentencing.

18          I disagree with your attorney that you should be

19   entitled to an acceptance of responsibility credit.  I think

20   while I agree you've largely conceded to the misdemeanors, I

21   think the obstruction charge was not just a matter of legal

22   questions, but also that you very much disagree, for

23   instance, with the Government's evidence and what I found

24   regarding your interactions with Officer Goodman.  I think

25   there were very real factual disputes about your intent.

1          The version, as I say, that you told to the FBI

2     immediately after your arrest or before your arrest is very

3     different in some ways to what I found.  I think all of

4     these things convince me that acceptance-of-responsibility

5     credit is not warranted, although I do believe your remorse

6     is relevant.

7          In light of your remorse, your lack of criminal

8     history and the unique circumstances that led to

9     January 6th, I'm not concerned about recidivism or specific

10    deterrence here.  However, I think the need for general

11    deterrence to reflect the seriousness of the offense, to

12    promote respect for the law and to provide just punishment

13    for the offense, do all argue for a significant period of

14    incarceration here.

15         The attorneys make several arguments about

16    unwarranted sentences disparities, which I want to address

17    now.

18         First, your attorneys point to the Portland riots

19    and the Justice Department's lassitude in prosecuting those

20    cases.  Your memorandum in aid of sentencing includes a

21    chart showing dozens of Portland rioters charged with felony

22    assaults, most of whom had their charges dismissed or

23    deferred altogether, and the rest of whom the Government

24    requested receive probationary or low-end sentences.

25         And it's not just defense attorneys who have

1   noticed this disparity.  The Government disclosed in one of

2   my recent January 6th trials that their lead case agent had

3   raised concerns with the FBI about the Justice Department's

4   overcharging of January 6th cases in relation to how it

5   treated the Portland riots.

6          Relatedly, two attorneys were just sentenced to

7   about a year in prison for fire-bombing a New York Police

8   Department cruiser during the Black Lives Matter riots in

9   2020.  Those low-end sentences were only possible because

10  the Justice Department allowed the Defendants, Colinford

11  Mattis and Urooj Rahman, to plead to charges carrying a

12  maximum of ten years' incarceration, far below their

13  original indictment carrying 45-year terms, and then the

14  Government incredibly allowed them to withdraw their pleas

15  and enter into even more generous pleas to charges with a

16  maximum of two years' incarceration.

17          It's hard to see how these charging decisions,

18  compared to the Government's response to the Capitol riots,

19  live up to -- and to see those things and think that the

20  Justice Department is living up to the Attorney General's

21  promise that there will not be one rule for Democrats and

22  another for Republicans, one rule for friends and another

23  for foes.

24          Having said all that, I am not the Justice

25  Department's Inspector General, nor I do sit on a

1    Congressional oversight committee.  I'm a trial judge, and I

2    need to handle the cases in front of me according to the law

3    and the Constitution.  The law at issue here, 18 USC

4    3553(a), only allows sentencing judges to consider

5    unwarranted sentencing disparities between defendants with

6    similar records who have been found guilty of similar

7    conduct.

8          I do not think the cases cited by your attorneys

9    fit this narrow category.  Among other reasons, the

10   defendants noted by your attorneys were charged with

11   assaultive conduct, while you were convicted of obstruction

12   of an official proceeding, the certification of the

13   electoral vote at that.  These cases are just too different

14   to be relevant to your sentence here.

15         As I've discussed, there's also disagreement about

16   what sentencing enhancements should apply.  The Government

17   argues that an eight-level enhancement applies because you

18   caused or threatened to cause physical injury to a person,

19   or property damage, in order to obstruct the administration

20   of justice.

21         Similarly, the Government argues that a

22   three-level enhancement is appropriate because the offense

23   resulted in substantial interference with the administration

24   of justice.

25         Of course, I have an independent duty to determine

1    the applicability of the enhancements.  I think the

2    guideline range calculated by the probation office and

3    recommended by the Government results in an overly harsh

4    sentence here.  In particular, I think the eight-level

5    enhancement under guideline 2J1.2 is too severe, given that

6    you yourself didn't injure anyone or damage any property.

7         Having said that, I think your actions with the

8    Confederate flag and specifically involving Officer Goodman

9    are aggravating factors that demand some additional

10   punishment over the guideline range I have calculated.

11        In short, I don't think that the guideline applies

12   here for various reasons; but even if it did, I would vary

13   down at least in part to compensate for what I think would

14   be an overly lengthy sentence.

15        I do think the substantial interference

16   three-level enhancement is relevant.  Even though I don't

17   think the administration-of-justice language actually

18   applies to this situation, I have no doubt that the

19   Sentencing Commission would have intended for this to apply

20   to substantial interference with an official proceeding like

21   the certification process, which is itself more significant

22   than almost any court proceeding.

23        And you and your fellow rioters were responsible

24   for substantially interfering with the certification,

25   causing a multiple-hour delay, numerous law enforcement

1    injuries and the expenditure of extensive resources.

2         Therefore, I intend to vary upwards from the

3    guideline I've calculated to reflect the substantial

4    interference you and others caused.

5         I think this is a difficult case to peg in

6    relation to the other Defendants who have been sentenced for

7    similar conduct.  On the one hand, as I've said, your

8    actions on that day seem to have been a complete aberration

9    for you, which puts you on a different category from

10   Defendants who have been planning and hoping for a

11   January 6th-type riot.

12        On the other hand, some of these Defendants have

13   pled guilty, and they are rightly entitled to credit for

14   their acceptance of responsibility that you are not entitled

15   to.

16        I've also considered the proposed sentencing

17   comparators submitted by the Government along with the

18   sentencing comparators in your memorandum regarding people

19   whose behavior you claim was worse than yours.

20        I do want to mention a few cases I see as

21   especially relevant comparators.  Most importantly I've

22   considered your son's sentence of 24 months.  He was

23   convicted of substantially the same charges as you, also

24   went to trial, also chased Officer Goodman and also has no

25   criminal history.

1          I think your role in encouraging your son's

2     participation and your actions with the flagpole are

3     aggravating factors that warrant a lengthier sentence than

4     his.

5          At the other end is Mr. Hale-Cusanelli in

6     21-CR-327, who was convicted at trial of similar counts.

7     Your conduct on January 6th was potentially even more

8     serious than his, but he also perjured himself on the stand,

9     showed a lack of remorse and had a history of racist conduct

10    that weighed against him.  I believe his sentence of 48

11    months is something of a ceiling for what you should face.

12         Finally, I've considered the case of Christian

13    Secor, 21-CR-157, who pled guilty to obstruction of an

14    official proceeding after he helped a group of rioters push

15    open the Capitol doors, trapping police officers who were

16    guarding the door, walked through the speaker's offices and

17    ultimately sat in the vice president's chair on the Senate

18    floor dais.

19         I think his conduct was probably more troubling

20    than yours, although he also was entitled to acceptance of

21    responsibility credit for pleading guilty rather than going

22    to trial.  He was sentenced to 42 months.

23         I've considered Mr. Ohm's reliance on *United*

24    *States versus Blair*.  I don't think *Blair* is very helpful

25    here in that the Defendant was only charged with conduct

1    outside the Capitol Building.  He pled guilty, which you

2    have not, and he was sentenced for civil disorder, which, as

3    Mr. Ohm admits, is a less serious charge than the one here.

4           Ultimately, I believe a sentence of 36 months is

5    appropriate here.  I believe both the seriousness of the

6    event you obstructed, the certification of the electoral

7    count and your particular role in it, the fact that you were

8    one of the first rioters to break into the Capitol Building,

9    your brandishing of a Confederate flag and then threatening

10   Officer Goodman with it, require a significant upward

11   variance from what I believe is the appropriately calculated

12   guideline range here.

13          And, as I say, I think an upward variance equal to

14   the substantial interference enhancement in guideline

15   2J1.2(b)(2) is appropriate.

16          This sentence also reflects the need for general

17   deterrence and a recognition of the seriousness of the

18   offense.

19          However, if the Government is correct about the

20   appropriate guideline range, I would still issue the same

21   sentence here because I think that full eight-point

22   enhancement is overly punitive, given the facts of this

23   case.  In short, whether this is viewed as an upward

24   variance from the guideline range I calculate or as a

25   downward variance from the range the probation office

1    calculated, I would still issue the same sentence,

2    recognizing that the guidelines are voluntary and are

3    frankly not very well-suited to this particular situation.

4         I believe the sentence is sufficient but not

5    greater than necessary to comply with the purposes of

6    sentencing.

7         The end result here, sir, is that you are facing a

8    significant period of incarceration for your conduct.  I

9    recognize this has been a dark period for you for many

10   reasons and that there is more to you than your actions on

11   January 6th.

12        You have friends who care about you and a grandson

13   who's depending on you.  I encourage you not to allow this

14   chapter to define the rest of your life.  That part is up to

15   you.

16        I'll now impose the sentence.

17        It is the judgment of the Court that you, Kevin

18   Seefried, are hereby sentenced to serve a term of 36 months'

19   incarceration on Count 1, a term of 12 months' incarceration

20   on Counts 2 and 3 each, a term of six months' incarceration

21   on Counts 4 and 5 each.  You must also pay a $170 special

22   assessment.  You also will serve a one-year term of

23   supervised release on Counts 1, 2 and 3.  All terms of

24   incarceration are to run concurrently and all terms of

25   supervised release are to run concurrently.

     1          Within 72 hours of your release from custody, you
     2     shall report in person to the probation office in the
     3     district to which you are released.
     4          While on supervision, you shall abide by the
     5     following mandatory conditions as well as the standard
     6     conditions of supervision listed in the most recent version
     7     of the Judgment in a Criminal Case Form AO 245B, which are
     8     imposed to establish the basic expectations of your conduct
     9     while on supervision.
    10          The mandatory conditions include:  You must not
    11     commit another federal, state or local crime; you must not
    12     unlawfully possess a controlled substance; you must refrain
    13     from any unlawful use of a controlled substance; you must
    14     submit to one drug test -- actually, I'm waiving the
    15     requirement that you submit to drug tests.  You must also
    16     cooperate in the collection of DNA as directed by the
    17     probation office.
    18          You shall abide by the following special
    19     conditions:  You must provide the probation officer access
    20     to any requested financial information and authorize the
    21     release of any financial information.  The probation office
    22     may share financial information with the United States
    23     Attorney's Office.
    24          The Court finds that you do not have the ability
    25     to pay a fine, and therefore waives imposition of a fine in

1   this case.  However, for the reasons stated in the

2   Government's memorandum in aid of sentencing, you are

3   ordered to make restitution to the Architect of the Capitol

4   in the amount of $2,000.

5          Restitution payments shall be made to the Clerk of

6   the Court for the U.S. District Court for the District of

7   Columbia for disbursement to the Architect of the Capitol.

8          You must pay the balance of any financial

9   obligations owed at a rate of no less than $200 each month

10  during your period of supervised release.

11         Payment of all special obligations described

12  herein are specific requirements of your supervised release.

13  The $100 special assessment is immediately payable to the

14  Clerk of the Court for the U.S. District Court for the

15  District of Columbia.  Within 30 days of any change of

16  address, you shall notify the Clerk of the Court of the

17  change until such time as this financial obligation is paid

18  in full.

19         The probation office shall release the presentence

20  investigation report to all appropriate agencies, which

21  includes the United States Probation Office in the approved

22  district of residence, in order to execute the sentence of

23  the Court.  Treatment agencies shall return the presentence

24  report to the probation office upon the Defendant's

25  completion or termination from treatment.

1          Pursuant to 18 USC 3742, you have the right to

2    appeal the sentence imposed by this Court if the period of

3    imprisonment is longer than the statutory maximum.  If you

4    choose to appeal, you must file any appeal within 14 days

5    after the Court enters judgment.

6          As defined in 28 USC 2255, you also have the right

7    to challenge the conviction entered or sentence imposed if

8    new and currently unavailable information becomes available

9    to you or on a claim that you received ineffective

10   assistance of counsel.

11         If you are unable to afford the cost of an appeal,

12   you may request permission from the Court to file an appeal

13   without cost to you.

14         Pursuant to *United States versus Hunter*, 809 F.3d

15   766 from the D.C. Circuit in 2016, are there any objections

16   to the sentence imposed that are not already noted on the

17   record?

18         Ms. Reed?

19         MS. REED:  No, your Honor.

20         THE COURT:  And Mr. Ohm?

21         MR. OHM:  We just want to make sure that the

22   record reflects that all of our arguments are noted for an

23   upward variance.

24         THE COURT:  They're noted.

25         And are you requesting self-surrender, sir?

1              MR. OHM:  Yes, your Honor.

2              We also would request a recommendation to

3      Allenwood, FCI Allenwood.

4              THE COURT:  Any objection to that, Ms. Reed?

5              MS. REED:  No, your Honor.

6              THE COURT:  I will allow the Defendant to

7      self-surrender.  I will recommend that the Defendant be

8      placed in FCI Allenwood.

9              MR. OHM:  One other thing, your Honor.  We were

10     hoping that we could -- for a briefing schedule for a motion

11     for release pending appeal.

12             THE COURT:  Okay.  How long do you need?

13             MR. OHM:  The Court's indulgence.

14             (Confers with co-counsel privately.)

15             Three to four weeks, your Honor.

16             THE COURT:  I'll give you three weeks.

17             MR. OHM:  Okay.

18             THE COURT:  Ms. Reed, can I ask you to respond

19     within two weeks?

20             MS. REED:  That's fine, your Honor.

21             THE COURT:  And I'll give the defense one week to

22     file any reply to that.

23             MR. OHM:  Wonderful.  Thank you.

24             THE COURT:  Thank you, folks.

25             MS. REED:  Oh, one thing.

```
 1                    THE COURT:  Yes, Ms. Reed.

 2                    MS. REED:  The Government moves to dismiss the

 3       indictment that was filed initially in this case.

 4                    THE COURT:  Okay.

 5                    MS. REED:  I didn't know if that's customary here.

 6       It is in my jurisdiction.  So I'm just doing it for the

 7       record.

 8                    THE COURT:  I'm sure Mr. Ohm does not disagree.

 9                    MR. OHM:  Who knows what will happen?

10                    THE COURT:  Good luck to you, sir.

11                    Thank you.

12                    (Proceedings concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                            **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8

9

10                   Dated this 10th day of February, 2023.

11

12              <u>/s/ Lisa Edwards, RDR, CRR</u>
                Official Court Reporter
13              United States District Court for the
                   District of Columbia
14              333 Constitution Avenue, Northwest
                Washington, D.C. 20001
15              (202) 354-3269

16

17

18

19

20

21

22

23

24

25